# EXHIBIT 2

Case 1:21-cv-03070-NRM-TAM Document 52-2 Filed 04/04/22 Page 2 of 99 PageID #: 1055

**Table of Contents**

**As filed with the Securities and Exchange Commission on August 7, 2019**

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM S-4

## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Social Capital Hedosophia Holdings Corp.*

**(Exact Name of Registrant as Specified in Its Charter)**

| | | |
|---|---|---|
| **Cayman Islands*** | **4789** | **98-1366046** |
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification Number)** |

**120 Hawthorne Avenue**
**Palo Alto, California 94301**
**(650) 521-9007**
**(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)**

**Chamath Palihapitiya**
**Chief Executive Officer**
**Social Capital Hedosophia Holdings Corp.**
**120 Hawthorne Avenue**
**Palo Alto, California 94301**
**(650) 521-9007**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| | | |
|---|---|---|
| **Howard L. Ellin** | **Matthew Gardner** | **Justin G. Hamill** |
| **Christopher M. Barlow** | **Michael Johns** | **Shayne Kennedy** |
| **Skadden, Arps, Slate, Meagher & Flom LLP** | **Michael Lockwood** | **Josh Dubofsky** |
| | **Maples and Calder** | **Charles K. Ruck** |
| **Four Times Square** | **PO Box 309, Ugland House,** | **Latham & Watkins LLP** |
| **New York, NY 10036** | **Grand Cayman, KY1-1104,** | **885 Third Avenue** |
| **(212) 735-3000** | **Cayman Islands** | **New York, NY 10022** |
| | **(345) 949-8066** | **(212) 906-1200** |

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this registration statement is declared effective and all other conditions to the business combination described in the enclosed proxy statement/prospectus have been satisfied or waived.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering: ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering: ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-l(d) (Cross-Border Third-Party Tender Offer) ☐

Table of Contents

## SUMMARY OF THE PROXY STATEMENT/PROSPECTUS

*This summary highlights selected information from this proxy statement/prospectus and does not contain all of the information that is important to you. To better understand the proposals to be submitted for a vote at the extraordinary general meeting, including the Business Combination, you should read this proxy statement/prospectus, including the Annexes and other documents referred to herein, carefully and in their entirety. The Merger Agreement is the primary legal document that governs the Business Combination and the other transactions that will be undertaken in connection with the Business Combination. The Merger Agreement is also described in detail in this proxy statement/prospectus in the section entitled "BCA Proposal—The Merger Agreement."*

*Unless otherwise specified, all share calculations (1) assume no exercise of redemption rights by the public shareholders in connection with the Business Combination and (2) do not include any shares issuable upon the exercise of the warrants.*

**Combined Business Summary**

We are a vertically-integrated aerospace company pioneering human spaceflight for private individuals and researchers. We believe the commercial exploration of space represents one of the most exciting and significant technology initiatives of our time. We are embarking on this commercial exploration journey with a mission to put humans into space and return them safely to earth on a routine, consistent and affordable basis. Using our proprietary and reusable technologies, and supported by a distinctive, Virgin–branded customer experience, we are developing a spaceflight system designed to offer customers, whom we also refer to as "Future Astronauts," a unique, multi-day experience culminating in a spaceflight that includes several minutes of weightlessness and views of Earth from space. We are in the final stages of development, having already completed two crewed flights of our vehicle into space, and anticipate our initial commercial launch in 2020.

Over the past decade, several trends have converged to invigorate the commercial space industry. Rapidly advancing technologies, decreasing costs, open innovation models with improved access to technology and greater availability of capital have driven significant growth in the commercial space market. According to the U.S. Chamber of Commerce, the commercial space market is expected to grow 6% per year, from $385.0 billion in 2017 to at least $1.5 trillion by 2040, reaching 5% of U.S. gross domestic product. As a result of these trends, we believe the exploration of space and the cultivation and monetization of space-related capabilities offer immense potential for the creation of economic value and future growth. Further, we believe we are at the center of these industry trends and well-positioned to capitalize on them by bringing human spaceflight to a broad global population that dreams of traveling to space.

The market for commercial human spaceflight for private individuals is new and untapped. As of August 1, 2019, only 573 humans have ever traveled above the Earth's atmosphere into space to become officially recognized as astronauts, cosmonauts or taikonauts. Overwhelmingly, these men and women have been government employees handpicked by government space agencies such as NASA and trained over many years at significant expense. Private commercial space travel has been limited to a select group of individuals who were able to reach space, generally only at great personal expense, risk and discomfort. We are planning to change that. We believe a significant market opportunity exists to provide high net worth individuals with a dynamic spaceflight experience at a fraction of the expense incurred by other private individuals to date. We believe this market opportunity is supported by the 603 reservations and approximately $80.0 million of deposits we had booked as of June 30, 2019, and also by the more than 2,500 flight reservation inquiries we have received since SpaceShipTwo's first spaceflight in December 2018.

1

**Table of Contents**

Over the last 14 years, we have developed an extensive portfolio of proprietary technologies that are embodied in the highly specialized assets that we have developed or leased to enable commercial spaceflight and address these industry trends. These assets include:

- ***Our carrier aircraft, WhiteKnightTwo***—WhiteKnightTwo is a twin-fuselage, custom-built aircraft designed to carry our spaceship, SpaceShipTwo, up to an altitude of approximately 45,000 feet, where the spaceship is released for its flight into space. Our carrier aircraft is designed to launch thousands of SpaceShipTwo flights over its lifetime. This reusable launch platform design provides a flight experience and economics similar to commercial airplanes, and offers a considerable economic advantage over other potential launch architectures. Additionally, our carrier aircraft has a rapid turnaround time, enabling it to provide frequent spaceflight launch services for multiple spaceships.
- ***Our spaceship, SpaceShipTwo***—SpaceShipTwo is a reusable spaceship with the capacity to carry two pilots and up to six Future Astronauts into space before returning them safely to the Earth's surface. SpaceShipTwo is a rocket-powered winged vehicle designed to achieve a maximum speed of over Mach 3 and has a flight duration, measured from the takeoff of our carrier aircraft to the landing of SpaceShipTwo, of up to approximately 90 minutes. SpaceShipTwo's cabin has been designed to optimize the Future Astronaut's safety, experience and comfort. For example, the sides and ceiling of the spaceship's cabin are lined by more than a dozen windows, offering Future Astronauts the ability to view the blackness of space as well as stunning views of the Earth below. With the exception of the rocket motor's fuel and oxidizer, which must be replenished after each flight, SpaceShipTwo is designed as a wholly reusable spaceship.
- ***Our hybrid rocket motor, RocketMotorTwo***—SpaceShipTwo is powered by a hybrid rocket propulsion system, RocketMotorTwo, that propels it on a trajectory into space. The term "hybrid" rocket refers to the fact that the rocket uses a solid fuel grain cartridge and a liquid oxidizer. The fuel cartridge is consumed over the course of a flight and replaced in between flights. RocketMotorTwo has been designed to provide performance capabilities necessary for spaceflight with a focus on safety, reliability and economy. Its design incorporates comprehensive critical safety features, including the ability to be safely shut down at any time, and its limited number of moving parts increases reliability and robustness for human spaceflight. Furthermore, the motor is made from a benign substance that needs no special or hazardous storage.
- ***Spaceport America***—The Future Astronaut flight preparation and experience will take place at our operational headquarters at Spaceport America. Spaceport America is the first purpose-built commercial spaceport in the world and serves as the home of our terminal hangar building, officially designated the "Virgin Galactic Gateway to Space." Spaceport America is located in New Mexico on 27 square miles of desert landscape with access to 6,000 square miles of restricted airspace running from the ground to space. The restricted airspace will facilitate frequent and consistent flight scheduling by preventing general commercial air traffic from entering the area. Additionally, the desert climate and its relatively predictable weather provide favorable launch conditions year-round. Our license from the FAA includes Spaceport America as a location from which we can launch and land our spaceflight system on a routine basis.

We have designed our spaceflight system with a fundamental focus on safety. Important elements of our safety design include horizontal takeoff and landing, highly reliable and rigorously tested jet engines on our carrier aircraft, two pilots in our carrier aircraft and the spaceship to provide important redundancy, a proprietary feathering system that allows the spaceship to properly align for re-entry with limited pilot input, extensive screening and training of our pilots, and the ability to safely abort at any time during the mission. In 2016, the FAA granted us our commercial space launch license with a limited number of verification and validation steps that must be completed before the FAA will clear us to include customers on our spaceflights. We are in the process of completing those steps.

2

Table of Contents

Our goal is to offer our Future Astronauts an unmatched, safe and affordable journey to space without the need for any special prior experience or significant prior training and preparation. We have worked diligently for over a decade to plan every aspect of the Future Astronaut's journey to become an astronaut, drawing on a world-class team with extensive experience with human spaceflight, high-end customer experiences, and reliable transportation system operations and safety. Each Future Astronaut will spend four days at Spaceport America, with the first three days spent on pre-flight training and the spaceflight itself occurring on the fourth day. In space, they will be able to exit their seats and experience weightlessness, floating about the cabin and positioning themselves at one of the many windows around the cabin sides and top. After enjoying several minutes of weightlessness, customers will maneuver back to their own seats to prepare for re-entry and the journey back into the Earth's atmosphere. Upon landing, astronauts will disembark and join family and friends to celebrate their achievements and receive their astronaut wings.

We have historically sold spaceflight tickets at a price point of up to $250,000 per ticket. Given demand for human spaceflight experiences and the limited available capacity, however, we expect the price of our tickets to increase for a period of time. We also anticipate offering premium pricing options for customers with an interest in further customizing or enhancing their astronaut journey. As of June 30, 2019, we had reservations for 603 spaceflight tickets and approximately $80.0 million in deposits. We believe these sales are largely attributable to the strength and prominence of the Virgin Galactic brand, which has driven many of our customers directly to us with inbound requests. As we transition to full commercialization, we intend to take a more active role in marketing and selling our spaceflight experience. Given that sales of spaceflights are consultative and generally require a one-on-one sales approach, we intend to go to market using our direct sales organization and may expand the reach of that organization using a global network of high-end travel professionals that we refer to as Accredited Space Agents.

Our senior management team has extensive experience in the aerospace industry and includes the former Chief of Staff for NASA as well as NASA's Space Shuttle Launch Integration Manager. Our team of pilots is similarly experienced, with over 216 years of collective flight experience, and includes former test pilots for NASA, the Royal Air Force, the U.S. Air Force, the Italian Air Force and the U.S. Marine Corps. Our commercial team is managed and supported by individuals with significant experience and success in building and growing a commercial spaceflight brand, selling spaceflight reservations and managing the pre-flight Future Astronaut community.

**The Parties to the Business Combination**

*SCH*

Social Capital Hedosophia Holdings Corp. is a blank check company incorporated on May 5, 2017 as a Cayman Islands exempted company and incorporated for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses. SCH has neither engaged in any operations nor generated any revenue to date. Based on SCH's business activities, it is a "shell company" as defined under the Exchange Act because it has no operations and nominal assets consisting almost entirely of cash.

On September 18, 2017, SCH consummated its initial public offering of its units, with each unit consisting of one SCH Class A ordinary share and one-third of one public warrant. Simultaneously with the closing of the initial public offering, SCH completed the private sale of 8,000,000 private placement warrants at a purchase price of $1.50 per private placement warrant, to the Sponsor generating gross proceeds to us of $12.0 million. The private placement warrants are identical to the warrants sold as part of the units in SCH's initial public offering except that, so long as they are held by the Sponsor or its permitted transferees: (1) they will not be

3

Table of Contents

redeemable by the Company; (2) they (including the shares issuable upon exercise of these warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold by the Sponsor until 30 days after the completion of SCH's initial business combination; (3) they may be exercised by the holders on a cashless basis; and (4) they (including the shares issuable upon exercise of these warrants) are entitled to registration rights.

Following the closing of SCH's initial public offering, a total of $690.0 million ($10.00 per unit) of the net proceeds from its initial public offering and the sale of the private placement warrants was placed in the trust account. The proceeds held in the trust account may be invested by the trustee only in U.S. government treasury bills with a maturity of 180 days or less or in money market funds investing solely in U.S. Treasury securities and meeting certain conditions under Rule 2a-7 under the Investment Company Act of 1940, as amended. As of March 31, 2019, funds in the trust account totaled $708,426,313 and were held in $463,353 of cash and $707,962,960 of U.S. Treasury Bills. These funds will remain in the trust account, except for the withdrawal of interest to pay taxes, if any, until the earliest of (1) the completion of a business combination (including the closing of the Business Combination), (2) the redemption of any public shares properly tendered in connection with a shareholder vote to amend SCH's Amended and Restated Memorandum and Articles of Association (as may be amended from time to time, the "Cayman Constitutional Documents") to modify the substance or timing of SCH's obligation to redeem 100% of the public shares if it does not complete a business combination by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), and (3) the redemption of all of the public shares if SCH is unable to complete a business combination by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders, or if such date is further extended at a duly called extraordinary general meeting, such later date), subject to applicable law.

SCH units, public shares and public warrants are listed on the NYSE under the symbols "IPOA.U," "IPOA," and "IPOA.WS," respectively.

SCH's principal executive office is located at 120 Hawthorne Avenue, Palo Alto, California, 94301. Its telephone number is (650) 521-9007. SCH's corporate website address is www.SocialCapitalHedosophiaHoldings.com. SCH's website and the information contained on, or that can be accessed through, the website is not deemed to be incorporated by reference in, and is not considered part of, this proxy statement/prospectus.

### Merger Subs

The merger subsidiaries are all direct wholly owned subsidiaries of SCH. Foundation Sub 1, Inc. is a Delaware corporation and was incorporated on July 8, 2019. Foundation Sub 2, Inc. is a Delaware corporation and was incorporated on July 8, 2019. Foundation Sub, LLC is a Delaware limited liability company and was formed on July 8, 2019. None of the Merger Subs owns any material assets or operates any business.

### The VG Companies and Their Subsidiaries

The VG Companies and their subsidiaries comprise a vertically-integrated aerospace company pioneering human spaceflight for private individuals and researchers. The VG Companies and their subsidiaries consist of VGH, LLC, a Delaware limited liability company formed June 26, 2019, TSC Vehicle Holdings Inc., a Delaware corporation incorporated June 26, 2014, Virgin Galactic Vehicle Holdings, Inc., a Delaware corporation formed December 18, 2017, Virgin Galactic Ltd., a company limited by shares under the laws of England and Wales on May 2, 2006, Virgin Galactic, LLC, a Delaware limited liability company formed July 27, 2004, and TSC, LLC, a Delaware limited liability company formed February 3, 2006. The VG Companies' principal executive office is located at . Their telephone number is .

4

Table of Contents

**Proposals to be Put to the Shareholders of SCH at the Extraordinary General Meeting**

The following is a summary of the proposals to be put to the extraordinary general meeting of SCH and certain transactions contemplated by the Merger Agreement. Each of the proposals below, except the Adjournment Proposal, is cross-conditioned on the approval of each other. The Adjournment Proposal is not conditioned upon the approval of any other proposal set forth in this proxy statement/prospectus. The transactions contemplated by the Merger Agreement will be consummated only if the Condition Precedent Proposals are approved at the extraordinary general meeting.

**BCA Proposal**

As discussed in this proxy statement/prospectus, SCH is asking its shareholders to approve by ordinary resolution and adopt the Merger Agreement, dated as of July 9, 2019, by and among SCH, V10, Merger Sub A, Merger Sub B, Merger Sub LLC, Company A, Company B and Company LLC, a copy of which is attached to the accompanying proxy statement/prospectus as Annex A. The Merger Agreement provides for, among other things, (1) following the Domestication of SCH to Delaware as described below, the merger of: (x) Merger Sub A with and into Company A, with Company A surviving the merger as a wholly owned subsidiary of VGH, Inc. ("Corp Merger A"), (y) Merger Sub B with and into Company B, with Company B surviving the merger as a wholly owned subsidiary of VGH, Inc. ("Corp Merger B") and (z) Merger Sub LLC with and into Company LLC, with Company LLC surviving the merger as a wholly owned subsidiary of VGH, Inc. (the "LLC Merger" and, collectively with Corp Merger A and Corp Merger B, the "Mergers"), in each case in accordance with the terms and subject to the conditions of the Merger Agreement as more fully described elsewhere in this proxy statement/prospectus. Pursuant to the terms of the Merger Agreement, under certain limited circumstances, V10, SCH and the VG Companies will work together in good faith to restructure Corp Merger A or Corp Merger B, including by changing the direction of the applicable merger, if it is determined to be in the best interests of the parties. After consideration of the factors identified and discussed in the section entitled "*BCA Proposal—SCH's Board of Directors' Reasons for the Business Combination*," SCH's board of directors concluded that the Business Combination met all of the requirements disclosed in the prospectus for SCH's initial public offering, including that the business of the VG Companies and their subsidiaries had a fair market value equal to at least 80% of the net assets held in trust (net of amounts disbursed to management for working capital purposes and excluding the amount of any deferred underwriting discount held in trust). For more information about the transactions contemplated by the Merger Agreement, see "*BCA Proposal.*"

*Aggregate Merger Consideration*

As a result of and upon the closing of the Mergers (the "Closing"), among other things, all outstanding shares of common stock or limited liability company interests, as applicable, of each of the VG Companies will be cancelled in exchange for the right to receive 130,000,000 shares of VGH, Inc. common stock, which shares shall be at a deemed value of $10.00 per share for an aggregate merger consideration of $1.3 billion (the "Aggregate Merger Consideration"). The Aggregate Merger Consideration does not take into account certain additional issuances and payments to V10 which may be made under the terms of the Merger Agreement and the Purchase Agreement, respectively, only to the extent certain conditions are satisfied or certain options are elected by V10, in each case, as contemplated thereunder, including, if applicable: (i) the issuance of additional shares of VGH, Inc. common stock to V10 or an affiliate of V10 as part of the Additional Holder Equity Amount under the terms of the Merger Agreement, (ii) the cash payment received by V10 in any Secondary Purchase under the terms of the Purchase Agreement, (iii) the issuance of additional shares of VGH, Inc. common stock to V10 in any Reinvestment under the terms of the Purchase Agreement, and (iv) any cash payment received by V10 in any Repurchase under the terms of the Merger Agreement, in each case, as described more fully elsewhere in this proxy statement/prospectus. Prior to the effective time of the Mergers, V10 will take all necessary and appropriate action so that, as of the effective time of the Mergers, all outstanding options to purchase common

5

Table of Contents

shares of V10 will be cancelled without consideration therefor. For further details, see "*BCA Proposal—The Merger Agreement—Consideration—Aggregate Merger Consideration.*"

*Closing Conditions*

The Merger Agreement is subject to the satisfaction or waiver of certain customary closing conditions, including, among others, (i) approval by SCH's shareholders of the Business Combination and related agreements and transactions, (ii) the effectiveness of the registration statement of which this proxy statement/prospectus forms a part, (iii) the receipt of certain regulatory approvals (including, but not limited to, approval for listing on the NYSE of the shares of VGH, Inc. common stock to be issued in connection with the Mergers), (iv) that VGH, Inc. has at least $5,000,001 of net tangible assets upon Closing and (v) the absence of any injunctions.

In addition, prior to the Closing, V10 and certain of its subsidiaries (including the VG Companies) will consummate the Pre-Closing Restructuring Plan, pursuant to which Company A, Company B and Company LLC will become, in each case, direct wholly owned subsidiaries of V10, and it is a condition to the obligations of SCH and Merger Subs to consummate the Mergers that (i) the Pre-Closing Restructuring Plan has been substantially completed and (ii) the VG Companies collectively hold cash in an amount equal to or greater than $2.0 million, in the aggregate, in each case, as of the Closing.

Other conditions to VG's obligations to consummate the Mergers include, among others, that as of the Closing, (i) the Domestication has been completed, and (ii) the amount of cash available in the trust account, after deducting the amount required to satisfy SCH's obligations to its shareholders (if any) that exercise their redemption rights pursuant to the Cayman Constitutional Documents, or the Trust Amount, is at least equal to the sum of (x) $400.0 million *plus* (y) if applicable, an aggregate of approximately $24.2 million of deferred underwriting commissions being held in the trust account, which we refer to as the Minimum Available Cash Amount.

However, if the Trust Amount as of the Closing is less than the Minimum Available Cash Amount, then V10 and its affiliates will have the right to purchase (or seek a third party to purchase) the Additional Holder Equity Amount, or additional shares of VGH, Inc. common stock at a price per share of $10.00, up to the Minimum Available Cash Amount less the Investment Amount, or the aggregate purchase price paid to SCH by Mr. Palihapitiya in a Primary Purchase. If the Available Cash (which is the sum of the Trust Amount, the Additional Holder Equity Amount and the Investment Amount) is equal to or greater than the Minimum Available Cash Amount, then this condition, which we refer to as the Minimum Cash Condition, will be deemed to have been satisfied.

The Minimum Cash Condition is for the sole benefit of VG except that this condition may not be waived by VG if the Trust Amount is less than $200.0 million, provided that V10 and its affiliates will have the right (but not the obligation) to purchase (or seek a third party to purchase) additional shares of VGH, Inc. common stock at a price per share of $10.00 in an aggregate amount such that the Available Cash is, at or immediately prior to the Closing, equal to at least $200.0 million after giving effect to such purchases. Therefore, if such conditions are not met, and such conditions are not or cannot be waived under the terms of the Merger Agreement, then the Merger Agreement could terminate and the proposed Business Combination may not be consummated.

For further details, see "*BCA Proposal—The Merger Agreement.*"

*Domestication Proposal*

As discussed in this proxy statement/prospectus, if the BCA Proposal is approved, then SCH will ask its shareholders to approve by special resolution the Domestication Proposal. As a condition to closing the Business

6

Table of Contents

Combination pursuant to the terms of the Merger Agreement, the board of directors of SCH has unanimously approved the Domestication Proposal. The Domestication Proposal, if approved, will authorize a change of SCH's jurisdiction of incorporation from the Cayman Islands to the State of Delaware. Accordingly, while SCH is currently governed by the Cayman Islands Companies Law, upon the Domestication, VGH, Inc. will be governed by the DGCL. There are differences between Cayman Islands corporate law and Delaware corporate law as well as the Cayman Constitutional Documents and the Proposed Organizational Documents. Accordingly, SCH encourages shareholders to carefully review the information in "*Comparison of Corporate Governance and Shareholder Rights.*"

As a result of and upon the effective time of the Domestication, (1) each of the then issued and outstanding SCH Class A ordinary shares will convert automatically, on a one-for-one basis, into a share of the VGH, Inc. common stock, (2) each of the then issued and outstanding SCH Class B ordinary shares will convert automatically, on a one-for-one basis, into a share of VGH, Inc. common stock; provided, however, that with respect to the SCH Class B ordinary shares held by the Sponsor, in connection with the Domestication the Sponsor will instead receive upon the conversion of the SCH Class B ordinary shares held by it, a number of shares of VGH, Inc. common stock equal to (x) the number of SCH Class B ordinary shares held by it as of immediately prior to the Domestication minus (y) after giving effect to the Domestication, the number of shares of VGH, Inc. common stock underlying the restricted stock units to be granted to certain members of the board of directors of SCH in connection with the Business Combination ("Director RSU Awards") that are outstanding as of immediately prior to the Domestication, (3) each then issued and outstanding SCH warrant will convert automatically into a VGH, Inc. warrant, pursuant to the Warrant Agreement and (4) each SCH unit will convert automatically into a VGH, Inc. unit, with each VGH, Inc. unit representing one share of VGH, Inc. common stock and one-third of one VGH, Inc. warrant.

For further details, see "*Domestication Proposal.*"

*Organizational Documents Proposals*

If the BCA Proposal and the Domestication Proposal are approved, SCH will ask its shareholders to approve by special resolution four separate proposals (collectively, the "Organizational Documents Proposals") in connection with the replacement of the Cayman Constitutional Documents, under the Cayman Islands Companies Law, with the Proposed Organizational Documents, under the DGCL. SCH's board has unanimously approved each of the Organizational Documents Proposals and believes such proposals are necessary to adequately address the needs of VGH, Inc. after the Business Combination. Approval of each of the Organizational Documents Proposals is a condition to the consummation of the Business Combination. A brief summary of each of the Organizational Documents Proposals is set forth below. These summaries are qualified in their entirety by reference to the complete text of the Proposed Organizational Documents.

    A.    *Proposal No. 3—Organizational Documents Proposal A—* to authorize the change in the authorized capital stock of SCH from (i) 500,000,000 SCH Class A ordinary shares, 50,000,000 SCH Class B ordinary shares and 5,000,000 preferred shares, par value $0.0001 per share, to (ii) shares of VGH, Inc. common stock and shares of VGH, Inc. preferred stock.

    B.    *Proposal No. 4—Organizational Documents Proposal B—* to authorize the board of directors of VGH, Inc. (the "Board") to issue any or all shares of VGH, Inc. preferred stock in one or more classes or series, with such terms and conditions as may be expressly determined by the Board and as may be permitted by the DGCL.

    C.    *Proposal No. 5—Organizational Documents Proposal C—* to provide that certain provisions of the certificate of incorporation of VGH, Inc. will be subject to the Stockholders' Agreement and certain provisions of the bylaws of VGH, Inc. will be subject to the Stockholders' Agreement and the Registration Rights Agreement.

7

**Table of Contents**

D.    *Proposal No. 6—Organizational Documents Proposal D*—to authorize all other changes in connection with the replacement of Cayman Constitutional Documents with the Proposed Certificate of Incorporation and Proposed Bylaws as part of the Domestication, including (1) changing the corporate name from "Social Capital Hedosophia Holdings Corp." to "Virgin Galactic Holdings, Inc.," (2) making VGH, Inc.'s corporate existence perpetual, (3) adopting Delaware as the exclusive forum for certain stockholder litigation, (4) granting an explicit waiver regarding corporate opportunities to certain "exempted persons" (including V10 and Mr. Palihapitiya and their respective affiliates and representatives), and (5) removing certain provisions related to SCH's status as a blank check company that will no longer be applicable upon consummation of the Business Combination, all of which SCH's board of directors believes is necessary to adequately address the needs of VGH, Inc. after the Business Combination.

The Proposed Organizational Documents differ in certain material respects from the Cayman Constitutional Documents and SCH encourages shareholders to carefully review the information set out in the section entitled "*Organizational Documents Proposals*" and the full text of the Proposed Organizational Documents of VGH, Inc., attached hereto as Annexes F and G.

*Director Election Proposal*

Assuming the BCA Proposal, the Domestication Proposal and each of the Organizational Documents Proposals are approved, SCH's shareholders are also being asked to approve by ordinary resolution the Director Election Proposal. Upon the consummation of the Business Combination, the Board will consist of seven directors. For additional information on the proposed directors, see "*Director Election Proposal.*"

*Stock Issuance Proposal*

Assuming the BCA Proposal, the Domestication Proposal, each of the Organizational Documents Proposals and the Director Election Proposal are approved, SCH's shareholders are also being asked to approve by ordinary resolution the Stock Issuance Proposal.

SCH's public shares are listed on the NYSE and, as such, SCH is seeking shareholder approval of the issuance of VGH, Inc. common stock to (1) V10 pursuant to the Merger Agreement and (2) Mr. Palihapitiya and V10, in each case, if applicable, pursuant to the Purchase Agreement, in order to comply with Section 312.03 of the NYSE's Listed Company Manual. For additional information, see "*Stock Issuance Proposal.*"

*Incentive Award Plan Proposal*

Assuming the BCA Proposal, the Domestication Proposal, the Organizational Documents Proposals, the Director Election Proposal and the Stock Issuance Proposal are approved, SCH's shareholders are also being asked to approve by ordinary resolution the 2019 Plan, in order to comply with Section 312.03(a) of the NYSE's Listed Company Manual and the Internal Revenue Code. For additional information, see "*Incentive Award Plan Proposal.*"

*Repurchase Proposal*

Assuming the BCA Proposal, the Domestication Proposal, each of the Organizational Documents Proposals, the Director Election Proposal, the Stock Issuance Proposal and the Incentive Award Plan Proposal are approved, SCH's shareholders are also being asked to approve, by ordinary resolution, the Repurchase Proposal pursuant to which we may be required to repurchase, at V10's election, up to 20,000,000 shares of VGH, Inc. common stock from V10 at a price of $10.00 per share with cash in an aggregate amount equal to the lesser of $200.0 million and the amount (if any) by which the Available Cash exceeds $500.0 million at the Closing. For additional information, see "*Repurchase Proposal.*"

8

Table of Contents

*Adjournment Proposal*

If, based on the tabulated vote, there are not sufficient votes at the time of the extraordinary general meeting to authorize SCH to consummate the Business Combination (because any of the Condition Precedent Proposals have not been approved (including as a result of the failure of any other cross-conditioned Condition Precedent Proposals to be approved)), SCH's board of directors may submit a proposal to adjourn the extraordinary general meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies. For additional information, see "*Adjournment Proposal.*"

**SCH's Board of Directors' Reasons for the Business Combination**

SCH was organized for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses.

In evaluating the Business Combination, the SCH board of directors consulted with SCH's management and considered a number of factors. In particular, the SCH board of directors considered, among other things, the following factors, although not weighted or in any order of significance:

- **Potential Public Investor Enthusiasm for Spaceflight**. Since the advent of space exploration, there has been limited means for public investors to invest in the economic and strategic value of human spaceflight. Against this backdrop, the Business Combination with the VG Companies will create the world's first and only publicly traded commercial human spaceflight company. VGH, Inc. will provide investors the opportunity to invest in commercial space travel and the potential value related to opening space to many tens of thousands of new astronauts.
- **Experienced and Proven Management Team**. The VG Companies' management team has extensive experience in key aspects of the aerospace industry. The senior management team represents some of the most experienced and recognized leaders in flight operations, technical manufacturing as well as general management. Led by their Chief Executive Officer, George Whitesides, a former Chief of Staff for the National Aeronautics and Space Agency, the VG Companies became the first commercial space company to put a human into space. We expect that the VG Companies' executives will continue with the combined company following the Business Combination. For additional information regarding VGH, Inc.'s executive officers, see the section entitled "*Management of VGH, Inc. Following the Business Combination—Executive Officers.*"
- **Attractive Entry Valuation**. VGH, Inc. will have an anticipated initial enterprise value of $1.5 billion implying a 2.5x multiple of 2023 projected revenue and a 5.5x multiple of 2023 projected EBITDA as VGH, Inc.'s commercial operations are expected to achieve scale. This represents approximately a 1.5x multiple of invested capital based on over $1 billion of capital investment to date. After the completion of the Business Combination, the majority of the net cash from SCH's trust account is expected to be held on VGH, Inc.'s balance sheet to fund operations and support continued growth.
- **Valuable Proprietary Intellectual Property**. Over the course of the last 14 years, the VG Companies have developed an extensive portfolio of proprietary technologies that are embodied in the highly specialized vehicles that they have developed to enable commercial spaceflight. These technologies are largely embodied in proprietary know-how and trade secrets. In addition, the VG Companies seek to further protect their technologies with patents and patent applications when possible and consistent with its overall strategy to safeguard intellectual property.
- **Vertically Integrated Go To Market Strategy**. The VG Companies are vertically integrated, meaning they design, develop, manufacture, test and operate the critical components of their mission, including the spaceships and carrier aircraft themselves. These internal capabilities enable the VG Companies to build and optimize their spaceflight systems for a dynamic customer experience and with other critical

9

Table of Contents

capabilities, such as reusability and efficiency, are expected to facilitate a go to market strategy and drive the long-term profitability and value of the VG Companies.

- **Robust Manufacturing Pipeline**. The VG Companies have two additional SpaceShipTwo vehicles under construction and expect to expand the fleet to a total of five SpaceShipTwo vehicles in service by the end of 2023, which will enable an increase in the flight rate to meet customer demand.
- **Attractive Business Model**. The VG Companies have several capabilities that will allow them to scale rapidly to meet customer demand—among these are the design and implementation of reusable vehicles. For example, a single spaceship is designed to be reused for hundreds of cycles, with primarily only its rocket motor fuel cartridge and oxidizer being changed in between flights. These design features meaningfully reduce the operational cost of each spaceflight over time and allow for short turnaround times between flights. Over time, the VG Companies expect to have the ability to leverage their suite of proprietary technologies and reusable design to lower costs and allow lower ticket prices, while preserving profitability and meeting the demand for human spaceflight in a market where most other alternatives are extremely expensive.
- **First Purpose-Built Commercial Spaceport.** The VG Companies will operate from Spaceport America in New Mexico. Spaceport America is a more than $200.0 million facility built by the New Mexico government and leased to the VG Companies at an attractive annual rate. The spaceport is located on 27 square miles of desert landscape, with access to 6,000 square miles of restricted airspace running from the ground to space. The restricted airspace facilitates frequent and consistent flight scheduling and the desert climate and its relatively predictable weather provides favorable launch conditions year-round. The facilities were built with the operational requirements and customers of the VG Companies in mind, with comprehensive consideration of its practical function, while also providing the basis for the Virgin Galactic experience. The VG Companies believe that this model will allow them to achieve high operational flight rates and can be used to scale to meet demand without significant additional capital outlays for physical plant and ground infrastructure. Similar models could also be used to facilitate international expansion in the future.
- **High Growth Industry.** The space race is shifting quickly from public-sector financing to private-sector financing. With this shift comes a more bottom-line focus on costs and utilization that creates the opportunity for an entirely new ecosystem of disruptive and profitable companies. According to the U.S. Chamber of Commerce, the commercial space market will grow 6% per year from $385.0 billion in 2017 to at least $1.5 trillion by 2040, reaching 5% of U.S. gross domestic product. Commercial spaceflight is expected to capture an important portion of this market as it will also allow for applications beyond initial use, including scientific research.
- **Strong Competitive Position**. The VG Companies' differentiated technology and capabilities, its horizontal take-off and landing design, experienced management team, iconic brand, vertically-integrated design and manufacturing capabilities and extensive customer base separate them from the competition. VSS Unity, the VG Companies' spaceship, was the first, and as of July 2019 remains the only, vehicle built for recurring commercial spaceflight service to have put humans into space. The VG Companies' inaugural spaceflight in December 2018 was also the first and only space launch from U.S. soil since 2011 that carried human crew members. During its second spaceflight in February 2019, VSS Unity became the first vehicle built for commercial service to not only carry pilots but a third crew member, as well. We believe that the additional capital provided by the Business Combination will provide VGH, Inc. with the support needed to reach broad commercialization. Additionally, the VG Companies have the licenses they need from the FAA to begin commercial operations once they have completed a validation and testing process to the FAA's satisfaction.
- **Competitive Dynamics**. The VG Companies' position within the emerging commercial human spaceflight market is reinforced by significant barriers to entry for potential competitors as well as key

10

Table of Contents

differences in safety and customer experience. The VG Companies are the only commercial space company to date to take a horizontal take-off and landing approach, which mimics traditional aircraft in how the spaceship leaves the ground and returns to earth. The VG Companies provide a piloted experience where two highly trained pilots will take passengers to space. Because their spaceship's rocket motor can be shut off at any time during flight, the VG Companies can conduct a safe abort at various phases of the flight mission. We are aware of only one competitor with a similar investment of time and money in suborbital commercial human spaceflight, which is taking a different approach to its launch architecture.

