**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SHANE LAVIN, Individually and On Behalf
of All Others Similarly Situated,

                    Plaintiff,

VIRGIN GALACTIC HOLDINGS, INC., MICHAEL
A. COLGLAZIER, GEORGE WHITESIDES, DOUG
AHRENS, JON CAMPAGNA,

                    Defendants.

Case No.: 1:21-cv-03070-ARR-TAM

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CORRECTED AMENDED COMPLAINT

**LATHAM & WATKINS LLP**

Michele D. Johnson (*pro hac vice*)
Kristin N. Murphy (*pro hac vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290
Email: michele.johnson@lw.com
        kristin.murphy@lw.com

Colleen C. Smith (*pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
Email: colleen.smith@lw.com

*Attorneys for Defendants*

April 4, 2022

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ...........................................................................1

II. BACKGROUND .............................................................................................3

    A.    Virgin Galactic Is a Pioneering Aerospace Company .............................3

    B.    Virgin Galactic Conducted Extensive Flight Testing With the Goal of Ensuring Safe Operations for Commercial Space Flights ........................5

    C.    Virgin Galactic Warned Investors About the Inherent Risks of Space Flight and the Possibility of Delays in the Development of Its Commercial Spaceflight Program........................................................................6

    D.    Virgin Galactic Has Never Experienced a Catastrophic Safety Event or Loss of Life During or After the Class Period ........................................8

    E.    Plaintiffs Filed This Lawsuit Based on a Theory That Had Nothing to Do With the Safety of Virgin Galactic's Commercial Spaceflight Program...............10

III. LEGAL STANDARD........................................................................................11

IV. ARGUMENT ................................................................................................12

    A.    Plaintiffs Do Not Adequately Plead a Section 10(b) Claim ...................12

        1.    Plaintiffs Have Not Alleged Facts Establishing Actionable False or Misleading Statements .................................................................12

            a.    Plaintiffs Do Not Allege Facts Rendering Any of Defendants' Statements False or Misleading................................12

            b.    Defendants' Forward-Looking Statements Are Protected by the PSLRA's Safe Harbor ................................................17

            c.    Defendants' Statements of General Corporate Optimism Are Not Actionable ........................................................20

            d.    Defendants' Opinion Statements Regarding Flight Progress, Safety, and Customer Experience Are Not Actionable ................................................................22

            e.    Plaintiffs' Allegations Do Not Establish a Violation of Items 303 or 503/105 ........................................................24

        2.    Plaintiffs Have Not Met Their Burden to Plead Particularized Facts Supporting a Strong Inference of Scienter .................................25

            a.    Plaintiffs Fail to Allege Particular Facts Demonstrating Conscious Misbehavior or Recklessness ...........................26

            b.    Defendants' Stock Sales Do Not Support Scienter.......................31

       c.      The Non-Fraudulent Inference Is More Compelling ....................32

     3.      Plaintiffs Have Not Met Their Burden to Plead Loss Causation ..............34

  B.     Plaintiffs Do Not Plead a Viable Claim Under Sections 20(**a**) or 20A ................37

V.     CONCLUSION .............................................................................................................38

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ........................................................... 36

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  __ F.4th __, 2022 WL 727149 (2d Cir. Mar. 11, 2022) ..................................... 30, 31

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..................................................................... 26, 37

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
  2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ................................................ 18

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ............................................................... 12

*Campo v. Sears Holdings Corp.*,
  635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) ...................... 27

*Chapman v. Mueller Water Products*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020) ...................................................... 31

*City of Warren Police and Fire Ret. Sys. v. Foot Locker, Inc.*,
  412 F. Supp. 3d. 206 (E.D.N.Y. 2019) ..................................................... 21

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .................................................... 11, 21, 26

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016) ...................................................... 42

*Foley v. Transocean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012) ...................................................... 20

*Freedman v. Value Health, Inc.*,
  135 F. Supp. 2d 317 (D. Conn. 2001), *aff'd*, 34 F. App'x 408 (2d Cir. 2002) .................... 19, 22

*Gordon v. Sonar Cap. Mgmt. LLC*,
  962 F. Supp. 2d 525 (S.D.N.Y. 2013) ...................................................... 37

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y.) *aff'd*, 757 F. App'x 35 (2d Cir. 2018) ................................. 17

*In re Adient plc Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ................................................... 16, 18

*In re Alcatel Sec. Litig.*,
   382 F. Supp. 2d 513 (S.D.N.Y. 2005) ............................................................. 12

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018) ................................................. 19, 20, 22, 32

*In re AT&T/DirecTV Now Sec. Litig.*,
   480 F. Supp. 3d 507 (S.D.N.Y. 2020) ............................................................. 22

*In re Bausch & Lomb, Inc. Sec. Litig.*,
   592 F. Supp. 2d 323 (W.D.N.Y. 2008) ............................................................. 32

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
   2022 WL 541891 (E.D.N.Y. Feb. 23, 2022) ................................................. 21, 25

*In re DNTW Chartered Accountants Sec. Litig.*,
   172 F. Supp. 3d 675 (S.D.N.Y. 2016) ......................................................... 25, 26

*In re Dynagas LNG Partners LP Sec. Litig.*,
   504 F. Supp. 3d 289 (S.D.N.Y. 2020) ............................................................. 24

*In re Federated Dept. Stores, Inc. Sec. Litig.*,
   2005 WL 696894 (S.D.N.Y. Mar. 25, 2005) ..................................................... 30

*In re GeoPharma, Inc. Sec. Litig.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006) ............................................................. 34

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
   2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) ................................................... 29

*In re Iconix  Brand Grp., Inc.*,
   2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ..................................................... 31

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) ......................................................... 34, 35

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ..................... 27, 28

*In re Micro Focus Int'l. Plc Sec. Litig.*,
   2020 WL 5817275 (S.D.N.Y. Sept. 29, 2020) ................................................... 22

*In re Molycorp, Inc. Sec. Litig.*,
   2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ..................................................... 20

*In re New Energy Sys. Sec. Litig.*,
    66 F. Supp. 3d 401 (S.D.N.Y. 2014) ...................................................... 36

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) ..................................... 13, 14, 16

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) .............................................. 34, 37

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ............................................................ 35, 36

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ...................................................... 38

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    2020 WL 5632901 (S.D.N.Y. Sept. 21, 2020) ........................................ 25

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017), *aff'd sub nom. Martin v. Quartermain*, 732 F.
    App'x 37 (2d Cir. 2018) ........................................................................ 24

*In re Rhodia S.A. Sec. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007) ...................................................... 36

*In re Supercom Inc. Sec. Litig.*,
    2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ............................ 20, 21, 22, 23

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ...................................................... 38

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) .................................................................... 26

*Lachman v. Revlon, Inc.*,
    487 F.Supp.3d 111 (E.D.N.Y. 2020) ................................................... 27, 28

*Lasker v. N. Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ........................................................................ 21

*Lau v. Opera Ltd.*,
    527 F. Supp. 3d 537 (S.D.N.Y. 2021) ................................................. 25, 37

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................ 34, 36

*Livingston v. Cablevision Sys. Corp.*,
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) ...................................................... 22

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) ...................................................................... 27

*Menora Mivtachim Ins. Ltd. v. Intl. Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ......................................................... 28

*Monroe Cty. Emps. Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014) ....................................................................... 14

*Okla. Firefighters Pension and Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v.*
    *Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ............................................. 20, 21, 23

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996) .......................................................................................... 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ........................................................................................... 23, 24

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018), *aff'd*, 970 F.3d 133 (2d Cir. 2020) ....... 15, 30

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
    2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) ..................................................... 11, 26

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Comm.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010), ...................................................................... 12

*River Birch Cap., LLC v. Jack Cooper Holdings Corp.*,
    2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ....................................................... 23, 34

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................................ 11, 13, 20

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011) ...................................................................... 34

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ...................................................................................... 26

*Salim v. Mobile Telesystems PJSC*,
    2022 WL 966903 (2d Cir. Mar. 31, 2022) ............................................................... 33

*Shemian v. Research In Mot. Ltd.*,
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) .......................................................... 30

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ........................................................................ 17, 19, 20

*Tellabs, Inc., v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................ 33

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ...................................................... 13, 23

*Villare v. Abiomed, Inc.*,
   2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ............................... 19

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
   __ F.3d __, 2022 WL 853252 (9th Cir. Mar. 23, 2022) ..... 2, 13, 16, 17, 29

*Woolgar v. Kingstone Cos., Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020) ....................................... 29, 32

## STATUTES

15 U.S.C. § 78t–1(a) ........................................................................ 37

15 U.S.C. § 78u-4(b) ........................................................................ 11

15 U.S.C. § 78u-4(b)(2) ..................................................................... 25

15 U.S.C. § 78u-5(c)(1)(A)-(B) ......................................................... 17

15 U.S.C. § 78u-5(i)(1)(A-D) ............................................................ 18

15 U.S.C. §78t ................................................................................. 37

## RULES

Fed. R. Civ. P. 12(b)(6) ..................................................................... 1

Fed. R. Civ. P. 9(b) ....................................................................... 1, 11

## REGULATIONS

17 C.F.R. § 229.105(a) ..................................................................... 25

17 C.F.R. § 229.303(a)(3)(ii) ............................................................ 24

84 Fed. Reg. 12674-01 .................................................................... 25

Defendants Virgin Galactic Holdings, Inc. ("Virgin Galactic" or the "Company"), Sir Richard Branson, Chamath Palihapitiya, George Whitesides, Michael Moses, and Michael Colglazier (the "Individual Defendants" and with Virgin Galactic, "Defendants") submit this memorandum of law in support of their motion to dismiss the Corrected Amended Complaint (the "AC" or "Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## I.    PRELIMINARY STATEMENT

Virgin Galactic is a pioneering commercial spaceflight operator that aims to open space travel to the public for human tourism, research, and education.  Unsurprisingly, creating a safe way for people to travel to space commercially has been no easy task, and along the way, Virgin Galactic has worked to anticipate and address various design, engineering, and potential safety issues.  To identify these issues and to ensure that its commercial flights would be safe, Virgin Galactic operated a multi-stage test flight program.  These test flights served their purpose.  Over the years, Virgin Galactic has developed data and feedback from its test flights that have occasionally led to modifications, maintenance, or other program changes that resulted in the delay of planned flights—all in service of the paramount goal of ensuring that its flights would operate safely.

