**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHANE LAVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VIRGIN GALACTIC HOLDINGS, INC., MICHAEL A. COLGLAZIER, GEORGE WHITESIDES, DOUG AHRENS, and JON CAMPAGNA,<br><br>Defendants. | Case No. 1:21-cv-03070-ARR-TAM |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

797931.1

**TABLE OF CONTENTS**

I. INTRODUCTION ....................................................................................................1

II. STATEMENT OF FACTS ......................................................................................3

 A. Early Catastrophes Plague Virgin Galactic ...............................................3

 B. Leading Up To Its Public Listing, VG Ignores Major Known Deficiencies ...........3

  1. Defendants Announce Virgin Galactic Is Going Public, Claiming It Is on the Cusp of Commercial Spaceflight ...........................................3

  2. Virgin Galactic Encounters Near Disaster on Four Out of Five Powered Test Flights in the Run-Up to its IPO ........................................4

  3. Unity and Eve are Flimsy Prototypes ...........................................6

  4. Unity and Eve's Actual Configurations Are A Mystery to Defendants ......7

III. STANDARD OF REVIEW.....................................................................................9

IV. PLAINTIFFS ALLEGE VIOLATIONS OF THE EXCHANGE ACT .............................10

 A. Plaintiffs Adequately Allege Actionable False and Misleading Statements .........10

  1. Applicable Falsity Pleading Standards .........................................10

  2. Defendants' Statements Touting the Success of VG's Testing Program Were Materially Misleading ...................................................11

  3. Defendants' Statements Setting Out a Timeline For Commercial Flights and Falsely Claiming To Have Cleared Milestones Were Materially Misleading ................................................................14

  4. Defendants' Assurances that VG's Testing Program Was Rigorous and Showed Safety Were Materially Misleading............................................18

  5. Defendants Violated Regulation S-K By Failing To Disclose that VG Had to Choose Between Years of Delays and Unsafe Flights .........................21

  6. The PSLRA's Safe Harbor Provision Does Not Protect Defendants' False and Misleading Statements ................................................21

   (a) Defendants' Statements Were Not Forward Looking ...................22

        (b)      The Statements Were Not Accompanied by Meaningful Cautionary Language and Plaintiffs Allege Defendants' Actual Knowledge of the Falsity of The Misrepresentations....................23

   B.     Plaintiffs Adequately Allege that Defendants Acted With Scienter......................25

      1.     Branson's and Palihapitiya's Sales of 100% of Their Available Shares for More than $1.3 Billion Support a Strong Inference of Scienter................25

      2.     Defendants' Admissions and the Consistent Accounts of Eight Former Employees and Schmidle Constitute Strong Circumstantial Evidence of Recklessness ...........................................................................................29

          (a)      Insider Accounts Support a Strong Inference of Scienter .............29

          (b)      The CAC Alleges That Defendants Had Access to Facts that Contradicted their Positive Public Statements, Including From the Investigation Following the February 2019 Flight........................32

          (c)      Meholic's Opinion Provides Context Which Supports Scienter ...34

          (d)      The Resignation of VG's Vice President of Safety and Testing Supports Scienter........................................................................35

          (e)      Defendants Fail to Raise a *More* Compelling Inference ...............35

   C.     Plaintiffs Adequately Allege Loss Causation.......................................................37

   D.     Plaintiffs Adequately Allege Claims Under Section 20(a) and Section 20A........40

V.     CONCLUSION ..................................................................................................................40

797931.1

# TABLE OF AUTHORITIES

CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ....................................................................................37

*Abuhamdan v. Blyth, Inc.*,
9 F. Supp. 3d 175 (D. Conn. 2014)...........................................................................39

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
19 F.4th 145 (2d Cir. 2021) .....................................................................................34

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) .....................................................................................35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .................................................................................................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................9

*Bldg. Trades Pension Fund of W. Pennsylvania v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022)............................................................23

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012)................................................................................11

*Bond v. Clover Health Invs., Corp.*,
2022 WL 602432 (M.D. Tenn. Feb. 28, 2022)........................................................28

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019)......................................................................34

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) .....................................................................18

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009) .....................................................................31

*Chapman v. Mueller Water Prod., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) .....................................................................27

*Christine Asia Co. v. Ma*,
    718 F. App'x 20 (2d Cir. 2017) ....................................................................................21

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ................................................................................18, 20

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...................................................................15, 25

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 23, 2013) ..............................................................24

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..............................................................................................37, 39

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ..................................................................................27, 29

*Fila v. Pingtan Marine Enter. Ltd.*,
    195 F. Supp. 3d 489 (S.D.N.Y. 2016) ..........................................................................39

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012) ..........................................................................24

*Freedman v. Value Health, Inc.*,
    135 F. Supp. 2d 317 (D. Conn. 2001)...........................................................................24

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..........................................................................35

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) .............................................................10, 13, 24

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018) ..........................................................................30

*Gammel v. Hewlett-Packard Co.*,
    2013 WL 1947525 (C.D. Cal. May 8, 2013)................................................................16

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ..............................................................................9, 32, 39

*Gordon v. Vanda Pharms. Inc.*,
    2021 WL 911755 (E.D.N.Y. Mar. 10, 2021)................................................................37

*Grae v. Corr. Corp. of Am.*,
  2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) ........................................................18

*Gruber v. Gilbertson*,
  2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) .........................................................32

*Hall v. Rent-A-Ctr., Inc.*,
  2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) .........................................................17

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ....................................................................35

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ...........................................................16

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) ....................................................................11

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010) ....................................................................23

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ....................................................................26

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008) ...................................................................27

*In re BP p.l.c. Sec. Litig.*,
  2012 WL 432611 (S.D. Tex. Feb. 13, 2012) ..........................................................16

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
  2022 WL 541891 (E.D.N.Y. Feb. 23, 2022) .....................................................17, 33

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) .........................................................11

*In re Forest Lab'ys Sec. Litig.*,
  2006 WL 5616712 (S.D.N.Y. July 21, 2006) ..........................................................26

*In re Global Brokerage, Inc.*,
  2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) .........................................................13

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ....................................................................................35

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ........................................................28

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014)........................................................18

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) ........................................................31

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D.W. Va. 2012)........................................................18

*In re New Energy Sys. Sec. Litig.*,
66 F. Supp. 3d 401 (S.D.N.Y. 2014) ........................................................39

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006) ........................................................14

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ........................................................39

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ........................................................30

*In re QuantumScape Sec. Litig.*,
2022 WL 137729 (N.D. Cal. Jan. 14, 2022)........................................................15

*In re Rhodia S.A. Sec. Litig.*,
531 F. Supp. 2d 527 (S.D.N.Y. 2007) ........................................................39

*In re Salix Pharm., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ........................................................23

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ........................................................26, 30

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010) ........................................................26

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020)........................................................18

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009) ........................................................39

*In re Vivendi Universal, S.A.*,
 2004 WL 876050 (S.D.N.Y. Apr. 22, 2004) ...................................................................16, 22

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016) ...........................................................................................22

*In re Winstar Commc'ns*,
 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ....................................................................11

*In re WorldCom, Inc. Sec. Litig.*,
 294 F. Supp. 2d 392 (S.D.N.Y. 2003) .............................................................................31

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
 818 F.3d 85 (2d Cir. 2016) .........................................................................................21, 32

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
 14 F.4th 141 (2d Cir. 2021) .......................................................................................10, 11

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ..........................................................................................13

*Klein v. Facebook, Inc.*,
 2022 WL 141561 (N.D. Cal. Jan. 14, 2022)....................................................................28

*Lachman v. Revlon, Inc.*,
 487 F. Supp. 3d 111 (E.D.N.Y. 2020) .............................................................................31

*Lau v. Opera Ltd.*,
 527 F. Supp. 3d 537 (S.D.N.Y. 2021) .............................................................................39

*Lea v. TAL Educ. Grp.*,
 837 F. App'x 20 (2d Cir. 2020)........................................................................................33

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005) ............................................................................................39

*Long Miao v. Fanhua, Inc.*,
 442 F. Supp. 3d 774 (S.D.N.Y. 2020) .............................................................................31

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
 797 F.3d 160 (2d Cir. 2015) .......................................................................................37, 40

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
 513 F.3d 702 (7th Cir. 2008) ..........................................................................................36

*Martin v. Altisource Residential Corp.*,
  2017 WL 1068208 (D.V.I. Mar. 16, 2017)....................................................................23

*McDermid v. Inovio Pharms., Inc.*,
  520 F. Supp. 3d 652 (E.D. Pa. 2021)..........................................................................15

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
  2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021).........................................................31, 32

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014) ...........................................................10, 11, 17, 19

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014) ............................................................................14

*Moshell v. Sasol Ltd.*,
  481 F. Supp. 3d 280 (S.D.N.Y. 2020) ..........................................................................14

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018) ..........................................................................26

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ...............................................................................25, 29

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .....................................................................................26

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
  98 F.3d 2 (2d Cir. 1996) ..............................................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ........................................................................................19, 20, 24

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018) ..........................................................................35

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019)...........................................................................28

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004) ..........................................................................................22

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020)..........................................................................28

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015) ...................................................................................29

*River Birch Cap., LLC v. Jack Cooper Holdings Corp*,
2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ........................................................................33

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) .......................................................................................13, 24

*Russo v. Bruce*,
777 F. Supp. 2d 505 (S.D.N.Y. 2011) .................................................................................33

*Salim v. Mobile Telesystems PJSC*,
2022 WL 966903 (2d Cir. Mar. 31, 2022) ...........................................................................33

*Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020) .......................................................................................11, 12

Similarly, in *Rihn v. Acadia Pharms. Inc.*,
2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ..................................................................14, 16

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ....................................................................10, 13

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 4208442 (S.D.N.Y. July 21, 2020) .......................................................................36

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010) .......................................................................................22, 24

*Stevelman v. Alias Research Inc.*,
174 F.3d 79 (2d Cir. 1999) ........................................................................................25, 26

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001) ............................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...............................................................................................9, 25

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ..........................................................................................13

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009) .................................................................................15

797931.1                                                    ix

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ....................................................................................................19, 20

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ........................................................................................13, 17

*Woolgar v. Kingstone Cos., Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020) ...............................................................................27

*Xiang v. Inovalon Holdings, Inc.*,
   254 F. Supp. 3d 635 (S.D.N.Y. 2017) ...............................................................................21

<u>STATUTES</u>

15 U.S.C. §78u-4(b)(1)(B) .........................................................................................................11

15 U.S.C. §78u-4(b)(2)...............................................................................................................25

15 U.S.C. §78u-5(c)(1)(A) .........................................................................................................22

<u>RULES</u>

Fed. R. Civ. P. 10(c) ..................................................................................................................35

<u>REGULATIONS</u>

17 C.F.R. § 240.10b-5(b)............................................................................................................10

## I.    INTRODUCTION[1]

In February 2019, five months before Virgin Galactic Holdings, Inc. ("Virgin Galactic", "VG", or the "Company") announced it would go public, it suffered a terrible accident that nearly resulted in its space vehicle blowing up. The accident resulted from a wide range of deficiencies in its space program. VG had no inspection programs to speak of; its vehicles' configuration was a mystery because key documentation was missing, unreliable, or wrong; and its vehicles were flimsy prototypes whose parts broke on every flight. The flight left the shuttle grounded for 14 months while VG's technicians repaired the damage and attempted to redesign key parts.

