**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

SHANE LAVIN, Individually and on Behalf of All Others Similarly Situated,

                    Plaintiff,

VIRGIN GALACTIC HOLDINGS, INC., MICHAEL A. COLGLAZIER, GEORGE WHITESIDES, DOUG AHRENS, JON CAMPAGNA,

                    Defendants.

Case No.: 1:21-cv-03070-ARR-TAM

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CORRECTED AMENDED COMPLAINT

**LATHAM & WATKINS LLP**

Michele D. Johnson (*pro hac vice*)
Kristin N. Murphy (*pro hac vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290
Email: michele.johnson@lw.com
           kristin.murphy@lw.com

Colleen C. Smith (*pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
Email: colleen.smith@lw.com

*Attorneys for Defendants*

May 18, 2022

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   ARGUMENT............................................................................................................3

    A.    Plaintiffs Fail to Plead a Section 10(b) Claim .........................................................3

        1.    Plaintiffs Do Not Plead Actionable False or Misleading Statements ..........3

            a.    Plaintiffs' Complaint Should Be Dismissed as Impermissible Puzzle Pleading ......................................................3

            b.    Plaintiffs Fail to Allege a False or Misleading Statement ...............4

            c.    Defendants' Statements of General Corporate Optimism Are Not Actionable ........................................................................17

            d.    Defendants' Opinion Statements Regarding Flight Progress, Safety, and Customer Experience Are Not Actionable ................................................................................19

            e.    Plaintiffs' Allegations Do Not Establish a Violation of Items 303 or 503/105 ....................................................................20

        2.    The More Compelling Inference Cuts Against Scienter...........................22

            a.    Plaintiffs' Allegations Do Not Establish Recklessness .................22

            b.    Plaintiffs' Allegations Do Not Establish Motive ..........................26

         3.    Plaintiffs Fail to Plead Loss Causation ...................................................29

    B.    Plaintiffs' Section 20(a) and 20A Claims Fail.......................................................32

    C.    Dismissal Should Be With Prejudice....................................................................32

III.  CONCLUSION........................................................................................................32

## TABLE OF AUTHORITIES

**Page**

### CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)........................................................................................ 29

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
19 F.4th 145 (2d Cir. 2021) ........................................................................................ 26

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ................................................................................. 15, 26

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ..................................................................................... 4

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)................................................................... 10, 11

*Budhani v. Monster Energy Co.*,
2021 WL 5761902 (S.D.N.Y. Dec. 3, 2021) .............................................................. 32

*BYD Co. Ltd. v. VICE Media LLC*,
531 F. Supp. 3d 810 (S.D.N.Y. 2021)......................................................................... 13

*Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) .............................................................. 5

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) .................................................................................. 22

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ...................................................................................... 11

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)........................................................................................ 12

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978)........................................................................................ 29

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................................... 32

*ECA, Loc. 134 IBEW Joint Pension Tr. Fund of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)........................................................................................ 17

ii

*Emps.' Ret. Sys. of the Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ................................................................. 26

*F5 Cap. v. Pappas*,
  856 F.3d 61 (2d Cir. 2017) .................................................................. 32

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  2020 WL 264146 (S.D.N.Y. Jan. 17, 2020) ..................................... 9, 17

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ................................................................. 31

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
  __ F. Supp. 3d. __, 2022 WL 541891 (E.D.N.Y. Feb. 23, 2022) .......... 25

*In re EDAP TMS S.A. Sec. Litig.*,
  2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) ................................... 19

*In re Ford Motor Co. Sec. Litig., Class Action*,
  381 F.3d 563 (6th Cir. 2004) ............................................................... 18

*In re Forest Lab'ys Sec. Litig.*,
  2006 WL 5616712 (S.D.N.Y. July 21, 2006) ..................................... 27

*In re GeoPharma, Inc. Sec. Litig.*,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006) ................................................ 23

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................ 27

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) ................................................................. 4

*In re Liberty Tax, Inc. Sec. Litig.*,
  435 F. Supp. 3d 457 (E.D.N.Y. 2020) ............................................... 31

*In re Lyft Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020) ............................................... 18

*In re Massey Energy Co. Sec. Litig.*,
  883 F. Supp. 2d 597 (S.D. W.Va. 2012) ............................................ 11

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ............................................................ 29, 31

*In re Peabody Energy Corp. Sec. Litig.*,
  2022 WL 671222 (S.D.N.Y. Mar. 7, 2022) ....................................... 18

*In re SLM Corp. Sec. Litig.*,
 740 F. Supp. 2d 542 (S.D.N.Y. 2010)..................................................................... 27

*In re Vale S.A. Sec. Litig.*,
 2020 WL 2610979 (E.D.N.Y. May 20, 2020) ........................................................ 11

*In re Vivendi Universal, S.A.*,
 2004 WL 876050 (S.D.N.Y. Apr. 22, 2004)................................................... 13, 14

*In re Vivendi Universal, S.A. Sec. Litig.*,
 634 F. Supp. 2d 352 (S.D.N.Y. 2009)..................................................................... 31

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001)..................................................................................... 28

*Lachman v. Revlon, Inc.*,
 487 F. Supp. 3d 111 (E.D.N.Y. 2020) ..................................................................... 23

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005)............................................................................. 29, 30

*Long Miao v. Fanhua, Inc.*,
 442 F. Supp. 3d 774 (S.D.N.Y. 2020)........................................................................ 6

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
 797 F.3d 160 (2d Cir. 2015)............................................................................. 30, 32

*McDermid v. Inovio Pharms., Inc.*,
 520 F. Supp. 3d 659 (E.D. Pa. 2021) ...................................................................... 16

*Meyer v. Jinksolar Holdings Co., Ltd.*,
 761 F.3d 245 (2d Cir. 2014)..................................................................................... 16

*Moshell v. Sasol Ltd.*,
 481 F. Supp. 3d 280 (S.D.N.Y. 2020)..................................................................... 16

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
 380 F.3d 1226 (9th Cir. 2004) ................................................................................. 27

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 575 U.S. 175 (2015)........................................................................................... 19, 20

*Ong v. Chipotle Mexican Grill*,
 294 F. Supp. 3d 199 (S.D.N.Y. 2018)..................................................................... 18

*Plumbers & Pipefitters Loc. Union No. 719 Pension Tr. Fund v. Conseco Inc.*,
 2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) .......................................................... 6

*Podany v. Robertson Stephens, Inc.*,
318 F. Supp. 2d 146 (S.D.N.Y. 2004)................................................................ 28

*Rice v. Intercept Pharms., Inc.*,
2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) ...................................................... 27

*Rihn v. Acadia Pharms. Inc.*,
2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) .................................................... 14

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009)...................................................................... 2, 23, 24

*Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020)................................................................................ 5

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001)................................................................................ 29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)............................................................................................ 3

*Tyler v. Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011)................................................................ 25

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ............................................................................... 8

*Wexner v. First Manhattan Co.*,
902 F.2d 169 (2d Cir. 1990)............................................................................... 28

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ........................................................................... 14

## STATUTES

15 U.S.C. § 78u-4(b)(1) ..................................................................................3, 4

## OTHER AUTHORITIES

Brief for the United States as Amicus Curiae Supporting Respondents,
*Leidos, Inc. v. Ind. Pub. Ret. Sys.*,
No. 16-581 (U.S. Sept. 7, 2017), 2017 WL 4004533 ........................................21

Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations,
Exchange Act Release No. 33-6835,
1989 WL 1092885 (May 18, 1989) ...................................................................21

7 Oxford English Dictionary 151 (1933) ...........................................................19

## I.    PRELIMINARY STATEMENT

Plaintiffs' Opposition would strongly suggest that Virgin Galactic endured some fatal and catastrophic accident that derailed its space flight program and fundamentally altered its trajectory.  Plaintiffs assert it was false and misleading for Virgin Galactic to describe its test flights as "successful" or "repeatable" because its space shuttle was a "flying band-aid" that "would never be ready for commercial flights."  Opposition ("Opp.") 29, 12.  And Plaintiffs say Virgin Galactic lied to the investing public by saying it had a "commitment to safety" when actually it oversaw an "unsafe space program."  Opp. 19, 21.  Except there was no catastrophic accident.  Not only were the test flights repeatable, they were *repeated*, and the "prototype" supposedly incapable of extended use, in fact, *did* send Virgin Galactic's founder Richard Branson into space, and remains in Virgin Galactic's fleet to this day.  Opp. 12.

