UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                     :
MARK KUSNIER and ROBERT SCHEELE, Individually    :        21-CV-03070-ARR-TAM
and On Behalf of All Others Similarly Situated,  :
                                                                     :
                    *Plaintiff,*                 :
                                                                     :        **OPINION & ORDER**
        -against-                                :
                                                                     :
VIRGIN GALACTIC HOLDINGS, INC., MICHAEL A.       :
COLGLAZIER, GEORGE WHITESIDES, MICHAEL           :
MOSES, RICHARD BRANSON, and CHAMATH              :
PALIHAPITIYA,                                    :
                                                 X
                    *Defendants.*

--------------------------------------------------------------------

        Plaintiffs Mark Kusnier, Robert Scheele, Xinqiang Cui, Justin Carough, Jennifer Ortiz, and

Richard O'Keefe-Jones bring this putative securities class action against defendants Virgin

Galactic Holdings, Inc. ("Virgin Galactic"), Richard Branson, Chamath Palihapitiya, George

Whitesides, Michael Moses, and Michael Colgazier[1] alleging violations of Sections 10(b), 20(a),

and 20A of the Securities Exchange Act of 1934 ("Exchange Act"). Defendants have moved to

dismiss the Corrected Amended Complaint in its entirety. For the reasons set forth below, I grant

this motion in part and grant plaintiffs leave to amend pursuant to Rule 15 of the Federal Rules of

Civil Procedure.

---

[1] The case caption also identifies Doug Ahrens and Jon Campagna as defendants, but plaintiffs
make no allegations regarding these individuals. The Clerk of Court is instructed to adjust the case
caption to the above.

## BACKGROUND

### *The Parties*

Plaintiffs Kusnier and Scheele purchased Virgin Galactic securities during the Class Period,[2] and plaintiffs Cui, Carlough, Ortiz, and O'Keefe-Jones purchased common stock in Virgin Galactic during the Class Period. Corrected Amended Compl. ¶¶ 28–29, ECF No. 36 ("Compl.").

Defendant Virgin Galactic was founded in 2004 and is in the business of taking customers to space. *Id.* ¶ 30. Virgin Galactic trades on the New York Stock Exchange under the ticker SPCE. *Id.* Defendant Branson is the founder of Virgin Galactic and was its controlling shareholder during the Class Period. *Id.* ¶ 31. Defendant Palihapitiya was Chairman of the Board of Social Capital Hedosophia Holdings Corp. ("Social Capital"), a special purpose acquisition company ("SPAC") that merged with Virgin Galactic in October 2019. *Id.* ¶¶ 32, 67. Following the October 2019 transaction, Palihapitiya was Chairman of the Board of Virgin Galactic. *Id.* ¶ 32.

Defendant Whitesides was Virgin Galactic's CEO from May 2010 through July 2020; he was replaced by Defendant Colgazier. *Id.* ¶¶ 33, 35. Defendant Moses is Virgin Galactic's President for Missions and Safety, a position he has held since June 2016; he was previously Virgin Galactic's Vice President of Operations. *Id.* ¶ 34.

### *Virgin Galactic's Spacecraft and Safety History*

The spacecraft utilized by Virgin Galactic during the Class Period, *Unity* and *Eve*, are a two-part system consisting of a carrier aircraft and a space shuttle. The carrier, *Eve*, takes the space shuttle to 45,000 feet, then releases the shuttle, *Unity*, which activates its own engine and flies to approximately 275,000 feet, the definition of "space" under U.S. law. *Id.* ¶¶ 4, 5, 82. The shuttle then glides down to Earth from space using a process known as "feathering," through which *Unity*

---

[2] Defined as July 10, 2019 through October 14, 2021, inclusive. Corrected Amended Compl. ¶ 1, ECF No. 36.

deploys wings (the "feather") in the higher, thinner part of the atmosphere to slow and stabilize the shuttle on reentry. *Id.* ¶¶ 84–85. Lower to the Earth's surface, where the atmosphere is thicker, the pilot retracts the feather and glides the shuttle to a landing strip. *Id.* ¶ 86.

Working with aircraft prototype maker Scaled Composites, Virgin Galactic developed a shuttle, *Enterprise*, and began operations and safety testing. *Id.* ¶ 87. Scaled Composites and Virgin Galactic conducted three types of flight tests (in addition to ground testing). *Id.* ¶¶ 97–99. The "least risky" type of test flight is a "captive carry flight," during which the carrier takes the shuttle to 45,000 feet but does not release it. *Id.* ¶ 97. Next, in a "glide test," the carrier releases the shuttle, but the shuttle does not engage its own engine and instead glides to a landing strip. *Id.* ¶ 98. Finally, in a "powered test," the carrier releases the shuttle, which engages its engine and proceeds to space before gliding back to the landing strip. *Id.* ¶ 99. During *Enterprise*'s development, Virgin Galactic conducted thirty glide tests and three "limited powered tests" during which the pilot engaged the rocket motor for less time than needed to reach space (approximately 60 seconds). *Id.* ¶ 100. During its first full powered test in October 2014, *Enterprise* disintegrated mid-flight as a result of the premature deployment of the feather, killing the co-pilot and severely injuring the pilot. Plaintiffs contend the accident was a result of Virgin Galactic's design flaws and failure to properly train pilots not to engage the feather prematurely. *See id.* ¶¶ 101–11.

As a result of the *Enterprise* accident, Virgin Galactic (1) implemented an overhauled testing program, (2) severed its relationship with Scaled Composites and determined to build craft only through The Spaceship Company, Virgin Galactic's sister company, and (3) took over from Scaled Composites the construction of *Unity*. *Id.* ¶¶ 121–23.

***Unsuccessful Powered Tests***

Virgin Galactic's safety testing of *Unity* revealed significant problems with its safety both before and during the Class Period. After several successful glide flights, Virgin Galactic

conducted a final glide flight on January 11, 2018, during which *Unity*'s left horizontal stabilizer

became stuck, a potentially disastrous problem. *Id.* ¶ 133. Virgin Galactic described this flight as

"successfully completed" and "well-executed" in a post-flight press release and did not describe

the issue with the horizontal stabilizer. *Id.* ¶ 134.

Virgin Galactic proceeded to conduct test powered flights with *Unity*, including:

- An April 5, 2018 flight during which the pilot aborted *Unity*'s ascent because his instruments were "messed up" and "nearly took *Unity* off course." *Id.* ¶ 135. Virgin Galactic's post-test press release did not mention the failure of its instruments or the fact that the flight nearly flew off course. *Id.* ¶ 136.
- A July 26, 2018 powered flight during which the pilot inadvertently activated *Unity*'s Reaction Control System, a series of pressurized nozzles used to control *Unity*'s movement in space and thin atmospheres, which caused *Unity* to roll "at a rate 10 times higher than its recommended maximum." *Id.* ¶ 139. Virgin Galactic was aware of the potential for this problem to arise before the test flight but did not fix the issue ahead of time. *Id.* ¶ 138. Virgin Galactic characterized the flight as "another significant step towards commercial service" and did not mention the issue with the Reaction Control System. *Id.* ¶ 140.
- A December 2018 flight during which *Unity* "began veering off course" 30 seconds into its 60-second flight path. *Id.* ¶ 297. Veering off course is dangerous because *Unity* glides to a landing and does not have the ability to reach a landing strip using its own engine. *Id.*

Following the powered flight testing, Virgin Galactic believed it was ready send its first non-

pilot "astronaut" to space. *Id.* ¶ 298. On February 22, 2019, *Eve* and *Unity* took Beth Moses, Virgin

Galactic's chief customer trainer (and wife of defendant Moses), to space. *Id.* ¶¶ 117, 299. During

this flight, *Unity* "suffered critical damage[] to its horizontal stabilizers" which was so extensive

that one employee told a journalist "I don't know how we didn't lose the vehicle and kill three

people." *Id.* ¶ 300. Virgin Galactic employees, including defendant Moses, "immediately noticed

a large gash running along the trailing edge of the right horizontal stabilizer," which was "way too

damaged to fly again." *Id.* ¶¶ 302, 304. The only reason the flight did not end in disaster was that

the horizontal stabilizer was damaged in the exact right spot to avoid destruction. *Id.* ¶ 305. Virgin

Galactic did not mention this incident in its post-flight press release. *Id.* ¶¶ 318–20.

*Engineering and Inspection Flaws*

Plaintiffs allege that Virgin Galactic's vehicles suffered from a series of design, engineering, and inspection flaws. Scaled Composites built *Eve* and had partially completed construction of *Unity* when it was turned over to Virgin Galactic, and *Unity* was completed based on Scaled Composites' designs. *Id.* ¶ 142. Scaled Composites never "produce[d] detailed designs and engineering drawings" to Virgin Galactic, such that "Virgin Galactic was continuously discovering that parts were included in *Unity* and *Eve*'s technical drawings that did not exist," making it impossible to model how the crafts would behave under certain conditions. *Id.* ¶¶ 145, 147. A confidential witness described Virgin Galactic as putting "blind faith" in the engineering drawings they had received from Scaled Composites. *Id.* ¶ 173. Another stated that the drawings they had received "did not have enough detail for Virgin Galactic to understand [components'] dimensions or specifications," nor could Virgin Galactic "know why a change was made" to a given part's specifications. *Id.* ¶¶ 175–76. The result was time-wasting attempts to "reverse engineer" the vehicles' construction. *Id.* ¶ 178.

Virgin Galactic then "compounded the problems by failing to consistently keep track of the modifications it was making," or by failing to "keep track of the parts it used to make repairs." *Id.* ¶ 148. Confidential witnesses describe that Virgin Galactic's system for tracking modifications to *Unity* and *Eve* as "a chaotic mess" that was not capable of tracking further changes to engineering orders after they were "published" to technicians. *Id.* ¶¶ 198–99. The system also erased technicians' notes of the name, lot number, serial number, and expiration date of parts that they had replaced. *Id.* ¶ 204. As a result, "engineers frequently did not know how old *Unity*'s components were," meaning that "Virgin Galactic would not know if a part has endured too much wear and tear and should either be replaced or taken in for some maintenance." *Id.* ¶ 209. In sum, a confidential witness describes Virgin Galactic's documentation of maintenance as "loosey-

goosey." *Id.* ¶ 216. Concerns about Virgin Galactic's ability to make repairs were amplified by a practice of "deliberately concealing problems" in order to maintain flight schedules. *Id.* ¶ 233. In one instance, a confidential witness stated that he heard a Vice President direct a colleague not to present slides about deferring maintenance to preserve flight schedules. *Id.* Another confidential witness stated that safety engineers "told management" that ignorance of the configuration of *Unity* was dangerous. *Id.* ¶ 235. Four confidential witnesses stated that they felt management set "unrealistic deadlines." *Id.* ¶ 246.

Further, "Virgin Galactic's inspections and processes could not reliably detect problems" and were "largely pro forma." *Id.* ¶ 151. Confidential witnesses described the inspections process as "pencil-whipping," *i.e.*, signing off on inspections that were not conducted or were conducted improperly. *Id.* ¶ 272. A confidential witness described inspectors as relying upon technicians who worked for the production department, a conflict of interest because that department had a vested interest in adhering to flight schedules. *Id.* ¶ 273. Further, technicians at Virgin Galactic "were not certified" under either Federal Aviation Administration ("FAA")[3] or industry guidelines. *Id.* ¶¶ 275–78. One confidential witness was hired to improve Virgin Galactic's inspection practices and found that inspectors were not adequately trained to, *e.g.*, inspect internal cracks using a borescope and determine how large they were. *Id.* ¶ 283. Finally, "Virgin Galactic ignored its own inspections." *Id.* ¶ 293.

