# EXHIBIT 1

Case 1:21-cv-03021-NRA Document 88-2 Filed 05/18/23 Page 1 of 29 PageID #: 2715

# EXHIBIT 2

Case 1:21-cv-03021-NRA Document 88-2 Filed 05/18/23 Page 2 of 29 PageID #: 2715

21-1076
*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

———————

August Term 2021
Argued: February 10, 2022
Decided: September 30, 2022
Amended: November 30, 2022

No. 21-1076

———————

MENORA MIVTACHIM INSURANCE LTD., MENORA MIVTACHIM AND THE
FEDERATION OF ENGINEERS PROVIDENT FUND MANAGEMENT LTD.,
CLAL INSURANCE COMPANY LTD., MENORA MIVTACHIM PENSIONS
AND GEMEL LTD., CLAL PENSION AND PROVIDENT LTD., ATUDOT
PENSION FUND FOR EMPLOYEES AND INDEPENDENT WORKERS,

*Plaintiffs-Appellants,*

v.

FRUTAROM INDUSTRIES LTD., ORI YEHUDAI, ARI ROSENTHAL, ALON
GRANOT, GUY GILL,

*Defendants-Appellees.* *

———————

On Appeal from the United States District Court
for the Southern District of New York

———————

    \* The Clerk of Court is respectfully directed to amend the caption accordingly.

1

Before: PARK, NARDINI, and PEREZ, *Circuit Judges.*

International Flavors & Fragrances Inc. ("IFF"), a U.S.-based seller of flavoring and fragrance products, acquired Frutarom Industries Ltd. ("Frutarom"), an Israeli firm in the same industry. Leading up to the merger, Frutarom allegedly made material misstatements about its compliance with anti-bribery laws and the source of its business growth. Plaintiffs, who bought stock in IFF, sued Frutarom, alleging that those misstatements violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. We conclude that Plaintiffs lack statutory standing to sue. Under the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities ~~issued by the company~~ about which a misstatement was made. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975). Plaintiffs here lack standing to sue based on alleged misstatements ~~that~~about Frutarom ~~made about itself~~ because they never bought or sold shares of Frutarom. **AFFIRMED.**

Judge Perez concurs in a separate opinion.

> JEREMY A. LIEBERMAN (Emma Gilmore, Marc I. Gross, Villi A. Shteyn, *on the brief),* Pomerantz LLP, New York, NY, *for Plaintiffs-Appellants.*
>
> ROGER A. COOPER (Lisa Vicens, Thomas S. Kessler, *on the brief),* Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendant-Appellee Frutarom Industries Ltd.*
>
> BRUCE G. VANYO, Katten Muchin Rosenman LLP, New York, NY (Jonathan A. Rotenberg, Thomas M. Artaki, Katten Muchin Rosenman LLP, New York, NY; Eric T. Werlinger, Katten Muchin Rosenman LLP, Washington, DC, *on the brief),* for Defendants-Appellees Ori Yehudai, Ari Rosenthal, Alon Granot, and Guy Gill.*

2

21-1076
*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*

PARK, *Circuit Judge:*

International Flavors & Fragrances Inc. ("IFF"), a U.S.-based seller of flavoring and fragrance products, acquired Frutarom Industries Ltd. ("Frutarom"), an Israeli firm in the same industry. Leading up to the merger, Frutarom allegedly made material misstatements about its compliance with anti-bribery laws and the source of its business growth. Plaintiffs, who bought stock in IFF, sued Frutarom, alleging that those misstatements violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. We conclude that Plaintiffs lack statutory standing to sue. Under the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities ~~issued by the company~~ about which a misstatement was made. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). Plaintiffs here lack standing to sue based on alleged misstatements ~~that~~about Frutarom ~~made about itself~~ because they never bought or sold shares of Frutarom. We thus affirm the district court's dismissal of the complaint.

## I. BACKGROUND

A.    <u>Factual Background</u>[1]

Plaintiffs are a putative class of investors who acquired IFF securities between May 7, 2018 and August 12, 2019. They allege that from 2002 to 2018, Frutarom's executives engaged in a "long-

---

[1]    The following facts are taken from Plaintiffs' Amended Complaint, Joint App'x at 20-102. In reviewing the district court's decision on a motion to dismiss, we accept these facts as true and draw all reasonable inferences in Plaintiffs' favor. *See Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 299 n.1 (2d Cir. 2021).

running bribery scheme" by which they bribed key employees of important clients in order to "generate continued and increased business with the customer[s]." Compl. ¶¶ 10, 66. They also bribed customs officials and quality assurance officials in Russia and Ukraine in order to import Frutarom products into those countries and to pass local certifications of product fitness.

