**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHANE LAVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VIRGIN GALACTIC HOLDINGS, INC., RICHARD BRANSON, CHAMATH PALIHAPITIYA, MICHAEL A. COLGLAZIER, and GEORGE WHITESIDES<br><br>Defendants. | Case No. 1:21-cv-03070-ARR-TAM |

**PLAINTIFFS' SUR-REPLY IN FURTHER OPPOSITION TO**

**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.    Introduction.......................................................................................................................... 1

II.   Pre-Merger Statements at Issue ........................................................................................ 2

III.  The Prospectuses at Issue Relate to Social Capital and Post-Merger Virgin Galactic
      Securities............................................................................................................................ 2

IV.   The Challenged Statements Were "About" Social Capital and Post-Merger Virgin
      Galactic Securities.............................................................................................................. 4

V.    *Frutarom I* Was Amended Precisely To Prevent The Result in *CarLotz* ........................ 5

VI.   *Frutarom II* and *CarLotz* Are Distinguishable On Their Facts......................................... 6

## I.    Introduction

Defendants argue that a recent district court opinion interpreting a 2022 Second Circuit decision mandates dismissal of all claims by all SPAC investors that are based on statements made before a SPAC merger closes. *In re CarLotz, Inc. Sec. Litig.*, 2023 WL 2744064, at *1 (S.D.N.Y. Mar. 31, 2023) (interpreting *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022) ("*Frutarom II*")).[1]

Defendants are wrong. *Frutarom II* reiterates controlling law that a cause of action under §10(b) of the Securities Exchange Act of 1934 is available to plaintiffs who "dealt in the security to which the prospectus, representation, or omission relates." *Id.* at 85 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975)). Here, Defendants made false statements in pre-merger prospectuses and other SEC filings that related directly to the decision of pre-merger Social Capital investors to approve the merger with Virgin Galactic. Class Period investors who bought Social Capital securities have standing to pursue these claims. Class Period investors who purchased post-merger Virgin Galactic securities likewise have standing to sue for Defendants' pre-merger statements, because those statements also "relate[]" to the securities they purchased. 421 U.S. at 747.

Indeed, the original *Frutarom* opinion ("*Frutarom I*") was withdrawn precisely to prevent the result in *CarLotz*. The Second Circuit panel clarified in *Frutarom II* that challenged statements need not be specifically about the *issuer* of a security to give rise to standing; rather, the statements need only relate to the *securities* purchased. *Frutarom II*, 54 F.4th at 84 (interpreting *Blue Chip Stamps* as conferring standing upon "purchasers or sellers of securities about which a misstatement

---

[1] This brief refers to: (1) Virgin Galactic Holdings, Inc., the private company that existed before the merger, as pre-merger Virgin Galactic; (2) the publicly traded company created through the merger as post-merger Virgin Galactic; (3) and the pre-merger SPAC, Social Capital Hedosophia Holdings Corp., as "Social Capital". The merger was completed on October 25, 2019.

was made."). Thus, the focus of Defendants and the *CarLotz* opinion on whether challenged statements were about the *issuer* of the securities is misplaced. Finally, both *CarLotz* and *Frutarom II* are distinguishable on their facts. Defendants' belated standing challenge fails.

## II.    Pre-Merger Statements at Issue

The Complaint alleges that Defendants made false statements in advance of the merger, including in various pre-merger SEC filings. These included: prospectuses on Form 425 filed July 9, 2019 (*e.g.*, ¶¶275-80) (the "July prospectuses"), prospectuses on Form 425 filed in September 2019 (*e.g.*, ¶¶285-94) (the "September prospectuses"), and a Form S-4 Registration Statement filed August 7, 2019, the prospectus for which was filed October 10, 2019 (*e.g.*, ¶283-84).[2]

## III.    The Prospectuses at Issue Relate to Social Capital and Post-Merger Virgin Galactic Securities

*Frutarom II* holds that "*Blue Chip Stamps*…continues to govern our analysis of statutory standing for Section 10(b) claims." 54 F.4th at 86. Referred to as the "purchaser-seller" rule, *Blue Chip Stamps* held that to allege standing for §10(b) claims, investors must have "dealt in the security to which the prospectus…relates." 421 U.S. at 747.