- **Iconic, Widely Recognized Brand**. Virgin is an iconic, widely recognized brand with significant brand strength and high awareness and a track record of creating memorable experiences.
- **Demonstrated Willingness to Pay**. Individuals, including those of high net worth, increasingly value experiences and the VG Companies offer a unique value proposition relative to comparably priced ultra-luxury travel and transportation experiences. As of June 30, 2019, the VG Companies had reservations for 603 spaceflights and approximately $80.0 million in deposits. Additionally, as of June 30, 2019, there have been more than 2,500 flight reservation inquiries since SpaceShipTwo's first spaceflight in December 2018. The VG Companies have had high retention rates despite deposits being refundable during the development program. We believe that the market for exclusive, experiential products will continue to expand quickly and represents a significant opportunity for future growth.
- **Expansive Future Opportunities.** The VG Companies have developed an extensive set of vertically integrated aerospace development capabilities and technologies. In the future, they expect to explore the application of those proprietary technologies and capabilities in areas such as design, engineering, composites manufacturing, high-speed vehicles and production for other commercial and government uses. Among other potential opportunities, the VG Companies believe their technology could be used to develop supersonic and hypersonic vehicles that drastically reduce travel time for point-to-point international travel.

For a more complete description of the SCH board of directors' reasons for approving the Business Combination, including other factors and risks considered by the SCH board of directors, see the section entitled "*BCA Proposal—SCH's Board of Directors' Reasons for the Business Combination.*"

**Related Agreements**

This section describes certain additional agreements entered into or to be entered into pursuant to the Merger Agreement. For additional information, see "*BCA Proposal—Related Agreements.*"

*The Purchase Agreement*

In connection with the Merger Agreement, SCH has entered into the Purchase Agreement, dated as of July 9, 2019, by and among SCH, V10 and Chamath Palihapitiya, a copy of which is attached to the accompanying proxy statement/prospectus as Annex B (the "Purchase Agreement"). The Purchase Agreement contemplates, among other things, concurrently with the Closing and at the option of V10, the purchase by Mr. Palihapitiya of (a) 10,000,000 newly issued shares of VGH, Inc. common stock in the Primary Purchase from VGH, Inc. at a price of $10.00 per share in cash and (b) a number of shares of VGH, Inc. common stock in the Secondary Purchase from V10 at a price of $10.00 per share in cash, which will reduce, on a one-for-one basis, the number of shares purchased directly from VGH, Inc. in the Primary Purchase ("Secondary Purchase" and, together with the Primary Purchase, the "Co-Investment") and provided further that the aggregate number of shares of VGH, Inc. common stock to be purchased in the Primary Purchase and Secondary Purchase will, in any event, be equal to 10,000,000 and the aggregate price paid for such shares will be equal to $100.0 million. The

11

Table of Contents

proceeds of such Secondary Purchase may be used by V10 to subsequently purchase additional newly issued shares of VGH, Inc. common stock at a price of $10.00 per share (the "Reinvestment"). For additional information, see "*BCA Proposal—Related Agreements—The Purchase Agreement*."

### Stockholders' Agreement

The Merger Agreement contemplates that, at the Closing, VGH, Inc. will enter into a Stockholders' Agreement with V10, the Sponsor and Mr. Palihapitiya (collectively with any individuals or entities that are signatories thereto or hereafter become party to the agreement, the "Voting Parties"), pursuant to which, among other things, (i) V10 and Mr. Palihapitiya will be granted rights to designate directors for election to the Board (and the Voting Parties will vote in favor of such designees), (ii) V10 will agree not to take action to remove the members of the Board designated by Mr. Palihapitiya pursuant thereto, (iii) Mr. Palihapitiya will agree not to take action to remove the members of the Board designated by V10 pursuant thereto and (iv) V10 will, under certain circumstances, have the right to approve certain matters as set forth therein.

From and after the Closing, the Stockholders' Agreement contemplates that, the Board will consist of seven directors with the Chairperson of the Board initially being Chamath Palihapitiya and also contains (i) certain provisions intended to maintain, following the consummation of the Merger, the Company's qualification as a "controlled company" within the meaning of Rule 303A of the NYSE corporate governance requirements and (ii) certain procedures for transactions with V10 and its affiliates. "*BCA Proposal—Related Agreements—Stockholders' Agreement*."

### Sponsor Support Agreement

In connection with the execution of the Merger Agreement, SCH entered into a sponsor support agreement, with the Sponsor, each officer and director of SCH, V10, Company A, Company B and Company LLC, a copy of which is attached to the accompanying proxy statement/prospectus as Annex D (the "Sponsor Support Agreement"). Pursuant to the Sponsor Support Agreement, the Sponsor and each officer and director of SCH agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement. "*BCA Proposal—Related Agreements—Sponsor Support Agreement*."

### Transfer Restrictions and Registration Rights

The Merger Agreement contemplates that, at the Closing, VGH, Inc., V10, the Sponsor and Mr. Palihapitiya will enter into an Amended and Restated Registration Rights Agreement (the "Registration Rights Agreement"), pursuant to which VGH, Inc. will agree to register for resale, pursuant to Rule 415 under the Securities Act, certain shares of VGH, Inc. common stock and other equity securities of VGH, Inc. that are held by the parties thereto from time to time.

Additionally, the Registration Rights Agreement contains certain restrictions on transfer with respect to the shares of VGH, Inc. common stock held by the Sponsor immediately following the Closing and the shares of VGH, Inc. common stock received by V10 in connection with the Business Combination, including a two-year lock-up of such shares in each case, subject to limited exceptions as contemplated thereby (including that V10 may transfer up to 50% of the shares of VGH, Inc. common stock received by it pursuant to the Merger Agreement after giving effect to the related transactions).

For additional information, see "*BCA Proposal—Related Agreements—Transfer Restrictions and Registration Rights*."

12

Table of Contents

*Trademark License Agreement*

In connection with the execution of the Merger Agreement, on July 9, 2019, Virgin Enterprises Limited ("VEL"), VGH, LLC and SCH entered into a deed of novation, amendment and restatement (the "Novation Deed"), pursuant to which an existing trade mark license agreement (granting VG, LLC certain rights to use certain VIRGIN marks that are legally and beneficially owned by VEL) will be novated to SCH and amended and restated in full in the form attached as an annex to the Novation Deed with effect on and from the Closing of the Business Combination (the "Closing Date") (the "Amended TMLA"). For additional information, see "*BCA Proposal—Related Agreements—Trademark License Agreement.*"

*Transition Services Agreements*

The Merger Agreement contemplates that, at the Closing, TSC, LLC, Virgin Galactic, LLC ("VG, LLC"), Galactic Ventures LLC ("GV LLC") and Virgin Orbit, LLC, a Delaware limited liability company ("VO, LLC") will enter into the Transition Services Agreement (the "U.S. Transition Services Agreement"), pursuant to which the parties will establish a service schedule to control the provision of services among the parties, as GV LLC and VO, LLC on the one hand and TSC, LLC and VG, LLC on the other hand, will no longer be members of the same consolidated corporate group following the Business Combination. For additional information, see "*BCA Proposal—Related Agreements—U.S. Transition Services Agreement.*"

The Merger Agreement contemplates that, at the Closing, VGL and Virgin Management Limited ("VML") will enter into the U.K. Transition Services Agreement (the "U.K. Transition Services Agreement" and, together with the U.S. Transition Services Agreement, the "Transition Services Agreements"), pursuant to which the parties will establish a service schedule to control the provision of certain services provided by VML to VGL. The proposed U.K. Transition Services Agreement is necessary in order for VGL to continue to operate its business on and after the Closing. For additional information, see "*BCA Proposal—Related Agreements—U.K. Transition Services Agreement.*"

**Ownership of VGH, Inc. following Business Combination**

As of the date of this proxy statement/prospectus, there are 86,250,000 ordinary shares issued and outstanding, which includes the 17,250,000 founder shares held by the Sponsor and the 69,000,000 public shares. As of the date of this proxy statement/prospectus, there is outstanding an aggregate of 31,000,000 warrants, which includes the 8,000,000 private placement warrants held by the Sponsor and the 23,000,000 public warrants. Each whole warrant entitles the holder thereof to purchase one SCH Class A ordinary share and, following the Domestication, will entitle the holder thereof to purchase one share of VGH, Inc. common stock. Therefore, as of the date of this proxy statement/prospectus (without giving effect to the Business Combination) the SCH fully diluted share capital would be 117,250,000.

It is anticipated that, following the Business Combination (assuming consummation of the transactions contemplated by the Purchase Agreement), (1) SCH's public shareholders are expected to own approximately 35.4% of the outstanding VGH, Inc. common stock, (2) V10 (without taking into account any public shares held by V10 equityholders prior to the consummation of the Business Combination) is expected to own approximately 51.4% of the outstanding VGH, Inc. common stock and (3) the Sponsor and related parties (including Mr. Palihapitiya) are expected to collectively own approximately 13.2% of the outstanding VGH, Inc. common stock. These percentages assume (i) that no public shareholders exercise their redemption rights in connection with the Business Combination or our extension proposal and (ii) that (x) VGH, Inc. issues 130,000,000 shares of VGH, Inc. common stock to V10 as the Aggregate Merger Consideration pursuant to the Merger Agreement, (y) VGH, Inc. repurchases 20,000,000 of such shares of VGH, Inc. common stock from V10 in the Repurchase pursuant to the Merger Agreement and (z) V10 elects under the Purchase Agreement to have Mr. Palihapitiya

13

Table of Contents

purchase 10,000,000 shares of VGH, Inc. common stock directly from V10 in a Secondary Purchase, in accordance with the terms and subject to the conditions of the Purchase Agreement. If the actual facts are different from these assumptions, the percentage ownership retained by SCH's existing shareholders in VGH, Inc. (following the consummation of the Business Combination) will be different. Outstanding shares of VGH, Inc. common stock held by the Sponsor excludes the 1,500,000 shares of VGH, Inc. common stock underlying the Director RSU Awards that will be granted in connection with the Business Combination. The Director RSU Awards will vest at the Closing but will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1 and December 31 of the year following the Closing.

The following table illustrates varying ownership levels in VGH, Inc. immediately following the consummation of the Business Combination based on the assumptions above, except for (i) varying levels of redemptions by the public shareholders and (ii) as a result of varying redemptions, the inclusion of the Repurchase, which cannot be exercised by V10 at the assumed redemption level.

| | Share Ownership in VGH, Inc. | | | |
| --- | --- | --- | --- | --- |
| | Full Secondary Purchase Election, Full Repurchase Election | | Full Secondary Purchase at Minimum Cash Condition ($400m in trust after deferred underwriting fee) | |
| | No additional redemptions | | Redemptions(1) | |
| | Number of Shares | Percentage of Outstanding Shares | Number of Shares | Percentage of Outstanding Shares |
| V10 | 100,000,000 | 51.4% | 120,000,000 | 64.1% |
| SCH's public shareholders | 69,000,000 | 35.4% | 41,311,777 | 22.1% |
| Sponsor & related parties (including Mr. Palihapitiya)(2) | 25,750,000 | 13.2% | 25,750,000 | 13.8% |
| Total(2) | 194,750,000 | 100.0% | 187,061,777 | 100.0% |

(1) Assumes that 27,688,233 public shares (being SCH's estimate of the number of public shares that could be redeemed in connection with the Business Combination (and our extension proposal, in the aggregate) in order to satisfy the closing conditions contained in the Merger Agreement at approximately $10.27 per share based on trust account figures as of March 31, 2019) are redeemed in connection with the Business Combination.

(2) Outstanding shares of VGH, Inc. common stock held by the Sponsor excludes the 1,500,000 shares of VGH, Inc. common stock underlying the Director RSU Awards that will be granted in connection with the Business Combination. The Director RSU Awards will vest at the Closing but will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1 and December 31 of the year following the Closing.

**Date, Time and Place of Extraordinary General Meeting of SCH's Shareholders**

The extraordinary general meeting of the shareholders of SCH will be held at , Eastern Time, on , 2019, at , to consider and vote upon the proposals to be put to the extraordinary general meeting, including if necessary, the Adjournment Proposal, to permit further solicitation and vote of proxies if, based upon the tabulated vote at the time of the extraordinary general meeting, each of the Condition Precedent Proposals have not been approved.

**Voting Power; Record Date**

SCH shareholders will be entitled to vote or direct votes to be cast at the extraordinary general meeting if they owned ordinary shares at the close of business on , 2019, which is the "record date" for the

14

Table of Contents

extraordinary general meeting. Shareholders will have one vote for each ordinary share owned at the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker to ensure that votes related to the shares you beneficially own are properly counted. SCH warrants do not have voting rights. As of the close of business on the record date, there were 86,250,000 ordinary shares issued and outstanding, of which 69,000,000 were issued and outstanding public shares.

**Quorum and Vote of SCH Shareholders**

A quorum of SCH shareholders is necessary to hold a valid meeting. A quorum will be present at the SCH extraordinary general meeting if a majority of the issued and outstanding ordinary shares entitled to vote at the extraordinary general meeting are represented in person or by proxy. Abstentions and broker non-votes, while considered present for the purposes of establishing a quorum, will not count as votes cast at the extraordinary general meeting. As of the record date for the extraordinary general meeting, 43,125,001 ordinary shares would be required to achieve a quorum.

The Sponsor has agreed to vote all of its ordinary shares in favor of the proposals being presented at the extraordinary general meeting. As of the date of this proxy statement/prospectus, the Sponsor owns 20% of the issued and outstanding ordinary shares.

The proposals presented at the extraordinary general meeting require the following votes:

(i)  *BCA Proposal:* The approval of the BCA Proposal requires an ordinary resolution under Cayman Islands law, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

(ii)  *Domestication Proposal:* The approval of the Domestication Proposal requires a special resolution under Cayman Islands Companies Law, being the affirmative vote of holders of at least two-thirds of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

(iii)  *Organizational Documents Proposals:* The separate approval of each of the Organizational Documents Proposals requires a special resolution under Cayman Islands Companies Law, being the affirmative vote of holders of at least two-thirds of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

(iv)  *Director Election Proposal:* The approval of the Director Election Proposal requires an ordinary resolution under Cayman Islands law, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

(v)  *Stock Issuance Proposal:* The approval of the Stock Issuance Proposal requires an ordinary resolution under Cayman Islands law, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

(vi)  *Incentive Award Plan Proposal:* The approval of the Incentive Award Plan Proposal requires an ordinary resolution under Cayman Islands law, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

(vii)  *Repurchase Proposal:* The approval of the Repurchase Proposal requires an ordinary resolution under Cayman Islands law, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

15

Table of Contents

(viii)   *Adjournment Proposal:* The approval of the Adjournment Proposal requires an ordinary resolution under Cayman Islands law, being the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

**Redemption Rights**

Pursuant to the Cayman Constitutional Documents, a public shareholder may request of SCH that VGH, Inc. redeem all or a portion of its public shares for cash if the Business Combination is consummated. As a holder of public shares, you will be entitled to receive cash for any public shares to be redeemed only if you:

(i)   (a) hold public shares or (b) if you hold public shares through units, you elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares;

(ii)   submit a written request to Continental Stock Transfer & Trust Company ("Continental"), SCH's transfer agent, that VGH, Inc. redeem all or a portion of your public shares for cash; and

(iii)   deliver your public shares to Continental, SCH's transfer agent, physically or electronically through DTC.

**Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 p.m., Eastern Time, on , 2019 (two business days before the extraordinary general meeting) in order for their shares to be redeemed.**

**Holders of units must elect to separate the units into the underlying public shares and public warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public shares and public warrants, or if a holder holds units registered in its own name, the holder must contact Continental, SCH's transfer agent, directly and instruct them to do so. Public shareholders may elect to redeem all or a portion of the public shares held by them regardless of if or how they vote in respect of the BCA Proposal.** If the Business Combination is not consummated, the public shares will be returned to the respective holder, broker or bank. If the Business Combination is consummated, and if a public shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers its shares to Continental, SCH's transfer agent, VGH, Inc. will redeem such public shares for a per-share price, payable in cash, equal to the pro rata portion of the trust account, calculated as of two business days prior to the consummation of the Business Combination. For illustrative purposes, as of March 31, 2019, this would have amounted to approximately $10.27 per issued and outstanding public share. If a public shareholder exercises its redemption rights in full, then it will be electing to exchange its public shares for cash and will no longer own public shares. The redemption takes place following the Domestication and, accordingly, it is shares of VGH, Inc. common stock that will be redeemed immediately after consummation of the Business Combination. See "*Extraordinary General Meeting of SCH—Redemption Rights*" in this proxy statement/prospectus for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

Notwithstanding the foregoing, a public shareholder, together with any affiliate of such public shareholder or any other person with whom such public shareholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares. Accordingly, if a public shareholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash.

The Sponsor has agreed to vote in favor of the Business Combination, regardless of how our public shareholders vote. Unlike some other blank check companies in which the initial shareholders agree to vote their

16

Table of Contents

shares in accordance with the majority of the votes cast by the public shareholders in connection with an initial business combination, the Sponsor and each officer and director of SCH have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement. As of the date of this proxy statement/prospectus, the Sponsor owns 20% of the issued and outstanding ordinary shares.

Holders of the warrants will not have redemption rights with respect to the warrants.

### Appraisal Rights

Neither SCH shareholders nor SCH warrant holders have appraisal rights in connection with the Business Combination or the Domestication under the Cayman Islands Companies Law or under the DGCL.

### Proxy Solicitation

Proxies may be solicited by mail, telephone or in person. SCH has engaged Morrow Sodali LLC to assist in the solicitation of proxies.

If a shareholder grants a proxy, it may still vote its shares in person if it revokes its proxy before the extraordinary general meeting. A shareholder also may change its vote by submitting a later-dated proxy as described in the section entitled "*Extraordinary General Meeting of SCH —Revoking Your Proxy.*"

### Interests of SCH's Directors and Executive Officers in the Business Combination

When you consider the recommendation of SCH's board of directors in favor of approval of the BCA Proposal, you should keep in mind that the Sponsor and SCH's directors and executive officers have interests in such proposal that are different from, or in addition to, those of SCH shareholders and warrant holders generally. These interests include, among other things, the interests listed below:

- If SCH does not consummate a business combination by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders, or if such date is further extended at a duly called extraordinary general meeting, such later date), it would cease all operations except for the purpose of winding up, redeeming all of the outstanding public shares for cash and, subject to the approval of its remaining shareholders and its board of directors, dissolving and liquidating, subject in each case to its obligations under the Cayman Islands Companies Law to provide for claims of creditors and the requirements of other applicable law. In such event, the 17,250,000 SCH Class B ordinary shares owned by the Sponsor would be worthless because following the redemption of the public shares, SCH would likely have few, if any, net assets and because the Sponsor has agreed to waive its rights to liquidating distributions from the trust account with respect to the Sponsor if SCH fails to complete a business combination within the required period. The Sponsor purchased the SCH Class B ordinary shares prior to SCH's initial public offering for approximately $0.0001 per share and certain of SCH's directors and executive officers, including Chamath Palihapitiya and Ian Osborne, have an economic interest in such shares. The shares of VGH, Inc. common stock that the Sponsor will hold following the Mergers (including after giving effect to the Domestication), if unrestricted and freely tradable, would have had aggregate market value of $ based upon the closing price of $ per share of public share on the NYSE on , 2019, the most recent closing price. Given such shares of VGH, Inc. common stock will be subject to certain restrictions, including those described above, SCH believes such shares have less value.
- Chamath Palihapitiya, SCH's Chief Executive Officer and Chairman of SCH's board of directors, is expected to be the Chairperson of the board of directors of VGH, Inc. after the consummation of the

17

Table of Contents

Business Combination. As such, in the future, Mr. Palihapitiya will receive any cash fees, stock options, stock awards or other remuneration that VGH, Inc.'s board of directors determines to pay to him.

- Adam Bain and James Ryans, current directors of SCH, are expected to be directors of VGH, Inc. after the consummation of the Business Combination (it is also anticipated that Dr. Ryans will serve as the chairperson of the audit committee of the Board). As such, in the future, Mr. Bain and Dr. Ryans will receive any cash fees, stock options, stock awards or other remuneration that VGH, Inc.'s board of directors determines to pay to them.

- In connection with the execution of the Merger Agreement, the board of directors of SCH approved the grant of the Director RSU Awards to select members of the board of directors of SCH that, at the Closing, will vest and be converted into the right to receive an aggregate of 1,500,000 shares of VGH, Inc. common stock. The Director RSU Awards will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1st and December 31st of the year following the Closing. The grant and vesting of the Director RSU Awards are contingent upon, among other things, the consummation of the Business Combination, the approval of the 2019 Plan by SCH's shareholders at the extraordinary general meeting and the continued service of the respective participants on the board of directors of SCH through the Closing Date.

- SCH's existing directors and officers will be eligible for continued indemnification and continued coverage under a directors' and officers' liability insurance policy after the Mergers and pursuant to the Merger Agreement.

- In the event that SCH fails to consummate a business combination within the prescribed time frame (pursuant to the Cayman Constitutional Documents), or upon the exercise of a redemption right in connection with the Business Combination (or our extension proposal), SCH will be required to provide for payment of claims of creditors that were not waived that may be brought against SCH within the 10 years following such redemption. In order to protect the amounts held in the trust account, the Sponsor has agreed that it will be liable to SCH if and to the extent any claims by a third party (other than SCH's independent auditors) for services rendered or products sold to SCH, or a prospective target business with which SCH has discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case, net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under the indemnity of the underwriters of SCH's initial public offering against certain liabilities, including liabilities under the Securities Act.

- A party related to our Sponsor and certain of our officers and directors has advanced funds to us for working capital purposes, including $0.4 million as of March 31, 2019. These advances are non-interest bearing, unsecured and due on demand. If we do not complete our initial business combination within the required period, we may use a portion of our working capital held outside the trust account to repay such advances and any other working capital advances made to us, but no proceeds held in the trust account would be used to repay such advances and any other working capital advances made to us, and such related party may not be able to recover the value it has loaned us and any other working capital advances it may make.

- In connection with the Public Offering, the underwriters of the Public Offering agreed to reimburse the Company for amounts paid by the Company to Connaught (UK) Limited for financial advisory services in an amount equal to 10% of the discount paid to the underwriters, of which $1.0 million was

18

Table of Contents

paid at the closing of the Public Offering and up to $2.4 million will be payable at the time of the closing of the initial Business Combination. Connaught (UK) Limited is an affiliate of us, our Sponsor and certain of our officers and directors.

- Following consummation of the Business Combination, the Sponsor, SCH's officers and directors and their respective affiliates would be entitled to reimbursement for certain out-of-pocket expenses related to identifying, investigating and consummating an initial business combination or repayment of loans, if any, and on such terms as to be determined by SCH from time to time, made by the Sponsor or any of SCH's officers or directors to finance transaction costs in connection with an intended initial business combination. However, if SCH fails to consummate a business combination within the required period, Sponsor and SCH's officers and directors and their respective affiliates will not have any claim against the trust account for reimbursement.
- In connection with the Purchase Agreement, if V10 elects to have Mr. Palihapitiya purchase shares of VGH, Inc. common stock (i) in a Primary Purchase, Mr. Palihapitiya will be issued up to 10 million newly issued shares of VGH, Inc. common stock (depending on the size of the Primary Purchase as elected by V10) or (ii) in a Secondary Purchase, Mr. Palihapitiya will be purchasing up to 10 million shares of VGH, Inc. common stock from V10 (depending on the size of the Secondary Purchase as elected by V10), in each case, at a price of $10.00 per share. It is anticipated that, following the Business Combination, if V10 elects that Mr. Palihapitiya purchase the maximum number of shares in a Secondary Purchase (also assuming that (x) no public shareholders exercise their redemption rights in connection with the Business Combination or our extension proposal assuming consummation of the transactions contemplated by the Purchase Agreement and (y) VGH, Inc. will repurchase 20,000,000 shares of VGH, Inc. common stock from V10 in a Repurchase pursuant to the Merger Agreement), the Sponsor and related parties (including Mr. Palihapitiya) are expected to collectively own approximately 13.2% of outstanding VGH, Inc. common stock. Outstanding shares of VGH, Inc. common stock held by the Sponsor excludes the 1,500,000 shares of VGH, Inc. common stock underlying the Director RSU Awards that will be granted in connection with the Business Combination. The restricted stock units will vest at the Closing but will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1 and December 31 of the year following the Closing.
- Pursuant to the Stockholders' Agreement, Mr. Palihapitiya will have the right to designate two directors to the Board of VGH, Inc. and such directors may have the power collectively to withhold approval in respect of future transactions between VGH, Inc. and its subsidiaries, on the one hand and V10 or its affiliates, on the other.
- Pursuant to the Registration Rights Agreement, the Sponsor, Mr. Palihapitiya and V10 will have customary registration rights, including demand and piggy-back rights, subject to cooperation and cut-back provisions with respect to the shares of VGH, Inc. common stock and warrants held by such parties.
- The Proposed Certificate of Incorporation will contain a provision that expressly elects not to be governed by Section 203 (Delaware's "interested stockholder" statute) of the Delaware General Corporation Law.

The Sponsor has agreed to vote in favor of the Business Combination, regardless of how our public shareholders vote. Unlike some other blank check companies in which the initial shareholders agree to vote their shares in accordance with the majority of the votes cast by the public shareholders in connection with an initial business combination, the Sponsor and each officer and director of SCH have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement. As of the date of this proxy statement/prospectus, the Sponsor owns 20% of the issued and outstanding ordinary shares.

Table of Contents

At any time at or prior to the Business Combination, during a period when they are not then aware of any material nonpublic information regarding us or SCH's securities, the Sponsor, Mr. Palihapitiya, V10, the VG Companies or their directors, officers, advisors or respective affiliates may purchase public shares from institutional and other investors who vote, or indicate an intention to vote, against any of the Condition Precedent Proposals, or execute agreements to purchase such shares from such investors in the future, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares or vote their public shares in favor of the Condition Precedent Proposals. Such a purchase may include a contractual acknowledgement that such shareholder, although still the record holder of SCH's shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that the Sponsor, Mr. Palihapitiya, V10, the VG Companies or their directors, officers, advisors or respective affiliates purchase shares in privately negotiated transactions from public shareholders who have already elected to exercise their redemption rights, such selling shareholder would be required to revoke their prior elections to redeem their shares. The purpose of such share purchases and other transactions would be to increase the likelihood of (1) satisfaction of the requirement that holders of a majority of the ordinary shares, represented in person or by proxy and entitled to vote at the extraordinary general meeting, vote in favor of the BCA Proposal, the Director Election Proposal, the Stock Issuance Proposal, the Incentive Award Plan Proposal, the Repurchase Proposal and the Adjournment Proposal, (2) satisfaction of the requirement that holders of at least two-thirds of the ordinary shares, represented in person or by proxy and entitled to vote at the extraordinary general meeting, vote in favor of the Domestication Proposal and the Organizational Documents Proposals, (3) satisfaction of the Minimum Cash Condition, (4) otherwise limiting the number of public shares electing to redeem and (5) SCH's net tangible assets (as determined in accordance with Rule 3a51(g)(1) of the Exchange Act) being at least $5,000,001.

Entering into any such arrangements may have a depressive effect on the ordinary shares (*e.g.*, by giving an investor or holder the ability to effectively purchase shares at a price lower than market, such investor or holder may therefore become more likely to sell the shares he or she owns, either at or prior to the Business Combination). If such transactions are effected, the consequence could be to cause the Business Combination to be consummated in circumstances where such consummation could not otherwise occur. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the proposals to be presented at the extraordinary general meeting and would likely increase the chances that such proposals would be approved. SCH will file or submit a Current Report on Form 8-K to disclose any material arrangements entered into or significant purchases made by any of the aforementioned persons that would affect the vote on the proposals to be put to the extraordinary general meeting or the redemption threshold. Any such report will include descriptions of any arrangements entered into or significant purchases by any of the aforementioned persons.

The existence of financial and personal interests of one or more of SCH's directors may result in a conflict of interest on the part of such director(s) between what he, she or they may believe is in the best interests of SCH and its shareholders and what he, she or they may believe is best for himself or themselves in determining to recommend that shareholders vote for the proposals. In addition, SCH's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*BCA Proposal—Interests of SCH's Directors and Executive Officers in the Business Combination*" for a further discussion of these considerations.

**Recommendation to Shareholders of SCH**

SCH's board of directors believes that the BCA Proposal and the other proposals to be presented at the extraordinary general meeting are in the best interest of SCH's shareholders and unanimously recommends that its shareholders vote "FOR" the BCA Proposal, "FOR" the Domestication Proposal, "FOR" each of the separate Organizational Documents Proposals, "FOR" the Director Election Proposal, "FOR" the Stock Issuance Proposal, "FOR" the Incentive Award Plan Proposal, "FOR" the Repurchase Proposal and "FOR" the Adjournment Proposal, in each case, if presented to the extraordinary general meeting.

Table of Contents

The existence of financial and personal interests of one or more of SCH's directors may result in a conflict of interest on the part of such director(s) between what he, she or they may believe is in the best interests of SCH and its shareholders and what he, she or they may believe is best for himself, herself or themselves in determining to recommend that shareholders vote for the proposals. In addition, SCH's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "*BCA Proposal—Interests of SCH's Directors and Executive Officers in the Business Combination*" for a further discussion of these considerations.

### Sources and Uses of Funds for the Business Combination

The following table summarizes the sources and uses for funding the Business Combination. These figures assume (i) that no public shareholders exercise their redemption rights in connection with the Business Combination or our extension proposal and (ii) that (x) VGH, Inc. issues 130,000,000 shares of VGH, Inc. common stock to V10 as the Aggregate Merger Consideration pursuant to the Merger Agreement, (y) VGH, Inc. repurchases 20,000,000 of such shares of VGH, Inc. common stock from V10 in the Repurchase pursuant to the Merger Agreement and (z) V10 elects under the Purchase Agreement to have Mr. Palihapitiya purchase 10,000,000 shares of VGH, Inc. common stock directly from V10 in a Secondary Purchase, in accordance with the terms and subject to the conditions of the Purchase Agreement. If the actual facts are different from these assumptions, the below figures will be different.

| Source of Funds (in millions) | | Uses (in millions) | |
|---|---|---|---|
| Existing cash in trust account(1) | $ 708 | Cash on balance sheet | $ 460 |
| Shares of VGH, Inc. issued to V10(2) | 1,000 | Repurchase of shares issued to V10 | 300 |
| Shares of VGH, Inc. issued to Mr. Palihapitiya(3) | 100 | Shares of VGH, Inc. issued to V10 | 1,000 |
| | | Transaction fees and expenses(4) | 48 |
| **Total Sources** | $ 1,808 | **Total Uses** | $ 1,808 |

(1)    Calculated as of March 31, 2019.
(2)    Shares issued to V10 are at a deemed value of $10.00 per share; after giving effect to the Secondary Purchase and Repurchase.
(3)    After giving effect to the Secondary Purchase.
(4)    Includes deferred underwriting commission of $24 million and estimated transaction expenses.

### U.S. Federal Income Tax Considerations

For a discussion summarizing the U.S. federal income tax considerations of the Domestication and exercise of redemption rights, please see "*U.S. Federal Income Tax Considerations.*"

### Expected Accounting Treatment

#### The Domestication

There will be no accounting effect or change in the carrying amount of the consolidated assets and liabilities of the Company as a result of the Domestication. The business, capitalization, assets and liabilities and financial statements of VGH, Inc. immediately following the Domestication will be the same as those of SCH immediately prior to the Domestication.

21

Table of Contents

*The Business Combination*

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, SCH has been treated as the "acquired" company for financial reporting purposes. This determination was primarily based on current shareholders of the VG Companies having a relative majority of the voting power of the combined entity, the operations of the VG Companies prior to the acquisition comprising the only ongoing operations of the combined entity, and senior management of the VG Companies comprising the majority of the senior management of the combined entity. Accordingly, for accounting purposes, the financial statements of the combined entity will represent a continuation of the financial statements of the VG Companies with the acquisition being treated as the equivalent of the VG Companies issuing stock for the net assets of SCH, accompanied by a recapitalization. The net assets of SCH will be stated at historical cost, with no goodwill or other intangible assets recorded.

**Regulatory Matters**

Under the HSR Act and the rules that have been promulgated thereunder by the FTC, certain transactions may not be consummated unless information has been furnished to the Antitrust Division of the Department of Justice ("Antitrust Division") and the FTC and certain waiting period requirements have been satisfied. Each of (x) the Business Combination and (y) the transactions contemplated by the Purchase Agreement are subject to these requirements and may not be completed until the expiration of a 30-day waiting period following the two filings of the required Notification and Report Forms with the Antitrust Division and the FTC or until early termination is granted. On July 23, 2019, SCH and the VG Companies filed the required forms under the HSR Act with respect to the Business Combination with the Antitrust Division and the FTC and requested early termination.

At any time before or after consummation of the Business Combination (or the transactions contemplated by the Purchase Agreement), notwithstanding termination of the respective waiting periods under the HSR Act, the applicable competition authorities in the United States or any other applicable jurisdiction could take such action under applicable antitrust laws as such authority deems necessary or desirable in the public interest, including seeking to enjoin the consummation of the Business Combination (or the transactions contemplated by the Purchase Agreement, as applicable), conditionally approving the Business Combination (or the transactions contemplated by the Purchase Agreement, as applicable) upon divestiture of VGH, Inc.'s assets, subjecting the completion of the Business Combination (or the transactions contemplated by the Purchase Agreement, as applicable) to regulatory conditions or seeking other remedies. Private parties may also seek to take legal action under the antitrust laws under certain circumstances. SCH cannot assure you that the Antitrust Division, the FTC, any state attorney general or any other government authority will not attempt to challenge the Business Combination (or the transactions contemplated by the Purchase Agreement, as applicable) on antitrust grounds, and, if such a challenge is made, SCH cannot assure you as to its result.

Although no approvals of the FAA are required prior to closing, the FAA may engage in a policy review with other U.S. Government agencies, with regard to foreign ownership in particular, to ensure the validity and continuation of all existing government licenses, registrations, permits, and pending applications post-closing.

None of SCH nor the VG Companies are aware of any material regulatory approvals or actions that are required for completion of the Business Combination other than the expiration or early termination of the waiting period under the HSR Act and registration under ITAR. It is presently contemplated that if any such additional regulatory approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any additional approvals or actions will be obtained.

Table of Contents

**Emerging Growth Company**

SCH is an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act, and it may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in SCH's periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

Further, section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. SCH has elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, SCH, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of SCH's financial statements with certain other public companies difficult or impossible because of the potential differences in accounting standards used.