And that is exactly what has happened.  Despite the fact that commercial space travel is unquestionably a high-risk proposition, Virgin Galactic's commercial space program has not resulted in any catastrophic safety events or loss of life during or after the alleged class period ("Class Period").  Virgin Galactic identified areas for improvement, and when appropriate, grounded its ships or delayed certain flights in order to make those improvements.  This is not securities fraud, and Plaintiffs' claims should be dismissed for several reasons.

*First*, the statements Plaintiffs challenge are not false, and Plaintiffs fail to allege facts establishing otherwise.  Although Plaintiffs make a series of allegations regarding Virgin

1

Galactic's history of safety, design, and maintenance decisions, those allegations do not render any of the challenged statements false or misleading. It is not enough to assert, as Plaintiffs do, that Virgin Galactic's test flights resulted in the identification of certain safety issues that could be corrected—*and were*. Especially during the process of developing a new technology or product, companies do not have an obligation under the federal securities laws to disclose every internal development, or every twist and turn of that "oft-tortuous path." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, ___ F.3d ___, 2022 WL 853252, at *6 (9th Cir. Mar. 23, 2022). Further, Plaintiffs' claims fail for the additional reasons that the challenged statements are forward-looking and protected from liability by the Private Securities Litigation Reform Act ("PSLRA") safe harbor, are generic statements of corporate optimism, or are opinion statements reflecting subjective beliefs—all of which are not actionable under the securities laws.

*Second*, Plaintiffs do not allege facts sufficient to support the necessary strong inference of scienter. They rely on a series of allegations from the book *Test Gods*, eight anonymous former employees, and a purported expert opinion, but none demonstrates scienter. The information in the Complaint supposedly reported in *Test Gods* took place years before the Class Period and has no tie to the challenged statements. The majority of the former employees likewise left before the Class Period, rendering their statements unreliable. And the remaining former employees offer no alleged facts suggesting that any of the Class Period statements was false, or that any defendant *knew* they were false. At most, these former employees offer observations that Virgin Galactic took on a complex, challenging, and first-of-its-kind project, that company personnel identified (and corrected) issues along the way, and that there were disagreements internally about the best practices for doing so. Nor can Plaintiffs fill this scienter pleading gap with allegations based on a so-called expert who purports to offer his hindsight

2

views on what Virgin Galactic *should have* done in certain circumstances. These unsupported and untested opinions are not facts, rendering them both irrelevant and improper for this stage of the case. Plaintiffs are left then to rely on stock sales made by Richard Branson and Chamath Palihapitiya. But the vast majority of those sales were made at times when Virgin Galactic's stock had gone down (not up), often *after* the very press releases Plaintiffs say revealed bad news, and *before* later increases in price. These stock sales are not suspicious. Indeed, the more logical and compelling non-fraudulent inference from all of these alleged facts is that Virgin Galactic's test flight program operated exactly as it should—enabling it to identify key operational, safety, and design issues, and where necessary make appropriate modifications and delay future flights, consistent with its commitment to and strong track record of safe operations.

*Third,* Plaintiffs entirely fail to plead loss causation. Rather than clearly identify the purported corrective disclosures, Plaintiffs broadly discuss press releases regarding test flights throughout 2020 and 2021 that supposedly led to stock price declines, without explaining what those press releases supposedly revealed for the first time or what challenged statements they corrected. That is not sufficient, particularly where—as here—the risks to the business of program delays, and safety, design, and maintenance issues were thoroughly disclosed.

## II.    BACKGROUND

### A.    Virgin Galactic Is a Pioneering Aerospace Company

Virgin Galactic is a pioneering aerospace company that designs, manufactures, and tests spaceflight vehicles for tourism, research, and education. *See* AC, Ex. 1, ¶¶ 30, 37, 194.[1] The Company's spaceflight vehicles are a product of years of research, engineering, and testing by

---

[1] While Virgin Galactic's corporate structure is complex and underwent a number of changes in the roughly seven year period covered by the Complaint, for purposes of this motion, Defendants refer to the Virgin Galactic entities collectively.

Virgin Galactic and its partners.  *See id.* ¶¶ 81, 97-99, 122-124, 129-139, 299, 387.  Initially founded as a joint venture with the spacecraft design firm Scaled Composites, in 2014 Virgin Galactic assumed responsibility for spaceship production from Scaled Composites and built its ships through its affiliate, then known as TSC, LLC (d/b/a "The Spaceship Company").  *Id*. ¶¶ 73, 77, 122.

Virgin Galactic stock became publicly traded on July 9, 2019, upon the completion of a merger with special purpose acquisition company ("SPAC") Social Capital Hedosophia ("SCH").  *Id*. ¶¶ 3, 4, 30, 50-54, 65, 67.  On October 25, 2019, post-market, the transaction closed, and Virgin Galactic's stock began trading on the New York Stock Exchange at $12.34 when the market opened on October 28, 2019.  *Id*. ¶ 67; Ex. 12 at 18 (SPCE Stock Price History).  Unlike many such "deSPAC" mergers, Virgin Galactic's deSPAC was an unquestionable success, with its stock trading above the initial $12.34 share price for the vast majority (almost 75%) of the Class Period.  Ex. 12 (SPCE Stock Price History).

The Individual Defendants represent some of the most prominent and highly respected leaders in the aerospace, travel, and technology industries.  AC ¶¶ 31-35, 117; Ex. 2 at 9 (Aug. 7, 2019 S-4).  Richard Branson founded Virgin Galactic in 2004 with the goal of "being the first [] to take tourists into space."  AC ¶ 75.  Mr. Palihapitiya was Virgin Galactic's Chairman of the Board through the majority of the Class Period.  *Id*. ¶ 32.  He brought to the Company his extensive management history and experience in identifying, investing in, and building next-generation technologies and companies.  Ex. 2 at 234 (Aug. 7, 2019 S-4).  Mr. Whitesides was Virgin Galactic's CEO from May 2010 to July 2020.  AC ¶ 33.  Prior to joining Virgin Galactic, Mr. Whitesides served as Chief of Staff for NASA and received the Distinguished Service Medal, the highest award the agency confers.  *Id.*; Ex. 2 at 233 (Aug. 7, 2019 S-4).  Mr.

Colglazier is the current CEO and President as well as a Board member.  AC ¶ 35.  He brings to the Company over thirty years of experience from his former positions at Disney, where he served in several executive roles implementing strategies across the world focused on product innovation and customer growth.  Ex. 5 at 87 (Aug. 3, 2020 S-1).  Mr. Moses is President of Space Missions and Safety, and was previously Vice President of Operations.  AC ¶ 34.  His wife, Beth Moses, was the first test engineer and non-pilot crewmember to go to space aboard a Virgin Galactic flight with the purpose of testing the spaceship cabin.  *Id*. ¶¶ 117, 299.  Prior to joining Virgin Galactic, Mr. Moses served at NASA in the Space Shuttle Program, where he was the Launch Integration Manager.  Ex. 2 at 234 (Aug. 7, 2019 S-4).  He oversaw the readiness of the Space Shuttle for launch, served as Chairman of the Mission Management Team, and provided ultimate launch decision authority for Space Shuttle missions.  *Id.*  Prior to that role, he was a Flight Director for NASA at the Johnson Space Center, where he led teams of flight controllers in the planning, training, and execution of Space Shuttle missions.  *Id.*

## B.    Virgin Galactic Conducted Extensive Flight Testing With the Goal of Ensuring Safe Operations for Commercial Space Flights

Virgin Galactic operates a multi-stage test flight program designed to ensure that its commercial space flights will be safe.  AC ¶¶ 92, 97-99.  Virgin Galactic's flight designs consist "of a carrier aircraft," or mothership, called Eve, and a spaceship, called Unity.  *Id.* ¶ 5.  Eve takes Unity to an altitude of about 45,000 feet, and then releases it.  *Id.* ¶¶ 5, 82-84.  Important elements of Virgin Galactic's safety design and engineering include extensive screening and training of its "elite test pilots" and their deployment for every single test flight (*id.* ¶ 152); a proprietary feathering system that allows the spaceship to properly align for entry back down to Earth with limited pilot input (*id.* ¶¶ 82-84); commercial aviation jet engines on its carrier aircraft; horizontal takeoff and landing (Ex. 2 at 198 (Aug. 7, 2019 S-4)); and the ability to safely

abort at any time during a mission (*id.*).

To make Eve and Unity operational, Virgin Galactic first conducted ground tests, followed by three different stages of flight tests. AC ¶¶ 97-99. In order of increasing difficulty and accompanying safety risk, these flight tests were: (i) "captive carry flights," in which Eve took Unity up to 45,000 feet but did not release it; (ii) "glide tests," in which Unity took Eve up to 45,000 feet and released it, but Unity did not engage its own rocket motor; and (iii) "powered tests," in which Eve took Unity up to 45,000 feet and released it, and Unity engaged its rocket motor. *Id.* When Unity was unveiled, Virgin Galactic already had the "benefit [of] incredibly useful data from 55 successful test flights." *Id.* ¶¶ 124, 127. By January 2018, Virgin Galactic had conducted seven glide tests with Unity, testing the entire spaceship in a series of ever-expanding flight envelopes. *Id.* ¶¶ 130-140.