As Defendant Moses would later tell *The Washington Post*, Defendants had internally concluded that the February 2019 flight was "[n]ot something that should be allowed to happen and something we clearly needed to address." Following that flight, VG's safety director resigned. The incident prompted a high-level internal investigation which revealed extensive corrective actions the Company must undertake. While Defendants did not publicly reveal the existence or results of the investigation, or even the incident that prompted it, Virgin Galactic's board and Branson were kept informed.

The incident presented Defendants with a stark choice: they could disclose to investors that it would take years and hundreds of millions of dollars to properly address VG's problems and deficiencies, thus effectively foreclosing any hope of going public in the near future, or Defendants

---

[1] Defendants are: VG; VG controlling shareholder Richard Branson ("Branson"); Social Capital Board Chairman Chamath Palihapitiya ("Palihapitiya"); Michael A. Colglazier, VG Chief Executive Officer ("CEO") since July 2020; George Whitesides ("Whitesides"), VG CEO from May 2010 to July 2020; and VG President – Missions and Safety Michael Moses ("Moses") ("Defendants"). All paragraph ("¶") citations refer to Plaintiffs' Corrected Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint" or "CAC"). The Class Period is July 10, 2019 through October 14, 2021. Unless otherwise indicated, all emphasis is added and all internal citation and quotations are omitted.

797931.1                                                    1

could, instead, continue with the plan to take the Company public while misleadingly concealing the flight program's failures and deficiencies. Because Virgin Galactic needed money to continue to develop its program, Defendant Branson needed money to retain control of his business empire, and Defendant Palihapitiya would make hundreds of millions of dollars on the deal – even if it was bad – but would lose everything if the deal fell through, they chose the latter.

Thus, even as the shuttle was grounded, Defendants claimed the February 2019 flight had been a success that showed VG's space flights were "safe" and "repeatab[le]." They told investors commercial flights would take place by mid-2020. And they claimed they had prioritized safety and undertaken a "step-by-step diligent approach throughout the test flight program."

Misled, investors approved the transaction that would take VG public. Defendants benefited immensely. The Company raised $1 billion. Palihapitiya made $320 million selling VG shares, Branson more than *$1 billion*. But investors lost enormous amounts of money as delay after delay – each linked to the conditions Defendants had concealed – caused VG's stock price to fall, as did the revelation that the February 2019 flight had been a disaster.

Defendants' motion to dismiss misconceives the CAC's theory. They argue that faced with a dilemma, they chose one horn: ensuring safety. The CAC – which alleges that Defendants knew of, misrepresented, and concealed the safety problems for years before the problems eventually materialized in flight delays – forecloses this claim. But even if it did not, Defendants misled investors by denying the dilemma existed. Spending years and hundreds of millions of dollars modifying its vehicles so they were less likely to kill passengers may be better than rushing to unsafe commercial flights, but it still means that VG was worth materially less than Defendants claimed. The CAC states a claim. The Court should deny the motion to dismiss.

797931.1                                        2

## II.    STATEMENT OF FACTS

### A.    Early Catastrophes Plague Virgin Galactic

Virgin Galactic's space vehicle design originates with Scaled Composites, an aerospace development company founded by Burt Rutan ("Rutan"). Rutan was an eccentric aerospace prototype designer notorious for his slapdash methods, who was known for his carbon composite designs but had no experience with rockets. ¶¶76-77. Branson and Rutan founded Virgin Galactic as a joint venture in 2004. ¶73. VG's design for space travel includes two vehicles: Eve and Unity. ¶5. Eve carries Unity to 45,000 feet and releases it. Unity then fires its own rocket to reach space.

Virgin Galactic's development program was marred by tragedies. In 2007, a Unity test rocket exploded on the ground, killing three people. ¶92. In October 2014, when attempting its first full powered flight to the edge of space, Unity's predecessor exploded, killing the pilot and seriously injuring the co-pilot. ¶¶101-09. A scathing National Transportation Safety Board ("NTSB") report cited, among other things, failures to train pilots, fix known problems, and address conditions that could cause a catastrophe. ¶¶107-13. The 2014 disaster threw VG into crisis. Defendants acknowledged that another fatal accident would likely doom the Company. ¶117; *see also* ¶118.

### B.    Leading Up To Its Public Listing, VG Ignores Major Known Deficiencies

#### 1.    Defendants Announce Virgin Galactic Is Going Public, Claiming It Is on the Cusp of Commercial Spaceflight

On July 9, 2019, Defendants announced that they were taking Virgin Galactic public through a transaction with a SPAC, which was a much-needed lifeline for all the Defendants. ¶¶65-69. For Palihapitiya, it meant a nine-figure payday regardless of the Company's future performance. *Id*. Palihapitiya sponsored the SPAC that "acquired" VG and thereby transformed the latter into a publicly traded company. *Id*. If the SPAC failed to complete an acquisition by

797931.1                                          3

September 18, 2019, Palihapitiya would receive nothing for two years' work and the SPAC would liquidate and return the shareholder money it had raised in its IPO. ¶¶458-59. If it closed on an acquisition by September 18, 2019, Palihapitiya would receive shares worth tens or hundreds of millions of dollars as a success fee regardless of performance. *Id*. For VG and its officers, it meant they could tap public markets for the billions of dollars they needed to commercialize their experimental space tourism program. ¶¶444-45. For Branson, it meant immediately selling at least $100 million of his VG stock and turning the remainder into publicly tradeable shares to sell. ¶434.

Defendants told Virgin Galactic's potential investors that they were buying shares in a company on the cusp of commercialization. ¶2. In urging investors to vote for the SPAC transaction (and not tender their shares), Defendants claimed VG had "demonstrated the repeatability of the full flight profile through the completion of two crewed spaceflights," and that the latter flight on February 22, 2019, was a "huge technical milestone" that Virgin Galactic had cleared. ¶¶503, 505. Palihapitiya told investors in October 2019 that commercial flights were, at most, nine months away. ¶522. In June 2020, Whitesides told investors Virgin Galactic was "within spitting distance" of commercial flights, which would take mere "months." ¶540.

### 2. Virgin Galactic Encounters Near Disaster on Four Out of Five Powered Test Flights in the Run-Up to its IPO

Virgin Galactic ran five powered test flights in 2018 and 2019 in the run-up to its public listing and experienced near-disasters on four of them. ¶503. The pilot had to abort the first flight in April 2018 because Unity shook too violently at Mach 1.8 to be manually controlled, and then nearly veered off course to his death when Unity's instruments failed. ¶135. Because the issue was Unity's structure, the uncontrollable shaking might recur whenever Unity reached Mach 1.8. ¶¶340-43. On Unity's third flight in July 2018, the pilot inadvertently triggered the nozzles of the vehicle's Reaction Control System ("RCS"), a series of pressurized nozzles placed along the

outside of the vehicle's hull to orient and position it, because of poor cockpit design. ¶¶241-43. Unity spun out of control and nearly ran out of gas to right itself. ¶¶139, 241. On the fourth flight in December 2018, this time to space, Unity began "veer[ing] off course" after 30 seconds – a potentially fatal problem. ¶297. Because Unity uses all its fuel reaching space and then glides to a landing, it cannot recover if it exhausts its fuel too far from the desired location. ¶¶297, 394-96.

During its fifth and last flight on February 22, 2019, Unity's horizontal stabilizers popped. ¶305. Before that flight, VG technicians had applied a layer of "goop" and Kapton (a heat shield) to Unity. ¶307. Because of VG's insufficient record keeping and software, the technicians had not been able to keep track of the goop and Kapton, inadvertently covered airholes in Unity's horizontal stabilizers, and did not report the application. ¶¶308-09. These airholes allow air to escape. ¶306. With nowhere for the air to go, the horizontal stabilizers "popped like a bag of chips." ¶305. Unity narrowly and luckily avoided a catastrophe – had the horizontal stabilizers popped in a different spot, the crew likely would have been killed. *Id.* The blocked air holes were not even the most obvious problem. A post-flight inspection found that the horizontal stabilizers' panels had not been properly screwed in and there was a baggie of loose screws taped inside. ¶¶310-12. Because VG had not created even the basics of an inspection program, the pre-flight inspection missed the baggie, the unscrewed plates, and the Kapton covering the airholes. *Id.*

VP of Safety and Testing Todd Ericson ("Ericson") told Nicholas Schmidle, a journalist who embedded himself in Virgin Galactic for years, "I don't know how we didn't lose the vehicle and kill three people." ¶300. Unity was grounded for 14 months (until May 2020) as VG tried to address the issues, including hiring an outside firm to design and build new horizontal stabilizers. ¶¶334-39.

All Defendants were aware of the February 2019 disaster contemporaneously. Moses witnessed the popped stabilizers when the shuttle was wheeled back into the hangar. ¶302. Moses

told *The Washington Post* that VG's Board members and shareholders (Branson was the controlling shareholder) were "immediately notified" about the flight. ¶327. Ericson met with the VG Board in early May 2019 and advised them that the testing program was unsafe, and that someone else would likely be killed if changes were not made. ¶322. The Company then hired an outside aviation firm to conduct a safety review of its testing program but ***refused to publicly disclose the results of the review***. ¶365. Ericson, dismayed that Virgin Galactic had "brush[ed the incident] under the rug," resigned a month before the announcement that VG was going public. ¶317. Whitesides "look[ed] stricken; his vice president of safety was resigning because he'd lost confidence in the safety regime." ¶326.