Instead, what Plaintiffs identify are operational challenges that arose during product testing.  But that is the point of testing.  A successful test is not necessarily one in which everything goes off without a hitch, but one where a problem is identified, understood, and addressed.  Beneath their overheated rhetoric, that is precisely what Plaintiffs allege—a company engaged in an inherently risky and first-of-its-kind endeavor that rigorously tested its product, and accomplished ambitious goals without any serious accident or loss of life.  Nothing in the securities laws required Virgin Galactic to give a blow-by-blow account of the details of each and every test flight.  Nor were Defendants obligated to negatively characterize Virgin Galactic's test flights as "failures" or to disclaim their "commitment to safety."  Opp. 2; Statement 3 (Compl. ¶ 501).

That leaves Plaintiffs with only statements purportedly misrepresenting the timeline on which commercial travel would be accomplished.  Those statements were reasonable forward-looking projections, and were consistently accompanied by disclosures informing investors of

1

the uncertainties inherent in predicting the course of a pioneering venture.  Defendants are thus fully protected under the PSLRA's safe harbor.  Expressing optimism in predicting how quickly the space program would progress is not securities fraud.  Indeed, it would be senseless to read the securities laws in such a way as to encourage companies to recklessly speed up operations in order to meet their original projections.

In any event, even if there were any false or misleading statement, Plaintiffs come nowhere close to satisfying the PSLRA's high bar for pleading scienter.  Defendants' general endorsement of Virgin Galactic's test flight program and its commitment to safety were plainly not so recklessly misleading as to constitute an "'extreme departure from the standards of ordinary care.'"  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation omitted).  And it is no surprise that Defendants were not able to perfectly predict the timeline for an unprecedented space travel program.  Plaintiffs' allegations come nowhere close to showing that any Defendant possessed "'a state of mind *approximating actual intent*'" to violate the law.  *Id.* (citation omitted).

Unable to establish recklessness, Plaintiffs place most of their emphasis on stock sales by two of the five defendants.  But Plaintiffs cannot deny that those sales do not fit any suspicious pattern—indeed, those sales occurred at times when the stock price was down, not up.  Plaintiffs identify no case where a court has found stock sales of such a kind to constitute sufficient evidence of motive to commit fraud.  Thus, Plaintiffs fall back on the argument that corporate officers wish to keep the stock price high in order to enhance their own compensation—but that is a general corporate motive the Second Circuit has long held is not enough to plead scienter under the PSLRA.

2

Finally, Plaintiffs' claims independently fail because they do not adequately plead loss causation. Plaintiffs cannot show any conflict between a concealed "truth" actually or constructively disclosed during the Class Period and any of Defendants' challenged statements to the investing public. What remains is a series of allegations untethered to any stock drop or correction regarding supposed internal problems within Virgin Galactic's programs. That story might make for a colorful book or documentary, but it does not state a claim for a violation of the federal securities laws.

Defendants' Motion to Dismiss should be granted in its entirety, and the Corrected Amended Complaint (the "Complaint") should be dismissed with prejudice.

## II.    ARGUMENT

### A.    Plaintiffs Fail to Plead a Section 10(b) Claim

#### 1.    Plaintiffs Do Not Plead Actionable False or Misleading Statements

Plaintiffs' claims fail for the fundamental reason that they have not identified which specific statements are purportedly false or misleading or why those statements were false or misleading when made. The statements Plaintiffs appear to challenge are all non-actionable because Plaintiffs do not plead particularized facts demonstrating that they are false or misleading. And several of those statements are non-actionable multiple times over because they are puffery, opinion, or protected under the PSLRA's safe harbor provision.

##### a.    Plaintiffs' Complaint Should Be Dismissed as Impermissible Puzzle Pleading

While Plaintiffs acknowledge that Defendants have correctly identified the thirty-five statements they challenge (Opp. 11 n.2), the Complaint nevertheless fails to clearly identify the particular "reason or reasons why" each of those statements is purportedly false or misleading. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-

3

4(b)(1)).  Plaintiffs say they have met this standard by reciting two laundry lists of purportedly omitted facts, which they repeat verbatim in nearly forty paragraphs of the Complaint.  *See* Opp. 13 n.3; *id.* at 19 n.14.  This is the very essence of puzzle pleading.  Neither the Court nor Defendants are required to "determine on [their] own initiative how and why . . . statements were false."  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012); *see also In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1554 (9th Cir. 1994) ("[W]e are loathe to allow plaintiffs to tax defendants, against whom they have leveled very serious charges, with the burden of solving puzzles in addition to the burden of formulating an answer to their complaint."), *superseded by statute on other grounds*, 15 U.S.C. § 78u-4(b)(1).  This improper puzzle pleading independently warrants dismissal.

### b.  Plaintiffs Fail to Allege a False or Misleading Statement

Even if the Court were to forgive this threshold deficiency, the Complaint should be dismissed for failure to allege any false or misleading statement.  Plaintiffs challenge statements that broadly fall into three categories:  (1) statements about Virgin Galactic's test flights and testing program (Statements 1, 4, 5, 9, 14, 17, 19, 20, 30, 32); (2) statements about Virgin Galactic's commitment to safety (Statements 3, 6, 7, 8, 10, 12, 15, 16, 18, 24, 25, 26, 29, 30, 31, 32, 34, 35); (3) forward-looking statements about expectations for commercial viability (Statements 2, 9, 11, 13, 21).  None is remotely false or misleading.

**Test Flights** (Defendants' Opening Brief ("MTD") 13-14; Opp. 11-14).  Plaintiffs first argue that Virgin Galactic made false or misleading statements when it described test flights that occurred in December 2018 and February 2019, before the Class Period began.  Opp. 11 (citing Statements 1, 5, 19 (Compl. ¶¶ 497, 505, 536)).  Plaintiffs contend these statements were false or misleading because they described the two flights as "successful," as "milestones," and as "demonstrat[ing] the repeatability of the full flight profile[]."  Opp. 11, 13 n.4.  But Plaintiffs

4

ultimately do not dispute that all of that was true.  Virgin Galactic's December 2018 trip was the first commercial space flight to bring people to space and back, which is a "milestone" by any measure.  The February 2019 flight brought a non-pilot crew member to space for the first time on a commercial space vehicle—also a successful milestone.  And not only were those test flights repeatable, they were, in fact, *repeated*.  As Plaintiffs themselves allege, in May 2021, Virgin Galactic again flew to space—gathering data that then formed the basis for the FAA to update Virgin Galactic's commercial space-transportation operator license to allow the Company to fly customers to space.  Statement 32 (Compl. ¶ 564).  And in July 2021, Virgin Galactic flew its founder, Richard Branson, and a full crew to space.  Statement 33 (*id*. ¶ 566).

This case is thus a world away from *Chicago Bridge & Iron Co. N.V. Securities Litigation*, 2018 WL 2382600 (S.D.N.Y. May 24, 2018), the case on which Plaintiffs primarily rely.  There, a defendant stated that it was "meeting its milestones without delay" even though it had recently issued a stop-work order following a Nuclear Regulatory Commission investigation.  *Id.* at *8.  Here, by contrast, Virgin Galactic was, in fact, meeting its milestones—and the data gathered from the December 2018 and February 2019 test flights and the subsequent maintenance were fully consistent with Defendants' measured disclosures about the testing program's progress.