As a result of these deficiencies, confidential witnesses described that *Eve* and *Unity* "constantly developed cracks," in particular in parts of the wings where components were bonded

---

[3] The Complaint acknowledges that FAA standards do not apply to Virgin Galactic. *See, e.g.*, *id.* ¶ 279.

with resin. *Id.* ¶¶ 254, 256. Prior to eventually hiring two individuals to investigate, Virgin Galactic "never attempted to determine why cracks formed on *Eve's* wings." *Id.* ¶ 261.

Plaintiffs allege the near-disastrous February 2019 flight resulted from these operational flaws within Virgin Galactic. Sometime before the flight, Virgin Galactic removed a layer of thermal protection from *Unity*'s horizontal stabilizers. *Id.* ¶ 306. To replace the layers, employees re-covered the surface with Kapton sheets, a film that provides thermal protection. *Id.* However, the technicians' application of Kapton covered holes in the horizontal stabilizers designed to vent air when moving to thinner atmospheres. *Id.* With nowhere to go during the February 2019 flight, the resulting air pressure cracked the horizontal stabilizers. *Id.* Following this incident, Moses was told that the Director of Maintenance should be fired, but Moses refused to do so. *Id.* ¶ 314. Moses later told the *Washington Post* that after the flight "the company immediately notified board members and shareholders as well as the FAA and kept them apprised regularly of what we were finding, as well as the corrective actions." *Id.* ¶ 327.

Following the February 2019 flight, Vice President of Safety Todd Ericson raised maintenance issues with Virgin Galactic's Board of Directors, telling the Board's safety committee that "failures in the maintenance organization were making the program unsafe and that if something didn't change someone was going to get killed." *Id.* ¶ 322. In response, the Board commissioned a report from a former Boeing executive, who interviewed those responsible for Virgin Galactic's safety. *Id.* ¶ 323. Based on this report, Virgin Galactic concluded that *Unity* was safe to fly. *Id.* ¶ 324. Believing his concerns were not taken seriously, Ericson resigned. *Id.* ¶ 326.

Virgin Galactic did not disclose the damage to *Unity* caused by the February 2019 flight in its SEC filings or otherwise; instead the *Washington Post* broke the news in a February 1, 2021 article. *Id.* ¶ 365.

***Delayed Attempts to Launch Branson into Space***

Virgin Galactic's "top priority" for 2020 was flying defendant Branson into space. *Id.* ¶ 330. On August 3, 2020, Virgin Galactic published a press release stating that Branson's flight would be delayed to 2021. *Id.* ¶ 331. Plaintiffs argue that this delay "was a materialization of the risk concealed by Defendants' fraud." *Id.* ¶ 333. All told, *Unity* did not fly for 14 months after the February 2019 flight, *id.* ¶ 334, because Virgin Galactic was (1) building replacement horizontal stabilizers, which ultimately weighed more than planned and required further modifications, and (2) Virgin Galactic "spent time addressing hazards it had known about for years," in particular *Unity*'s tendency to shake at certain speeds, by installing a digital stabilizer control system. *Id.* ¶¶ 336–48.

Virgin Galactic scheduled a powered flight for December 12, 2020, the first time since modifying *Unity*. *Id.* ¶ 356. After reaching 45,000 feet, *Unity* failed to start its rocket and the flight automatically aborted, due to electromatic interference between the digital stabilizer control system and the rocket motor controller. *Id.* ¶¶ 358–59. On December 14, 2020, Virgin Galactic published a press release stating that the cause of *Unity*'s failure to launch was the triggering of the failsafe system that halted ignition of the rocket motor. *Id.* ¶ 362.

After initially stating that the problem was solved and that Virgin Galactic intended to conduct another powered flight in mid-February, *id.* ¶ 363, the powered flight was further delayed because Virgin Galactic had not fully fixed the electromagnetic interference issue. *Id.* ¶¶ 376–78. Plaintiffs allege that "*Unity* could not have flown in February even if Virgin Galactic had fully addressed the electromagnetic interference problem," based on an anonymous source who told the *Washington Post* that "*Unity* had 'serious structure problems now appearing, including composite structure coming apart'" and a confidential witness who stated the February 2021 flight was delayed "because an inspection found serious problems that required repairs and modifications."

*Id.* ¶ 380. Virgin Galactic then conducted a powered flight on May 22, 2021, without issue. *Id.* ¶ 384.

### *Alleged Misrepresentations About Branson's Spaceflight*

On June 6, 2021, Virgin Galactic competitor Blue Origin announced that it would take its founder, Jeff Bezos, to space on July 20, 2021. *Id.* ¶ 385. In response, Virgin Galactic announced that it would take Branson to space on July 11, 2021. *Id.* ¶ 386. After Branson's flight, defendants declared the flight a "complete success." *Id.* ¶ 387. However, this was not the case—Branson's flight "dangerously strayed from its landing cone, thus imperiling the lives of its passengers." *Id.* ¶ 391. Because *Unity* glides to Earth rather than using fuel to land, pilots must ensure that the ship maintains position within a "landing cone" during the trip. *Id.* ¶ 393. If the ship leaves the cone, *Unity* may not be able to return to the landing strip and would need to crash land. *Id.* ¶ 394. In *Unity*, a yellow cockpit warning light indicates to pilots that *Unity* is about to leave the cone; a red light means that it has left the cone. *Id.* On September 1, 2021, the *New Yorker* reported that during Branson's flight, the red light flashed, meaning that *Unity* had strayed from the landing cone. *Id.* ¶ 397. *Unity* ultimately stayed outside of the cone for 1 minute and 41 seconds, approximately 10% of the flight. *Id.* ¶ 399.

This deviation attracted the attention of the FAA, which investigated the flight for straying from its assigned airspace. *Id.* ¶ 398. The plaintiffs note that "per FAA regulations, [the departure] is considered a mishap," a term of art describing "a serious incident that did not result in an accident." *Id.* ¶ 402 & n.16. ON September 2, 2021, the FAA announced it was grounding *Unity*. *Id.* ¶ 408. On September 16, 2021, Virgin Galactic announced that it had resolved the FAA's concerns. *Id.* ¶ 405.

***Virgin Galactic Becomes a Public Company Through a De-SPAC Transaction***

The purpose of a SPAC such as Social Capital is to acquire another company via reverse merger. *Id.* ¶¶ 51, 53. The SPAC first goes public through a traditional initial public offering, after which the cash raised via the SPAC's IPO is maintained in a trust account. *Id.* ¶ 52. When a private company wishes to go public via a SPAC transaction, the SPAC formally acquires the private company, but issues SPAC shares to the private company's shareholders, "such that they hold the majority, and usually the substantial majority, of the SPAC's shares." *Id.* ¶ 53. Following the SPAC's acquisition of the private company, the SPAC assumes the private company's name and operations, SPAC shares are mostly held by the shareholders in the original private company, and the private company receives the cash that was held in the SPAC's trust account. *Id.* ¶ 54. Together, this series of transactions is known as a "de-SPAC" transaction. *Id.*

A SPAC's structure is designed to encourage its sponsors, here Palihapitiya, to conduct a de-SPAC transaction and take a private company public. *Id.* ¶ 55. Ordinarily if a transaction is consummated, the SPAC's sponsor is entitled to new shares in the SPAC, usually equivalent to 25% of the SPAC's pre-merger shares. *Id.* If a de-SPAC transaction is not completed within two years, the sponsor does not receive the additional shares, the SPAC's trust is liquidated, and the proceeds are returned to investors on a *pro rata* basis. *Id.* ¶ 56. Therefore, a SPAC sponsor earns considerably more if it completes a de-SPAC transaction by the assigned transaction date. Social Capital's transaction date was September 18, 2019. *Id.* ¶¶ 63–64.

***Defendants' Rationale for Taking Virgin Galactic Public***

Plaintiffs allege that Branson's decision to take Virgin Galactic public was driven by his need for cash and desire to avoid losing control of Virgin Atlantic, an airline company Branson founded. *Id.* ¶¶ 424–26. Branson considered Virgin Atlantic the "crown jewel of his empire" and like "one of his children." *Id.* ¶ 423. In May 2017, Branson held 51% of Virgin Atlantic's shares, but

"reluctantly" agreed to sell a 31% stake to Air France-KLM, meaning that he would lose control. *Id.* ¶ 425. Plaintiffs attribute Branson's decision to sell this stake in Virgin Atlantic to the fact that he was "cash poor" and "most of [his] companies were private, meaning that he could not easily sell their shares to meet his pressing needs for cash." *Id.* ¶¶ 426–27.

In October 2018, sixteen months after Branson agreed to sell his stake in Virgin Atlantic, Virgin Galactic began exploring a merger with Social Capital. *Id.* ¶ 430. Merger discussions began in January 2019, and in February 2019, the parties negotiated an additional transaction through which Virgin Galactic would purchase up to $100 million in shares from Viceo 10 Ltd., a company 80.7% owned by Branson. *Id.* ¶¶ 430–31. During the parties' negotiations, this amount increased to $200 million, *id.* ¶ 432, subject to a requirement that Virgin Galactic have $500 million in cash on hand after the SPAC transaction was completed (*i.e.*, Virgin Galactic's ability to purchase shares from Viceo 10 Ltd. was limited by its post-transaction cash balance), *id.* ¶ 435. Branson and Palihapitiya also negotiated for Palihapitiya to purchase an additional $100 million in shares from Viceo 10 Ltd. *Id.* ¶ 433. When the de-SPAC transaction closed, Virgin Galactic ultimately purchased only $52.1 million in Viceo 10 Ltd. shares. *Id.* ¶ 436.

Plaintiffs allege that Palihapitiya's involvement in SPACs arose from the failure of his venture capital fund, *id.* ¶¶ 447–53, and that Palihapitiya saw SPACs as a means of resurrecting his career. *Id.* ¶ 456.

The Virgin Galactic de-SPAC transaction closed on October 25, 2019. *Id.* ¶ 67. As a result of the transaction, Virgin Galactic's shareholders were issued 130 million shares at $10 each; Social Capital's existing shareholders held about 65 million shares; Social Capital's sponsors, including Palihapitiya, were issued 15.75 million new shares for free; Palihapitiya bought 10 million shares for $100 million from Viceo 10 Ltd.; and Virgin Galactic repurchased about 5.2 million shares

from Viceo 10 Ltd. *Id.* ¶¶ 66–67. As a result of these transactions, Branson received approximately

$152.1 million from the de-SPAC transaction.[4] *Id.* ¶ 436.