On May 7, 2018, Frutarom and IFF announced an anticipated merger. Plaintiffs allege that leading up to the consummation of the merger, Frutarom made materially misleading statements about its compliance with anti-bribery laws and the sources of its business growth, most of which were incorporated into IFF's Form S-4 Registration Statement. For instance, Plaintiffs allege that Frutarom falsely stated that since December 31, 2014, Frutarom had not "violated the [Foreign Corrupt Practices Act], the U.K. Bribery Act 2010, the [Organisation for Economic Co-operation and Development] Convention on Combating Bribery of Foreign Public Officials in International Business Transactions or any other applicable Law relating to anti-corruption or anti-bribery." *Id.* ¶ 146. Plaintiffs also allege that Frutarom misled investors by attributing its financial growth in 2016 and 2017 to factors such as "organic growth," "acquisitions," and "positive currency effects" while failing to mention growth due to the bribery scheme. *Id.* ¶¶ 136-37.

IFF's acquisition of Frutarom closed in October 2018, after which Frutarom became a wholly-owned subsidiary of IFF. On August 5, 2019, IFF acknowledged that Frutarom had "made improper payments to representatives of a number of customers" in Russia and Ukraine. *Id.* ¶ 211. The following day, IFF's share price dropped nearly 16%.

4

### B.  Procedural History

Plaintiffs sued IFF and two of its officers as well as Frutarom and five of its officers. Plaintiffs alleged that Defendants' materially misleading misstatements violated Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a); and Securities and Exchange Commission ("SEC") Rule 10b-5,17 C.F.R. § 240.10b-5.[2]

The district court granted Defendants' motion to dismiss for failure to state a claim, finding that the complaint "fail[ed] to allege with the requisite particularity that Frutarom's misconduct continued into the Class Period" and concluding that, in any case, the allegedly false statements and omissions of material fact were not actionable or material. Spec. App'x at 23-24. The district court also concluded that "plaintiffs lack statutory standing under Section 10(b) to bring claims against the Frutarom defendants for statements made about Frutarom." *Id.* at 78. Plaintiffs pursue their appeal against only Frutarom and four of its officers. *See* Appellants' Br. at 3.

## II. DISCUSSION

### A.  Standard of Review

"We review a district court's dismissal of a complaint under [Federal Rule of Civil Procedure] 12(b)(6) de novo." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

### B.  The Purchaser-Seller Rule

---

[2]  Plaintiffs also asserted a claim under the Israeli Securities Law of 1968. The district court declined to exercise supplemental jurisdiction over the claim, and Plaintiffs do not challenge that decision on appeal.

Neither Section 10(b) of the Exchange Act nor Rule 10b-5 provides an express private right of action, but the Supreme Court has long held that one is implied. *See, e.g., Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971). Recognizing the advantages of limitations to this judicially created private right of action, the Court in *Blue Chip Stamps* adopted the rule from *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), which limited the class of plaintiffs who could sue under Rule 10b-5 to those who purchased or sold the securities ~~of an issuer~~ about which a material misstatement was made. *See Blue Chip Stamps*, 421 U.S. at 730 (noting that the *Birnbaum* rule limited "the plaintiff class for purposes of a private damage action under § 10(b) and Rule 10b-5 . . . to actual purchasers and sellers of securities"); *see also id.* at 742 (explaining that the *Birnbaum* rule "permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question"); *id.* at 747 ("The virtue of the *Birnbaum* rule, simply stated, in this situation, is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates.").

The Court observed in *Blue Chip Stamps* that "[a]vailable evidence from the texts of the [Securities Act of 1933 and the Exchange Act] . . . supports the result reached by the *Birnbaum* court."[3] *Id.* at 733. It also noted the fact that the purchaser-seller

---

[3]    The Court noted, for example, that "[t]he wording of § 10(b) directed at fraud 'in connection with the purchase or sale' of securities stands in contrast with the parallel antifraud provision of the [Securities] Act, § 17(a) . . . reaching fraud 'in the offer or sale' of securities." *Blue Chip Stamps*, 421 U.S. at 733-34 (citing 15 U.S.C. §§ 77q, 78j(b)). It also observed that "[t]he principal express

rule had gained widespread acceptance across the country and that Congress had "fail[ed] to reject *Birnbaum's* reasonable interpretation of the wording of § 10(b)" despite two attempts to amend the statute. *Id.* at 732-33; *see also id.* at 731-32 ("[V]irtually all lower federal courts facing the issue in the hundreds of reported cases presenting this question over the past quarter century have reaffirmed *Birnbaum's* conclusion that the plaintiff class for purposes of § 10(b) and Rule 10b-5 private damage actions is limited to purchasers and sellers of securities.").

The Court expressed concern about "the danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5." *Id.* at 740. And it warned against an "endless case-by-case erosion" of the purchaser-seller rule by creating exceptions, concluding that "such a shifting and highly fact-oriented disposition" of statutory standing is not a "satisfactory basis for a rule of liability imposed on the conduct of business transactions." *Id.* at 755.

We have followed the purchaser-seller rule since first articulating it in our 1952 *Birnbaum* decision. *See, e.g., Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977), *abrogated on other grounds by Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444

---

nonderivative private civil remedies, created by Congress contemporaneously with the passage of § 10(b), for violations of various provisions of the [Securities Act and the Exchange Act] are by their terms expressly limited to purchasers or sellers of securities." *Id.* at 735-36. In light of that observation, it concluded, "It would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." *Id.* at 736.