Here, the challenged prospectuses "relate to" the securities of Social Capital and post-merger Virgin Galactic. That Social Capital's own prospectuses relate to the Social Capital securities that investors purchased during the pre-merger part of the Class Period cannot reasonably be disputed. For example, the September prospectuses indicated they were prepared "to assist interested parties in making their own evaluation with respect to the [merger]"[3]—

---

[2] The Complaint also alleges that Defendant Palihapitiya made false statements relating to Virgin Galactic and the proposed transaction (¶281), but as the Chairman of Social Capital's board soliciting Social Capital investors, *Frutarom II* is not relevant to his liability to pre-merger Social Capital shareholders.

[3] *E.g.* September 5 Prospectus on Form 425, page 1, second sentence under "Disclaimer" (*available at* https://www.sec.gov/Archives/edgar/data/1706946/000119312519238298/d740846d425.htm)).

necessarily meaning the vote by Social Capital investors on approval of the merger. The August 7, 2019, Form S-4 and prospectus similarly urged investors to "CAREFULLY REVIEW[] THIS PROXY STATEMENT/PROSPECTUS"[4] before voting on the merger.[5]

Those pre-merger prospectuses also relate to the Virgin Galactic securities purchased after the merger closed. The prospectuses explicitly stated that they were prepared for the purpose of creating publicly traded shares of post-merger Virgin Galactic; clearly, then, the prospectuses "relate" to those shares. For example, all of the Forms 425 contained words to the effect that the information contained therein "*relates to a proposed transaction* between Virgin Galactic, The Spaceship Company, and SCH", *i.e.*, the transaction to take Virgin Galactic public.[6] Moreover, the prospectus within the August 4, 2019 Form S-4 explicitly referred to "Risk Factors" associated with *post-merger Virgin Galactic's business*[7] and the purported risks discussed primarily related to *post-merger* commercialization issues.[8] In sum, the pre-merger prospectuses necessarily "relate" to post-merger Virgin Galactic shares purchased by investors during the Class Period, and those investors have standing to sue.

---

[4] *See* https://www.sec.gov/Archives/edgar/data/1706946/000119312519215509/d785777ds4.htm

[5] The September 2019 prospectuses similarly urged both current and prospective investors that "[b]efore making any voting decision, investors and security holders of SCH are urged to read the [August 7, 2019] registration statement, the proxy statement/prospectus included therein and all other relevant documents filed or that will be filed with the SEC in connection with the proposed transaction as they become available because they will contain important information about the proposed transaction." *All* of those referenced documents contained "important information" about post-merger Virgin Galactic.
(*available at* https://www.sec.gov/Archives/edgar/data/1706946/000119312519255338/d629444d425.htm)

[6] *E.g.* September 5 Prospectus, page 1, first sentence under Additional Information and Where to Find It.

[7] August 4, 2019 Form S-4 at 33 ("Unless the context otherwise requires, all references in this subsection to the "Company," "we," "us" or "our" refer to the business of the VG Companies and their subsidiaries prior to the consummation of the Business Combination, *which will be the business of VGH, Inc. and its subsidiaries following the consummation of the Business Combination*.") (emphasis added).
(*available at* https://www.sec.gov/Archives/edgar/data/1706946/000119312519215509/d785777ds4.htm)

[8] *Id.* at 33-51.

IV.    **The Challenged Statements Were "About" Social Capital and Post-Merger Virgin Galactic Securities**

*Blue Chip Stamps* and *Frutarom II* also confer standing upon investors who purchase securities to which the challenged statements "relate" or "about which" challenged statements were made. *Blue Chip Stamps*, 421 U.S. at 747 (standing exists if investor "dealt in the security to which the… representation, or omission relates"); *Frutarom II*, 54 F.4th at 84 (standing exists for "purchasers or sellers of securities about which a misstatement was made.").

Moreover, the Second Circuit has found that fraudulent statements can concern multiple securities. For example, the Second Circuit found that one set of statements gave plaintiffs standing to sue regarding every security that traded on the New York Stock Exchange. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007).[9] Here, Plaintiffs' argument is considerably more modest: the challenged pre-merger statements were "about" or "relate to" Social Capital and post-merger Virgin Galactic securities because, among other things, they were made in documents disseminated to investors for the purpose of creating a publicly traded post-merger Virgin Galactic and describing post-merger Virgin Galactic's business.

Indeed, *all* of the challenged pre-merger statements were "about" or "relate to" post-merger Virgin Galactic's commercial viability. For example, post-merger Virgin Galactic securities relate to the pre-merger statement that "by demonstrating the repeatability of the full flight profile through the completion of two crewed spaceflights, VG believes it has overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service." ¶275. Similarly, pre-merger statements made by Defendants in September 2019

---

[9] The district court noted that "[t]his is a securities class action brought on behalf of public investors who purchased and/or sold shares listed on the New York Stock Exchange ("NYSE") during the Class period." *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 289 (S.D.N.Y. 2005).

regarding Virgin Galactic's "Fleet Build Progress and Expected Expansion Schedule" (¶287) and assumed "June 2020 commencement of commercial operations" (¶289) likewise "relate" to post-merger Virgin Galactic securities. Post-merger investors have standing to sue for those pre-merger statements because they "relate" to the securities purchased after the merger closed.