We will remain an emerging growth company until the earlier of: (1) the last day of the fiscal year (a) following the fifth anniversary of the closing of SCH's initial public offering, (b) in which we have total annual gross revenue of at least $1.07 billion or (c) in which we are deemed to be a large accelerated filer, which means the market value of our common equity that is held by non-affiliates exceeds $700 million as of the end of the prior fiscal year's second fiscal quarter; and (2) the date on which we have issued more than $1.00 billion in non-convertible debt securities during the prior three-year period. We currently anticipate that we will lose our "emerging growth company" status as of the end of the year ended December 31, 2019 based on our unaffiliated market capitalization as of June 30, 2019. References herein to "emerging growth company" shall have the meaning associated with it in the JOBS Act.

**Risk Factors**

In evaluating the proposals to be presented at the SCH extraordinary general meeting, a shareholder should carefully read this proxy statement/prospectus and especially consider the factors discussed in the section entitled "*Risk Factors*."

23

**Table of Contents**

**RISK FACTORS**

*SCH shareholders should carefully consider the following risk factors, together with all of the other information included in this proxy statement/prospectus, before they decide whether to vote or instruct their vote to be cast to approve the relevant proposals described in this proxy statement/prospectus.*

**Risks Related to VGH, Inc.'s Business**

*Unless the context otherwise requires, all references in this subsection to the "Company," "we," "us" or "our" refer to the business of the VG Companies and their subsidiaries prior to the consummation of the Business Combination, which will be the business of VGH, Inc. and its subsidiaries following the consummation of the Business Combination.*

***We have incurred significant losses since inception, we expect to incur losses in the future and we may not be able to achieve or maintain profitability.***

We have incurred significant losses since inception. We incurred net losses of $42.6 million, $138.1 million and $138.2 million for the three months ended March 31, 2019 and the years ended December 31, 2018 and 2017, respectively. While we have generated limited revenue from flying payloads into space, we have not yet started commercial human spaceflight operations, and it is difficult for us to predict our future operating results. As a result, our losses may be larger than anticipated, and we may not achieve profitability when expected, or at all, and even if we do, we may not be able to maintain or increase profitability.

We expect our operating expenses to increase over the next several years as we move towards commercial launch of our human spaceflight operations, continue to attempt to streamline our manufacturing process, increase our flight cadence, hire more employees and continue research and development efforts relating to new products and technologies. These efforts may be more costly than we expect and may not result in increased revenue or growth in our business. Any failure to increase our revenue sufficiently to keep pace with our investments and other expenses could prevent us from achieving or maintaining profitability or positive cash flow. Furthermore, if our future growth and operating performance fail to meet investor or analyst expectations, or if we have future negative cash flow or losses resulting from our investment in acquiring customers or expanding our operations, this could have a material adverse effect on our business, financial condition and results of operations.

***The success of our business will be highly dependent on our ability to effectively market and sell human spaceflights.***

We have generated only limited revenue from spaceflight, and we expect that our success will be highly dependent, especially in the foreseeable future, on our ability to effectively market and sell human spaceflight experiences. We have limited experience in marketing and selling human spaceflights, which we refer to as our astronaut experience, and if we are unable to utilize our current sales organization effectively, or to expand our sales organization as needed, in order to adequately target and engage our potential customers, our business may be adversely affected. To date, we have primarily sold the reservations for our astronaut experience to customers through direct sales and have sold a limited number of seats each year. Since 2014, we have not been actively selling our astronaut experience. Our success depends, in part, on our ability to attract new customers in a cost-effective manner. While we had a backlog of 603 customers as of June 30, 2019, and have received over 2,500 inbound inquiries since December 2018, we expect that we will need to make significant investments in order to attract new customers. Our sales growth is dependent upon our ability to implement strategic initiatives and these initiatives may not be effective in generating sales growth. In addition, marketing campaigns, which we have not historically utilized, can be expensive and may not result in the acquisition of customers in a cost-effective manner, if at all. Further, as our brand becomes more widely known, future marketing campaigns or brand content may not attract new customers at the same rate as past campaigns or brand content. If we are unable to attract new customers, our business, financial condition and results of operations will be harmed.

Table of Contents

***The market for commercial human spaceflight has not been established with precision, is still emerging and may not achieve the growth potential we expect or may grow more slowly than expected.***

The market for commercial human spaceflight has not been established with precision and is still emerging. Our estimates for the total addressable market for commercial human spaceflight are based on a number of internal and third-party estimates, including our current backlog, the number of consumers who have expressed interest in our astronaut experience, assumed prices at which we can offer our astronaut experience, assumed flight cadence, our ability to leverage our current manufacturing and operational processes and general market conditions. While we believe our assumptions and the data underlying our estimates are reasonable, these assumptions and estimates may not be correct and the conditions supporting our assumptions or estimates may change at any time, thereby reducing the predictive accuracy of these underlying factors. As a result, our estimates of the annual total addressable market for our astronaut experience, as well as the expected growth rate for the total addressable market for that experience, may prove to be incorrect.

***We anticipate commencing commercial spaceflight operations with a single spaceflight system, which has yet to complete flight testing. Any delay in completing the flight test program and the final development of our existing spaceflight system would adversely impact our business, financial condition and results of operations.***

We expect to commence commercial operations with a single spaceflight system. While we have already been issued our commercial launch license, we must clear a final set of provisos related to the analysis of test flight data before we fly commercial passengers using our spaceflight system. Following each flight test we undertake, we analyze the resulting data and determine whether additional changes to the spaceflight system are required. Historically, changes have been required and implementing those changes has resulted in additional delay and expense. For example, an unanticipated in-flight incident involving an earlier model of SpaceShipTwo manufactured and operated by a third-party contractor, led to the loss of that spaceship and significant delays in the planned launch of our spaceflight system as we addressed design and safety concerns, including with applicable regulators. If issues like this arise or recur, if our remediation measures and process changes do not continue to be successful or if we experience issues with manufacturing improvements or design and safety, the anticipated launch of our commercial human spaceflight operations could be delayed.

***Any inability to operate our spaceflight system after commercial launch at our anticipated flight rate could adversely impact our business, financial condition and results operations.***

Even if we complete development and commence commercial human spaceflight operations, we will be dependent on a single spaceflight system. To be successful, we will need to maintain a sufficient flight rate, which will be negatively impacted if we are not able to operate that system for any reason. We may be unable to operate our current spaceflight system at our anticipated flight rate for a number of reasons, including, but not limited to, unexpected weather patterns, maintenance issues, pilot error, design and engineering flaws, natural disasters, changes in governmental regulations or in the status of our regulatory approvals or applications or other events that force us to cancel or reschedule flights. In the event we need to replace any components or hardware of our spaceflight system, there are limited numbers of replacement parts available, some of which have significant lead time associated with procurement or manufacture, so any unplanned failures could result in reduced numbers of flights and significant delays to our planned growth.

***Our ability to grow our business depends on the successful development of our spaceflight systems and related technology, which is subject to many uncertainties, some of which are beyond our control.***

Our current primary research and development objectives focus on the development of our existing and any additional spaceflight systems and related technology. If we do not complete this development in our anticipated timeframes or at all, our ability to grow our business will be adversely affected. The successful development of our spaceflight systems and related technology involves many uncertainties, some of which are beyond our control, including:

- timing in finalizing spaceflight systems design and specifications;

34

Table of Contents

- successful completion of flight test programs, including flight safety tests;
- our ability to obtain additional applicable approvals, licenses or certifications from regulatory agencies, if required, and maintaining current approvals, licenses or certifications;
- performance of our manufacturing facilities despite risks that disrupt productions, such as natural disasters and hazardous materials;
- performance of a limited number of suppliers for certain raw materials and supplied components;
- performance of our third-party contractors that support our research and development activities;
- our ability to maintain rights from third parties for intellectual properties critical to our research and development activities; and
- our ability to continue funding and maintain our current research and development activities.

***Unsatisfactory safety performance of our spaceflight systems could have a material adverse effect on our business, financial condition and results of operation.***

We manufacture and operate highly sophisticated spaceflight systems and offer a specialized astronaut experience that depends on complex technology. While we have built operational processes to ensure that the design, manufacture, performance and servicing of our spaceflight systems meet rigorous quality standards, there can be no assurance that we will not experience operational or process failures and other problems, including through manufacturing or design defects, pilot error, cyber-attacks or other intentional acts, that could result in potential safety risks. Any actual or perceived safety issues may result in significant reputational harm to our businesses, in addition to tort liability, maintenance, increased safety infrastructure and other costs that may arise. Such issues with our spaceflight systems or customer safety could result in delaying or cancelling planned flights, increased regulation or other systemic consequences. Our inability to meet our safety standards or adverse publicity affecting our reputation as a result of accidents, mechanical failures, damages to customer property or medical complications could have a material adverse effect on our business, financial condition and results of operation.

***We may not be able to convert our orders in backlog or inbound inquiries about flight reservations into revenue.***

As of June 30, 2019, our backlog represents orders from 603 customers for which we have not yet recognized revenue. While many of these orders were accompanied by a significant deposit, the deposits are largely refundable and the reservations may be cancelled under certain circumstances without penalty. As a result, we may not receive revenue from these orders, and any order backlog we report may not be indicative of our future revenue. Additionally, we have received over 2,500 inbound inquiries about flight reservations since SpaceShipTwo's first spaceflight in December 2018, but those inquiries have not been accompanied by any deposits, and we may not be able to convert those inquiries into reservations and revenue.

Many events may cause a delay in our ability to fulfill reservations or cause planned spaceflights to not be completed at all, some of which may be out of our control, including unexpected weather patterns, maintenance issues, natural disasters, changes in governmental regulations or in the status of our regulatory approvals or applications or other events that force us to cancel or reschedule flights. If we delay spaceflights or if customers reconsider their astronaut experience, those customers may seek to cancel their planned spaceflight, and may obtain a full or partial refund.

***We have not yet tested flights at our anticipated full passenger capacity of our spaceship.***

To date, only one of our test flights included a crew member that was not a pilot. The success of our human spaceflight operations will depend on our achieving and maintaining a sufficient level of passenger capacity on

35

Table of Contents

our spaceflights. We have not yet tested flights with a full cabin and it is possible that the number of passengers per flight may not meet our expectations for a number of factors, including maximization of the passenger experience and satisfaction. Any decrease from our assumptions in the number of passengers per flight could adversely impact our ability to generate revenue at the rate we anticipate.

***Any delays in the development and manufacture of additional spaceflight systems and related technology may adversely impact our business, financial condition and results of operations.***

We have previously experienced, and may experience in the future, delays or other complications in the design, manufacture, launch, production, delivery and servicing ramp of new spaceflight systems and related technology. If delays like this arise or recur, if our remediation measures and process changes do not continue to be successful or if we experience issues with planned manufacturing improvements or design and safety, we could experience issues in sustaining the ramp of our spaceflight system or delays in increasing production further.

If we encounter difficulties in scaling our delivery or servicing capabilities, if we fail to develop and successfully commercialize spaceflight technologies, if we fail to develop such technologies before our competitors, or if such technologies fail to perform as expected, are inferior to those of our competitors or are perceived as less safe than those of our competitors, our business, financial condition and results of operations could be materially and adversely impacted.

***If we are unable to adapt to and satisfy customer demands in a timely and cost-effective manner, our ability to grow our business may suffer.***

The success of our business depends in part on effectively managing and maintaining our existing spaceflight system, manufacturing more spaceflight systems, operating a sufficient number of spaceflights to meet customer demand and providing customers with an astronaut experience that meets or exceeds their expectations. If for any reason we are unable to manufacture new spaceflight systems or are unable to schedule spaceflights as planned, this could have a material adverse effect on our business, financial condition and results of operations. If our current or future spaceflight systems do not meet expected performance or quality standards, including with respect to customer safety and satisfaction, this could cause operational delays. In addition, any delay in manufacturing new spacecraft as planned could cause us to operate our existing spaceflight system more frequently than planned and in such a manner that may increase maintenance costs. Further, flight operations within restricted airspace require advance scheduling and coordination with government range owners and other users, and any high priority national defense assets will have priority in the use of these resources, which may impact our cadence of spaceflight operations or could result in cancellations or rescheduling. Any operational or manufacturing delays or other unplanned changes to our ability to operate spaceflights could have a material adverse effect on our business, financial condition and results of operations.

***We may be unable to manage our future growth effectively, which could make it difficult to execute our business strategy.***

If our operations continue to grow as planned, of which there can be no assurance, we will need to expand our sales and marketing, research and development, customer and commercial strategy, products and services, supply, and manufacturing and distribution functions. We will also need to continue to leverage our manufacturing and operational systems and processes, and there is no guarantee that we will be able to scale the business and the manufacture of spacecraft as currently planned or within the planned timeframe. The continued expansion of our business may also require additional manufacturing and operational facilities, as well as space for administrative support, and there is no guarantee that we will be able to find suitable locations or partners for the manufacture and operation of our spaceflight systems.

Our continued growth could increase the strain on our resources, and we could experience operating difficulties, including difficulties in hiring, training and managing an increasing number of pilots and employees,

36

Table of Contents

finding manufacturing capacity to produce our spaceflight systems and related equipment, and delays in production and spaceflights. These difficulties may result in the erosion of our brand image, divert the attention of management and key employees and impact financial and operational results. In addition, in order to continue to expand our fleet of spacecraft and increase our presence around the globe, we expect to incur substantial expenses as we continue to attempt to streamline our manufacturing process, increase our flight cadence, hire more employees, and continue research and development efforts relating to new products and technologies and expand internationally. If we are unable to drive commensurate growth, these costs, which include lease commitments, headcount and capital assets, could result in decreased margins, which could have a material adverse effect on our business, financial condition and results of operations.

***Our prospects and operations may be adversely affected by changes in consumer preferences and economic conditions that affect demand for our spaceflights.***

Because our business is currently concentrated on a single, discretionary product category, commercial human spaceflight, we are vulnerable to changes in consumer preferences or other market changes. The global economy has in the past, and will in the future, experience recessionary periods and periods of economic instability. During such periods, our potential customers may choose not to make discretionary purchases or may reduce overall spending on discretionary purchases, which may include not scheduling spaceflight experiences or cancelling existing reservations for spaceflight experiences. There could be a number of other effects from adverse general business and economic conditions on our business, including insolvency of any of our third-party suppliers or contractors, decreased consumer confidence, decreased discretionary spending and reduced consumer demand for spaceflight experiences. Moreover, future shifts in consumer spending away from our spaceflight experience for any reason, including decreased consumer confidence, adverse economic conditions or heightened competition, could have a material adverse effect on our business, financial condition and results of operations. If such business and economic conditions are experienced in future periods, this could reduce our sales and adversely affect our profitability, as demand for discretionary purchases may diminish during economic downturns, which could have a material adverse effect on our business, financial condition and results of operations.

***Adverse publicity stemming from any incident involving us or our competitors, or an incident involving a commercial airline or other air travel provider, could have a material adverse effect on our business, financial condition and results of operations.***

We are at risk of adverse publicity stemming from any public incident involving our company, our people or our brand. If our personnel or one of our spaceflight systems, or the personnel or spacecraft of one of our competitors or the personnel or aircraft of a commercial airline or governmental agency, were to be involved in a public incident, accident or catastrophe this could create an adverse public perception of spaceflight and result in decreased customer demand for spaceflight experiences, which could cause a material adverse effect on our business, financial conditions and results of operations. Further, if our personnel or our spaceflight systems were to be involved in a public incident, accident or catastrophe, we could be exposed to significant reputational harm or potential legal liability. Any reputational harm to our business could cause customers with existing reservations to cancel their spaceflights and could significantly impact our ability to make future sales. The insurance we carry may be inapplicable or inadequate to cover any such incident, accident or catastrophe. In the event that our insurance is inapplicable or not adequate, we may be forced to bear substantial losses from an incident or accident.

***Due to the inherent risks associated with commercial spaceflight, there is the possibility that any accident or catastrophe could lead to the loss of human life or a medical emergency.***

Human spaceflight is an inherently risky activity that can lead to accidents or catastrophes impacting human life. For example, on October 31, 2014, VSS Enterprise, an earlier model of SpaceShipTwo manufactured and operated by a third-party contractor, had an accident during a rocket-powered test flight. The pilot was seriously

Table of Contents

injured, the co-pilot was fatally injured and the vehicle was destroyed. While we have taken steps to address the causes of this accident and taken other preventative safety measures, there is a possibility that other accidents may occur in the future for a variety of reasons, some of which may be out of our control. Any such accident could result in substantial losses to us, including reputational harm and legal liability, and, as a result, could have a material adverse effect on our business, financial condition and results of operations.

***We may require substantial additional funding to finance our operations, but adequate additional financing may not be available when we need it, on acceptable terms or at all.***

Since our inception, we have financed our operations and capital expenditures primarily through cash flows financed by V10. In the future, we could be required to raise capital through public or private financing or other arrangements. Such financing may not be available on acceptable terms, or at all, and our failure to raise capital when needed could harm our business. We may sell equity securities or debt securities in one or more transactions at prices and in a manner as we may determine from time to time. If we sell any such securities in subsequent transactions, our current investors may be materially diluted. Any debt financing, if available, may involve restrictive covenants and could reduce our operational flexibility or profitability. If we cannot raise funds on acceptable terms, we may not be able to grow our business or respond to competitive pressures.

***Certain future operational facilities may require significant expenditures in capital improvements and operating expenses to develop and foster basic levels of service needed by the spaceflight operation, and the ongoing need to maintain existing operational facilities requires us to expend capital.***

As part of our growth strategy, we may utilize additional spaceports outside the United States. Construction of a spaceport or other facilities in which we conduct our operations may require significant capital expenditures to develop, and in the future we may be required to make similar expenditures to expand, improve or construct adequate facilities for our spaceflight operations. While Spaceport America was funded by the State of New Mexico and we intend to pursue similar arrangements in the future, we cannot assure that such arrangements will be available to us on terms similar to those we have with the State of New Mexico or at all. If we cannot secure such an arrangement, we would need to use cash flows from operations or raise additional capital in order to construct additional spaceports or facilities. In addition, as Spaceport America and any other facilities we may utilize mature, our business will require capital expenditures for the maintenance, renovation and improvement of such existing locations to remain competitive and maintain the value of our brand standard. This creates an ongoing need for capital, and, to the extent we cannot fund capital expenditures from cash flows from operations, we will need to borrow or otherwise obtain funds. If we cannot access the capital we need, we may not be able to execute on our growth strategy, take advantage of future opportunities or respond to competitive pressures. If the costs of funding new locations or renovations or enhancements at existing locations exceed budgeted amounts or the time for building or renovation is longer than anticipated, our business, financial condition and results of operations could be materially adversely affected.

***We rely on a limited number of suppliers for certain raw materials and supplied components. We may not be able to obtain sufficient raw materials or supplied components to meet our manufacturing and operating needs, or obtain such materials on favorable terms, which could impair our ability to fulfill our orders in a timely manner or increase our costs of production.***

Our ability to produce our current and future spaceflight systems and other components of operation is dependent upon sufficient availability of raw materials and supplied components, such as nitrous oxide, valves, tanks, special alloys, helium and carbon fiber, which we secure from a limited number of suppliers. Our reliance on suppliers to secure these raw materials and supplied components exposes us to volatility in the prices and availability of these materials. We may not be able to obtain sufficient supply of raw materials or supplied components, on favorable terms or at all, which could result in delays in manufacture of our spacecraft or increased costs. For example, there are only a few nitrous oxide plants around the world and if one or more of these plants were to experience a slowdown in operations or to shutdown entirely, we may need to qualify new suppliers or pay higher prices to maintain the supply of nitrous oxide needed for our operations.

Table of Contents

In addition, we have in the past and may in the future experience delays in manufacture or operation as we go through the requalification process with any replacement third-party supplier, as well as the limitations imposed by ITAR and other restrictions on transfer of sensitive technologies. Additionally, the imposition of tariffs on such raw materials or supplied components could have a material adverse effect on our operations. Prolonged disruptions in the supply of any of our key raw materials or components, difficulty qualifying new sources of supply, implementing use of replacement materials or new sources of supply or any volatility in prices could have a material adverse effect on our ability to operate in a cost-efficient, timely manner and could cause us to experience cancellations or delays of scheduled spaceflights, customer cancellations or reductions in our prices and margins, any of which could harm our business, financial condition and results of operations.

***Our spaceflight systems and related equipment may have shorter useful lives than we anticipate.***

Our growth strategy depends in part on the continued operation of our current spaceflight system and related equipment, as well as the manufacture of other spaceflight systems in the future. Each spaceflight system has a limited useful life, which is driven by the number of cycles that the system undertakes. While the vehicle is designed for a certain number of cycles, known as the design life, there can be no assurance as to the actual operational life of a spaceflight system or that the operational life of individual components will be consistent with its design life. A number of factors impact the useful lives of the spaceflight systems, including, among other things, the quality of their design and construction, the durability of their component parts and availability of any replacement components, the actual combined environment experienced compared to the assumed combined environment for which the spaceflight systems were designed and tested and the occurrence of any anomaly or series of anomalies or other risks affecting the spaceflight systems during launch, flight and reentry. In addition, we are continually learning, and as our engineering and manufacturing expertise and efficiency increases, we aim to leverage this learning to be able to manufacture our spaceflight systems and related equipment using less of our currently installed equipment, which could render our existing inventory obsolete. Any continued improvements in spaceflight technology may make obsolete our existing spaceflight systems or any component of our spacecraft prior to the end of its life. If the spaceflight systems and related equipment have shorter useful lives than we currently anticipate, this may lead to greater maintenance costs than previously anticipated such that the cost to maintain the spacecraft and related equipment may exceed their value, which would have a material adverse effect on our business, financial condition and results of operations.

***Failure of third-party contractors could adversely affect our business.***

We are dependent on various third-party contractors to develop and provide critical technology, systems and components required for our spaceflight system. For example, each spaceflight currently requires replenishment of certain components of our RocketMotorTwo propulsion system that we obtain from third-party contractors. Should we experience complications with any of these components, which are critical to the operation of our spacecraft, we may need to delay or cancel scheduled spaceflights. We face the risk that any of our contractors may not fulfill their contracts and deliver their products or services on a timely basis, or at all. We have experienced, and may in the future experience, operational complications with our contractors. The ability of our contractors to effectively satisfy our requirements could also be impacted by such contractors' financial difficulty or damage to their operations caused by fire, terrorist attack, natural disaster or other events. The failure of any contractors to perform to our expectations could result in shortages of certain manufacturing or operational components for our spacecraft or delays in spaceflights and harm our business. Our reliance on contractors and inability to fully control any operational difficulties with our third-party contractors could have a material adverse effect on our business, financial condition and results of operations.

***We expect to face intense competition in the commercial spaceflight industry and other industries in which we may develop products.***

The commercial spaceflight industry is still developing and evolving, but we expect it to be highly competitive. Currently, our primary competitor in establishing a commercial suborbital spaceflight offering is

39

Table of Contents

Blue Origin, a privately funded company founded in 2000. In addition, we are aware of several large, well-funded, public and private entities actively engaged in developing products within the aerospace industry, including SpaceX and Boeing. While these companies are currently focused on providing orbital spaceflight transportation to government agencies, a fundamentally different product from ours, we cannot assure you that one or more of these companies will not shift their focus to include suborbital spaceflight and directly compete with us in the future.

Many of our current and potential competitors are larger and have substantially greater resources than we have and expect to have in the future. They may also be able to devote greater resources to the development of their current and future technologies or the promotion and sale of their offerings, or offer lower prices. Our current and potential competitors may also establish cooperative or strategic relationships amongst themselves or with third parties that may further enhance their resources and offerings. Further, it is possible that domestic or foreign companies or governments, some with greater experience in the aerospace industry or greater financial resources than we possess, will seek to provide products or services that compete directly or indirectly with ours in the future. Any such foreign competitor, for example, could benefit from subsidies from, or other protective measures by, its home country.

We believe our ability to compete successfully as a commercial provider of human spaceflight does and will depend on a number of factors, which may change in the future due to increased competition, including the price of our offerings, consumer confidence in the safety of our offerings, consumer satisfaction for the experiences we offer, and the frequency and availability of our offerings. If we are unable to compete successfully, our business, financial condition and results of operations could be adversely affected.

***We may in the future invest significant resources in developing new offerings and exploring the application of our proprietary technologies for other uses and those opportunities may never materialize.***

While our primary focus for the foreseeable future will be on commercializing human spaceflight, we may invest significant resources in developing new technologies, services, products and offerings. However, we may not realize the expected benefits of these investments. In addition, we expect to explore the application of our proprietary technologies for other commercial and government uses, including, among other things, supersonic and hypersonic point-to-point travel. These anticipated technologies, however, are unproven and these products or technologies may never materialize or be commercialized in a way that would allow us to generate ancillary revenue streams. Relatedly, if such technologies become viable offerings in the future, we may be subject to competition from our competitors within the commercial spaceflight industry, some of which may have substantially greater monetary and knowledge resources than we have and expect to have in the future to devote to the development of these technologies. Further, under the terms of the Amended TMLA, our ability to operationalize some of the technologies may be dependent upon the consent of VEL. Such competition or any limitations on our ability to take advantage of such technologies could impact our market share, which could have a material adverse effect on our business, financial condition and results of operations.

Such research and development initiatives may also have a high degree of risk and involve unproven business strategies and technologies with which we have limited operating or development experience. They may involve claims and liabilities (including, but not limited to, personal injury claims), expenses, regulatory challenges and other risks that we may not be able to anticipate. There can be no assurance that consumer demand for such initiatives will exist or be sustained at the levels that we anticipate, or that any of these initiatives will gain sufficient traction or market acceptance to generate sufficient revenue to offset any new expenses or liabilities associated with these new investments. Further, any such research and development efforts could distract management from current operations, and would divert capital and other resources from our more established offerings and technologies. Even if we were to be successful in developing new products, services, offerings or technologies, regulatory authorities may subject us to new rules or restrictions in response to our innovations that may increase our expenses or prevent us from successfully commercializing new products, services, offerings or technologies.

40

Table of Contents

***The "Virgin" brand is not under our control, and negative publicity related to the Virgin brand name could materially adversely affect our business.***

We believe the "Virgin" brand, which is integral to our corporate identity, represents quality, innovation, creativity, fun, a sense of competitive challenge and employee-friendliness. As part of the Business Combination, we will enter into the Amended TMLA with VEL, an entity affiliated with the Virgin Group, pursuant to which we will obtain rights to use the Virgin brand. For more information on the terms of the Amended TMLA, please refer to the section of this proxy statement/prospectus titled "*Information about the VG Companies—Intellectual Property—Virgin Trademark and License Agreement*." We expect to rely on the general goodwill of consumers and our pilots and employees towards the Virgin brand as part of our internal corporate culture and external marketing strategy. The Virgin brand is also licensed to and used by a number of other companies unrelated to us and in a variety of industries, and the integrity and strength of the Virgin brand will depend in large part on the efforts and the licensor and any other licensees of the Virgin brand and how the brand is used, promoted and protected by them, which will be outside of our control. Consequently, any adverse publicity in relation to the Virgin brand name or its principals, or in relation to another Virgin-branded company over which we have no control or influence, could have a material adverse effect on our business, financial condition and results of operations.

***If we fail to adequately protect our proprietary intellectual property rights, our competitive position could be impaired and we may lose valuable assets, generate reduced revenue and incur costly litigation to protect our rights.***

Our success depends, in part, on our ability to protect our proprietary intellectual property rights, including certain methodologies, practices, tools, technologies and technical expertise we utilize in designing, developing, implementing and maintaining applications and processes used in our spaceflight systems and related technologies. To date, we have relied primarily on trade secrets and other intellectual property laws, non-disclosure agreements with our employees, consultants and other relevant persons and other measures to protect our intellectual property, and intend to continue to rely on these and other means, including patent protection, in the future. However, the steps we take to protect our intellectual property may be inadequate, and we may choose not to pursue or maintain protection for our intellectual property in the United States or foreign jurisdictions. We will not be able to protect our intellectual property if we are unable to enforce our rights or if we do not detect unauthorized use of our intellectual property. Despite our precautions, it may be possible for unauthorized third parties to copy our technology and use information that we regard as proprietary to create technology that competes with ours.

Further, the laws of some countries do not protect proprietary rights to the same extent as the laws of the United States, and mechanisms for enforcement of intellectual property rights in some foreign countries may be inadequate. To the extent we expand our international activities, our exposure to unauthorized copying and use of our technologies and proprietary information may increase. Accordingly, despite our efforts, we may be unable to prevent third parties from infringing upon, misappropriating or otherwise violating our technology and intellectual property.

We rely in part on trade secrets, proprietary know-how and other confidential information to maintain our competitive position. Although we enter into non-disclosure and invention assignment agreements with our employees, enter into non-disclosure agreements with our customers, consultants and other parties with whom we have strategic relationships and business alliances and enter into intellectual property assignment agreements with our consultants and vendors, no assurance can be given that these agreements will be effective in controlling access to and distribution of our technology and proprietary information. Further, these agreements do not prevent our competitors from independently developing technologies that are substantially equivalent or superior to our products.

Table of Contents

***We rely on licenses from third parties for intellectual property that is critical to our business, and we would lose the rights to use such intellectual property if those agreements were terminated or not renewed.***

We rely on licenses from third parties for certain intellectual property that is critical to our branding and corporate identity, as well as the technology used in our spacecraft. Termination of our current or future license agreements could cause us to have to negotiate new or restated agreements with less favorable terms or cause us to lose our rights under the original agreements.

In the case of our branding, we will not own the Virgin brand or any other Virgin-related assets, as we will license the right to use the Virgin brand pursuant to the Amended TMLA. VEL controls the Virgin brand, and the integrity and strength of the Virgin brand will depend in large part on the efforts and businesses of VEL and the other licensees of the Virgin brand and how the brand is used, promoted and protected by them, which will be outside of our control. For example, negative publicity or events affecting or occurring at VEL or other entities who use the Virgin brand, including transportation companies and/or other entities unrelated to us that presently or in the future may license the Virgin brand, may negatively impact the public's perception of us, which may have a material adverse effect on our business, contracts, financial condition, operating results, liquidity and prospects.

In addition, the license to the Virgin brand granted to us under the Amended TMLA will expire in no later than forty-five years under the terms of the agreement and there is no guarantee that we will renew or replace the Amended TMLA on commercially reasonable terms or at all. In addition, there are certain circumstances under which the Amended TMLA may be terminated in its entirety, including our material breach of the Amended TMLA (subject to a cure period, if applicable), our insolvency, our improper use of the Virgin brand, our failure to commercially launch a spaceflight for paying passengers by a specified date, if we are unable to undertake any commercial flights for paying passengers for a specified period (other than in connection with addressing a significant safety issue), and our undergoing of a change of control to an unsuitable buyer, including a competitor of VEL's group. Termination of the Amended TMLA would eliminate our rights to use the Virgin brand and may result in our having to negotiate a new or reinstated agreement with less favorable terms or cause us to lose our rights under the Amended TMLA, including our right to use the Virgin brand, which would require us to change our corporate name and undergo other significant rebranding efforts. These rebranding efforts may require significant resources and expenses and may affect our ability to attract and retain customers, all of which may have a material adverse effect on our business, contracts, financial condition, operating results, liquidity and prospects.

In the case of a loss of technology used in our spaceflight systems, we may not be able to continue to manufacture certain components for our spacecraft or for our operations or may experience disruption to our manufacturing processes as we test and requalify any potential replacement technology. Even if we retain the licenses, the licenses may not be exclusive with respect to such component design or technologies, which could aid our competitors and have a negative impact on our business.

***Protecting and defending against intellectual property claims may have a material adverse effect on our business.***

Our success depends in part upon successful prosecution, maintenance, enforcement and protection of our owned and licensed intellectual property, including the Virgin brand and other intellectual property that we license from VEL under the Amended TMLA. Under the terms of the Amended TMLA, VEL has the primary right to take actions to obtain, maintain, enforce and protect the Virgin brand. If, following our written request, VEL elects not take an action to maintain, enforce or protect the Virgin brand, we may do so, at our expense, subject to various conditions including that so long as doing so would not have a material adverse effect on VEL, any of VEL's other licensees or the Virgin brand and we reasonably believe failing to do so would materially adversely affect our business. Should VEL determine not to maintain, enforce or protect the Virgin brand, we and/or the Virgin brand could be materially harmed and we could incur substantial cost if we elect to take any such action.

42

Table of Contents

To protect our intellectual property rights, we may be required to spend significant resources to monitor and protect these rights. Litigation may be necessary in the future to enforce our intellectual property rights and to protect our trade secrets. Such litigation could be costly, time consuming and distracting to management and could result in the impairment or loss of portions of our intellectual property. Furthermore, our efforts to enforce our intellectual property rights may be met with defenses, counterclaims and countersuits attacking the validity and enforceability of our intellectual property rights. Our inability to protect our proprietary technology, as well as any costly litigation or diversion of our management's attention and resources, could disrupt our business, as well as have a material adverse effect on our financial condition and results of operations. The results of intellectual property litigation are difficult to predict and may require us to stop using certain technologies or offering certain services or may result in significant damage awards or settlement costs. There is no guarantee that any action to defend, maintain or enforce our owned or licensed intellectual property rights will be successful, and an adverse result in any such proceeding could have a material adverse impact on our business, financial condition, operating results and prospects.

In addition, we may from time to time face allegations that we are infringing, misappropriating or otherwise violating the intellectual property rights of third parties, including the intellectual property rights of our competitors. We may be unaware of the intellectual property rights that others may claim cover some or all of our technology or services. Irrespective of the validity of any such claims, we could incur significant costs and diversion of resources in defending against them, and there is no guarantee any such defense would be successful, which could have a material adverse effect on our business, contracts, financial condition, operating results, liquidity and prospects.

Even if these matters do not result in litigation or are resolved in our favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could divert the time and resources of our management team and harm our business, our operating results and our reputation.

***We have government customers, which subjects us to risks including early termination, audits, investigations, sanctions and penalties.***

We derive limited revenue from contracts with NASA and the U.S. government and may enter into further contracts with the U.S. or foreign governments in the future, and this subjects us to statutes and regulations applicable to companies doing business with the government, including the Federal Acquisition Regulation. These government contracts customarily contain provisions that give the government substantial rights and remedies, many of which are not typically found in commercial contracts and which are unfavorable to contractors. For instance, most U.S. government agencies include provisions that allow the government to unilaterally terminate or modify contracts for convenience, and in that event, the counterparty to the contract may generally recover only its incurred or committed costs and settlement expenses and profit on work completed prior to the termination. If the government terminates a contract for default, the defaulting party may be liable for any extra costs incurred by the government in procuring undelivered items from another source.

Some of our federal government contracts are subject to the approval of appropriations being made by the U.S. Congress to fund the expenditures under these contracts. In addition, government contracts normally contain additional requirements that may increase our costs of doing business, reduce our profits, and expose us to liability for failure to comply with these terms and conditions. These requirements include, for example:

- specialized disclosure and accounting requirements unique to government contracts;
- financial and compliance audits that may result in potential liability for price adjustments, recoupment of government funds after such funds have been spent, civil and criminal penalties, or administrative sanctions such as suspension or debarment from doing business with the U.S. government;
- public disclosures of certain contract and company information; and
- mandatory socioeconomic compliance requirements, including labor requirements, non-discrimination and affirmative action programs and environmental compliance requirements.