### C. Virgin Galactic Warned Investors About the Inherent Risks of Space Flight and the Possibility of Delays in the Development of Its Commercial Spaceflight Program

Virgin Galactic repeatedly warned investors of the risks associated with being the first "spaceliner," both in its business combination proxy and in its other public statements issued throughout the Class Period. Specifically, Virgin Galactic disclosed that:

- "Any delay in completing the flight test program and the final development of our existing spaceflight system would adversely impact our business, financial condition and results of operations." It warned that historically, its test flights have been followed by "additional changes to the spaceflight system" and "additional delay and expense." Virgin Galactic made no secret of the fact that it had encountered issues with a prior spaceship, and that if "we experience issues *with manufacturing improvements or design and safety*, the anticipated launch of our commercial human spaceflight operations *could be delayed*." Ex. 2 at 34 (Aug. 7, 2019 S-4) (emphasis added).

- "We may be unable to operate our current spaceflight system at our anticipated flight rate for a number of reasons, including, but not limited to . . . maintenance issues, pilot error, [or] design and engineering flaws." It warned that "any unplanned failures could result in reduced numbers of flights and *significant delays* to our planned growth." *Id.* (emphasis added).

- "[T]he successful development of our spaceflight systems and related technology []is subject to many uncertainties, some of which are beyond our control, including . . . successful completion of flight test programs, including flight safety tests." *Id.* at 34-35.

- "[T]here can be no assurance that we will not experience operational or process failures . . . that could result in potential safety risks.  Any actual or perceived safety issues . . . *could result in delaying or cancelling planned flights*." *Id.* at 35 (emphasis added).

- "If our current or future spaceflight systems does not meet expected performance or quality standards, including with respect to customer safety and satisfaction, this could cause *operational delays*." *Id.* at 36 (emphasis added).

- "Human spaceflight is an *inherently risky activity* that can lead to accidents or catastrophes impacting human life." *Id.* at 37 (emphasis added).  Virgin Galactic warned that a prior test flight had resulted in a fatal injury to a co-pilot and that "there is a possibility that other accidents may occur in the future for a variety of reasons." *Id.* at 37-38.[2]

After its July 2019 IPO, and as testing proceeded, Virgin Galactic's executive leaders made a series of public disclosures warning that delays were possible or even likely because the Company was committed to making decisions regarding commercialization based on safety.  For example, Mr. Whitesides noted Virgin Galactic's "hope to have investors who are here for the long term . . . and [understand] the need to progress at a pace that keeps safety at the forefront." Ex. 8 at 12 (Q4 2019 Earnings Call Tr.).  Mr. Colglazier expressed that Virgin Galactic's "central focus" on safety meant that it would progress "with a step-by-step diligent approach through the test flight program," and that "our schedule may adjust as we process data from each of our test flights." Ex. 9 at 11 (Q2 2020 Earnings Call Tr.).  Mr. Moses cautioned that Virgin Galactic would need to run its test vehicles "through all of its paces before we're ready to commit to a launch" date.  Ex. 10 at 12 (Q4 2020 Earnings Call Tr.).

---

[2] *See also* Ex. 3 at 24-39 (Feb. 28, 2020 10-K) (disclosing "Risks Related to Our Business"); Ex. 4 at 5-23 (May 1, 2020 S-1) (same); Ex. 5 at 11-31 (Aug. 3, 2020 S-1) (same); Ex. 6 at 23-40 (Mar. 1, 2021 10-K) (same); Ex. 7 at 2 (May 28, 2021 S-3) (incorporating risk factors disclosed in most recent 10-K).

D. **Virgin Galactic Has Never Experienced a Catastrophic Safety Event or Loss of Life During or After the Class Period**

Not a single catastrophic safety event has occurred during or after the Class Period, despite the risks and uncertainties inherent in developing commercial human spaceflight.  In fact, the only major incident to occur in Virgin Galactic's 18-year history was in 2014 when Virgin Galactic was still partnered with Scaled Composites.  After a deadly accident in 2014, Virgin Galactic took over responsibility for building its spaceships, and since then has "overhauled its testing program."  AC ¶¶ 121-22.  Indeed, Virgin Galactic has demonstrated its commitment to flight safety by delaying, grounding, or aborting certain flights and by updating the anticipated launch date of its commercial human spaceflight operations, all for the purpose of ensuring safety.  *See, e.g.*, *id*. ¶¶ 15, 20, 22, 135, 331, 334, 378, 410.

Virgin Galactic followed through on this commitment to safety.  Although it had previously announced following its July 2019 IPO that its "priority [was] to fly Richard Branson into space on a commercial flight in 2020" (*id*. ¶ 330), on August 3, 2020, the Company announced that it required additional time to "advance to the next phase of our test flight program" and therefore "anticipate[d]" flying Richard Branson "in the first quarter of 2021."  *Id*. ¶¶ 331-32.  Later, on December 12, 2020, a test flight was automatically aborted when a rocket failed to start.  *Id*. ¶¶ 356-60.  Because Virgin Galactic had designed Unity with full mission abort capability and other critical safety features, a fail-safe scenario was triggered, and the pilots were able to conduct a safe landing.  Ex. 11 (Dec. 14, 2020 Press Release).  Virgin Galactic reported this aborted test flight to investors and the public the next business day.  *See id.*

A few months later, on February 12, 2021, a test flight initially targeted for launch that month was delayed based on an anomaly identified during pre-flight readiness checks.  AC ¶¶ 376-77.  Once again, Virgin Galactic disclosed the issue and the associated delay, explaining

that while it had concluded the anomaly was likely caused by electromagnetic interference, the best course of action was to enhance the new flight computer system, thoroughly test that system on the ground, and recommence the flight test program only when it was confident the problem had been addressed.  Ex. 10 at 6 (Q4 2020 Earnings Call Tr.).

On May 22, 2021, Virgin Galactic performed another test flight, which validated that the electromagnetic interference problem had been addressed.  AC ¶¶ 378, 564.  The data coming out of that flight was submitted to the FAA, which resulted in the FAA updating the Company's commercial space transportation operator license to allow the Company to fly customers to space.  *Id*. ¶ 564.

On July 11, 2021, the Company performed Unity's first full crewed space flight, on which Richard Branson was a crewmember (the "Unity 22 Flight").  *Id*. ¶ 566.  On August 11, 2021, Virgin Galactic was formally notified of an FAA investigation that focused on the deviation from protected air space and the failure to notify the FAA during the Unity 22 Flight. *Id*. ¶ 400, n.14.  In September 2021, the Company was notified by the FAA that it had addressed the FAA's concerns, and the inquiry would be closed.  *Id*. ¶ 405.

On October 14, 2021, Virgin Galactic announced it would delay the Unity 23 test flight until the fourth quarter of 2022 in order to address maintenance issues.  *Id*. ¶¶ 410-12.  Rather than rush to profitable commercial flight operations, Virgin Galactic opted to make these safety-focused modifications, which necessarily resulted in delays to the estimated timeline for spaceflight commercialization.

While Virgin Galactic faced challenges and delays in the development of its flight test program and spaceflight system, as a result of its thorough testing and procedures, it achieved several, unprecedented milestones during the Class Period, including completing (over Eve's

lifetime) 289 test flights with Eve (Ex. 6 at 12 (Mar. 1, 2021 10-K); completing 50 flight tests

with Unity, eight of which were rocket-powered test flights (*id.* at 13); carrying eight payloads

for space mission research (*id.* at 17); flying five crew members to space (each of whom was

then awarded official U.S. government commercial astronaut wings) (*id.* at 9); and obtaining

FAA licensure to carry commercial passengers on suborbital spaceflights (*id.* at 20).

The culmination of Virgin Galactic's commercial spaceflight program occurred on July

11, 2021, when it accomplished the monumental goal of sending its founder, Richard Branson, to

space aboard Unity, along with three other mission specialists and two pilots.  AC ¶ 387.

### E.    Plaintiffs Filed This Lawsuit Based on a Theory That Had Nothing to Do With the Safety of Virgin Galactic's Commercial Spaceflight Program

Plaintiffs filed the original complaint in this case on May 28, 2021, focusing at that time

on allegations that Virgin Galactic had misled investors about the accounting treatment of

warrants issued prior to its deSPAC merger with SCH, necessitating a restatement of its financial

statements.  Dkt No. 1.  Despite the fact that Virgin Galactic had, by May 2021, made countless

public statements and disclosures about its test flights and progress toward commercial

spaceflight, including having announced delays in August 2020, December 2020, and February

2021, the original complaint contained no mention of any purported false or misleading

statements predating these announcements, nor did it point to any associated stockholder losses.

Indeed, across this period of time, Virgin Galactic's stock price increased—more than doubling

from the beginning of the Class Period (July 10, 2019, $10.78) to its end (October 14, 2021,

$24.06).  Ex. 12 at 2, 20 (SPCE Stock Price History).

Virgin Galactic's stock price also increased after its ministerial restatement correcting the

accounting treatment of the warrants.  *Id*. at 5; Dkt No. 1 at 13.  So in the amended complaint

filed December 7, 2021, Plaintiffs changed course, asserting an entirely new theory of

stockholder losses based on purportedly misleading statements about Virgin Galactic's commitment to safety. Plaintiffs' new hindsight theory of securities fraud alleges violations of Section 10(b), 20(a), and 20A of the Exchange Act of 1934 (AC ¶¶ 595-610) based on challenges to 35 statements that Plaintiffs contend misled investors regarding the design and safety of Virgin Galactic's spacecraft (*id*. ¶¶ 497-570). These claims should be dismissed.

## III.  LEGAL STANDARD

To state a claim under Section 10(b), a plaintiff must plead (i) a material misrepresentation or omission; (ii) scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation. *See Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at *10 (S.D.N.Y. Sept. 30, 2017). Such claims are subject to the strict and rigorous pleading requirements of Rule 9(b) and the PSLRA. Rule 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud or mistake," FED. R. CIV. P. 9(b), and in particular, "specify the statements that the plaintiff contends were fraudulent," "identify the speaker," "state where and when the statements were made," and "explain why the statements were fraudulent," *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Similarly, the PSLRA requires a plaintiff to "state with particularity" (i) "each act or omission alleged to violat[e]" Section 10(b); (ii) the "reasons why" those statements or omissions are false or misleading; and (iii) specific "facts giving rise to a strong inference" that each defendant acted with the required intent to defraud—*i.e.*, "scienter." 15 U.S.C. § 78u-4(b); *see also ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Claims that are based on "speculation and conclusory allegations" must be dismissed. *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010).