### 3. Unity and Eve are Flimsy Prototypes

While touting VG's testing program, Defendants were at all times aware that Unity and Eve were flimsy prototypes that could never support tourist space travel. FE 2, a safety engineer assigned to Unity from August 2017 through January 2019 (¶39), described Unity as a "flying band aid." ¶255. FE 6 who had overall responsibility for building Unity and its predecessor from inception in the early 2000's through July 2015 and thereafter served as a Production Manager for VG's sister company, The Spaceship Company, stated that Scaled Composites built and delivered vehicles to Virgin Galactic on the understanding that they would serve as mere prototypes. ¶¶43, 156. These vehicles, including Eve, Unity's predecessor, and 65% of Unity, were "home-built" with "very little" testing. ¶154. Still, ten years later, VG was "pushing [its] luck" by continuing to fly Unity and Eve. ¶160. FE 6 – who helped build Unity – declined to enter an employee lottery to win a ticket to space on Unity because FE 6 was too scared to ride on it. ¶¶268-70.

By the time of the Class Period, Unity and Eve had accumulated many more defects that required remedying. For example, Eve's wings developed visible structural cracks on every flight. ¶¶254-57. A study conducted by VG during the Class Period discovered that this problem occurred

because too much resin had been applied. ¶261. According to FE 1, who headed VG's inspection teams, the cracks could bring Eve down. ¶260. Further, after years of patchwork modifications, Unity was "[w]ay heavier than [Eve] was designed for." ¶421. As a result, Eve was not up to the task and developed deficiencies. For instance, former employees report that Eve's pylons, to which Unity was attached in flight, cracked after every flight. ¶416. Another source reported that parts were "just slapped together and not as strong as they were supposed to be." ¶415. Yet another source reported that the pylons were poorly manufactured, raising "monster" issues. ¶417. These facts were known to Defendants from at least 2018. *See, e.g.*, ¶¶40, 44, 45, 421.

### 4. Unity and Eve's Actual Configurations Are A Mystery to Defendants

Complex machines like Unity and Eve have many moving parts. ¶126. Without detailed engineering drawings, it is impossible to understand the vehicles, their capabilities, or the stresses they can bear. ¶¶161-62. At the time that VG severed ties with Scaled Composites, Scaled Composites had built Eve and Unity was more than 65% complete. ¶¶42, 123, 142. However, Scaled Composites had not been contracted to, and thus did not, produce engineering drawings to accompany the vehicles. ¶¶165-66. The drawings that Scaled Composites gave VG were largely preliminary sketches, sometimes on napkins, sometimes in crayon, sometimes stained with coffee, and sometimes stained with beer. ¶70. Scaled Composites also failed to document many of the changes it had made to Eve and Unity, such that the drawings documented parts that were not actually in the vehicles, and Eve was, according to a former VG technician, "nothing like it was supposed to be." ¶191. Underscoring the serious problems inherent in the lack of engineering drawings, it took half a decade for VG to discover that Scaled Composites had radically altered the structure of Eve's wings without documenting the change. ¶¶190-91.

Virgin Galactic compounded the problem by failing to keep track of the changes it made to Unity and Eve after the break with Scaled Composites. Though Unity and Eve were prototypes

797931.1    7

constantly being modified, VG used software designed to keep track of maintenance on regular commercial aircraft, which only required technicians to fill out a maintenance checklist, rather than specifically detail design changes. ¶¶198-99. As a result, Virgin Galactic's technicians were constantly making unlogged changes or failing to make changes that were logged as having been completed. ¶¶194-231. Virgin Galactic's engineers thus did not know Unity and Eve's actual condition and configuration. ¶207. These problems existed when FE 1 was hired in June 2019 and worsened throughout FE 1's tenure ending December 2020. ¶¶38, 213. Even in 2021, Virgin Galactic's technicians were regularly discovering that parts they thought were in the vehicles were not, or vice versa. ¶192. Worse, VG's software deleted all previously-inputted information whenever Engineering ordered a change mid-task. ¶209. This meant that VG frequently did not know its parts' serial numbers, resistance, and longevity – a huge safety risk because the vehicles' parts were flight-cycle dependent. *Id*. Thus, the Company only replaced parts when they were "worn down" and should have been replaced "months ago." *Id.*

Many parts that made up Unity and Eve were made from unstandardized single-use molds, meaning ostensibly identical parts differed from each other, and also differed from the specifications set in any records that VG ***did*** have about its vehicle and part specifications. ¶¶221-24. Without knowing the exact thickness and composition of the parts that comprised Unity and Eve, it was impossible to produce exact replacements. ¶161. Moreover, because some of the non-standard parts are so deeply embedded in Unity and Eve, they remain to this day. ¶222.

Resin was particularly problematic. Unity is made of multiple layers of carbon composite materials glued together with resin. ¶179. The number of layers is critical (¶180), but VG did not know how many layers there were because its technicians did not or could not keep track of whether or how many layers had been applied. ¶¶180, 203-04. According to FE 1—who created

797931.1                                                     8

Virgin Galactic's inspection teams—a difference of even three to four layers is critical considering the speed at which Unity flies, but in some cases the number of layers might be anywhere between 50 and 200, as far as VG knew. ¶182. VG's problems with resin were so serious that in October 2018, its chief test pilot Mark Stucky ("Stucky") wanted to test every resin bond on the ship with industrial suction cups. ¶¶228, 230. Instead, Virgin Galactic had technicians with no inspection training superficially examine just one part of Unity. ¶¶230, 271-80.

Not only was Virgin Galactic's terrible recordkeeping a safety issue, but it also created substantial delays in the Company's progress towards commercial flight during the Class Period. Virgin Galactic had to develop and implement custom-made stress tests to reverse engineer Unity and Eve to determine their configuration and capabilities. ¶178. Technicians were delayed because they did not know which design was the latest. ¶213.

Similarly, VG's inspection procedures at the beginning of the Class Period were contained in a grossly inadequate eight-page document which did not even set forth the criteria to pass an inspection. ¶280. The Company's safety inspection procedures were so weak that FE 8 was hired in August 2019 (*i.e.*, *after Defendants announced VG would go public*) **to develop them**. *Id.*

## III.    STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety" (*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)) and must draw "all reasonable inferences in the plaintiffs' favor." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

Defendants challenge falsity, scienter, and loss causation, conceding the other elements of Plaintiffs' claims under the Securities Exchange Act of 1934 ("Exchange Act") are sufficiently alleged. As discussed herein, falsity, scienter, and loss causation too are sufficiently alleged.

## IV.    PLAINTIFFS ALLEGE VIOLATIONS OF THE EXCHANGE ACT

### A.    Plaintiffs Adequately Allege Actionable False and Misleading Statements

#### 1.    Applicable Falsity Pleading Standards

The "fundamental purpose" of the Exchange Act is to promote "a philosophy of full disclosure." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). SEC Rule 10b-5, promulgated to enforce Section 10(b), makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5(b).

A statement is actionable "if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). A statement or portions of a statement, even if "literally true" "are actionable if they create a materially misleading impression." *Id.* The Court considers the statement holistically, in context, and must credit Plaintiffs' plausible interpretation of how a reasonable investor would understand the statement. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 147 (2d Cir. 2021).

An omission is actionable "if the omitted information was subject to an 'affirmative legal disclosure obligation' or the omitted information is necessary to prevent existing disclosures from being misleading…." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020), *reconsideration denied*, 2020 WL 4208442 (S.D.N.Y. July 21, 2020). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth" and the disclosure must "be both accurate and complete." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

797931.1                                     10

Finally, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Plaintiffs have done so here. *See* ¶¶497-571.[2]

### 2. Defendants' Statements Touting the Success of VG's Testing Program Were Materially Misleading

Statements that falsely state or imply that a company has taken material steps towards a goal are actionable. *IWA*, 14 F.4th at 141; *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018). In *Chicago Bridge*, statements that the company had "made good progress" and reached a "milestone" were actionable where the company had in fact instituted a three-month stop work order because of production problems. *Id*. at *8. Similarly, statements that describe particular events put the topic "in play" and create an obligation "to speak accurately and completely." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 209 & n.15 (2d Cir. 2020); *Meyer*, 761 F.3d at 250.

Here, Defendants told investors that in the December 2018 and February 2019 flights, Virgin Galactic had "cleared" "key milestones" that "demonstrate[ed] the repeatability of the full flight profile[]" (¶¶497, 505, 536), when in fact they showed that flights were ***not*** repeatable. In the December 2018 flight, Unity veered dangerously off course. ¶297. And at the time of the

---

[2] Defendants claim that the CAC constitutes impermissible "puzzle pleading" (MTD at 12), but Defendants themselves admit that they were indeed able to easily identify what Plaintiffs allege to be false or misleading and why. *See* Defs. Appendix A. *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012) and *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513 (S.D.N.Y. 2005), are distinguishable. In *Bahash*, the complaint was contradictory (506 F App'x at 39), and in *Alcatel*, plaintiffs block quoted text without highlighting false statements or linking statements to the facts. 382 F. Supp. 2d at 534. Here, the CAC sets forth the statements alleged to be materially false or misleading, and specifically describes "how" and "why" those statements are actionable. ¶¶497-571; *see also In re Winstar Commc'ns*, 2006 WL 473885, at *8 n.8 (S.D.N.Y. Feb. 27, 2006) (rejecting puzzle-pleading argument because the "allegations are sufficiently particularized to provide the defendants with fair notice of the claims").

statements, ***Unity was grounded because of the damage it sustained*** on the February 2019 flight, when its horizontal stabilizers popped because of shoddy fixes and pre-flight inspection failures that missed obvious defects. ¶¶16, 151, 300-06, 365. As VG's head of safety said of the February 2019 flight, far from showing repeatability, "I don't know how we didn't lose the vehicle and kill three people." ¶365. Just as in *Setzer*, Defendants put the supposed success of the December and February flights in play, giving rise to the duty to disclose the material problems experienced.

Defendants also put the testing program in play. Whitesides said in October 2019 that "we've been flight testing these vehicles, for now, nearly ten years, and we believe we have an architecture that is ***extremely reliable***." ¶516. When asked in October 2019 how many more test flights were needed, Branson suggested all that remained was fitting out the cabin interior. ¶514. In fact, Unity was a "flying band aid," a prototype well past its sell-by date which likely would never be ready for commercial flights and would in any case have to be thoroughly overhauled before then. Meanwhile, Eve's wings developed structural cracks after every flight and its launch pylon was "falling apart," in part because Unity was "[w]ay heavier than [Eve] was designed for." ¶421. These vehicles were not "reliable" nor anywhere near ready for "repeatable" space flight.