Nor were these statements rendered misleading because they did not convey the details of operational issues arising from the test flights.  Opp. 12.  Defendants do not have an obligation "to disclose all the facts that pertain to a subject"—only those "whose omission, in light of what was stated, would be misleading."  *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020).  Plaintiffs assert that by describing past test flights as "successful," Defendants undertook an obligation to disclose that the December 2018 flight "veered off

5

course" and that "Unity was grounded" after the February 2019 flight.  Opp. 5, 11-12, 14 n.6.  But the *very purpose* of a test flight is to identify operational challenges.  Plaintiffs offer no reason why a successful test flight requires that everything go perfectly.  By Plaintiffs' own allegations, no one was injured, useful data were generated, and areas for improvement were identified.  Compl. ¶¶ 249, 378, 564.  That is a successful test flight.

Plaintiffs generally insist that statements about Unity's reliability were misleading because Defendants did not also say that "Unity was a 'flying band aid,' a prototype well past its sell-by date which likely would never be ready for commercial flights and would in any case have to be thoroughly overhauled before then."  Opp. 12.  But those are Plaintiffs' characterizations of the facts, not objective facts.  *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 795 (S.D.N.Y. 2020) ("[Plaintiff's] characterization does not make any statement (or omission) by [defendants] false or misleading.").  In fact, Plaintiffs' characterizations would themselves have been misleading:  Unity continued to fly after October 2019, completing flights to space in May 2021 and July 2021.  Compl. ¶¶ 384, 387.  Unity has not been "overhauled," and Plaintiffs do not point to a single allegation suggesting now (let alone during the Class Period) that it would "never be ready for commercial flight."  Opp. 12.  Defendants certainly had no legal duty to disparage their product by (falsely) describing it as a "flying band aid."  *See Plumbers & Pipefitters Loc. Union No. 719 Pension Tr. Fund v. Conseco Inc.*, 2011 WL 1198712, at *5, 20-22 (S.D.N.Y. Mar. 30, 2011) (dismissing complaint where plaintiff asserted that defendants' statements "are 'false and misleading' because they failed to disclose plaintiff's pejorative characterization" of defendant's operations).

Plaintiffs assert that it was false and misleading for Defendants to claim to have built "operational processes," by pointing to the recent hiring of contractors and employees such as

6

FE 1 and FE 8 "to create inspection programs."[1]  Opp. 12 (citing Statement 6 (Compl. ¶ 507)). But an effort to improve existing processes through new hires does not suggest that no "operational process" was already in place.  *See* Compl. ¶ 280.  Indeed, the Complaint itself suggests the opposite.  *Id*. (indicating that FE 8 improved existing inspection protocol).  And while Plaintiffs point to purported operational failures, the very next clause of the quoted statement warns that "there can be no assurance that we will not experience operational or process failures or other problems."  *Id.*

Plaintiffs next point to purported discrepancies in maintenance documentation that allegedly caused Virgin Galactic to "los[e] track of the changes it made" to its vehicles.  Opp. 12. Plaintiffs' allegations tellingly do not indicate that Virgin Galactic's engineers were unable to reconcile any documentation or to ensure that all proper maintenance steps were actually performed.  And even if there were document discrepancies, Plaintiffs do not connect any of them to specific problems that affected Virgin Galactic's testing program or its overall ability to maintain "rigorous quality standards."  Statement 6 (Compl. ¶ 507).

Finally, Plaintiffs contend that it was misleading to say that Unity's new metal horizontal stabilizers were "upgraded" or "improved" because they had to be "replaced."  Opp. 13 (citing Statements 27, 28 (Compl. ¶¶ 553, 555)).  But it is entirely natural (and accurate) to describe the replacement of one part with another as an "upgrade" or an "improvement."  The allegations do not support that such a minor difference in language rendered Defendants' statements misleading.

---

[1] The "Former Employees" or "FEs" referred to in Plaintiffs' Complaint are referred to as "Confidential Witnesses" or "CWs" in Defendants' Opening Brief and Reply.  MTD 27.

At bottom, Plaintiffs' argument is that Defendants should have negatively characterized the pioneering flight tests Virgin Galactic undertook, because of operational problems that were encountered. But these were just *tests*—and the point of Virgin Galactic's extensive testing was to identify the very operational problems that Plaintiffs describe. When it comes to "the oft-tortuous path of product development," as the Ninth Circuit aptly explained in the recent *Twitter* decision, companies are not obligated to disclose every adverse "internal development." MTD 16-17 (citing *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022)). "Indeed, to do so would inject instability into the securities market, as stocks may wildly gyrate based on even fleeting developments." *Twitter*, 29 F.4th at 620. Virtually any product testing regime will turn up problems with the product that must be addressed; the securities laws do not demand that companies give real-time updates on such "fleeting developments"—especially when, as here, those developments did not lead to any long-term problem with the product.

Plaintiffs try to create distance from the *Twitter* decision, asserting that "*Twitter* merely found that the defendants' statements were too indefinite in context to be misleading." Opp. 13 n.5. But here, the challenged statements were likewise not misleading in context, as the flights did successfully accomplish significant milestones and were repeatable. Just as in *Twitter*, Plaintiffs have simply identified a negative internal development that, at most, "'a reasonable investor might consider material,'" without establishing any duty to disclose that information. 29 F.4th at 620 (citation omitted).

**Safety** (MTD 14-15; Opp. 18-20). Plaintiffs next challenge statements regarding Virgin Galactic's "uncompromising commitment to safety and customer satisfaction." Opp. 18-19; *see, e.g.*, Statement 3 (Compl. ¶ 501) (Company's "uncompromising commitment to safety"); Statement 8 (*id.* ¶ 512) (Company's "emphasis on safety"); Statement 15 (*id.* ¶ 526) (Company

8

had "a vehicle and an operation which means we can fly confidently and safely"); Statement 18 (*id.* ¶ 533) ("our number one priority is to fly safely").  Plaintiffs do not separately address many of these statements, referring to them only in a footnote that generically challenges Virgin Galactic's statements regarding its "supposed safety."  Opp. 19 n.14 (citing Statements 7, 12, 16, 18, 29, 31, 34, 35 (Compl. ¶¶ 509, 520, 528-29, 533, 557, 561-62, 568, 570)).  Plaintiffs provide no context or substantive argument as to many of these statements, and any reliance on them has thus been waived.  *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020) ("By raising the argument in a footnote, [the party] waived the argument.").  Plaintiffs' abandonment of these statements is for good reason—as Defendants have explained, Plaintiffs do not and cannot show that these general statements about Virgin Galactic's safety culture, performance, and goals were false or misleading.  MTD 14-15.

With respect to the statements they do address, Plaintiffs fail to show that any of them were false or misleading.  Most important, Plaintiffs fail to allege facts establishing that the program was actually unsafe, that Virgin Galactic was not, in fact, committed to safety, or that it experienced a single catastrophic safety event during the Class Period or at any time since.  Plaintiffs' challenges to Virgin Galactic's statements about the safety of its processes and vehicles (Statements 6, 10, and 30 (Compl. ¶ 507, 516, 559)), its commitment to safety (Statements 3, 8, 24, 25, 26, and 32 (Compl. ¶ 501, 512, 547, 549, 551, 564)), and its safety track record (Statement 15 (Compl. ¶ 526)) therefore fail.

Plaintiffs next point to Mr. Whitesides's statement in October 2019 that "we believe we have an architecture that is extremely reliable."  Opp. 12; Statement 10 (Compl. ¶ 516).  As noted below, *infra* at 19-20, this is an inactionable opinion statement.  In any event, it was neither false nor misleading because Virgin Galactic's spacecraft architecture had proven

9

reliable.  As Plaintiffs acknowledge, Virgin Galactic had been testing its space vehicles for nearly ten years.  Compl. ¶¶ 121, 124, 516; MTD 8-10; Ex. 6 at 12 (Mar. 1, 2021 10-K) (As of December 31, 2020, Eve "had completed a total of 289 test flights," 50 of which were with Unity).  Plaintiffs do not allege that any of Eve's or Unity's flights resulted in injuries or other disaster.  There is nothing misleading about describing that extensive track record as reliable.