The proceeds from the de-SPAC transaction allowed Branson "to keep his controlling interest

in Virgin Atlantic, particularly as Branson could now sell Virgin Galactic stock on the open market

when he needed more cash." *Id.* ¶ 437. Plaintiffs suggest that the sale of 31% of Virgin Atlantic to

Air France-KLM was cancelled because Branson now had cash from Virgin Galactic. *See id.*

### Defendants' Stock Sales During the Class Period

Branson "sold every Virgin Galactic share he was allowed to sell during the Class Period," for

total proceeds of approximately $891.7 million. *Id.* ¶¶ 440–43. During the Class Period, Virgin

Galactic sold shares for total proceeds of approximately $960.2 million. *Id.* ¶ 445. Palihapitiya

also sold all the stock he was able to sell for total proceeds of approximately $310.6 million. *Id.*

¶ 462. A timeline of defendants' stock sales is set forth below:

- On May 14-22, 2020, Branson, through Viceo 10, sold 23.7 million shares for $358.8 million, *id.* ¶ 440(a);
- On June 2, 2020, Branson, through Viceo 10, sold 12.5 million shares for $188.3 million, *id.* ¶ 440(b);
- On August 5, 2020, Virgin Galactic sold 23.6 million shares of stock for $460.2 million, *id.* ¶ 445(a);
- On December 14 and 15, 2020, Palihapitiya sold 3.8 million shares for $97.8 million, *id.* ¶ 462(c);
- On March 2 and 3, 2021, Palihapitiya sold 6.2 million shares for $212.8 million, *id.* ¶ 462(d);
- Between April 12 and April 14, 2021, Branson sold approximately 5.6 million shares for $150.3 million, *id.* ¶ 440(d);
- Between July 12 and July 16, 2021, Virgin Galactic sold approximately 13.7 million shares for $500 million, *id.* ¶ 445(b); and
- Between August 10 and August 12, 2021, Branson sold 10.4 million shares for $299.9 million, *id.* ¶ 440(e).

---

[4] Plaintiffs assume that the full proceeds of the two transactions with Viceo 10 Ltd. went to Branson, although Branson held 80.7 percent of Viceo 10 Ltd. *See id.* ¶ 436 (stating full proceeds of $152.1 million went to Branson).

*Procedural History*

Plaintiff Lavin filed his initial Complaint on May 28, 2021. ECF No. 1. Following motion practice concerning appointment of the lead plaintiff in this putative securities class action, the court appointed Robert Scheele and Mark Kusnier lead plaintiffs and appointed co-class counsel. ECF No. 22. Plaintiffs then filed their Corrected Amended Complaint on December 7, 2021. ECF No. 36.

Defendants filed a motion to dismiss on April 4, 2022. *See* ECF No. 51; Defs.' Mem. in Supp. Mot. Dismiss, ECF No. 53 ("Mem."). Plaintiffs filed their opposition on May 4, 2022. Pls.' Mem. in Opp'n Mot. Dismiss, ECF No. 56 ("Opp'n"). Defendants filed a reply on May 18, 2022. Defs.' Reply in Supp. Mot. Dismiss, ECF No. 57 ("Reply").

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), I accept all factual allegations in the Complaint as true and draw all reasonable inferences in favor of the non-moving party. *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). The Complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Accordingly, only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 476 (2d Cir. 2009). I am "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In securities fraud cases such as this one, the Private Securities Litigation Reform Act ("PSLRA") requires that the complaint "specify each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Rule 9(b) of the Federal Rules of Civil Procedure imposes a comparable requirement on allegations of fraud. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

### *Exchange Act Section 10(b)*

Plaintiffs allege that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by "disseminat[ing] or approv[ing]" a number of "materially false and misleading statements . . . which they knew, or were deliberately reckless in not knowing, were misleading." Compl. ¶ 596.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" the SEC's rules and regulations. 15 U.S.C. § 78j(b). Rule 10b-5 in turn prohibits "mak[ing] any untrue statement of a material fact or [] omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. Because Section 10(b) claims sound in fraud, plaintiffs' allegations must meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the PSLRA. *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 535 (S.D.N.Y. 2017). Plaintiffs must plead six elements: "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation and citation omitted). Defendants challenge only the elements requiring a materially misleading statement or omission, loss causation, and scienter. *See generally* Mem. Accordingly, I address only these elements.

## DISCUSSION

### *Material Misrepresentations*

Under Rule 10b-5, an omission is "material" where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The challenged statement must be both material and misleading; "[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Id.* at 238. "[T]he materiality of an omission [or false statement] is a mixed question of law and fact," and I must "analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

Plaintiffs have alleged that 35 statements made by defendants over the course of the Class Period were materially misleading. *See* Compl. ¶¶ 497–571; *see also* Mem. App. A, ECF No. 53-1 (defendants' chart summarizing challenged statements).

### *1. Defendants' "Puzzle Pleading" and Waiver Arguments*

Defendants contend that plaintiffs' Complaint should be dismissed because it constitutes improper "puzzle pleading," that is, it "places the burden on courts and defendants to 'determine on [their] own initiative how and why . . . statements were false.'" Mem. 12 (quoting *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012)). While *Bahash*

found that the operative complaint failed to plead with specificity "the reasons why [each] statement [is] misleading" as required under the PSLRA, plaintiffs in that case had simply referred the court and defendants to a single cross-referenced paragraph and "the factual detail contained throughout [the] Complaint." 506 F. App'x at 38. Here, plaintiffs have identified specific statements (and added emphasis where challenged assertions are embedded in longer passages) and followed each by a list of reasons why those statements are allegedly misleading. Although plaintiffs' stated reasons are unnecessarily voluminous, defendants and I had no trouble determining why plaintiffs allege the statements were false. I decline to dismiss the claims on these grounds.

In their reply brief, defendants argue that the plaintiffs did not "separately address" certain statements that defendants highlighted in their briefing and that I should therefore consider plaintiffs' reliance on these statements to be waived or abandoned. Reply 9 (suggesting that plaintiffs' reference to a number of statements solely via footnote waived argument). On review of the plaintiffs' opposition, I conclude that they have not waived argument as to any challenged statements. Though defendants complain that plaintiffs addressed argument as to 16 statements via footnote, in context it is clear that plaintiffs are identifying these statements as examples of their argument that "[b]y responding that VG's program was safe and detailing some of the steps they had taken, [d]efendants misleadingly conveyed that there were no major undisclosed safety deficiencies" and "[d]efendants induced investors to rely upon their assurances about VG's supposed safety by constantly repeating them." Opp'n 19 & n.14. Defendants' reliance on *Fin Guar. Ins. Co. v. Putnam Advisory Co.* is misplaced; in that case, the court denied a request to file a supplemental summary judgment motion because the defendants failed to raise an affirmative defense at the motion to dismiss stage *and* raised the affirmative defense for the first time via

footnote in its summary judgment briefing. No. 12 Civ. 7372 (AT), 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020). I will not consider these arguments waived solely because plaintiffs addressed them via footnote.[5]

### 2.   *Opinion Statements*

Defendants contend that four of the statements alleged to be misleading are inactionable opinion statements. Mem. 22 & App. A (citing statements in Compl. ¶¶ 497, 516, 526, 564).

The Supreme Court elaborated on the standard for challenging a statement of opinion in *Omnicare, Inc. v. Labs. Dist. Council Construction Indus. Pension Fund*. 575 U.S. 175 (2015) (applying standard to Section 11 of the Securities Act of 1933); *see also Tongue v. Sanofi*, 816 F.3d 199, 209–14 (2d Cir. 2016) (applying the same standard to Section 10(b) claims). The Court explained that "[a] reasonable person understands, and takes into account, the difference . . . between a statement of fact and one of opinion," but also agreed that a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 187–89. An opinion statement can be materially misleading, but "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context," which the Court noted "is no small task for an investor." *Id.* at 194. The Court also cautioned that "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts" and "[a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion

---

[5] Defendants also argue for waiver of plaintiffs' arguments that certain statements are not puffery because plaintiffs merely argued via footnote that the cases cited by defendants on this point were "distinguishable." Reply 17 (citing Opp'n 17 n.11). I decline to find these arguments were waived for the same reasons.

statement," so that an opinion statement "is not necessarily misleading, when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189–90 (emphasis in original).

First, although plaintiffs contend that the statement "[Virgin Galactic] believes it has now reached an inflection point in its development as it progresses towards launching commercial operations" following the December 2018 and February 2019 test flights is a statement of fact rather than opinion, *see* Opp'n 16 (citing Compl. ¶ 497), this is an opinion statement. Virgin Galactic's belief that it was at an "inflection point" is "a generalized statement of subjective optimism," and no reasonable investor would have understood this statement to convey a particular fact about Virgin Galactic's tests. *Sanofi*, 816 F.3d at 213. Plaintiffs concede that the rest of this statement and the other statements identified by defendants are opinion statements and contend that they are materially misleading under *Omnicare* because they did not align with defendants' knowledge of safety problems and conflict with a reasonable investor's understanding of the statements. *See* Opp'n 19–20.

I find that the statement in Compl. ¶ 497 that test flights had "demonstrated the repeatability of the full flight profile" and showed that VG "ha[d] overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service" was materially misleading in context. Where an "opinion [is] without a basis in fact or the speakers [are] aware of facts undermining the positive statements," even an "optimistic projection[] of future performance" may be actionable. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006). When this statement was made, Virgin Galactic had grounded *Unity* to address safety issues following a flight in which its horizontal stabilizers "suffered critical damage" and needed complete replacement. Compl. ¶¶ 300, 498. Although defendants argue that this damage is a "purported safety, design, and[/or] maintenance issue[]" and a mere "fact cutting

18

the other way" under *Omnicare*, Mem. 24, a reasonable investor reading the statement that test flights "demonstrated the repeatability of the full flight profile" and had resulted in the company "overcom[ing] a substantial number of technical hurdles" would conclude that Virgin Galactic believed only minor technical challenges remained. Unlike the defendants' statements that they expected a decision on FDA approval for a key drug by the end of the year in *Sanofi*, 816 F.3d at 205, Virgin Galactic lacked a reasonable basis to opine that it had "overcome a substantial number of technical hurdles" and "demonstrated the repeatability of the full flight profile" at the time this statement was made. The statement in Compl. ¶ 526 is materially misleading for the same reasons. This statement was made shortly after the February 2019 flight which left *Unity* critically damaged and was a near-disaster. Defendants contend that there is no "basis for concluding that a reasonable investor would assume these opinions implied that test-pilots were at no risk or that the test flights encountered no operational issues." Reply 20. I agree that a reasonable investor, reading a description of the test flight as "safe," would not conclude that the flights lacked risk or were operationally perfect. However, the February 2019 test flight did not suffer from a minor operational problem but a serious structural failure of the spacecraft. As a confidential witnesses described, the horizontal stabilizer "popped like a bag of chips," but avoided disaster because it popped in the "right spot." Compl. ¶ 305. A reasonable investor would not conclude that this level occurred from the description of the flight as "safe." Accordingly, this statement is materially misleading.

The statement in Compl. ¶ 516 is not materially misleading. Whitesides stated that "we've been flight testing these vehicles . . . and we believe we have an architecture that is extremely reliable." *Id.* Many of the facts proffered by plaintiffs to suggest that this statement was misleading actually support Whitesides' opinion, including that *Unity* was grounded to address safety

problems at the time this statement was made. *Id.* ¶ 517. Although plaintiffs contend that "Virgin Galactic had encountered unresolved major safety problems in its first, third, fourth, and fifth powered flights," *id.*, there is no suggestion in the Complaint that Virgin Galactic did not act to correct these problems. Plaintiffs have not demonstrated that Whitesides had contrary information at the time he made this statement or that his opinion that the safety processes of Virgin Galactic were "extremely reliable" was undercut by a fact so significant that it needed to be disclosed to render his opinion not materially misleading. *Compare Omnicare*, 575 U.S. at 189–90 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion."). For the same reasons, I find the statement in Compl. ¶ 564 that "I would say safety is built in at the foundation of everything we do" is not materially misleading.