7

U.S. 11 (1979); *Lawrence v. Cohn*, 325 F.3d 141, 152-54 (2d Cir. 2003); *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004). And *Blue Chip Stamps*, which embraced *Birnbaum* nearly five decades ago, continues to govern our analysis of statutory standing for Section 10(b) claims.

C.    Application

The purchaser-seller rule requires plaintiffs to have bought or sold ~~a~~the security ~~of the issuer~~ about which a misstatement was made in order to have standing to sue under Section 10(b). Plaintiffs here lack statutory standing to sue Frutarom based on alleged misstatements ~~that the company made~~ about ~~itself~~Frutarom because they bought shares of IFF, not Frutarom.

As IFF shareholders, Plaintiffs argue that they have standing because there was a sufficiently "direct relationship" between Frutarom's misstatements about itself and the price of IFF's shares. Appellants' Br. at 18. This argument is meritless.

First, judicially created private rights of action should be construed narrowly. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." (citation omitted)).[4] Plaintiffs urge

---

[4]    *See also, e.g., Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020) (referencing *Sandoval* and *Blue Chip Stamps* in narrowly construing a judicially created private cause of action in the civil rights context); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 167 (2008) ("This conclusion is consistent with the narrow dimensions we must give to a right of action Congress did not authorize . . . .").

us to read Section 10(b) "flexibly to effectuate its remedial purposes." *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151 (1972) (quoting *SEC v. Cap. Gains Rsch. Bureau,* 375 U.S. 180, 195 (1963)).[5] *Blue Chip Stamps,* however, recognized the need to limit this judicially created private right of action. *See* 421 U.S. at 749 ("We are dealing with a private cause of action which has been judicially found to exist, and which will have to be judicially delimited one way or another . . . ."). And the Supreme Court has emphasized that "in analyzing . . . Rule 10b-5 . . . we must give narrow dimensions to a right of action Congress did not authorize." *Janus Cap. Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011) (cleaned up); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.,* 552 U.S. 148, 165 (2008) ("Concerns with the judicial creation of a private cause of action caution against its expansion. . . . Though it remains the law, the § 10(b) private right should not be extended beyond its present boundaries."). We thus apply the purchaser-seller rule as adopted by the Supreme Court in *Blue Chip Stamps.*

Second, adopting Plaintiffs' "direct relationship" test for standing would begin exactly the "endless case-by-case erosion" of the purchaser-seller rule about which *Blue Chip Stamps* warned. 421 U.S. at 755. Under Plaintiffs' "direct relationship" test, standing would be a "shifting and highly fact-oriented" inquiry, *id.,* requiring courts to determine whether there was a sufficiently direct link between one company's misstatements and another

---

[5] Plaintiffs also argue that Section 10(b)'s language prohibiting "any person" from making material misstatements entitles them to have standing to sue Frutarom. 15 U.S.C. § 78j. But this language speaks only to who may *be sued* under the statute, not who may *bring suit.*

company's stock price. For example, Plaintiffs point to joint press releases, IFF's SEC filings and investor presentations, and investment bank reports about IFF's acquisition of Frutarom to show a direct relationship between Frutarom's misstatements and IFF's stock. *See* Appellants' Br. at 24-27. But *Blue Chip Stamps* cautioned against adding further uncertainty to Section 10(b)'s "rule of liability imposed on the conduct of business transactions." 421 U.S. at 755; *see also Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1283 (11th Cir. 2007) (concluding that the purchaser-seller requirement entails a "formal" and not a "functional" inquiry because "the Court deliberately endorsed a standing rule that would not be subject to 'endless case-by-case erosion' by courts employing a functional analysis to every new group of potential plaintiffs" (quoting *Blue Chip Stamps*, 421 U.S. at 755)).

Third, Plaintiffs' reliance on dicta in *Nortel* is misplaced. In *Nortel*, JDS Uniphase Corporation ("JDS") sold one of its business units to its largest customer, Nortel Networks Corporation ("Nortel") in exchange for Nortel stock. 369 F.3d at 29. Plaintiffs, who were JDS shareholders, sued Nortel for allegedly misleading statements it made about itself leading up to the transaction. *Id.* at 29-30. We held that plaintiffs lacked standing because "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Id.* at 34.