**V.      *Frutarom I* Was Amended Precisely To Prevent The Result in *CarLotz***

*Frutarom I*, the panel's earlier opinion, required that "plaintiffs [] bought or sold *a security of the issuer about which a misstatement was made* in order to have standing to sue under Section 10(b)." *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, Case No. 21-1076, Dkt No. 121-1 (2d Cir. Sept. 30, 2022) ("Original Opinion") at 8 (emphasis added).

When the plaintiffs sought a rehearing *en banc*, a group of securities laws scholars filed an amicus brief ("Securities Scholars Brief"). They explained that the language that the plaintiffs must have bought "a security *of the issuer* about which a misstatement was made" could have serious unintended consequences, including with respect to SPACs like Virgin Galactic:

> [A] misrepresentation may "relate" to important classes of securities that are not "issued" by the company "about which a misstatement was made" but whose value is nonetheless a function of that company's prospects. Examples include options and other derivatives, *securities of SPACs* …"

*See* Declaration of Ex Kano S. Sams II ("Sams Decl."), Ex. 2 (Securities Scholars Brief), at 6.

The Securities Scholars Brief explained the stakes: if the Original Opinion *did* release all SPACs, it would be issuing get-out-of-jail free cards to more than half of the new public listings in 2020. *Id.* at 9.

After the Securities Scholars filed their brief, the panel withdrew the Original Opinion. *Frutarom II* replaced the references to "the issuer" with "the security". *See* Sams Decl., Ex. 1 (redline showing changes from *Frutarom I* to *Frutarom II*). The Second Circuit then denied rehearing *en banc*.

5

*Frutarom II* preserves standing for investors who did not purchase the issuer's security. The result here is that post-merger Virgin Galactic investors, who did not purchase Social Capital (*i.e.* the pre-merger issuer's) shares, nonetheless have standing to pursue claims for pre-merger statements because those statements relate to the securities they purchased.

An examination of options further illustrates the point. Under the Original Opinion, investors arguably might not have standing to pursue claims based on stock options, because options are not "a security ***of the issuer***".[10] Yet statements about the security to which stock options relate are also "about" the options, so *Frutarom II* preserves the standing of options investors to sue under §10(b)—as it was required to by *Blue Chip Stamps* and earlier panel rulings allowing options holders to bring §10(b) claims. *E.g. Powers v. Brit. Vita, P.L.C.*, 57 F.3d 176, 190 (2d Cir. 1995). For exactly the same reason, *Frutarom II* removes any doubt that investors who purchased SPAC securities before the merger have standing to sue over statements that nominally concern the target. After the merger was announced, a share of Social Capital was no more than the right to receive a Virgin Galactic share upon the merger's closing. Likewise, while post-merger investors did not purchase securities of the *issuer* of the securities at the time misleading pre-merger misstatements were made, they have standing because those statements are "about" and "relate to" the securities they purchased after the merger. Under both *Blue Chip Stamps* and *Frutarom II*, the focus of *CarLotz* and Defendants on whether the challenged statements are about the ***issuer*** of the securities purchased is entirely misplaced.

## VI. *Frutarom II* and *CarLotz* Are Distinguishable On Their Facts

In *Frutarom II*, the plaintiffs bought shares of International Flavors & Fragrances, Inc.

---

[10] *See, e.g., Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 961 (N.D. Cal. 2005) (unlike common stock—but like stock in a merger target, and contingent rights to acquire stock—equity-linked debt securities make their owners into *potential* holders of the linked corporation's common stock).

("Acquiror") after it had announced plans to acquire Frutarom Industries Ltd. ("Target"). 54 F.4th at 84.  The Target was a large company whose shares were traded on the London Stock Exchange. *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Frangrances Inc.*, 2021 WL 1199035, *2 (S.D.N.Y. Mar. 30, 2021). As a result, the Target made regular public reports about its operations for its own shareholders' benefit. The plaintiffs brought claims against the Target because *its* statements to *its* shareholders were incorporated into certain statements the Acquiror made to its own shareholders. The lower court dismissed the §10(b) claim against the Acquiror not on standing grounds, but for failure to allege scienter. *Id*. at *29-*30 (failure to plead scienter as to Acquiror and dismissing for lack of standing as to Target). The plaintiffs pursued their appeal only against the Target.