43

Table of Contents

Government contracts are also generally subject to greater scrutiny by the government, which can initiate reviews, audits and investigations regarding our compliance with government contract requirements. In addition, if we fail to comply with government contract laws, regulations and contract requirements, our contracts may be subject to termination, and we may be subject to financial and/or other liability under our contracts, the Federal Civil False Claims Act (including treble damages and other penalties), or criminal law. In particular, the False Claims Act's "whistleblower" provisions also allow private individuals, including present and former employees, to sue on behalf of the U.S. government. Any penalties, damages, fines, suspension, or damages could adversely affect our ability to operate our business and our financial results.

***If we commercialize outside the United States, we will be exposed to a variety of risks associated with international operations that could materially and adversely affect our business.***

As part of our growth strategy, we may leverage our initial U.S. operations to expand internationally. In that event, we expect that we would be subject to additional risks related to entering into international business relationships, including:

- restructuring our operations to comply with local regulatory regimes;
- identifying, hiring and training highly skilled personnel;
- unexpected changes in tariffs, trade barriers and regulatory requirements, including ITAR, EAR and OFAC;
- economic weakness, including inflation, or political instability in foreign economies and markets;
- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;
- foreign taxes, including withholding of payroll taxes;
- the need for U.S. government approval to operate our spaceflight systems outside the United States;
- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue;
- government appropriation of assets;
- workforce uncertainty in countries where labor unrest is more common than in the United States; and
- disadvantages of competing against companies from countries that are not subject to U.S. laws and regulations, including the FCPA, OFAC regulations and U.S. anti-money laundering regulations, as well as exposure of our foreign operations to liability under these regulatory regimes.

***Our business is subject to a wide variety of extensive and evolving government laws and regulations. Failure to comply with such laws and regulations could have a material adverse effect on our business.***

We are subject to a wide variety of laws and regulations relating to various aspects of our business, including with respect to our spaceflight system operations, employment and labor, health care, tax, privacy and data security, health and safety, and environmental issues. Laws and regulations at the foreign, federal, state and local levels frequently change, especially in relation to new and emerging industries, and we cannot always reasonably predict the impact from, or the ultimate cost of compliance with, current or future regulatory or administrative changes. We monitor these developments and devote a significant amount of management's time and external resources towards compliance with these laws, regulations and guidelines, and such compliance places a significant burden on management's time and other resources, and it may limit our ability to expand into certain jurisdictions. Moreover, changes in law, the imposition of new or additional regulations or the enactment of any new or more stringent legislation that impacts our business could require us to change the way we operate and could have a material adverse effect on our sales, profitability, cash flows and financial condition.

44

Table of Contents

Failure to comply with these laws, such as with respect to obtaining and maintaining licenses, certificates, authorizations and permits critical for the operation of our business, may result in civil penalties or private lawsuits, or the suspension or revocation of licenses, certificates, authorizations or permits, which would prevent us from operating our business. For example, commercial space launches, reentry of our spacecraft and the operation of our spaceflight system in the United States require licenses and permits from certain agencies of the DOT, including the FAA, and review by other agencies of the U.S. Government, including the Department of Defense, Department of State, NASA, and Federal Communications Commission. License approval includes an interagency review of safety, operational, national security, and foreign policy and international obligations implications, as well as a review of foreign ownership. In 2016, the FAA granted us our commercial space launch license with a limited number of verification and validation steps that we must complete before we can include customers on our spaceflights. While we are in the process of completing those steps, delays in FAA action allowing us to conduct spaceflights with customers on board imposed by the agency could adversely affect our ability to operate our business and our financial results.

Additionally, the FAA and other state government agencies also enforce informed consent and cross-waiver requirements for spaceflight participants and have the authority to regulate training and medical requirements for crew. Certain related federal and state laws provide for indemnification or immunity in the event of certain losses. However, this indemnification is subject to limits, and money to be used for indemnification under federal laws is still subject to appropriation by Congress. Furthermore, no such claim regarding the immunity provided by these informed consent provisions has been brought in New Mexico or in federal courts, and we are unable to determine whether the protections provided by applicable laws or regulations would be upheld by U.S. or foreign courts. See "*Information about the VG Companies—Regulatory—Federal Aviation Administration*" and "*Information about the VG Companies—Regulatory—Informed Consent and Waiver.*"

Moreover, regulation of our industry is still evolving, and new or different laws or regulations could affect our operations, increase direct compliance costs for us or cause any third-party suppliers or contractors to raise the prices they charge us because of increased compliance costs. For example, the FAA has an open notice of proposed rulemaking relating to commercial space launches, which could affect us and our operations. Application of these laws to our business may negatively impact our performance in various ways, limiting the collaborations we may pursue, further regulating the export and re-export of our products, services, and technology from the United States and abroad, and increasing our costs and the time necessary to obtain required authorization. The adoption of a multi-layered regulatory approach to any one of the laws or regulations to which we are or may become subject, particularly where the layers are in conflict, could require alteration of our manufacturing processes or operational parameters which may adversely impact our business. Potential conflicts between U.S. policy and international law defining the altitude above the earth's surface where "space" begins and defining the status of, and obligations toward, spaceflight participants could introduce an additional level of legal and commercial complexity. We may not be in complete compliance with all such requirements at all times and, even when we believe we are in complete compliance, a regulatory agency may determine that we are not.

***We are subject to stringent U.S. export and import control laws and regulations. Unfavorable changes in these laws and regulations or U.S. government licensing policies, our failure to secure timely U.S. government authorizations under these laws and regulations, or our failure to comply with these laws and regulations could have a material adverse effect on our business, financial condition and results of operation.***

Our business is subject to stringent U.S. import and export control laws and regulations as well as economic sanctions laws and regulations. We are required to import and export our products, software, technology and services, as well as run our operations in the United States, in full compliance with such laws and regulations, which include the EAR, the ITAR, and economic sanctions administered by the Treasury Department's OFAC. Similar laws that impact our business exist in other jurisdictions. These foreign trade controls prohibit, restrict, or regulate our ability to, directly or indirectly, export, deemed export, re-export, deemed re-export or transfer certain hardware, technical data, technology, software, or services to certain countries and territories, entities, and individuals, and for end uses. If we are found to be in violation of these laws and regulations, it could result in

45

**Table of Contents**

civil and criminal, monetary and non-monetary penalties, the loss of export or import privileges, debarment and reputational harm.

Pursuant to these foreign trade control laws and regulations, we are required, among other things, to (i) maintain a registration under the ITAR, (ii) determine the proper licensing jurisdiction and export classification of products, software, and technology, and (iii) obtain licenses or other forms of U.S. government authorization to engage in the conduct of our spaceflight business. The authorization requirements include the need to get permission to release controlled technology to foreign person employees and other foreign persons. Changes in U.S. foreign trade control laws and regulations, or reclassifications of our products or technologies, may restrict our operations. The inability to secure and maintain necessary licenses and other authorizations could negatively impact our ability to compete successfully or to operate our spaceflight business as planned. Any changes in the export control regulations or U.S. government licensing policy, such as those necessary to implement U.S. government commitments to multilateral control regimes, may restrict our operations. Given the great discretion the government has in issuing or denying such authorizations to advance U.S. national security and foreign policy interests, there can be no assurance we will be successful in our future efforts to secure and maintain necessary licenses, registrations, or other U.S. government regulatory approvals.

***Failure to comply with federal, state and foreign laws and regulations relating to privacy, data protection and consumer protection, or the expansion of current or the enactment of new laws or regulations relating to privacy, data protection and consumer protection, could adversely affect our business and our financial condition.***

We collect, store, process, and use personal information and other customer data, including medical information, and we rely in part on third parties that are not directly under our control to manage certain of these operations and to collect, store, process and use payment information. Due to the volume and sensitivity of the personal information and data we and these third parties manage and expect to manage in the future, as well as the nature of our customer base, the security features of our information systems are critical. A variety of federal, state and foreign laws and regulations govern the collection, use, retention, sharing and security of this information. Laws and regulations relating to privacy, data protection and consumer protection are evolving and subject to potentially differing interpretations. These requirements may not be harmonized, may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another or may conflict with other rules or our practices. As a result, our practices may not have complied or may not comply in the future with all such laws, regulations, requirements and obligations.

We expect that new industry standards, laws and regulations will continue to be proposed regarding privacy, data protection and information security in many jurisdictions, including the CCPA, which will go into effect on January 1, 2020, and the European e-Privacy Regulation, which is currently in draft form. We cannot yet determine the impact such future laws, regulations and standards may have on our business. Complying with these evolving obligations is costly. For instance, expanding definitions and interpretations of what constitutes "personal data" (or the equivalent) within the United States, the EEA and elsewhere may increase our compliance costs and legal liability.

As we have expanded our international presence, we are also subject to additional privacy rules, many of which, such as the GDPR and national laws supplementing the GDPR, such as in the United Kingdom, are significantly more stringent than those currently enforced in the United States. The law requires companies to meet stringent requirements regarding the handling of personal data of individuals located in the EEA. These more stringent requirements include expanded disclosures to inform customers about how we may use their personal data through external privacy notices, increased controls on profiling customers and increased rights for data subjects (including customers and employees) to access, control and delete their personal data. In addition, there are mandatory data breach notification requirements. The law also includes significant penalties for non-compliance, which may result in monetary penalties of up to the higher of €20.0 million or 4% of a group's worldwide turnover for the preceding financial year for the most serious violations. The GDPR and other similar

46

Table of Contents

regulations require companies to give specific types of notice and informed consent is required for the placement of a cookie or similar technologies on a user's device for online tracking for behavioral advertising and other purposes and for direct electronic marketing, and the GDPR also imposes additional conditions in order to satisfy such consent, such as a prohibition on pre-checked tick boxes and bundled consents, thereby requiring customers to affirmatively consent for a given purpose through separate tick boxes or other affirmative action.

A significant data breach or any failure, or perceived failure, by us to comply with any federal, state or foreign privacy or consumer protection-related laws, regulations or other principles or orders to which we may be subject or other legal obligations relating to privacy or consumer protection could adversely affect our reputation, brand and business, and may result in claims, investigations, proceedings or actions against us by governmental entities or others or other penalties or liabilities or require us to change our operations and/or cease using certain data sets. Depending on the nature of the information compromised, we may also have obligations to notify users, law enforcement or payment companies about the incident and may need to provide some form of remedy, such as refunds, for the individuals affected by the incident.

### Failures in our technology infrastructure could damage our business, reputation and brand and substantially harm our business and results of operations.

If our main data center were to fail, or if we were suffer an interruption or degradation of services at our main data center, we could lose important manufacturing and technical data, which could harm our business. Our facilities are vulnerable to damage or interruption from earthquakes, hurricanes, floods, fires, cyber security attacks, terrorist attacks, power losses, telecommunications failures and similar events. In the event that our or any third-party provider's systems or service abilities are hindered by any of the events discussed above, our ability to operate may be impaired. A decision to close the facilities without adequate notice, or other unanticipated problems, could adversely impact our operations. Any of the aforementioned risks may be augmented if our or any third-party provider's business continuity and disaster recovery plans prove to be inadequate. The facilities also could be subject to break-ins, computer viruses, sabotage, intentional acts of vandalism and other misconduct. Any security breach, including personal data breaches, or incident, including cybersecurity incidents, that we experience could result in unauthorized access to, misuse of or unauthorized acquisition of our or our customers' data, the loss, corruption or alteration of this data, interruptions in our operations or damage to our computer hardware or systems or those of our customers. Moreover, negative publicity arising from these types of disruptions could damage our reputation. We may not carry sufficient business interruption insurance to compensate us for losses that may occur as a result of any events that cause interruptions in our service. Significant unavailability of our services due to attacks could cause users to cease using our services and materially and adversely affect our business, prospects, financial condition and results of operations.

We use complex proprietary software in our technology infrastructure, which we seek to continually update and improve. Replacing such systems is often time-consuming and expensive, and can also be intrusive to daily business operations. Further, we may not always be successful in executing these upgrades and improvements, which may occasionally result in a failure of our systems. We may experience periodic system interruptions from time to time. Any slowdown or failure of our underlying technology infrastructure could harm our business, reputation and ability to acquire and serve our customers, which could materially adversely affect our results of operations. Our disaster recovery plan or those of our third-party providers may be inadequate, and our business interruption insurance may not be sufficient to compensate us for the losses that could occur.

### We are highly dependent on our senior management team and other highly skilled personnel, and if we are not successful in attracting or retaining highly qualified personnel, we may not be able to successfully implement our business strategy.

Our success depends, in significant part, on the continued services of our senior management team and on our ability to attract, motivate, develop and retain a sufficient number of other highly skilled personnel, including pilots, manufacturing and quality assurance, engineering, design, finance, marketing, sales and support

47

Table of Contents

personnel. Our senior management team has extensive experience in the aerospace industry, and we believe that their depth of experience is instrumental to our continued success. The loss of any one or more members of our senior management team, for any reason, including resignation or retirement, could impair our ability to execute our business strategy and have a material adverse effect on our business, financial condition and results of operations.

Competition for qualified highly skilled personnel can be strong, and we can provide no assurance that we will be successful in attracting or retaining such personnel now or in the future. We have not yet started commercial spaceflight operations, and our estimates of the required team size to support our estimated flight rates may require increases in staffing levels that may require significant capital expenditure. Further, any inability to recruit, develop and retain qualified employees may result in high employee turnover and may force us to pay significantly higher wages, which may harm our profitability. Additionally, we do not carry key man insurance for any of our management executives, and the loss of any key employee or our inability to recruit, develop and retain these individuals as needed, could have a material adverse effect on our business, financial condition and results of operations.

***Any acquisitions, partnerships or joint ventures that we enter into could disrupt our operations and have a material adverse effect on our business, financial condition and results of operations.***

From time to time, we may evaluate potential strategic acquisitions of businesses, including partnerships or joint ventures with third parties. We may not be successful in identifying acquisition, partnership and joint venture candidates. In addition, we may not be able to continue the operational success of such businesses or successfully finance or integrate any businesses that we acquire or with which we form a partnership or joint venture. We may have potential write-offs of acquired assets and/or an impairment of any goodwill recorded as a result of acquisitions. Furthermore, the integration of any acquisition may divert management's time and resources from our core business and disrupt our operations or may result in conflicts with our business. Any acquisition, partnership or joint venture may not be successful, may reduce our cash reserves, may negatively affect our earnings and financial performance and, to the extent financed with the proceeds of debt, may increase our indebtedness. We cannot ensure that any acquisition, partnership or joint venture we make will not have a material adverse effect on our business, financial condition and results of operations.

***We are subject to many hazards and operational risks that can disrupt our business, including interruptions or disruptions in service at our primary facilities, which could have a material adverse effect on our business, financial condition and results of operations.***

Our operations are subject to many hazards and operational risks inherent to our business, including general business risks, product liability and damage to third parties, our infrastructure or properties that may be caused by fires, floods and other natural disasters, power losses, telecommunications failures, terrorist attacks, human errors and similar events. Additionally, our manufacturing operations are hazardous at times and may expose us to safety risks, including environmental risks and health and safety hazards to our employees or third parties.

Moreover, our commercial spaceflight operations are being moved to operate entirely out of a single facility, Spaceport America, in New Mexico, and our manufacturing operations are based in Mojave, California. Any significant interruption due to any of the above hazards and operational to the manufacturing or operation of our spaceflight systems at one of our primary facilities, including from weather conditions, growth constraints, performance by third-party providers (such as electric, utility or telecommunications providers), failure to properly handle and use hazardous materials, failure of computer systems, power supplies, fuel supplies, infrastructure damage, disagreements with the owners of the land on which our facilities are located, or damage sustained to our runway could result in manufacturing delays or the delay or cancellation of our spaceflights and, as a result, could have a material adverse effect on our business, financial condition and results of operations.

In addition, Spaceport America is run by a state agency, the New Mexico Spaceport Authority, and there may be delays or impacts to operations due to considerations unique to doing business with a government

48

**Table of Contents**

agency. For example, governmental agencies often have an extended approval process for service contracts, which may result in delays or limit the timely operation of our Spaceport America facilities.

Moreover, our insurance coverage may be inadequate to cover our liabilities related to such hazards or operational risks. In addition, passenger insurance may not be accepted or may be prohibitive to procure. Moreover, we may not be able to maintain adequate insurance in the future at rates we consider reasonable and commercially justifiable, and insurance may not continue to be available on terms as favorable as our current arrangements. The occurrence of a significant uninsured claim, or a claim in excess of the insurance coverage limits maintained by us, could harm our business, financial condition and results of operations.

*Natural disasters, unusual weather conditions, epidemic outbreaks, terrorist acts and political events could disrupt our business and flight schedule.*

The occurrence of one or more natural disasters such as tornadoes, hurricanes, fires, floods and earthquakes, unusual weather conditions, epidemic outbreaks, terrorist attacks or disruptive political events in certain regions where our facilities are located, or where our third-party contractors' and suppliers' facilities are located, could adversely affect our business. Natural disasters including tornados, hurricanes, floods and earthquakes may damage our facilities or those of our suppliers, which could have a material adverse effect on our business, financial condition and results of operations. Severe weather, such as rainfall, snowfall or extreme temperatures, may impact the ability for spaceflight to occur as planned, resulting in additional expense to reschedule the operation and customer travel plans, thereby reducing our sales and profitability. Terrorist attacks, actual or threatened acts of war or the escalation of current hostilities, or any other military or trade disruptions impacting our domestic or foreign suppliers of components of our products, may impact our operations by, among other things, causing supply chain disruptions and increases in commodity prices, which could adversely affect our raw materials or transportation costs. These events also could cause or act to prolong an economic recession in the United States or abroad. To the extent these events also impact one or more of our suppliers or contractors or result in the closure of any of their facilities or our facilities, we may be unable to maintain spaceflight schedules, provide other support functions to our astronaut experience or fulfill our other contracts. In addition, the disaster recovery and business continuity plans we have in place currently are limited and are unlikely to prove adequate in the event of a serious disaster or similar event. We may incur substantial expenses as a result of the limited nature of our disaster recovery and business continuity plans and, more generally, any of these events could cause consumer confidence and spending to decrease, which could adversely impact our commercial spaceflight operations.

*We have identified two material weaknesses in our internal control over financial reporting and may identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control, which may result in material misstatements of our financial statements or cause us to fail to meet our periodic reporting obligations.*

In connection with the audit of our combined financial statements as of and for the year ended December 31, 2018, we identified two material weaknesses in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. The first material weakness is related to the lack of a sufficient number of personnel to execute, review and approve all aspects of the financial statement close and reporting process. This material weakness may not allow for us to have proper segregation of duties and the ability to close our books and records and report our results, including required disclosures, on a timely basis. The second material weakness arises from the need to augment our information technology and application controls.

We are in the process of designing and implementing measures to improve our internal control over financial reporting to remediate the material weaknesses, primarily by implementing additional review procedures within our accounting and finance department, hiring additional staff, designing and implementing

Table of Contents

information technology and application controls in our financially significant systems, and, if appropriate, engaging external accounting experts to supplement our internal resources in our computation and review processes. While we are designing and implementing measures to remediate the material weaknesses, we cannot predict the success of such measures or the outcome of our assessment of these measures at this time. We can give no assurance that these measures will remediate either of the deficiencies in internal control or that additional material weaknesses or significant deficiencies in our internal control over financial reporting will not be identified in the future. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that may lead to a restatement of our financial statements or cause us to fail to meet our reporting obligations.

As a public company, we will be required, pursuant to Section 404 of the Sarbanes-Oxley Act, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting for each annual report on Form 10-K to be filed with the SEC. This assessment will need to include disclosure of any material weaknesses identified by our management in our internal control over financial reporting. Our independent registered public accounting firm will also be required to attest to the effectiveness of our internal control over financial reporting in each annual report on Form 10-K to be filed with the SEC. We will be required to disclose changes made in our internal control and procedures on a quarterly basis. To comply with the requirements of being a public company, we expect to need to undertake various actions, such as implementing new internal controls and procedures and hiring accounting or internal audit staff. Failure to comply with the Sarbanes-Oxley Act could potentially subject us to sanctions or investigations by the SEC, the NYSE or other regulatory authorities, which would require additional financial and management resources. We have begun the costly and challenging process of compiling the system and processing documentation necessary to perform the evaluation needed to comply with Section 404, but we may not be able to complete our evaluation, testing and any required remediation in a timely fashion.

***Our operating results may fluctuate significantly, which makes our future operating results difficult to predict and could cause our operating results to fall below expectations or any guidance we may provide.***

Our quarterly and annual operating results may fluctuate significantly, which makes it difficult for us to predict our future operating results. These fluctuations may occur due to a variety of factors, many of which are outside of our control, including:
- the number of flights we schedule for a period, the number of seats we are able to sell in any given spaceflight and the price at which we sell them;
- unexpected weather patterns, maintenance issues, natural disasters or other events that force us to cancel or reschedule flights;
- the cost of raw materials or supplied components critical for the manufacture and operation of our spaceflight system;
- the timing and cost of, and level of investment in, research and development relating to our technologies and our current or future facilities;
- developments involving our competitors;
- changes in governmental regulations or in the status of our regulatory approvals or applications;
- future accounting pronouncements or changes in our accounting policies; and
- general market conditions and other factors, including factors unrelated to our operating performance or the operating performance of our competitors.

The individual or cumulative effects of factors discussed above could result in large fluctuations and unpredictability in our quarterly and annual operating results. As a result, comparing our operating results on a period-to-period basis may not be meaningful.

50

Table of Contents

This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our revenue or operating results fall below the expectations of analysts or investors or below any guidance we may provide, or if the guidance we provide is below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any previously publicly stated guidance we may provide.

*We may become involved in litigation that may materially adversely affect us.*

From time to time, we may become involved in various legal proceedings relating to matters incidental to the ordinary course of our business, including intellectual property, commercial, product liability, employment, class action, whistleblower and other litigation and claims, and governmental and other regulatory investigations and proceedings. Such matters can be time-consuming, divert management's attention and resources, cause us to incur significant expenses or liability or require us to change our business practices. Because of the potential risks, expenses and uncertainties of litigation, we may, from time to time, settle disputes, even where we believe that we have meritorious claims or defenses. Because litigation is inherently unpredictable, we cannot assure you that the results of any of these actions will not have a material adverse effect on our business.

*We are subject to environmental regulation and may incur substantial costs.*

We are subject to federal, state, local and foreign laws, regulations and ordinances relating to the protection of the environment, including those relating to emissions to the air, discharges to surface and subsurface waters, safe drinking water, greenhouse gases and the management of hazardous substances, oils and waste materials. Federal, state and local laws and regulations relating to the protection of the environment may require a current or previous owner or operator of real estate to investigate and remediate hazardous or toxic substances or petroleum product releases at or from the property. Under federal law, generators of waste materials, and current and former owners or operators of facilities, can be subject to liability for investigation and remediation costs at locations that have been identified as requiring response actions. Compliance with environmental laws and regulations can require significant expenditures. In addition, we could incur costs to comply with such current or future laws and regulations, the violation of which could lead to substantial fines and penalties.

We may have to pay governmental entities or third parties for property damage and for investigation and remediation costs that they incurred in connection with any contamination at our current and former properties without regard to whether we knew of or caused the presence of the contaminants. Liability under these laws may be strict, joint and several, meaning that we could be liable for the costs of cleaning up environmental contamination regardless of fault or the amount of waste directly attributable to us. Even if more than one person may have been responsible for the contamination, each person covered by these environmental laws may be held responsible for all of the clean-up costs incurred. Environmental liabilities could arise and have a material adverse effect on our financial condition and performance. We do not believe, however, that pending environmental regulatory developments in this area will have a material effect on our capital expenditures or otherwise materially adversely affect its operations, operating costs, or competitive position.

*Changes in tax laws or regulations may increase tax uncertainty and adversely affect results of our operations and our effective tax rate.*

We will be subject to taxes in the United States and certain foreign jurisdictions. Due to economic and political conditions, tax rates in various jurisdictions, including the United States, may be subject to change. Our future effective tax rates could be affected by changes in the mix of earnings in countries with differing statutory tax rates, changes in the valuation of deferred tax assets and liabilities and changes in tax laws or their interpretation. In addition, we may be subject to income tax audits by various tax jurisdictions. Although we believe our income tax liabilities are reasonably estimated and accounted for in accordance with applicable laws and principles, an adverse resolution by one or more taxing authorities could have a material impact on the results of our operations.

51

Table of Contents

*Recent U.S. tax legislation could adversely affect our business and financial condition.*

Legislation enacted in December 2017 significantly changed the U.S. federal income taxation of U.S. corporations, including by reducing the U.S. corporate income tax rate, limiting interest deductions, permitting immediate expensing of certain capital expenditures, adopting elements of a territorial tax system, imposing a one-time transition tax, or repatriation tax, on all undistributed earnings and profits of certain U.S.-owned foreign corporations, revising the rules governing net operating losses and the rules governing foreign tax credits, and introducing new anti-base erosion provisions. Notwithstanding the reduction in the corporate income tax rate, the overall impact of this tax reform or of any future administrative guidance interpreting the provisions thereof is uncertain, and our business and financial condition could be adversely affected.

**Risks Related to the Business Combination and SCH**

*The Sponsor has agreed to vote in favor of the Business Combination, regardless of how our public shareholders vote.*

Unlike some other blank check companies in which the initial shareholders agree to vote their shares in accordance with the majority of the votes cast by the public shareholders in connection with an initial business combination, the Sponsor and each officer and director of SCH have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement. As of the date of this proxy statement/prospectus, the Sponsor owns 20% of the issued and outstanding ordinary shares.

*Neither the SCH board of directors nor any committee thereof obtained a third party valuation in determining whether or not to pursue the Business Combination.*

Neither the SCH board of directors nor any committee thereof is required to obtain an opinion from an independent investment banking or accounting firm that the price that we are paying for the VG Companies is fair to us from a financial point of view. Neither the SCH board of directors nor any committee thereof obtained a third party valuation in connection with the Business Combination. In analyzing the Business Combination, the SCH board of directors and management conducted due diligence on the VG Companies. The SCH board of directors reviewed comparisons of selected financial data of the VG Companies with their peers in the industry and the financial terms set forth in the Merger Agreement, and concluded that the Business Combination was in the best interest of its shareholders. Accordingly, investors will be relying solely on the judgment of the SCH board of directors and management in valuing the VG Companies, and the SCH board of directors and management may not have properly valued such businesses. The lack of a third party valuation may also lead an increased number of shareholders to vote against the Business Combination or demand redemption of their shares, which could potentially impact our ability to consummate the Business Combination.

*We may be forced to close the Business Combination even if we determined it is no longer in our shareholders' best interest.*

Our public shareholders are protected from a material adverse event of the VG Companies arising between the date of the Merger Agreement and the Closing primarily by the right to redeem their public shares for a pro rata portion of the funds held in the trust account, calculated as of two business days prior to the vote at the extraordinary general meeting. Accordingly, if a material adverse event were to occur after approval of the Condition Precedent Proposals at the extraordinary general meeting, we may be forced to close the Business Combination even if we determine it is no longer in our shareholders' best interest to do so (as a result of such material adverse event) which could have a significant negative impact on our business, financial condition or results of operations.

Additionally, if we do not obtain shareholder approval at the extraordinary general meeting, VG can continually obligate us to hold additional extraordinary general meetings to vote on the Condition Precedent

52

Table of Contents

Proposals until the earlier of such shareholder approval being obtained and September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), the date by which we must cease all operations and begin to windup if we have not completed a business combination. This could limit our ability to seek an alternative business combination that our shareholders may prefer after such initial vote.

***Since the Sponsor and SCH's directors and executive officers have interests that are different, or in addition to (and which may conflict with), the interests of our shareholders, a conflict of interest may have existed in determining whether the Business Combination with the VG Companies is appropriate as our initial business combination. Such interests include that Sponsor will lose its entire investment in us if our business combination is not completed.***

When you consider the recommendation of SCH's board of directors in favor of approval of the BCA Proposal, you should keep in mind that the Sponsor and SCH's directors and executive officers have interests in such proposal that are different from, or in addition to, those of SCH shareholders and warrant holders generally. These interests include, among other things, the interests listed below:

- If SCH does not consummate a business combination by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders, or if such date is further extended at a duly called extraordinary general meeting, such later date), it would cease all operations except for the purpose of winding up, redeeming all of the outstanding public shares for cash and, subject to the approval of its remaining shareholders and its board of directors, dissolving and liquidating, subject in each case to its obligations under the Cayman Islands Companies Law to provide for claims of creditors and the requirements of other applicable law. In such event, the 17,250,000 SCH Class B ordinary shares owned by the Sponsor would be worthless because following the redemption of the public shares, SCH would likely have few, if any, net assets and because the Sponsor has agreed to waive its rights to liquidating distributions from the trust account with respect to the Sponsor if SCH fails to complete a business combination within the required period. The Sponsor purchased the SCH Class B ordinary shares prior to SCH's initial public offering for approximately $0.0001 per share and certain of SCH's directors and executive officers, including Chamath Palihapitiya and Ian Osborne, have an economic interest in such shares. The shares of VGH, Inc. common stock that the Sponsor will hold following the Mergers (including after giving effect to the Domestication), if unrestricted and freely tradable, would have had aggregate market value of $ based upon the closing price of $ per share of public share on the NYSE on , 2019, the most recent closing price. Given such shares of VGH, Inc. common stock will be subject to certain restrictions, including those described above, SCH believes such shares have less value.
- Chamath Palihapitiya, SCH's Chief Executive Officer and Chairman of SCH's board of directors, is expected to be the Chairperson of the board of directors of VGH, Inc. after the consummation of the Business Combination. As such, in the future, Mr. Palihapitiya will receive any cash fees, stock options, stock awards or other remuneration that VGH, Inc.'s board of directors determines to pay to him.
- Adam Bain and James Ryans, current directors of SCH, are expected to be directors of VGH, Inc. after the consummation of the Business Combination (it is also anticipated that Dr. Ryans will serve as the chairperson of the audit committee of the Board). As such, in the future, Mr. Bain and Dr. Ryans will receive any cash fees, stock options, stock awards or other remuneration that VGH, Inc.'s board of directors determines to pay to them.
- In connection with the execution of the Merger Agreement, the board of directors of SCH approved a grant of the Director RSU Awards to select members of the board of directors of SCH that, at the Closing, will vest and be converted into the right to receive an aggregate of 1,500,000 shares of VGH, Inc. common stock. The Director RSU Awards will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1st and December 31st of the year following the Closing. The grant and vesting of the Director RSU Awards are contingent upon, among

53

Table of Contents

other things, the consummation of the Business Combination, the approval of the 2019 Plan by SCH's shareholders at the extraordinary general meeting and the continued service of the respective participants on the board of directors of SCH through the Closing Date.

- SCH's existing directors and officers will be eligible for continued indemnification and continued coverage under a directors' and officers' liability insurance policy after the Mergers and pursuant to the Merger Agreement.

- In the event that SCH fails to consummate a business combination within the prescribed time frame (pursuant to the Cayman Constitutional Documents), or upon the exercise of a redemption right in connection with the Business Combination (or our extension proposal), SCH will be required to provide for payment of claims of creditors that were not waived that may be brought against SCH within the 10 years following such redemption. In order to protect the amounts held in the trust account, the Sponsor has agreed that it will be liable to SCH if and to the extent any claims by a third party (other than SCH's independent auditors) for services rendered or products sold to SCH, or a prospective target business with which SCH has discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case, net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under the indemnity of the underwriters of SCH's initial public offering against certain liabilities, including liabilities under the Securities Act.

- A party related to our Sponsor and certain of our officers and directors has advanced funds to us for working capital purposes, including $0.4 million as of March 31, 2019. These advances are non-interest bearing, unsecured and due on demand. If we do not complete our initial business combination within the required period, we may use a portion of our working capital held outside the trust account to repay such advances and any other working capital advances made to us, but no proceeds held in the trust account would be used to repay such advances and any other working capital advances made to us, and such related party may not be able to recover the value it has loaned us and any other working capital advances it may make.

- In connection with the Public Offering, the underwriters of the Public Offering agreed to reimburse the Company for amounts paid by the Company to Connaught (UK) Limited for financial advisory services in an amount equal to 10% of the discount paid to the underwriters, of which $1.0 million was paid at the closing of the Public Offering and up to $2.4 million will be payable at the time of the closing of the initial Business Combination. Connaught (UK) Limited is an affiliate of us, our Sponsor and certain of our officers and directors.

- Following consummation of the Business Combination, the Sponsor, SCH's officers and directors and their respective affiliates would be entitled to reimbursement for certain out-of-pocket expenses related to identifying, investigating and consummating an initial business combination or repayment of loans, if any, and on such terms as to be determined by SCH from time to time, made by the Sponsor or any of SCH's officers or directors to finance transaction costs in connection with an intended initial business combination. However, if SCH fails to consummate a business combination within the required period, none of the Sponsor or SCH's officers or directors or their respective affiliates will have any claim against the trust account for reimbursement.

- In connection with the Purchase Agreement, if V10 elects to have Mr. Palihapitiya purchase shares of VGH, Inc. common stock (i) in a Primary Purchase, Mr. Palihapitiya will be issued up to 10,000,000 newly issued shares of VGH, Inc. common stock (depending on the size of the Primary Purchase as elected by V10) or (ii) in a Secondary Purchase, Mr. Palihapitiya will be purchasing up to 10,000,000 shares of VGH, Inc. common stock from V10 (depending on the size of the Secondary Purchase as elected by V10), in each case, at a price of $10.00 per share. It is anticipated that, following the

54

Table of Contents

Business Combination, if V10 elects that Mr. Palihapitiya purchase the maximum number of shares in a Secondary Purchase (also assuming that (x) no public shareholders exercise their redemption rights in connection with the Business Combination or our extension proposal assuming consummation of the transactions contemplated by the Purchase Agreement and (y) VGH, Inc. will repurchase 20,000,000 shares of VGH, Inc. common stock from V10 in a Repurchase pursuant to the Merger Agreement), the Sponsor and related parties (including Mr. Palihapitiya) are expected to collectively own approximately 13.2% of outstanding VGH, Inc. common stock.

- Pursuant to the Stockholders' Agreement, Mr. Palihapitiya will have the right to designate two directors to the Board of VGH, Inc. and such directors may have the power collectively to withhold approval in respect of future transactions between VGH, Inc. and its subsidiaries, on the one hand and V10 or its affiliates, on the other.
- Pursuant to the Registration Rights Agreement, the Sponsor, Mr. Palihapitiya and V10 will have customary registration rights, including demand and piggy-back rights, subject to cooperation and cut-back provisions with respect to the shares of VGH, Inc. common stock and warrants held by such parties.
- The Proposed Certificate of Incorporation will contain a provision that expressly elects not to be governed by Section 203 (Delaware's "interested stockholder" statute) of the Delaware General Corporation Law.