## IV.    ARGUMENT

### A.    Plaintiffs Do Not Adequately Plead a Section 10(b) Claim

#### 1.    Plaintiffs Have Not Alleged Facts Establishing Actionable False or Misleading Statements

Plaintiffs' claims fail for the fundamental reason that they have not identified which specific statements are purportedly false or misleading or why those statements were false or misleading when made.  Instead, the Complaint repeats a grab-bag of supposed omissions for each Class Period public announcement.  AC ¶¶ 498-571.  This kind of "puzzle pleading" that places the burden on courts and defendants to "determine on [their] own initiative how and why . . . statements were false" is not sufficient to allege a false or misleading statement.  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012); *see also In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (defendants and the court should not be left to surmise which statements are at issue and "which statements link up with which issues in the laundry list" of purportedly omitted facts).  This shortcoming alone is a sufficient basis for dismissal.

In the accompanying appendix, Defendants have identified 35 statements that Plaintiffs appear to challenge by using bolded and italicized text in their Complaint.  *See* Appendix A. Plaintiffs do not plead facts establishing that any of these statements are actionable under the federal securities laws.

##### a.    Plaintiffs Do Not Allege Facts Rendering Any of Defendants' Statements False or Misleading

Plaintiffs appear to challenge 35 statements regarding Virgin Galactic's (1) completion of various test flight milestones, (2) prioritization of safety, and (3) ability to meet its anticipated timeline for spaceflight commercialization.  Plaintiffs fundamentally allege that these statements were false or misleading because Defendants did not also disclose every detail regarding

purported design, safety, and maintenance issues identified during Virgin Galactic's testing program.  But the federal securities laws do not require public companies to provide such details, particularly in the face of clear disclosures warning that Virgin Galactic had in the past and likely would in the future encounter "issues with manufacturing improvements or design and safety" (Ex. 2 at 34 (Aug. 7, 2019 S-4)), and that these issues could result in delays to its commercial spaceflight program (*id.* at 34-35).  *See Twitter*, 2022 WL 853252, at *6.  Plaintiffs do not identify (as they must) specific facts contradicting each challenged statement or rendering it false.  *See Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (omitted facts must "conflict with what a reasonable investor would take from the [challenged] statement" to be actionable) (citation omitted); *Rombach*, 355 F.3d at 174 (stating that plaintiffs "must do more" than merely allege the at-issue statements were false or misleading, they "must demonstrate with specificity why and how that is so"); *In re Nokia Oyj (Nokia Corp.) Sec. Litig*., 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006) ("[A] complaint must explain, with adequate specificity, why the alleged false or misleading statements were actually false or misleading when made.").  These shortcomings mandate dismissal.

**Test Flight Statements.**  *First*, Plaintiffs challenge statements regarding Virgin Galactic's achievement of key test flights and milestones and general discussions of its testing program, without providing any contradictory information or otherwise explaining why the statements were false.  *See* Appendix A (Stmts. 1, 4, 5, 9, 14, 17, 19, 20, 30, 32).  These statements include announcements that Virgin Galactic flew its first non-pilot crew member on a commercial space vehicle in February 2019 (AC ¶¶ 524, 531, 536), achieved "two crewed spaceflights" in July 2019 (*id*. ¶¶ 497, 503, 505), "made five new astronauts" as of October 2019 (*id*. ¶ 514), collected data after each flight that it evaluated and critiqued (*id*. ¶ 559), and

completed a second glide flight in June 2020 (*id*. ¶ 538) and a third test flight in May 2021 (*id*. ¶ 564). But Plaintiff does not allege that Virgin Galactic *did not do* any of these things. Rather, Plaintiffs assert that these statements were somehow false or misleading because Defendants did not disclose every detail of the safety, operational, maintenance, and other data that were collected during these many test flights. *See, e.g.*, *id*. ¶¶ 498, 504, 506, 515, 525, 532, 537, 539, 560, 565 (alleging the foregoing statements were false because "the February 2019 flight . . . had nearly ended in disaster," "the flights were not repeatable, as on the second flight, Unity's horizontal stabilizers were destroyed and took up to fourteen months to replace," "Virgin Galactic had grounded Unity to address . . . known safety problems," "Eve developed cracks every flight," and "Virgin Galactic's inspection could not detect problems"). Defendants did not have an obligation to disclose every detail of every flight, especially where—as Plaintiffs admit—the test flight program was successful in identifying safety and maintenance issues that needed to be addressed. *Id*. ¶ 249 (alleging deadlines slipped so that Virgin Galactic could implement "major repairs"); *see Monroe Cty. Emps. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) ("An omission is only actionable when the failure to disclose renders a statement misleading. There is no duty to disclose all information even tangentially related to the subject matter of a statement.") (internal quotations omitted); *see also Nokia*, 423 F. Supp. 2d at 393 ("Although obvious, it also bears noting that it is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true.") (internal alterations, quotation marks, and citation omitted).

**Safety Statements**. *Second*, Plaintiffs challenge statements involving descriptions of Virgin Galactic's commitment to safety (Appendix A, Stmts. 3, 6, 7, 8, 10, 12, 15, 16, 18, 24, 25, 26, 29, 30, 31, 32, 34, 35), including statements expressing its "uncompromising commitment to

safety and customer satisfaction" (AC ¶ 501), observing that safety continued to be its "central focus" (*id*. ¶ 547), and defining safety as a "number one priority" (*id*. ¶ 533). *See also id*. ¶¶ 507, 509, 512, 516, 520, 526, 529, 549, 551, 557, 559, 562, 564, 568, 570. Plaintiffs once again do not identify any alleged facts showing these statements were not true. Instead, they complain that these statements were misleading because Virgin Galactic did not disclose the particular safety or engineering concerns that were identified and addressed, hypothesizing that these issues *might* have ended in disaster. *See, e.g., id*. ¶ 133 ("*would* have ended in disaster"); *id*. ¶ 139 ("*nearly* proved disastrous") *id*. ¶ 149 ("*might* bring the plane down") *id*. ¶ 189 ("*could have* broken"); *id*. ¶ 237 ("*could have* resulted in a catastrophic accident"). But no such "disaster" materialized. It makes no sense to conclude that a company's professed commitment to safety means that it will never identify any safety issues; to the contrary, a safety-focused enterprise would search out, identify, and correct such issues—which is exactly what happened here. Courts have declined to accept Plaintiffs' logic. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statements about monitoring of "quality and food safety programs" and the implementation of training and operating standards for food safety were not false where plaintiffs' allegations "merely quibble[d] with Chipotle's execution of those programs and procedures"), *aff'd*, 970 F.3d 133 (2d Cir. 2020).

**Commercial Timeline Statements.** *Third*, Plaintiffs challenge statements about Virgin Galactic's progress to commercial flight and completion of various repairs and improvements (Appendix A, Stmts. 2, 11, 13, 21, 22, 23, 27, 28, 33), such as having reached an "advanced point" in its development program (AC ¶ 499), reporting progress toward commercial operations (*id*. ¶¶ 518, 522, 540, 566), and discussing design and engineering updates (*id*. ¶¶ 542, 544, 553, 555). *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *13 (S.D.N.Y. Apr. 2, 2020), is

instructive.  There, the court held that the defendants' statements concerning the progress of improvements in a particular business segment were not false and misleading merely because the defendants failed to disclose "certain operational issues that existed" within the segment.  *Id.* Likewise here, Plaintiffs identify day-to-day operational matters, but they do not offer any alleged facts establishing that Virgin Galactic's development program was not progressing toward commercial operations as disclosed.  Bumps along the road to a goal do not render general statements about progress to the goal false.  *See id.*; *Nokia*, 423 F. Supp. 2d at 393.

Indeed, the Ninth Circuit's recent decision in the *Twitter* case, even though decided outside the Second Circuit, is exactly on point with this case and therefore particularly relevant here.  There, the plaintiffs alleged that Twitter made false or misleading statements because it did not disclose the existence and scope of software bugs in its data-sharing and targeted advertising products, while those features were under development.  *See Twitter*, 2022 WL 853252, at *3. Affirming dismissal, the Court held that "companies do not have an obligation to offer an instantaneous update of every internal development, especially when it involves the oft-tortuous path of product development."  *Twitter*, 2022 WL 853252, at *6.  The Ninth Circuit explained that Twitter was not obligated to disclose a "setback in dealing with software bugs" simply because it had made "somewhat optimistic" statements regarding general product improvement efforts.  *Id.*  The court drew an apt analogy, comparing the product development process to the work required to build modular furniture, observing that when someone is assembling an item of IKEA furniture, responses like "'I'm in the middle of it but I'm not there yet,' 'I'm continuing it,' or '[i]t's ongoing'" do not "misleadingly suggest that the person has not suffered setbacks" along the way.  *Id.* at *6 n.3.  Likewise here, Virgin Galactic's statements about its space vehicles and the development of its program did not give rise to an obligation to disclose every

single detail about its path to commercial flight operations; Defendants' statements about Virgin

Galactic's progress did not indicate that it had never faced complications or obstacles and did not

misrepresent that "everything is on track without a hitch." *Id.* Especially in the course of

developing something as unique and unprecedented as commercial spaceflight, Plaintiffs' theory

that the securities laws require real time disclosure of every detail of Virgin Galactic's

development program and its progress along the way makes no sense.