Defendants further misled investors as to the Company's inspection and safety procedures. VG lauded its "operational processes to ensure that the … servicing of our spaceflight systems meet rigorous quality standards" and boasted of its "[e]mphasis on safety, reliability, and maintainability," but it had *just* hired its first formal inspector (FE 1) and an engineer (FE 8) to create inspection programs and it could not perform modifications without losing track of the changes it made. ¶507. Meanwhile, VG had no "operational processes to ensure" the quality of its "design" because it did not even know what that design was. *Id.* Defendant Moses told *The Washington Post* on February 2, 2021, that Defendants "thoroughly inspect the vehicle, updating

our analysis [] and make sure we're happy with the results before we go to those next flights" (¶559), at a time when Unity **had been flying** with serious problems, including that its "composite structure [was] coming apart" and fixed with "bolts to try to hold things together." ¶380.[3]

Moreover, when Defendants later claimed to have "upgraded" or "improved" the horizontal stabilizers (¶¶551, 553, 555), they misleadingly suggested that existing stabilizers were working and VG decided to improve them, when in fact they had to be completely replaced because they were destroyed in the February 2019 flight. *See Skiadas*, 2020 WL 3268495, at *7 ("literally true statements are actionable if they create a materially misleading impression.").[4]

Defendants rely on *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022) to argue that they had no duty to disclose the test flight failures. MTD at 2, 13, 16. But *Twitter* **acknowledged** that "a company must disclose a negative internal development [] if its omission would make other statements misleading."[5] Here, Defendants' specific claims that the December

---

[3] *See also* ¶¶499, 503, 505, 514, 520, 524, 526, 528-29, 531, 533, 538, 540, 542, 544, 546-47, 549, 559, 564, 566.

[4] Defendants' attempt to obtain dismissal by arguing that portions of the challenged statements were true (*e.g.*, MTD at 13-14), while ignoring the actionable portions of the same statements, fails. For example, while VG *did* take its first non-pilot crew member to space in February 2019, Defendants added that the flight was "successful" – hardly how a reasonable investor would view a flight that left Unity grounded for 14 months. ¶531.

   *See also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019) ("once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."); *In re Global Brokerage, Inc.*, 2019 WL 1428395, at *9 (S.D.N.Y. Mar. 28, 2019) ("a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue."); *Freudenberg*, 712 F. Supp. 2d at 180.

[5] The court in *Twitter* merely found that the defendants' statements were too indefinite in context to be misleading. 29 F.4th at 620. And in *Tongue* (MTD at 13), the defendants' failure to disclose that the FDA had expressed concerns with Sanofi's methodology for its clinical trials was not actionable where reasonable investors would have known that the FDA would be concerned about Sanofi's reliance on a single-blind trial. *Tongue v. Sanofi*, 816 F.3d 199, 211-12 (2d Cir. 2016). In *Rombach*, the plaintiffs alleged that the company omitted to disclose that it was failing to integrate acquisitions—but the court noted that that is *exactly* what the defendants had disclosed. *Rombach*

---

2018 and February 2019 flights "demonstrate[ed] the repeatability of the full flight profile" (¶497) and were "key milestones…that demonstrate our progress and pace so far" were materially misleading where, in fact, the December 2018 flight had veered dangerously off course (¶297) and Unity was grounded because of the damage it sustained on the February 2019 flight (¶316). The omission of these adverse facts rendered their positive statements about the flights misleading.[6]

### 3. Defendants' Statements Setting Out a Timeline For Commercial Flights and Falsely Claiming To Have Cleared Milestones Were Materially Misleading

Timeline statements are misleading if there are significant obstacles, known to the speaker, that materially conflict with what investors would expect and that cast doubt on the ability to achieve the timeline. For example, in *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 286 (S.D.N.Y. 2020), a company publicized a timeline and budget for a major project, which it repeatedly pushed back and increased, respectively. Allegations of "obvious cost overruns, delays, and poor management" were sufficient to allege falsity because they showed that the timeline and budget likely could not be achieved. *Id.*[7] Similarly, in *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, *6 (S.D. Cal. Sept. 19, 2016), the defendants' statements that the company was "on track" and "comfortable" with the stated timeline to submit its application to the FDA were actionable where

---

*v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Likewise, in *Nokia* and *YPF*, the defendants disclosed precisely what the plaintiffs allege was withheld. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 393 (S.D.N.Y. 2006); *Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 355 (S.D.N.Y. 2014). By contrast here, Defendants concealed the flights' near-disasters and instead falsely touted them as successes.

[6] Contrary to Defendants' repeated mischaracterization of Plaintiffs' claims, Plaintiffs do not allege that Defendants had a duty to disclose every "setback" in its flight testing program (MTD at 12-16, 29); rather, because Defendants claimed the December 2018 and February 2019 flights demonstrated "repeatability" they had a duty to disclose the failures.

[7] The plaintiffs in *Moshell* alleged that in one instance the company entered into a contract in excess of the then-publicized budget, but that fact would not have made other statements about the project and its timeline misleading. *Id.* at 286.

the defendants knew that there remained a long list of time-consuming steps to take to prepare the manufacturing process and application.[8]

Contrary to Defendants' arguments (MTD at 22-24), Plaintiffs have alleged that statements about Virgin Galactic's commercial flight timeline were materially misleading because Defendants knew at the time of their statements that there were significant obstacles that would prevent them from achieving the timeline that they touted. While knowing of the problems that made their timeline highly doubtful, if not impossible—including the lack of an inspection program and the defects in the vehicles themselves, plus the fact that Unity was grounded from February 2019 to May 2020—Defendants promised that commercial flights would occur in 2020. ¶518 (Branson in October 2019); ¶522 (Palihapitiya in November 2019, claiming 6- to 9-months).[9] As in *QuantumScape* and *Acadia*, the long list of conditions VG had to remediate prior to commercial flight rendered Defendants' timeline statements misleading. Among other things, VG still had to: (a) develop an inspection program; (b) develop and test new horizontal stabilizers and controls that would prevent losing control of the shuttle; (c) strengthen Eve so that its wings,

---

[8] *See also In re QuantumScape Sec. Litig.*, 2022 WL 137729, *3, *12 (N.D. Cal. Jan. 14, 2022) (statements that principle remaining obstacle to commercialization was production were actionable where the company's product was not yet commercial grade and might never be); *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 666 (E.D. Pa. 2021) (then-unachievable promise to deliver one million vaccines by end of year actionable); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) (statements that the company "was doing well" and "had no performance issues" actionable); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) (statements about progress remediating internal control deficiencies actionable where no real progress had been made).

[9] *See also* ¶499 ("on track…to begin commercial service"), ¶514 (Branson stating in 2019 "next year I'll go up, and then we'll start putting people up"), ¶540 (within "spitting distance" of commercial flight); ¶549 (claiming "final preparations" for commercial flight underway), ¶564 ("we are technically ready to go"). Defendants argue that the statements in ¶¶522 and 540 are puffery (MTD at 21), but they do so by omitting the portions of the statements that refer to timing. And even as Whitesides spoke of commercial flight in "spitting distance", VG had *just recently* implemented its first inspection program and had overhauled its design to address known safety problems, none of which had been tested. VG was not "months" away from commercial flights.

pylons, and horizontal stabilizers would stop cracking because Unity weighed more than planned; and (d) turn Unity and Eve from flimsy prototypes into commercial-grade vehicles. These tasks could not reasonably be completed in mere months, as Defendants' stated commercialization timelines would require, thus their timeline statements were misleading.[10]

Nor were Defendants' statements the kind of vague platitudes courts have found unactionable. Defendants argue they cannot be sued for describing Unity as "beautiful" (MTD at 21), but the statement continues: "Great progress in our test flight program means that ***we are on track*** for our beautiful spaceship ***to begin commercial service***." ¶499. Courts have held that similar statements are actionable. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2012 WL 432611, at *34-*36 (S.D. Tex. Feb. 13, 2012) (statements that company "was making significant progress" actionable); *In re Vivendi Universal, S.A.*, 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004) (statement that company was "on track" actionable); *Acadia*, 2016 WL 5076147, *6 ("on track" actionable).

Moreover, the statement that VG "believes it has overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service" is not a mere unactionable opinion because it was coupled with the affirmative, misleading claim that VG "had reached an inflection point in its development" based on the supposedly successful December 2018 and February 2019 flights. ¶497. Courts have held that statements such as this and Whitesides' representation that "[w]ith the clearing of the huge technical milestone…we were

---

[10] In *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *13 (S.D.N.Y. Apr. 2, 2020) (MTD at 15, 18), the defendants were engaged in a three-pronged plan to improve margins. The plaintiffs alleged that *one* prong could not be achieved in time. Not only might the other two prongs carry the program's weight, but the plaintiffs did not point to facts, instead only alleging that other non-speaking employees believed the plan as to that prong was not achievable. Here, by contrast, Plaintiffs alleged concrete steps that defendants still needed to take to meet the timeline, which rendered the timeline misleading. *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *11 (C.D. Cal. May 8, 2013) (timeline statements misleading where plaintiffs alleged products were still in "concept stage" and "HP could not produce these products by the end of 2011.").

presented with a few options, and have decided this is the best course for the business" (¶503) are actionable. *See Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *20 (E.D. Tex. Oct. 19, 2017) (allegations that company reached "specific milestones" were not puffery).[11]

This case is nothing like *Twitter*. MTD at 16, 29. There, the court found that the defendants had no obligation to disclose setbacks because the defendants had *not* "suggest[ed] that Twitter's MAP program was 'on track'" and had *not* "set a specific deadline" for the product. 29 F.4th at 620-21. Here, by contrast, Defendants explicitly claimed VG was "on track" to begin commercial service (¶499) and told investors that flights would take place in 2020 and, even more specifically, six to nine months from October 2019 (¶¶518, 522).

Finally, Defendants' argument that their statements did not specifically state that VG had never faced any "complications or obstacles" is a red herring. MTD at 17. In *Meyer*, the plaintiffs alleged that the defendants misled investors by disclosing steps the company took to comply with environmental laws without disclosing that it was currently violating some of those laws. 761 F.3d at 251. The Second Circuit held that the statements would not have led investors to believe the company was in "100% compliance 100% of the time," but would have reassured investors that deviations were not major. *Id.* at 252. Similarly, here, Defendants promised commercial flights were months away—thus falsely reassuring investors that any additional problems remaining were not major—even as Unity was grounded because it had sustained critical damage on its last flight.