Mr. Moses's February 2021 statement to the *Washington Post* that Virgin Galactic "thoroughly inspect[s] the vehicle" was likewise not misleading.  Statement 30 (Compl. ¶ 559).  Plaintiffs claim this statement was misleading because "Unity *had been flying* with serious problems" prior to February 2021.  Opp. 13.  But the allegation that Plaintiffs cite simply says that problems were "now appearing."  Compl. ¶ 380.  The emergence of problems does not suggest that Virgin Galactic's inspection procedure was anything less than "thorough[]." Statement 30 (*id*. ¶ 559).  To the contrary, discovery of problems is a sign of a thorough inspection regime.  Plaintiffs' allegations fail to show that the "error that occurred in processing on the ground" prior to the February 2019 flight had not been fully "address[ed]" (Compl. ¶ 365) when Mr. Moses described Virgin Galactic's "thorough[]" inspections in February 2021. Statement 30 (Compl. ¶ 559).

Tellingly, the cases on which Plaintiffs rely all involve catastrophic safety events that caused death or injury.  Opp. 18.  For example, in *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223 (S.D.N.Y. 2012), plaintiffs brought Exchange Act claims against offshore oil drilling contractors in the wake of the *Deepwater Horizon* explosion, a disaster that killed "eleven workers and [caused] the worst oil spill in U.S. history."  *Id.* at 228.  Plaintiffs challenged the defendant's statements that its safety and training programs were "extensive" as misleading because defendant's "measures were insufficient to

10

address applicable legal requirements," and those failures led to a catastrophic event.  *Id.* at 243; *see also id.* at 233 (discussing how defendant had violated "numerous federal regulations").  The other cases on which Plaintiffs rely likewise involved catastrophic accidents, following violations of safety laws and regulations.  *See In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 605-06, 617 (S.D. W.Va. 2012) (safety-related statements sufficiently alleged to be false and misleading where mine "was the subject of '124 citations and 53 assessed penalties totaling $188,769'" leading to deaths of 29 miners in an explosion); *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *2, 7, 13 (E.D.N.Y. May 20, 2020) (safety practices statements misleading where company allegedly manipulated regulatory requirements to skirt safety issues, leading to dam collapse that buried town, killed nineteen people, resulted in imposition of administrative sanctions on company); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 658-59 (6th Cir. 2005) (safety-related statements contradicted by contemporaneous knowledge of "2,200 rollover accidents, over 700 serious injuries and approximately 174 fatalities" and concealment of "accident rate data . . . from safety regulators").  These cases ultimately highlight what is missing here.  Virgin Galactic was fully compliant with all safety-related laws, and there was no serious accident or loss of life—despite the extraordinary inherent danger of space travel—and Plaintiffs do not allege otherwise.  Nothing about Defendants' statements expressing commitment to safety was remotely false or misleading.

Indeed, unable to identify any subsequent event that would render Defendants' safety statements false or misleading, Plaintiffs argue that delays to ensure safety somehow rendered Defendants' safety statements false.  Opp. 20.  That is baseless.  A "commitment to safety" is entirely consistent with the facts as Plaintiffs allege them—a company that took all necessary steps to ensure continuing safety, including inspections, repairs, and, on occasion, delaying

11

flights. *See* Statement 24 (Compl. ¶ 547) ("As always safety will remain our central focus and we will continue to progress with a step-by-step diligent approach throughout the test flight program as we prepare for commercial service. As such, our schedule may adjust as we process data from each of our test flights."); Statement 30 (*id*. ¶ 559) ("We take our time and make sure things are right."). Those steps are in service of the ultimate goal of ensuring that when Virgin Galactic begins commercial operations, those flights will be safe. *See* Statement 20 (*id*. ¶ 538) ("Our focus for this year remains unchanged on ensuring the vehicles and our operations are prepared for long-term, regular commercial spaceflight service."). The very safety-related delays that Virgin Galactic implemented in service of that goal are not evidence that its statements regarding a commitment to safety statements were somehow false. Nor does Plaintiffs' Complaint support their contention that the delays were caused by safety issues that were "unresolved for years." Opp. 20. There is no allegation tying a single delay to any such "unresolved" safety-related deficiency. Rather, Plaintiffs' allegations are entirely consistent with Virgin Galactic appropriately taking the time to resolve safety-related issues identified during the test flights. To suggest that Defendants should have been able to predict exactly how long resolution of those issues would take—and speculate to the market about delays that occurred years into the future—is pure "fraud by hindsight" pleading. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (citation omitted).

Ultimately, the core problem with Plaintiffs' challenge to these statements is that being "committed to safety" and being ready for commercial operations are two entirely different things. Having "an uncompromising commitment to safety" does not guarantee that a company will be ready for commercial operation on its originally anticipated timeline. Statement 3 (Compl. ¶ 501). In fact, such a commitment suggests the opposite—that scrupulous adherence to

safety might lead to additional delays.  Virgin Galactic's statements regarding its commitment to safety are thus entirely consistent with its subsequent actions implementing that very commitment.

**Commercial Timeline** (MTD 15-20; Opp. 14-17).  The challenged statements about the spaceflight program's anticipated commercial timeline are all forward-looking statements protected by the PSLRA's safe-harbor provision.  As Defendants have explained, forward-looking statements are not actionable under the PSLRA's safe-harbor provision so long as (1) they are identified and accompanied by meaningful cautionary language, or (2) Plaintiffs fail to plead that they were made with actual knowledge that they were false or misleading when made.  MTD 15-20.[2]  Plaintiffs fail on both prongs.

Plaintiffs first argue that these statements were not forward-looking because saying that one is "on track" to achieve certain goals is a statement of present or historical fact.  Opp. 22-23.  But Plaintiffs provide no authority for that proposition.  They cite the unpublished opinion in *In*

---

[2] Defendants' motion to dismiss initially identified other statements in the commercial timeline category, and explained why none is false or misleading.  *See* MTD 15-17 (addressing Statements 22, 23, 33 (Compl. ¶¶ 542, 544, 566)); *id.* at 20-22 (explaining that Statements 22 and 33 are puffery).  Plaintiffs fail to substantively address those statements in their Opposition at all.  *See* Opp. 13 n.3 (string-citing Compl. ¶¶ 542, 544, 566 without addressing their content); *id.* at 27 (citing Compl. ¶ 566 without addressing its content).  Because Plaintiffs have failed to respond to the arguments in the motion to dismiss as to these statements, they have abandoned reliance on them.  *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 819 (S.D.N.Y. 2021) ("[F]ailure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue."), *aff'd,* 2022 WL 598973 (2d Cir. Mar. 1, 2022).  In any event, as Defendants have explained, these statements merely praise Virgin Galactic vehicles' designs, capabilities, and accomplishments in general terms.  It is completely unclear what Plaintiffs perceive to be false or misleading about them—and two of the three are puffery in any event.  *See* Statement 22 (Compl. ¶ 542) ("It's this cabin that will enable hundreds and then thousands of people to embark on one of the most unforgettable journeys of their lives, that a space flight."); Statement 23 (*id.* ¶ 544) ("Virgin Galactic Spaceship 2 system is designed to fly both humans and science research payloads to space."); Statement 33 (*id.* ¶ 566) ("Today is a landmark achievement for the Company and a historic moment for the new commercial space industry. With each successful mission we are paving the way for the next generation of astronauts.").

13

*re Vivendi Universal, S.A.*, 2004 WL 876050 (S.D.N.Y. Apr. 22, 2004) (cited Opp. 16, 22), but there, the court found that the safe harbor did not shield an "on track" statement because it was not accompanied by adequate meaningful cautionary language. *Id.* at *7. *Vivendi* thus provides no support for Plaintiffs' contention that "on track" statements are not forward-looking to begin with. Plaintiffs' only other authority is *Rihn v. Acadia Pharmaceuticals Inc.*, 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016). But that decision's reasoning is inconsistent with the Ninth Circuit's own later precedent confirming that statements indicating a company is "on track" to achieve an objective are forward-looking:

> Because any announced "objective" for "future operations" *necessarily* reflects an implicit assertion that the goal is achievable based on current circumstances, an unadorned statement that a company is "on track" to achieve an announced objective, or a simple statement that a company knows of no issues that would make a goal impossible to achieve, are merely alternative ways of declaring or reaffirming the objective itself. The statutory safe harbor would cease to exist if it could be defeated simply by showing that a statement has the sort of features that are inherent in *any* forward-looking statement.

*Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021).

Here, Richard Branson's statement that Virgin Galactic was "on track for our beautiful spaceship to begin commercial service" (Statement 2 (Compl. ¶ 499)) merely described a future goal and implied its achievability based on current circumstances—just like "*any* forward-looking statement" does. *Wochos*, 985 F.3d at 1192. The same is true of Mr. Whitesides's statement that "I think it's fair to say that we are now within spitting distance, and we are in a multi-month march to commercial ops. So things are going well." Statement 21 (Compl. ¶ 540). This statement's only "implicit assertion" is that a future projection is "achievable based on current circumstances"—making it a quintessential forward-looking statement. *Wochos*, 985 F.3d at 1192. The rest of the timeline statements are similarly focused on the future. *See* Statement 9 (Compl. ¶ 514) ("next year I'll go up, and then we'll start putting people up");

Statement 11 (*id.* ¶ 518) ("next year I'll be going into space, and we'll be starting to send a lot of people into space"); Statement 13 (*id.* ¶ 522) ("We'll start commercial operations in the middle of next year").

Plaintiffs next argue that these statements are nonetheless actionable because they were not accompanied by meaningful cautionary language. Opp. 23-24. To the contrary, Virgin Galactic's disclosures clearly and specifically "identifie[d] the particular risk that the Investors ran." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022). Virgin Galactic's warnings made clear that scheduled test flights could experience "significant delays" due to "maintenance issues [and] design and engineering flaws." MTD 18-19 (quoting Ex. 2 at 34 (Aug. 7, 2019 S-4)). And Virgin Galactic even disclosed that "[h]istorically, changes have been required and implementing those changes has resulted in additional delay and expense." Ex. 2 at 34 (Aug. 7, 2019 S-4). Defendants' forward-looking statements were thus accompanied by meaningful cautionary language regarding both future risks and historical risks that materialized in the past. No more comprehensive disclosure is required.

In any event, these forward-looking statements are inactionable because Plaintiffs do not allege that Defendants had actual knowledge that they were false or misleading. Indeed, Plaintiffs do not even make this argument as to most of these statements, arguing only that Richard Branson's knowledge that Unity was being repaired did not "fairly align" (Opp. 24) with his statements in October 2019 that "next year [he will] go up, and then we'll start putting people up." Statement 9 (Compl. ¶ 514); Statement 11 (*id.* ¶ 518) ("[N]ext year I'll be going into space, and we'll be starting to send a lot of people into space."). But knowledge that Unity was undergoing repairs is not the same as knowledge that the timeline was unachievable, and

15

Plaintiffs conspicuously point to no facts suggesting that he knew that repairs would make commercialization infeasible in the near future.

This case is thus nothing like *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280 (S.D.N.Y. 2020) (cited Opp. 14), where the defendant knew that its projections about budget were impossible, because a contractually binding change order would push its costs nearly $3 billion above the stated budget. *Id.* at 286; *see also Meyer v. Jinksolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (cited Opp. 17) (company's statements about pollution abatement equipment and twenty-four-hour environmental monitoring were misleading in light of company's contemporaneous report to environmental regulators regarding "existing problems" with compliance); *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 659, 666 (E.D. Pa. 2021) (cited Opp. 15 n.9) (statement that company could produce one million vaccine doses by end of year with current contract manufacturers was false when made because manufacturer had no further production capacity). Here, Defendants knew of no such obstacle that would prevent them from achieving the projected timeline, and Plaintiffs allege none.

Faced with this problem, Plaintiffs resort to mischaracterizing their own allegations. For example, Plaintiffs claim that Richard Branson misstated how soon commercial operations might begin because he said in October 2019 that "all that remained was fitting out the cabin interior." Opp. 12 (citing Statement 9 (Compl. ¶ 514)). But this argument ignores the question, the surrounding context, and the actual statement. Richard Branson was asked to "[g]*ive us a sense of the frequency of the test flights and how far they travel and what you've learned so far from them.*" He answered:

> So, we've had an incredible few months. We're the only space company in America, including NASA, to put people into space since 2009. *We put five – we made five new astronauts. And, so, now what they're doing is fitting out the interior of the spaceship*

*for passenger use, moving the mothership and the spaceship to our lovely space port in New Mexico.* We'll then do a few more test flights. Then next year I'll go up, *and then we'll start putting people up.* And, so, we've got an exciting few months ahead.

Statement 9 (Compl. ¶ 514). In context, the statement clearly indicates the need for further test flights, and in no way indicates that "all that remained" before commercial travel was possible was "fitting out the interior."

In short, Plaintiffs cannot overcome either prong of the PSLRA's safe harbor for forward-looking statements—and the challenged commercial timeline statements are thus inactionable.

### c. Defendants' Statements of General Corporate Optimism Are Not Actionable

Defendants' motion explained that thirteen of the challenged statements (Statements 1, 2, 3, 4, 12, 13, 15, 16, 21, 22, 33, 34, 35) are inactionable puffery. MTD 20-22. Plaintiffs do not address this argument directly in their Opposition, instead burying responses in footnotes and ignoring certain statements altogether. *See, e.g.*, Opp. 17 n.11 (asserting in a footnote that other cases finding statements non-actionable on puffery grounds are "distinguishable" because they involved "vague statements that made no factual representations," without explaining how the statements here are any less vague). Those arguments are so threadbare as to be waived. *See Fin. Guar. Ins. Co.,* 2020 WL 264146, at *2 ("By raising the argument in a footnote, [party] waived the argument.").

In the few instances where Plaintiffs do mount a substantive response, their arguments are unpersuasive. Plaintiffs broadly assert that statements about safety are categorically excluded from the puffery doctrine when they are repeated or made by companies in industries where safety is a significant concern. Opp. 18-19. But there is no "safety statements" exemption for puffery. Just as with any other kind of statement, a statement about safety that is "too general to cause a reasonable investor to rely upon [it]" is inactionable. *ECA, Loc. 134 IBEW Joint*

17

*Pension Tr. Fund of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (statement that company "'set the standard' for 'integrity'" "did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices"). Other courts considering nearly identical statements have deemed them puffery. *See In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570-71 (6th Cir. 2004) (statements such as Ford is "designing safety into . . . [its] cars and trucks" because it wants "customers to feel safe and secure in their vehicles at all times" were inactionable puffery); *In re Peabody Energy Corp. Sec. Litig.*, 2022 WL 671222, at *13 (S.D.N.Y. Mar. 7, 2022) (mining company's statement that its "sharp focus on creating value . . . begins with an emphasis on safe and productive operations" and other similar statements were puffery); *In re Lyft Sec. Litig.*, 484 F. Supp. 3d 758, 765-66, 770-771 (N.D. Cal. 2020) (statements such as "Safety is our top priority, and establishing a community built on trust and safety is paramount to our success" were puffery). Statements describing Defendants' "uncompromising commitment to safety" (Statement 3 (Compl. ¶ 501)) are plainly "aspirational" and too general to form the basis of a Section 10(b) claim. *See Ong v. Chipotle Mexican Grill*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statement that "Chipotle is 'committed to serving safe, high quality food to [its] customers'" and that "'[q]uality and food safety are integrated throughout [Chipotle's] supply chain and everything [the Company] do[es]'" were puffery).

Plaintiffs seem to claim that statements that include references to timing cannot constitute puffery. Opp. 15 n.9 (citing Statements 13, 21 (Compl. ¶¶ 522, 540)). But a statement that "things are going well" does not become a concrete, actionable statement simply because it is paired with a reference to "being within spitting distance" of retiring a technical risk, or being on a "multi-month march to commercial ops." Statement 21 (*id*. ¶ 540). Those references to timing

are *themselves* too vague and general to be relied upon.  A "multi-month march," for example, could be any number of months—and no reasonable investor would take action based on such an indefinite projection.  *See In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at \*9-10 (S.D.N.Y. Sept. 14, 2015) (statement "declar[ing defendants'] belief that they were 'moving through the approval process in a timely manner'" was puffery)

### d. Defendants' Opinion Statements Regarding Flight Progress, Safety, and Customer Experience Are Not Actionable

Defendants explained that four statements (Statements 1, 10, 15, and 32) are non-actionable opinions.  MTD 22-24.  Plaintiffs' response is again unpersuasive.