   *3.   Statements Subject to the PSLRA's Safe Harbor for Forward-Looking Statements*

   Defendants identify five challenged statements that are forward-looking and therefore not actionable under the PSLRA's "safe harbor." Mem. 17–18 (citing Compl. ¶¶ 499, 514, 518, 522, 540). The PSLRA provides that a person "shall not be liable with respect to any forward-looking statement, whether written or oral" if that statement is (i) identified as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" (ii) immaterial; or (iii) "made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). A "forward-looking statement" includes "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," and "a statement of future economic performance." *Id.* § 78u-5(i)(1).

   Plaintiffs contend that no statement is forward-looking because each "purported to represent the then-current state of [Virgin Galactic's] test flight program." Opp'n 22–23. Plaintiffs note the

statements are in the present tense; for instance, Compl. ¶ 499 identifies Branson as stating that "*we are* on track for our beautiful spaceship to begin commercial service." *Id.* at 22 (emphasis added). The only authority cited by plaintiffs for the proposition that present tense statements cannot be forward-looking is *In re Vivendi Universal, S.A. Sec. Litig.*, however that case found that the defendants had not satisfied the PSLRA's requirements that the statements be accompanied by meaningful cautionary statements and that the plaintiff had "allege[d] facts showing that the speaker did not genuinely or reasonably believe the statements at the time they were made." No. 02 Civ. 5571 (RJH), 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004) (quotation omitted) In other words, the statements in *Vivendi* could not meet the requirements of the safe harbor. Courts in this circuit have often held that statements that refer to a company being "presently on track" with goals are forward-looking. *See, e.g.*, *Villare v. Abiomed, Inc.*, No. 19 CIV 7319 (ER), 2021 WL 4311749, at *17 (S.D.N.Y. Sept. 21, 2021) (collecting cases). Each of the statements identified by defendants is "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer" and is therefore a "forward-looking statement" within the meaning of the PSLRA. *See* Compl. ¶ 499 ("[W]e are on track for our beautiful spaceship to begin commercial service."); *id.* ¶ 514 ("[W]e'll then do a few more test flights. Then next year I'll go up, and then we'll start putting people up."); *id.* ¶ 518 ("[N]ext year I'll be going into space, and we'll be starting to send a lot of people into space."); *id.* ¶ 522 ("[Commercial flights will] begin in about six to nine months. . . . We'll start commercial operations in the middle of next year."); *id.* ¶ 540 ("I think it's fair to say that we are now within spitting distance [of ending technical testing] and we are in a multi-month march to commercial ops.").

Plaintiffs next argue that the statements are not accompanied by meaningful cautionary language because they failed to disclose that Virgin Galactic was "already experiencing" the risks warned of—safety issues resulting in delayed flights. Opp'n 23. Defendants respond that their public filings disclosed that "significant delays" were possible owing to "changes to the spaceflight system" following test flights, or that Virgin Galactic might be unable to "operate [its] current spaceflight system . . . for a number of reasons, including . . . maintenance issues [and] design and engineering flaws." Mem. 18 (citing Aug. 7, 2019 Form S-4, Mem. Ex. 2 at 34, ECF No. 53-2 (hereinafter "Ex. 2")). In their reply brief, defendants also identify the risk factor that "[h]istorically, changes have been required and implementing those changes has resulted in additional delay and expense." Reply 15 (citing Ex. 2 at 34). It is true that where disclosures "fail[] to warn investors that the risks [identified by cautionary statements] were not hypothetical," the safe harbor does not apply because the risks identified have become much more likely. *See City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132(CM)(THK), 2013 WL 1197755, at *14 (S.D.N.Y. Mar. 25, 2013). However, plaintiffs do not identify what had ceased to be "hypothetical" about defendants' warnings. I assume based on the common allegation that *Unity* was grounded at the time the majority of these statements were made that plaintiffs contend that the risk of a safety-related grounding had materialized. However, investors were well-aware of delays in Virgin Galactic's test flight program at the time each of these statements were made—with respect to the statements identified in Compl. ¶¶ 499, 514, 518, and 522, there is no allegation in the Complaint that Virgin Galactic concealed from the public that it had not conducted a test flight since February 2019.[6] Nor is there any reason to conclude that the then-nine-month gap between the February

---

[6] The statement in Compl. ¶ 540 was made after *Unity* had been repaired and Virgin Galactic had conducted another test flight, apparently without incident. Plaintiffs do not specify a risk that had

22

2019 powered test flight and the November 20, 2019 statement by Palihapitiya identified in Compl. ¶ 522 would have been understood by a reasonable investor to be unrelated to safety or maintenance, given defendants' on-point disclosures of these risks. I find that these disclosures properly identified the risk that would render Virgin Galactic's actual results different from those discussed in the challenged forward-looking statements.

Plaintiffs' claims that the PSLRA safe harbor does not apply fail for the independent reason that plaintiffs have failed to plead actual knowledge on the part of any defendant. *See Villare*, 2021 WL 4311749, at *17 (noting that "the scienter requirement for forward-looking statements—actual knowledge—is stricter than for statements of current fact" (citation omitted)). To do so, plaintiffs must demonstrate that defendants either did not genuinely believe their statements, actually knew they had no reasonable basis for making the statement, or were aware of undisclosed facts that would seriously undermine the accuracy of the statement. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 775 (2d Cir. 2010). Plaintiffs argue that actual knowledge can be inferred from their allegations because defendants "knew (and concealed) [*Unity*'s] major safety defects – including the fact that *Unity* was then-grounded and undergoing major repairs as a result of those defects." Opp'n 24. Assuming that plaintiffs have adequately pleaded knowledge of this fact, plaintiffs have failed to show that statements that "we are on track," "next year I'll go up, and then we'll start putting people up," "next year I'll be going into space," "we are in a multi-month march to commercial ops," or the projection that commercial flights would "begin in about six to nine months," are "seriously undermined" by the defendants' knowledge. Plaintiffs point to no facts

---

materialized that would remove this statement from the protection of the safe harbor. Accordingly, I find that this statement is subject to the PSLRA safe harbor.

that defendants were aware that *Unity*'s repairs would likely push the start of commercial operations beyond their promised timelines, only that they were aware *Unity* was grounded.

### 4. Puffery

Defendants argue that thirteen of the statements challenged by plaintiffs are non-actionable statements of corporate optimism, also known as puffery. Mem. 20 (citing statements in Compl. ¶¶ 497, 499, 501, 503, 520, 522, 526, 529, 540, 542, 566, 568, 570).[7] Puffery statements are those "optimistic statement[s] that [are] so vague, broad, and non-specific that a reasonable investor would not rely on [them], thereby rendering [them] immaterial as a matter of law." *Villare*, 2021 WL 4311749, at *13.

Courts generally find that present tense statements of optimism describing things as "going well," "progressing well," "just amazing," and the like are puffery because they are too general to be relied upon. *See In re Supercom Inc. Sec. Litig.*, No. 15 CIV. 9650 (PGG), 2018 WL 4926442, at *22 (S.D.N.Y. Oct. 10, 2018) (collecting cases). Similarly, boasts that a company had "risk management processes that are highly disciplined and designed to preserve the integrity of the risk management process" and "set the standard for integrity" are not actionable, at least insofar as they do not "amount to a guarantee that [the company's] choices would prevent failures." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009). Statements may be actionable if they are "guarantees or are supported by specific statements of fact." *Supercom*, 2018 WL 4926442, at *22 (quoting *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015)). Plaintiffs point to a line of cases holding that, where the statements discuss safety and the business operates

---

[7] I have already ruled on the statements in Compl. ¶¶ 497, 499, 522, 526, and 540 and do not revisit them.

in an industry in which safety is a particular concern, statements touting safety may not be puffery. Opp'n 18 (citing *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223 (S.D.N.Y. 2012) and *In re Vale S.A. Sec. Litig*, No. 19 CV 526 (RJD)(SJB), 2020 WL 2610979 (E.D.N.Y. May 20, 2020)). Where "it is to be expected that investors will be greatly concerned about [a company's] safety and training efforts," repeated assertions about safety cannot be deemed "obviously unimportant" puffery. *Transocean*, 866 F. Supp. 2d at 244. Still, "to the extent these statements contain purely aspirational language, such language is inactionable." *Vale*, 2020 WL 2610979, at *12.

The statement in Compl. ¶ 501 in which Palihapitiya hailed VG as "light years ahead of the competition" and boasted of its "uncompromising commitment to safety and customer satisfaction" is pure puffery. Much like the statement in *ECA* that the defendant had "risk management processes that are highly disciplined," Palihapitiya's statement that Virgin Galactic has an "uncompromising commitment to safety" does not guarantee that Virgin Galactic would prevent failure and is so general that no reasonable investor would depend upon it. 553 F.3d at 205; *see also Vale*, 2020 WL 2610979, at *12 (statement that defendant "strives to achieve Zero Damage" not actionable). Similarly, Branson's statement that Virgin Galactic has "a tested and tried system that is performing well" and Whitesides' later statement that *Unity* "will enable hundreds and then thousands of people to embark on one of the most unforgettable journeys of their lives" are classic puffery. Compl. ¶¶ 520, 542. These statements convey nothing of substance to a reasonable investor.

On a February 25, 2020 call, Whitesides stated that Virgin Galactic "continued to achieve key milestones in our mission to open access to space in a safe, innovative and affordable way," citing Virgin Galactic's "strong momentum" toward a commercial launch. Compl. ¶ 529. Plaintiffs

contend that this is a "safety statement" of the kind found to be actionable in *Vale*. *See* Opp'n 18. However, unlike the statements in *Vale*, this statement more generically refers to Virgin Galactic reaching "key milestones" rather than tying them to particular events or safety programs. "Such a generalized statement of subjective optimism arguably does not even 'convey facts about how the speaker has formed the opinion.'" *Sanofi*, 816 F.3d at 213 (quoting *Omnicare*, 575 U.S. at 188). As such, this statement is puffery and not actionable.

However, the statement in Compl. ¶ 503 that Virgin Galactic "clear[ed] the huge technical milestone which came from demonstrating *Unity*'s full flight profile with two trips to space" is not puffery and in context is materially misleading. This statement affirmatively represents that Virgin Galactic had "demonstrate[ed] *Unity*'s full flight profile" and "clear[ed]" an important milestone. A reasonable investor would be interested in the progress of a commercial spaceflight company's testing program, and these statements are not so generic as to be ignored. Moreover, plaintiffs have adequately alleged that the "clearing of the huge technical milestone" of powered test flights also came with the sizable, undisclosed technical setback of the need to replace *Unity*'s horizontal stabilizers. This statement is thus materially misleading for the same reasons the statements in Compl. ¶¶ 497 and 526 are misleading. Additionally, although defendants do not argue that the statement in Compl. ¶ 505 is puffery, I hold that the statement that "[g]reat progress in our test flight program means that the remaining hurdles . . . are steadily being cleared" is materially misleading for the same reasons.