Notwithstanding the holding of the case, Plaintiffs argue that *Nortel* would have found standing if there had been a sufficiently "direct relationship" between Nortel's statements

10

and JDS's stock price. They point to dicta noting that because "a merger creates a far more significant relationship between two companies than does the sale of a business unit," "a potential merger might require a different outcome." [6] *Id.* But we said that was "a question that we leave for another day and about which we express no opinion." *Id.* For the reasons explained above, we now answer that question by holding that purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies.[7]

Nor does our subsequent decision *In re NYSE Specialists Securities Litigation,* 503 F.3d 89 (2d Cir. 2007) *("NYSE Specialists"),* change this result. In that case, we clarified that *Nortel* did not preclude purchasers of a stock from suing "underwriters, brokers, bankers, and non-issuer sellers" under Rule 10b-5. *Id.* at 102. That is entirely consistent with the purchaser-seller rule: Plaintiffs may

---

[6] This dicta appears only in the context of distinguishing *Nortel* from another case, *Semerenko v. Cendant Corp.,* 223 F.3d 165 (3d Cir. 2000). *Nortel* rejected *Cendant* as persuasive authority, so Plaintiffs' attempt to invoke *Cendant* to argue that other courts have allowed plaintiffs in their circumstances to sue is unavailing. In any event, as we noted in *Nortel, Cendant* did not discuss standing. *See Nortel,* 369 F.3d at 33 ("[T]he opinion *[in Cendant]* never explicitly addressed the standing requirement of Rule 10b-5, and this limits its persuasiveness.... [W]e do not agree with the plaintiffs that it presents a compelling argument *in* favor of standing.").

[7] The concurrence states that our opinion "create[s] new law" and urges that we should simply apply *Nortel.* Concurrence at 41. We respectfully disagree. The "direct relationship" test in *Nortel* is dicta and, more importantly, is inconsistent with *Blue Chip Stamps,* as explained below. *See infra* at 12.

11

be able to sue entities other than the issuer of a security if those entities made material misstatements about the ~~issuer~~<u>security</u>, as long as the plaintiffs purchased or sold the securities ~~of the issuer~~ about which the misstatements were made.[8]

In short, Section 10(b) standing does not depend on the significance or directness of the relationship between two companies. Rather, the question is whether the plaintiff bought or sold ~~shares of~~ the ~~company~~<u>securities</u> about which the misstatements were made. *See Nortel,* 369 F.3d at 32 (stating that the plaintiffs' argument that they had standing was "entirely at odds with the purchaser-seller requirement in *Blue Chip Stamps* that 'limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." (quoting *Blue Chip Stamps,* 421 U.S. at 747)). Our conclusion follows directly from our decision in *Nortel.* In both cases, a company whose stock the plaintiffs did not purchase made material misstatements about itself that negatively impacted another company's stock, which plaintiffs did purchase. The fact that this case involved a merger instead of the sale of a business unit and that IFF incorporated some of Frutarom's misstatements in its SEC filings and investor presentations does not change the analysis here. Plaintiffs did not purchase <u>the</u> securities ~~of the issuer~~ about which misstatements were made,

---

[8]  *NYSE Specialists* cast the *Nortel* Court as holding that the connection between Nortel's false statements and plaintiffs' purchase of JDS stock was "too remote to sustain an action under Rule 10b-5." *NYSE Specialists,* 503 F.3d at 102. But *NYSE Specialists* did not purport to answer the question left open *in Nortel.*

so they did not have standing to sue under Section 10(b) or Rule 10b-5.[9]

## III. CONCLUSION

For the reasons set forth above, the district court's judgment is affirmed.

---

[9] Of course, this does not mean that a target company and its officers are free to make material misstatements or omissions as long as the company is acquired. In appropriate circumstances, the acquiring company or its shareholders may have claims against the target company and its officers under state law. *See, e.g., Capax Discovery, Inc. v. AEP RSD Invs., LLC*, 285 F. Supp. 3d 579, 586-89, 593-95 (W.D.N.Y. 2018); *Chase v. Columbia Nat'l Corp.*, 832 F. Supp. 654, 660-63 (S.D.N.Y. 1993). Here, the amended complaint alleges that IFF and Frutarom sued Defendant Yehudai in Israel for making false statements that were "the same or substantially similar to the false representations Plaintiffs allege in [their] complaint." Joint App'x at 26. Shareholders of the target company may also be able to bring claims against the officers or the target company itself, if it continues to exist as a separate legal entity. *See, e.g., In re Stillwater Cap. Partners Inc. Litig.*, 853 F. Supp. 2d 441, 458-59 (S.D.N.Y. 2012) (allowing investors in a target company to sue the target company and its directors under Rule 10b-5 for failure to disclose material facts related to a completed merger). And nothing about the statutory standing of private plaintiffs forecloses the SEC from pursuing enforcement actions. *See* 15 U.S.C. § 78u(d)(3) (giving the SEC authority to bring an action to impose civil penalties).

13

PEREZ, *Circuit Judge,* concurring in the judgment:

I respectfully submit that this Court need not have created new law to dispose of this case and could have resolved the question presented by applying this Circuit's reasoning in *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F.3d 27 (2d Cir. 2004) *("Nortel").* ~~Because I, however, agree with~~Moreover, the majority opinion ~~that plaintiff IFF investors ("Plaintiffs") lack statutory standing to sue Frutarom and its former executives based on the alleged misstatements that Frutarom made about itself~~fails to explain how its new "about which" standard is different from the standard set forth in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 747 (1975) and applied in *Nortel.*[1] *Compare* Op. at 3 (plaintiffs must have purchased a security *"about which* a misstatement was made" (emphasis added)), *with Blue Chip Stamps,* 421 U.S. at 747 (plaintiffs must have "at least dealt in the security *to which* the prospectus, representation, or omission *relates"* (emphasis added)). Nonetheless, because following this

---

[1] The majority opinion and the parties describe the issue before us as a statutory standing issue. To be clear, "[t]he Supreme Court has recently clarified ... that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.,* 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 128, 128 n.4 (2014)). In any event, I believe that no confusion exists as to what this Court is being asked to decide—that is, whether Plaintiffs can bring a claim under Section 10(b) and Rule 10b-5 against Frutarom and its officers.