Thus, in *Frutarom II*, most of the statements the plaintiffs challenged were addressed to the Target's existing public shareholders. When they were speaking to the Target's investors, the Targets' officers' statements were naturally about the Target, and the Target alone. Indeed, the Target needed its shareholders to approve the merger; the Acquiror did not. The Second Circuit found that the Acquiror's incidental use of the Target's statements did not grant the Acquiror's shareholders standing to sue the Target for statements that the Target made to its own shareholders.

The subject of a statement depends on the context in which the statement is made. "It would be a shame if something were to happen to your business" can be about extortion or insurance, for example, depending on speaker's identity. Here, the documents which contained the challenged statements were addressed to Social Capital shareholders. Nor could Virgin Galactic be addressing its own shareholders. When pre-merger Virgin Galactic wanted to disseminate information to its shareholders, it called Richard Branson. Likewise, the documents which contained the challenged statements were issued for the express purpose of creating publicly traded post-merger Virgin Galactic shares. So when they made statements before the Merger, Defendants had only two

7

audiences: Social Capital investors, whose votes they were soliciting, and investors considering whether to buy post-merger Virgin Galactic shares once the merger closed.

Similarly, after the merger was announced, Social Capital securities related to only one substantive matter: Virgin Galactic and its space program. Defendants' pre-merger statements were about Social Capital and post-merger Virgin Galactic securities because the point of the statements was to get investors to do something—buy shares, vote, don't redeem—about those securities.

Nor was there anything else upon which Social Capital investors could focus. In *Frutarom*, the Acquiror was itself a large publicly-traded company. The Acquiror's investors would not pay the Target's statements undue attention. Social Capital's only business was merging with Virgin Galactic. There was nothing else for investors to consider. Thus, unlike in *Frutarom II*, pre-merger statements about Virgin Galactic were also about Social Capital.

In *CarLotz*, the plaintiffs apparently conceded that the pre-merger statements were about pre-merger CarLotz (the target) and no other company. *CarLotz*, 2023 WL 2744064, at *4. Instead, they argued incorrectly that there was no difference between pre-merger CarLotz and post-merger CarLotz. The court rejected their argument because it did not address *Frutarom* on its terms.

The *CarLotz* plaintiffs raised the immense public policy costs that the defendants' argument would effectively give SPACs a license to lie. Though it seemed disturbed, the court read the Second Circuit's opinion as having rejected the concerns. The court was wrong. As set out above, the Second Circuit withdrew *Frutarom I* precisely because it might deprive SPAC investors (among others) of a cause of action. The *CarLotz* court also credited the concurrence's assertion that the majority was making policy rather than following existing law. The conclusion was unwarranted; not only did the majority disagree that it was making new policy, but not even

8

the concurrence suggested that the majority was making new policy ***about SPACs***.

Indeed, Defendants implicitly concede that *CarLotz* erred. Defendants assert that they are raising this point "at the first pragmatically possible time," because *CarLotz* was decided after they filed their opening brief. Defendants' Reply at p. 5, n.2. Yet the *CarLotz* court dismissed the claims because it believed it was bound by *Frutarom II*. And *Frutarom II* was decided on November 30, 2022, well before Defendants filed their opening brief in support of their motion to dismiss, which did not cite *Frutarom II*. If *CarLotz* correctly interpreted *Frutarom II*, then the "first pragmatically possible time" Defendants could have challenged standing would have been when Defendants filed their opening brief. So either Defendants are improperly raising arguments in reply that they could have raised in their opening brief, in which case the Court should disregard the argument, or *CarLotz* misinterprets *Frutarom II*, in which case the Court should deny Defendants' arguments on the merits.

In conclusion, Plaintiffs have standing to challenge Defendants' pre-merger statements. The Court should reject Defendants' standing arguments and deny the motion to dismiss in its entirety.

Dated: May 23, 2023

**GLANCY PRONGAY & MURRAY LLP**

Kara M. Wolke
Ex Kano S. Sams II
Natalie S. Pang
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
phone: (310) 201-9150
fax: (310) 432-1495
Email: kwolke@glancylaw.com
Email: esams@glancylaw.com
Email: npang@glancylaw.com

**THE ROSEN LAW FIRM, P.A.**
By: *s/  Jonathan Horne*
Jonathan Horne, Esq. (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*

10