The existence of financial and personal interests of one or more of SCH's directors may result in a conflict of interest on the part of such director(s) between what he, she or they may believe is in the best interests of SCH and its shareholders and what he, she or they may believe is best for himself or themselves in determining to recommend that shareholders vote for the proposals. In addition, SCH's officers have interests in the Business Combination that may conflict with your interests as a shareholder. See the section entitled "—*Interests of SCH's Directors and Executive Officers in the Business Combination*" for a further discussion of these considerations.

The personal and financial interests of the Sponsor and Mr. Palihapitiya as well as SCH's directors and executive officers may have influenced their motivation in identifying and selecting the VG Companies as a business combination target, completing an initial business combination with the VG Companies and influencing the operation of the business following the initial business combination. In considering the recommendations of SCH's board of directors to vote for the proposals, its shareholders should consider these interests.

***The exercise of SCH's directors' and executive officers' discretion in agreeing to changes or waivers in the terms of the Business Combination may result in a conflict of interest when determining whether such changes to the terms of the Business Combination or waivers of conditions are appropriate and in SCH's shareholders' best interest.***

In the period leading up to the closing of the Business Combination, events may occur that, pursuant to the Merger Agreement, would require SCH to agree to amend the Merger Agreement, to consent to certain actions taken by the VG Companies or to waive rights that SCH is entitled to under the Merger Agreement. Such events could arise because of changes in the course of the VG Companies' businesses or a request by VG to undertake actions that would otherwise be prohibited by the terms of the Merger Agreement. In any of such circumstances, it would be at SCH's discretion, acting through its board of directors, to grant its consent or waive those rights. The existence of financial and personal interests of one or more of the directors described in the preceding risk factors (and described elsewhere in this proxy statement/prospectus) may result in a conflict of interest on the part of such director(s) between what he, she or they may believe is best for SCH and its shareholders and what he, she or they may believe is best for himself, herself or themselves in determining whether or not to take the requested action. As of the date of this proxy statement/prospectus, SCH does not believe there will be any changes or waivers that SCH's directors and executive officers would be likely to make after shareholder approval of the BCA Proposal has been obtained. While certain changes could be made without further

55

Table of Contents

shareholder approval, SCH will circulate a new or amended proxy statement/prospectus and resolicit SCH's shareholders if changes to the terms of the transaction that would have a material impact on its shareholders are required prior to the vote on the BCA Proposal.

***V10 and the other stockholders that are party to the Stockholders' Agreement will control the direction of VGH, Inc.'s business, and the concentrated ownership of VGH, Inc.'s common stock will prevent you and other stockholders from influencing significant decisions.***

In connection with the Business Combination, VGH, Inc. will enter into the Stockholders' Agreement with V10, the Sponsor and Mr. Palihapitiya. Pursuant to the terms of the Stockholders' Agreement, VGH, Inc. will be required to take all necessary action to cause the specified designees of V10 and Mr. Palihapitiya to be nominated to serve on VGH, Inc.'s board of directors, and each of the holders will be required, among other things, to vote all of the securities of VGH, Inc. held by such party in a manner necessary to elect the individuals designated by such holders. For so long as these parties hold a majority of VGH, Inc.'s common stock, they will be able to control the composition of VGH, Inc.'s board of directors, which in turn will be able to control all matters affecting VGH, Inc., subject to the terms of the Stockholders' Agreement, including:

- any determination with respect to VGH, Inc.'s business direction and policies, including the appointment and removal of officers and, in the event of a vacancy on VGH, Inc.'s board of directors, additional or replacement directors;
- any determinations with respect to mergers, business combinations or disposition of assets;
- determination of VGH, Inc.'s management policies;
- VGH, Inc.'s financing policy;
- VGH, Inc.'s compensation and benefit programs and other human resources policy decisions; and
- the payment of dividends on VGH, Inc.'s common stock.

Additionally, V10 will individually control shares representing a majority of VGH, Inc.'s total outstanding shares of common stock upon completion of the Business Combination. Even if V10 were to control less than a majority of the common stock, it will be able to influence the outcome of corporate actions so long as it owns a significant portion of common stock. Specifically, under the terms of the Stockholders' Agreement, for so long as V10 continues to beneficially own at least 25% of the shares of common stock it beneficially owns upon completion of the Business Combination, V10's consent will be required for, among other things:

- any non-ordinary course sales of our assets having a fair market value of at least $10.0 million;
- any acquisition of an entity, or the business or assets of any other entity, having a fair market value of at least $10.0 million;
- certain non-ordinary course investments having a fair market value of at least $10.0 million;
- any increase or decrease in the size of VGH, Inc.'s board of directors;
- any payment by VGH, Inc. of dividends or distributions to its stockholders or repurchases of stock by VGH, Inc., subject to certain limited exceptions; or
- incurrence of certain indebtedness.

Furthermore, V10's consent will also be required for the following, among other things, for so long as V10 continues to beneficially own at least 10% of the shares of common stock it beneficially owns upon completion of the Business Combination:

- any sale, merger, business combination or similar transaction to which VGH, Inc. or any of its subsidiaries are a party;

56

**Table of Contents**

- any amendment, modification or waiver of any provision of VGH, Inc.'s certificate of incorporation or bylaws;
- any liquidation, dissolution, winding-up or causing any voluntary bankruptcy or related actions with respect to VGH, Inc. or any of its subsidiaries; or
- any issuance or sale of any shares of VGH, Inc.'s capital stock or securities convertible into or exercisable for any shares of VGH, Inc.'s capital stock in excess of 5% of its then-issued and outstanding shares, other than issuances of shares of capital stock upon the exercise of options to purchase shares of VGH, Inc.'s capital stock.

Because the interests of these stockholders may differ from the interests of VGH, Inc. or its other stockholders, actions that these stockholders take with respect to us may not be favorable to VGH, Inc. or its other stockholders. For additional information, see "*BCA Proposal—Related Agreements— Stockholders' Agreement.*"

***The announcement of the proposed Business Combination could disrupt VGH, Inc.'s relationships with its customers, suppliers, joint venture partners and others, as well as its operating results and business generally.***

Whether or not the Business Combination and related transactions are ultimately consummated, as a result of uncertainty related to the proposed transactions, risks relating to the impact of the announcement of the Business Combination on VGH, Inc.'s business include the following:
- its employees may experience uncertainty about their future roles, which might adversely affect VHG, Inc.'s ability to retain and hire key personnel and other employees;
- customers, suppliers, joint venture partners and other parties with which VHG, Inc. maintains business relationships may experience uncertainty about its future and rescind their deposits, seek alternative relationships with third parties, seek to alter their business relationships with VHG, Inc. or fail to extend an existing relationship with VGH, Inc.; and
- VGH, Inc. has expended and will continue to expend significant costs, fees and expenses for professional services and transaction costs in connection with the proposed Business Combination.

If any of the aforementioned risks were to materialize, they could lead to significant costs which may impact VHG, Inc.'s results of operations and cash available to fund its businesses.

***Following the Business Combination, VGH, Inc. will be a controlled company within the meaning of the NYSE rules, and, as a result, will qualify for, and we expect it to rely on, exemptions from certain corporate governance requirements that provide protection to stockholders of other companies. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

Following the completion of the Business Combination, V10, the Sponsor and Mr. Palihapitiya will collectively control more than 50% of VGH, Inc.'s common stock and, on account of the voting agreement between those holders included in the Stockholders' Agreement, VGH, Inc. will be considered a "controlled company" for the purposes of NYSE rules and corporate governance standards. As a controlled company, it will be exempt from certain NYSE corporate governance requirements, including those that would otherwise require its board of directors to have a majority of independent directors and require that VGH, Inc. either establish compensation and nominating and corporate governance committees, each comprised entirely of independent directors, or otherwise ensure that the compensation of its executive officers and nominees for directors are determined or recommended to the board of directors by the independent members of the board of directors. Because we expect VGH, Inc. to rely on these exemptions, holders of VGH, Inc.'s common stock will not have the same protections afforded to stockholders of companies that are subject to all of the NYSE corporate governance requirements.

Table of Contents

If VGH, Inc. ceases to be a "controlled company" in the future, it will be required to comply with the NYSE corporate governance requirements, which may require replacing a number of its directors and will require development of certain other governance-related policies and practices (including adopting written charters for each committee and instituting annual performance evaluations). These and any other actions necessary to achieve compliance with such rules may increase VGH, Inc.'s legal and administrative costs, will make some activities more difficult, time-consuming and costly and may also place additional strain on its personnel, systems and resources.

***Subsequent to consummation of the Business Combination, we may be exposed to unknown or contingent liabilities and may be required to subsequently take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our share price, which could cause you to lose some or all of your investment.***

We cannot assure you that the due diligence conducted in relation to the VG Companies has identified all material issues or risks associated with the VG Companies, their businesses or the industry in which they compete. Furthermore, we cannot assure you that factors outside of the VG Companies' and our control will not later arise. As a result of these factors, we may be exposed to liabilities and incur additional costs and expenses and we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in our reporting losses. Even if our due diligence has identified certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. If any of these risks materialize, this could have a material adverse effect on our financial condition and results of operations and could contribute to negative market perceptions about our securities or VGH, Inc. Additionally, we have no indemnification rights against V10 under the Merger Agreement and all of the purchase price consideration will be delivered to V10 at the Closing.

We are attempting to obtain and bind a representation and warranty insurance policy ("R&W Insurance Policy") prior to the Closing with respect to certain of the representations and warranties of VG contained in the Merger Agreement and VG has agreed to cooperate with and provide assistance to us in our efforts. In the event that the R&W Insurance Policy only covers the pro rata portion of losses attributable to SCH's pre-Closing shareholders (SCH's shareholders as of immediately prior to the effective time of the Mergers), V10 agrees that it will take all such reasonably necessary action to ensure that any proceeds paid pursuant to the R&W Insurance Policy are paid only to such SCH shareholders, including by agreeing to amendments to the Merger Agreement to provide such SCH shareholders a non-transferrable, contractual contingent value right to such proceeds, and ensuring that VGH, Inc. pays any such proceeds received pursuant to the R&W Insurance Policy to such SCH shareholders in accordance with such contingent value right. However, there is no guarantee that an R&W Insurance Policy will be available on terms acceptable to us, or at all, or that such R&W Insurance Policy will not contain significant exclusions.

Accordingly, any shareholders or warrant holders of SCH who choose to remain VGH, Inc. stockholders or warrant holders following the Business Combination could suffer a reduction in the value of their shares, warrants and units. Such shareholders warrant holders are unlikely to have a remedy for such reduction in value unless they are able to successfully claim that the reduction was due to the breach by our officers or directors of a duty of care or other fiduciary duty owed to them, or if they are able to successfully bring a private claim under securities laws that the registration statement or proxy statement/prospectus relating to the Business Combination contained an actionable material misstatement or material omission.

***The historical financial results of the VG Companies and unaudited pro forma financial information included elsewhere in this proxy statement/prospectus may not be indicative of what VGH, Inc.'s actual financial position or results of operations would have been.***

The historical financial results of the VG Companies included in this proxy statement/prospectus do not reflect the financial condition, results of operations or cash flows they would have achieved as a standalone

58

Table of Contents

company during the periods presented or those VGH, Inc. will achieve in the future. This is primarily the result of the following factors: (i) the VG Companies' historical financial results reflect charges for certain support functions (such as expenses for technology, facilities, legal, finance, human resources, business development and public affairs) that will be provided under the TSAs that will be entered into in connection with the Business Combination; (ii) the VG Companies' historical financial results reflect charges for the use of certain intellectual property licensed from VEL under a prior trademark license agreement, while VGH, Inc. will have the right to use such intellectual property following the Business Combination pursuant to the Amended TMLA; (iii) VGH, Inc. will incur additional ongoing costs as a result of the Business Combination, including costs related to public company reporting, investor relations and compliance with the Sarbanes-Oxley Act; and (iv) VGH, Inc.'s capital structure will be different from that reflected in the VG Companies' historical financial statements. The historical combined financial statements included in this proxy statement/prospectus for periods prior to VGH, Inc.'s Pre-Closing Restructuring Plan have been prepared on a "carve-out" basis from V10 and may not be indicative of VGH, Inc.'s results of operations and financial condition had it operated as a standalone entity during such periods. VGH, Inc.'s financial condition and future results of operations could be materially different from amounts reflected in its historical financial statements included elsewhere in this proxy statement/prospectus, so it may be difficult for investors to compare VGH, Inc.'s future results to historical results or to evaluate its relative performance or trends in its business.

Similarly, the unaudited pro forma financial information in this proxy statement/prospectus is presented for illustrative purposes only and has been prepared based on a number of assumptions including, but not limited to, SCH being treated as the "acquired" company for financial reporting purposes in the Business Combination, the total debt obligations and the cash and cash equivalents of the VG Companies on the Closing Date and the number of SCH Class A ordinary shares that are redeemed in connection with the Business Combination. Accordingly, such pro forma financial information may not be indicative of VGH, Inc.'s future operating or financial performance and VGH, Inc.'s actual financial condition and results of operations may vary materially from VGH, Inc.'s pro forma results of operations and balance sheet contained elsewhere in this proxy statement/prospectus, including as a result of such assumptions not being accurate. See *"Unaudited Pro Forma Condensed Combined Financial Information."*

***We may be able to complete only one Business Combination with the proceeds of our Public Offering and the sale of the private placement warrants, which will cause us to be solely dependent on a single business which may have a limited number of products or services. This lack of diversification may negatively impact our operations and profitability.***

We may effectuate our Business Combination with a single target business or multiple target businesses simultaneously or within a short period of time. However, we may not be able to effectuate our Business Combination with more than one target business because of various factors, including the existence of complex accounting issues and the requirement that we prepare and file pro forma financial statements with the SEC that present operating results and the financial condition of several target businesses as if they had been operated on a combined basis. By completing our Business Combination with only a single entity our lack of diversification may subject us to numerous economic, competitive and regulatory risks. Further, we would not be able to diversify our operations or benefit from the possible spreading of risks or offsetting of losses, unlike other entities which may have the resources to complete several business combinations in different industries or different areas of a single industry. Accordingly, the prospects for our success may be:

- solely dependent upon the performance of a single business, property or asset; or
- dependent upon the development or market acceptance of a single or limited number of products, processes or services.

This lack of diversification may subject us to numerous economic, competitive and regulatory risks, any or all of which may have a substantial adverse impact upon the particular industry in which we may operate subsequent to our Business Combination.

59

Table of Contents

***We have a specified maximum redemption threshold. This redemption threshold may make it more difficult for us to complete the Business Combination as contemplated.***

The Merger Agreement provides that VG's obligation to consummate the Business Combination is conditioned on, among other things, that as of the Closing, the Trust Amount, or the amount of cash available in the trust account into which substantially all of the proceeds of our initial public offering and private placements of our warrants have been deposited for the benefit of SCH, certain of our public shareholders and the underwriters of our initial public offering, after deducting the amount required to satisfy our obligations to our shareholders (if any) that exercise their rights to redeem their public shares (each, a "Redemption") pursuant to the Cayman Constitutional Documents, is at least equal to the Minimum Available Cash Amount, which is the sum of (x) $400.0 million plus (y) if applicable, an aggregate of approximately $24.2 million of deferred underwriting commissions being held in the trust account (the "Minimum Cash Condition").

However, if the Trust Amount as of the Closing is less than the Minimum Available Cash Amount, then V10 and its affiliates will have the right (but not the obligation) to purchase (or seek a third party to purchase) additional shares of VGH, Inc. common stock at a price per share of $10.00 (the "Additional Holder Equity Amount") up to the Minimum Available Cash Amount less the amount of the aggregate purchase price paid to SCH by Mr. Palihapitiya in any Primary Purchase (the "Investment Amount"). If the Trust Amount when added to the Additional Holder Equity Amount and the Investment Amount (such aggregate amount, the "Available Cash") is equal to or greater than the Minimum Available Cash Amount, then the Minimum Cash Condition will be deemed to have been satisfied. The Minimum Cash Condition is for the sole benefit of VG except that this condition may not be waived by VG if the Trust Amount is less than $200.0 million, provided that V10 and its affiliates will have the right (but not the obligation) to purchase (or seek a third party to purchase) additional shares of VGH, Inc. common stock at a price per share of $10.00 in an aggregate amount such that the Available Cash is, at or immediately prior to the Closing, equal to at least $200.0 million after giving effect to such purchases.

There can be no assurance that VG could and would waive the Minimum Cash Condition. Furthermore, as provided in our memorandum and articles of association, in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we do not then become subject to the SEC's "penny stock" rules). If such conditions are not met, and such conditions are not or cannot be waived under the terms of the Merger Agreement, then the Merger Agreement could terminate and the proposed Business Combination may not be consummated.

If such conditions are waived and the Business Combination is consummated with less than the Minimum Available Cash Amount in the trust account, the cash held by VGH, Inc. and its subsidiaries (including the VG Companies) in the aggregate, after the Closing may not be sufficient to allow us to operate and pay our bills as they become due as the VG Companies will only be required to have held an aggregate of $2.0 million in cash as of the Closing under the terms of the Merger Agreement. Furthermore, our affiliates are not obligated to make loans to us in the future (other than our Sponsor's commitment to provide us an aggregate of $200,000 in loans in order to finance transaction costs in connection with a business combination). The exercise of redemption rights with respect to a large number of our public shareholders may make us unable to take such actions as may be desirable in order to optimize the capital structure of VGH, Inc. after consummation of the Business Combination and we may not be able to raise additional financing from unaffiliated parties necessary to fund our expenses and liabilities after the Closing. Any such event in the future may negatively impact the analysis regarding our ability to continue as a going concern at such time.

***The Sponsor may elect to purchase shares from public shareholders prior to the consummation of the Business Combination, which may influence the vote on the Business Combination and reduce the public "float" of our Class A ordinary shares.***

At any time at or prior to the Business Combination, during a period when they are not then aware of any material nonpublic information regarding us or SCH's securities, the Sponsor, Mr. Palihapitiya, V10, the VG

60

Table of Contents

Companies or their directors, officers, advisors or respective affiliates may purchase public shares from institutional and other investors who vote, or indicate an intention to vote, against any of the Condition Precedent Proposals, or execute agreements to purchase such shares from such investors in the future, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares or vote their public shares in favor of the Condition Precedent Proposals. Such a purchase may include a contractual acknowledgement that such shareholder, although still the record holder of SCH's shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that the Sponsor, Mr. Palihapitiya, V10, the VG Companies or their directors, officers, advisors or respective affiliates purchase shares in privately negotiated transactions from public shareholders who have already elected to exercise their redemption rights, such selling shareholder would be required to revoke their prior elections to redeem their shares. The purpose of such share purchases and other transactions would be to increase the likelihood of (1) satisfaction of the requirement that holders of a majority of the ordinary shares, represented in person or by proxy and entitled to vote at the extraordinary general meeting, vote in favor of the BCA Proposal, the Director Election Proposal, the Stock Issuance Proposal, the Incentive Award Plan Proposal, the Repurchase Proposal and the Adjournment Proposal, (2) satisfaction of the requirement that holders of at least two-thirds of the ordinary shares, represented in person or by proxy and entitled to vote at the extraordinary general meeting, vote in favor of the Domestication Proposal and the Organizational Documents Proposals, (3) satisfaction of the Minimum Cash Condition, (4) otherwise limiting the number of public shares electing to redeem and (5) SCH's net tangible assets (as determined in accordance with Rule 3a51(g)(1) of the Exchange Act) being at least $5,000,001.

Entering into any such arrangements may have a depressive effect on the ordinary shares (*e.g.*, by giving an investor or holder the ability to effectively purchase shares at a price lower than market, such investor or holder may therefore become more likely to sell the shares he or she owns, either at or prior to the Business Combination). If such transactions are effected, the consequence could be to cause the Business Combination to be consummated in circumstances where such consummation could not otherwise occur. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the proposals to be presented at the extraordinary general meeting and would likely increase the chances that such proposals would be approved. In addition, if such purchases are made, the public "float" of our public shares and the number of beneficial holders of our securities may be reduced, possibly making it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

***Future resales of common stock after the consummation of the Business Combination may cause the market price of VGH, Inc.'s securities to drop significantly, even if VGH, Inc.'s business is doing well.***

After the consummation of the Business Combination and subject to certain exceptions, V10 will be contractually restricted from selling or transferring more than 50% of the shares of common stock it received in connection with the Business Combination, and the Sponsor will be contractually restricted from selling or transferring any of its shares of common stock. However, following the expiration of such lockup, neither V10 nor the Sponsor will be restricted from selling shares of VGH, Inc.'s common stock held by them, other than by applicable securities laws. As such, sales of a substantial number of shares of VGH, Inc. common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of VGH, Inc. common stock. Upon completion of the Business Combination, V10 and the Sponsor will collectively own approximately 59.5% of the outstanding shares of VGH, Inc. common stock (not including the shares of VGH, Inc. common stock that will be owned by Mr. Palihapitiya but will not be subject to the lock-up under the Registration Rights Agreement), assuming that no public shareholders redeem their public shares in connection with the Business Combination or our extension proposal, that V10 elects to have Mr. Palihapitiya purchase in a Secondary Purchase the maximum number of shares contemplated by the terms of the Purchase Agreement and that VGH, Inc. repurchases the maximum number of shares in the Repurchase contemplated by the terms of the Merger Agreement. Assuming approximately 27,688,223 public shares (which is the estimated number of public shares that could be redeemed in connection with the Business Combination and our extension proposal, in the aggregate, in order to satisfy the closing conditions contained in the Merger Agreement, at approximately $10.27 per share (based on trust account

Table of Contents

figures as of March 31, 2019)) are redeemed in connection with the Business Combination and our extension proposal, in the aggregate, the collective ownership of V10 and the Sponsor would rise to 72.5% of the outstanding shares of VGH, Inc. common stock (not including the shares of VGH, Inc. common stock that will be owned by Mr. Palihapitiya but will not be subject to the lock-up under the Registration Rights Agreement). Outstanding VGH, Inc. common stock shares held by the Sponsor excludes the 1,500,000 shares of VGH, Inc. common stock underlying the Director RSU Awards that were granted in connection with the Business Combination. The restricted stock units will vest at the Closing but will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1 and December 31 of the year following the Closing.

While each of V10 and the Sponsor will agree to certain restrictions regarding the transfer of the shares of VGH, Inc. common stock issued to them in connection with the Business Combination, these shares may be sold after the expiration of the applicable lock-up period under the Registration Rights Agreement. As restrictions on resale end and registration statements (filed after the closing of the Business Combination to provide for the resale of such shares from time to time) are available for use, the sale or possibility of sale of these shares could have the effect of increasing the volatility in VGH, Inc.'s share price or the market price of VGH, Inc. common stock could decline if the holders of currently restricted shares sell them or are perceived by the market as intending to sell them.

***We are not registering the shares of VGH, Inc. common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants and causing such warrants to expire worthless.***

We are not registering the shares of VGH, Inc. common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time. However, under the terms of the Warrant Agreement, we have agreed, as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, to use our best efforts to file a registration statement under the Securities Act covering the issuance of such shares and maintain a current prospectus relating to the shares of VGH, Inc. common stock issuable upon exercise of the warrants, until the expiration of the warrants in accordance with the provisions of the warrant agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current or correct or the SEC issues a stop order. If the shares issuable upon exercise of the warrants are not registered under the Securities Act, we will be required to permit holders to exercise their warrants on a cashless basis. However, no warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder or an exemption from registration is available. Notwithstanding the above, if the VGH, Inc. common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but we will use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any warrant, or issue securities or other compensation in exchange for the warrants in the event that we are unable to register or qualify the shares underlying the warrants under applicable state securities laws and no exemption is available. If the issuance of the shares upon exercise of the warrants is not so registered or qualified or exempt from registration or qualification, the holder of such warrant shall not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the shares of VGH, Inc. common stock included in the units. If and when the

62

Table of Contents

warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying shares of VGH, Inc. common stock for sale under all applicable state securities laws.

***If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per share redemption amount received by shareholders may be less than $10.00 per share (which was the offering price per unit in our initial public offering).***

Our placing of funds in the trust account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers (other than our independent auditors), prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account, there is no guarantee that they will execute such agreements or even if they execute such agreements that they would be prevented from bringing claims against the trust account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will enter into an agreement with a third party that has not executed a waiver only if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Upon redemption of our public shares, if we are unable to complete our business combination within the prescribed time frame, or upon the exercise of a redemption right in connection with our business combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the 10 years following redemption. Accordingly, the per share redemption amount received by public shareholders could be less than the $10.00 per share initially held in the trust account, due to claims of such creditors.

The Sponsor has agreed that it will be liable to us if and to the extent any claims by a third party (other than our independent auditors) for services rendered or products sold to us, or a prospective target business with which we have discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (1) $10.00 per public share or (2) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, the Sponsor will not be responsible to the extent of any liability for such third party claims. We have not independently verified whether the Sponsor has sufficient funds to satisfy its indemnity obligations and believe that the Sponsor's only assets are securities of our company. The Sponsor may not have sufficient funds available to satisfy those obligations. We have not asked the Sponsor to reserve for such obligations, and therefore, no funds are currently set aside to cover any such obligations. As a result, if any such claims were successfully made against the trust account, the funds available for our business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our business combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of our officers or directors will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

63

Table of Contents

***If, after we distribute the proceeds in the trust account to our public shareholders, SCH files a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our board of directors may be exposed to claims of punitive damages.***

If, after we distribute the proceeds in the trust account to our public shareholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by shareholders could be viewed under applicable debtor/creditor or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our shareholders. In addition, our board of directors may be viewed as having breached its fiduciary duty to our creditors or having acted in bad faith, thereby exposing it and us to claims of punitive damages, by paying public shareholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

***If, before distributing the proceeds in the trust account to our public shareholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our shareholders and the per share amount that would otherwise be received by our shareholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the trust account to our public shareholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our shareholders. To the extent any bankruptcy claims deplete the trust account, the per share amount that would otherwise be received by our shareholders in connection with our liquidation may be reduced.

***Our shareholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.***

If we are forced to enter into an insolvent liquidation, any distributions received by shareholders could be viewed as an unlawful payment if it was proved that immediately following the date on which the distribution was made, we were unable to pay our debts as they fall due in the ordinary course of business. As a result, a liquidator could seek to recover all amounts received by our shareholders. Furthermore, our directors may be viewed as having breached their fiduciary duties to us or our creditors or may have acted in bad faith, and thereby exposing themselves and our company to claims, by paying public shareholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

***Compliance obligations under the Sarbanes-Oxley Act may make it more difficult for us to effectuate the Business Combination, require substantial financial and management resources and increase the time and costs of completing a business combination.***

The fact that we are a blank check company makes compliance with the requirements of the Sarbanes-Oxley Act particularly burdensome on us as compared to other public companies because the VG Companies are not currently subject to Section 404 of the Sarbanes-Oxley Act. The standards required for a public company under Section 404 of the Sarbanes-Oxley Act are significantly more stringent than those required of the VG Companies as privately held companies. Management may not be able to effectively and timely implement controls and procedures that adequately respond to the increased regulatory compliance and reporting requirements that will be applicable to VGH, Inc. after the Business Combination. If we are not able to implement the requirements of Section 404, including any additional requirements once we are no longer an emerging growth company, in a timely manner or with adequate compliance, we may not be able to assess whether its internal controls over financial reporting are effective, which may subject us to adverse regulatory consequences and could harm

64

**Table of Contents**

investor confidence and the market price of VGH, Inc. common stock. Additionally, once we are no longer an emerging growth company, we will be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting.

***The price of VGH, Inc. common stock, warrants and units may be volatile.***

Upon consummation of the Business Combination, the price of VGH, Inc. common stock, as well as VGH, Inc. warrants and units may fluctuate due to a variety of factors, including:

- changes in the industries in which VGH, Inc. and its customers operate;
- the number of flights VGH, Inc. schedules for a period, the number of seats it is able to sell in any given spaceflight and the price at which it sells them;
- developments involving VGH, Inc.'s competitors;
- unexpected weather patterns, maintenance issues, natural disasters or other events that force VGH, Inc. to cancel or reschedule flights;
- variations in its operating performance and the performance of its competitors in general;
- actual or anticipated fluctuations in VGH, Inc.'s quarterly or annual operating results;
- publication of research reports by securities analysts about VGH, Inc. or its competitors or its industry;
- the public's reaction to VGH, Inc.'s press releases, its other public announcements and its filings with the SEC;
- additions and departures of key personnel;
- changes in laws and regulations affecting its business;
- commencement of, or involvement in, litigation involving the combined company;
- changes in the its capital structure, such as future issuances of securities or the incurrence of additional debt;
- the volume of shares of VGH, Inc. common stock available for public sale; and
- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations, corruption, political instability and acts of war or terrorism.

These market and industry factors may materially reduce the market price of VGH, Inc. common stock, warrants and units regardless of the operating performance of VGH, Inc., including the VG Companies businesses acquired in the Business Combination.

***The obligations associated with being a public company will involve significant expenses and will require significant resources and management attention, which may divert from VGH, Inc.'s business operations.***

As a public company, VGH, Inc. will become subject to the reporting requirements of the Exchange Act and the Sarbanes-Oxley Act. The Exchange Act requires the filing of annual, quarterly and current reports with respect to a public company's business and financial condition. The Sarbanes-Oxley Act requires, among other things, that a public company establish and maintain effective internal control over financial reporting. As a result, VGH, Inc. will incur significant legal, accounting and other expenses that the VG Companies did not previously incur. VGH, Inc.'s entire management team and many of its other employees will need to devote substantial time to compliance, and may not effectively or efficiently manage its transition into a public company.

These rules and regulations will result in VGH, Inc. incurring substantial legal and financial compliance costs and will make some activities more time-consuming and costly. For example, these rules and regulations

65

Table of Contents

will likely make it more difficult and more expensive for VGH, Inc. to obtain director and officer liability insurance, and it may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. As a result, it may be difficult for VGH, Inc. to attract and retain qualified people to serve on its board of directors, its board committees or as executive officers.

***While we anticipate losing our emerging growth company status by the end of 2019, we are currently an emerging growth company and a smaller reporting company within the meaning of the Securities Act, and to the extent we have taken advantage of certain exemptions from disclosure requirements available to emerging growth companies or smaller reporting companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.***

We are currently an "emerging growth company" within the meaning of the Securities Act, as modified by the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. As a result, our shareholders may not have access to certain information they may deem important. We cannot predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company, which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accountant standards used.

We currently anticipate that we will lose our "emerging growth company" status as of the end of the year ending December 31, 2019 based on the public float of SCH's Class A ordinary shares as of June 30, 2019. As a result of losing such status, we will no longer be able to take advantage of certain exemptions from reporting, and we will also be required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act. We will incur additional expenses in connection with such compliance and our management will need to devote additional time and effort to implement and comply with such requirements. We will also lose status as a "smaller reporting company" at the end of the year ending December 31, 2019.

***The public stockholders will experience immediate dilution as a consequence of the issuance of VGH, Inc. common stock as consideration in the Business Combination.***

It is anticipated that, following the Business Combination (assuming consummation of the transactions contemplated by the Purchase Agreement), (1) our public stockholders are expected to own approximately 35.4% of the outstanding VGH, Inc. common stock, (2) V10 (without taking into account any public shares held by the equityholders of V10 prior to the consummation of the Business Combination) is expected to own approximately

66

**Table of Contents**

51.4% of the outstanding VGH, Inc. common stock and (3) the Sponsor and related parties (including Mr. Palihapitiya) are expected to collectively own approximately 13.2% of the outstanding VGH, Inc. common stock. These percentages assume (i) that no public shareholders exercise their redemption rights in connection with the Business Combination or our extension proposal and (ii) that (x) VGH, Inc. issues 130,000,000 shares of VGH, Inc. common stock to V10 as the Aggregate Merger Consideration pursuant to the Merger Agreement, (y) VGH, Inc. repurchases 20,000,000 of such shares of VGH, Inc. common stock from V10 in the Repurchase pursuant to the Merger Agreement and (z) V10 elects under the Purchase Agreement to have Mr. Palihapitiya purchase 10,000,000 shares of VGH, Inc. common stock directly from V10 in a Secondary Purchase, in accordance with the terms and subject to the conditions of the Purchase Agreement. If the actual facts are different from these assumptions, the percentage ownership retained by the Company's existing shareholders in the combined company will be different. Outstanding shares of VGH, Inc. common stock held by the Sponsor excludes the 1,500,000 shares of VGH, Inc. common stock underlying the Director RSU Awards that will be granted in connection with the Business Combination. The restricted stock units will vest at the Closing but will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1 and December 31 of the year following the Closing.

The issuance of additional common stock will significantly dilute the equity interests of existing holders of SCH securities and may adversely affect prevailing market prices for our units, public shares or public warrants.

### Warrants will become exercisable for VGH, Inc. common stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders.

If the Business Combination is completed, outstanding warrants to purchase an aggregate of 31,000,000 shares of VGH, Inc. common stock will become exercisable in accordance with the terms of the Warrant Agreement governing those securities. These warrants will become exercisable 30 days after the completion of the Business Combination. The exercise price of these warrants will be $11.50 per share. To the extent such warrants are exercised, additional shares of VGH, Inc. common stock will be issued, which will result in dilution to the holders of VGH, Inc. common stock and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market or the fact that such warrants may be exercised could adversely affect the market price of VGH, Inc. common stock. However, there is no guarantee that the public warrants will ever be in the money prior to their expiration, and as such, the warrants may expire worthless. See "—*Even if the Business Combination is consummated, the public warrants may never be in the money, and they may expire worthless and the terms of the warrants may be amended in a manner adverse to a holder if holders of at least 65% of the then outstanding public warrants approve of such amendment.*"

### Even if the Business Combination is consummated, the public warrants may never be in the money, and they may expire worthless and the terms of the warrants may be amended in a manner adverse to a holder if holders of at least 65% of the then outstanding public warrants approve of such amendment.

The warrants were issued in registered form under a Warrant Agreement between Continental Stock Transfer & Trust Company, as warrant agent, and SCH. The Warrant Agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 65% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 65% of the then outstanding public warrants approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least 65% of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, shorten the exercise period or decrease the number of shares of VGH, Inc. common stock purchasable upon exercise of a warrant.

Table of Contents

***We may redeem your unexpired warrants prior to their exercise at a time that is disadvantageous to you, thereby making your warrants worthless.***

We have the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of the VGH, Inc. common stock equals or exceeds $18.00 per share (as adjusted for share splits, share dividends, rights issuances, subdivisions, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date we send the notice of redemption to the warrant holders. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force you to: (i) exercise your warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so (ii) sell your warrants at the then-current market price when you might otherwise wish to hold your warrants; or (iii) accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of your warrants.

None of the Private Placement Warrants will be redeemable by us so long as they are held by our Sponsor or its permitted transferees.

***VGH, Inc. does not intend to pay cash dividends for the foreseeable future.***

Following the Business Combination, VGH, Inc. currently intends to retain its future earnings, if any, to finance the further development and expansion of its business and does not intend to pay cash dividends in the foreseeable future. Any future determination to pay dividends will be at the discretion of VGH Inc.'s board of directors and will depend on its financial condition, results of operations, capital requirements, restrictions contained in the Stockholders' Agreement and future agreements and financing instruments, business prospects and such other factors as its board of directors deems relevant.