### b. Defendants' Forward-Looking Statements Are Protected by the PSLRA's Safe Harbor

Plaintiffs' five challenged statements concerning the next stages of Virgin Galactic's

commercial space program (Appendix A, Stmts. 2, 9, 11, 13, 21) are independently inactionable

because they are forward-looking statements protected by the PSLRA's safe harbor. Under the

PSLRA, forward-looking statements are not actionable where (i) they are "identified and

accompanied by meaningful cautionary language," *or* (ii) plaintiff fails to plead Defendants had

"actual knowledge" that they were false or misleading when made. *Gregory v. ProNAi*

*Therapeutics Inc.*, 297 F. Supp. 3d 372, 397 (S.D.N.Y.) *aff'd*, 757 F. App'x 35 (2d Cir. 2018);

*see also* 15 U.S.C. § 78u-5(c)(1)(A)-(B); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir.

2010) (stating that "[t]he safe harbor is written in the disjunctive.").

**The statements were forward-looking.** The PSLRA defines a forward-looking

statement as "(A) a statement containing a projection of revenues, income . . . , earnings . . ., or

other financial items; (B) a statement of the plans and objectives of management for future

operations; (C) a statement of future economic performance; (D) any statement of the

assumptions underlying or relating to any statement described in subparagraph (A), (B), or

(C) . . . ." 15 U.S.C. § 78u-5(i)(1)(A-D). Plaintiffs challenge statements such as "[w]e'll start

commercial operations in the middle of next year" (AC ¶ 522), "we are on track for our beautiful

spaceship to begin commercial service" (*id*. ¶ 499), "we'll start putting people up" (*id*. ¶ 514),

"we are in a multi-month march to commercial ops (*id*. ¶ 540), and "next year I'll be going into

space" (*id*. ¶ 518). These are all forward-looking. *See* 15 U.S.C. § 78u-5(i)(1)(A-D); *see also*

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc*., 2022 WL 784017, at *9 (S.D.N.Y. Mar.

15, 2022) (defendant's statement that company "was 'on track' to meet . . . projections" was

"protected as [a] forward-looking statement[] under the PSLRA"); *Adient*, 2020 WL 1644018, at

*19 (S.D.N.Y. Apr. 2, 2020) ("Even statements about Adient being 'on track' with respect to its

projected margin expansion are 'forward-looking' statements within the meaning of the PSLRA,

and not statements of 'present fact'").

**The statements were accompanied by meaningful cautionary language.** Virgin

Galactic's forward-looking statements were accompanied by meaningful cautionary language

that warned of possible "significant delays" caused by "changes to the spaceflight system"

following "each flight test," and an inability to "operate [its] current spaceflight system . . . for a

number of reasons, including . . . maintenance issues [and] design and engineering flaws,"

among others. Ex. 2 at 34 (Aug. 7, 2019 S-4). The Company advised that it may experience

problems "that could result in potential safety risks" (*id.* at 35); warned that if its remediation

measures were unsuccessful, leading to issues with "design and safety," the anticipated launch of

commercial operations could be delayed (*id.* at 34); and cautioned investors that any "actual or

perceived safety issues . . . could result in delaying or cancelling planned flights . . ." (*id.* at 35).

Dismissal is required where, as here, the disclosures "warn[ed] investors of exactly the risk the

plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir.

1996); *see also Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317, 338 (D. Conn. 2001), *aff'd*,

34 F. App'x 408 (2d Cir. 2002) (dismissing claim that company omitted information regarding

risks of contract losses where risk disclosure "statement warned shareholders of exactly the risk they claim was not disclosed"); *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 210–11 (S.D.N.Y. 2012) (dismissing claims that company omitted information regarding its poor "safety culture" where company disclosed that it "had experienced and would continue to experience, safety-related problems").

**No actual knowledge of falsity.**  Plaintiffs' claims based on the forward-looking statements fail for the independent reason that they do not establish any Defendant's "actual knowledge" that the statement was false at the time it was made.  *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *17 (S.D.N.Y. Sept. 21, 2021); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 756 (S.D.N.Y. 2018) (stating that the actual knowledge standard for forward-looking statements "is 'stricter than for statements of current fact'") (quoting *Slayton*, 604 F.3d at 773).  Under this exceedingly high standard, Plaintiffs must plead facts showing "knowing falsity," *i.e.*, that Defendants (1) did not genuinely believe their statements were true, (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement.  *See Slayton*, 604 F.3d at 775 (quotation omitted).  Plaintiffs do not plead any facts regarding the knowledge that any individual defendant purportedly had at the time.  As one example, Plaintiffs challenge statements made in 2019 by Richard Branson like "next year I'll go up, and then we'll start putting people up" (AC ¶ 514), and "next year I'll be going up into space, and we'll be starting to send a lot of people into space" (*id.* ¶ 518).  But Plaintiffs fail to allege any facts supporting an inference that he did not genuinely believe he would be flying into space in 2020, had actual knowledge that he would not be flying to space in 2020 when he made the statement, or was aware of facts that would seriously undermine this statement.  All Plaintiffs allege is that, due to

19

various alleged design and performance issues, "*there was no basis* to claim that Branson would fly in 2020." *Id.* ¶¶ 515, 519.  But "no basis to claim" is not the standard; rather, Plaintiffs must allege that Richard Branson *actually knew* at the time he made the statement that it was false. Plaintiffs' purported "circumstantial evidence of actual knowledge is not adequate." *Slayton*, 604 F.3d at 776 (2d Cir. 2010); *see also Aratana*, 315 F. Supp. 3d at 759 (dismissing claim where plaintiffs alleged that defendants "secretly knew" the statements were false); *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *13 (S.D.N.Y. Mar. 12, 2015) (allegations that defendants were involved in operations, that a confidential witness was told senior management knew facts undermining their statement, or that the company was covering up issues were all insufficient to show defendants actual knowledge).  The forward-looking statements cannot support a claim for fraud.

### c.  Defendants' Statements of General Corporate Optimism Are Not Actionable

Plaintiffs challenge thirteen statements regarding Virgin Galactic's competitive positioning and business outlook.  Appendix A (Stmts. 1, 2, 3, 4, 12, 13, 15, 16, 21, 22, 33, 34, 35).  These statements are non-actionable expressions of corporate optimism, or "puffery," that are "too general to cause a reasonable investor to rely upon them."  *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *22 (S.D.N.Y. Oct. 10, 2018); *Rombach*, 355 F.3d at 174 ("expressions of puffery and corporate optimism do not give rise to securities violations").  Puffery simply does "not give an investor an assessment that can be measured or verified," *Okla. Firefighters Pension and Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019), and such statements are actionable only if they are worded as "guarantees, are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."

*Supercom*, 2018 WL 4926442, at *22.  But much of the Complaint targets exactly these types of generalized statements.

Statements like those that Virgin Galactic had "reached an inflection point in its development" (AC ¶ 497), was "confident that [it] is light years ahead of the competition" (*id.* ¶ 501), was "within spitting distance" of overcoming technical hurdles (*id.* ¶ 540), that its "full-fledged business value will become apparent very quickly" (*id.* ¶ 522), and that it would enable "hundreds and then thousands of people to embark on one of the most unforgettable journeys of their lives" (*id.* ¶ 542) are all classic puffery.  None of these statements was "worded as [a] guarantee," nor have Plaintiffs alleged they were supported by specific facts or that the speakers did not believe them.  *Supercom*, 2018 WL 4926442, at *22 (citation omitted).  Courts routinely hold similar statements to be inactionable.  *See ECA,* 553 F.3d at 206 ("set the standard for integrity" and commitment to "focus on financial discipline" were puffery because "a reasonable investor would not depend on [them] as a guarantee"); *Okla. Firefighters,* 300 F. Supp. 3d. at 569-70 (statements touting "competitive advantage," "great technology," and "expectations of business success" were "mere puffery"); *City of Warren Police and Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d. 206, 220-21 (E.D.N.Y. 2019) ("strong leadership position" was puffery); *Lasker v. N. Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (conviction that "business strategies [would] lead to continued prosperity" was puffery); *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 541891, at *16 (E.D.N.Y. Feb. 23, 2022) (statement describing platform's "applicability to new and emerging infectious diseases" and company's consequent "ability to expand our . . . technology" was puffery).

Self-promoting statements regarding Virgin Galactic's "beautiful spaceship" (AC ¶ 499), "tested and tried system" (*id.* ¶ 520), "clearing of [a] huge technical milestone" (*id.* ¶ 503),

"landmark achievement" (*id.* ¶ 566), and "strong momentum" (*id.* ¶ 529), and noting a "number of flawless flights" (*id.* ¶ 570), are also puffery and cannot form the basis of a securities fraud claim. *See Supercom*, 2018 WL 4926442, at *22 (description of sales opportunities as "just amazing" and remark that company was "progressing well" were puffery); *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) (statement describing company's "superior products, superior customer service" was puffery); *Freedman*, 135 F. Supp. at 342 ("thriving business" was puffery). So too are statements regarding Virgin Galactic's "safe but enjoyable customer experience" (AC ¶ 526) and that the Company is "anchored in [the] safety experience" (*id.* ¶ 568). *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 524, 541 (S.D.N.Y. 2020) (statements that company provided the "'best entertainment' and communications experience" and "premium content for our customers" and that "customers [were] feeling good about getting value" were puffery); *In re Micro Focus Int'l. Plc Sec. Litig.*, 2020 WL 5817275, at *10, 14 (S.D.N.Y. Sept. 29, 2020) ("focus on delivering customer-centered innovation," "a great customer experience," and "getting back on track to focus on our outstanding customer and partner relationships" were puffery).