---

[11] The cases Defendants cite are distinguishable for the reasons set out in their brief: the plaintiffs attacked vague statements that made no factual representations. MTD. at 21-22 ("set the standard for integrity," "great technology," "strong leadership position," "lead to continued prosperity," "just amazing," "superior products," "thriving business," "best entertainment," "a great customer experience"). In *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 541891 (E.D.N.Y. Feb. 23, 2022), defendants' representations regarding the speed at which their platform had developed a COVID test was unactionable because the statements did not contain information relevant to the claims the plaintiffs were advancing in their lawsuit. *Id*. at *16.

17

**4.      Defendants' Assurances that VG's Testing Program Was Rigorous and Showed Safety Were Materially Misleading**

Courts have found statements concerning the safety of operations actionable in at least two circumstances. First, such statements are actionable when the company indicates that safety is a priority and operates in an industry in which safety is a critical concern, or the company repeats the statement ad nauseum. *See, e.g.*, *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (statement that safety training is "extensive" not puffery because "[i]n an industry as dangerous as deepwater drilling, it is to be expected that investors will be greatly concerned about an operator's safety and training efforts."); *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020) (repeated statements that emphasized commitment to safety "put the topic at issue such that [the court] cannot say that, as a matter of law, investors would not find [certain] representations material").[12]

Second, safety statements are actionable when, in context, they stated or implied specific facts. For example, statements that a device is "safe" can be actionable because safety could be measured against an objective metric. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014); *see also Massey Energy*, 883 F. Supp. 2d at 616 (similar); *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017) (prison operator's statement that its prisons were safe was misleading because it implied its few customers were satisfied with its practices, which they were not).

As in *Transocean* and *Massey Energy*, safety was VG's paramount concern: a single fatal accident would likely doom the Company. *E.g.*, ¶¶117-18, 507. It was in this context that

---

[12] *See also In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617 (S.D.W. Va. 2012) (statements that safety was the "first priority" misleading because company prioritized production over safety); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 661, 672 (6th Cir. 2005) (otherwise generic statement that "data clearly reinforces our belief that these are high-quality, safe tires" misleading in context of calls for voluntary safety recall).

Defendants touted VG's "***uncompromising commitment to safety***" (¶501), its "***[e]mphasis on safety***…rooted in ***decades of best practices***" (¶512), that VG's rocket was the "***safest***" (¶516), and that VG had "provid[ed] a vehicle and an operation which means ***we can fly confidently and safely.***" ¶526.[13] And in one interview held shortly before VG went public, Defendants were asked whether VG could bear the scrutiny of being a public company because of accident risks. ¶516. By responding that VG's program was safe and detailing some of the steps they had taken, Defendants misleadingly conveyed that there were no major undisclosed safety deficiencies. *See Meyer*, 761 F.3d at 251. Further, as in *Vale*, Defendants induced investors to rely upon their assurances about VG's supposed safety by constantly repeating them during the Class Period.[14]

Contrary to Defendants' argument, their safety statements were not mere unactionable opinions. MTD at 22-23. "[C]onclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991); *accord Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (analyzing falsity under §11 of the Securities Act, holding opinions are actionable if they do not "fairly align[] with the information in the issuer's possession at the time" or if omitted facts "conflict with what a reasonable investor would take from the statement itself[.]").

Here, the CAC alleges material facts, which Defendants omitted, that did not "fairly align" with what Defendants knew about VG's safety problems and that "conflict with what a reasonable

---

[13] In addition, on August 3, 2020, Defendants stated "[a]s always, safety will remain our central focus and we will continue to progress with a step-by-step diligent approach throughout the test flight program[.]" ¶¶546-47. On July 2, 2021, Moses stated, "I would say safety is built in at the foundation of everything we do…. [T]he technical readiness is there and it's there because…of the diligence of the team." ¶564.

[14] *E.g.*, ¶¶501, 507, 509, 512, 516, 520, 528-29, 533, 540, 549, 551, 557, 559, 561-62, 568, 570.

investor would take from" Defendants' repeated assurances about safety. *Virginia Bankshares*, 501 U.S. at 1093; *Omnicare*, 575 U.S. at 189. For example, Branson's claim that VG had flown "the same vehicle *safely* to space and back twice in a little over two months" (¶526, MTD at 23) does not "fairly align" with the fact that both of those flights narrowly escaped disaster, and the latter left Unity grounded with serious damage and prompted the resignation of VG's safety director.[15] Indeed, those facts directly conflict with what a reasonable investor would take from Branson's claim that the flights had been completely "safely."

Defendants alternatively argue that Plaintiffs' safety-related claims fail because "Virgin Galactic opted to delay flights precisely because of its commitment to safety." MTD at 33. This argument parrots their misleading Class Period claim that they had taken a "step-by-step diligent approach throughout the test flight program" which had led to the "delays." ¶547. In truth, Defendants rushed through testing, ignoring or papering over problems, which meant that they had a decade's worth of problems to resolve before any commercial flights were possible. Defendants' claim during the Class Period was misleading, and their argument today fails, because both misrepresent the *reason* that VG had to delay the commercial flight timelines: *because Defendants had previously left vast and critical safety deficiencies unresolved for years*, all the while misleadingly touting VG's safety profile.

---

[15] Defendants try to downplay the significance of the flights' near-disasters by arguing that they had no duty to disclose them because "no such disaster[s] materialized." MTD at 15. But that is an argument about loss causation, not falsity, and it ignores entirely the context of their statements and what Plaintiffs allege to be misleading about Defendants' assurances of safety. Similarly, after several accidents, Bridgestone addressed its unsafe tires with a costly recall, *Bridgestone*, 399 F.3d at 663, just as Virgin Galactic managed to avoid a disaster through endless delays. Bridgestone's statements that its tires *were* safe were actionable even though Bridgestone *could make* its tires safe. Further, Virgin Galactic avoided disasters after 2014 not because it was careful, but because it was lucky. Virgin Galactic's luck has little to do with whether it was safe.

**5.      Defendants Violated Regulation S-K By Failing To Disclose that VG Had to Choose Between Years of Delays and Unsafe Flights**

Falsity is also alleged because the undisclosed adverse facts about the test flights constituted known trends, uncertainties, and risks that required specific disclosure in VG's Registration Statements under Items 303 and 503, which require issuers to disclose "known trends and uncertainties" that are reasonably likely to impact the company's performance, as well as "the most significant factors that make the offering risky or speculative." ¶¶572-85. The scope of these regulatory disclosure requirements is broad, from changes in the law, *Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644 (S.D.N.Y. 2017), to employees' fraudulent acts. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016).

In *Christine Asia Co. v. Ma*, 718 F. App'x 20 (2d Cir. 2017) ("*Alibaba*"), the government imparted direction to Alibaba that left it with a stark choice: end a business practice that garnered the company considerable revenues or face significant fines. *Id.* at 22. The company risked significant losses whatever it chose. *Id.* It did not disclose the government's position, thereby violating Item 303, which alleged falsity under § 10(b). *Id.* at 23. Here, VG spent years putting band-aids on defects that made every flight a potential disaster. As in *Alibaba*, VG faced a choice where either decision posed material adverse consequences: proceed with an unsafe space program while hoping to patchwork it together, or spend years to meaningfully address and rectify the known defects. Defendants were required by Items 303 and 503 to disclose the conditions that made this choice necessary, and their failure to do so alleges falsity.

**6.      The PSLRA's Safe Harbor Provision Does Not Protect Defendants' False and Misleading Statements**

The safe harbor provision of the PSLRA does not insulate Defendants' false and misleading statements. "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate

797931.1                                          21

and conveyed substantive information." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010); 15 U.S.C. §78u-5(c)(1)(A).

Accordingly, "[v]ague disclaimers are inadequate." *Vivendi*, 838 F.3d at 247. Additionally, "where defendants make mixed statements…the non-forward-looking statements are not protected by the safe harbor." *Vivendi*, 838 F.3d at 246. Moreover, Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor…." *Slayton*, 604 F.3d at 773; *Vivendi*, 838 F.3d at 247.

Defendants identify only five statements that they claim were forward-looking (MTD at 17-18, citing ¶¶499, 514, 518, 522, 540), thus conceding that all of the other misrepresentations alleged were not forward looking. An analysis of the statements that Defendants do identify, moreover, demonstrates that these statements are not protected by the PSLRA's safe harbor.

### (a)   Defendants' Statements Were Not Forward Looking

"[M]isrepresentation of present or historical facts cannot be cured by cautionary language." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004). Defendants claim that Branson's statement that "[g]reat progress in our test flight program means that ***we are on track*** for our beautiful spaceship to begin commercial service" (¶499) is protected by the PSLRA's safe harbor provision. MTD at 17-18. However, Branson's statement ("we *are* on track" as opposed to "we will be") purported to represent the ***then-current*** state of VG's test flight program, and it is thus not insulated by the safe harbor. *Vivendi*, 2004 WL 876050, at *7 (claim that company was "'on track' to achieve earnings targets" not forward-looking).

CEO Whitesides' statements that "we ***are now*** within spitting distance, and ***we are in*** a multi-month march to commercial ops. So things ***are going well***" (¶540) also were statements of

present conditions, none of which were forward looking.[16] And to the extent that Whitesides alluded to future commercial operations, the "safe harbor provision does not apply to any allegedly false statement that has both a forward-looking aspect and an aspect that encompasses a representation of present fact." *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *9-10 (S.D.N.Y. Apr. 22, 2016) (statements of expectations predicated on statements of current fact are not forward-looking). For the same reasons, Defendants' statements that "we'll start putting people up," or about going to space, were predicated on representations of current or historical facts regarding the progress of test flights (¶¶514, 518, 522), which Defendants cannot divorce from the context of the entire statement. MTD at 18.

> **(b)    The Statements Were Not Accompanied by Meaningful Cautionary Language and Plaintiffs Allege Defendants' Actual Knowledge of the Falsity of The Misrepresentations**

Statements are "not entitled to safe harbor" protection where "then-existing problems" are concealed. *Martin v. Altisource Residential Corp.*, 2017 WL 1068208, at *6 (D.V.I. Mar. 16, 2017). Similarly, "warnings of specific risks…do not shelter defendants from liability" if they fail, as Defendants did here, "to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010).