Plaintiffs concede that "the statement [] VG '*believes* it has overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service'" is an opinion statement, but contend it is nonetheless actionable "because it was coupled with the affirmative, misleading claim that Virgin Galactic 'had reached an inflection point in its development' based on the supposedly successful December 2018 and February 2019 flights."  Opp. 16 (citing Statement 1 (Compl. ¶ 497)).  But the description of an event as "an inflection point" is itself an opinion statement.  Statement 1 (Compl. ¶ 497).  The contention that an inflection point has been reached is a "subjective and uncertain assessment" of the relationship between past performance and future success, not "a determinate, verifiable statement."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184, 186 (2015); *see id.* at 183-184 (an opinion statement is one that "rest[s] on grounds insufficient for complete demonstration" (quoting 7 Oxford English Dictionary 151 (1933)).  Coupling one opinion statement with another does not make either actionable.

Plaintiffs appear to concede that (1) Richard Branson's statement that he was "immensely proud of everyone involved" for "[f]lying the same vehicle safely to space and back twice in a

19

little over two months" and (2) Mr. Whitesides's statement that "we believe we have an architecture that is extremely reliable" are opinion statements, but contend they are still actionable because they falsely implied Virgin Galactic was "safe" and "reliable."  Opp. 19 (citing Statements 10, 15 (Compl. ¶¶ 516, 526)).  Plaintiffs do not allege any facts establishing that either speaker did not subjectively believe what they said.  Mr. Whitesides's belief in the reliability of Virgin Galactic's architecture is fully consistent with his knowledge of the February 2019 flight's results because that damage was the result of a "*process*[]" error, not a fundamental design flaw.  Compl. ¶ 365 (emphasis added).  Nor is there any basis for concluding that a reasonable investor would assume these opinions implied that test-pilots were at no risk or that the test flights encountered no operational issues.  *See Omnicare*, 575 U.S. at 194 (noting it is "no small task" to show that an opinion statement would be "misleading to a reasonable person reading the statement fairly and in context.").  These are not the rare opinion statements that are actionable under *Omnicare*'s stringent standard.

### e.  Plaintiffs' Allegations Do Not Establish a Violation of Items 303 or 503/105

Virgin Galactic satisfied Item 303 and Item 105 of Regulation S-K by disclosing known trends and uncertainties that were material to its financial prospects and by disclosing material factors that made its offering speculative or risky.  MTD 24-25.  Its disclosures throughout the Class Period made plain that possible delays, engineering challenges, and safety risks associated with space travel made its offering risky, and if a catastrophic event occurred (*which it still has not*), Virgin Galactic's business could be harmed.  *See* MTD 25 (citing Ex. 2 at 37 (Aug. 7, 2019 S-4)); *see also* MTD 6-7 & n.2.

Plaintiffs argue that Virgin Galactic should have said more.  Opp. 21.  According to Plaintiffs, Virgin Galactic should have told investors that it faced a "choice" between continuing

an unsafe space program and enduring years of costly delays to fix safety problems. *Id.* That is nonsense. Defendants were not obligated to speculate about future delays in 2020 and 2021 based on the limited information they had in early 2019. As the SEC has advised, disclosures under Item 303 are "optional" where they would "involve[] anticipating a less predictable impact of a known event, trend or uncertainty." Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, Exchange Act Release No. 33–6835, 1989 WL 1092885, at *4 (May 18, 1989). The SEC has acknowledged that establishing a duty to disclose under Item 303 is difficult because of the "judgment calls" that Item 303 demands. Brief for the United States as Amicus Curiae Supporting Respondents at 13, *Leidos, Inc. v. Ind. Pub. Ret. Sys.*, No. 16-581 (U.S. Sept. 7, 2017), 2017 WL 4004533, at *13. Here, the "impact" of the operational problems that arose during the test flights in late 2018 and early 2019 was far from "predictable." Mgmt.'s Discussion & Analysis, Exchange Act Release No. 33–6835, 1989 WL 1092885, at *4. The test flight program yielded valuable data, and Virgin Galactic considered and adapted to the data. Compl. ¶¶ 249, 378, 564. The test flight program was designed to foster precisely this type of iterative development process—but nothing in the data compelled the conclusion that there would be an adverse financial impact years later.

Plaintiffs next argue that the subsequent delays were inevitable because Unity was a "flying band aid" that would "never" be capable of commercial travel. Opp. 12; *see also id.* at 21. This assertion is unsupported by the alleged facts, as Unity did, in fact, provide the basis for a commercial license issued by the FAA and did successfully take Richard Branson to space. Compl. ¶ 387. Item 303 does not demand Defendants to tell the market that Unity would be incapable of doing things it ultimately did.

21

The authority on which Plaintiffs rely, the unpublished decision in *Christine Asia Co. v. Ma*, 718 F. App'x 20 (2d Cir. 2017) ("*Alibaba*"), is nothing like this case. In *Alibaba*, government regulators told the company in advance of its initial public offering that it could either stop "host[ing] a marketplace for the sale of counterfeit goods on its website" or face "huge repeating fines." *Id.* at 22. The court agreed with the plaintiffs that the threat of huge ongoing fines by a government agency was a specific, known uncertainty that was not, but should have been, disclosed. *Id.* at 22-23. Here, by contrast, the supposedly known trend or uncertainty is a generalized risk of future delays to Virgin Galactic's space program based on a grab-bag of purported safety issues. That is not sufficiently specific to support a disclosure obligation under Regulation S-K. And, regardless, Virgin Galactic made exactly this disclosure, consistently describing the uncertainties and risks known to Virgin Galactic—namely, that commercial space flight was a hazardous and unprecedented enterprise, that a major safety incident would inflict severe harm on Virgin Galactic's business, and that past test flights had led to maintenance-related delays necessary to ensure safety. MTD 25.

### 2.   The More Compelling Inference Cuts Against Scienter

Even if Plaintiffs were able plead a false or misleading statement, their allegations do not come close to satisfying the PSLRA's high bar for pleading scienter. Defendants expressed optimism that they could make safe commercial space travel feasible, while acknowledging the risks and obstacles inherent in trying to do so. When setbacks delayed pursuit of its goal, Virgin Galactic promptly disclosed the setbacks and took the time necessary to address them. That is not federal securities fraud.

### a.   Plaintiffs' Allegations Do Not Establish Recklessness

To establish recklessness, a defendant's conduct must represent such an "'extreme departure from the standards of ordinary care'" as to "'approximat[e] actual intent'" to mislead

investors. *Hennessee Grp. LLC*, 573 F.3d at 109 (citation omitted). It "is especially important [for a court] to rigorously apply the standard for pleading intent," because "[i]t is entirely possible for a defendant to make an honest but negligent mistake in judging how much detail needs to be included in public statements in order to avoid misleading the market." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 436-37 (S.D.N.Y. 2006). The allegations of scienter here do not come close to meeting this standard. Plaintiffs' Opposition simply repeats the conclusory refrain that Virgin Galactic was "facing overwhelming problems that prevented it from flying safely." Opp. 29. The allegations support the opposite inference. Seeking to pioneer the field of commercial space travel—an inherently risky endeavor—Virgin Galactic diligently tested its equipment, made adjustments to address inevitable set-backs, and ultimately accomplished the milestones it set out to—all without any serious accident or loss of life. Those achievements happened on a slightly longer time horizon than initially predicted, but Virgin Galactic consistently disclosed that possibility.

*Test Gods* **& Confidential Witnesses.** Plaintiffs rely primarily on excerpts from the book *Test Gods* and various Confidential Witnesses in an effort to plead scienter. As an initial matter, as discussed in Defendants' Opening Brief (MTD 26-27), many of the allegations pre-date the Class Period. Plaintiffs argue that they are permitted to rely on pre-Class Period allegations to establish "what defendants knew and how." Opp. 30. But there is no basis in the Complaint to believe that pre-Class Period operational issues went unaddressed, such that they were an on-going problem when the challenged statements were made. The non-Class Period allegations thus do not establish facts that contradict Defendants' statements at the time they were made. *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 137 (E.D.N.Y. 2020).