The statements in Compl. ¶¶ 566, 568, and 570 each discuss the July 11, 2021 flight that took Branson to space. Each positively describes the flight as, *e.g.*, "successful," "perfect," and "flawless." The statements in paragraphs 568 and 570 go further and attribute the success of the flight to "our incredibly safety diligent program . . . [which is] anchored in safety experience" and

state the flight was devoid of "major technical issues," respectively. These statements fall within the line of cases finding statements relating to safety are not puffery where repeated emphasis on safety as a priority "put[s] the topic at issue such that [I] cannot say that, as a matter of law, investors would not find certain representations material." *Vale*, 2020 WL 2610979, at \*12 (citation omitted). In context, these statements are not mere puffery and are materially misleading. The chairman of Virgin Galactic had just become among the first non-test pilots to fly on Virgin Galactic's spacecraft. The timing of his trip to space was allegedly pushed forward in order to ensure that he would be the first of many other entrepreneurs backing private spaceflight to reach space. Compl. ¶¶ 385–86. I cannot hold that statements conveying positive news following such a critical corporate event are immaterial to investors as a matter of law. A reasonable investor would not conclude from defendants' characterizations of the July 11, 2021 test flight as "successful," "perfect," and "flawless" that the flight had deviated from its vertical glide cone and FAA airspace. Each of these statements implies that the flight had, at most, minor problems. Plaintiffs have adequately alleged that a deviation from the glide cone is dangerous "because the vehicle may not have enough energy to make it back to the landing strip" and "would then have to land somewhere else." Compl. ¶ 394. And the flight's variance drew the attention of the FAA, which "ground[ed]" Virgin Galactic as a result. *Id.* ¶ 408.

5. *Remaining Statements*

As to the remaining statements, defendants contend that plaintiffs' theories rest on the proposition "that these statements were false or misleading because [d]efendants did not also disclose every detail regarding the purported design, safety, and maintenance issues identified during Virgin Galactic's testing program." Mem. 12–13.

27

a. *Test Flight Statements*

Besides those statements on which I have already ruled, defendants have identified five further "test flight statements" they contend plaintiffs have not shown are materially misleading. *Id.* at 13 (citing statements in Compl. ¶¶ 524, 531, 536, 538, 559). Plaintiffs repeat a similar list of alleged reasons why these statements were false including, *inter alia*, failure to disclose the close call on the February 2019 test flight, the fact that *Unity* had been grounded following the destruction of its horizontal stabilizers, *Eve*'s tendency to develop cracks on flights, *Eve* and *Unity*'s construction as prototypes, Virgin Galactic's lack of understanding as to craft configuration, and Virgin Galactic's inability to detect problems through its inspections. Mem. 14; *see* Compl. ¶¶ 525, 532, 537, 539, 560. Defendants characterize these allegations as imposing "an obligation to disclose every detail of every flight" and note that "the test flight program was successful in identifying safety and maintenance issues that needed to be addressed." Mem. 14.

The statements in Compl. ¶¶ 524, 531, and 538 are not materially misleading in context. With respect to the statement in ¶ 524, the truthful assertion that Virgin Galactic's craft went to space "again" and "with a third crew member on board" does not create a misleading impression that the February 2019 flight had no problems. Similarly, the statement that "Beth Moses . . . completed her first successful space flight" is not misleading. Compl. ¶ 531. Although plaintiffs contend that the February 2019 flight cannot be characterized as "successful" given its consequences to *Unity*, in context this statement refers to Beth Moses's experience as a non-pilot passenger. A reasonable investor would not interpret this statement as a complete endorsement of all aspects of the February 2019 flight, and plaintiffs have pleaded no facts that demonstrate that Beth Moses's passenger experience was not "successful." The statement in ¶ 538 describes a June 2020 glide test flight as "successful[]" and "important," such that Virgin Galactic could "start preparing the vehicles for powered flight." Plaintiffs have pleaded no facts that the June 2020 glide test was unsuccessful,

28

and, although they allege that this statement omits that "*Unity* was not ready for powered flights because Virgin Galactic employees were still installing parts necessary for it to function," *id.* ¶ 539, the statement truthfully discloses that Virgin Galactic would "*start preparing* the vehicles for powered flight." *Id.* ¶ 538 (emphasis added). Accordingly, it is not misleading.

The statement in Compl. ¶ 536 is not materially misleading. The flight it describes as "successful" is the December 2018 test flight. Plaintiffs have pleaded that this flight began "veering off course" and "rolling," but also that the pilot ultimately corrected the issue. Compl. ¶ 297. No reasonable investor would consider this statement materially misleading because it omitted to note that during the December 2018 test flight the pilot averted a potentially dangerous situation. With respect to the contention that it also implies the February 2019 flight was "successful," the statement is not materially misleading for the same reason that the statement in ¶ 531 is not misleading.

Following publication of the *Washington Post* article concerning Virgin Galactic's February 2019 test flight, defendant Moses told the *Post* that Virgin Galactic "thoroughly inspect[s] the vehicle, updating our analysis; we update and critique our performance and make sure we're happy with the results before we go to those next flights. . . . We take our time and make sure things are right." Compl. ¶ 559. Plaintiffs' litany of proffered reasons this statement is misleading do not hold up to scrutiny. As an initial matter, alleged omissions concerning the February 2019 test flight cannot support the argument that Moses's statement was misleading, because these alleged omissions had each been revealed to the market. *See* Compl. ¶ 365 (quoting from the February 1, 2021 *Washington Post* article about the February 2019 flight). Moses was not obligated to independently disclose the very facts his statements were responding to. Plaintiffs also contend that this statement was misleading because "*Eve* developed cracks every flight, many of which

29

were not being fixed; . . . Virgin Galactic's inspections could not detect problems; . . . in at least one instance, in Defendant Moses's presence, a Virgin Galactic executive specifically told an employee not to put a potential safety hazard 'on paper' . . .; [and] Virgin Galactic did not know *Unity* and *Eve*'s configuration." *Id.* ¶ 560. This summary overstates plaintiffs' pleaded allegations regarding Virgin Galactic's safety programs. With respect to the cracks in *Eve*, plaintiffs have pleaded that Virgin Galactic evidently "either . . . fixed the cracks . . . or it didn't . . . . It chose the latter very often" but also describe instances of Virgin Galactic acting to fix this problem. *Id.* ¶ 149. *But see id.* ¶ 250 (providing example of Virgin Galactic overriding an employee who did not want to fix cracks); *id.* ¶ 260 (citing confidential witness statement "that technicians were always working on or repairing *Eve*'s wings because of cracks"); *id.* ¶ 261 (describing a "huge study" by Virgin Galactic concerning cracks in *Eve*'s wings). The contention that Virgin Galactic's inspections "could not detect problems" is also undermined because the Complaint identifies a number of alleged concerns with Virgin Galactic's repair program, which would not exist if Virgin Galactic was incapable of identifying problems with its spacecraft. *E.g.*, *id.* ¶¶ 191 (describing engineer concerns that repairs would be sufficient), 216 (describing concerns with recordkeeping of repairs), 249 (describing Virgin Galactic "push[ing] off deadlines by two months" for "major repairs" as a "regular occurrence"). Nor can a single incident in which Moses allegedly heard an executive direct someone not to document a potential safety hazard support an affirmative obligation to disclose this incident in public statements about safety.[8] Although plaintiffs no doubt would be interested in this information, they point to no law suggesting Moses had an obligation to disclose this alleged incident in his public statements. *See Sanofi*, 816 F.3d at 212 (feedback

---

[8] This incident could have happened no later than January 2019, two years prior to Moses's challenged statement, because the former employee who witnessed it left Virgin Galactic in January 2019. Compl. ¶¶ 39, 233.

received from the FDA was of interest to plaintiffs but there existed no obligation to disclose it even where defendants had expressed confidence in FDA approval). After delving deeper into plaintiffs' allegations, I conclude that plaintiffs' allegations do not conflict with Moses's statements, but rather "merely quibble with [Virgin Galactic's] execution" of its safety programs. *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018). Finding that statements such as "[w]e take our time and make sure things are right" are actionable would no doubt "bring within the sweep of federal securities laws many routine representations" about safety. *ECA*, 553 F.3d at 206. Accordingly, I conclude that this statement is not materially misleading.

### b. Safety Statements

The statements in Compl. ¶¶ 507, 509, 512, 533, 547, 549, 557, and 562 each relate to Virgin Galactic's safety processes and procedures or emphasize that safety is a priority for Virgin Galactic and are not materially misleading for the same reasons that the statement in Compl. ¶ 559 is not misleading. Although the statements were made prior to the public disclosure of the problems with the February 2019 test flight, these statements do not affirmatively opine that the test flights were "successful" and instead warn of "operational or process failures," *id.* ¶ 507, and "[the] possibility that other accidents may occur in the future for a variety of reasons." *Id.* ¶ 509. In context, a reasonable investor would not conclude from these statements that all powered test flights had been successful.

Finally, the statement in ¶ 544 that the "Virgin Galactic Spaceship 2 system is designed to fly both humans and science research payloads to space" is not materially misleading. Plaintiffs offer no meaningful argument in their briefing as to why this statement is misleading, other than to string cite it following the point that "literally true statements are actionable if they create a materially misleading impression." Opp'n 13 & n.3 (quoting *Skiadas v. Acer Therapeutics, Inc.*, No. 19 CV

31

6137 (GHW), 2020 WL 3268495, at *7 (E.D.N.Y. June 16, 2020)). None of the pleaded reasons relates to the challenged statement other than the allegation that *Unity* was a prototype not designed for commercial flights. Compl. ¶ 545. However, the alleged omission that *Unity* was a prototype is "not sufficiently related to the subject matter of the statement[] to render [that] statement[] misleading." *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 356 (S.D.N.Y. 2014). Plaintiffs have not shown how, because *Unity* was a prototype, it could not "fly both humans and science research payloads to space." Accordingly, I find this statement is not a material misrepresentation.

### c.   *Horizontal Stabilizer Statements*

The statements in ¶¶ 551, 553, and 555 concern Virgin Galactic's statements about *Unity*'s new horizontal stabilizers, made after the February 2019 flight destroyed the previous ones. Each of these statements described the new stabilizers as "upgraded" or similar, and plaintiffs argue they are materially misleading because this language fails to advise investors that the upgrades were necessary because the prior stabilizers had been damaged beyond repair. *See* Compl. ¶¶ 552, 554, 556. Defendants respond that "it is entirely natural (and accurate) to describe the replacement of one part with another as an 'upgrade' or an 'improvement'" and characterize the plaintiffs' position as attempting to use a "minor difference in language" to render these statements misleading. Reply 7. Defendants' argument misses the point; it is not the language used but the impression conveyed that renders a statement misleading by omission under the securities laws. I find that these omissions are materially misleading and that a reasonable investor would view the fact that the stabilizers had to be replaced because they were destroyed as altering the "total mix of information" about this function of the spacecraft. *Basic*, 485 U.S. at 232 (citation omitted). Defendants' statements imply that the new stabilizers were installed by Virgin Galactic as a means of improving *Unity*'s flight performance. But, assuming plaintiffs' allegations to be true, the

stabilizers had to be installed to ensure that *Unity* could fly *at all*. In other words, Virgin Galactic failed to disclose that its upgrades to the stabilizers were required in order to fulfill the company's central business function, and not merely to improve *Unity*'s flight capabilities. The fact that these improvements also accomplished the latter does not render these statements not materially misleading in context.