Circuit's long-standing precedent leads to the same conclusion as the majority opinion, I concur in the ~~judgment~~result.[1]

\* \* \*

Approximately seventy years ago, this Court announced what is known as the "purchaser-seller" rule. In *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), plaintiff stockholders tried to sue their company and its directors for breach of fiduciary duty by corporate insiders resulting in fraud. *Id.* at 462-63. The plaintiffs claimed that one of the directors made misrepresentations in connection with *his* sale of stock. *Id.* at 462. This Court held that Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")[2] and Rule 10b-5[3] did not apply to these claims, as Section 10(b)

---

[1] ~~"The Supreme Court has recently clarified . . . that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 527 U.S. 118, 128, 128 n.4 (2014)). This concurrence nevertheless uses the phrases "standing to sue" and "statutory standing" as the parties and the majority opinion do.~~

[2] Section 10(b) states that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission ("SEC")] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

[3] SEC Rule 10b-5 states that "[i]t shall be unlawful for any person... (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or

2

is "directed solely at [the] type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs" and Rule 10b-5 "extended protection only to the defrauded purchaser or seller." *Id.* at 464. About twenty years later, the Supreme Court in *Blue Chip Stamps ~~v. Manor Drug Stores, 421 U.S. 723 (1975)~~* adopted the *Birnbaum* purchaser-seller rule. *See ~~id~~421 U.S.* at 754-55. In doing so, the Supreme Court limited the class of plaintiffs who could sue under Section 10(b) and Rule 10b-5 to those who purchased or sold securities. *See id.* at 730 (noting that the *Birnbaum* rule limited "the plaintiff class for purposes of a private damage action under [Section] 10(b) and Rule 10b-5 . . . to actual purchasers and sellers of securities"). *Blue Chip Stamps* explained *Birnbaum's* holding as limiting plaintiffs to those "who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* at 747.

Almost thirty years later, in *Nortel*, ~~our~~this Court ~~limited this class of plaintiffs further, holding that~~clarified that under the *Birnbaum* rule, even actual purchasers of stock "do not have standing to sue . . . when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." 369 F.3d at 34. *Nortel's* reasoning, or what this concurrence refers to as *"Nortel's* 'direct relationship' test,"* has been applied by this Court to reject

course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

3

certain claims.[4] A precedential opinion from this Court, *In re NYSE Specialists Securities Litigation,* 503 F.3d 89 (2d Cir. 2007) *("NYSE Specialists"),* clarified *Nortel's* holding as focusing on the significance of the relationship between alleged misstatements and plaintiff's purchase of the securities. *Id.* at 102 ("In the particular circumstances of *[Nortel],* the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b-5."); *see also Harbinger Cap. Partners LLC v. Deere & Co.,* 632 F. App'x 653, 656 (2d Cir. 2015) *("Harbinger")* (summary order) (concluding there was "no relevant difference between Harbinger and the plaintiffs in *Nortel Networks"* and "the connection between defendants' omissions . . . and Harbinger's purchase of . . . stock was too remote to sustain an action under [Section] 10(b) and Rule 10b-5" (internal quotation marks omitted)).

Each case involved a different set of facts. *Blue Chip Stamps* did not involve stockholders, only a prospective offeree —neither a purchaser nor a seller of stock. *See* 421 U.S. at 754. *Nortel,* like the case before us but unlike *Blue Chip Stamps,* involved stockholders — actual purchasers —whose stock was negatively impacted by the alleged misstatements of a company in which they did not purchase

---

[4] The *Nortel* decision may be critiqued as discussing statutory standing and whether a plaintiff has a cause of action as separate inquiries, but any resulting confusion was later clarified *in American Psychiatric Ass'n,* 821 F.3d at 359 and *Lexmark International,* 572 U.S. at 128 n.4, as explained *supra* note 1. *Nortel's* distinction is of no moment here because its "direct relationship" test is not inconsistent with Section 10(b) and Rule 10b-5's requirement that the fraudulent conduct be made *in* connection with the purchase or sale of any security.

4

stock. *See* 369 F.3d at 29. But *Nortel,* unlike the case before us, did not involve a merger, but rather the sale of a business unit. *Id.* at 34 ("[A] merger creates a far more significant relationship between two companies than does the sale of a business unit. Thus, while a potential merger might require a different outcome, [that is] a question that we leave for another day and about which we express no opinion . . . ."). Each case required the reviewing court to make a policy choice informed by statutory text and judicial precedent about who could bring claims under Section 10(b) and Rule 10b-5.