***NYSE may not list VGH, Inc.'s securities on its exchange, which could limit investors' ability to make transactions in VGH, Inc.'s securities and subject VGH, Inc. to additional trading restrictions.***

In connection with the Business Combination, in order to continue to maintain the listing of our securities on NYSE, we will be required to demonstrate compliance with NYSE's initial listing requirements, which are more rigorous than NYSE's continued listing requirements. We will apply to have VGH, Inc.'s securities listed on NYSE upon consummation of the Business Combination. We cannot assure you that we will be able to meet all initial listing requirements. Even if VGH, Inc.'s securities are listed on NYSE, VGH, Inc. may be unable to maintain the listing of its securities in the future.

If VGH, Inc. fails to meet the initial listing requirements and NYSE does not list its securities on its exchange, VG would not be required to consummate the Business Combination. In the event that VG elected to waive this condition, and the Business Combination was consummated without VGH, Inc.'s securities being listed on NYSE or on another national securities exchange, VGH, Inc. could face significant material adverse consequences, including:

- a limited availability of market quotations for VGH, Inc.'s securities;
- reduced liquidity for VGH, Inc.'s securities;
- a determination that VGH, Inc. common stock is a "penny stock" which will require brokers trading in VGH, Inc. common stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for VGH, Inc.'s securities;
- a limited amount of news and analyst coverage; and
- a decreased ability to issue additional securities or obtain additional financing in the future.

68

Table of Contents

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." If VGH, Inc.'s securities were not listed on the NYSE, such securities would not qualify as covered securities and we would be subject to regulation in each state in which we offer our securities because states are not preempted from regulating the sale of securities that are not covered securities.

### Reports published by analysts, including projections in those reports that differ from our actual results, could adversely affect the price and trading volume of our common shares.

Securities research analysts may establish and publish their own periodic projections for VGH, Inc. following consummation of the Business Combination. These projections may vary widely and may not accurately predict the results we actually achieve. Our share price may decline if our actual results do not match the projections of these securities research analysts. Similarly, if one or more of the analysts who write reports on us downgrades our stock or publishes inaccurate or unfavorable research about our business, our share price could decline. If one or more of these analysts ceases coverage of us or fails to publish reports on us regularly, our securities price or trading volume could decline. While we expect research analyst coverage following consummation of the Business Combination, if no analysts commence coverage of us, the market price and volume for our securities could be adversely affected.

### Risks Related to the Consummation of the Domestication

### The Domestication may result in adverse tax consequences for holders of SCH Class A ordinary shares and warrants.

U.S. Holders (as defined in "*U.S. Federal Income Tax Considerations*" beginning on page 163 of this proxy statement/prospectus) may be subject to U.S. federal income tax as a result of the Domestication. Because the Domestication will occur immediately prior to the redemption of SCH Class A ordinary shares, U.S. Holders exercising redemption rights will be subject to the potential tax consequences of the Domestication. Additionally, non-U.S. Holders (as defined in "*U.S. Federal Income Tax Considerations*" below) may become subject to withholding tax on any dividends paid on VGH, Inc. common stock after the Domestication.

A U.S. Holder who on the day of the Domestication beneficially owns (actually or constructively) SCH Class A ordinary shares with a fair market value of less than $50,000 on the date of the Domestication will not recognize any gain or loss and will not be required to include any part of our earnings in income. A U.S. Holder who on the day of the Domestication beneficially owns (actually or constructively) SCH Class A ordinary shares with a fair market value of $50,000 or more, but less than 10% of the total combined voting power of all classes of SCH stock entitled to vote and less than 10% or more of the total value of all classes of SCH stock, generally will recognize gain (but not loss) in respect of the Domestication as if such U.S. Holder exchanged its SCH Class A ordinary shares for VGH, Inc. common stock in a taxable transaction, unless such U.S. Holder elects in accordance with applicable Treasury Regulations to include in income as a deemed dividend the "all earnings and profits amount" (as defined in the Treasury Regulations under Section 367 of the Code) attributable to the SCH Class A ordinary shares held directly by such U.S. Holder. A U.S. Holder who on the day of the Domestication beneficially owns (actually or constructively) 10% or more of the total combined voting power of all classes of SCH stock entitled to vote or 10% or more of the total value of all classes of SCH stock, will generally be required to include in income as a deemed dividend the "all earnings and profits amount" (as defined in the Treasury Regulations) attributable to the SCH Class A ordinary shares held directly by such U.S. Holder.

Additionally, proposed Treasury Regulations with a retroactive effective date have been promulgated under Section 1291(f) of the Code which generally require that, a U.S. person who disposes of stock of a PFIC (including for this purpose exchanging warrants for newly issued warrants in the Domestication) must recognize gain equal to the excess of the fair market value of such PFIC stock over its adjusted tax basis, notwithstanding

69

Table of Contents

any other provision of the Code. Because we are a blank check company with no current active business, we believe that it is likely that SCH is classified as a PFIC for U.S. federal income tax purposes. As a result, these proposed Treasury Regulations, if finalized in their current form, would generally require a U.S. Holder of SCH Class A ordinary shares to recognize gain on the exchange of SCH Class A ordinary shares for VGH, Inc. common stock pursuant to the Domestication unless such U.S. Holder has made certain tax elections with respect to such U.S. Holder's SCH Class A ordinary shares. Proposed Treasury Regulations, if finalized in their current form would also apply to a U.S. Holder who exchanges SCH warrants for newly issued VGH, Inc. warrants; a U.S. Holder, however, cannot currently make the election mentioned above with respect to such U.S. Holder's SCH warrants. Any gain recognized from the application of the PFIC rules described above would be taxable income with no corresponding receipt of cash. The tax on any such gain would be imposed at the rate applicable to ordinary income and an interest charge would apply based on complex rules designed to offset the tax deferral to such U.S. Holder on the undistributed earnings, if any, of SCH. It is not possible to determine at this time whether, in what form, and with what effective date, final Treasury Regulations under Section 1291(f) of the Code may be adopted or how any such Treasury Regulations would apply.

**All holders are urged to consult their own tax advisor regarding the tax consequences of the Domestication, including the impact of the PFIC rules and the proposed Treasury Regulations described above, to their particular situation. For a more detailed description of the U.S. federal income tax consequences associated with the Domestication, see "*U.S. Federal Income Tax Considerations*" (beginning on page 163 of this proxy statement/prospectus).**

*Upon consummation of the Business Combination, the rights of holders of VGH, Inc. common stock arising under the DGCL as well as Proposed Organizational Documents will differ from and may be less favorable to the rights of holders of SCH Class A ordinary shares arising under the Cayman Islands Companies Law as well as our current memorandum and articles of association.*

Upon consummation of the Business Combination, the rights of holders of VGH, Inc. common stock will arise under the Proposed Organizational Documents as well as the DGCL. Those new organizational documents and the DGCL contain provisions that differ in some respects from those in our current memorandum and articles of association and the Cayman Islands Companies Law and, therefore, some rights of holders of VGH, Inc. common stock could differ from the rights that holders of SCH Class A ordinary shares currently possess. For instance, while class actions are generally not available to shareholders under Cayman Islands Companies Law, such actions are generally available under the DGCL. This change could increase the likelihood that VGH, Inc. becomes involved in costly litigation, which could have a material adverse effect on VGH, Inc.

In addition, there are differences between the new organizational documents of VGH, Inc. and the current constitutional documents of SCH. For a more detailed description of the rights of holders of VGH, Inc. common stock and how they may differ from the rights of holders of SCH Class A ordinary shares, please see "*Comparison of Corporate Governance and Shareholder Rights*." The forms of the Proposed Certificate of Incorporation and the Proposed Bylaws of VGH, Inc. are attached as Annex F and Annex G, respectively, to this proxy statement/prospectus and we urge you to read them.

*Delaware law and VGH, Inc.'s Proposed Organizational Documents contain certain provisions, including anti-takeover provisions that limit the ability of stockholders to take certain actions and could delay or discourage takeover attempts that stockholders may consider favorable.*

The Proposed Organizational Documents that will be in effect upon consummation of the Business Combination, and the DGCL, contain provisions that could have the effect of rendering more difficult, delaying, or preventing an acquisition that stockholders may consider favorable, including transactions in which stockholders might otherwise receive a premium for their shares. These provisions could also limit the price that investors might be willing to pay in the future for shares of our common stock, and therefore depress the trading price of VGH, Inc. common stock. These provisions could also make it difficult for stockholders to take certain

70

Table of Contents

actions, including electing directors who are not nominated by the current members of VGH, Inc.'s board of directors or taking other corporate actions, including effecting changes in our management. Among other things, the Proposed Organizational Documents include provisions regarding:

- the ability of VGH, Inc.'s board of directors to issue shares of preferred stock, including "blank check" preferred stock and to determine the price and other terms of those shares, including preferences and voting rights, without stockholder approval, which could be used to significantly dilute the ownership of a hostile acquirer;
- subject to the terms of the Stockholders' Agreement, VGH, Inc.'s board of directors will have the exclusive right to expand the size of its board of directors and to elect directors to fill a vacancy created by the expansion of the board of directors or the resignation, death or removal of a director, which will prevent stockholders from being able to fill vacancies on the board of directors;
- once VGH, Inc. no longer qualifies as a "controlled company" under the listing standards of the NYSE, its stockholders will not be able to act by written consent, which will force stockholder action to be taken at an annual or special meeting of stockholders;
- the amended and restated certificate of incorporation will prohibit cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;
- the limitation of the liability of, and the indemnification of, VGH, Inc.'s directors and officers;
- the ability of VGH, Inc.'s board of directors to amend the bylaws, which may allow VGH, Inc.'s board of directors to take additional actions to prevent an unsolicited takeover and inhibit the ability of an acquirer to amend the bylaws to facilitate an unsolicited takeover attempt;
- advance notice procedures with which stockholders must comply to nominate candidates to VGH, Inc.'s board of directors or to propose matters to be acted upon at a stockholders' meeting, which could preclude stockholders from bringing matters before annual or special meetings of stockholders and delay changes in the VGH, Inc.'s Board and also may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of VGH, Inc.;
- expansive negative consent rights for V10 which provide that as long as V10 maintains certain ownership thresholds to appoint a director under the Stockholders' Agreement, the written consent of V10 is required to enter into certain business combinations or related transaction; and
- the Stockholders' Agreement requires that VGH, Inc.'s board of directors may not approve any transaction (excluding those involving consideration less than $120,000) between an interested stockholder and VGH, Inc. without the affirmative vote of at least a majority of the directors of VGH, Inc. that are not designees of V10 until the earlier of (i) V10 no longer has the right to designate two directors to the board of directors and (ii) Mr. Palihapitiya no longer has the right to designate two directors to the board of directors.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in VGH, Inc.'s board of directors or management.

***The provisions of the proposed certificate of incorporation requiring exclusive forum in the Court of Chancery of the State of Delaware for certain types of lawsuits may have the effect of discouraging lawsuits against our directors and officers.***

VGH, Inc.'s proposed certificate of incorporation provides that, to the fullest extent permitted by law, and unless VGH, Inc. consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for (i) any derivative action or proceeding brought on VGH, Inc.'s behalf, (ii) any action asserting a claim of breach of a fiduciary duty owed by any of its directors, officers,

71

**Table of Contents**

employees or agents to VGH, Inc. or its stockholders, (iii) any action asserting a claim against VGH, Inc. or any of its directors, officers, stockholders, employees or agents arising out of or related to any provision of the DGCL or its certificate of incorporation or bylaws or (iv) any action asserting a claim against VGH, Inc. or any of its directors, officers, stockholders, employees or agents governed by the internal affairs doctrine; provided, however, that, in the event that the Court of Chancery of the State of Delaware lacks subject matter jurisdiction over any such action or proceeding, the sole and exclusive forum for such action or proceeding will be another state or federal court located within the State of Delaware, in each such case, unless the Court of Chancery (or such other state or federal court located within the State of Delaware, as applicable) has dismissed a prior action by the same plaintiff asserting the same claims because such court lacked personal jurisdiction over an indispensable party named as a defendant therein. Notwithstanding the foregoing, the proposed certificate of incorporation will provide that the exclusive forum provision will not apply to suits brought to enforce a duty or liability created by the Securities Act or the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder. Similarly, Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder.

These provisions may have the effect of discouraging lawsuits against VGH, Inc.'s directors and officers. The enforceability of similar choice of forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that, in connection with any applicable action brought against VGH, Inc., a court could find the choice of forum provisions contained in the proposed certificate of incorporation to be inapplicable or unenforceable in such action.

***VGH, Inc.'s proposed certificate of incorporation limits liability of V10 and Mr. Palihapitiya and their respective affiliates' liability to VGH, Inc. for breach of fiduciary duty and could also prevent VGH, Inc. from benefiting from corporate opportunities that might otherwise have been available to it.***

The proposed restated certificate of incorporation provides that, to the fullest extent permitted by law, and other than corporate opportunities that are expressly presented to one of VGH, Inc.'s directors in his or her capacity as such, V10 and Mr. Palihapitiya and their respective affiliates (other than VGH, Inc. and its officers and employees):

- will not have any fiduciary duty to refrain from engaging in the same or similar business activities or lines of business as VGH, Inc., even if the opportunity is one that VGH, Inc. might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so;
- will have no duty to communicate or offer such business opportunity to VGH, Inc.; and
- will not be liable to VGH, Inc. for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such exempted person pursues or acquires such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to VGH, Inc.

**Risks Related to the Redemption**

***Public shareholders who wish to redeem their public shares for a pro rata portion of the trust account must comply with specific requirements for redemption that may make it more difficult for them to exercise their redemption rights prior to the deadline. If shareholders fail to comply with the redemption requirements specified in this proxy statement/prospectus, they will not be entitled to redeem their public shares for a pro rata portion of the funds held in the trust account.***

A public shareholder will be entitled to receive cash for any public shares to be redeemed only if such public shareholder: (1)(a) holds public shares, or (b) if the public shareholder holds public shares through units, the public shareholder elects to separate its units into the underlying public shares and public warrants prior to

72

Table of Contents

exercising its redemption rights with respect to the public shares; (2) submits a written request to Continental, SCH's Stock Transfer & Trust Company, our transfer agent, that VGH, Inc. redeem all or a portion of its public shares for cash; and (3) delivers its public shares to Continental Stock Transfer & Trust Company, our transfer agent, physically or electronically through DTC. Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 p.m., Eastern Time, on , 2019 (two business days before the extraordinary general meeting) in order for their shares to be redeemed. In order to obtain a physical share certificate, a shareholder's broker or clearing broker, DTC and Continental Stock Transfer & Trust Company, our transfer agent, will need to act to facilitate this request. It is our understanding that shareholders should generally allot at least two weeks to obtain physical certificates from the transfer agent. However, because we do not have any control over this process or over DTC, it may take significantly longer than two weeks to obtain a physical stock certificate. If it takes longer than anticipated to obtain a physical certificate, public shareholders who wish to redeem their public shares may be unable to obtain physical certificates by the deadline for exercising their redemption rights and thus will be unable to redeem their shares.

If the Business Combination is consummated, and if a public shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers its shares to Continental Stock Transfer & Trust Company, our transfer agent, VGH, Inc. will redeem such public shares for a per-share price, payable in cash calculated as of two business days prior to the consummation of the Business Combination. Please see the section entitled "*Extraordinary General Meeting of SCH—Redemption Rights*" for additional information on how to exercise your redemption rights.

**If a public shareholder fails to receive notice of our offer to redeem public shares in connection with the Business Combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.**

If, despite our compliance with the proxy rules, a public shareholder fails to receive our proxy materials, such public shareholder may not become aware of the opportunity to redeem his, her or its public shares. In addition, the proxy materials that we are furnishing to holders of public shares in connection with the Business Combination describes the various procedures that must be complied with in order to validly redeem the public shares. In the event that a public shareholder fails to comply with these procedures, its public shares may not be redeemed. Please see the section entitled "*Extraordinary General Meeting of SCH—Redemption Rights*" for additional information on how to exercise your redemption rights.

**If you or a "group" of shareholders of which you are a part are deemed to hold an aggregate of more than 15% of the public shares, you (or, if a member of such a group, all of the members of such group in the aggregate) will lose the ability to redeem all such shares in excess of 15% of the public shares.**

A public shareholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the public shares. In order to determine whether a shareholder is acting in concert or as a group with another shareholder, we will require each public shareholder seeking to exercise redemption rights to certify to us whether such shareholder is acting in concert or as a group with any other shareholder. Such certifications, together with other public information relating to stock ownership available to us at that time, such as Section 13D, Section 13G and Section 16 filings under the Exchange Act, will be the sole basis on which we make the above-referenced determination. Your inability to redeem any such excess shares will reduce your influence over our ability to consummate the Business Combination and you could suffer a material loss on your investment in SCH if you sell such excess shares in open market transactions. Additionally, you will not receive redemption distributions with respect to such excess shares if we consummate the Business Combination. As a result, you will continue to hold that number of shares aggregating to more than 15% of the public shares and, in order to dispose of such excess shares, would be required to sell your stock in open market transactions, potentially at a loss. We cannot assure you that the value of such excess shares will appreciate over time following the Business Combination or

73

Table of Contents

that the market price of the public shares will exceed the per-share redemption price. Notwithstanding the foregoing, shareholders may challenge our determination as to whether a shareholder is acting in concert or as a group with another shareholder in a court of competent jurisdiction.

However, our shareholders' ability to vote all of their shares (including such excess shares) for or against the Business Combination is not restricted by this limitation on redemption.

***There is no guarantee that a shareholder's decision whether to redeem its shares for a pro rata portion of the trust account will put the shareholder in a better future economic position.***

We can give no assurance as to the price at which a shareholder may be able to sell its public shares in the future following the completion of the Business Combination or any alternative business combination. Certain events following the consummation of any initial business combination, including the Business Combination, may cause an increase in SCH share price, and may result in a lower value realized now than a shareholder of SCH might realize in the future had the shareholder not redeemed its shares. Similarly, if a shareholder does not redeem its shares, the shareholder will bear the risk of ownership of the public shares after the consummation of any initial business combination, and there can be no assurance that a shareholder can sell its shares in the future for a greater amount than the redemption price set forth in this proxy statement/prospectus. A shareholder should consult the shareholder's own tax or financial advisor for assistance on how this may affect his, her or its individual situation.

### Risks if the Adjournment Proposal is Not Approved

***If the Adjournment Proposal is not approved, and an insufficient number of votes have been obtained to authorize the consummation of the Business Combination and the Domestication, our board of directors will not have the ability to adjourn the extraordinary general meeting to a later date in order to solicit further votes, and, therefore, the Business Combination will not be approved, and, therefore, the Business Combination may not be consummated.***

Our board of directors is seeking approval to adjourn the extraordinary general meeting to a later date or dates if, at the extraordinary general meeting, based upon the tabulated votes, there are insufficient votes to approve each of the Condition Precedent Proposals. If the Adjournment Proposal is not approved, our board of directors will not have the ability to adjourn the extraordinary general meeting to a later date and, therefore, will not have more time to solicit votes to approve the Condition Precedent Proposals. In such events, the Business Combination would not be completed.

### Risks if the Domestication and the Business Combination are not Consummated

***If we are not able to complete the Business Combination with the VG Companies by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), nor able to complete another business combination by such date, in each case, as such date may be further extended pursuant to the Cayman Constitutional Documents, we would cease all operations except for the purpose of winding up and we would redeem our Class A ordinary shares and liquidate the trust account, in which case our public shareholders may only receive approximately $10.00 per share and our warrants will expire worthless.***

If SCH is not able to complete the Business Combination with the VG Companies by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), nor able to complete another business combination by such date, in each case, as such date may be extended pursuant to SCH's Cayman Constitutional Documents SCH will: (1) cease all operations except for the purpose of winding up; (2) as promptly as reasonably possible but not more than 10 business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (less up to $100,000 of interest to pay dissolution expenses and which interest shall be net of taxes payable), divided by the number of then issued and outstanding public shares, which redemption will completely

74

**Table of Contents**

extinguish public shareholders' rights as shareholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (3) as promptly as reasonably possible following such redemption, subject to the approval of SCH's remaining shareholders and its board, dissolve and liquidate, subject in each case to its obligations under Cayman Islands law to provide for claims of creditors and the requirements of other applicable law. In such case, our public shareholders may only receive approximately $10.00 per share and our warrants will expire worthless.

***You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. To liquidate your investment, therefore, you may be forced to sell your public shares or public warrants, potentially at a loss.***

Our public shareholders will be entitled to receive funds from the trust account only upon the earliest of (1) the completion of a business combination (including the closing of the Business Combination), and then only in connection with those public shares that such public shareholder properly elected to redeem, (2) the redemption of any public shares properly tendered in connection with a shareholder vote to amend the Cayman Constitutional Documents to modify the substance and timing of our obligation to redeem 100% of the public shares if we do not complete a business combination by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), or (3) the redemption of all of the public shares if we are unable to complete an initial business combination by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), subject to applicable law, and as further described in this proxy statement/prospectus. In no other circumstances will a public shareholder have any right or interest of any kind in the trust account. Accordingly, to liquidate your investment, you may be forced to sell your public shares or public warrants, potentially at a loss.

***If we are unable to consummate our initial business combination, our public shareholders may be forced to wait until after September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders) before redemption from the trust account.***

If we are unable to consummate our initial business combination by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders, or if such date is further extended at a duly called extraordinary general meeting, such later date), we will distribute the aggregate amount then on deposit in the trust account (less up to $100,000 of the net interest to pay dissolution expenses and which interest shall be net of taxes payable), pro rata to our public shareholders by way of redemption and cease all operations except for the purposes of winding up of our affairs, as further described in this proxy statement/prospectus. Any redemption of public shareholders from the trust account shall be affected automatically by function of our amended and restated memorandum and articles of association prior to any voluntary winding up. If we are required to wind-up, liquidate the trust account and distribute such amount therein, pro rata, to our public shareholders, as part of any liquidation process, such winding up, liquidation and distribution must comply with the applicable provisions of the Cayman Islands Companies Law. In that case, investors may be forced to wait beyond September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders, or if such date is further extended at a duly called extraordinary general meeting, such later date), before the redemption proceeds of the trust account become available to them, and they receive the return of their pro rata portion of the proceeds from the trust account. We have no obligation to return funds to investors prior to the date of our redemption or liquidation unless we consummate our initial business combination prior thereto and only then in cases where investors have sought to redeem their public shares. Only upon our redemption or any liquidation will public shareholders be entitled to distributions if we are unable to complete our initial business combination.

Table of Contents

***If our funds not being held in the trust account are insufficient to allow us to operate until September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), we may be unable to complete our initial business combination.***

The funds available to us outside of the trust account may not be sufficient to allow us to operate until September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), assuming that our initial business combination is not completed during that time. We expect to incur significant costs in pursuit of our acquisition plans. However, our affiliates are not obligated to make loans to us in the future (other than our Sponsor's commitment to provide us an aggregate of $0.2 million in loans in order to finance transaction costs in connection with a business combination), and we may not be able to raise additional financing from unaffiliated parties necessary to fund our expenses. Any such event in the future may negatively impact the analysis regarding our ability to continue as a going concern at such time.

We believe that, as of March 31, 2019, the funds available to us outside of the trust account as well as funds available pursuant to commitment letters from the Sponsor of up to an aggregate of $0.2 million, will be sufficient to allow us to operate until September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders); however, we cannot assure you that our estimate is accurate. Of the funds available to us, we could use a portion of the funds available to us to pay fees to consultants to assist us with our search for a target business. We could also use a portion of the funds as a down payment or to fund a "no-shop" provision (a provision in letters of intent designed to keep target businesses from "shopping" around for transactions with other companies or investors on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we entered into a letter of intent where we paid for the right to receive exclusivity from a target business and were subsequently required to forfeit such funds (whether as a result of our breach or otherwise), we might not have sufficient funds to continue searching for, or conduct due diligence with respect to, a target business. If we are unable to complete our Business Combination, our public shareholders may receive only approximately $10.00 per share, or less in certain circumstances, on the liquidation of our trust account and our Warrants will expire worthless.

***If the net proceeds of our initial public offering not being held in the trust account are insufficient to allow us to operate through to September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), and we are unable to obtain additional capital, we may be unable to complete our initial business combination, in which case our public shareholders may only receive $10.00 per share, and our warrants will expire worthless.***

As of March 31, 2019, SCH had cash of $0.3 million held outside the trust account, which is available for use by us to cover the costs associated with identifying a target business and negotiating a business combination and other general corporate uses. In addition, as of March 31, 2019, SCH had total current liabilities of $0.7 million. The funds available to us outside of the trust account may not be sufficient to allow us to operate until September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders), assuming that our initial business combination is not completed during that time. Of the funds available to us, we could use a portion of the funds available to us to pay fees to consultants to assist us with our search for a target business. We could also use a portion of the funds as a down payment or to fund a "no-shop" provision (a provision in letters of intent designed to keep target businesses from "shopping" around for transactions with other companies on terms more favorable to such target businesses) with respect to a particular proposed business combination, although we do not have any current intention to do so. If we entered into a letter of intent where we paid for the right to receive exclusivity from a target business and were subsequently required to forfeit such funds (whether as a result of our breach or otherwise), we might not have sufficient funds to continue searching for, or conduct due diligence with respect to, a target business.

If we are required to seek additional capital, we would need to borrow funds from Sponsor, members of our management team or other third parties to operate or may be forced to liquidate. Neither the members of our

76

**Table of Contents**

management team nor any of their affiliates is under any further obligation to advance funds to SCH in such circumstances. Any such advances would be repaid only from funds held outside the trust account or from funds released to us upon completion of our initial business combination. If we are unable to obtain additional financing, we may be unable to complete our initial business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. Consequently, our public shareholders may only receive approximately $10.00 per share on our redemption of the public shares and the public warrants will expire worthless.

77

**Table of Contents**

**INFORMATION ABOUT THE VG COMPANIES**

*Unless the context otherwise requires, all references in this section to the "Company," "we," "us," or "our" refer to the business of the VG Companies and their subsidiaries prior to the consummation of the Business Combination.*

**Overview**

We are a vertically-integrated aerospace company pioneering human spaceflight for private individuals and researchers. We believe the commercial exploration of space represents one of the most exciting and significant technology initiatives of our time. We are embarking on this commercial exploration journey with a mission to put humans into space and return them safely to earth on a routine, consistent and affordable basis. Using our proprietary and reusable technologies, and supported by a distinctive, Virgin-branded customer experience, we are developing a spaceflight system designed to offer customers, whom we also refer to as "Future Astronauts," a unique, multi-day experience culminating in a spaceflight that includes several minutes of weightlessness and views of Earth from space. We are in the final stages of development, having already completed two crewed flights of our vehicle into space, and anticipate our initial commercial launch in 2020.

Over the past decade, several trends have converged to invigorate the commercial space industry. Rapidly advancing technologies, decreasing costs, open innovation models with improved access to technology and greater availability of capital have driven significant growth in the commercial space market. According to the U.S. Chamber of Commerce, the commercial space market is expected to grow 6% per year, from $385 billion in 2017 to at least $1.5 trillion by 2040, reaching 5% of U.S. gross domestic product. As a result of these trends, we believe the exploration of space and the cultivation and monetization of space-related capabilities offer immense potential for the creation of economic value and future growth. Further, we believe we are at the center of these industry trends and well-positioned to capitalize on them by bringing human spaceflight to a broad global population that dreams of traveling to space.

The market for commercial human spaceflight for private individuals is new and untapped. As of August 1, 2019, only 573 humans have ever traveled above the Earth's atmosphere into space to become officially recognized as astronauts, cosmonauts or taikonauts. Overwhelmingly, these men and women have been government employees handpicked by government space agencies such as NASA and trained over many years at significant expense. Private commercial space travel has been limited to a select group of individuals who were able to reach space, generally only at great personal expense, risk and discomfort. We are planning to change that. We believe a significant market opportunity exists to provide high net worth individuals with a dynamic spaceflight experience at a fraction of the expense incurred by other private individuals to date. We believe this market opportunity is supported by the 603 reservations and approximately $80.0 million of deposits we had booked as of June 30, 2019, and also by the more than 2,500 flight reservation inquiries we have received since SpaceShipTwo's first spaceflight in December 2018.

Over the last 14 years, we have developed an extensive portfolio of proprietary technologies that are embodied in the highly specialized assets that we have developed or leased to enable commercial spaceflight and address these industry trends. These assets include:

- *Our carrier aircraft, WhiteKnightTwo*—WhiteKnightTwo is a twin-fuselage, custom-built aircraft designed to carry our spaceship, SpaceShipTwo, up to an altitude of approximately 45,000 feet, where the spaceship is released for its flight into space. Our carrier aircraft is designed to launch thousands of SpaceShipTwo flights over its lifetime. This reusable launch platform design provides a flight experience and economics similar to commercial airplanes, and may offer a considerable economic advantage over other potential launch alternatives. Additionally, our carrier aircraft has a rapid turnaround time, enabling it to provide frequent spaceflight launch services for multiple spaceships.
- *Our spaceship, SpaceShipTwo*—SpaceShipTwo is a reusable spaceship with the capacity to carry two pilots and up to six Future Astronauts into space before returning them safely to the Earth's surface.

197

Table of Contents

SpaceShipTwo is a rocket-powered winged vehicle designed to achieve a maximum speed of over Mach 3 and has a flight duration, measured from the takeoff of our carrier aircraft to the landing of SpaceShipTwo, of up to approximately 90 minutes. SpaceShipTwo's cabin has been designed to optimize the Future Astronaut's safety, experience and comfort. For example, the sides and ceiling of the spaceship's cabin are lined by more than a dozen windows, offering Future Astronauts the ability to view the blackness of space as well as stunning views of the Earth below. With the exception of the rocket motor's fuel and oxidizer, which must be replenished after each flight, SpaceShipTwo is designed as a wholly reusable spaceship.

- *Our hybrid rocket motor, RocketMotorTwo*—SpaceShipTwo is powered by a hybrid rocket propulsion system, RocketMotorTwo, that propels it on a trajectory into space. The term "hybrid" rocket refers to the fact that the rocket uses a solid fuel grain cartridge and a liquid oxidizer. The fuel cartridge is consumed over the course of a flight and replaced in between flights. RocketMotorTwo has been designed to provide performance capabilities necessary for spaceflight with a focus on safety, reliability and economy. Its design incorporates comprehensive critical safety features, including the ability to be safely shut down at any time, and its limited number of moving parts increases reliability and robustness for human spaceflight. Furthermore, the motor is made from a benign substance that needs no special or hazardous storage.

- *Spaceport America*—The Future Astronaut flight preparation and experience will take place at our operational headquarters at Spaceport America. Spaceport America is the first purpose-built commercial spaceport in the world and serves as the home of our terminal hangar building, officially designated the "Virgin Galactic Gateway to Space." Spaceport America is located in New Mexico on 27 square miles of desert landscape, with access to 6,000 square miles of restricted airspace running from the ground to space. The restricted airspace will facilitate frequent and consistent flight scheduling by preventing general commercial air traffic from entering the area. Additionally, the desert climate and its relatively predictable weather provide favorable launch conditions year-round. Our license from the FAA includes Spaceport America as a location from which we can launch and land our spaceflight system on a routine basis.

We have designed our spaceflight system with a fundamental focus on safety. Important elements of our safety design include horizontal takeoff and landing, highly reliable and rigorously tested jet engines on our carrier aircraft, two pilots in our carrier aircraft and the spaceship to provide important redundancy, a proprietary feathering system that allows the spaceship to properly align for re-entry with limited pilot input, extensive screening and training of our pilots, and the ability to safely abort at any time during the mission. In 2016, the FAA granted us our commercial space launch license with a limited number of verification and validation steps that must be completed before the FAA will clear us to include customers on our spaceflights. We are in the process of completing those steps.

Our goal is to offer our Future Astronauts an unmatched, safe and affordable journey to space without the need for any special prior experience or significant prior training and preparation. We have worked diligently for over a decade to plan every aspect of the Future Astronaut's journey to become an astronaut, drawing on a world-class team with extensive experience with human spaceflight, high-end customer experiences and reliable transportation system operations and safety. Each Future Astronaut will spend four days at Spaceport America, with the first three days spent on pre-flight training and the spaceflight itself occurring on the fourth day. In space, they will be able to exit their seats and experience weightlessness, floating about the cabin and positioning themselves at one of the many windows around the cabin sides and top. After enjoying several minutes of weightlessness, customers will maneuver back to their own seats to prepare for re-entry and the journey back into the Earth's atmosphere. Upon landing, astronauts will disembark and join family and friends to celebrate their achievements and receive their astronaut wings.

We have historically sold spaceflight tickets at a price point of up to $250,000 per ticket. Given demand for human spaceflight experiences and the limited available capacity, however, we expect the price of our tickets to

198

Table of Contents

increase for a period of time. We also anticipate offering premium pricing options for customers with an interest in further customizing or enhancing their astronaut journey. As of June 30, 2019, we had reservations for 603 spaceflight tickets and approximately $80.0 million in deposits. We believe these sales are largely attributable to the strength and prominence of the Virgin Galactic brand, which has driven many of our customers directly to us with inbound requests. As we transition to full commercialization, we intend to take a more active role in marketing and selling our spaceflight experience. Given that sales of spaceflights are consultative and generally require a one-on-one sales approach, we intend to go to market using our direct sales organization and may expand the reach of that organization using a global network of high-end travel professionals that we refer to as Accredited Space Agents.

Our senior management team has extensive experience in the aerospace industry and includes the former Chief of Staff for NASA as well as NASA's space shuttle launch integration manager. Our team of pilots is similarly experienced, with over 216 years of collective flight experience, and includes former test pilots for NASA, the Royal Air Force, the U.S. Air Force, the Italian Air Force and the U.S. Marine Corps. Our commercial team is managed and supported by individuals with significant experience and success in building and growing a commercial spaceflight brand, selling spaceflight reservations and managing the pre-flight Future Astronaut community.

**Commercial Space Industry**

The commercial exploration of space represents one of the most exciting and important technological initiatives of our time. For the last six decades, crewed spaceflight missions commanded by the national space agencies of the United States, Russia and China have captured and sustained the attention of the world, inspiring countless entrepreneurs, scientists, inventors, ordinary citizens and new industries. Despite the importance of these missions and their cultural, scientific, economic and geopolitical influence, as of August 1, 2019, only 573 humans have ever traveled above the Earth's atmosphere into space to become officially recognized astronauts, cosmonauts or taikonauts. Overwhelmingly, these men and women have been government employees handpicked by government space agencies such as NASA and trained over many years at significant expense. While these highly capable government astronauts have inspired millions, individuals in the private sector have had extremely limited opportunity to fly into space, regardless of their personal wealth or ambitions. We are planning to change that.