### d.  Defendants' Opinion Statements Regarding Flight Progress, Safety, and Customer Experience Are Not Actionable

Four of the statements Plaintiffs challenge are opinion statements that "reflect judgments as to values that are not objectively determinable," and "express expectations about the future rather than presently existing, objective facts." *Aratana*, 315 F. Supp. 3d at 758 (internal quotations marks and alterations omitted); *see also* Appendix A (Stmts. 1, 10, 15, 32). Opinion statements such as these are "often marked by phrases such as "I believe," and are actionable only if a plaintiff alleges specific facts establishing that (i) Defendants "did not hold the belief [ ] professed," (ii) "the supporting fact[s] [] supplied were untrue," or (iii) Defendants omitted

22

information that made the statement "misleading to a reasonable investor." *Sanofi*, 816 F.3d at

210 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175,

186-87 (2015)).  Sustaining a securities fraud claim based on opinions "is no small task."

*Supercom*, 2018 WL 4926442, at *23 (citation omitted).  Plaintiffs have not done so here.

These opinion statements reflect Defendants' beliefs regarding test flight progress (AC

¶ 497: "*VG believes* it has overcome a substantial number of the technical hurdles required to

make the company a viable and profitable commercial service"; *id.* ¶ 526: "Flying the same

vehicle safely to space and back twice in a little over two months . . . is [a] testament to the

unique capability we have built up . . . . *I am immensely proud* of everyone involved."

(emphases added)); safety (*id.* ¶ 564: "*I would say* safety is built in at the foundation of

everything we do"); and the customer experience (*id.* ¶ 516: "*[w]e believe* we have an

architecture that is extremely reliable and also has aspects that are very suited to the customer

experience" (emphasis added)).  "These evaluative assessments are quintessential statements of

opinion." *Okla. Firefighters*, 300 F. Supp. 3d at 575 (holding that "I think on our existing

contracts, we've got a good path to work through kind of the final touches," "[n]ow, in my view,

we're making visible progress here," and "[w]e feel like we've got a good handle on this" were

opinion statements); *River Birch Cap., LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943,

at *1, *5 (S.D.N.Y. Mar. 8, 2019) (holding that "[w]e believe the long-term contractual

relationships with our customers provide us with revenue visibility" and "[w]e believe that we

will be able to continue to enter into new contracts and modify existing contracts" were opinion

statements).

Plaintiffs do not allege a single fact suggesting that any of these statements were untrue

when made, much less that any Defendant believed them to be untrue.  Rather, all they allege is

that Defendants should have disclosed additional purported safety, design, and maintenance issues to make these opinion statements not misleading.  *See generally* AC ¶¶ 498-565.  That is not enough, as "[a]n opinion statement is not necessarily misleading" simply because "[a defendant] knows, but fails to disclose, some fact cutting the other way."  *Omnicare*, 575 U.S. at 189; *see also In re Pretium Res. Inc. Sec. Litig.,* 256 F. Supp. 3d 459, 476 (S.D.N.Y. 2017), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) (opinion statements that mine would be highly productive were not false when plaintiffs alleged "no basis . . . to conclude that [the defendant] did not honestly believe its forecasts"); *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 317 (S.D.N.Y. 2020) (opinion statements that distribution rates were sustainable not misleading where plaintiffs "have not pleaded facts to support their claim that the new distribution rates were unachievable").

### e.  Plaintiffs' Allegations Do Not Establish a Violation of Items 303 or 503/105

Finally, Plaintiffs contend that Defendants violated Items 303 of SEC Regulation S-K ("Item 303"), which requires issuers to disclose "known trends and uncertainties that . . . will have a material favorable or unfavorable impact on net sales or revenue or income from continuing operations," 17 C.F.R. § 229.303(a)(3)(ii)," and Item 503, amended as Item 105, of Regulation S-K ("Item 105"),[3] which requires issuers to include "a discussion of the material factors that make the offering speculative or risky," 17 C.F.R. § 229.105(a), by failing to disclose that a "catastrophic incident" or "fatal accident" could "mark the end of Virgin Galactic."  AC ¶¶ 580, 582.  Both allegations fail.  No such catastrophic incident or fatal accident occurred.

---

[3] "Effective May 2, 2019, the SEC relocated former Item 503(c) to Item 105 'without substantively changing the underlying disclosure requirements.'" *Chembio Diagnostics*, 2022 WL 541891, at *16 n.15 (quoting FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674-01, 12688, 12712).

And to the extent the occurrence of such an event may have adverse consequences for Virgin

Galactic, that risk was disclosed, repeatedly. *See, e.g.*, Ex. 2 at 37 (Aug. 7, 2019 S-4)

(cautioning that any "public incident, accident or catastrophe . . . could cause a material adverse

effect on our business, financial conditions and results of operations" and that "[h]uman

spaceflight is an inherently risky activity that can lead to accidents or catastrophes impacting

human life").  In the face of such warnings that "directly address" the "specific risk" at issue,

there is no Item 303 or 105 violation. *See Chembio Diagnostics*, 2022 WL 541891, at *17; *In re*

*Philip Morris Int'l Inc. Sec. Litig.*, 2020 WL 5632901, at *5 (S.D.N.Y. Sept. 21, 2020) (no Item

303 or 503 violations where defendants' disclosures "convey[ed] the precise risk that [the

p]laintiffs contend [d]efendants failed to disclose) (internal quotation marks omitted); *Lau v.*

*Opera Ltd.*, 527 F. Supp. 3d 537, 555–56 (S.D.N.Y. 2021) (no Item 105 violation where the

defendant disclosed the allegedly omitted risks).

### 2.    Plaintiffs Have Not Met Their Burden to Plead Particularized Facts Supporting a Strong Inference of Scienter

The Complaint should also be dismissed because Plaintiffs' allegations do not support the

required "strong" inference of scienter.  15 U.S.C. § 78u-4(b)(2); *In re DNTW Chartered*

*Accounts. Sec. Litig.*, 172 F. Supp. 3d 675, 684 (S.D.N.Y. 2016).  To survive dismissal, the

inference of scienter "must be more than merely plausible or reasonable—it must be cogent and

at least as compelling as any opposing inference of nonfraudulent intent." *DNTW*, 172 F. Supp.

3d at 684.  It is not enough to "set out facts from which, if true, a reasonable person could infer

that the defendant acted with the required intent." *S. Cherry St., LLC v. Hennessee Grp. LLC*,

573 F.3d 98, 110-11 (2d Cir. 2009) (quotation marks and citation omitted).  A plaintiff must

allege particularized facts showing that (1) defendants had the "motive and opportunity to

commit the fraud," or (2) "strong circumstantial evidence of conscious misbehavior or

recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Where, as here, a "plaintiff has failed to demonstrate that defendants had a motive to defraud the

shareholders, he must produce *a stronger inference* of recklessness" and "the strength of the

circumstantial allegations must be *correspondingly greater*." *Kalnit v. Eichler*, 264 F.3d 131,

142-43 (2d Cir. 2001) (emphases added).

<blockquote>

**a.  Plaintiffs Fail to Allege Particular Facts Demonstrating Conscious Misbehavior or Recklessness**

</blockquote>

Establishing conscious misbehavior or recklessness requires alleged facts establishing "a

state of mind approximating actual intent, and not merely a heightened form of negligence."

*Plumbers & Steamfitters Local 137*, 2017 WL 4403314, at *20; *see also ECA*, 553 F.3d at 202-

03 ("conduct that is at the least . . . highly unreasonable and which represents an extreme

departure from the standards of ordinary care . . ."). Plaintiffs offer no alleged facts approaching

this standard. Indeed, Plaintiffs rely almost entirely on allegations from (1) Nicolas Schmidle's

book, *Test Gods*, (2) unreliable and irrelevant statements by confidential witnesses, and (3) a

purported expert, who offers his own unsupported and untested opinions. None supports the

requisite strong inference of scienter.

***Test Gods*.** Plaintiffs cannot establish scienter by relying on pre-Class Period allegations,

which includes all of the allegations in the Complaint from *Test Gods*—a book written by *New

Yorker* staff writer Nicholas Schmidle that details his observations "from late 2014 through about

July 2018." AC ¶ 46; *see e.g., id.* AC ¶ 241 (describing alleged issues with a test flight on July

26, 2018); *id.* ¶ 297 (describing alleged issues with a test flight in December 2018). For

example, *Test Gods* discusses safety issues Virgin Galactic encountered in connection with

certain component parts during pre-Class Period test flights. *Id.* ¶¶ 241-242, 306. But Plaintiffs

do not point to any facts establishing that these particular issues went unaddressed or that they

persisted during the Class Period.  Courts routinely decline to draw an inference of scienter on reports such as this one that predate the class period.  *See, e.g.*, *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 333 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) (scienter not pled where cited "articles merely report press speculation" about "opinions years earlier"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (dismissing allegations concerning issues and events that "occurred well before the Class Period and say[] nothing about" the company's conduct during the relevant period).

**Confidential Witness Allegations.**  Plaintiffs' confidential witnesses likewise do not support scienter.  Half of them left Virgin Galactic before the Class Period started; none of the assertions attributed to the CWs (or as Plaintiffs call them "FEs") renders the challenged statements false; and none has personal knowledge of the information known to any of Virgin Galactic's senior officers and directors.  *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803 (S.D.N.Y. 2020) (plaintiff failed "to anchor" the confidential witness statements in the class period and offered no contemporaneous knowledge); *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 137 (E.D.N.Y. 2020) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

First, of the eight former employees identified in the Complaint, only four worked at Virgin Galactic or The Spaceship Company during the relevant period.  AC ¶ 39 (FE 2 predated the Class Period by four months); *id.* ¶ 40 (FE 3 predated the Class Period by ten months); *id.* ¶ 41 (FE 4 predated the Class Period by over a year and a half ); *id.* ¶ 44 (FE 7 predated the Class Period by six months).  Accordingly, the purported statements of FEs 2, 3, 4, and 7 are unreliable and should be rejected.  *See Menora Mivtachim Ins. Ltd. v. Intl. Flavors & Fragrances Inc.*, 2021 WL 1199035, at *12 (S.D.N.Y. Mar. 30, 2021) (rejecting allegations from confidential

witnesses in part because they "left the company [before the class period] and no longer had direct knowledge" of relevant conduct during the class period); *Lululemon,* 14. F. Supp. 3d at 580-81 (rejecting allegations from confidential witness concerning pre-class period issues that said "nothing" about relevant conduct during the class period).