To the extent any of the five subject statements is considered forward-looking, the safe harbor does not apply because Defendants' disclaimers were not meaningful. Their warnings of "***possible***" issues that "***could*** result in delaying or cancelling planned flights" (MTD at 18) were ineffective – and themselves misleading – because VG was *already* experiencing such issues and delays. "Cautionary words about future risk cannot insulate from liability the failure to disclose

---

[16] In *Bldg. Trades Pension Fund of W. Pennsylvania v. Insperity, Inc.*, 2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) (MTD at 18), is inapplicable because there, unlike here, the plaintiffs did not point to concrete facts imperiling the alleged timeline. *Id*. at *9.

that the risk has transpired." *Rombach*, 355 F.3d at 173.[17]

Finally, Plaintiffs allege that Defendants had actual knowledge of the misleading nature of their claims. For example, Defendants argue that Plaintiffs fail to allege facts showing Branson's actual knowledge that his claims in October 2019 that "next year…we'll be starting to send a lot of people into space" (MTD at 19-20, citing ¶¶518, 514) were misleading. But they ignore the contradictory facts that Branson knew (and concealed) about the shuttle's major safety defects – including the fact that Unity was then-grounded and undergoing major repairs and modifications as a result of those defects – which are sufficient to infer his actual knowledge that his optimistic statements were misleading. *See Omnicare*, 575 U.S. at 188-89 (an investor "expects not just that the issuer believes the opinion (however irrationally), ***but that it fairly aligns with the information in the issuer's possession at the time***."). Indeed, Defendants' threadbare warnings cannot possibly be meaningful because, if so, "any issuer could list its lines of business, say we could have problems in any of these, and avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight." *Slayton*, 604 F.3d at 771 n.8.

---

[17] Defendants' cases are inapposite, MTD at 18-19, because none of them involved material risks that had already occurred. *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 4, 6 (2d Cir. 1996) (registration allegedly misleadingly failed to disclose that ***if*** interest rates fell, then the fund would be less profitable, so it was sufficient to show that registration statement ***did*** make such disclosure); *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 211-12 (S.D.N.Y. 2012) (company disclosed that it had and would continue to have safety problems, and while plaintiffs alleged it should have identified some of the problems, they were relatively mundane for a large company with multinational operations); *Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317, 334 (D. Conn. 2001), *aff'd,* 34 F. App'x 408 (2d Cir. 2002) (company was not required to disclose that three of its hundreds of contracts were unprofitable). Here, "[e]ven assuming that Defendants sufficiently identified the correct risk factors for the public, the disclosures failed to warn investors that the risks were not hypothetical – which, of course, dramatically increased the possibility of adverse consequences." *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *14 (S.D.N.Y. Mar. 23, 2013); *Freudenberg*, 712 F. Supp. 2d at 193.

797931.1                                                24

### B.      Plaintiffs Adequately Allege that Defendants Acted With Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. Scienter is alleged: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). "Either set of allegations will suffice to satisfy the necessary scienter element of a securities fraud claim." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999).

"[C]ourts must consider the complaint in its entirety… The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (italics in original). Scienter is sufficiently strong if a "reasonable person would deem the inference of scienter cogent and *at least as compelling as* any opposing inference one could draw from the facts alleged." *Id.* at 324-26. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be just as plausible as any non-culpable inference. *Id.* at 324. "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Lockheed*, 875 F. Supp. 2d at 372.

#### 1.      Branson's and Palihapitiya's Sales of 100% of Their Available Shares for More than $1.3 Billion Support a Strong Inference of Scienter

"To show motive and opportunity, plaintiffs must allege a likelihood that defendants could realize 'concrete benefits' through the deception." *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001). Defendants certainly did.

First, Defendants' stock sales support a strong inference of scienter. "[U]nusual insider trading activity during the class period" may "permit an inference of bad faith and scienter."

797931.1                                    25

*Stevelman*, 174 F.3d at 85. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001).

If the motive allegations in the Complaint are insufficient, then nothing is. During the Class Period, Branson sold $123 million worth of his VG shares in the SPAC transaction[18] and another $892 million on the open market, for a total of ***$1.015 billion***. Defendant Palihapitiya sold $320 million. Astronomical profits from stock sales like Branson's and Palihapitiya's will, by themselves, permit an inference of scienter. *In re Forest Lab'ys Sec. Litig.*, 2006 WL 5616712, at *12 (S.D.N.Y. July 21, 2006) (collective sale of $300 million by insiders inherently suspicious regardless of other facts); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sale of $900 million in stock suspicious even though it only accounted for 2.1% of holdings). Defendants' sales are inherently suspicious.

Sales that amount to a large percentage of insiders' total holdings also support scienter. *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (insider's sale of 97% of stock for approximately $50 million were unusual "***by any measure***"). Branson and Palihapitiya both sold 100% of the shares they had available to sell.[19] Thus, ***either*** the amount ***or*** the percentage suffice, by themselves, to plead scienter based on motive.

---

[18] Consisting of Branson's 80.7% share of the total proceeds of $152 million.

[19] In calculating total shares available for sale, courts exclude from the denominator shares that an executive cannot actually sell, such as shares subject to a lock up. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 497 (S.D.N.Y. 2018), *rev'd in part on other grounds* 965 F.3d 165 (2d Cir. 2020). "[T]he decisive question in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she *could have* sold." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018) (emphasis in original). Branson sold every share that was not subject to a two-year lockup. ¶442. Palihapitiya sold all of the shares he personally held. ¶462.

Ignoring that the inquiry is contextual, Defendants advance a *per se* rule that sales more than two months before a corrective disclosure are never suspicious. MTD at 31-32. The Second Circuit has rejected that very argument. *See Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (stock sales nine months, seven months, and five months before corrective disclosure were suspicious).[20]

The timing of the sales is *also* suspicious. VG could not have completed the SPAC transaction had investors known the true state of its space program. Branson spent months negotiating to take as much money out of VG as possible. ¶¶431-34. Because of the SPAC transaction's structure, every dollar Branson could convince investors to keep in VG went directly to his investment vehicle, and he personally cleared $123 million by selling every share he could. ¶436. Branson needed the cash immediately to change the terms of an agreement that would have had him relinquish control of Virgin Atlantic, which he considered to be "one of my children." ¶¶424-25. With the cash, Branson renegotiated the deal to retain control of Virgin Atlantic. And his May and June 2020 open market sales were in the midst of VG's campaign to claim spaceflight was just around the corner. *E.g.*, ¶¶526, 533, 536. Branson made his April and August 2021 sales during a promotional campaign built on his flight to space. ¶¶383-91, 566, 568. The latter was made while Branson knew, but did not disclose, that his flight had left its designated airspace for 10% of its journey, risking its ability to reach its landing strip. ¶¶391-94.

---

[20] In *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382 (S.D.N.Y. 2020), the court did not find the sales suspicious because the defendants were exercising expiring options and selling some to pay resulting taxes. *Id.* at 411. Whatever the courts in *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008) and *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 235 (S.D.N.Y. 2020) *said*, they both conducted the contextual analysis required by controlling authority. *Bausch & Lomb*, 592 F. Supp. 2d at 344 (sales alone did not allege scienter because they were made pursuant to a Rule 10b5-1 plan); *Woolgar*, 477 F. Supp. 3d at 235 (considering "other circumstances" surrounding stock sales).

Palihapitiya also had a motive to complete the SPAC transaction to rescue his career. While "a generalized desire to maintain a higher stock price will not rise to the level of motive . . . the artificial inflation of a stock price *in order to achieve some more specific goal* may satisfy the pleading requirement." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 169 (D. Conn. 2019). "[A]n executive's realistic fears that his or her career is at stake can support a particularized motive supporting scienter." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *10 (E.D. Pa. Mar. 25, 2020).  At the beginning of the Class Period, Palihapitiya's career had hit bottom. ¶¶446-62. He counted on SPACs to rescue it. *Id*. Had the VG SPAC transaction not closed, Palihapitiya would have received nothing for two years' work. *Id*. Further, had the VG SPAC transaction not closed, his other four SPACs likely would have collapsed, too, taking his career with them. *Id*.

Finally, the inference that Palihapitiya had a motive to lie is bolstered by the fact that he has repeatedly succumbed to the temptation to deceive. In *Bond v. Clover Health Invs., Corp.*, 2022 WL 602432, at *25 (M.D. Tenn. Feb. 28, 2022), a court found plaintiffs adequately alleged that Palihapitiya fraudulently concealed that another of his SPACs was engaged in a widespread bribery campaign. In *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386 (N.D. Cal. 2020) *aff'd,* 13 F.4th 940 (9th Cir. 2021), the court found the plaintiffs adequately alleged that Palihapitiya violated the securities laws through a misleading omission. And in *Klein v. Facebook, Inc.*, 2022 WL 141561, at *27 (N.D. Cal. Jan. 14, 2022), a court found that the plaintiffs had sufficiently alleged that Palihapitiya, then a Facebook executive, had falsely denied to *The New York Times* that Facebook was deceptively collecting personal information from customers who had opted out and then selling it to third parties.

**2.    Defendants' Admissions and the Consistent Accounts of Eight Former Employees and Schmidle Constitute Strong Circumstantial Evidence of Recklessness**

Allegations of recklessness suffice if they show that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306. The Complaint draws information from Schmidle and eight former employees. [21]

**(a)    Insider Accounts Support a Strong Inference of Scienter**

The accounts of former employees support a strong inference of scienter because "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. The CAC describes the former employees with sufficient detail to demonstrate their reliability. ¶¶38-45. Though Defendants assert the contrary (MTD at 27-28), "there is no baseline requirement of [contact with defendants] in order to allege sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015). As set out above, Schmidle and the former employees describe a company facing overwhelming problems that prevented it from flying safely, including missing, inaccurate, or unreliable documentation of Unity and Eve, no inspection programs, and persistent structural defects that made Unity "a flying band-aid" and left Eve riven with structural cracks. The sources show that almost every powered flight nearly ended in disaster and in some cases left the vehicles laid up for months for repairs.[22]

---

[21] *See* ¶¶78, 151, 154-60, 165-70, 172-73, 175-76, 178, 182-86, 188, 190-92, 195-99, 201, 203-28, 231, 233, 235, 237, 239, 242, 246-53, 255-56, 258-61, 263, 265-70, 272-74, 280-83, 285-86, 289-95, 305, 307-09, 311-13, 315, 321, 336, 338, 346-47, 349, 380, 415-18, 420-21, 467, 469-73, 475.