For the same reason, Mr. Ericson's resignation prior to the start of the Class Period does not give rise to an inference of scienter. Plaintiffs fail to establish that whatever concerns Mr. Ericson held before the Class Period began persisted when the challenged statements were made or that any such concern would make Defendants' specific statements about Virgin Galactic's progress and prospects extreme departures from the ordinary standard of care. *See Hennessee Grp. LLC*, 573 F.3d at 109.

The Confidential Witness accounts that describe Virgin Galactic's operations during the Class Period likewise do not provide specific facts showing that the challenged statements were knowingly false or misleading, or even that the Confidential Witnesses had any insight into the Individual Defendants' states of mind when they made those statements. Plaintiffs principally argue that scienter can be inferred from the fact that the Individual Defendants were informed that Unity required maintenance after the February 2019 flight. But the fact that the Individual Defendants purportedly were kept apprised of certain safety-related maintenance issues suggests attention to safety, not any intent to deceive. Opp. 32-33.

According to Plaintiffs, Defendants' knowledge that Unity sustained damage during the February 2019 flight meant they were acting recklessly when they spoke of Virgin Galactic's test flights, safety, and commercial timeline. Opp. 29-32. To be sure, Mr. Moses told the *Washington Post* that "the failure to catch the Kapton covering airholes was "[c]learly a problem[,] [n]ot something that should be allowed to happen and something we clearly needed to address." Opp. 32 (quoting Compl. ¶ 365). But there is a wide gulf between knowing that a problem that precipitated repairs must be resolved and knowing that the problem is incapable of resolution. *See id.* ¶ 327 (alleging that the February 2019 flight prompted investigation and that Mr. Moses kept management "apprised regularly about what we were finding as well as the

24

corrective actions"). This distinction is central in the scienter analysis. That Defendants knew of an obstacle does not establish that they made statements about Virgin Galactic's spaceflight program with any intent to deceive the market.

**Physical Layout of the Office.** Unable to plead any concrete basis for Defendants' knowledge of wrongdoing, Plaintiffs ask the Court to infer knowledge from the "physical layout" of Defendants' offices. Opp. 33-34. Specifically, Plaintiffs assert that scienter can be inferred from the fact that Mr. Moses's and Mr. Whitesides's offices "were located on the edge of an elevated platform in the same hangar as Unity and Eve." *Id.* at 34. Plaintiffs fail to offer any reason why physical proximity to the space shuttles would give Mr. Moses or Mr. Whitesides specific knowledge that any of their statements were false or misleading. Plaintiffs' argument thus amounts to baseless speculation. Such reliance on office proximity only highlights the threadbare nature of Plaintiffs' scienter allegations here.

Plaintiffs' general allusion to the "core operations" doctrine is likewise unpersuasive. Opp. 33-34. It has long been understood in this circuit that an allegation that a "fraudulent statement concerned 'core operations,' standing alone, is insufficient to support strong circumstantial evidence of scienter." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). At most, "the 'core operations doctrine' bolsters the strength of the inference of scienter when plaintiff has *already adequately alleged* facts indicating that defendants might have known their statements were false." *Id.* (emphasis added). In fact, the case on which Plaintiffs rely for their "core operations" theory actually *rejects* that argument, because the plaintiffs did not adequately allege knowing falsity or recklessness. *See In re Chembio Diagnostics, Inc. Sec. Litig.*, __ F. Supp. 3d. __, 2022 WL 541891, at *10 & n.9 (E.D.N.Y. Feb. 23, 2022) (cited at Opp. 33). The same is true here.

25

**Expert Opinions.**  The opinions of Plaintiffs' purported expert, Greg Meholic, likewise fail to support scienter.  MTD 30-31.  Indeed, Plaintiffs largely disclaim reliance on his opinions to establish scienter, claiming that they merely "provide context" for other allegations.  Opp. 34 (citing *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021)).  Plaintiffs thus appear to recognize what the Second Circuit's case law makes clear—Meholic's general observations about the spaceflight industry are no substitute for the specific facts that a plaintiff must plead to establish scienter.  *See Bristol-Myers Squibb Co.*, 28 F.4th at 354.

### b.   Plaintiffs' Allegations Do Not Establish Motive

Plaintiffs' efforts to show scienter based on motive and opportunity are equally flawed.  Stock sales by Richard Branson and Mr. Palihapitiya do not raise an inference of scienter because the sales were not timed to profit before an announcement of bad news or to take advantage of peak stock prices.  MTD 31-32.  *Employees' Retirement System of the Government of the Virgin Islands v. Blanford*, 794 F.3d 297 (2d Cir. 2015), is not to the contrary.  There, the Second Circuit paid special attention to the fact that executives sold stock at "opportune moments" as the price rose or approached its peak.  *Id.* at 308-09.  In this case, by contrast, Richard Branson and Mr. Palihapitiya sold their stock at decidedly inopportune moments.  MTD 31-32.

Rather than confront these circumstances undermining their theory, Plaintiffs characterize Defendants' position as an inflexible rule that "sales more than two months before a corrective disclosure are never suspicious."  Opp. 27.  Defendants advocate for no such position.  The inquiry properly trains on the context in which the sales occurred—and the context here (that the two individuals sold when the stock was lower, not higher) simply does not establish a compelling inference of motive.  *See* Ex. 12 at 1 (SPCE Stock Price History).

26

Indeed, it is Plaintiffs who seek to impose an inflexible and incorrect rule regarding stock sales, arguing that substantial stock sales by two executives "suffice, by themselves to plead scienter." Opp. 26. To the contrary, it is well-settled that "[t]he mere fact that insider stock sales occurred does not suffice to establish scienter." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (citation omitted). A "critical consideration in determining whether stock sales are unusual [or] suspicious is the timing of the sales." *Rice v. Intercept Pharms., Inc.*, 2022 WL 837114, at \*19-20 (S.D.N.Y. Mar. 21, 2022) (defendant's sale of "50,517 shares" did not occur "at the times one would have expected sales if [defendant] was intending to take advantage of stock movements").

The cases Plaintiffs cite (Opp. 26) likewise emphasize the timing of sales, not exclusively profits or percentages of shares sold, in determining whether those sales were "unusual." *See In re Forest Lab'ys Sec. Litig.*, 2006 WL 5616712, at \*6 (S.D.N.Y. July 21, 2006) (crediting allegation that stock sales were executed after stock price was inflated by statements about product's purported efficacy); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (noting that stock sales occurred within two months of disclosure of disappointing sales figures); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 552-53 (S.D.N.Y. 2010) (examining stock sales before public disclosures of events that increased lender's financial risk and reduced chances of successful merger). Plaintiffs' far-reaching theory that stock sales by insiders by themselves are enough to adequately plead scienter is plainly wrong, and inconsistent with Second Circuit precedent.

Plaintiffs' other motive arguments also miss the mark. Plaintiffs claim that Mr. Palihapitiya's desire to complete a deSPAC transaction supports an inference of scienter. Opp. 28. This theory rests on motives the Second Circuit has consistently deemed insufficient to

27

generate an inference of scienter, such as keeping stock prices high to enhance officer compensation, *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001), and speculation about the stakes of the transaction for Mr. Palihapitiya's career.  *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) ("[C]laims of fraud" cannot be based on "speculation and conclusory allegations.").  It also does not make logical sense, given that Mr. Palihapitiya was not an insider at all but rather on the outside looking in at Virgin Galactic at the time the deSPAC was negotiated.  Compl. ¶ 328.

Plaintiffs next point to other suits against Mr. Palihapitiya, but untested and unproven allegations deemed sufficient at the pleading stage in other lawsuits do not prove any violation of the securities laws, let alone suggest that Mr. Palihapitiya acted with scienter in this unrelated case.  *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 158 (S.D.N.Y. 2004) ("[A]lleging fraud in a different transaction does not undercut plaintiffs' obligation to allege provable facts giving rise to an inference of scienter in the transaction at hand").