### 6.  *Items 303 and 503/105*

Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. § 229.303, requires a public company to identify in its filings known trends or demands from the prior year that would be reasonably likely to result in a material impact on the company's results or operations. *See* Item 303(b)(2)(ii). The same requirement applies to material changes that occur during an interim period. *See* Item 303(c)(2)(ii). Item 105[9] of Regulation S-K ("Item 105"), 17 C.F.R. § 229.105, requires a discussion of "Risk Factors," which are the "material factors that make an investment in the registrant or offering speculative or risky." Item 105(a). Plaintiffs contend that the risk of a catastrophic incident would "cause reported financial information not to be necessarily indicative of future operating results" under Item 303 and "the most significant factor[] that make[s] the offering risky or speculative" under Item 105. Compl. ¶¶ 580, 583. Plaintiffs allege that Virgin Galactic should have disclosed "at least" that *Unity* and *Eve* were prototypes not suited to commercial flight, that Virgin Galactic lacked detailed engineering drawings of its spacecraft, that *Unity*'s flight control system buckled in flight and *Eve*'s wings cracked, that Virgin Galactic's inspections could not detect problems, and that the April 2018, July 2018, December 2018, and February 2019 test flights "all nearly ended in disaster." *Id.* ¶¶ 581, 585.

---

[9] Prior to the SEC's FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12674-01, 12688, 12712, this regulation was known as Item 503. The relocation to Item 105 was done "without substantively changing the underlying disclosure requirements." *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 229 n.15 (E.D.N.Y. 2022).

Regulation S-K imposes a duty to disclose "where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). Plaintiffs argue that Virgin Galactic "faced a choice where either decision posed material adverse consequences: proceed with an unsafe space program while hoping to patchwork [the spacecraft] together, or spend years to meaningfully address and rectify the known defects." Opp'n 21.

Plaintiffs fail to address defendants' point that Virgin Galactic disclosed the risk that an accident could cause a material adverse effect on its business. *See* Mem. 25 (citing Ex. 2 at 37 (risk factor stating that "[h]uman spaceflight is an inherently risky activity that can lead to accidents or catastrophes impacting human life")). This is the exact risk plaintiffs contend was not disclosed to the market. *See* Compl. ¶¶ 580, 584; *In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18-CV-08049 (RA), 2020 WL 5632901, at *5 (S.D.N.Y. Sept. 21, 2020) (declining to find Item 303 and 503 violations where the challenged risk was exactly what was disclosed). And the fact that Virgin Galactic was testing its craft and that further delays were possible after testing were already part of the "total mix" of information available to the market, both through Virgin Galactic's filings and otherwise. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) (rejecting argument that Item 303 does not require disclosure of already public information). Plaintiffs have not shown why or how any of their proffered undisclosed facts increased the risk of a catastrophic accident or altered the potential future impact of operations in a way that was not already conveyed by Virgin Galactic's warning. *Compare id.* at 720 (holding Item 303 violated where new information "mask[ed] a change in earnings or other trends"). Nor have plaintiffs adequately alleged that Virgin Galactic faced the "choice" plaintiffs describe, because, although delayed,

flight testing ultimately resumed in 2020 and no catastrophic accident occurred. Without more than these conclusory allegations, I cannot say that Virgin Galactic violated their duty to disclose under Items 303 or 105 of Regulation S-K.

   *7. Conclusion*

   I find that plaintiffs have adequately pleaded that the statements in ¶¶ 497, 503, 505, 526, 551, 553, 555, 566, 568, and 570 are materially misleading in context. I dismiss the claims with respect to all other statements.

### Loss Causation

   To plead loss causation, a complaint "must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005). It is not sufficient to simply allege "that the price of the security on the date of purchase was inflated because of the [alleged] misrepresentation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 338 (2005) (quotation omitted); *see also Lentell*, 396 F.3d at 174 (explaining that an allegation "that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality . . . is nothing more than a paraphrased allegation of transaction causation" (quotation omitted)). Plaintiffs must show a "sufficiently direct" relationship between their investment losses and information concealed or misstated by defendants. *Lentell*, 396 F.3d at 174. In other words, the "plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173 (internal quotation marks and citation omitted).

"Loss causation may be adequately pleaded by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline." *In re Am. Inter. Grp., Inc., 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (citation omitted). However, these are not "fundamentally different pathways for proving loss causation . . . . Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261–62 (2d Cir. 2016). Although a corrective disclosure need not "take a particular form or be of a particular quality," and "need not reflect every detail of an alleged fraud, it must reveal some aspect of it." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) (quotation omitted); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179–80 (2d Cir. 2020) (analyst report suggesting a minor breach of clinical trial protocol was not a corrective disclosure of a false statement concerning trial enrollment). "Moreover, the disclosed fact must be new to the market." *Omnicom*, 541 F. Supp. 2d at 551 (citation omitted). Where plaintiffs pursue a materialization of the risk theory, they must further show an that the event constructively disclosing the fraud is "attributable to the concealed" risk. *Abramson*, 965 F.3d at 179.

Defendants contend that, insofar as plaintiffs allege losses related to concealed safety, design, and maintenance issues, "Virgin Galactic was clear about the material risks . . . offering specific warnings that maintenance issues, safety issues, and design and engineering flaws could lead to flight delays and material financial impact." Mem. 35 (citing Ex. 2 at 34–35). Under these circumstances, defendants argue that because the risks were known to the market, plaintiffs "must allege (i) facts sufficient to support an inference that it was defendants' fraud—rather than other

36

salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *Id.* (quoting *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 406 (S.D.N.Y. 2014)). In effect, defendants argue that plaintiffs allege only a materialization of a *known* risk, which cannot be the basis of a loss causation allegation. *See Lentell*, 396 F.3d at 176–77 (holding loss causation not sufficiently alleged where risk of price volatility was clearly disclosed before materializing).

Plaintiffs point to a 13.7% decline in Virgin Galactic's share price on August 4, 2020 (following the announcement that Branson's flight would be delayed), a 17.4% decline in price on December 14, 2020 (following the unsuccessful powered flight on December 12), and a 16.9% decline in share price on October 15, 2021 (following the announcement of a delayed flight taking members of the Italian air force to space) as materializations of Virgin Galactic's allegedly concealed problems with maintenance and safety.[10] Opp'n 38. Plaintiffs also identify a 9.6% drop in share price following the February 1, 2021 *Washington Post* article as a "corrective disclosure" concerning the true cause of delays. *Id.*

I consider loss causation only with respect to the risks concealed by those misrepresentations I have already found were adequately alleged to be material. Compl. ¶¶ 497, 503, 505, 526, 551, 553, 555, 566, 568, 570.

---

[10] I "may take judicial notice of well publicized stock prices without converting the motion to dismiss into a motion for summary judgment." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000). Virgin Galactic is publicly traded on the New York Stock Exchange; accordingly, I take judicial notice of Virgin Galactic's stock price at all relevant times.

### 1. *February 2019 Flight Statements*

The statements in Compl. ¶¶ 497, 503, 505, and 526 each tout the success of the February 2019 flight in a materially misleading way. Plaintiffs have adequately pleaded loss causation with respect to these statements. The delay of Branson's spaceflight announced on August 4, 2020 and the revelations in the February 1, 2021 *Washington Post* article were materializations of the risks concealed by the statements touting the February 2019 flight, which suggested that remaining technical issues were relatively minor. Although it is true that defendants warned that Virgin Galactic may be "unable to operate our spaceflight system . . . [due to] maintenance issues, pilot error, [or] design and engineering false," and that "[a]ny actual or perceived safety issues . . . could result in delaying or cancelling planned flights," Mem. 35, plaintiffs need only show that a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173. Plaintiffs have adequately alleged at this stage that the "something" concealed was not the abstract risk of delays but the destruction of a critical component of *Unity* that led to considerable delays in Virgin Galactic's testing and commercialization efforts. Compl. ¶¶ 305, 339.

However, plaintiffs have not adequately alleged that the December 14, 2020 and October 15, 2021 events caused their losses. The December 14, 2020 decline in stock price followed Virgin Galactic's announcement that a December 12, 2020 test flight was aborted because *Unity* failed to independently engage its engines once released. This was subsequently found to be caused by electromagnetic interference from the newly installed digital control system for *Unity*'s horizontal stabilizers. *Id.* ¶¶ 358–60. Plaintiffs contend that this was a materialization of the risk that "*Unity* shook uncontrollably when it reached Mach 1.8," thus "render[ing] *Unity* unsuitable for commercial operations." Opp'n 38. However, the actionable misstatements at best tangentially

relate to *Unity*'s tendency to shake at this speed and plaintiffs have not shown how the failed December 2020 test flight is attributable to any other actionable omission. Similarly, plaintiffs contend that the October 15, 2021 announcement and subsequent decline in share price was a manifestation of known risks in the design and maintenance of *Eve*, *see* Compl. ¶¶ 410–22, but have not adequately pleaded how the subject matter of any of the surviving misstatements, which concern Virgin Galactic's test flights, was revealed to the market and caused a price decline by the announcement that the October 2021 flight would be delayed in order to make repairs to *Eve*. Further, plaintiffs have alleged that the *Washington Post* reported "that *Eve* had serious problems, including that its launch pylon is falling apart in part because *Unity* [was] way heavier than *Eve* was designed for" in February 2021. *Id.* ¶ 421 (quotation omitted). The October 15, 2021 announcement thus did not reveal an undisclosed fact. *See In re Omnicom Grp., Inc. Sec. Litig.* 597 F.3d 501, 511 (2d Cir. 2011) (holding that a publicly discussed accounting method that attempted to avoid a significant loss was not later "revealed"). There is nothing in the Complaint suggesting that the October 15, 2021 announcement was the materialization of a concealed risk as opposed to a disclosed risk, nor have plaintiffs shown "facts sufficient to support an inference that it was defendants' fraud—rather than other salient factors—that proximately caused [their] loss" or "facts sufficient to apportion the losses between the disclosed and concealed portions of the risk" of *Eve* needing repair in light of the "substantial indicia of the risk" already publicly known. *Lentell*, 396 F.3d at 177. Accordingly, I hold that plaintiffs do not adequately allege loss causation insofar as they rely on the December 2020 and October 2021 disclosures and attendant drops in Virgin Galactic's share price.

2. *July 2021 Flight Statements*

Paragraphs 566, 568, and 570 of the Complaint each identify statements describing Branson's July 11, 2021 flight as "successful," "perfect," and "flawless," respectively. Plaintiffs have adequately pleaded loss causation as to these statements. These statements are misleading because they omit to disclose *Unity*'s dangerous departure from its landing cone during the flight. Plaintiffs have pleaded that one of the risks of the deviation was the regulatory intervention by the FAA, that the truth of the July 2021 flight was revealed to the market after close of trading on September 1, 2021, and that the next day the FAA announced the grounding of *Unity*, leading to a decline in Virgin Galactic's share price. Compl. ¶¶ 402, 407–09. The drop in stock price is adequately alleged to be caused by the revelation of the fact that the July 2021 flight left its landing cone.

3. *Horizontal Stabilizer Statements*

Although the statements in paragraphs 551, 553, and 555 of the Complaint are materially misleading, plaintiffs have not adequately alleged loss causation as to these statements. The only allegation of loss even slightly connected to the new horizontal stabilizers is the allegation that the delay in Branson's flight resulted from the destruction of *Unity*'s prior stabilizers. However, plaintiffs have not demonstrated how a statement that leads to the misleading impression that the replacement of *Unity*'s stabilizers was voluntary is causally connected to the fact that materialized on August 4, 2020—that Virgin Galactic's testing and commercialization delays would be longer. Accordingly, I dismiss the plaintiffs' claims with respect to these three alleged misstatements for failure to adequately plead loss causation.