Today this Court, the majority opinion also makes a policy choice. It holds by holding that standing the ability to bring a claim under Section 10(b) and Rule 10b-5 is limited to "purchasers or sellers of securities issued by the company *about which* a misstatement was made. This holding is unsurprising given" The majority opinion provides no explanation as to why it is now necessary to alter the language that the Supreme Court and our Court's historically "restrictive view of standing under Rule 10b-5." *Id.* at 31. It is also a defensible answer to the question left open by *Nortel.* this Circuit have used for decades since *Birnbaum.* Nor does the majority opinion provide any clarifying guidance on how litigants should apply the new standard, except to say that the "about which" inquiry does *not* look to the connection, or relation, between the false statements and the plaintiff's purchase of stock, as *Nortel's* "direct relationship" test instructs. Op. at 10-12. The majority opinion's new standard only adds confusion, given that the purchaser-seller requirement plainly instructs courts to evaluate whether plaintiffs "have at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps,* 421 U.S. at 747.

5

~~But this Court need not have created new law to resolve this case. We have twice interpreted or applied *Nortel's* holding and analysis regarding statutory standing. *See In re*~~ We could have decided this case on an application of *Nortel* and *NYSE Specialists* ~~*Sec. Litig.*, 503 F.3d 89 (2d Cir. 2007) ("*NYSE Specialists*"); *Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653 (2d Cir. 2015) ("*Harbinger*") (summary order). And as in *Nortel* and *Harbinger*, Plaintiffs lack standing because, under the circumstances of the case, the relationship between one company's material misstatements about itself and another company's stock price was "too remote to sustain an action" under Section 10(b) and Rule 10b 5.~~ (as in *Harbinger*), thus leaving open the question *Nortel* raised about a potential merger, Op. at 11, and allowing for future consideration of other fact patterns by this Court and the trial courts when the outcome would be dispositive. *See NYSE Specialists*, 503 F.3d at 102 (clarifying *Nortel*); *see also Harbinger*, 632 F. App'x at 656. ~~We could have decided this case on an application of *Nortel* (as happened in *Harbinger*), thus leaving open the question *Nortel* raised and allowing for future consideration of other fact patterns by this Court and the trial courts.~~And as in *Nortel* and *Harbinger*, Plaintiffs cannot prevail on their claim because, under the circumstances of the case, the relationship between material misstatements about one company and Plaintiffs' purchase of securities in another was "too remote to sustain an action" under Section 10(b) and Rule 10b-5. *NYSE Specialists*, 503 F.3d at 102; *Harbinger*, 632 F. App'x at 656.

6

## I.

~~*Nortel's* reasoning can be applied here.[4]~~Applying *Nortel's* "direct relationship" test, ~~Plaintiffs lack statutory standing to sue.~~

the question is whether Plaintiffs have demonstrated a ~~sufficiently direct~~<u>sufficient</u> relationship between Frutarom's alleged misstatements and IFF's stock price. They have not.

First, Plaintiffs have not demonstrated a more direct relationship than in *Nortel*~~,~~— the bare minimum given that ~~we concluded the *Nortel* plaintiffs did not have standing because~~ "the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was *too remote* to sustain an action under Rule 10b-5." *NYSE Specialists,* 503 F.3d at 102 (emphasis added). Plaintiffs have not demonstrated that Frutarom's "representations had a . . . more direct relationship to

---

~~[4]   *Nortel's* "direct relationship" reasoning, *see* 369 F.3d at 34, has been incorporated by this Court in a precedential opinion, *NYSE Specialists,* which clarified *Nortel's* holding to focus on the significance of the relationship between alleged misstatements and the issuer, *see* 503 F.3d at 102 ("In the particular circumstances of *[Nortel],* the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b-5."). Moreover, this Court has already applied *Nortel* to deny standing. *See Harbinger,* 632 F. App'x at 656 (concluding plaintiff Harbinger lacked statutory standing, as there was "no relevant difference between Harbinger and the plaintiffs in *Nortel Networks*" and "the connection between defendants' omissions . . . and Harbinger's purchase of . . . stock was too remote to sustain an action under [Section] 10(b) and Rule 10b-5" (internal quotation marks omitted)). Thus, *Nortel's* reasoning, or what I am describing as "*Nortel's* 'direct relationship' test," can also be applied here.~~

the value of [IFF's] stock than Nortel's statements did to the value of JDS's stock." *Nortel*, 369 F.3d at 34. As the majority opinion correctly summarizes, Plaintiffs point to joint IFF-Frutarom press releases and statements, IFF's SEC filings and investor presentations, and third-party reports to establish this "direct relationship." *See* Op. at 10. But these factors were also present in *Nortel*. Nortel and JDS Uniphase together announced the sale, *see Nortel*, 369 F.3d at 29 ("Nortel and JDS confirmed that JDS was selling their laser business to Nortel in exchange for $2.5 billion in Nortel stock and a promise of increased fiber optic component purchases."); Nortel based its expected growth and revenue on its purchase from and business relationship with JDS Uniphase, *see id.* ("Nortel publically [sic] indicated that it saw strong demand for its fiber optics products and expected 30% growth in revenue and earnings for 2001."); and market analysts tied the value of Nortel's stock to JDS Uniphase, *see id.* ("[M]arket analysts determined that this transaction would make it more likely that JDS would meet its 2001 financial projections."). Thus, as in *Nortel*, ~~Frutarom's~~the false statements about ~~itself~~Frutarom and Plaintiffs' purchase of IFF stock were "too remote to sustain an action" under Section 10(b) and Rule 10b-5. *NYSE Specialists*, 503 F.3d at 102.