Over the past decade, several trends have converged to invigorate the commercial space industry. Rapidly advancing technologies, decreasing costs, open innovation models with improved access to technology and greater availability of capital have driven explosive growth in the commercial space market. According to the U.S. Chamber of Commerce, the commercial space market will grow 6% per year, from $385.0 billion in 2017 to at least $1.5 trillion by 2040, reaching 5% of U.S. gross domestic product. The growth in private investment in the commercial space industry has led to a wave of new companies reinventing parts of the traditional space industry, including human spaceflight, satellites, payload delivery and methods of launch, in addition to unlocking entirely new potential market segments. Government agencies have taken note of the massive potential and growing import of space and are increasingly relying on the commercial space industry to spur innovation and advance national space objectives. In the United States, this has been evidenced by notable policy initiatives and by commercial contractors' growing share of space activity.

As a result of these trends, we believe the exploration of space and the cultivation and monetization of space-related capabilities offers immense potential for creation of economic value and future growth. Further, we believe we are at the center of these industry trends and well-positioned to capitalize on them by bringing human spaceflight to a broader global population that dreams of traveling to space. We are initially focused on human spaceflight for recreation and research, but we believe our differentiated technology and unique capabilities can be leveraged to address numerous additional commercial and government opportunities in the commercial space industry.

199

Table of Contents

We have developed extensive vertically integrated aerospace development capabilities for developing, manufacturing and testing aircraft and related propulsion systems. These capabilities encompass preliminary systems and vehicle design and analysis, detail design, manufacturing, ground testing, flight testing and post-delivery support and maintenance. We believe our unique approach and rapid prototyping capabilities enable innovative ideas to be designed quickly and built and tested with the process and rigor. In addition, we have expertise in configuration management and developing documentation needed to transition our technologies and systems to commercial applications. Further, we have developed a significant amount of know-how, expertise and capability that we believe we can leverage to capture growing demand for innovative, agile and low-cost development projects for third parties, including contractors, government agencies and commercial service providers. We are actively exploring strategic relationships to identify new applications for our technologies and to develop advanced aerospace technologies for commercial and transportation applications that we believe will accelerate progress within relevant industries and enhance our growth.

*Human Spaceflight*

The market for commercial human spaceflight for private individuals is new and virtually untapped. To date, private commercial space travel has been limited to a select group of individuals who were able to reach space only at great personal expense, risk and discomfort. In effect, these individuals became temporary members of the Russian Space Agency, were required to learn the Russian language and trained for months prior to spaceflight. In 2001, Dennis Tito was the first private individual to purchase a ticket for space travel, paying an estimated $20.0 million for a ride to the ISS on a Russian Soyuz rocket. Since then, six individuals have purchased tickets and flown successful orbital missions that have included time on the ISS, and current prices for spaceflights to the ISS approximately range between $50.0 million and $75.0 million per trip. One individual, Charles Simonyi, flew twice.

Other than these limited and extremely expensive alternatives, we are unaware of any currently available alternatives for private space travel. Historically, the privatization of human spaceflight has been limited primarily by cost and availability to private individuals. In the past, the technologies necessary to journey to space have been owned and controlled strictly by government space agencies. With the exception of a few seats on the Russian Soyuz rocket, government agencies have not demonstrated interest in providing vehicles or seats to the private sector for human spaceflight. Instead, government efforts in human spaceflight have focused on research missions and have historically required billions of dollars of investment. Because of the government's research orientation and because of the high cost of development, historically there has been limited innovation to foster the commercial viability of human spaceflight. For example, most spacecraft were developed as single-use vehicles; and while the Space Shuttle was built as a reusable vehicle, it required significant recovery and refurbishment between flights.

The interconnected dynamics of national security concerns, government funding, a lack of competing technologies and economies of scale, as well as the infrequency of flights, have all contributed to sustained high costs of human spaceflight. In addition to the cost, privatization has also been limited by concerns surrounding the ability to safely transport untrained general members of the public into space.

While these obstacles have significantly limited the adoption of human space travel, we believe the few private individuals who have already flown at significant personal cost provide important insight into the potential demand for private space travel, particularly if these obstacles can be addressed. To evaluate the potential market opportunity, we have performed a high-level analysis based on publicly available information to estimate the net worth of our existing reservation holders. Based on that analysis, we estimate that over 90% of our existing reservation holders have a net worth of over $1.0 million, and approximately 70% have a net worth of less than $20.0 million. As a result, we expect our commercial human spaceflight offering will receive interest broadly across the spectrum of high net worth individuals. However, in the near term we expect the majority of our spaceflight customers will consist of individuals with a net worth of $10.0 million or more.

200

Table of Contents

A recent report by the Credit Suisse Research Institute estimated that in 2018 there were approximately 1.8 million high net worth individuals globally with a net worth greater than $10.0 million and that this group of individuals was expected to grow at a compound annual growth rate of approximately 6% through 2023. In light of this, we believe a significant market opportunity exists for a company that can provide high net worth individuals with the opportunity to enjoy a spaceflight experience in comfort and safety. We believe this is supported by the 603 reservations, backed by approximately $80.0 million of deposits, that we had received as of June 30, 2019. This customer backlog represents approximately $120.0 million in expected future revenue upon payment of the full ticket price for SpaceShipTwo flights. Though we have not been actively selling our astronaut experience since 2014, having established proof of market and in order to focus resources on community management and achieving. However, we have received more than 2,500 flight reservation inquiries since SpaceShipTwo's first spaceflight in December 2018.

## Our Strategy

Using our proprietary and reusable flight system, and supported by a distinctive, Virgin-branded customer experience, we are seeking to provide affordable, safe, reliable and regular transportation to space. To accomplish this we intend to:

- ***Launch our commercial program for human spaceflight.*** In December 2018, we flew our first spaceflight using our current SpaceShipTwo, VSS Unity. This marked the first ever flight of a vehicle designed for commercial service to take humans into space and was the first crewed space launch from U.S. soil since 2011. In February 2019, we flew VSS Unity to space for a second time and, in addition to the two pilots, carried a crew member in the cabin. The crew member was able to unbuckle her seatbelt and float around the cabin in weightlessness – another first for a commercial space vehicle. All five crew members flown across these two flights were thereafter awarded official U.S. government commercial astronaut wings in recognition of having traveled more than 50 miles above sea level. We are now in the final phases of readying our commercial spaceflight program. As part of this preparatory work, we are transitioning our operational headquarters to our purpose-built facility at Spaceport America in New Mexico and completing the final work on VSS Unity for commercial service, including the installation of the cabin interior. The interior furnishings and fixtures are also being installed at Spaceport America, along with finalizing everything needed to prepare our first customers for flight. We expect to conclude the final portion of the flight test program from Spaceport America and expect successful completion of those tests to lead to our first commercial flight in 2020.

- ***Expand the fleet to increase our flight rate.*** We will commence commercial operations with our SpaceShipTwo spaceship, VSS Unity, and our WhiteKnightTwo carrier aircraft, VMS Eve, which together comprise our spaceflight system. We believe these craft will be sufficient to meet our initial operating plan. We have two additional SpaceShipTwo vehicles under construction, as well an additional WhiteKnightTwo carrier undergoing design engineering. We plan to expand the fleet to a total of five SpaceShipTwo vehicles in service by the end of 2023, which should allow us to increase our annual flight rate. Beyond that, we plan to identify opportunities to expand to additional spaceports.

- ***Lower operating costs.*** We are focused on developing and implementing manufacturing efficiencies in an effort to decrease the manufacturing cost per spaceship. Additionally, we expect that, as we commence commercial operations, our staff will become more efficient in various aspects of operations and maintenance such that we can reduce operating costs.

- ***Leverage our proprietary technology and deep manufacturing experience to augment our product and service offerings and expand into adjacent and international markets.*** We have developed an extensive set of vertically integrated aerospace development capabilities and technologies. While our primary focus for the foreseeable future will be on commercializing human space flight, we expect to explore the application of our proprietary technologies and our capabilities in areas such as design, engineering, composites manufacturing, high-speed propulsion and production for other commercial and government uses. Among other opportunities, we believe our technology could be used to develop

201

Table of Contents

supersonic and hypersonic vehicles that drastically reduce travel time for point-to-point international travel. By leveraging our technology and operations, we believe we will also have an opportunity in the future to pursue growth opportunities abroad, including by potentially opening additional spaceports or entering into other arrangements with different international government agencies.

**Our Competitive Strengths**

We are a pioneer in commercial human spaceflight with a mission to enhance our world by opening space to a broad audience and facilitating the further exploration of our universe. We believe that our collective expertise, coupled with the following strengths, will allow us to build our business and expand our market opportunity and addressable markets:

- *Differentiated technology and capabilities.* Over the last 14 years, we have developed reusable vehicles and capabilities that will allow us to move towards airline-like operations for spaceflight, and which were the basis for the FAA granting us our commercial space launch license in 2016. Our spaceflight system and our hybrid rocket motor together enable the following key differentiators:
  - horizontal take-off and landing using winged vehicles and traditional airplane runway infrastructure that enable a familiar airplane-like experience;
  - use of our carrier aircraft for first stage of flight and then to air launch our spaceship, which is intended to maximize the safety and efficiency of our spaceflight system;
  - pilot-designed and pilot-flown missions to avoid complexity, aiding safety and customer confidence;
  - carbon composite construction that is light, strong and fatigue-resistant;
  - robust, controllable spaceship hybrid rocket motor propulsion system that can be safely shut down at any time during the flight;
  - large cabin with multiple windows, allowing for an experience of weightlessness and easy access to views of Earth for all of our customers; and
  - unique "wing-feathering" system, designed to enable a safe, aerodynamically controlled re-entry into the Earth's atmosphere on a repeated basis.
- *Significant backlog and pent up customer demand.* While not yet in commercial service, we have already received significant interest from Future Astronauts and research organizations. As of June 30, 2019, we had reservations for SpaceShipTwo flights from 603 customers, backed by approximately $80.0 million of deposits. We have not been actively selling new reservations for spaceflights at the end of 2014, having established a proof of market and in order to focus resources on community management and achieving commercialization. Since then, we have experienced strong additional demand, with more than 2,500 people having registered interest in flying to space since our first spaceflight in December 2018. Additionally, we have flown eight payloads for space research missions and intend to pursue similar arrangements for additional research missions.
- *Iconic brand associated with unique customer experiences.* The Virgin brand carries an exceptional reputation worldwide for innovation, customer experience, adventure and luxury. We have been planning our customer journey for many years and have refined our plans with the help of our potential Future Astronauts, many of whom are highly regarded enthusiasts who are committed to optimizing their experience and our success. The customer journey starts with marketing materials, the sales process and the purchase of a reservation. It concludes with a four-day spaceflight experience at Spaceport America, which includes a personalized training and preparation program designed to optimize the flight for each individual and incorporates an activity program for friends and family. The experience culminates in an epic flight to space and a full video and photographic record of the journey. A clear customer service ethos and language runs through the entire journey and is managed by our uniquely experienced team.

202

Table of Contents

- *Limited competition with natural barriers to entry.* Entry into the commercial human spaceflight market requires a significant financial investment as well as many years of high-risk development. We were formed in 2004 after the basic architecture of our spaceflight system had been proven in prototype form, which in itself had taken several years. In total, development of our platform and capabilities has required more than $1 billion in total investment to date. We are aware of only one competitor with a similar investment of time and money in suborbital commercial human spaceflight, which is taking a different approach to its launch architecture.
- *Highly specialized and vertically integrated design and manufacturing capabilities.* We possess highly specialized and vertically integrated capabilities that enable us to manage and control almost all elements of design and manufacturing of our spaceship and our carrier aircraft. These capabilities include a unique approach to rapid prototyping that enables us to design, build and test innovative ideas quickly; a deep composite manufacturing experience with broad applications in the aerospace industry; a dedicated team and facilities that support the full development of our high performance vehicles; and a 200,000 square foot campus in Mojave, California that houses fabrication, assembly, hangar and office space and where we perform ground and test operations.
- *First purpose-built commercial spaceport.* Spaceport America was designed to be both functional and beautiful and sets the stage for our Future Astronaut experiences. Spaceport America is located in New Mexico on 27 square miles of desert landscape, with access to 6,000 square miles of restricted airspace running from the ground to space. The restricted airspace will facilitate frequent and consistent flight scheduling and the desert climate and its relatively predictable weather provide favorable launch conditions year-round. The facilities were built with our operational requirements and our customers in mind, with comprehensive consideration of its practical function, while also providing the basis for the Virgin Galactic experience.
- *Experienced management team and an industry-leading flight team.* Our management team has extensive experience in the aerospace industry and includes the former Chief of Staff for NASA as well as NASA's Space Shuttle Launch Integration Manager. Our team of pilots is similarly experienced, with over 216 years of flight experience, and includes former test pilots for NASA, the Royal Air Force, the U.S. Air Force, the Italian Air Force and the U.S. Marine Corps. Our commercial team is managed and supported by individuals with significant experience and success in building and growing a commercial spaceflight brand, selling spaceflight reservations and managing the pre-flight Future Astronaut community.

**Our Assets**

Over the course of the last 14 years, we have developed an extensive portfolio of proprietary technologies that are embodied in the highly specialized vehicles that we have created to enable commercial spaceflight. These technologies underpin our carrier aircraft, WhiteKnightTwo; our spaceship, SpaceShipTwo; our hybrid rocket motor; and our safety systems. Our Future Astronauts will interact with these technologies at our operational headquarters at Spaceport America, the first purpose-built commercial spaceport, and our terminal hangar building, officially designated the "Virgin Galactic Gateway to Space."

**Table of Contents**



*Our Carrier Aircraft—WhiteKnightTwo*

WhiteKnightTwo is a twin-fuselage, custom-built aircraft designed to carry SpaceShipTwo up to an altitude of approximately 45,000 feet, where the spaceship is released for its flight into space. Using WhiteKnightTwo rather than a standard ground-launch rocket reduces the energy requirements for suborbital launch because SpaceShipTwo is not required to propel its way through the higher density atmosphere nearer to the Earth's surface. Air-launch systems have a well-established flight heritage, having first been used in 1947 for the Bell X-1, which was the first aircraft to break the speed of sound, and later on the X-15 suborbital spaceplane, in Northrop Grumman's Pegasus rocket system and in earlier versions of our spaceflight system.

WhiteKnightTwo's differentiating design features include its twin boom configuration, its single-piece composite main wing spars, its reusability as the first stage in our space launch system, and its versatility as a flight trainer for SpaceShipTwo. The twin boom configuration allows for a spacious central area between the two fuselages to accommodate a launch pylon to which SpaceShipTwo can be attached. Both cabins of WhiteKnightTwo are constructed on the same tooling and are identical in shape and size to the SpaceShipTwo cabin. The commonality of cabin construction provides cost savings in production, as well as operational, maintenance and crew training advantages. WhiteKnightTwo's all-composite material construction substantially reduces weight as compared to an all-metal design. WhiteKnightTwo is powered by four Pratt and Whitney Canada commercial turbo-fan engines. Spare parts and maintenance support are readily available for these engines, which have reliably been in service on WhiteKnightTwo since December 2008.

WhiteKnightTwo's pilots are all located in the right boom during all phases of ground operations and flight. At present, the left boom is empty and unpressurized; however, in the future, the left boom could be used to accommodate additional crew, research experiments or astronauts training for their flight on SpaceShipTwo, if permitted by relevant government agencies.

204

Table of Contents

WhiteKnightTwo's 140 foot main wing houses large air brakes that allow WhiteKnightTwo to mimic SpaceShipTwo's aerodynamic characteristics in the gliding portions of SpaceShipTwo's flight. This provides our pilots with a safe, cost-effective and repeatable way to train for SpaceShipTwo's final approach and landing.

Our carrier aircraft is designed to launch thousands of SpaceShipTwo flights over its lifetime. As such, our spaceflight launch platform system provides a flight experience and economics akin to commercial airplanes and offers a considerable economic advantage over other potential launch architectures. Additionally, our carrier aircraft has a rapid turnaround time, enabling it to provide frequent spaceflight launch services for multiple spaceships.

WhiteKnightTwo was designed with a view towards supporting our international expansion and has a range of up to 2,800 nautical miles. As a result, WhiteKnightTwo can transport SpaceShipTwo virtually anywhere in the world to establish launch capabilities.

WhiteKnightTwo has completed an extensive, multi-year test program that included a combination of ground and flight tests. As of June 30, 2019, WhiteKnightTwo had completed a total of 264 test flights, with more than 50 of those being dual tests with SpaceShipTwo.

Although specifically designed to carry and launch SpaceShipTwo, WhiteKnightTwo has various features that we believe could enable it to be used by third parties as a strategic asset for other commercial and government applications. These features include:

- ***Expansive payload and high altitude capacity.*** When not carrying SpaceShipTwo, WhiteKnightTwo has been designed to carry a payload pod that can carry up to 30,000 pounds at takeoff and 17,000 pounds at landing. Additionally, WhiteKnightTwo is designed to slow cruise and reach a maximum altitude above 55,000 feet, making it potentially compatible with, and differentiated for, a variety of government-related mission profiles.
- ***Symmetrical airflow and benign separation characteristics.*** The symmetrical airflow design helps provide payload stability and facilitates a clean separation from the payload.
- ***Interchangeable payload pods.*** Pods can be used by various customers for a variety of missions. Payload pods can be swapped easily on the WhiteKnightTwo, requiring limited redesign of a pod to change payloads. This provides customers with significant optionality in terms of what payloads can be carried on the WhiteKnightTwo. Payload pods can be pressurized and human rated, allowing commercial off-the-shelf parts to be used to accelerate the development of the customer's specific payload or technology. We have an existing contract to design a payload pod for a major U.S. aerospace prime contractor for a U.S. government contract that they have been awarded and expect to pursue similar work for commercial and government customers in the future.

**Table of Contents**



*Our Spaceship—SpaceShipTwo*

SpaceShipTwo is a reusable spaceship with the capacity to carry two pilots and up to six spaceflight participants into space before returning them safely to the Earth's surface. SpaceShipTwo is a rocket-powered winged vehicle designed to achieve a maximum speed of over Mach 3 and has a flight duration, measured from WhiteKnightTwo's takeoff to landing, of up to approximately 90 minutes.

SpaceShipTwo begins each mission by being carried to an altitude of approximately 45,000 feet by WhiteKnightTwo before being released. Upon release, the pilot fires the hybrid rocket motor, which propels SpaceShipTwo on a near vertical trajectory into space. Once in space, after providing the Future Astronauts with amazing views and a weightlessness experience, a pilot uses the spaceship's unique wing feathering feature in order to prepare the vehicle for re-entry. The feathering system works like a shuttlecock in badminton, naturally orienting SpaceShipTwo into the desired re-entry position with minimal pilot and computer input. This re-entry position uses the entire bottom of the spaceship to create substantial drag, thereby slowing the vehicle to a safe re-entry speed and preventing unacceptable heat loads. Once SpaceShipTwo has descended back to an altitude of approximately 55,000 feet above sea level, the wings un-feather back to their normal position, and SpaceShipTwo glides back to the base for a runway landing, similar to NASA's Space Shuttle or any other glider. SpaceShipTwo's feathering system was originally developed and tested on SpaceShipTwo's smaller predecessor, SpaceShipOne.

SpaceShipTwo's cabin has been designed to maximize customer safety and comfort. A dozen windows in the cabin line the sides and ceiling of the spaceship, offering customers the ability to view the black of space as well as stunning views of the Earth below. Exposure to G-forces during ascent and descent is mitigated by the use of an articulated seat that is upright during rocket boost and reclined during re-entry, enabling customers to

206

Table of Contents

experience G-forces that peak at approximately 3 to 4 times the force of gravity during re-entry in a relatively comfortable and safe orientation.

With the exception of the rocket motor's fuel and oxidizer, which must be replenished after each flight, SpaceShipTwo is designed to be a reusable spaceship. Like WhiteKnightTwo, SpaceShipTwo was constructed with all-composite material construction, providing beneficial weight and fatigue characteristics.

SpaceShipTwo, the VSS Unity, is completing an extensive flight test program that began in March 2010 with the original SpaceShipTwo, VSS Enterprise, which was built by a third-party contractor. This flight program was designed to include a rigorous series of ground and flight tests. As of June 30, 2019, the SpaceShipTwo configuration had completed more than 50 test flights of which eight were rocket-powered test flights, including successful flights to space in December 2018 and February 2019. Prior to commercial launch, SpaceShipTwo will complete its flight test program at Spaceport America in New Mexico. We anticipate our initial commercial launch will be in 2020.

### Hybrid Rocket Motor

SpaceShipTwo is powered by a hybrid rocket propulsion system, RocketMotorTwo, that propels it on a trajectory into space. The term "hybrid" rocket refers to the fact that the rocket uses a solid fuel grain and a liquid oxidizer. The fuel cartridge is consumed over the course of a flight, meaning that each SpaceShipTwo flight will require the installation of a new, replaceable fuel cartridge that contains the fuel used in the hybrid rocket motor. Assembly of this fuel cartridge is designed to be efficient and to support high rates of commercial spaceflight. In 2018, RocketMotorTwo set a Guinness world record as the most powerful hybrid rocket to be used in manned flight, and in February 2019 it was accepted into the permanent collection of the National Air and Space Museum.

RocketMotorTwo has been designed to provide required mission performance capability with a focus on safety, reliability and economy. Its design benefits from critical safety features including its ability to be shut down safely at any time and its limited number of moving parts, which increases reliability and robustness for human spaceflight. Furthermore, the motor is made from a benign substance that needs no special or hazardous storage.

As of June 30, 2019, we have built 116 full-scale motors and completed over 100 test firings of full scale RocketMotorTwos, including eight in-flight firings. Of these, two were full-duration firings that took SpaceShipTwo into space. Additionally, a variety of subscale tests have been performed to validate basic production and design methods.

Our in-house propulsion team is in the process of upgrading our fuel cartridge production plant to increase the production rate and to reduce unit production cost in order to accommodate planned growth in the SpaceShipTwo fleet and drive increasingly attractive per-flight economics.

### Safety Systems

We have designed our spaceflight system with a fundamental focus on safety. Important elements of our safety design include:

- *Horizontal takeoff and landing.* We believe that launching SpaceShipTwo from WhiteKnightTwo offers several critical safety advantages. Among other advantages, horizontal launch generally requires less fuel, oxidizer and pressurant on board than would otherwise be required. Moreover, the horizontal launch method allows increased time for pilots and crew to respond to any potential problems that may arise with the spaceship or its propulsion system. As such, if the pilots observe a problem while SpaceShipTwo is still mated to WhiteKnightTwo, they can quickly and safely return to the ground without releasing SpaceShipTwo. Furthermore, if potential concerns emerge after release from WhiteKnightTwo, SpaceShipTwo can simply glide back to the runway.

207

Table of Contents

- ***WhiteKnightTwo engine reliability.*** Highly reliable and rigorously tested jet engines made by Pratt and Whitney Canada power the first 45,000 feet of the journey to space.
- ***Two pilots per vehicle.*** Two pilots will fly in each WhiteKnightTwo and SpaceShipTwo. Having a second pilot in the vehicles spreads the workload and provides critical redundancies.
- ***Design of RocketMotorTwo.*** RocketMotorTwo is a simple and robust, human-rated spaceflight rocket motor with no turbo-pumps or complicated machinery. This rocket offers simple shut-off control at any point in the trajectory, unlike a traditional solid rocket motor.
- ***Feathering system.*** Our unique wing feathering technology provides self-correcting capability that requires limited pilot input for SpaceShipTwo to align properly for re-entry.
- ***Astronaut preparation.*** Each of our Future Astronauts will go through a customized medical screening and flight preparation process, including training for use of communication systems, flight protocols, emergency procedures and G-force training. In addition, initial customer questionnaires and health tracking have been completed and are maintained in a comprehensive and secure medical database.
- ***Full mission abort capability***. Due to our air-launch configuration, there are various safety mechanisms at different points in the flight in the case of an aborted mission. For example, if pre-launch release criteria are not met, the SpaceShipTwo is designed to remain attached to the carrier aircraft and make a smooth, mated landing. In the event of an abort in a short-burn duration, the spaceship pilot may choose to fly a parabolic, gliding recovery. For longer duration burns, pilots will continue to climb to configure a feathered re-entry and establish a gliding recovery at nominal altitudes.

### Spaceport America

The Future Astronauts' flight preparation and experience will take place at Spaceport America, the first purpose-built commercial spaceport in the world. Spaceport America is located in New Mexico on 27 square miles of desert landscape and includes a space terminal, hangar facilities and a 12,000 foot runway. The facility has access to 6,000 square miles of restricted airspace running from the ground to space. The restricted airspace will facilitate frequent and consistent flight scheduling, and the desert climate and its relatively predictable weather provide favorable launch conditions year-round. The development costs of Spaceport America were largely funded by the State of New Mexico. Our license from the FAA includes Spaceport America as a location from which we can launch and land our spaceflight system.

The terminal hangar building, officially designated the "Virgin Galactic Gateway to Space," was designed to be both functional and beautiful, matching customers' high expectations of a Virgin-branded facility and delivering an aesthetic consistent with the Virgin Galactic experience. The form of the building in the landscape and its interior spaces capture the drama and mystery of spaceflight, reflecting the thrill of space travel for our customers. The LEED-Gold certified building has ample capacity to accommodate our staff, our customer training and preparation facilities and our fleet of vehicles.

### The Astronaut Journey

Our goal is to offer our Future Astronauts an unmatched but affordable opportunity to experience spaceflight safely and without the need for any special prior experience or significant prior training and preparation. We have worked diligently for over a decade to plan every aspect of the customer's journey to become an astronaut, drawing on a world-class team with extensive experience with human spaceflight, high-end customer experiences and reliable transportation system operations and safety. We have had the considerable advantage of building and managing our initial community of Future Astronauts, comprised of individuals from 60 countries who have made reservations to fly on SpaceShipTwo. This community is actively engaged, allowing us to understand the style of customer service and experience expected before, during and after each flight. We have used customer input to ensure that each customer's journey with us, from end to end, will represent a pinnacle life experience and achievement.

Table of Contents

The journey begins with a personalized and consultative sales process. Once the reservation transaction is completed, the customer receives an "onboarding" call from our direct sales organization, known as our Astronaut Office, in London and is provided with a personalized welcome pack. This pack contains a desktop model of the spaceship, a Future Astronaut community membership card and other branded assets, along with a video message and personal letter from Sir Richard Branson welcoming the Future Astronaut into the Virgin Galactic family. Future Astronauts are kept apprised of community activity and company news through an app-accessed customer portal. Once we commence commercial operations, this portal will be the principal tool by which we will provide and receive necessary information from our customers in preparation for their spaceflights.

Prior to traveling to Spaceport America to begin his or her journey, each customer will be required to complete a medical history questionnaire. In addition to completing this questionnaire, each customer will also undergo a physical exam with an aerospace medicine specialist, typically within six months of flight. Some customers may be asked for additional testing as indicated by their health status. Based on our observations in tests involving a large group of our early customers, we believe that the vast majority of people who want to travel to space in our program will not be prevented from doing so by health or fitness considerations.

### Pre-Flight Training

Future Astronauts will participate in three days of pre-flight training at Spaceport America. The spaceflight is expected to occur on the fourth day of the astronaut experience.

Pre-flight training will include classroom education, mock-up training and time spent with the mission's fellow Future Astronauts and crew. The purpose of this training is to prepare the customers to safely experience the spaceflight, particularly the key attributes of the unique sensation of weightlessness and the feeling of dramatic acceleration upon launch.

We have worked with training experts, behavioral health experts, experienced flight technicians, and experienced government astronauts in order to customize training for our suborbital missions. This program is expected to include training for emergency egress, flight communication systems, flight protocols, seat ingress and egress and will meet all training requirements prescribed by applicable regulation.

The training program has been built on the philosophy that familiarization with the systems, procedures, equipment and personnel that will be involved in the actual flight will make the Future Astronaut more comfortable and allow the customer to focus his or her attention on having the best possible experience. As a result, most training is expected to involve hands-on activities with real flight hardware or with high fidelity mock-ups.

Although broadly similar for each flight, the training program and the flight schedule may vary slightly depending on the backgrounds, personalities, physical health of the astronauts and weather and other conditions. Additionally, we expect to review, assess and modify the program regularly as we gain commercial experience.

### The Spaceflight Experience

On the morning of their flight to space, the Future Astronauts will head out to the spaceport for their final flight briefings and preparation. Customers will change into personal, custom-designed flight suits developed and fabricated by Under Armour via brand partnership. The Future Astronauts then will meet up with their fellow Future Astronauts and board SpaceShipTwo, which will already be mated to the WhiteKnightTwo.

The spaceship cabin has been designed, like the spaceport interior, to deliver an aesthetic consistent with our brand values and to optimize the flight experience. User experience features are expected to include strategically positioned high definition video cameras, flight data displays and cabin lighting. Virgin Group companies are renowned for their interior design, particularly in the aviation industry. That experience and reputation has been brought to bear on both spaceship and spaceport interiors in an effort to optimize the customer journey.

209

Table of Contents

Once all customers are safely onboard and the pilots have coordinated with the appropriate regulatory and operational groups, WhiteKnightTwo will take-off and climb to an altitude of approximately 45,000 feet. Once at altitude, the pilots will perform all necessary vehicle and safety checks and then will release SpaceShipTwo from WhiteKnightTwo. Within seconds, the rocket motor will be fired, instantly producing acceleration forces of up to 4Gs as the spaceship undertakes a near vertical climb and achieves speeds of more than Mach 3.

After the rocket motor has fired for approximately 60 seconds, the pilots will shut it down, and the spaceship will coast up to apogee. Customers will be able to exit their seats and experience weightlessness, floating about the cabin and positioning themselves at one of the dozen windows around the cabin sides and top. The vehicle's two pilots will maneuver the spaceship in order to give the astronauts spectacular views of the Earth and an opportunity to look out into the blackness of space. While the astronauts are enjoying their time in space, SpaceShipTwo's pilots will have reconfigured the spaceship into its feathered re-entry configuration.

After enjoying several minutes of weightlessness, customers will maneuver back to their own seats to prepare for re-entry. We have conducted seat egress and ingress testing in weightlessness to verify that customers will be able to return to their seats quickly and safely. Our personalized seats, custom-designed to support each astronaut safely during each phase of flight, will cushion the astronauts as the spaceship rapidly decelerates upon re-entry. Customers will enjoy the journey back into the Earth's atmosphere at which time the vehicle's wings will be returned to their normal configuration, and the spaceship will glide back to the original runway from which the combined WhiteKnightTwo and SpaceShipTwo pair had taken off less than two hours prior. Upon landing, astronauts will disembark and join family and friends to celebrate their achievements and receive their astronaut wings.

**Sales and Marketing**

As of June 30, 2019, we had reservations for 603 spaceflight tickets and approximately $80 million in deposits, representing potential revenue of approximately $120 million. Through strong capabilities in community management we have high retention rates, despite deposits being refundable. We believe these sales are largely attributable to the strength and prominence of the Virgin Galactic brand, which has driven many of our customers directly to us with inbound requests. For example, between the December 2018 spaceflight and June 30, 2019, over 2,500 individuals registered interest in a spaceflight reservation on our website. We have also benefited from Richard Branson's personal network to generate new inquiries and reservation sales, as well as referrals from existing reservation holders. As we transition to full commercialization, we intend to take a more active role in marketing and selling our spaceflight experience.

Given that sales of spaceflights are consultative and generally require a one-on-one sales approach, we intend to go to market using our direct sales organization. Our direct sales organization, known as the Astronaut Office, is headquartered in London, England. The Astronaut Office also actively manages our Future Astronaut community and sits within our commercial team, which has additional responsibilities including the management of related social channels, public relations, brand management and brand partnerships, including those with Under Armour and Land Rover.

We intend to expand the reach of our direct sales organization using a global network of high-end travel professionals that we refer to as Accredited Space Agents. Our Accredited Space Agents consist of high-end travel professionals from over 30 countries that we hand-picked and individually trained to sell our spaceflights. Accredited Space Agents have contracted with us to sell spaceflight reservations and, while they actively sell other travel experiences, are precluded from selling spaceflight experiences from any other provider. While many of our reservations came through direct inquiry, our Accredited Space Agents were responsible for selling approximately 23% of our reservations as of June 30, 2019.

210

Table of Contents

We are continuing to evaluate and develop our marketing strategy in anticipation of commercial operations and believe our existing direct sales organization, together with our available network of Accredited Space Agents, possess the people, processes, systems and experience we will need to support profitable and fast-growing commercial operations.

We have historically sold spaceflight tickets at a price point of up to $250,000 per ticket. However, given the expected demand for human spaceflight experiences and the limited available capacity, we expect the price of our tickets to increase for a period of time upon resuming sales activities. We also anticipate offering premium pricing options for customers with an interest in further customizing or enhancing their astronaut journey.

**Research and Education Applications**

In addition to the potential market for human space travel, we believe our existing technology has potential application in other ancillary markets, such as research and education. Historically, the ability to perform research and education activities in space has been limited by the same challenges facing human spaceflight, including the significant cost associated with traveling to space and the limited physical capacity available for passengers or other payloads. Additionally, the long launch lead times and the low launch rate for these journeys make it difficult to run an experiment quickly or to fly repeated experiments, and there has traditionally been a significant delay in a researcher's ability to obtain the data from the experiment once the journey was complete. Moreover, traditional spaceflight is hard on research payloads due to the high G-loads at launch. As a result, researchers have attempted to use parabolic aircraft and drop towers to create moments of microgravity and conduct significant research activities. While these solutions help address cost concerns, they offer only seconds of microgravity per flight and do not offer access to the upper atmosphere or space, rapid re-flight or, in the case of drop towers and sounding rockets, the opportunity for the principal investigator to fly with the scientific payload. We believe our existing spaceflight system addresses many of these issues by providing:
- researchers the ability to accompany and monitor their experiments in space;
- the ability to fly payloads repeatedly, which can enable lower cost and iterative experiments;
- prompt access to experiments following landing;
- access to a large payload capacity; and
- in the case of sounding rockets, dramatically gentler G-loading.

We believe the demand for access to suborbital research is likely to come from educational and commercial research institutions across a broad range of technical disciplines. Multiple government agencies and research institutions have expressed interest in contracting with us to deliver research payloads to space and to conduct suborbital experiments. We have flown eight payloads for research-related missions and we expect research missions to form an important part of our launch manifest in the future.

**Design, Development and Manufacturing**

Headquartered at the Mojave Air and Space Port in Mojave, California, our development and manufacturing team consists of over 500 talented and dedicated engineers, technicians and professionals with thousands of years of combined design, engineering, manufacturing and flight test experience from a wide variety of the world's leading research, commercial and military aerospace organizations.

We have developed extensive vertically integrated aerospace development capabilities for developing, manufacturing and testing aircraft and related propulsion systems. These capabilities encompass preliminary systems and vehicle design and analysis, detail design, manufacturing, ground testing, flight testing and post-delivery support and maintenance. We believe our unique approach and rapid prototyping capabilities enable innovative ideas to be designed quickly and built and tested with process rigor. In addition, we have expertise in configuration management and developing documentation needed to transition our technologies and systems to

211

Table of Contents

commercial applications. We believe our breadth of capabilities, experienced and cohesive team, and culture would be difficult to re-create and can be easily leveraged on the future design, build and test of transformational aerospace vehicles.