Second, as to the remaining four (FEs 1, 5, 6, and 8), none of their observations renders the challenged statements false, and none has personal knowledge of the information known to any of Virgin Galactic's senior officers and directors during the Class Period.  FE 5, for starters, found it "disheartening" that Virgin Galactic made constant changes to its design plans (AC ¶ 210), and claims that it was a "regular occurrence" for the team to push off deadlines to address safety concerns (*id.* ¶ 249).  In other words, Virgin Galactic *took the time to get it right*, rather than rushing to meet deadlines—which is the opposite of fraud.  FE 6 allegedly reported that he said "h*** no" to participating in an employee lottery that could have allowed him a spot on a Unity Test Flight.  *Id.* ¶ 270.  The bulk of FE 6's purported concerns stem from the fact that Unity, Eve, and Enterprise were originally intended to be research prototypes rather than commercial vessels.  *Id.* ¶¶ 154-156.  Of course, FE 6 does not point to any contemporaneous facts that the vehicles were indeed not commercially ready, or at least safe to test when Virgin Galactic ran its test flights.  *See Woolgar v. Kingstone Cos., Inc.,* 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2020) (rejecting allegations from confidential witnesses because "Plaintiff [did] not establish how any of the CWs' allegations are inconsistent with the challenged statements.").

FEs 1 and 8 likewise offer no support for Plaintiffs' claims.  These former employees' allegations—that design drawings were informal, or constantly changing (AC ¶¶ 170-172); that maintenance documentation contained discrepancies (*id.* ¶¶ 216-219); and that inspection protocols were brief and "not streamlined" at the time FE 8 was hired to *develop those protocols*

(*id.* ¶ 281)—are all unremarkable observations for a pioneering endeavor like the one Virgin Galactic was developing.  And they certainly do not show (as Plaintiffs must) that Defendants' public statements about safety and commercial promise were false.  As in the IKEA furniture example in *Twitter*, one who touts that work is "ongoing" or "continuing" does not "misleadingly suggest that the person has not suffered setbacks."  2022 WL 853252, at *6 n.3. Virgin Galactic accurately disclosed the status of its spaceflight program, including delays and setbacks caused by necessary repairs—but it was not required to disclose every detail of every test flight or challenge.  *See id.* at *6.

Finally, not one of the FEs offers anything more than unsupported speculation about what any defendant knew during the Class Period.  Vague allegations that "technicians and inspectors kept yelling 'Fire!', but senior management ignored them" (AC ¶ 253); "virtually all of Virgin Galactic's engineers 'had [Moses's] ear'" (*id.* ¶ 473); or that FEs spoke frequently or attended meetings with Mr. Moses (*id.* ¶ 475), are insufficient to support scienter.  *See In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *17 (S.D.N.Y. Sept. 22, 2021) (noting that "courts have been loath . . . to sustain as sufficiently particular securities fraud complaints based on uncorroborated statements by CWs . . . where CWs 'cannot establish that the challenged statements were knowingly false when made'") (citation omitted); *Shemian v. Research In Mot. Ltd.*, 2013 WL 1285779, at *16 (S.D.N.Y. Mar. 29, 2013) (holding that "information provided by [] confidential informants [did] not support a strong inference of scienter" where plaintiff did not "provide specific instances in which Defendants received information that was contrary to their public declarations"); *In re Federated Dept. Stores, Inc. Sec. Litig.*, 2005 WL 696894, at *3 (S.D.N.Y. Mar. 25, 2005) (finding no scienter where CWs alleged defendants attendance at quarterly meetings without specific allegations about facts discussed).

**Meholic "Expert" Opinion.** *Third,* Plaintiffs similarly cannot rely on their purported expert, Mr. Greg Meholic, to sustain their claims. The Second Circuit recently had reason to address this issue when it analyzed a complaint that relied on an expert opinion. The court held that "[a]lthough it is permissible for a plaintiff to bolster a complaint by including a nonconclusory opinion to which an expert may potentially testify, opinions cannot substitute for facts under the PSLRA." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, __ F.4th __, 2022 WL 727149, at \*7 (2d Cir. Mar. 11, 2022) (quotation and citation omitted). Accordingly, an expert's opinion "cannot rescue the [plaintiffs'] claims, unless that opinion was based on particularized facts sufficient to state a claim for fraud." *Id.* (holding scienter not adequately pled despite expert opinion); *see Chipotle*, 294 F. Supp. 3d at 223 (striking expert opinion from complaint because "opinions cannot substitute for facts" and collecting cases where courts have declined to consider expert opinions attached to complaints in securities fraud actions). Here, Mr. Meholic's opinions do not rely on any facts, much less particularized facts that undermine the challenged statements. Mr. Meholic simply purports to provide a number of observations and best practices regarding the spaceflight industry—including his thoughts on engineering drawings and vehicle inspection and maintenance. *See, e.g.*, AC ¶ 163 ("According to Mr. Meholic, engineers should supplement detailed engineering drawings with literature that provides the reasons why particular parts are made in particular ways and installed in particular places"); *see also id.* ¶¶ 161-162, 171, 174, 177, 183, 236, 257, 284, 340, 348. Much like the expert in *Bristol-Myers,* there is "no indication anywhere in the Complaint that [the Company] was aware of the opinion [Mr. Meholic] expresses in this litigation or that [Mr. Meholic] was personally aware of [the Company's] knowledge" of the purported information. 2022 WL

727149, at *9.  Accordingly, his hindsight views on what Virgin Galactic should have done with respect to the maintenance and repair of its spaceflight vehicles have no bearing on scienter.

### b.  Defendants' Stock Sales Do Not Support Scienter

Failing to articulate any plausible theory of scienter based on conscious misbehavior or recklessness, Plaintiffs must adequately allege "motive and opportunity," which requires stating with particularity that Defendants "benefitted in some concrete and personal way from the purported fraud."  *In re Iconix  Brand Grp., Inc*., 2017 WL 4898228, at *14 (S.D.N.Y. Oct. 25, 2017).  Here, the only allegations that Plaintiffs offer in support of fraudulent motive are the stock sales of two of the five Individual Defendants, Richard Branson and Chamath Palihapitiya.  AC ¶¶ 440, 462.  But stock sales can establish motive supporting scienter only if the alleged facts demonstrate that the sales are "unusual or suspicious" in amount, timing, or otherwise.  *See Chapman v. Mueller Water Products*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (considering whether sales occurred "soon after statements defendants are alleged to know to be misleading" or "shortly before corrective disclosures or materialization of the alleged risk").  The stock sales by Richard Branson and Chamath Palihapitiya do not meet this standard.

First, Plaintiffs allege that from May 14 to May 22, 2020, and on June 2, 2020, Richard Branson (via Vieco 10 Ltd.) sold a total of 36.2 million shares.  AC ¶¶ 440a, 440b.  But these sales were made months before any announcement leading to a stock price decline (August 4, 2020, AC ¶¶ 331-332).  Accordingly, they are not indicative of scienter.  *See Woolgar*, 477 F. Supp. 3d at 235 ("Courts in the Second Circuit have found that 'stock sales are not indicative of scienter when they are "more than two months before the announcement" in question.'"); *In re Bausch & Lomb, Inc. Sec. Litig*., 592 F. Supp. 2d 323, 344-45 (W.D.N.Y. 2008) (noting that the fact "the stock sales at issue took place, for the most part, over two months prior to the release of the negative disclosures" did "not suggest that [the defendants] meant to realize profits

immediately prior to the expected and dramatic fall in the stock's price."). And tellingly, the stock price actually rose after Richard Branson sold his shares, including by nearly 10% mere days after his June sale, negating any inference of fraudulent motive. Ex. 12 at 1, 13 (SPCE Stock Price History).

Second, Plaintiffs point to stock sales on December 14 and 15, 2020, by Chamath Palihapitiya. AC ¶ 462c. But these sales took place *after* Virgin Galactic had disclosed that a test flight two days earlier "did not reach space as planned, as the rocket motor did not fire due to the ignition sequence not completing," and *before* the stock price more than doubled weeks later, reaching $54.53 by February 12, 2021. AC ¶ 462c; Ex. 12 at 1, 7-9 (SPCE Stock Price History). The fact that Chamath Palihapitiya sold after a stock price decline weighs against any argument that his sales were unusual or suspicious. *See Aratana*, 315 F. Supp. 3d at 764 (holding that defendants' stock sales were not suspicious because they occurred after the relevant disclosure had been made).

Finally, Plaintiffs point to stock sales on March 2 and 3, 2021, by Chamath Palihapitiya, and sales by Richard Branson on April 12-14, 2021, and August 10-12, 2021. AC ¶¶ 440d, 440e, 462d. Again, all of these sales occurred after the stock price had declined. Ex. 12 at 1, 3, 6-7 (SPCE Stock Price History). The timing of these sales weighs against any inference of a fraudulent motive.