[22] For example, FE 4 stated that VG failed to maintain proper documentation for Unity and the Company concealed concerns and problems that FE 4 raised. ¶¶41, 214-15, 251. FE 5 said that it was a "regular occurrence" to have to push off deadlines by months to effectuate "major repairs."

"[C]orroboration from multiple sources" further bolsters scienter. *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018). The accounts are remarkably consistent. For example, former employees from each of VG's technical branches – Engineering, Technicians, and Inspection – all report the exact same problems with VG's software and recordkeeping. ¶¶193-231. *Three* former employees reported that Scaled Composites' drawings were in crayon or on napkins. ¶170. FE 1 and FE 8 *both* report that they were hired to start developing inspection programs in the summer of 2019. ¶¶38, 45, 280, 281-82. Schmidle and the former employees describe the very same events with great detail. *E.g.* ¶¶225-30 (October 2018 discovery of resin deficiency); 299-305 (February 2019 flight).

That some of the employees did not work for VG during the Class Period and that Schmidle was embedded from 2014 through 2018 (MTD at 26-28) do not defeat scienter. *Scholastic*, 252 F.3d at 72 ("Any information that sheds light on whether class period statements were false or materially misleading is relevant."). Courts rely on allegations from pre- or post-class period former employees to establish what defendants knew and how. *E.g. In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (former employee not employed by company during class period showed defendants had access to certain reports). Contrary to Defendants' assertion, moreover (MTD at 27), the *problems recounted by the FEs were indeed unaddressed and persisted throughout the Class Period*. *E.g.*, ¶¶192, 213, 280, 291, 305-12, 334-39, 416, 418-20.

Pre-Class Period former employees who report on Defendants' hands-on management style

---

¶¶42, 249. According to FE 6, Eve and Unity were "research vehicles" that were never intended for commercial use. ¶¶43, 154-60. FE 6 was scared to ride on Unity because it was "poorly built." ¶¶270, 312-13. FE 7 stated that VG: (1) often had to perform custom-made stress tests to reverse engineer the vehicles' configuration and capabilities or that of specific components; (2) did not know the age of its parts; and (3) knew that Eve and Unity developed cracks after every flight. ¶¶44, 178, 220-24, 255, 258-60, 263, 416. According to FE 8, VG's inspections were both inadequate and ignored. ¶¶45, 291-93, 380, 417, 418, 420-21.

also can bolster scienter. *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003). The FEs here report that Moses attended regular weekly meetings, regular Flight Readiness Reviews (¶233), and other meetings. At one meeting Moses attended, a VG Vice President told an employee to remove a slide on which Virgin Galactic had deferred maintenance, in order to stick to a flight schedule and to conceal the fact from the NTSB should there be an accident. ¶¶233-34.

The FEs also show that the problems that afflicted VG during the Class Period arose long before it and continued through it. For example, pre-Class Period former employees show the record-keeping problems FE 1 reports had plagued VG for a decade. Schmidle's book – which was based upon nearly four years of being embedded in Virgin Galactic – revealed that VG's February 2019 flight almost ended in disaster and that the Company engaged in practices that seriously compromised the design and safety of Unity and Eve.[23] In *Test Gods* and his September

---

[23] *See* ¶¶21, 46-47, 78-79, 117, 228-30, 241, 243-44, 297, 300-04, 306-07, 310-12, 317, 322, 324-26, 335, 337, 343-44, 365, 394, 396, 397, 399, 407.

Citing *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 333 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010), Defendants contend that allegations based on Schmidle's book do not support scienter because he was embedded in VG between 2014 and 2018. MTD at 26-27. But all *Campo* held is that a journalist's *uninformed* speculation about what a defendant *must have known* is entitled to no more deference than a plaintiff's. Schmidle, by contrast, reported facts he observed. In *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015), the plaintiffs alleged that a supplier had encountered a quality issue before the class period that it could well have fixed before the defendants' allegedly contrary statements. But here, many of Defendants' challenged statements were themselves about events that occurred before the Class Period (*e.g.*, ¶¶497, 503, 505, 516), and Class Period former employees report that the problems persisted and remained unaddressed throughout their tenures.

Defendants' other cases fare no better. In *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774 (S.D.N.Y. 2020), the allegations were "unmoored in time" among other problems, *id.* at 798, and the witnesses reported financial impropriety involving the company's former CEO, but that CEO had been forced out for pre-Class Period impropriety not at issue in the case. In *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 137-38 (E.D.N.Y. 2020), the allegations were unreliable because they were vague, not because they were mistimed. And in *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021), because the plaintiffs pled that defendants failed to disclose an illegal bribery scheme, they faced an imposing pleading standard that required them to plead "the who, what, when where, and how of the alleged improper

---

797931.1                                    31

2021 New Yorker article, Schmidle made precise statements about the February 2019 and July 2021 flights. His statements were verified by professional fact checkers and confirmed by VG.[24]

> **(b)     The CAC Alleges That Defendants Had Access to Facts that Contradicted their Positive Public Statements, Including From the Investigation Following the February 2019 Flight**

One of the best ways to show that Defendants knew about undisclosed facts that rendered their statements misleading is to show that they received the results of an investigation before making contradictory statements. *SAIC*, 818 F.3d at 96; *Gruber v. Gilbertson*, 2018 WL 1418188, at *12 (S.D.N.Y. Mar. 20, 2018). When Unity landed after the February 2019 flight, its horizontal stabilizers were visibly damaged. "[I]t looked like someone ripped the caulking out of a bathtub." ¶303. When Moses saw the damage, he "felt his stomach sink." ¶302. Indeed, according to VG's safety director, the flight "should have been a Come-to-Jesus moment." ¶317. Moses admitted that the failure to catch the Kapton covering airholes was "[c]learly a problem[,] [n]ot something that should be allowed to happen and something we clearly needed to address." ¶365. Moses also told *The Washington Post* that after the February 2019 flight, "the company ***immediately notified board members and shareholders*** [Branson was the principal shareholder] as well as the FAA and '***kept them apprised regularly of what we were finding, as well as the corrective actions.***'" ¶327.

---

transactions." *Id.* at *9. The former employees had left the company four years before the Class Period and did not even attempt to allege any transactions. Plaintiffs here face no such challenge.

[24] Defendants' remaining arguments fail. For instance, Defendants claim that FE 5's account of constant delays caused by safety issues demonstrates that VG purportedly "*took the time to get it right*, rather than rushing to meet deadlines—which is the opposite of fraud." MTD at 28 (italics in original). Defendants' assertion is not only belied by the other facts alleged demonstrating that safety issues persisted and that Defendants did not "get it right," but it also improperly asks the Court to view the facts in Defendants' favor when the Court must draw "all reasonable inferences in the plaintiffs' favor." *Ganino*, 228 F.3d at 161.  Additionally, contrary to Defendants' assertions (MTD at 28), FE 6's account is corroborated by other facts alleged, including Schmidle's account showing that Unity and Eve were unsafe. *See* ¶¶241, 243-44.

Moses and Whitesides were senior management, Branson was a controlling shareholder, and it is inconceivable that Palihapitiya would have somehow missed such a well-documented event. The obvious danger that describing such a disaster as a "successful" flight that demonstrated "repeatability" would be misleading to reasonable investors establishes Defendants' recklessness.

In any case, the February 2019 flight and its aftermath could not possibly be kept from Defendants. Unity was grounded after the flight as VG replaced its horizontal stabilizers and made other repairs to address its lack of safety. Being regularly informed of "corrective actions" (¶327), Defendants knew both the scope of the damage and that it would take VG considerable time to fix it. Defendants knew, too, that Virgin Galactic's inspections had been cursory because it had no inspection programs. ¶280. VG could not create a successful inspection program overnight. Indeed, VG did not even begin to develop an inspection process for the vehicles until the summer of 2019, when it hired FE 1 and FE 8, who were tasked with designing and implementing an inspection program. ¶¶38, 45.[25]

Finally, the doctrine that "when contradictory facts of critical importance to the company either were apparent or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company" can support, though not independently raise, an inference of scienter. *Chembio*, 2022 WL 541891, at *10 n.9. The inference is strengthened when the plaintiff alleges with particularity how a defendant might learn the contradictory facts, such as through direct participation in transactions. *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 27 (2d Cir. 2020). And an office's physical layout can support scienter.

---

[25] In the cases Defendants cite (MTD at 33), unlike here, the defendants accurately and timely disclosed – rather than concealed – the results of their investigations. *Salim v. Mobile Telesystems PJSC*, 2022 WL 966903, at *2 (2d Cir. Mar. 31, 2022); *Russo v. Bruce*, 777 F. Supp. 2d 505, 526 (S.D.N.Y. 2011); *River Birch Cap., LLC v. Jack Cooper Holdings Corp*, 2019 WL 1099943, at *10 (S.D.N.Y. Mar. 8, 2019).

*Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019). Here, Virgin Galactic had one core operation: turning Unity and Eve into commercial vehicles. Moses's (for the whole Class Period) and Whitesides's (through October 2019) offices were located on the edge of an elevated platform in the same hangar as Unity and Eve. ¶ ¶470-472. Further, because Virgin Galactic had an open office plan, Moses and Whitesides could look directly down on Unity and Eve without even standing up from their desks. Monday through Friday as they did their jobs, they could literally see the damage to and repairs on Unity and Eve, the cracks on Eve's wings, and the inspectors' and technicians' struggles as they tried to fix or upgrade the vehicles.

### (c)      Meholic's Opinion Provides Context Which Supports Scienter

Contrary to Defendants' argument (MTD at 30), courts routinely rely upon allegations based upon expert opinions, such as the opinions of Meholic. *See, e.g.*, *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021) (reversing the dismissal of a securities fraud complaint that relied upon the allegations of an expert). The Complaint cites Meholic to provide context for or explain certain concepts. *E.g.*, ¶¶161-63, 177 (lack of engineering drawings); ¶236 (proper inspection of structural bonds); ¶¶257, 284 (structural cracking); 348 (significance of VG's lacking digital controls). Defendants appear only to take issue with Meholic's conclusion that engineers make and require detailed engineering drawings of aerospace vehicles. Meholic's own experience as an aerospace engineer designing and producing vehicles plainly provides him with the necessary expertise, and his statement is consistent with common sense. Indeed, Meholic is exactly the kind of expert envisaged by the case Defendants cite, which held that "it is permissible for a plaintiff to bolster a complaint by including a nonconclusory

797931.1                                            34

opinion to which an expert may potentially testify….” *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022).[26]

### (d)   The Resignation of VG's Vice President of Safety and Testing Supports Scienter

The resignation of Ericson (Virgin Galactic's Vice President of Safety and Testing) also bolsters the strong inference of scienter alleged. Ericson raised the issue of the near disastrous February 2019 flight with Virgin Galactic's Board of Directors.  ¶322. On June 10, 2019, upset that Defendant Moses was not taking his concerns seriously, Ericson resigned. ¶326. Thus, Ericson's resignation contributes to the strong inference of scienter alleged. *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) ("The timing and circumstances surrounding the resignations . . . also contribute to the inference of scienter"); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012).