Finally, Plaintiffs argue that Richard Branson was seeking to obtain cash immediately by taking Virgin Galactic public rather than selling a 31% stake in Virgin Atlantic.  Opp. 27; Compl. ¶ 425.  Plaintiffs' case is about statements concerning the commercialization of Virgin Galactic's space flight program, not about taking Virgin Galactic public.  Plaintiffs fail to explain why Richard Branson could not at once be seeking financing and be optimistic about Virgin Galactic's abilities to overcome the obstacles inherent in pioneering commercial space flight.  *See Kalnit*, 264 F.3d at 139 (motivations "generally possessed by most corporate directors and officers" are insufficient to establish scienter).  Setting an ambitious schedule for overcoming those obstacles does not constitute conscious misbehavior or recklessness.

28

In short, the non-fraudulent inference is far more compelling than any inference of fraudulent intent.  MTD 32-33.  Commercial space travel is likely one of the most uncertain and inherently risky business enterprises in modern history.  Defendants were optimistic about their prospects, but consistently cautioned the market that  any "public incident, accident or catastrophe . . . could cause a material adverse effect on our business."  *See* Ex. 2 at 37 (Aug. 7, 2019 S-4).  And when obstacles emerged, Virgin Galactic put safety first, delaying or grounding flights when necessary—even if doing so meant delays.  That Defendants did not display "greater clairvoyance . . . does not constitute fraud."  *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).  Once the Complaint's rhetoric and conclusory allegations are stripped away, the only compelling inference to be drawn from Plaintiffs' Complaint is a non-fraudulent one.

### 3.      Plaintiffs Fail to Plead Loss Causation

Defendants' Opening Brief explained that Plaintiffs failed to show a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted).  Such a link is established where "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."  *Id.* at 173 (quoting *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).  The Complaint does not meet this pleading standard.  MTD 34-37.

Plaintiffs' Opposition does not establish the necessary loss-causation link.  Plaintiffs principally rely on a materialization-of-risk theory based on delayed or aborted flights, which Plaintiffs claim "constructively disclos[ed]" previously concealed risks.  Opp. 37-38 (quoting *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020)).  But far from being concealed, the risk that there could be delays for maintenance or safety reasons was repeatedly disclosed to investors.  MTD 6-7.  A loss resulting from the materialization of a disclosed risk cannot establish loss causation.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d

Cir. 2010) ("A misrepresentation is 'the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations . . . .'" (quoting *Lentell*, 396 F.3d at 173)).  Accordingly, Virgin Galactic's later announcements of delays on August 4, 2020, December 14, 2020, February 25, 2021, and October 14, 2021 (Opp. 38) that resulted in stock price declines do not satisfy the loss-causation requirement.

Plaintiffs rely on *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160 (2d Cir. 2015), but that is not a materialization-of-risk case at all.  *Loreley* involved misrepresentations that investment vehicles were responsibly managed, when in fact the vehicles were investing in toxic assets.  *Id.* at 186.  In *Loreley*, the market was, of course, not warned that those assets might be toxic—and so when that toxicity was disclosed, and the stock price dropped, it was reasonable to infer loss causation.  *Id.* at 188-89.  But, here, the market was warned about the prospect of delays.  That the stock declined when those delays were announced was the materialization of a disclosed (not concealed) risk, and thus cannot satisfy loss causation as a matter of law.

Nor can Plaintiffs' claims proceed on a corrective-disclosure theory of loss causation. Plaintiffs belatedly attempt to supply in their Opposition the corrective disclosures they failed to plead in their Complaint.  But none connects the loss (as it must) to the "correction" of any material misstatement or omission.  First, as noted above, disclosure of information about delays or specific setbacks could not have corrected any prior statement because Virgin Galactic consistently cautioned investors about the risk of delays associated with safety, design, and maintenance concerns.  MTD 36-37 (citing Ex. 2 at 34 (Aug. 7, 2019 S-4)).  Without a connection between the bad news that is disclosed and a prior risk that was concealed, pleading "a drop in stock price following an announcement of bad news" does not suffice to allege loss

30

causation. *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 471 (E.D.N.Y. 2020) (citation omitted); *cf. In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 367 (S.D.N.Y. 2009) (disclosed risk of company's quick sale of asset that caused stock drop was closely related to undisclosed liquidity problems).

Plaintiffs' sole non-delay disclosure—the February 1, 2021 *Washington Post* article—fares no better. Plaintiffs point to the publication of this *Washington Post* article describing the February 2019 flight's effect on Unity's horizontal stabilizers and Mr. Ericson's resignation as a corrective disclosure. Opp. 38. But Plaintiffs make no effort whatsoever to connect that loss to any particular false or misleading statement. Tellingly, Plaintiffs describe the *Post* article as "plainly a corrective disclosure" but fail to identify what misrepresentation it is supposed to have corrected. *Id.* Adequately pleading loss causation requires more than simply pointing to adverse news that leads to a stock decline—it requires a plaintiff to trace the decline to a material misrepresentation or omission that was required to be disclosed by law. *Omnicom*, 597 F.3d at 510 ("[P]laintiffs must show 'a sufficient connection between [the fraudulent conduct] and the losses suffered.'" (citation omitted)). Defendants were not required by law to specifically disclose either the damage to the horizontal stabilizers or Mr. Ericson's resignation. *See supra* at 8. And the only statements that Plaintiffs identify relating to the stabilizers at all (Statements 26-28 (Compl. ¶¶ 551, 553, 555), discussing how the stabilizers had been upgraded and improved) were neither false nor misleading. *See supra* at 7. Plaintiffs thus fail to establish that any loss caused by the *Post* article was causally connected to Defendants' statements.

Finally, Plaintiffs characterize Defendants' loss causation argument as a "truth-on-the-market" defense that cannot be resolved at the motion to dismiss stage. Opp. 39 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)). To the contrary, the issue here is not

whether the market knew of the alleged omissions, but whether Plaintiffs have properly pleaded a stock price decline causally related to a disclosure.  It is Plaintiffs' burden under settled law to plead such a "causal connection."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Because they have failed to do so, the Complaint should be dismissed on this ground as well.

### B.      Plaintiffs' Section 20(a) and 20A Claims Fail

Because Plaintiffs have failed to plead a primary violation of the Exchange Act, Plaintiffs' Section 20(a) and Section 20A claims against the Individual Defendants fail.  *See* MTD 37.  And while Plaintiffs now argue that Richard Branson traded while in possession of material, non-public information because his July 2021 flight to space aboard Unity "had very nearly ended in disaster" (Opp. 40), this allegation does not appear in the Complaint.  Plaintiffs cannot use their Opposition to amend their Complaint.  *See Budhani v. Monster Energy Co.*, 2021 WL 5761902, at *3 (S.D.N.Y. Dec. 3, 2021).  And in any event, Plaintiffs do not offer a single, specific factual allegation establishing that Richard Branson actually had this purported information (*see generally* MTD 37-38), providing a further basis to dismiss this claim.

### C.      Dismissal Should Be With Prejudice

The many flaws in the Complaint cannot be cured by amendment.  Indeed, Plaintiffs request leave to amend, yet point to no allegation or theory that would salvage their claims.  Because "any amendment would be futile," the Court should dismiss the Complaint with prejudice.  MTD 38; *see also F5 Cap. v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017) (citing *Loreley*, 797 F.3d at 190).

### III.   CONCLUSION

Defendants respectfully request that the Court grant the motion to dismiss with prejudice.

Dated:   May 18, 2022

Respectfully submitted,

*/s/ Michele D. Johnson*

LATHAM & WATKINS LLP

Michele D. Johnson (*pro hac vice*)
Kristin N. Murphy (*pro hac vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
Facsimile: (714) 755-8290
Email: michele.johnson@lw.com
        kristin.murphy@lw.com

Colleen C. Smith (*pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
Email: colleen.smith@lw.com

*Attorneys for Defendants*

33