**Scienter**

An individual "defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting," and cannot lead to liability under Section 10(b). *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611,

641 (S.D.N.Y. 2007) (quoting *Writ v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998)). Therefore, where "fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant. A complaint may not simply clump defendants together in vague allegations . . . ." *Id.* Following my analysis of the alleged misstatements and loss causation, the only remaining actionable statements made by individual defendants were made by Branson (Compl. ¶¶ 505, 526, 570), Colglazier (Compl. ¶¶ 566, 568), and Whitesides (Compl. ¶ 503). I will analyze scienter only with respect to these individuals and Virgin Galactic as a whole.

Plaintiffs must allege particularized facts demonstrating that defendants either had "motive and opportunity to commit the fraud" or point to "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). I am to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007) (emphasis in original). The facts alleged, taken together, must "giv[e] rise to a strong inference of scienter." *Ark. Pub. Emps.' Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022). Where "no motive or opportunity . . . is shown, the circumstantial evidence of conscious misbehavior 'must be correspondingly greater' and show 'highly unreasonable' behavior or that which evinces 'an extreme departure from the standards of ordinary care.'" *Id.* (citing *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Finally, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, [I] must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323.

### 1. *Branson's Motive and Opportunity*

Plaintiffs' allegations and arguments on motive and opportunity concern only Branson and Palihapitiya. *See* Opp'n 25–28 (discussing Branson and Palihapitiya only). It is undisputed that as Virgin Galactic's primary shareholder Branson had the "opportunity" to commit fraud. The sole question is whether the plaintiffs have sufficiently pleaded motive. Plaintiffs must allege that Branson "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (citation omitted). However, "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* "[I]nsider trading is considered a classic example of a 'concrete and personal' benefit that suffices to plead motive to commit securities fraud." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 349 (S.D.N.Y. 2011).

Plaintiffs argue that the stock trading activity undertaken by Branson constitutes an unusual pattern of trading activity that satisfies this test. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic*, 252 F.3d at 74–75. Plaintiffs contend that "either the amount or the percentage [of sales] suffice, by themselves, to plead scienter based on motive," Opp'n 26, but emphasize both factors. Branson sold shares worth a total of $1.015 billion during the Class Period.[11] *Id.* Moreover, plaintiffs allege that these amounts were "100% of the shares [Branson] had available to sell." *Id.*

---

[11] Plaintiffs alleged that Branson's stock sales totaled approximately $891.7 million. Compl. ¶ 443. Plaintiffs appear to have arrived at the $1.015 billion figure by adding to the $891.7 million Branson's proceeds from the side transaction conducted with Virgin Galactic and Palihapitiya.

Defendants contend that because certain "sales were made months before any announcement leading to a stock price decline . . . they are not indicative of scienter." Mem. 31; *see also* Reply 26 (noting that this "context in which the sales occurred . . . simply does not establish a compelling inference of motive"). In particular, Branson's sales of May 14 to May 22, 2020 and June 2, 2020 (via Viceo 10 Ltd.) were made over two months prior to alleged stock price declines of August 4, 2020. Mem. 31 (citing Compl. ¶¶ 331–32). Defendants argue that the April 12-14, 2021 and August 10-12, 2021 sales by Branson also occurred after declines in the stock price. *Id.* at 32.

Plaintiffs respond that Branson's "May and June 2020 open market sales were in the midst of VG's campaign to claim spaceflight was just around the corner" and his "April and August 2021 sales" were made "during a promotional campaign built on his flight to space." Opp'n at 27. With respect to the August sales, plaintiffs argue that the sales were "made while Branson knew, but did not disclose, that his flight had left its designated airspace for 10% of its journey, risking its ability to reach its landing strip." *Id.*

Branson's sale of 100% of his available stock is unusual and contributes to an inference of scienter. *Compare In re Iconix Brand Grp., Inc.*, No. 15 CIV. 4860 (PGG), 2017 WL 4898228, at *15–16 (S.D.N.Y. Oct. 25, 2017) (sale of less than 9% of holdings not unusual) *and Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (noting that sales of 2.1% and 7% of holdings would not ordinarily be suspicious if the amounts were not so high) *with In re Scholastic*, 252 F.3d at 74–75 (sale of 80% of defendant's holdings sufficient to demonstrate motive) *and In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) ("[L]iquidation of 97% of [defendant's] holdings [] are unusual for a corporate officer by any measure."). Although "[a] large sale does not necessarily give rise to an inference of scienter," *SLM*, 740 F. Supp. at 558, the volume of the sales contributes to an inference of scienter here because Branson sold off over

43

$1 billion of stock during the Class Period, an incredible amount. *See Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 308–09 (2d Cir. 2015) (total sales of $49 million during Class Period was suspicious); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (a "$78 million profit from sales . . . is . . massive by any measure"); *see also Oracle Corp.*, 380 F.3d at 1232 (finding sales of $900 million suspicious despite comprising a small percentage of shareholder's overall holdings).

However, the timing of these sales remains pertinent to whether plaintiffs have strongly raised an inference of scienter. I am not persuaded that volume and percentage alone are sufficient on these facts, since the alleged Class Period in this case spans nearly two and a half years. *See* Compl. ¶ 1. The cases cited by plaintiffs involve both suspicious volume of stock sales and suspicious timing. In *Scholastic*, for instance, the individual defendant sold approximately 80% of his shares over the course of a week, while in possession of information that was revealed the following month. 252 F.3d at 75. Similarly, in *SLM*, the individual defendant sold 97% of his holdings in a single day. 740 F. Supp. 2d at 553. The timing of sales requires some connection to alleged misrepresentations; I decline to find a *per se* rule that Branson acted with scienter solely because he sold a considerable volume and percentage of his shares. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 586, *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (declining to find suspicious sales where a defendant's "stock sales fail[ed] to match up closely with her allegedly false and misleading statements"); *In re Wachovia*, 753 F. Supp. 2d at 350 (finding no scienter where plaintiffs "identif[ied] only one transaction by a named Defendant that occurred close in time to an alleged misstatement"). "Indeed, courts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure." *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at

*14 (S.D.N.Y. July 23, 2018) (collecting cases). Timing is typically "unusual or suspicious" when it is "calculated to maximize personal benefit from inside information." *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 344 (W.D.N.Y. 2008) (quotation omitted).

Defendants argue that there can be no finding of scienter with respect to the May and June 2020 stock sales because the sales were made months before any announcement that lead to a pleaded drop in SPCE's stock price. Mem. 31; Compl. ¶¶ 331–32 (noting 13.7% drop in stock price on August 4, 2020 following announcement that Branson's flight would be delayed to 2021). Plaintiffs respond that these stock sales were made "in the midst of [Virgin Galactic's] campaign to claim spaceflight was just around the corner." Opp'n 27. The statements cited by plaintiffs as part of this "campaign" include those in Compl. ¶¶ 526, 533, and 536; of these, I have found that only the statement in ¶ 526 misleading.

Plaintiffs do not address defendants' argument about the timing of these stock sales. Defendants are correct that Branson sold these shares during a period in which SPCE's stock price was relatively low, and that these sales occurred shortly before an increase in Virgin Galactic's share price. Mem. 32; SPCE Stock Price History 13, ECF No. 52-12. The rise in price shortly after the May and June 2020 sales "rebuts any inference that [Branson] acted with the intent to defraud" with respect to these statements. *City of Taylor Gen. Emps.' Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013).

With respect to the April 2021 stock sales, plaintiffs argue that these sales are probative of scienter because they were made "during a promotional campaign built on [Branson's] flight to space," Opp'n 27, but this argument is unavailing Virgin Galactic did not conduct a test flight until May 22, 2021 and did not announce that it would take Branson to space until July 1, 2021. Compl. ¶¶ 383, 385. The inference of scienter as to these sales is further reduced because by this time the

public was aware of the near-disaster on Virgin's February 2019 test flight and that further powered flights had been delayed. *See id.* ¶¶ 365, 376–78.

Accordingly, I find that the May 2020, June 2020, and April 2021 stock sales do not contribute to an inference of scienter.

I find that Branson did have motive and opportunity with respect to the statements regarding the success of his July 11, 2021 test flight. As discussed, these statements were materially misleading when made because they implied that the flight was a success while omitting the fact that the flight deviated from its landing cone for approximately 10% of the total flight time, which drew the attention of the Federal Aviation Administration and ultimately led to a drop in Virgin Galactic's share price when *Unity* was grounded. Branson sold over 10 million shares of stock for total proceeds of nearly $300 million in August 2021, just weeks before it was publicly revealed that *Unity* had strayed from its landing cone and risked a crash landing, resulting in a decline in Virgin Galactic's stock price. *See* Opp'n 27; Compl. ¶ 391. Accordingly, the plaintiffs have adequately pleaded Branson's scienter with respect to the statement in Compl. ¶ 570.

I also find that plaintiffs have adequately pleaded Branson's scienter with respect to the statement in Compl. ¶ 505, which defendants have not addressed directly. This statement was made in a publicly filed letter in advance of the de-SPAC transaction, from which Branson earned $123 million. Compl. ¶¶ 436, 505. Although the letter was filed in July 2019, three months before the transaction, Branson had no other means of selling the shares before the de-SPAC was completed. In light of the timing and amount of this stock sale, I find that plaintiffs have adequately pleaded scienter with respect to the statement in ¶ 505.[12]

---

[12] Because I find the timing and amount of this sale sufficient to establish scienter, I do not consider the plaintiffs' purported additional motivation for these stock sales—that Branson used the sales to maintain his majority share in Virgin Atlantic.

Defendants point to the opposing inference that Branson was both "seeking financing and[] optimistic about Virgin Galactic's abilities to overcome the obstacles inherent in pioneering commercial space flight." Reply 28. But the inference that Branson simply intended to sell his shares while also being "optimistic" about Virgin Galactic is undercut by the facts of which he was aware, but the market did not know, when he sold his shares. When he made his sale during the de-SPAC transaction, Branson was aware that *Unity* had sustained damage to its horizontal stabilizers and could not fly for either test or commercial flights, and when he sold following his July 2021 trip to space he was aware that the flight had deviated from its landing cone. Because Branson was allegedly aware of these facts at the time he made considerable stock sales, I cannot find that the proffered "nonculpable explanation[] for [Branson's conduct]" is more compelling. *Tellabs*, 551 U.S. at 324. Branson's "personal financial gain" thus "weigh[s] heavily in favor of a scienter inference." *Id.* at 325 (noting that the absence of this allegation is not fatal to a claim). Nor have defendants pointed to any other reason Branson sold shares on these dates that would support an opposing inference. *See In re Lululemon*, 14 F. Supp. 3d at 586 (holding scienter inadequately alleged where executive "had an established practice" of quarterly sales and had increased her volume of sales because she was retiring).

### 2. *Whitesides and Colglazier*

The only remaining actionable statements attributable to an individual defendant were made by defendants Whitesides (Compl. ¶ 503) and Colglazier (Compl. ¶¶ 566, 568). Plaintiffs advance only a recklessness theory of scienter with respect to these defendants. Accordingly, I must determine whether plaintiffs have shown "strong circumstantial evidence of conscious misbehavior or recklessness," which, because no motive or opportunity is shown, "must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme

departure from the standards of ordinary care." *Ark. Pub. Emps.' Ret. Sys.*, 28 F. 4th at 355 (quotations omitted).