Second, Plaintiffs have not demonstrated how the IFF-Frutarom merger itself created a more "direct relationship" between Frutarom's misstatements and IFF's stock price than the sale of a business unit in *Nortel*. By focusing on the form of the relationship between IFF and Frutarom, Plaintiffs—as the majority opinion aptly notes—rely too heavily on *Nortel's* dicta. *See* Op. at 10-11. While *Nortel* left open the possibility that "a potential merger might require a different outcome," 369 F.3d at 34,

8

Plaintiffs fail to persuasively explain how the IFF-Frutarom merger here pushed them over the threshold.

For these reasons, I agree with my colleagues that we should affirm the district court's judgment.

## II.

The majority opinion's broad language about narrowing judicially created implied private rights of action, *see* Op. at 8 (citing *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)), is outside the scope of the matter before us, and the relevant cited cases speak only to concerns in the Section 10(b) and Rule 10b-5 context.

*Sandoval's* counsel against the creation of implied private rights of action, *see* 532 U.S. at 287 ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." (citation omitted)), does not apply here, where this Court is not asked to create a new right. Indeed, the Supreme Court has already "implied a private cause of action from the text and purpose of [Section] 10(b)." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008) ("[T]he implied right of action . . . is now a prominent feature of federal securities regulation."). Thus, the task of courts, including this Court, is to define the scope of this right, for "[w]e are dealing with a private cause of action . . . which will have to be *judicially delimited* one way or another unless and until Congress addresses the question." *Blue Chip Stamps*, 421 U.S. at 749 (emphasis added).

By contrast, *Blue Chip Stamps*, the leading case on the purchaser-seller rule, does not provide support for any concern

9

with judicially created implied private rights of action. Quite simply, the Supreme Court in *Blue Chip Stamps* concluded that *Birnbaum's* purchaser-seller rule made good policy sense and that nothing in the text of the statute or rule prevented the Court from adopting that rule. *See id.* at 748-49 ("[W]e are not dealing here with any private right created by the express language of [Section] 10(b) or of Rule 10b-5. No language in either of those provisions speaks at all to the contours of a private cause of action for their violation. However flexibly we may construe the language of both provisions, nothing in such construction militates against the *Birnbaum* rule."); *see also id.* at 755 (noting the "general adoption of the *[Birnbaum]* rule by other federal courts in the 25 years since it was announced, and the consistency of the rule with the statutes involved and their legislative history" as grounds for its adoption).

The other cases the majority opinion cites narrowly concern private plaintiffs suing under Section 10(b) and Rule 10b-5.[5] *See*

---

[5]   The majority opinion also cites a civil rights case interpreting the private right of action under 42 U.S.C. § 1981. *See* Op. at 8 n.4 (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 140 S. Ct. 1009, 1015 (2020)). But that case does not support the majority opinion's proposition. In *Comcast Corp.,* the Supreme Court relied on the traditional tools of statutory interpretation to reach its holding, not on any guiding principle on narrowly construing judicially created implied private rights of action. *See* 140 S. Ct. at 1013 (looking to "th[e] particular statute's text and history" to conclude that a § 1981 plaintiff must establish but-for causation); *id.* at 1014 (relying on "clues from the statute's text, its history, and [Supreme Court] precedent" to reach its conclusion); *id.* at 1019 (explaining that "[a]ll the traditional tools of statutory interpretation persuade [the Supreme Court] that § 1981 follows the usual rules, not any exception"). Indeed, *Comcast Corp.* references *Sandoval* to

*Janus Cap. Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011) (explaining that "in analyzing . . . Rule 10b-5 . . . we must give narrow dimensions to a right of action Congress did not authorize" (cleaned up)); *Stoneridge Inv. Partners,* 552 U.S. at 164 (noting the "history of the [Section] 10(b) private right and the careful approach the Court has taken before proceeding without congressional direction"); *id.* at 165 ("Concerns with the judicial creation of a private cause of action caution against its expansion. The decision to extend the cause of action is for Congress, not for us. Though it remains the law, the [Section] 10(b) private right should not be extended beyond its present boundaries.").