The first vehicle we manufactured was VSS Unity, the second SpaceShipTwo. Leveraging the extensive design engineering invested in VSS Unity, we are currently manufacturing additional spaceships based on that design, at a substantially lower cost. In addition, we are manufacturing rocket motors to support growth of our commercial operations over time.

Additionally, we have developed a significant amount of know-how, expertise and capabilities that we believe we can leverage to capture growing demand for innovative, agile and low-cost development projects for third parties, including contractors, government agencies and commercial service providers. We are actively exploring strategic relationships to develop new applications for our technologies and to develop new aerospace technologies for commercial and transportation applications that we believe will accelerate progress within relevant industries and enhance our growth.

All of our manufacturing operations, which include among others fabrication, assembly, warehouse and both ground and test operations, are located in Mojave, California at the Air and Space Port, where our campus spans over 200,000 square feet. This location provides us with year-round access to airspace for various flight test programs. We believe having all manufacturing operations located at this campus facilitates rapid experimentation of new concepts, which is key to delivering innovation.

**Additional Potential Applications of our Technology**

We believe we can leverage our robust platform of advanced technologies, significant design, engineering and manufacturing experience, and thousands of hours of flight training to develop additional aerospace applications, including, among others, supersonic and hypersonic point-to-point travel. Supersonic and hypersonic aircraft are aircraft capable of traveling at speeds faster than the speed of sound and five times the speed of sound, respectively. We believe a significant market opportunity exists for vehicles with this capability, as they could be used to drastically reduce international travel times. Other potential applications of our technology include urban air mobility, or the ability to enable rapid, reliable transportation within cities and urban areas; captive carry and launch services; and high altitude long endurance vehicles. While our primary focus for the foreseeable future will be on commencing and managing our commercial human spaceflight operations, we expect to continue to explore and evaluate the application of our technologies into these and other ancillary applications.

**Competition**

The commercial spaceflight industry is still developing and evolving but we expect it to be highly competitive. Currently, our primary competitor in establishing a suborbital commercial human spaceflight market is Blue Origin, a privately-funded company that is seeking to develop a vertically-launched, suborbital spaceship. In addition, we are aware of several large, well-funded, public and private entities actively engaged in developing competitive products within the aerospace industry, including SpaceX and Boeing. While these companies are currently focused on providing orbital spaceflight transportation to government agencies, a fundamentally different product from ours, we cannot ensure that one or more of these companies will not shift their focus to include suborbital spaceflight and directly compete with us in the future.

Many of our current and potential competitors are larger and have substantially greater resources than we do. They may also be able to devote greater resources to the development of their current and future technologies or the promotion and sale of their offerings, or to offer lower prices. Our current and potential competitors may also establish cooperative or strategic relationships amongst themselves or with third parties that may further enhance their resources and offerings. Further, it is possible that domestic or foreign companies or governments,

212

**Table of Contents**

some with greater experience in the aerospace industry or greater financial resources than we possess, will seek to provide products or services that compete directly or indirectly with our products and services in the future. Any such foreign competitor could potentially, for example, benefit from subsidies from or other protective measures by its home country.

We believe our ability to compete successfully as a commercial provider of human spaceflight does and will depend on a number of factors including the price of our offerings, consumer confidence in the safety of our offerings, consumer satisfaction for the experiences we offer, and the frequency and availability of our offerings. We believe that we compete favorably on the basis of these factors.

## Intellectual Property

Our success depends in part upon our ability to protect our core technology and intellectual property. We attempt to protect our intellectual property rights, both in the United States and abroad, through a combination of patent, trademark, copyright and trade secret laws, as well as nondisclosure and invention assignment agreements with our consultants and employees, and we seek to control access to and distribution of, our proprietary information through non-disclosure agreements with our vendors and business partners. Unpatented research, development and engineering skills make an important contribution to our business, but we pursue patent protection when we believe it is possible and consistent with our overall strategy for safeguarding intellectual property.

### *Virgin Trademark License Agreement*

Since 2009, VG, LLC has possessed certain exclusive and non-exclusive rights to use the name and brand "Virgin Galactic" and the Virgin signature logo. On July 9, 2019 and in connection with our entry into the Merger Agreement, we agreed that the trademark license agreement with VEL would, effective on the consummation of the Business Combination, be amended and restated and novated to VGH, Inc. in order for us to continue to have these certain rights to the "Virgin Galactic" name and brand and the Virgin signature logo following consummation of the Business Combination. Our rights under the amended and restated trademark license are subject to certain reserved rights and pre-existing licenses granted by VEL to third parties. In addition, for the term of the Amended TMLA, to the extent the Virgin Group does not otherwise have a right to place a director on the board of directors of VGH, Inc., such as V10's right to designate the VG designees under the Stockholder's Agreement, under the Amended TMLA, VGH, Inc. has agreed to provide VEL with the right to appoint one director to VGH, Inc.'s board of directors (provided the designee is qualified to serve on the board under all applicable corporate governance policies and regulatory and NYSE requirements).

Unless terminated earlier, the Amended TMLA will have an initial term of 25 years from the date of the consummation of the Business Combination, subject to up to two additional 10-year renewals by mutual agreement of the parties. The Amended TMLA may be terminated by VEL upon the occurrence of a number of specified events, including if:
- we commit a material breach of our obligations under the Amended TMLA (subject to a cure period, if applicable);
- we materially damage the Virgin brand;
- we use the brand name "Virgin Galactic" outside of the scope of the activities licensed under the Amended TMLA (subject to a cure period);
- we become insolvent;
- we undergo a change of control to an unsuitable buyer, including to a competitor of VEL's group;
- we fail to make use of the "Virgin Galactic" brand to conduct our business;
- we challenge the validity or entitlement of VEL to own the "Virgin" brand; or

213

Table of Contents

- the commercial launch of our services does not occur by a fixed date or thereafter if we are unable to undertake any commercial flights for paying passengers for a specified period (other than in connection with addressing a significant safety issue).

Upon any termination or expiration of the Amended TMLA, we will (unless otherwise agreed with VEL) have ninety days to exhaust, return or destroy any products or other materials bearing the licensed trademarks, and to change our corporate name to a name that does not include any of the licensed trademarks, including the Virgin name.

Pursuant to the terms of the Amended TMLA, we are obligated to pay VEL quarterly royalties equal to the greater of (a) a low single-digit percentage of our gross sales and (b)(i) prior to the first spaceflight for paying customers, a mid-five figure amount in dollars and (ii) from our first spaceflight for paying customers, a low-six figure amount in dollars, which increases to a low-seven figure amount in dollars over a four-year ramp up and thereafter increases in correlation with the consumer price index. In relation to certain sponsorship opportunities, a higher, mid-double-digit percentage royalty on related gross sales applies.

The Amended TMLA also contains, among other things, customary mutual indemnification provisions, representations and warranties, information rights of VEL and restrictions on our and our affiliates' ability to apply for or obtain registration for any confusingly similar intellectual property to that licensed to us pursuant to the Amended TMLA. Furthermore, VEL is generally responsible for the protection, maintenance, enforcement and protection of the licensed intellectual property, including the Virgin brand, subject to our step-in rights in certain circumstances.

All Virgin and Virgin-related trademarks are owned by VEL and our use of such trademarks is subject to the terms of the Amended TMLA, including our adherence to VEL's quality control guidelines and granting VEL customary audit rights over our use of the licensed intellectual property.

*Spacecraft Technology License Agreement*

We are party to a Spacecraft Technology License Agreement, as amended, with Mojave Aerospace Ventures, LLC ("MAV") pursuant to which we possess a non-exclusive, worldwide license under certain patents and patent applications, including improvements that have been reduced to practice within a specified period. Unless terminated earlier, the term of this license agreement will expire on the later of a fixed date and the expiration date of the last to expire of the patent rights granted under the agreement. The license agreement and the associated licenses granted thereunder may be terminated if we commit a material breach of our obligations under the agreement that is uncured for more than 30 days, or if we become insolvent.

Under the terms of the license agreement, we are obligated to pay MAV license fees and royalties through the later of a fixed date and the expiration date of the last to expire of the patent rights granted under the agreement of (a) a low-single-digit percentage of our commercial spaceflight operating revenue, subject to an annual cap that is adjusted annually for changes in the consumer price index, (b) a low-single-digit percentage of our gross operating revenue on the operation of spacecraft, and (c) a mid-single-digit percentage of our gross sales revenue of spacecraft sold to third parties.

**Regulatory**

*Federal Aviation Administration*

The regulations, policies and guidance issued by the FAA apply to the use and operation of our spaceflight system. When we operate our spaceflight system as "launch vehicles," meaning a vehicle built to operate in, or place a payload or human beings in, space, and a suborbital rocket, the FAA's commercial space transportation requirements apply. Operators of launch vehicles are required to have proper licenses, permits and authorizations from the FAA and comply with the FAA's insurance requirements for third-party liability and government

214

**Table of Contents**

property. While our vehicles currently are registered with the FAA, in the event that the parties decide, pursuant to the Merger Agreement, that the Merger Subs should survive the Mergers, we will need to file new vehicle registration applications for the surviving Merger Subs. In that instance, once any such new vehicle registration applications are filed, the applications will serve as registrations until the FAA issues the new vehicle registrations, which will allow us to continue our operations during that period. Congress enacted a law prohibiting the FAA from issuing regulations until 2023 for the safety of persons on launch vehicles such as the SpaceShipTwo and WhiteKnightTwo, unless a death or serious injury, or event that could have led to a death or serious injury, were to occur earlier. Once this law expires, we may face increased and more expensive regulation from the FAA relating to our spaceflight activities. The FAA has an open notice of proposed rulemaking process relating to commercial launch that could impact our operations. While we are monitoring these developments, we cannot predict the timing, scope or terms of any proposed rulemaking relating to commercial launch.

When not operating as launch vehicles, our spaceflight system vehicles are regulated as experimental aircraft by the FAA. The FAA is responsible for the regulation and oversight of matters relating to experimental aircraft, the control of navigable air space, the qualification of flight personnel, flight training practices, compliance with FAA aircraft certification and maintenance, and other matters affecting air safety and operations.

In 2016, the FAA granted us our commercial space launch license with a limited number of verification and validation steps that must be completed before the FAA will clear us to include customers on our spaceflights. We are in the process of completing those steps. Our license from the FAA includes both the Air and Space Port in Mojave, California and Spaceport America in New Mexico as locations from which we can launch and land our spaceflight system.

Failure to comply with the FAA's aviation or space transportation regulations may result in civil penalties or private lawsuits, or the suspension or revocation of licenses or permits, which would prevent us from operating our spaceflight system.

### *Informed Consent and Waiver*

Our commercial human spaceflight operations and any third-party claims that arise from our operation of spaceflights are subject to federal and state laws governing informed consents and waivers of claims, including under the Commercial Space Launch Amendments Act of 2004 ("CSLA") and the New Mexico Space Flight Informed Consent Act ("SFICA").

Under U.S. federal law and the CSLA, operators of spaceflights are required to obtain informed consent from both participants and members of crew for any commercial human spaceflight. In addition, the CSLA requires that an operator must obtain any spaceflight participant's informed consent before receiving compensation or making an agreement to fly. While compensation is not defined in regulation or statute, the FAA does not consider refundable deposits for future spaceflight to be compensation. Moreover, the CSLA established a three-tiered indemnification system, subject to appropriations, for a portion of claims by third parties for injury, damage or loss that result from a commercial spaceflight incident. All operators with an FAA-license for commercial launches and reentries are covered by this federal indemnification and are required to carry insurance in amounts up to the maximum probable loss level likely to occur in an accident subject to a cap. In the instance of a catastrophic loss, U.S. law provides that the federal government will pay up to $3.0 billion to indemnify the operator above the levels covered by insurance.

Additionally, the SFICA offers spaceport-related companies protection in New Mexico, where we will conduct our commercial operations, from lawsuits from passengers on space vehicles where spaceflight participants provide informed consent and a waiver of claims. This law generally provides coverage to operators, manufacturers and suppliers, and requires operators to maintain at least $1.0 million in insurance for all space flight activities. The SFICA will automatically be repealed in July 2021 unless New Mexico chooses to extend it.

Table of Contents

At this time, no such claim regarding these informed consent provisions has been brought in New Mexico or in federal courts, and we are unable to determine whether the immunity provided by the CSLA, the SFICA or other applicable laws or regulations would be upheld by U.S. or foreign courts. The various federal and state regulations regarding informed consent for suborbital commercial spaceflight are evolving, and we continue to monitor these developments. However, we cannot predict the timing, scope or terms of any other state, federal or foreign regulations relating to informed consent and waivers of claims relating to commercial human spaceflight.

### International Traffic in Arms Regulations and Export Controls

Our spaceflight business is subject to, and we must comply with, stringent U.S. import and export control laws, including the ITAR and the EAR. The ITAR generally restrict the export of hardware, software, technical data, and services that have defense or strategic applications. The EAR similarly regulate the export of hardware, software, and technology that has commercial or "dual-use" applications (i.e., for both military and commercial applications) or that have less sensitive military or space-related applications that are not subject to the ITAR. The regulations exist to advance the national security and foreign policy interests of the United States.

The U.S. government agencies responsible for administering the ITAR and the EAR have significant discretion in the interpretation and enforcement of these regulations. The agencies also have significant discretion in approving, denying, or conditioning authorizations to engage in controlled activities. Such decisions are influenced by the U.S. government's commitments to multilateral export control regimes, particularly the Missile Technology Control Regime with respect to the spaceflight business.

Many different types of internal controls and efforts are required to ensure compliance with such export control rules. In particular, we are required to maintain a registration under the ITAR; determine the proper licensing jurisdiction and classification of products, software and technology; and obtain licenses or other forms of U.S. government authorizations to engage in activities, including the performance of services for foreign persons, related to and that support our spaceflight business. The authorization requirements include the need to get permission to release controlled technology to foreign person employees and other foreign persons. The inability to secure and maintain necessary licenses and other authorizations could negatively affect our ability to compete successfully or to operate our spaceflight business as planned. Any changes in the export control regulations or U.S. government licensing policy, such as that necessary to implement U.S. government commitments to multilateral control regimes, may restrict our operations.

Failures by us to comply with export control laws and regulations could result in civil or criminal penalties, fines, investigations, more onerous compliance requirements, loss of export privileges, debarment from government contracts, or limitations on our ability to enter into contracts with the U.S. government.

### Employees

Our employees are critical to our success. As of June 30, 2019, we had 669 employees and 155 contractors. Prior to joining our company, many of our employees had prior experience working for a wide variety of reputed research, commercial and military aerospace and non-aerospace organizations. To date, we have not experienced any work stoppages, and we consider our relationship with our employees to be good.

### Facilities

We operate primarily at two locations in California and New Mexico. All of our facilities are located on land that is leased from third parties. We believe that such facilities meet our current and future anticipated needs.

We maintain more than 200,000 square feet of manufacturing and operations facilities at the Mojave Air and Space Port in Mojave, California. This campus includes six main operational buildings and several storage

216

Table of Contents

buildings under separate lease agreements that collectively house fabrication, assembly, warehouse, office and test operations. These facilities are leased pursuant to several agreements, which generally have two- or three-year initial terms coupled with renewal options. Several leases are either operating in renewal periods or on a month-to-month basis.

We will conduct our commercial operations at Spaceport America in Sierra County, New Mexico. Located on more than 25 square miles of desert landscape and with access to more than 6,000 square miles of protected airspace, Spaceport America is the world's first purpose-built commercial spaceport and is home to the Virgin Galactic Gateway to Space terminal. State and local governments in New Mexico have invested more than $200.0 million in Spaceport America, with Virgin Galactic serving as the facility's anchor tenant under a 20-year lease scheduled to expire in 2028, subject to our right to extend the term for an additional five years.

**Legal Proceedings**

We are from time to time subject to various claims, lawsuits and other legal and administrative proceedings arising in the ordinary course of business. Some of these claims, lawsuits and other proceedings may involve highly complex issues that are subject to substantial uncertainties, and could result in damages, fines, penalties, non-monetary sanctions or relief. However, we do not consider any such claims, lawsuits or proceedings that are currently pending, individually or in the aggregate, to be material to our business or likely to result in a material adverse effect on our future operating results, financial condition or cash flows.

217

Table of Contents

**MANAGEMENT OF VGH, INC. FOLLOWING THE BUSINESS COMBINATION**

The following sets forth certain information, as of July 31, 2019, concerning the persons who are expected to serve as directors and executive officers of VGH, Inc. following the consummation of the Business Combination and assuming the election of the nominees at the extraordinary general meeting as set forth in "*Director Election Proposal*."

| Name | Age | Position |
|---|---|---|
| George Whitesides | 45 | Chief Executive Officer |
| Jon Campagna | 46 | Chief Financial Officer |
| Mike Moses | 51 | President, VG, LLC |
| Enrico Palermo | 40 | President, TSC, LLC |
| Chamath Palihapitiya | 42 | Chairperson of the Board of Directors |
| Adam Bain | 45 | Director |
| James Ryans | 43 | Director |
| | | Director |
| | | Director |
| | | Director |
| | | Director |

**Executive Officers**

*George Whitesides.* Upon consummation of the Business Combination, George Whitesides will serve as VGH, Inc.'s Chief Executive Officer. Mr. Whitesides has been Chief Executive Officer of the VG Companies since May 2010. Prior to joining the VG Companies, Mr. Whitesides served as Chief of Staff for NASA from July 2009 to April 2010, and served on the NASA Transition Team from November 2008 to January 2009. Upon departure from the American space agency, he received the Distinguished Service Medal, the highest award the agency confers. Mr. Whitesides has served on various governmental and charitable boards in his career, such as chair of the Reusable Launch Vehicle Work Group for the FAA's Commercial Space Transportation Advisory Committee, and as a member of the board of Virgin Unite USA, a charitable entity related to Virgin Group. Mr. Whitesides has also served on the executive committee of the Commercial Spaceflight Federation, an industry association (currently as Vice Chair), Caltech's Space Innovation Council, Princeton University's Advisory Council for Mechanical and Aerospace Engineering, and the World Economic Forum's Global Future Council on Space Technologies (as Co-Chair and Member). Mr. Whitesides graduated from Princeton University with a degree from the Woodrow Wilson School of Public and International Affairs, earned a MPhil in geographic information systems and remote sensing from the University of Cambridge, and was a Fulbright Scholar.

*Jon Campagna.* Upon consummation of the Business Combination, Jon Campagna will serve as VGH, Inc.'s Chief Financial Officer. Mr. Campagna has been the Chief Financial Officer for the VG Companies since April 2018. Mr. Campagna previously served as Vice President of Finance for the VG Companies from October 2015 to April 2018. Prior to joining the VG Companies, Mr. Campagna served as Controller from July 2012 to October 2015 at ICON Aircraft, a light sport aircraft manufacturer, where he helped transition the organization from a research and development centric organization to a full production environment. Before his tenure at ICON, Mr. Campagna held various financial leadership positions at Ericsson from April 2007 to July 2012, and prior to Ericsson was the Corporate Controller at Tandberg Television from June 2006 to April 2007, when it was acquired by Ericsson. Prior to Tandberg Television, Mr. Campagna was the Corporate Controller at GoldPocket Interactive, a media software provider, from May 2000 to June 2006, shortly after it was acquired by Tandberg Television. Mr. Campagna started his career in the audit and assurance services practice at PwC after graduating from California Polytechnic State University, San Luis Obispo with a bachelor's degree in Business Administration . Mr. Campagna is a certified public accountant (inactive) in the State of California.

233

Table of Contents

*Mike Moses.* Upon consummation of the Business Combination, Mike Moses will serve as President of VG, LLC, which will be VGH, Inc.'s wholly owned subsidiary focused on the operation of our spaceflight systems. Mr. Moses has been President of VG, LLC since June 2016 and is responsible for overseeing program development and spaceflight operations, including vehicle processing, flight planning, astronaut training, and flight crew operations. Mr. Moses previously served as VG, LLC's Vice-President of Operations from October 2011 to June 2016. Prior to joining the VG Companies, Mr. Moses served at NASA's Kennedy Space Center in Florida as the Launch Integration Manager from August 2008 to October 2011, where he led all space shuttle processing activities from landing through launch, including serving as the chair of NASA's Mission Management Team, where he provided ultimate shuttle launch decision authority. Mr. Moses served as Flight Director at NASA's Johnson Space Center from April 2005 to August 2008 where he led teams of flight controllers in the planning, training, and execution of space shuttle missions. Mr. Moses graduated from Purdue University with a bachelor's degree in Physics and a master's degree in Aeronautical and Astronautical Engineering, and earned a master's degree in Space Sciences from the Florida Institute of Technology. Mr. Moses is a two-time recipient of the NASA Outstanding Leadership Medal.

*Enrico Palermo.* Upon consummation of the Business Combination, Enrico Palermo will serve as President of TSC, LLC, which will be VGH, Inc.'s wholly owned subsidiary focused on the development and manufacture of our spaceflight systems. Mr. Palermo has been President of TSC, LLC since February 2018 and is responsible for the development, manufacturing and testing of the VG Companies' fleet of spaceships, carrier aircraft and rocket motors. Mr. Palermo previously served as TSC, LLC's Executive Vice President and General Manager from August 2016 to February 2018 and as Vice President of Operations from July 2011 to July 2016. Mr. Palermo joined the VG Companies in November 2006 and was instrumental in implementing and developing spaceship manufacturing operations and capabilities for TSC, LLC in Mojave, California. Upon receipt of a scholarship from the European Space Agency, Mr. Palermo studied at the International Space University in Strasbourg, France, completing the university's intensive Space Studies Program in September 2006. Mr. Palermo graduated from the University of Western Australia with a Bachelor of Engineering in Mechanical Engineering and Bachelor of Science in Physics and Applied Mathematics.

**Directors**

Upon the consummation of the Business Combination, SCH anticipates the initial size of VGH, Inc.'s board of directors being seven directors, each of whom will be voted upon by SCH's shareholders at the extraordinary general meeting.

*Chamath Palihapitiya.* Upon consummation of the Business Combination, Mr. Palihapitiya will serve as the Chairperson of VGH, Inc.'s board of directors. Biographical information for Mr. Palihapitiya is set forth under "*Information about SCH—Directors and Executive Officers.*" Mr. Palihapitiya is well qualified to serve as the Chairperson of VGH, Inc.'s board of directors because of his extensive management history and experience in identifying, investing in and building next-generation technologies and companies, and because he will be a significant stockholder of VGH, Inc. after the Business Combination.

*Adam Bain.* Upon consummation of the Business Combination, Mr. Bain will serve as one of VGH, Inc.'s directors. Biographical information for Mr. Bain is set forth under "*Information About SCH—Directors and Executive Officers.*" Mr. Bain is well qualified to serve on VGH, Inc.'s board of directors because of his extensive experience relating to business growth and development within technology and other related industries.

*James Ryans.* Upon consummation of the Business Combination, Dr. Ryans will serve as one of VGH, Inc.'s directors. Biographical information for D. Ryans is set forth under "*Information About SCH—Directors and Executive Officers.*" Dr. Ryans is well qualified to serve on VGH, Inc.'s board of directors because of his extensive background and expertise relating to financial consulting, financial accounting and other related industries.

Table of Contents

Upon consummation of the Business Combination, will serve as one of VGH, Inc.'s directors.

Upon consummation of the Business Combination, will serve as one of VGH, Inc.'s directors.

Upon consummation of the Business Combination, will serve as one of VGH, Inc.'s directors.

Upon consummation of the Business Combination, will serve as one of VGH, Inc.'s directors.

## Corporate Governance

### *Composition of the Board of Directors*

The business and affairs of VGH, Inc. will be managed under the direction of its board of directors. Following the consummation of this Business Combination, its board of directors will initially consist of seven directors. Subject to the terms of the Stockholders' Agreement and VGH, Inc.'s Proposed Certificate of Incorporation and Proposed Bylaws, the number of directors will be fixed by VGH, Inc.'s board of directors.

When considering whether directors and director nominees have the experience, qualifications, attributes and skills, taken as a whole, to enable VGH, Inc.'s board of directors to satisfy its oversight responsibilities effectively in light of its business and structure, the board of directors expects to focus primarily on each person's background and experience as reflected in the information discussed in each of the directors' individual biographies set forth above in order to provide an appropriate mix of experience and skills relevant to the size and nature of its business.

Prior to the consummation of this offering, V10, Sponsor and Mr. Palihapitiya (together with any individuals or entities that are signatories thereto or hereafter become party to the agreement, the "Voting Parties"), whose total combined voting power immediately following the consummation of the Business Combination will represent more than 50% of the combined voting power of VGH, Inc., will enter into the Stockholders' Agreement pursuant to which, among other things, (i) V10 and Mr. Palihapitiya will be granted rights to designate directors for election to the Board (and the Voting Parties will vote in favor of such designees at any annual or special meeting of stockholders in which directors are elected,), (ii) V10 will agree not to take action to remove the members of the Board designated by Mr. Palihapitiya pursuant thereto, (iii) Mr. Palihapitiya will agree not to take action to remove the members of the Board designated by V10 pursuant thereto, and (iv) V10 will, under certain circumstances, have the right to approve certain matters as set forth therein. See "*BCA Proposal—Related Agreements—Stockholders' Agreement*."

Under the Stockholders' Agreement, V10 will have the right to designate three directors (the "VG designees") for as long as V10 beneficially owns a number of shares of VGH, Inc. common stock representing at least the 50% of the number of shares beneficially owned by V10 immediately following the effective time of the Mergers (after taking into account the consummation of the transactions contemplated by the Purchase Agreement) (provided that when such percentage falls below (x) 50%, V10 will have the right to designate only two directors, (y) 25%, V10 will have the right to designate only one director and (z) 10%, V10 will not have the right to designate any directors). Each of Sponsor and Mr. Palihapitiya will agree to vote, or cause to vote, all of their outstanding shares of its common stock at any annual or special meeting of stockholders in which directors are elected, so as to cause the election of the VG designees.

Additionally, pursuant to the Stockholders' Agreement, Mr. Palihapitiya will also have the right to designate two directors ("CP designees"), one of which must qualify as an "independent director" under stock exchange

235

Table of Contents

regulations applicable to VGH, Inc., for as long as Mr. Palihapitiya and the Sponsor collectively beneficially own a number of shares of VGH, Inc. common stock representing at least 90% of the number of shares beneficially owned by them as of immediately following the effective time of the Mergers (excluding any shares purchased by Mr. Palihapitiya pursuant to the Purchase Agreement) (provided that when such percentage falls below (x) 90%, Mr. Palihapitiya will have the right to designate only one director, who will not be required to qualify as an "independent director" and (y) 50%, Mr. Palihapitiya will not have the right to designate any directors). V10 will agree to vote, or cause to vote, all of its outstanding shares of VGH, Inc.'s common stock at any annual or special meeting of stockholders in which directors are elected, so as to cause the election of the CP designees. The initial chairperson of the board of directors (as defined in the bylaws) will be Mr. Palihapitiya (provided that Mr. Palihapitiya is entitled to designate at least one director for election) until such time as V10 identifies a permanent chairperson who qualifies as an independent director and is reasonably acceptable to Mr. Palihapitiya.

After consummation of the Business Combination, under the terms of the Stockholders' Agreement, two directors (the "Other designees"), each of whom must qualify as an "independent director" under stock exchange regulations applicable to VGH, Inc. and one of whom must qualify as an "audit committee financial expert" as defined under the rules of the SEC, will initially be appointed in accordance with the Stockholders' Agreement and, thereafter, will be determined by the board of directors. V10 has been deemed to have designated for election to VGH, Inc.'s board of directors, Mr. Palihapitiya has been deemed to have designated Messrs. Palihapitiya and Bain for election to the board of directors and James Ryans and have been deemed to have been designated as the Other designees for election to the board of directors.

Pursuant to the terms of the Stockholders' Agreement, the VG designees, the CP designees and the Other designees will only be able to be removed with or without cause at the request of the party entitled to designate such director. In all other cases and at any other time, directors will only be able to be removed by the affirmative vote of at least a majority of the voting power of VGH, Inc.'s common stock. See "*BCA Proposal—Related Agreements— Stockholders' Agreement—Resignation; Removal; Vacancies.*"

In addition, under the Amended TMLA, to the extent the Virgin Group does not otherwise have a right to place a director on the board of directors of VGH, Inc., such as V10's right to designate the VG designees under the Stockholders' Agreement, VGH, Inc. has agreed to provide VEL with the right to appoint one director to VGH, Inc.'s board of directors (provided the designee is qualified to serve on the board under all applicable corporate governance policies and regulatory and NYSE requirements). See "*BCA Proposal—Related Agreements—Trademark License Agreement.*"

### Director Independence

As a result of VGH, Inc.'s common stock being listed on the NYSE following consummation of the Business Combination, it will be required to comply with the applicable rules of such exchange in determining whether a director is independent. Prior to the completion of this Business Combination, the parties undertook a review of the independence of the individuals named above and have determined that each of , and qualifies as "independent" as defined under the applicable NYSE rules.

### Controlled Company Exemption

Upon consummation of the Business Combination, the Voting Parties will collectively beneficially own more than 50% of the combined voting power for the election of directors. As a result, VGH, Inc. will be a "controlled company" within the meaning of the corporate governance standards of the NYSE and may elect not to comply with certain corporate governance standards, including, but not limited to, the following requirements:

• that a majority of its board of directors consist of directors who qualify as "independent" as defined under the rules of the NYSE;

236

Table of Contents

- that it have a nominating and corporate governance committee and, if it has such a committee, that it is composed entirely of independent directors; and
- that it have a compensation committee and, if it has such a committee, that it is composed entirely of independent directors.

Immediately following the consummation of the Business Combination, VGH, Inc. may elect to utilize one or more of these exemptions for so long as it remains a "controlled company." Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of these corporate governance requirements. In the event that VGH, Inc. ceases to be a "controlled company" and its shares continue to be listed on the NYSE, VGH, Inc. will be required to comply with these provisions within the applicable transition periods. See "*Risk Factors—Risks Related to the Business Combination and SCH—V10 and the other stockholders that are party to the Stockholders' Agreement will control the direction of VGH, Inc.'s business, and the concentrated ownership of VGH, Inc.'s common stock will prevent you and other stockholders from influencing significant decisions.*" and "*Risk Factors—Risks Related to the Business Combination and SCH—Following the Business Combination, VGH, Inc. will be a controlled company within the meaning of the NYSE rules, and, as a result, will qualify for, and we expect it to rely on, exemptions from certain corporate governance requirements that provide protection to stockholders of other companies. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.*"

### Committees of the Board of Directors

VGH, Inc.'s board of directors will direct the management of it business and affairs, as provided by Delaware law, and will conduct its business through meetings of the board of directors and standing committees. VGH, Inc. will have a standing audit committee, which will operate under a written charter, but expects that it will not initially have a compensation committee or a nominating and corporate governance committee, for so long as VGH, Inc. remains a controlled company under the NYSE rules. For so long as VGH, Inc. does not have a compensation committee, VGH, Inc. expects that its board of directors will approve compensation for its executive officers and will serve as the administrator under its incentive plans.

In addition, from time to time, special committees may be established under the direction of the board of directors when the board deems it necessary or advisable to address specific issues. Current copies of VGH, Inc.'s charters will be posted on its website, *www.virgingalactic.com*, as required by applicable SEC and NYSE rules. The information on or available through any of such website is not deemed incorporated in this proxy statement/prospectus and does not form part of this proxy statement/prospectus.

### Audit Committee

The audit committee's responsibilities will include, among other things:
- appointing, compensating, retaining, evaluating, terminating and overseeing VGH, Inc.'s independent registered public accounting firm;
- discussing with VGH, Inc.'s independent registered public accounting firm their independence from management;
- reviewing with VGH, Inc.'s independent registered public accounting firm the scope and results of their audit;
- approving all audit and permissible non-audit services to be performed by VGH, Inc.'s independent registered public accounting firm;
- overseeing the financial reporting process and discussing with management and VGH, Inc.'s independent registered public accounting firm the interim and annual financial statements that VGH, Inc. files with the SEC;

237

Table of Contents

- reviewing and monitoring VGH, Inc.'s accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements; and
- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

Upon consummation of the Business Combination, the audit committee will consist of , and , with serving as chair. The parties have affirmatively determined that each expected member of the audit committee qualifies as independent under NYSE rules applicable to board members generally and under the NYSE rules and Exchange Act Rule 10A-3 specific to audit committee members. All expected members of VGH, Inc.'s audit committee meet the requirements for financial literacy under the applicable NYSE rules. In addition, will qualify as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K.

### Code of Ethics

VGH, Inc. will have a code of ethics that applies to all of its executive officers, directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The code of ethics will be available on VGH, Inc.'s website, *www.virgingalactic.com*. VGH, Inc. intends to make any legally required disclosures regarding amendments to, or waivers of, provisions of its code of ethics on its website rather than by filing a Current Report on Form 8-K.

### Compensation Committee Interlocks and Insider Participation

None of VGH, Inc.'s executive officers has, during the last year, participated in deliberations of its board of directors concerning executive officer compensation. None of VGH, Inc.'s executive officers currently serves, or has served during the last year, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of VGH, Inc.'s board of directors.

238

Table of Contents

*SIGNATURES*

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Los Angeles, California, on the 7th day of August, 2019.

SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP.

By:    /s/ Chamath Palihapitiya
Name:  Chamath Palihapitiya
Title:  Chief Executive Officer

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Chamath Palihapitiya, Steven Trieu, Simon Williams and Anthony Bates as his or her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him or and in his or her name, place and stead, in any and all capacities, to sign one or more Registration Statements on Form S-4, or other appropriate form, and all amendments thereto, including post-effective amendments, of Social Capital Hedosophia Holdings Corp. and to file the same, with any exhibits thereto, with the Securities and Exchange Commission, or any state securities department or any other federal or state agency or governmental authority granting unto such attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or his substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Chamath Palihapitiya<br>Chamath Palihapitiya | Chief Executive Officer and Chairman of the Board of Directors (Principal Executive Officer) | August 7, 2019 |
| /s/ Ian Osborne<br>Ian Osborne | President and Director | August 7, 2019 |
| /s/ Steven Trieu<br>Steven Trieu | Chief Financial Officer (Principal Financial and Accounting Officer) | August 7, 2019 |
| /s/ Simon Williams<br>Simon Williams | General Counsel and Secretary | August 7, 2019 |
| /s/ Anthony Bates<br>Anthony Bates | Vice Chairman of the Board of Directors | August 7, 2019 |
| /s/ Adam Bain<br>Adam Bain | Director | August 7, 2019 |
| /s/ Andrea Wong<br>Andrea Wong | Director | August 7, 2019 |

II-6

**Table of Contents**

| Signature | Title | Date |
|---|---|---|
| /s/ Jacqueline D. Reses<br>Jacqueline D. Reses | Director | August 7, 2019 |
| /s/ James Ryans<br>James Ryans | Director | August 7, 2019 |

II-7