### c. The Non-Fraudulent Inference Is More Compelling

When determining whether allegations "give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). Here, Plaintiffs' theory is that Defendants concealed safety issues because the Company "urgently needed cash." AC ¶¶ 423-462. But Defendants' conduct contradicts this theory. Virgin Galactic not only informed investors that space travel is

inherently dangerous and that safety performance issues could lead to delays (*id.* ¶¶ 507, 509), but also delayed or grounded flights at several points during the Class Period, in part to ensure that there were no catastrophic safety failures (*id.* ¶¶ 20, 22). Indeed, when the former Head of Safety raised safety concerns, the board engaged a former Boeing executive who "spent hours interviewing the people responsible for Virgin Galactic's safety." *Id.* ¶¶ 322-324. In February 2019, Mr. Moses' wife, Beth Moses, became the first non-pilot crewmember to fly into space (*id.* ¶¶ 365, 531), and in July 2021, Richard Branson flew successfully to space, also accompanied by Beth Moses (*id.* ¶ 387)—contradicting any possible inference that either had unaddressed safety concerns. Far from supporting securities fraud, the more cogent and compelling inference is that Virgin Galactic opted to delay flights precisely because of its commitment to safety. *See Salim v. Mobile Telesystems PJSC*, 2022 WL 966903, at *1-2 (2d Cir. Mar. 31, 2022) (summary order) (affirming district court's finding that defendants' disclosure to investors of government investigations, a civil complaint, and other facts regarding a bribery scheme "support[ed] the more reasonable inference" that the company was not concealing its "potential liability under the FCPA"); *Russo v. Bruce*, 777 F. Supp. 2d 505, 526-27 (S.D.N.Y. 2011) (holding that inference of nonfraudulent intent was more compelling where company "was making steady, if slow, progress towards its goal of obtaining the Final Permit" and publicly disclosed "many of the hiccoughs in the permit application process"—"candidness [which] undermine[d] an inference of fraudulent intent"); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 466 n.83 (S.D.N.Y. 2006) (illogical allegations do not raise a strong inference of scienter); *River Birch Cap.*, 2019 WL 1099943, at *10 (no scienter where nonfraudulent inference was "just as persuasive" as alleged fraud).

### 3.    Plaintiffs Have Not Met Their Burden to Plead Loss Causation

Plaintiffs' Complaint warrants dismissal for the additional reason that it fails to plead loss causation – *i.e.*, "that the economic harm that [they] suffered occurred as a result of the alleged misrepresentations." *Lentell v. Merill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir. 2005) (emphasis omitted). Loss causation can be established by showing that (1) the market reacted negatively to a corrective disclosure of the facts supposedly misrepresented or concealed, or (2) the risks that were concealed by the alleged misrepresentations or omissions materialized, leading to a stock price decline. *See Omnicom,* 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) ("*Omnicom I*"). Whether supporting loss causation through corrective disclosures or a materialization of risk theory, to plead a viable claim, a plaintiff must demonstrate a connection between the content of the alleged misstatements (or the omitted information) and the facts later disclosed or the risks that ultimately materialized. *See Lentell,* 396 F.3d at 173 (holding that loss causation is not pled unless "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security") (internal quotations omitted); *In re Initial Pub. Offering Sec. Litig.,* 399 F. Supp. 2d 261, 266 n.26 (S.D.N.Y. 2005) (finding loss causation insufficiently pled absent allegations that "the ultimate decline in the companies' stock price was attributable to the very thing that the defendants allegedly lied about") (internal quotation and citation omitted). Plaintiffs oddly do not include any discussion of loss causation in the Complaint. Accordingly, Plaintiffs have not explained whether their claims are based on a corrective disclosure or materialization of the risk theory, and by extension, what the alleged corrective disclosures were, or when and how the supposedly concealed risks materialized. This shortcoming is independently sufficient grounds for dismissal. *See, e.g.*, *Initial Pub. Offering*, 399 F. Supp. 2d at 265 ("[I]n material misstatement and omission cases, a court cannot presume

dissipation of the inflationary effect; a plaintiff must explicitly allege a disclosure or some other corrective event.").

Drawing every possible inference in Plaintiffs' favor, there is no sustainable loss causation theory. To the extent Plaintiffs are attempting to plead a materialization of concealed risks theory, that attempt fails because all of the risks Plaintiffs complain were "concealed"— safety, design, and maintenance issues (AC ¶¶ 333, 413, 422)—were actually disclosed. To show a materialization of concealed risks, Plaintiffs must allege that the events reveal new information previously concealed and that the revelation is "the 'proximate cause' of an investment loss [because] the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *In re Omnicom Grp., Inc. Sec. Litig*., 597 F.3d 501, 513 (2d Cir. 2010) (emphasis omitted) ("*Omnicom II*"). But here, Virgin Galactic was clear about the material risks associated with its spaceflight program, offering specific warnings that maintenance issues, safety issues, and design and engineering flaws could lead to flight delays and material financial impact. *See, e.g.*, Ex. 2 at 34-35 (Aug. 7, 2019 S-4) (emphasis added) (risk warnings stating that Virgin Galactic may be "unable to operate our spaceflight system . . . for a number of reasons, including, but not limited to . . . maintenance issues, pilot error, [or] design and engineering flaws," and that "[a]ny actual or perceived safety issues . . . *could result in delaying or cancelling planned flights*").

"In these circumstances, when there are 'substantial indicia of the risk' already in the public domain, a plaintiff must allege (i) facts sufficient to support an inference that it was defendants' fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d

401, 406 (S.D.N.Y. 2014) (quotations and citation omitted).  Plaintiffs have done neither.

Instead, they offer the conclusory assertion that the stock price drops represented materialization

of a concealed risk.  AC ¶¶ 333, 413, 422.  Courts have routinely dismissed complaints that rely

on similar *ipse dixit*.  *See Lentell,* 396 F.3d at 176 (2d Cir. 2005) (dismissing action where the

risk that led to the alleged stock price was "apparent on the face of every report challenged in the

underlying complaints"); *Omnicom II*, 597 F.3d at 513 (dismissing claims based on allegedly

concealed  risk that was "publicly known"); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 209

(D. Conn. 2014) (dismissing complaint that did "not even attempt to explain why the

materialization of the concealed risk, not the disclosed risk, caused the decline in sales and . . .

decline in . . . share price"); *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 547 (S.D.N.Y.

2007) (finding that "[t]he allegations in the Complaint describe a slow, steady decline which,

importantly, Defendants never actually hid from the public.").

      If instead, Plaintiffs are pursuing a corrective disclosure theory of loss causation, that also

fails.  Plaintiffs point to various dates on which Virgin Galactic's stock price declined, but they

do not identify the corrective facts disclosed on those dates, do not connect any of the

information disclosed on those dates to any misstatements or omissions, and do not explain how

the disclosures on those dates corrected any prior statements.  Instead, Plaintiffs identify a

hodge-podge of stock price declines—in August 2020 (AC ¶¶ 331-332), December 2020 (*id.*

¶¶ 356-360), February 2021 (*id.* ¶¶ 377, 382), September 2021 (*id.* ¶ 408), and October 2021 (*id.*

¶¶ 410-411)—but do not tie these disclosures to any prior contradictory statements.  And the

principal "fact" Plaintiffs say was concealed (and later revealed)—namely, "the risk of delays"

related to safety, design, and maintenance (*id.* ¶¶ 377-380)—was actually disclosed by Virgin

Galactic, repeatedly and long before any of these stock price declines.  *See* Ex. 2 at 34 (Aug. 7,

2019 S-4) (disclosing that if Virgin Galactic "experience[d] issues with manufacturing improvements or design and safety, the anticipated launch of [its] commercial human spaceflight operations could be delayed"); *id.* (inability "to operate our spaceflight system … for a number of reasons, including, but not limited to . . . maintenance issues, pilot error, [or] design and engineering flaws . . . could result in reduced numbers of flights and significant delays to our planned growth"). Although "a disclosure need not reflect every detail of an alleged fraud, it must reveal some aspect of it and it must actually expose the falsity of the fraudulent representation." *Omnicom I*, 541 F. Supp. 2d at 551. Such is not the case here, particularly where the information in question was already public. *See, e.g.*, *Lau*, 527 F. Supp. 3d at 559 ("Already-public information cannot constitute a corrective disclosure for purposes of alleging loss causation."); *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016) (no loss causation when the corrective disclosure was based on public information).

### B.    Plaintiffs Do Not Plead a Viable Claim Under Sections 20(a) or 20A

A Section 20(a) claim must have, as a predicate, a primary violation of the Securities Exchange Act of 1934. *See* 15 U.S.C. §78t. The same is true for a Section 20A claim. *See* 15 U.S.C. § 78t-1(a). Because Plaintiffs fail to state a claim under Section 10(b), the Section 20(a) and Section 20A claims must be dismissed. *See ATSI*, 493 F.3d at 108 (affirming dismissal of Section 20(a) claim for failure to plead a Section 10(b) claim); *Gordon v. Sonar Cap. Mgmt. LLC*, 962 F. Supp. 2d 525, 528 (S.D.N.Y. 2013) (same).

Plaintiffs' Section 20A claim against Richard Branson and Chamath Palihapitiya fails for the additional reason that a Section 20A claim requires plaintiff to plead that the defendants traded in the security at issue "contemporaneously" with the plaintiff and that the defendant was "in possession of material, nonpublic information" at the time of the trade. *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255 (S.D.N.Y. 2007). Plaintiffs fail to allege what, if any,

material, non-public information either possessed at the time of their trades.  Plaintiffs allege only in conclusory fashion that "defendants Branson and Palihapitiya were in possession of material, non-public information concerning Virgin Galactic" (AC ¶ 606), which is insufficient. *See Openwave*, 528 F. Supp. 2d at 256 (plaintiff's "conclusory allegations" failed to establish that defendant "was privy to any material, nonpublic information concerning the backdating scheme" required to sustain 20A claim); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 310-11 (S.D.N.Y. 2008) (dismissing 20A claim where plaintiffs conclusorily alleged that defendants "possessed material, nonpublic information").

## V.    CONCLUSION

Defendants respectfully urge the Court to dismiss the Complaint, with prejudice.


Dated:  April 4, 2022                                Respectfully submitted,

*/s/ Michele D. Johnson*

LATHAM & WATKINS LLP

Michele D. Johnson (*pro hac vice*)
Kristin N. Murphy (*pro hac vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290
Email: michele.johnson@lw.com
         kristin.murphy@lw.com

Colleen C. Smith (*pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
Email: colleen.smith@lw.com

*Attorneys for Defendants*