### (e)   Defendants Fail to Raise a *More* Compelling Inference

The court must consider "the total weight of the circumstantial allegations together with the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 138 (2d Cir. 2021) (failure to consider motive in conjunction with circumstantial allegations of fraud was reversible error). Here, the CAC alleges that Defendants repeatedly misrepresented the

---

[26] In *Bristol-Myers*, the plaintiffs alleged the existence of an industry consensus inconsistent with defendants' statements, but their allegations showed there was no consensus. 28 F.4th at 354. They could not rescue their claims through an expert witness who reviewed the same materials and concluded the opposite. And in *Ong*—which predates *Bristol-Myers* by four years—the court declined to consider a separate expert declaration as a "written instrument" under FRCP 10(c) or incorporated by reference, but did "*not* grant that portion of Defendants' motion requesting it to strike any paragraphs from the SAC that rely on the Declaration." *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 223-24 (S.D.N.Y. 2018).

state of VG's flight program during the Class Period while Branson and Palihapitiya collectively sold *$1.4 billion* of their VG shares. Scienter is alleged.

Defendants' argument that VG "opted to delay flights precisely because of its commitment to safety" (MTD at 33) does not raise a more compelling inference. The CAC alleges that Defendants knew the root causes and extent of deficiencies that would have to be addressed if VG were ever to fly safely, and that throughout the Class Period Defendants concealed these actual, existing problems from the market and affirmatively misrepresented VG's flight readiness. Even accepting Defendants' proffered inference as true – that they *hoped* they would be able to fix the vehicles and launch a safe commercial flight program on schedule – that is a far cry from what they told the market about the state of the program at the time. *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("a gamble—concealing bad news in the hope that it will be overtaken by good news" alleges scienter); *accord Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *7 (S.D.N.Y. July 21, 2020). As Branson himself has admitted, he deliberately "talk[s] ahead of [him]self" in an attempt to get "everybody around [him] to catch up." ¶244.[27]

Indeed, the CAC tells a cogent and compelling story. Without consummating the SPAC transaction: Palihapitiya risked losing hundreds of millions of dollars, two years of efforts, and imperiling his career; Branson would have to give up control of Virgin Atlantic; and VG could not get the billions it needed to continue its operations. Well aware that the February 2019 flight had showed that VG's flight program had years-worth of deficiencies to address, including major problems that left Unity grounded, Defendants – desperate to ensure the SPAC transaction would be approved – nonetheless assured investors that the February 2019 flight showed VG's

---

[27] This is all par for the course for Branson. Branson has been telling the public flights were just around the corner since 2005. His false statements caused New Mexico to spend $225 million of its taxpayers' money on a spaceport. ¶¶479-80.

commercial space travel program was safe and repeatable, that commercial flights were imminent, and that VG had pursued its development and testing program methodically. The inference of scienter is at least as plausible as any competing non-culpable inferences.

### C.     Plaintiffs Adequately Allege Loss Causation

To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," "which is not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "[P]laintiffs sufficiently plead loss causation[] when they allege that their share's 'price fell significantly after the truth became known' through an express, corrective disclosure[] or 'through events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020). A plaintiff need not show that the disclosures were a mirror image of the concealed facts but only that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* "Unlike scienter, loss causation is governed by the traditional 'short and plain statement' rule laid out in Rule 8[.]" *Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, at *3 (E.D.N.Y. Mar. 10, 2021).

Defendants contend that the delays were manifestations of disclosed rather than concealed risks. But loss causation was adequately alleged where, for example: (a) a defendant made misstatements about the quality of a portfolio; and (b) the portfolio collapsed in the 2008 Great Recession. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 (2d Cir. 2015). All that is required is that "the fraudulent statement that induced [the plaintiff] to invest can also be shown to have made her investment, in fact, more disposed to suffer the alleged harm [] than honestly described alternative investments." *Id.* Just like the portfolio manager in *Loreley*, Defendants made statements that concealed defects in VG's space program. The defects made delays more likely, indeed inevitable, and VG's stock price fell when the delays were announced.

First, VG's stock price fell 13.7% on August 4, 2020, the day after VG announced that it was pushing Branson's flight to 2021 – because it had spent fourteen months repairing the damage from the February 2020 flight and was still addressing other concealed safety defects. ¶¶331-52.

Unity shook uncontrollably when it reached Mach 1.8. ¶344. The defect rendered Unity unsuitable for commercial operations, but VG persisted with tests anyway, concealing it from investors. ¶¶340-43. During the Class Period, VG finally attempted to address this problem by installing a digital control system for its horizontal stabilizers. ¶345. The digital control system caused electromagnetic interference ("EMI") which aborted its maiden December 12, 2020, flight. ¶¶355-58. Thus, Defendants' attempt to address a problem they had fraudulently concealed caused VG's stock price to fall 17.4% on the next trading day, December 14, 2020.  ¶¶355-59.

After close of trading on February 1, 2021, *The Washington Post* revealed that Unity's horizontal stabilizers had ruptured on the February 2019 flight and that Ericson had resigned as a result. ¶365. This news, plainly a corrective disclosure, caused VG's stock price to fall 9.6%. ¶366.

On February 25, 2021, VG announced that a flight it had said would take place in February was postponed to May. ¶377. Defendants blamed continuing EMI from the digital control system – more fallout from the Mach 1.8 shaking they had concealed – but in truth, there remained further concealed problems with Unity and Eve that would have prevented Unity from flying even without EMI. ¶¶380-81. On February 26, VG's stock price fell by 11.8%. ¶382.

Then on October 14, 2021, VG announced that it would delay a flight scheduled to take place within days for at least a year. ¶410. Virgin Galactic later claimed that an inspection had discovered problems with Eve's horizontal stabilizers and launch pylons. ¶412. But these were the very problems Defendants had known about, and ignored, since 2018. ¶¶412-13. On October 15, 2021, VG's shares closed $4.05 (16.9%) lower than their previous close. ¶411.

These facts provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. Thus, and, contrary to Defendants' assertion (MTD at 36-37), Plaintiffs have adequately alleged loss causation based upon both materialization of the risk and corrective disclosures. *See, e.g.*, ¶¶331, 333-52, 363, 366, 377, 380, 382, 410-12.[28]

Defendants raise a truth-on-the-market defense, arguing that "the information in question was already public." MTD at 37. While the public did not know the poor condition of VG's space program, courts have typically rejected Defendants' attempted truth-on-the-market defense at the pleading stage. *See Ganino*, 228 F.3d at 167 (a truth-on-the-market defense is "intensely fact-intensive" and "rarely an appropriate basis for dismissing a §10(b) complaint"). Defendants warned that delays "could" happen, but their more specific false statements suggested that VG had already addressed many of the obstacles that could cause delays. In any case, "[w]hile defendants argue that . . . the market had already absorbed the news, they can point to no reason why the stock declined." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009).

---

[28] Defendants string-cite cases for the unremarkable proposition that a plaintiff must have some loss causation allegations. MTD at 36, citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (no connection between outside analysts' allegedly fraudulent recommendation to "buy" or "accumulate" shares and subsequent drop in share price when analyst report set out facts and riskiness of investment); *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 547 (S.D.N.Y. 2007) ("Allegations of an inflated purchase price and nothing more do not satisfy loss causation pleading requirements."); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 209 (D. Conn. 2014) ("[t]he Complaint does not even attempt to explain" loss causation)). Here, as detailed above, the CAC links Class Period stock price declines to the conditions Defendants concealed from investors. In the other cases Defendants cite, the plaintiffs' allegations failed because the news they claimed was concealed had been publicly disclosed. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("What appellant has shown is a negative characterization of already-public information."); *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 405 (S.D.N.Y. 2014) (plaintiffs alleged that the company publicly disclosed the facts it had allegedly concealed but that its stock price did not fall); *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 560 (S.D.N.Y. 2021) (corrective disclosure based on "revelation" of information that was public and referenced in company's prior filings); *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 497 (S.D.N.Y. 2016) (plaintiffs alleged no more than "[a] negative journalistic characterization of previously disclosed facts."). Defendants concealed the problems with VG's space program from investors.

**D.     Plaintiffs Adequately Allege Claims Under Section 20(a) and Section 20A**

Claims under Sections 20(a) and 20A of the Exchange Act are derivative. Each requires a primary violation of the Exchange Act. Defendants' sole argument against the Section 20(a) claims is that the Complaint does not allege a primary violation, so they concede the Section 20(a) allegations suffice if any Section 10(b) claim is alleged. As to Section 20A, Defendants also claim the Complaint does not allege that Defendants had material non-public information. They did: at a minimum, they had the information they concealed from investors for which they are liable under Section 10(b). Branson also knew that his July 2021 flight – which he touted as a success – had very nearly ended in disaster. Thus, Defendants implicitly concede that they have no additional arguments against the Section 20A claims either.

**V.     CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, the Court should grant leave to amend. *Loreley*, 797 F.3d at 191 (dismissal of fraud claim without leave to amend (a) violates the spirit of Rule 15 and (b) must be supported by finding that there is an issue as to which "the complaint is deficient and [] amendment would be futile).

Dated: May 4, 2022                              Respectfully submitted,

                                                GLANCY PRONGAY & MURRAY LLP

                                                By: *s/ Ex Kano S. Sams II*
                                                Kara M. Wolke
                                                Ex Kano S. Sams II
                                                Natalie S. Pang
                                                1925 Century Park East, Suite 2100
                                                Los Angeles, CA 90067
                                                phone: (310) 201-9150
                                                fax: (310) 432-1495
                                                Email: kwolke@glancylaw.com
                                                       esams@glancylaw.com
                                                       npang@glancylaw.com

797931.1                              40

THE ROSEN LAW FIRM, P.A.

By: *s/ Jonathan Horne*
Jonathan Horne, Esq. (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiffs*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On May 4, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Eastern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 4, 2022, at Los Angles, California.

*/s/ Ex Kano S. Sams II*
Ex Kano S. Sams II