### a. Whitesides

The only remaining misstatement attributable to Whitesides is a statement that *Unity* "clear[ed]" "the huge technical milestone" of powered flight testing following the February 2019 flight. Compl. ¶ 503. Plaintiffs argue that they have shown that Virgin Galactic "fac[ed] overwhelming problems that prevented it from flying safely," including unreliable documentation of *Unity* and *Eve*'s design, failure to properly inspect, and structural problems in both spacecraft, which culminated in multiple near misses during powered flight testing and "in some cases left the vehicles laid up for months for repairs." Opp'n 29. They also point to the fact that defendants "received the results of an investigation before making contradictory statements," Opp'n 32, and allude to the doctrine that high-level officers can be found to have known facts of critical importance to their company. *Id.* at 33. Finally, they note that the resignation of Virgin Galactic's Vice President of Safety supports the inference of scienter. *Id.* at 35.

Plaintiffs' strongest argument that Whitesides was aware of the facts rendering the statement in Compl. ¶ 503 misleading is that he was "immediately notified" of the damage from the February 2019 flight and was "apprised regularly of what [a team led by Moses was] finding, as well as the corrective actions." Compl. ¶ 327 (quoting Moses). Plaintiffs have also alleged that Virgin Galactic's board commissioned a report from former Boeing executive Dennis O'Donoghue concerning its safety, following concerns raised by Virgin Galactic's VP of Safety. *Id.* ¶¶ 322–23. However, it is not enough for plaintiffs to allege that a report was made to an individual defendant or that the individual defendant attended a meeting about the report, because the "complaint must allege more than the mere existence of contradictory information to support a securities fraud

claim; it must allege particularized facts that suggest that the defendants knew of and disregarded such information." *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 220 (S.D.N.Y. 2020) (quotation omitted). Far from pleading with particularity the facts Whitesides is alleged to have known and disregarded, plaintiffs allege that O'Donoghue's report actually concluded that *Unity* was safe to fly. Compl. ¶ 324. Even if the board was told "that failures in the maintenance organization were making the program unsafe and that if something didn't change someone was going to get killed," *id.* ¶ 322, plaintiffs' own allegations suggest the board received additional information that indicated the opposite.

Nor have plaintiffs adequately alleged that any of the confidential witnesses' concerns "were brought to the attention" of Whitesides. *In re Lululemon*, 14 F. Supp. 3d at 582. None of the witnesses reported directly to Whitesides and only one witness is even alleged to have had a reporting line to Whitesides. Compl. ¶¶ 38–45; *id.* ¶ 42 ("Former Employee 5" was three reporting levels removed from Whitesides). Even assuming that references to concerns being raised with "management" identify statements made to Virgin Galactic's executive team, *e.g.*, Compl. ¶ 253, no allegation about a concern raised with management establishes that Whitesides "knew or honestly believed [his] statements to be false." *Woolgar*, 477 F. Supp. 3d at 220.

Plaintiffs also argue that Ericson's resignation from the post of Vice President of Safety supports an inference of scienter. Although it is true that a corporate officer's resignation or termination can contribute to the inference of scienter, Ericson's resignation was not "tied to the fraud alleged" by plaintiffs, nor have plaintiffs shown how his resignation "somehow alerted defendants to the fraud." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011). At best, this allegation adds to the minimal circumstantial evidence of scienter. *See id.* Similarly, plaintiffs' reliance on the "core operations doctrine" can only be used to support an inference of scienter and

fails without "more to tie [Whitesides] to specific information contradicting the substance of [his] statement[]." *Shemian v. Rsch. In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

Plaintiffs have not carried their burden to plead with particularity the reasons Whitesides knew or was reckless to the risk that his statement in Compl. ¶ 503 was false. At most, they have shown that he was cognizant of the damage from the February 2019 flight following a report from Moses, but that he also received a board-commissioned report suggesting that *Unity* was safe to operate. In light of the requirement that plaintiffs present "strong circumstantial evidence" where motive and opportunity is not alleged, I cannot deem Whitesides's statement "highly unreasonable" or an "extreme departure from the standards of ordinary care." *Ark. Pub. Emps.' Ret. Sys.*, 28 F. 4th at 355 (quotation omitted). Accordingly, I dismiss the action with respect to Whitesides.

   *b.  Colglazier*

 Colglazier's remaining statements relate entirely to Branson's July 11, 2021 flight. Plaintiffs have not demonstrated that Colglazier knew that Branson's flight had departed from its landing cone at the time he made the statements touting the flight's success that same day. The mere fact that Colglazier was CEO of Virgin Galactic at the time is insufficient to allege scienter. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 806 (S.D.N.Y 2020) ("[I]t is practically hornbook law that accusations . . . which are founded on nothing more than a defendant's corporate position, are entitled to no weight." (quotation omitted)). None of the allegations in plaintiffs' description of the July 11 flight pertain to Colglazier. Compl. ¶¶ 383–409. Absent any allegations that Colglazier was told that the flight deviated from its landing cone prior to making his public statements, I cannot find that his statement was reckless, and I dismiss the action with respect to him.

3.  *Virgin Galactic*

For corporate defendants, the PSLRA's pleading standard requires "that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 44 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "[T]he most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant," thereby imputing that individual's scienter to the corporation. *Id.*

Because I have found that plaintiffs have adequately pleaded that Branson acted with scienter in making the statements in Compl. ¶¶ 505 and 570, scienter as to these statements is adequately pleaded against Virgin Galactic as well.

The only remaining statement to be analyzed is that in Compl. ¶ 497. The statement is not attributed to any individual defendant, and the parties have not advanced separate arguments regarding scienter as to this statement. I have found that Branson's similar statement on the same day touting "[g]reat progress in our test flight program" was adequately alleged to be made with scienter because Branson had motive and opportunity. The statement in Compl. ¶ 497 that Virgin Galactic had "reached an inflection point in its development" and "overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service" is adequately alleged to be misleading for the same reasons, and plaintiffs have alleged enough at this stage of the proceedings to show that Branson acted with scienter with respect to statements concerning Virgin Galactic's "successful" February 2019 flight. Accordingly, I find scienter adequately alleged with respect to the statement in ¶ 497.

**Plaintiffs' Section 20(a) and 20A Claims**

In addition to their putative class action claims against defendants, plaintiffs also bring claims under Sections 20(a) and 20A of the Exchange Act. Section 20(a) provides for joint and several

liability for control persons of those who violate the securities laws. *See* 15 U.S.C. § 78t(a). Section 20A provides that those who trade a security while in possession of material non-public information can be held liable to contemporaneous traders who purchased or sold securities of the same class. *See* 15 U.S.C. § 78t-1.

### 1. *Effect of Other Findings in this Opinion*

Both causes of action require a primary violation of the securities laws. *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant."); *In re Refco*, 503 F. Supp. 2d at 665 ("[T]here can only be § 20A liability if the predicate violation of the Exchange Act was an act of insider trading . . . ."). Because I have found primary violations of the securities laws only with respect to Branson, I dismiss plaintiffs' Section 20(a) insofar as they relate to any individual defendant's control of any non-Branson individual defendant. Because I have dismissed all Section 10(b) claims against Palihapitiya, I also dismiss the Section 20A claims with respect to him.

### 2. *Control Person Liability*

Plaintiffs have failed to allege that any individual defendant had control over Branson during the Class Period. *See ATSI Commc'ns*, 493 F.3d at 108 (prima facie case of control person liability requires demonstrating "control of the primary violator by the defendant"). Rather, plaintiffs have alleged that *Branson* was "controlling shareholder of Virgin Galactic" throughout the Class Period. Compl. ¶ 31. No other defendant has been adequately alleged to have "controlled" Branson during the Class Period, and I dismiss the Section 20(a) claims against all individual defendants.

52

3. *Section 20A*

I must partially dismiss plaintiffs' Section 20A claims on two grounds. First, Branson's alleged primary violations of Section 10(b) only align with some of his stock sales—during Virgin Galactic's October 2019 de-SPAC transaction and in August 2021 following his July 2021 trip to space. With respect to the Section 20A claims against Branson, plaintiffs do not allege any contemporaneous trading when the de-SPAC transaction occurred. *See* Compl. ¶ 608 (list of purchases contemporaneous with Branson's sales). The only individual plaintiffs who purchased shares of Virgin Galactic close in time to Branson's August 2021 sales are O'Keefe-Jones and Ortiz. *See id.* I therefore dismiss the claims against Branson insofar as they rely on his sales other than those made between August 10 and August 12, 2021.

Second, a trade is "contemporaneous" under Second Circuit caselaw if it "occur[s] within a reasonable period of time, usually limited to a few days," of the initial trade. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n.51 (S.D.N.Y. 2008) (collecting cases). However, Branson cannot be held liable for a purchase carried out by a plaintiff prior to the conduct that constitutes the alleged insider trading. *Id.* Accordingly, O'Keefe-Jones's purchases on July 30 and August 6, 2021 cannot serve as the basis for a Section 20A claim against Branson as a matter of law, and I dismiss the claim with prejudice insofar as it concerns these trades. The remaining trades occurred during either Branson's August 10-12, 2021 trading window or within three trading days of it. These are sufficiently contemporaneous to plead a claim under Section 20A. *See In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 508–09 (S.D.N.Y. 2011) (concluding that "five trading days appears to be a reasonable period of time within which sales and purchases will be considered contemporaneous" under Second Circuit caselaw).

***Leave to Amend***

Plaintiffs requested leave to amend their pursuant to Federal Rule of Civil Procedure 15. Opp'n 40. Defendants argue that plaintiffs "point to no allegation or theory that would salvage their claims" and contend that allowing amendment would be futile. Reply 32. Because this is the first time I have ruled on the legal sufficiency of any of plaintiffs' claims, when plaintiffs requested leave to amend they were not in a position to propose a cure. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015). Further, "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI Commc'ns*, 493 F.3d at 108.

I grant plaintiffs leave to amend the complaint. However, I strongly urge plaintiffs to consider the breadth of their pleading in light of my analysis of their claims in this opinion. Plaintiffs' complaint comprised 153 pages (excluding exhibits) and 610 paragraphs, and challenged 35 statements, many of which were clearly not misleading. Further, allegations of the reasons why certain statements were misleading were often repetitive and not closely connected to the actual statement. Plaintiffs would be wise to use their leave to amend to trim their allegations to those they believe sufficient to state their case, and nothing more.

**CONCLUSION**

In light of the above, I:

(1) Dismiss Count I of the Complaint insofar as it relies upon any allegedly misleading statement other than those contained in ¶¶ 497, 505, 526, 551, 553, 555, and 570 of the Complaint;

(2) Dismiss Count I of the Complaint as to ¶¶ 551, 553, and 555 on the grounds that plaintiffs have not adequately alleged loss causation as to these statements;

(3) Dismiss Count I of the Complaint as to all individual defendants except Branson for lack of scienter;

(4) Dismiss Count II of the Complaint as to all defendants;

(5) Dismiss Count III of the Complaint as to defendant Palihapitiya;

(6) Dismiss Count III of the Complaint as to Branson insofar as it alleges violations of Section 20A outside of Branson's trades on August 10-12, 2021;

(7) Dismiss Count III of the Complaint as to Branson, with prejudice, insofar as it relies on trades made by individual plaintiffs before Branson committed allegedly culpable conduct; and

(8) Grant plaintiffs leave to amend their Complaint by no later than 21 days from the date of this opinion, on or before November 28, 2022.

SO ORDERED.


_____ /s/_____

Allyne R. Ross

United States District Judge


Dated:          November 7, 2022

                Brooklyn, New York