Nevertheless, "caution against [the] expansion," ~~*Stoneridge Inv. Partners,* 552 U.S. at 165,~~ of a judicially created implied private right of action does not require courts to limit the scope of such a right as a matter of course. *Stoneridge Inv. Partners, 552 U.S. at 165.* Rather, we must focus our task on defining the scope of these rights in light of the statutory text. *See Blue Chip Stamps,* 421 U.S. at 755-56 (Powell, J., concurring) (writing separately to "emphasize the significance of . . . the language of [Section] 10(b) and Rule 10b-5"

---

provide historical context for the judicial creation of implied private rights of action. *See id.* at 1015 (citing *Sandoval,* 532 U.S. at 286-87). Further, *Comcast Corp.* references *Blue Chip Stamps* for the undisputed proposition that, when defining the scope of such rights, the Supreme Court has looked to other parts of the relevant statutory text, "insist[ing] on legal elements at least as demanding as those Congress specified for analogous causes of action actually found in the statutory text." *Id.* (citing *Blue Chip Stamps,* 421 U.S. at 736); *see also id.* ~~at 1015~~ (noting that "[t]he larger structure and history of the Civil Rights Act of 1866 provide further clues" in support of its interpretation).

11

and explaining that "[t]he starting point in every case involving construction of a statute is the language itself").

~~Today's holding is a defensible one because nothing in the text of Section 10(b) or Rule 10b-5 "militates against" it, *see id.* at 749, and Supreme Court and Second Circuit precedent provide support for it.~~ Any views the majority opinion expresses regarding implied private rights of actions generally are dicta and go beyond the question before us.

## III.

It is important to acknowledge <u>that</u> today's holding is an example of judicial policymaking.

Of course, the Supreme Court has endorsed judicial policymaking in ~~this~~<u>the</u> securities <u>fraud</u> context. *See Blue Chip Stamps*, 421 U.S. at 749 ("Given the peculiar blend of legislative, administrative, and judicial history which now surrounds Rule 10b-5, we believe that practical factors . . . are entitled to a good deal of weight."); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 84 (2006) ("Unlike the *Birnbaum* court, which relied on Rule 10b-5's text in crafting its purchaser-seller limitation, th[e] [Supreme] Court in *Blue Chip Stamps* relied chiefly, and candidly, on policy considerations in adopting that limitation." (internal quotation marks omitted)).

Indeed, this Court has previously relied on these "policy considerations," among other factors, to define the scope of this private right of action. *See Nortel*, 369 F.3d at 31 ("When we deal with private actions under Rule 10b-5, we deal with a judicial oak which has grown from little more than a legislative acorn. It is therefore proper that we consider . . . what may be described as

12

policy considerations when we come to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance." (cleaned up) (quoting *Blue Chip Stamps*, 421 U.S. at 737)); *see also id.* at 33.

By rejecting *Nortel's* "direct relationship" test here in favor of an "about which" standard, the majority opinion similarly reflects a policy choice.[6] The advantages of formalism in the law of business transactions are sensibly described in the majority opinion, *see* Op. at 10, but, as noted in *Blue Chip Stamps*, there are disadvantages to such rigidity, *see* 421 U.S. at 743 ("The *Birnbaum* rule undoubtedly excludes plaintiffs who have in fact been damaged by violations of Rule 10b-5, and to that extent it is undesirable. But it also separates in a readily demonstrable

---

[6] Indeed, the majority opinion's statement that *Nortel's* "direct relationship" test is inconsistent with *Blue Chip Stamps, see* Op. at 11 n.7, overlooks the policy choices that courts have had to make to interpret standing under Section 10(b) and Rule 10b-5. In any event, *Nortel's* "direct relationship" test, *see NYSE Specialists,* 503 F.3d at 102, is consistent with *Blue Chip Stamps. Blue Chip Stamps* did not define fully the scope of the purchaser-seller rule, for it involved neither a purchaser nor seller of securities. *See supra* at 3. *Nortel* itself recognized the limits of any straightforward application of *Blue Chip Stamps's* purchaser-seller rule and rejected its plaintiffs' argument by invoking legislative intent and policy considerations. *See* 369 F.3d at 32-33. So, while *Blue Chip Stamps* provides a foundation for today's holding, it could did not predetermine the outcome of this case, nor did it foreclose a "direct relationship" test. *Nortel's* requirement —that the statements at issue have a sufficient connection to the plaintiff's purchase of securities—is plainly consistent with the elements necessary to bring a claim under Section 10(b) and Rule 10b-5.

13

manner the group of plaintiffs who actually purchased or actually sold . . . . [a]nd this fact is one of its advantages."). Openly acknowledging the value judgments behind judicial decisions benefits all stakeholders to the judicial process, including the other branches of government and the public.

Given the Court's decision today, Congress can choose to ratify ~~this Court's holding~~<u>the majority's opinion</u> if it has the inclination and occasion to do so. *See Stoneridge Inv. Partners*, 552 U.S. at 166 ("It is appropriate for us to assume that when [the Private Securities Litigation Reform Act ("PSLRA")] was enacted, Congress accepted the [Section] 10(b) private cause of action as then defined but chose to extend it no further."); *id.* at 176 n.11 (Stevens, J., dissenting) ("The Court does concede that Congress has now ratified the private cause of action in the PSLRA."). And Congress also can amend the Exchange Act, if in its view, this Court erred today.

14