**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHANE LAVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>   v.<br><br>VIRGIN GALACTIC HOLDINGS, INC., MICHAEL A. COLGLAZIER, GEORGE WHITESIDES, DOUG AHRENS, and JON CAMPAGNA,<br><br>    Defendants. | Case No. 1:21-cv-03070-ARR-TAM |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION, CERTIFICATION FOR INTERLOCUTORY APPEAL, AND/OR ENTRY OF FINAL JUDGMENT

**TABLE OF CONTENTS**

I.  Introduction ............................................................................................................... 1

II. The Court Should Reconsider Two Discrete Aspects Of The Order ................................. 6

    A.  Standards Applicable To A Motion To Reconsider ................................................. 6

    B.  The Court Should Reconsider Its Dismissal Of Statements Made In Virgin Galactic's December 13, 2019 Press Release .......................................................... 6

        1.  The Court Previously Held The Hyperlinked Statement Was Misleading When Made On December 13, 2019, And Has Now Reversed Its Prior Ruling In The Order ................................................................................................. 6

        2.  The Statements In The December 2019 Press Release, Including The Hyperlinked Statements, Were "Made" By Post-Merger Virgin Galactic ........................... 9

        3.  The Statements In The December 2019 Press Release Were "About" Post-Merger Virgin Galactic .............................................................................. 12

    C.  The Court Should Reconsider Its Holding That Plaintiffs Failed To Plead Defendant Branson's Violation Of The §10(b) And Rule 10b-5 Prohibition On Insider Trading As To His August 10-12, 2021 Sales .................................................................... 13

III. The Court Should Certify The Order For Interlocutory Appeal Under 28 U.S.C. §1292 To Resolve Substantial Grounds For Difference Of Opinion Regarding The Application Of *Frutarom* In SPAC Cases ............................................................................................. 15

    A.  The Court's Dismissal Order Is Based On A Controlling Question Of Law ........ 16

    B.  There Are Substantial Grounds For Difference Of Opinion ................................ 17

        1.  The Application Of *Frutarom*'s "About Which" Test To The SPAC Context Presents A Difficult Question Of First Impression ................................... 18

        2.  *Frutarom* Was Amended To Avoid Conflict With Prior Binding Second Circuit Authority In *In re NYSE Specialists* ........................................... 20

        3.  *Frutarom* Does Not Compel the Court's Conclusion Because Plaintiffs Are At the Core of §10(b)'s Concerns ............................................................... 23

        4.  The Court's Application Of *Frutarom* Would Mean Several Second Circuit Decisions Reached The Wrong Result .................................................... 25

        5.  The Court's Reading of *Frutarom* Arguably Conflicts With *Blue Chip Stamps* ........................................................................................ 26

C.     An Immediate Appeal Would Materially Advance The Litigation ...................... 27

D.     Discretionary Factors Support An Immediate Appeal ......................................... 29

IV.    If The Court Declines To Reconsider Dismissal Of The Specified Claims And Declines To Certify Its Order For Interlocutory Appeal, It Should Enter Judgment Pursant To Fed. R. Civ. Proc. 54(b) So Impacted Investors May Pursue An Immediate Appeal .......................... 30

V.    CONCLUSION ..................................................................................................... 34

## TABLE OF AUTHORITIES

CASES

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012).............................................................................. 11

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
   106 F.3d 11 (2d Cir. 1997)........................................................................ 31, 32

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)............................................................................... *passim*

*Bond v. Clover Health Invs., Corp.*,
   587 F. Supp. 3d 641 (M.D. Tenn. 2022)........................................................ 24

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
   No. 4:19-CV-957, 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021).......................... 24

*Curtiss-Wright Corp. v. Gen. Elec. Co.*,
   446 U.S. 1 (1980)................................................................................. 30, 31

*Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
   606 F. Supp. 3d 124 (E.D. Pa. 2022) ............................................................ 24

*DeLeonardis v. Berg*,
   40 F. Supp. 2d 488 (E.D.N.Y. 1999) ............................................................ 33

*DeLeonardis v. Berg*,
   199 F.3d 1321 (2d Cir. 1999)...................................................................... 33

*Elkind v. Liggett & Myers, Inc.*,
   635 F.2d 156 (2d Cir. 1980)....................................................................... 11

*Glory Wealth Shipping Serv. Ltd. v. Five Ocean Corp.*,
   571 F. Supp. 2d 542 (S.D.N.Y. 2008)............................................................. 6

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995)................................................................................. 27

*Guzman v. First Chinese Presbyterian Cmty. Affairs Home Attendant Corp.*,
   2021 WL 1852038 (S.D.N.Y. May 7, 2021) .............................................. 17, 29

*In Re CarLotz, Inc. Sec. Litig.*,
   2023 WL 2744064 (S.D.N.Y. Mar. 31, 2023) ................................................... 9

*In re Garrett Motion Inc. Sec. Litig.*,
    2022 WL 976269 (Mar. 31, 2022) ................................................................. 8, 12

*In re Gen. Motors LLC Ignition Switch Litig.*,
    427 F. Supp. 3d 374 (S.D.N.Y. 2019) ......................................................... 28, 29

*In re IronNet, Inc. Sec. Litig.*,
    No. 1:22CV449RDAJFA, 2023 WL 5110932 (E.D. Va. Aug. 9, 2023) ................................... 24

*In re Lehman Bros. Sec. & Erisa Litig.*,
    131 F. Supp. 3d 241 (S.D.N.Y. 2015) ............................................................ 22

*In re NYSE Specialists Securities Litigation*,
    503 F.3d 89 (2d Cir. 2007) ......................................................................... 20

*In re Pfizer Inc. Sec. Litig.*,
    819 F.3d 642 (2d Cir. 2016) ............................................................... 4, 10, 25

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    MDL No. 1869, 34 F.4th 1 (D.C. Cir. 2022) ..................................................... 17

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    2021 WL 2433737 (D.D.C. June 15, 2021) ...................................................... 17

*In re Romeo Power Inc. Sec. Litig.*,
    No. 21 CIV. 3362 (LGS), 2022 WL 1806303 (S.D.N.Y. June 2, 2022) ................................ 24

*In Re Stable Rd. Acquisition Corp.*,
    No. CV215744JFWSHKX, 2022 WL 2762213 (C.D. Cal. July 13, 2022) .............................. 24

*In re The Warnaco Group, Inc. Sec. Litig.*,
    388 F. Supp. 2d 307 (S.D.N.Y. 2005) ........................................................... 8, 11

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ..................................................................... 4, 26

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ............................................................................... 10

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
    Amministrazione Straordinaria*,
    921 F.2d 21 (2d Cir. 1990) ....................................................................... 29

*LPD N.Y., LLC v. Adidas Am., Inc.*,
    295 F. Supp. 3d 275 (E.D.N.Y. 2017) ............................................................... 6

*Markewich v. Adikes*,
    422 F. Supp. 1144 (E.D.N.Y. 1976) ................................................................. 12

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
    54 F.4th 82 (2d Cir. 2022) ................................................................... *passim*

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances, Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ........................................... 19

*Moradpour v. Velodyne Lidar, Inc.*,
    No. 21-CV-01486-SI, 2022 WL 2391004 (N.D. Cal. July 1, 2022) ......................................... 24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................... 11

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004) ............................................................... 23, 25

*Perez v. Ortiz*,
    849 F.2d 793 (2d Cir. 1988) ..................................................................... 9

*Phillips v. Girdich*,
    408 F.3d 124 (2d Cir. 2005) ............................................................... 3, 15

*Pollack v. Laidlaw Holdings, Inc.*,
    1993 WL 254932 (S.D.N.Y. June 25, 1993) ............................................... 28

*S.E.C. v. Tecumseh Holdings Corp.*,
    765 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................................ 11

*SEC v. Curshen*,
    372 Fed. Appx. 872 (10th Cir. 2010) ........................................................ 11

*SEC v. Garber*,
    959 F. Supp. 2d 374 (S.D.N.Y. 2013) ........................................................ 10

*Theodore v. Purecycle Techs., Inc.*,
    No. 6:21-CV-809-PGB-RMN, 2023 WL 4035880 (M.D. Fla. June 15, 2023) ........................ 24

*Topps Co. v. Cadbury Stani S.A.I.C.*,
    526 F.3d 63 (2d Cir. 2008) ..................................................................... 33

*Topps Co. v. Cadbury Stani, S.A.I.C.*,
    2006 WL 3247360 (S.D.N.Y. Nov. 7, 2006) ............................................... 32

*U.S. v. Greenfield*,
   2001 WL 1230538 (S.D.N.Y. Oct. 16, 2001) ............................................................. 9

*U.S. v. O'Hagan*,
   521 U.S. 642 (1997) .................................................................................................. 14

STATUTES

15 U.S.C. § 78j ............................................................................................................... 23

28 U.S.C. §1292 ............................................................................................................. 15

28 U.S.C. §1292(b) ................................................................................................. *passim*

Del. Code tit. 8, § 251, 252 ........................................................................................... 24

Del. Code tit. 8, § 265 ................................................................................................... 25

RULES

Fed. R. Civ. P. 54(b) ............................................................................................... *passim*

Fed. R. Civ. P. 59 ............................................................................................................ 6

Fed. R. Civ. P. 60 ............................................................................................................ 6

REGULATIONS

17 C.F.R. § 240.10b5-1 ................................................................................................. 14

## I.      **Introduction**

The Court's Order granting in part and denying in part Defendants' motion to dismiss (ECF No. 87, the "Order") dismissed the claims of all investors except those who purchased Virgin Galactic shares in the two-month period from July 11, 2021 through September 2, 2021.[1]  In doing so, the Court reversed a portion of its earlier opinion granting in part and denying in part Defendants' motion to dismiss the First Amended Complaint (ECF No. 58, "FAC Order"), which found that Plaintiffs sufficiently alleged that Defendants made false statements beginning on July 9, 2019 that were actionable under §10(b) of the Securities Exchange Act of 1934.  The Court based its recent decision on a new Second Circuit case, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022), which the Court interpreted as foreclosing all of Plaintiffs' claims concerning statements made prior to the merger of Pre-Merger Virgin Galactic and Social Capital.

Plaintiffs seek: **(a)** reconsideration of two discrete aspects of the Order: (1) dismissal of Plaintiffs' §10(b) claims based on Post-Merger Virgin Galactic's December 13, 2019 statements, and (2) dismissal of Plaintiffs' §10(b) insider trading claims regarding Branson's August 10-12, 2021 stock sales; and **(b)** amendment of the Order to include a certification for an interlocutory appeal under 28 U.S.C. §1292(b).  In the event the Court declines to reconsider its dismissal of the December 13, 2019 press release and declines to certify the Order for an immediate interlocutory appeal under §1292(b), then the claims of the two Lead Plaintiffs and four named Plaintiffs—Mark Kusnier, Robert Scheele, Xinqiang Cui, Justin Carlough, Vipul Gupta, and Maria Joseph Rosales (the "Dismissed Plaintiffs")—would be extinguished in their entirety.  In that event, the Dismissed Plaintiffs seek an

---

[1] Capitalized terms not otherwise defined herein have the same meaning as in Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 78-3) and the Order.  Unless otherwise indicated, all paragraph references are to Plaintiffs' Second Amended Complaint (ECF No. 68), all emphasis is added, and citations have been cleaned up.

order pursuant to Fed. R. Civ. P. 54(b) entering a final judgment and finding no just cause for delay for them to seek an immediate appeal.

Reconsideration:  The FAC Order found that Defendants made false statements in a press release initially issued in February 2019 and hyperlinked in a Post-Merger press release published December 13, 2019 (the "December 2019 press release").  FAC Order at 19, 55 (sustaining statement in FAC ¶ 526).  In the recent Order, however, the Court found that the "[m]ere reference" to the February 2019 press release in the December 2019 press release was not enough to constitute a Class Period statement and that the underlying statement was "about" Pre-Merger Virgin Galactic, not Post-Merger Virgin Galactic.  Order at 28.  The Court's finding, which was based on an argument Defendants first made in their Reply, overlooked key facts about the December 2019 press release. That Post-Merger press release was a summary of Virgin Galactic's 2019 accomplishments.  Therein, Post-Merger Virgin Galactic touted the purported success of the February 2019 flight and stated as to that flight that "we did it again."  ¶ 297.  By stating "we," which could only mean Post-Merger Virgin Galactic, Post-Merger Virgin Galactic made clear that the hyperlinked statement was a recapitulation of its *own* corporate history and accomplishments.  So not only did the December 2019 press release *repeat* the statements contained in the February 2019 Press Release, but those statements were also "about" ***Post-Merger*** Virgin Galactic.

The Court should also reconsider its dismissal of Plaintiffs' §10(b) insider trading claims regarding Branson's August 10-12, 2021 stock sales.  The Court found that Branson was in possession of material non-public information about his flight when he made his August 10-12, 2021 sales and, on that basis, upheld the Section 20A insider claims.  *See* Order at 41, 61.  The Court dismissed the §10(b) claims because the count did not specifically reference his August 2021 flight in the non-exclusive list of material non-public information he possessed throughout the Class Period.  *Id.* at 53.

2

The Court's dismissal on "technical pleading irregularities [that] neither undermine the purpose of notice pleading nor prejudice the adverse party" violates the "command [of the Federal Rules of Civil Procedure] never to exalt form over substance." *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005).

Certification Under §1292(b): The Court also should certify the Order for an immediate appeal because, among other things, there are substantial grounds for a difference of opinion as to the application of *Frutarom* in SPAC cases. The question of law at issue is whether under *Frutarom*, when SPAC defendants or a SPAC target make representations relating to the target during the pre-merger period, claims based on those pre-merger statements are precluded on standing grounds.

Under *Frutarom*, plaintiffs have standing to sue based on statements that are "about" the "securities" they purchased. The Court acknowledged that the Pre-Merger statements were made to public investors to induce them to purchase public shares of the post-merger entity. But the Court found that the statements were about Pre-Merger Virgin Galactic, the company, and therefore only about Pre-Merger Virgin Galactic securities. There are substantial grounds to disagree with this.

First, Pre-Merger Virgin Galactic *securities* were not for sale. Unlike *Frutarom*, in which the merger target was itself a public company with public shareholders to whom defendants were speaking, in this case, Pre-Merger Virgin Galactic had no public shareholders; thus, the pre-merger statements were directed specifically to the shareholders of Social Capital, trying to convince them to support the Merger (and thereby "buy" Post-Merger Virgin Galactic securities), and to prospective purchasers of Post-Merger Virgin Galactic securities. The Court's reading of *Frutarom* is only one possible reading of *Frutarom*'s formal rule. Another is that the shareholders of Company A may sue Company B, so long as Company B's statement "relates" to the *securities* of Company A. As discussed *infra*, the facts of this case satisfy the *Frutarom* test for standing.

The Court rejected Plaintiffs' reading as arguing for the same fact-based "case-by-case

3

erosion" that *Frutarom* rejected.  Interpreting §10(b), *Frutarom* was concerned with expanding §10(b) liability beyond a statement's intended or reasonably foreseeable audience, thus expanding the reach of §10(b)'s text.  But imposing liability on speakers who use a "manipulative or deceptive device" to influence an investment decision is §10(b)'s very core.  Thus, analyzing facts to determine which investment decision a speaker aimed to influence does not stretch the scope of §10(b)'s private right of action—it is squarely within it.

Second, the Court's reading of *Frutarom* would mean that two recent Second Circuit decisions reached the wrong result.  In both cases, one on a motion to dismiss and the other after trial, the Second Circuit found that investors who had purchased securities could sue for statements that had occurred before a change of corporate form.  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 657 (2d Cir. 2016); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).  Under the Court's reading of *Frutarom*, these investors would have been in the same situation as Post-Merger Virgin Galactic investors suing over Pre-Merger statements, and for the same reason, they would have had no standing.

Third, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975), the Supreme Court decision *Frutarom* interprets, held that plaintiffs have standing to sue if they "dealt in the security to which the prospectus … relates."  By definition, a "prospectus" is a document that relates to a contemplated future offering of securities; thus, under longstanding precedent, statements made in relation to a security that does not yet exist can be actionable.  Here, both Pre-Merger Social Capital investors and Post-Merger Virgin Galactic investors purchased shares relying on the allegedly false and misleading statements made in Pre-Merger prospectuses.

Certifying an interlocutory appeal so that the Second Circuit can resolve this issue would materially advance this case.  While there is limited overlap, the claims remaining in the case allege different facts and legal theories than those at issue in the claims the Court dismissed.  The length of

4

the Class Period and the size of the Class, as well as the nature of the claims, would change dramatically if the dismissed claims were reinstated.  If the Second Circuit were to reverse the Court's ruling after a trial, the parties would have to start discovery from scratch and the claims of the now-dismissed Plaintiffs, who comprise the vast majority of the putative Class, will have been delayed for years.  The far more efficient course is to determine *now* whether those dismissed Plaintiffs have standing to sue, so their claims can proceed alongside the remaining Class members' claims.

Moreover, certification of an interlocutory appeal would have salutary effects for litigation of SPAC cases throughout this Circuit.  At this moment, seven District Judges in the Second Circuit (excluding this Court and Judge Abrams) have securities class actions before them involving SPACs in which the plaintiffs who purchased publicly traded securities allege §10(b) claims based on pre-merger statements, and each will have to decide whether investors have standing to sue based on statements made in anticipation of a SPAC merger.  An immediate appeal here would not only materially advance this case; it would benefit these seven other cases and conserve judicial resources.

Immediate Appeal Under Rule 54(b): If the Court denies reconsideration of the dismissal of the December 13, 2019 press release and declines to certify the Order for interlocutory appeal under §1292(b), it should enter a final judgment against the Dismissed Plaintiffs and find no just reason for delay.  The Order dismissed the claims of investors who only purchased shares before July 12, 2021, or after September 2, 2021, *i.e.*, the Dismissed Plaintiffs, from this action.  These include both Lead Plaintiffs and four of the seven additional named Plaintiffs, and the dismissal of the claims of these representative plaintiffs will impact the vast majority of the putative Class they sought to represent.  Without an immediate judgment, they must stand by for years while the remaining plaintiffs take their case to trial.  Moreover, the dismissed claims are divorced from those the Court upheld.  The dismissed claims allege that Defendants made false statements about Virgin Galactic's preparedness for, and

5

timeline to enter, commercial operations.  The remaining claims allege that Branson made a false statement about his July 2021 flight to space.  The facts here exceed those the Second Circuit has found supported entry of an immediate judgment under Rule 54(b).

## II.      The Court Should Reconsider Two Discrete Aspects Of The Order

### A.      Standards Applicable To A Motion To Reconsider

Pursuant to Fed. R. Civ. P. 59, Fed. R. Civ. P. 60, and E.D.N.Y. Loc. R. 6.3, the Court has discretion to alter or amend an order.  "The major grounds justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  *Glory Wealth Shipping Serv. Ltd. v. Five Ocean Corp.*, 571 F. Supp. 2d 542, 544 (S.D.N.Y. 2008).  Reconsideration is appropriate where there are "controlling decisions or data that the court overlooked . . . that might reasonably be expected to alter the conclusion reached by the court." *LPD N.Y., LLC v. Adidas Am., Inc.*, 295 F. Supp. 3d 275, 284 (E.D.N.Y. 2017).

### B.      The Court Should Reconsider Its Dismissal Of Statements Made In Virgin Galactic's December 13, 2019 Press Release

#### 1.      The Court Previously Held The Hyperlinked Statement Was Misleading When Made On December 13, 2019, And Has Now Reversed Its Prior Ruling In The Order

On December 13, 2019, Post-Merger Virgin Galactic published a press release on its website titled *Reflecting on a Remarkable Year*.  ¶ 297.  The December 2019 press release stated:

> Ten weeks after *our* first flight to space, *we* did it again, travelling higher and faster than ever before and, for the first time, with a third crew member on board. This flight saw two more of our pilots, Dave Mackay and Mike 'Sooch' Masucci, become commercial astronauts, with Chief Pilot Mackay entering the record books as the first Scot in space.

*Id*.

The words "This flight" were hyperlinked, directing investors to read a Pre-Merger Virgin Galactic's pre-Class Period press release dated February 22, 2019 about a test flight conducted that

day (the "February 2019 press release"). ¶ 298.  That release quoted Defendant Branson as stating the following in reference to December 2018 and February 2019 test flights:

> "*Flying the same vehicle safely to space and back twice in a little over two months,* while at the same time expanding the flight envelope, is *testament to the unique capability we have built* up within the Virgin Galactic and The Spaceship Company organizations."

*Id*.

During the February 2019 flight, however, Unity "suffered critical damage to its horizontal stabilizers" which was so extensive that Virgin Galactic's head of safety, Todd Ericson, told a journalist "I don't know how we didn't lose the vehicle and kill three people." ¶ 78.  Virgin Galactic employees, including Ericson and Virgin's President of Missions and Safety, Michael Moses, "immediately noticed a large gash running along the trailing edge of the right horizontal stabilizer." ¶ 80.  Observers noted that Unity was "way too damaged to fly again" because the "[w]hole structure ruptured." ¶82; *see also* ¶¶ 78-84, 219.  As the Court previously noted, "[t]he only reason the flight did not end in disaster was that the horizontal stabilizer was damaged in the exact right spot to avoid destruction." FAC Order at 4 (citing FAC ¶ 305).  After the February 2019 flight, Unity was grounded for about 15 months, until May 2020, while Virgin Galactic attempted to re-design and re-build the horizontal stabilizers. ¶¶ 84, 58.  As the Court previously held, "Virgin Galactic did not disclose the damage to Unity caused by the February 2019 flight in its SEC filings or otherwise; instead the Washington Post broke the news in a February 1, 2021 article." FAC Order at 7 (citing FAC ¶ 365).

As a result, the Court previously held that the December 13, 2019 press release's hyperlinked statement, originally made in the February 2019 press release (FAC ¶ 526), was actionable.  *See* FAC Order at 19 (stating "The statement in Compl. ¶ 526 is materially misleading . . . . This statement was made shortly after the February 2019 flight which left Unity critically damaged and was a near-disaster. . . . A reasonable investor would not conclude that this level [of damage] occurred from the

7

description of the flight as 'safe.'"); *see also id.* at 35, 38, 55; Order at 28 (acknowledging that the Court "previously found [the statement] materially misleading in context"). This is the very same statement challenged at SAC ¶ 298. Nothing should have changed the prior analysis.

Nevertheless, the Order dismisses Plaintiffs' claims based on the December 2019 press release, stating "[a] mere reference to a document containing an allegedly false statement is insufficient to incorporate it into a different document" and, relatedly, that "[m]ere reference to the statement in SAC ¶ 298 by virtue of the hyperlink in the press release in SAC ¶ 297 was insufficient to transform the statement into a statement by Post-Merger Virgin Galactic." Order at 28.

Irrespective of the Court's holdings concerning the application of *Frutarom* and Plaintiffs' request for certification of an interlocutory appeal under 28 U.S.C. §1292(b), the Court should reconsider its decision with respect to the December 2019 press release because (1) the statements in the December 2019 press release, including Defendants' decision to adopt and repeat the February 2019 press release statements about the February 2019 test flight by hyperlinking to that press release, were "made" by Post-Merger Virgin Galactic, and (2) the statements, as reframed in the December 2019 press release, were "about" Post-Merger Virgin Galactic. As detailed below, the Court overlooked key facts and controlling precedents in reaching its decision on these statements.

Certain of these facts and precedents were not addressed by Plaintiffs in their opposition to Defendants' motion to dismiss. However, several of the key arguments and authorities raised by Defendants and relied on by the Court were raised for the first time in their reply brief. *See* Reply at 4 (citing *In re The Warnaco Group, Inc. Sec. Litig.*, 388 F. Supp. 2d 307, 313-14 (S.D.N.Y. 2005); *In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, *16 (Mar. 31, 2022)); Order at 28 (citing *Warnaco* and *Garrett*). While recognizing that Plaintiffs alleged that Defendants repeated the February 2019 statements by way of the December 2019 press release, Defendants' opening brief took

8

a different position: that the February 2019 statements were not actionable because they were made before the Class Period.  Opening Brief at 2, 11, 15.  And even though Plaintiffs were given leave to file a sur-reply, that sur-reply was limited by agreement of the parties to the "narrow issue" of statutory standing under *In Re CarLotz, Inc. Sec. Litig.*, 2023 WL 2744064 (S.D.N.Y. Mar. 31, 2023).  *See* Plaintiffs' Unopposed Motion for Leave to File Sur-Reply, ECF No. 83 at 1.

Moreover, the Court had already ruled in favor of Plaintiffs as to the hyperlinked statements in the December 2019 press release, so Plaintiffs did not see a need to exhaustively brief these Post-Merger statements.  Finally, the Court did not hold oral argument and decided Defendants' motion on the papers.  Under these unusual circumstances, where Plaintiffs did not have an opportunity to respond to Defendants' arguments, reconsideration is appropriate.  *Cf. U.S. v. Greenfield*, 2001 WL 1230538, at *2 (S.D.N.Y. Oct. 16, 2001) (granting motion for reconsideration based on decisions court had overlooked, even though movant did not cite those decisions in prior briefing, because court inadvertently issued order before movant's reply brief was due); *Perez v. Ortiz*, 849 F.2d 793, 797 (2d Cir. 1988) (when granting motion for summary judgment *sua sponte*, court must give party notice and an opportunity to be heard).

### 2. The Statements In The December 2019 Press Release, Including The Hyperlinked Statements, Were "Made" By Post-Merger Virgin Galactic

In dismissing Plaintiffs' claims based on the December 2019 press release, the Court held that "[a] mere reference to a document containing an allegedly false statement is insufficient to incorporate it into a different document."  Order at 28.  Post-Merger Virgin Galactic's December 2019 press release, however, did not merely "reference" the February 2019 press release. Rather, the December 2019 press release: (1) described the February 2019 flight; (2) said, as to that flight, that "*we* did it again"; and (3) provided a link to a February 2019 press release that described the flight in further detail.  The December 2019 press release's very title—*Reflecting on a Remarkable Year*—shows that

9

it was a retrospective summary of Virgin Galactic's accomplishments during 2019, including the February 2019 test flight.  By characterizing the December 2019 press release as merely "referenc[ing]" the February 2019 press release, the Court overlooked these important facts.  In the context of the December 2019 press release's use of the first person plural and adoption of the February 2019 test flight as the Post-Merger Virgin Galactic's own accomplishment ("*we* did it again"),[2] the hyperlink to the February 2019 press release was not a "mere reference" to the prior statement that the flight had been completed safely, but an endorsement of that statement and a renewed representation that "This flight" had in fact been completed safely.

Indeed, Post-Merger Virgin Galactic's decision to repeat this statement—by directing investors with a hyperlink to read it—*does* render the statement one "made" by Post-Merger Virgin Galactic to current and prospective investors.  As the Supreme Court held in *Janus*, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  The Second Circuit applied the *Janus* "ultimate authority" test in *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016).  In *Pfizer*, the Second Circuit held at summary judgment that Pfizer could be held liable for statements made *by its predecessors' employees* to newspapers and journal articles about the risks associated with the drug Celebrex when those statements were disseminated during the class period.  *Id.* at 657 (holding that "[a]lthough the evidence is not abundant, we are unable to conclude that no reasonable jury could find from this evidence that Pfizer had "ultimate authority" over the eight statements to the press.").[3]  Similarly here, Post-Merger Virgin Galactic plainly had "ultimate

---

[2] The December 2019 press release also referred to the December 2018 test flight as "*our* first flight to space." ¶ 297.

[3] *See also SEC v. Garber*, 959 F. Supp. 2d 374, 381 (S.D.N.Y. 2013) (defendants who sold unregistered penny stocks liable as maker of statements, even though attorneys provided the content in form of

10

authority" over a press release it issued in its own name, and had "ultimate authority" to include in it a link to an earlier press release which contained Defendant Branson's statements.[4]

Additionally, Defendants are liable for statements of others if they themselves make "an implied representation that the information" conveyed "is true or at least in accordance with the [defendant's] views." *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980), *superseded by statute on other grounds as stated in Acticon AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 38-40 (2d Cir. 2012).  Indeed, in *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), the Second Circuit held that defendants may be liable for false statements in analyst reports they subsequently endorsed.  Similarly, courts hold makers liable for the content of statements they incorporate by reference.  *See, e.g.*, *S.E.C. v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 352 (S.D.N.Y. 2011) (defendant made materially false statements under §10(b) by "continuing to incorporate by reference the 2001 profit projections into its offering memoranda" after those projections had become false).  By linking to an earlier press release Virgin Galactic itself had issued, Defendants misleadingly implied that the statements in the press release were true.

The cases cited by the Court refusing to extend liability based on different "incorporation by reference" theories are readily distinguishable. Order at 28.  In *Warnaco*, the court declined to extend liability to Warnaco's auditor, Deloitte, for alleged false statements in Warnaco's unaudited financial statements merely because the statements indicated that "Deloitte 'examined and reviewed' them." 388 F. Supp. 2d at 313 (finding Warnaco, not Deloitte, was the maker of the statements).  But Deloitte

---

opinion letters, because the defendants had the ultimate authority to issue the prospectus in which the statements were made).

[4] To be sure, Defendants can be held liable for statements they disseminate by hyperlink.  *SEC v. Curshen*, 372 Fed. Appx. 872, 874 (10th Cir. 2010) (affirming judgment against defendant for securities law violations where defendant, *inter alia*, published an internet post hyperlinking to an investor report which expressed an overly optimistic view of subject company's financial future).

was not liable because the statements, though they concerned Deloitte's work, were defendants' statements. The statements did not refer to, republish, or incorporate by reference any statement made by Deloitte. Here, both the February 2019 and December 2019 press releases were ***Virgin Galactic's*** own, and Post-Merger Virgin Galactic specifically referred investors to the February 2019 release.[5]

*Garrett* is similarly distinguishable. There, the plaintiffs sued over a statement made before the class period on the theory that it was incorporated by reference into statements made during the class period. 2022 WL 976269, at *16. The issue, though, was whether the initial speaker—who had left the company before the class period—was liable for the class-period statements because she had no control over them. The court had ***already*** dismissed claims against the company and its class period-officers and directors—Virgin Galactic and Branson's equivalents—for all their statements because the plaintiffs had not alleged their scienter.

### 3. The Statements In The December 2019 Press Release Were "About" Post-Merger Virgin Galactic

The Court's second basis for dismissing Plaintiffs' claims based on the December 2019 press release was its conclusion that the hyperlinked statement "was not '***about***' Post-Merger Virgin Galactic." Order at 28. While the Court did not expressly cite *Frutarom* in this portion of its Order, the Court's rationale suggests that it was relying on *Frutarom*'s "about" test for statutory standing. *Id.*

The Court's apparent reasons for dismissal misapply the *Frutarom* standing test. Under *Frutarom*, Post-Merger Virgin Galactic's December 13, 2019 statement incorporating the February 2019 press release is actionable because it was a post-merger statement that related directly to investors' purchases of Post-Merger Virgin Galactic's securities. *See Frutarom*, 54 F.4th at 84

---

[5] *Markewich v. Adikes*, 422 F. Supp. 1144, 1147 (E.D.N.Y. 1976) is even more attenuated. There, the court held that statements were not incorporated by reference when the defendants affirmatively declined to do so.

("Under the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities about which a misstatement was made.").

It matters not that the February 2019 press release was issued Pre-Merger and referred to Pre-Merger events. When Post-Merger Virgin Galactic chose to make the statement again in December 2019 (*see* Sec. II.B.2, *supra*), it was talking to Post-Merger investors about the prospects of Post-Merger Virgin Galactic's business based, in large part, on the supposed successes of the test flight program, including the February 2019 flight—the last flight before the Merger closed. Post-Merger Virgin Galactic was trying to get current and prospective investors to buy Post-Merger Virgin Galactic securities, and investors did so in spades. Virgin Galactic drummed up this investor interest, in large part, by touting (and re-touting) the supposedly successful February 2019 flight both before *and during the Post-Merger period*. That the statement refers to a Pre-Merger event does not inoculate Defendants where, as here, they repeated it Post-Merger to induce purchases of Post-Merger Virgin Galactic securities.

Further, the statement in the December 2019 press release that "*we* did it again" necessarily was about Post-Merger Virgin Galactic. "We" cannot refer to Pre-Merger Virgin Galactic; it no longer existed. Rather, *Post*-Merger Virgin Galactic was claiming credit for *Pre*-Merger Virgin Galactic's flight. This is hardly surprising: though in legal form the SPAC had acquired Virgin Galactic, for all practical purposes Virgin Galactic had gone public. Thus, Post-Merger Virgin Galactic's boasts about its performance before the merger were *about* Post-Merger Virgin Galactic securities under *Frutarom*.

C.     **The Court Should Reconsider Its Holding That Plaintiffs Failed To Plead Defendant Branson's Violation Of The §10(b) And Rule 10b-5 Prohibition On Insider Trading As To His August 10-12, 2021 Sales**

On July 11, 2021, Defendant Branson participated in a flight wherein Unity strayed dangerously from its airspace, endangering the crew and passengers, and resulting in the FAA grounding Unity. ¶¶ 16, 235-255. The FAA learned that Unity strayed from its landing cone on or

13

about July 21, 2021 and requested an incident report from Virgin Galactic. ¶ 246. On or about August 3, 2021, Virgin Galactic briefed the FAA about the incident. ¶ 249. On August 11, 2021, the FAA concluded its investigation with an email to Virgin Galactic's management which provided, among other things, that the July 11 2021 flight was a "launch incident" "mishap" resulting from "a failure of VG's safety organization, design, or operations to properly communicate real-time vehicle status during flight operations essential to . . . ensuring public safety." ¶ 250. Meanwhile, from August 10-12, 2021, Branson sold nearly $300 million worth of his Virgin Galactic shares. ¶ 338.

The court correctly articulated the §10(b) and Rule 10b-5 prohibition on insider trading: "Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." Order at 48-49 (citing *U.S. v. O'Hagan*, 521 U.S. 642, 651-52 (1997)). "[A] purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale." 17 C.F.R. § 240.10b5-1.

Plaintiffs have alleged exactly this in connection with Branson's August 10-12 sales. *See*, *e.g.*, ¶¶ 236-37 ("From August 10 through August 12, 2021, Branson sold 10.4 million shares for $299.9 million. Branson sold every share he was entitled to sell; his remaining shares were subject to a lockup agreement. Yet, at the time of the sales, Defendants knew material nonpublic information: Branson's flight had dangerously strayed from its landing cone and FAA airspace, thus imperiling the lives of its passengers."). Finding that Plaintiffs had adequately alleged that these facts constituted material non-public information in Branson's possession, the Court sustained Plaintiffs' Section 20A insider trading claims as to Branson's August 10-12 stock sales. Order at 51.

But the Court dismissed Plaintiffs' §10(b) insider trading claims, stating that "Plaintiffs have

14

not adequately pleaded a claim for Rule 10b-5 insider trading as to Branson's August 10–12, 2021 trades.  By the time of these trades, the truth of the February 2019 flight had been revealed to the market, and *plaintiffs do not advance insider trading claim based on Branson's knowledge that the July 2021 flight had encountered problems*."  Order at 53 (citing ¶ 387).  The Court appears to be basing the dismissal on the fact that ¶ 387 cited *other* facts in support of the insider trading count but, because of a scrivener's error, did not specifically delineate the facts about the problematic July 2021 flight.  While the Complaint did not include the facts in a non-exhaustive list which began with "including, among others," the count must be read in conjunction with the totality of the facts alleged in the SAC.  *See Phillips*, 408 F.3d at 128 ("*All* complaints must be read liberally [because] the [Federal Rules of Civil Procedure] command us never to exalt form over substance [citation].  We will therefore excuse technical pleading irregularities as long as they neither undermine the purpose of notice pleading nor prejudice the adverse party.").  These facts include the allegations set forth at ¶¶ 236-37 which establish that Branson had material non-public information about the flight.

The Court's analysis and holding at 50-51 of the Order shows that Plaintiffs have sufficiently alleged that Branson had material non-public information concerning his July 2021 flight when he sold $300 million of his Virgin Galactic stock on August 10-12, 2021.  The Court should reconsider its dismissal of the §10(b) insider trading claims related to that sale.

III.   **The Court Should Certify The Order For Interlocutory Appeal Under 28 U.S.C. §1292 To Resolve Substantial Grounds For Difference Of Opinion Regarding The Application Of *Frutarom* In SPAC Cases**

A district judge may certify an order for interlocutory appeal if it (a) "involves a controlling question of law" (b) "as to which there is substantial ground for difference of opinion" and (c) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. §1292(b).  All prongs are met here.

*Frutarom* is controlling authority, but the application of its "about which" standing test in

15

SPAC cases involves a novel question of law with substantial grounds for difference of opinion that numerous courts in the Second Circuit will confront. Moreover, allowing investors to immediately appeal their dismissed claims will materially advance the ultimate termination of the litigation because should their claims be revived, it would be more efficient to litigate this case just one time.

Seven district court judges within the Second Circuit in seven pending cases must decide whether *Frutarom* denies standing to plaintiffs who bought post-merger securities but bring claims based on pre-merger statements. A quick resolution from the Second Circuit would save significant judicial resources by resolving the question authoritatively.

**A.      The Court's Dismissal Order Is Based On A Controlling Question Of Law**

The Court's ruling raises a controlling question of law: whether plaintiff SPAC investors who did not purchase the pre-merger private company's securities have standing to sue based on statements addressed to those plaintiffs. *Frutarom* holds that standing is available under §10(b) of the Exchange Act for "purchasers or sellers of securities about which a misstatement was made." 54 F.4th at 84; *see also id.* at 85 (standing is available to plaintiffs who "'dealt in the security to which the prospectus, representation, or omission relates'") (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975)). *Frutarom*, however, does not instruct courts how to determine what security a statement is "about." The Court acknowledged that the Pre-Merger statements were directed to public investors, but rejected Plaintiffs' reading of "about which" that would consider the context of the statement, including what investment decision the speaker sought to influence.

The question of what securities the statements or prospectuses were "about" or to which they "relate[d]" is controlling. By deciding whether the "about which" test considers who the statements are addressed to and what investment decision they are trying to influence, the Second Circuit will decide, at a minimum, whether Plaintiffs' claims for the period between July 10, 2019 and July 10,

2021 can proceed, as the FAC Order allowed.  Further, based on its reading of *Frutarom*, the Court declined to consider whether Plaintiffs' newly-alleged Pre-Merger statements (¶¶ 281, 283, 285-94) stated a claim.  Order at 17.  These statements, many of which are more specific than some of the development/status-related statements the Court previously found non-actionable, could change the results of the loss causation analysis.

**B.      There Are Substantial Grounds For Difference Of Opinion**

A substantial ground for difference of opinion exists when, among other situations, "the issue is particularly difficult and of first impression for the Second Circuit."  *Guzman v. First Chinese Presbyterian Cmty. Affairs Home Attendant Corp.*, 2021 WL 1852038, at *2 (S.D.N.Y. May 7, 2021) (leave to appeal granted Sept. 1, 2021).  When a movant proceeds on this ground, the court focuses on "the strength of the arguments in opposition to the challenged ruling."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2021 WL 2433737, at *5 (D.D.C. June 15, 2021) (leave to appeal granted as stated in *In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 34 F.4th 1, 5 (D.C. Cir. 2022)).

In this case, the Order presents substantial grounds for difference of opinion because its application of *Frutarom*'s "about which" test to the SPAC context (1) focuses on the company making the statements rather than the security to which the statement relates, potentially conflicting with *Frutarom*'s language, (2) takes a contestable position on the significance of the amendment of the *Frutarom* decision, which directed courts to determine which security a statement was about, rather than which issuer, showing that any presumption that a company's statements are necessarily about its own securities is not binding and requires a case-by-case analysis of which securities a particular statement relates to, (3) arguably overreads *Frutarom*'s policing of §10(b)'s periphery so broadly that it creates exceptions to the core of §10(b)'s protections based on ordinary corporate housekeeping; (4)

17

implies that other recent Second Circuit decisions predating *Frutarom* reached the wrong result, and (5) is inconsistent with the language of the Supreme Court's ruling in *Blue Chip Stamps* that investors can sue if they "dealt in the security to which the prospectus . . . relates."

### 1. The Application Of *Frutarom*'s "About Which" Test To The SPAC Context Presents A Difficult Question Of First Impression

The Court ruled that *Frutarom* barred Plaintiffs from recovering for misleading statements made by Defendants before the Merger. In doing so, the Court rejected an alternative reading of *Frutarom* that statements made by Defendants prior to the Merger were nonetheless "about" or "relate[d]" to Post-Merger Virgin Galactic because: (i) the statements themselves concerned, at least in part, Post-Merger Virgin Galactic's operations and commercialization timeline (*e.g.*, ¶¶ 287, 289, 291); and/or (ii) Defendants aimed to influence investors' decision to purchase Post-Merger Virgin Galactic shares by touting the success of the test flights (*e.g.*, ¶¶ 275, 279) and the condition and supposed capabilities of the vehicles (¶¶ 277, 283, 285, 287, 289), either directly after the merger or by supporting it. *Frutarom* does not compel the Court's conclusion.

The Court acknowledged that "the point of the challenged communications was to convince Social Capital's shareholders to approve the merger with Pre-Merger Virgin Galactic." Order at 14. This is true in general in SPAC cases, which are an important and growing category of cases within this Circuit. *See infra* at Sec. III.B.4. In the SPAC context, the acquisition target is always a non-public company with no public shareholders of its own. That's because the purpose of a SPAC transaction is to provide an alternative mechanism for a company to go public that avoids the regulatory expense and scrutiny of an IPO. When the officers or controlling shareholders of a SPAC acquisition target speak publicly, they are not speaking to the target's shareholders; instead; they are speaking to shareholders of the SPAC with respect to their decision to hold their SPAC shares (and thereby "purchase" shares of the new combined entity) and to prospective purchasers of the securities

18

of the post-merger company.  The securities to which the statements relate, therefore, are the securities that Defendants were attempting to induce Plaintiffs to buy.

By contrast, in *Frutarom*, unlike SPAC cases, the merger target was itself a publicly traded company that was required to make disclosures to its own public shareholders, and the alleged misstatements at issue were directed to Frutarom's own shareholders, not the shareholders of the acquiror International Flavors & Fragrances, Inc. ("IFF").  *See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances, Inc.*, 2021 WL 1199035, at *1-2 (S.D.N.Y. Mar. 30, 2021) (prior to the merger, the securities of IFF traded on the New York Stock Exchange (NYSE), while the securities of Frutarom traded on the Tel-Aviv Stock Exchange (TASE) and London Stock Exchange (LSE)).  Indeed, several of the challenged statements were made in Frutarom's required filings to the TASE and LSE, including a notice to Frutarom shareholders filed with the Israeli Securities Authority (ISA) and the TASE and two Directors' Reports filed with the TASE and LSE.  *See, e.g.*, Memorandum of Law in Support of the Frutarom Individuals' Motion to Dismiss ("Frutarom Individuals' Memo"), *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances, Inc.*, Case No. 19-cv-07536 (NRB), ECF No. 96, at 3, 7) (noting, *inter alia*, that Frutarom's statements in its notice "were made to ISA, TASE and, at most, *Frutarom's* shareholders") (emphasis in original).[6]  Some of the other challenged statements were made in the merger agreement between Frutarom and IFF that IFF incorporated into its SEC filings, but even these statements were directed to IFF (as Frutarom's transaction partner), not to IFF's shareholders.  *See* Frutarom Individuals' Memo in IFF, ECF No. 96 at 7 ("The representations in the

---

[6] *See also* Amended Complaint in *IFF*, Case No. 19-cv-07536 (NRB), ECF No. 50 at ¶¶ 122-34 (alleging false and misleading statements in Q1 2018 Directors' Report), ¶¶ 156-60 (alleging false and misleading statements in Notice) & ¶¶ 163-76 (alleging false and misleading statements in Q2 2018 Directors' Report)).

Merger Agreement were made solely to IFF on behalf of Frutarom."). The statements were not directed to IFF shareholders because their consent "was *neither required nor solicited*." *Id.* at 3 n.4

### 2.   *Frutarom* Was Amended To Avoid Conflict With Prior Binding Second Circuit Authority In *In re NYSE Specialists*

In its original decision, the *Frutarom* panel held that to have standing, plaintiffs must have "bought or sold *a security of the issuer* about which a misstatement was made." *See* Plaintiffs' Sur-reply, ECF No. 86 at 5-6. Following the plaintiffs' request for a rehearing *en banc* and the filing of an amicus brief by a group of securities laws scholars, the panel replaced the phrase "*a security of the issuer* about which a misstatement was made" with "*the security* about which a misstatement was made." *Frutarom*, 54 F. 4th at 86. This amendment was not only aimed at avoiding *en banc* review; it was also necessary to prevent a conflict with the Second Circuit's decision in *In re NYSE Specialists Securities Litigation*, 503 F.3d 89 (2d Cir. 2007), which the *Frutarom* panel did not have the authority to overrule.

In its Order, the Court stated that *Frutarom* was nonetheless "unconvinced that misrepresentations made 'about' an acquisition target, even if incorporated into SEC filings by the acquiror, meant that the misstatements were 'about' the acquiror's securities" and held that "plaintiffs' approach simply articulates the same 'direct relationship' test rejected in *Frutarom*." Order at 14-15. But the "direct relationship" test proposed by the plaintiffs in *Frutarom* concerned the alleged relationship between the defendants' statements and the *price* of the acquiror's security. *Frutarom*, 54 F 4th at 86. Here, Plaintiffs contend *the statements related to the securities of the SPAC and the Post-Merger entity* because there were no other securities to which the statements could relate. Thus, the *only* investment decisions that the statements related to were the decisions of SPAC shareholders to support the Merger and of prospective Post-Merger investors to purchase Post-Merger securities. Those decisions are both about Post-Merger Virgin Galactic securities.

20

The dismissed Pre-Merger statements—which concerned the supposed success of Virgin Galactic's test flights, the state of its vehicles, and its progress toward its Post-Merger commercialization plans (*e.g.*, ¶¶ 275, 277, 279, 281,[7] 283, 285, 287, 289, 291, 293)—all related directly to Post-Merger Virgin Galactic's prospects and operations, and thus related to Post-Merger Virgin Galactic's securities. Post-Merger Virgin Galactic investors continued to rely on the Pre-Merger statements in making their investment decisions, as the artificial inflation caused by those statements remained in the stock price long after the Merger closed.[8]

*Frutarom* does not compel the Court to ignore this distinction. The Court's ruling suggests that the *Frutarom* test essentially collapses into whether investors bought the shares of the legal entity about which the statements were made, which arguably gives too little weight to the *Frutarom* amendment that was necessary to comply with *NYSE Specialists*.

In its Order, the Court expressed concern that accepting Plaintiffs' conclusion would entail the same fact-based "'case-by-case' analysis" that *Frutarom* rejected. Order at 12, 16. The Court's application of *Frutarom*, however, goes beyond *Frutarom*'s precise articulation of its rule: "Plaintiffs may be able to sue entities other than the issuer of a security if those entities made material misstatements about the security, ***as long as the plaintiffs purchased or sold the <u>securities</u> about which the misstatements were made***." *Frutarom*, 54 F. 4th at 88.

---

[7] For example, Defendant Palihapitiya said on July 9, 2019 that "They have all the regulatory elements in place to start commercial operations. That was a huge part of our justification. So you're exactly right that all of these things are critical to making sure that public investors have the full picture." ¶281. While the "they" in Palihapitiya's statement referred to Pre-Merger Virgin Galactic, the "public investors" he was referring to were Pre-Merger Social Capital investors and Post-Merger Virgin Galactic investors.

[8] For example, the Court previously held that Plaintiffs sufficiently alleged the misleading statements about the February 2019 flight caused artificial inflation in the share price, which was dissipated (and damaged investors) when the risks concealed in those statements partially materialized on August 4, 2020 and February 1, 2021. FAC Order at 38 (citing FAC ¶¶497, 503, 505, and 526).

The amendment shows that a company's statements will sometimes relate to the securities of another company. Applying the *Frutarom* test in light of the *NYSE Specialists* corollary, therefore, will require a "case-by-case analysis" of whether a company's statement "relates" to its own securities or the securities of another company. The factors involved in making such a determination naturally include, *inter alia*, whether the company making the statement has public shareholders of its own, and whether the statement was made in connection with a particular securities offering or a proposed transaction on which a particular set of securities holders are being asked to vote. And failing to conduct the case-by-case inquiry would overturn conclusions that have been confirmed in decades of litigation. For instance, auditors can be held liable for statements attesting that they "conducted [their] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)." *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 248 (S.D.N.Y. 2015). The statements are about the auditor, not the company, but courts have never questioned that investors have standing to sue if accounting opinions "could have been materially misleading to a reasonable person reading the statement[s] fairly and in context." *Id.* at 255.

Indeed, during oral argument in the *TMC* case, Judge Komitee recently expressed serious skepticism about applying *Frutarom* to mean that statements about a SPAC merger target are necessarily statements about that entity's securities. *See* Ex. A (Transcript of Oral Argument on July 12, 2023, at 8-15 (*Carper v. TMC The Metals Company, Inc.*, 21-cv-5991 (EK) (SJB) (E.D.N.Y.)). Among other things, Judge Komitee noted that such an application of *Frutarom* standing rule in the SPAC context was "hypertechnical and criticized by a large amount of securities law professors in their amicus brief to the en banc Second Circuit." *Id.* at 15:3-5. He also asked whether defendants' interpretation of *Frutarom* required the absurd result "that any time you've got a literal change in the security, new CUSIP number issued, whatever it is, that wipes the slate clean entirely?" *Id.* at 11:12-

22

14.  While Judge Komitee has not yet issued a decision, the concerns he raised support the conclusion that there are substantial grounds for a difference of opinion as to how *Frutarom* should be applied in the SPAC context.

### 3.    *Frutarom* Does Not Compel the Court's Conclusion Because Plaintiffs Are At the Core of §10(b)'s Concerns

Ultimately, *Frutarom* does not compel the Court's conclusion because the text of §10(b) does not.  Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device."  15 U.S.C. § 78j.  *Blue Chip Stamps*, *Nortel*,[9] and *Frutarom* are all interpretations of this statutory language.  *E.g. Blue Chip Stamps*, 421 U.S. at 755 (plaintiff had no standing because he was not a "purchaser" or a "seller" under the statutory language).  Courts like *Frutarom* have read §10(b) narrowly when a plaintiff purchased a security that has only a tangential connection with the manipulative or deceptive device.  Thus, *Frutarom* adopted a formal test requiring that plaintiffs purchase the securities "about which" a statement was made to prevent the securities laws from expanding and imposing liability that strays far beyond the defendant's intended audience.

But here, Plaintiffs are at the very core of §10(b)'s concern because they were the ***targets*** of Defendants' deceptive device: they engaged in the very securities transactions Defendants aimed to induce through their fraudulent statements.  Rather than preventing endless case-by-case erosion of the *Blue Chip Stamps* rule, the Court's reading of *Frutarom* promotes case-by-case erosion of the securities laws based on arbitrary distinctions.

To that point, had Virgin Galactic gone public through an IPO rather than a SPAC, its

---

[9] *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004).

23

statements would have been subject to §10(b). Yet no court outside the Second Circuit has ever found that SPAC investors do not have standing to sue for statements made by the pre-merger entity, and plenty have found that they do.[10] Nor did any court in the Second Circuit do so before *Frutarom*.[11]

The Court's interpretation of *Frutarom* would also imbue ordinary corporate housekeeping with outsized consequences. For instance, companies sometimes legally re-domicile in a different jurisdiction, such as for tax reasons or to benefit from different corporate law. The re-domiciliation is an ordinary legal development that reasonable investors hardly notice. But as the Court reads *Frutarom*, investors who purchased the company's shares after the re-domiciliation, if it was accomplished through a merger, would have no standing to sue over statements made before the re-domiciliation, because the statements were about a different legal entity. And even if investors notice that there was a re-domiciliation, they would not take note of the precise mechanics through which it was accomplished. But, following the Court's application of *Frutarom*, whether Defendants are liable under the securities laws would depend on these mechanics. For example, companies can re-domicile to Delaware by creating a Delaware subsidiary and merging with it. Del. Code tit. 8, § 251, 252. But

---

[10] *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 654 (M.D. Tenn. 2022) (plaintiffs who did not purchase pre-merger entity's securities had standing to pursue claims made about target in announcing de-SPAC actionable under §10(b)); *In Re Stable Rd. Acquisition Corp.*, No. CV215744JFWSHKX, 2022 WL 2762213, at *5, *9 (C.D. Cal. July 13, 2022) (same); *Moradpour v. Velodyne Lidar, Inc.*, No. 21-CV-01486-SI, 2022 WL 2391004, at *13 (N.D. Cal. July 1, 2022), opinion clarified, No. 21-CV-01486-SI, 2022 WL 19796570 (N.D. Cal. Oct. 12, 2022) (same); *Theodore v. Purecycle Techs., Inc.*, No. 6:21-CV-809-PGB-RMN, 2023 WL 4035880, at *1 (M.D. Fla. June 15, 2023) (same); *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No. 4:19-CV-957, 2021 WL 1416025, at *11 (S.D. Tex. Apr. 14, 2021) (same); *In re IronNet, Inc. Sec. Litig.*, No. 1:22CV449RDAJFA, 2023 WL 5110932, at *1 (E.D. Va. Aug. 9, 2023) (same); *Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 135 (E.D. Pa. 2022) (same).

[11] *In re Romeo Power Inc. Sec. Litig.*, No. 21 CIV. 3362 (LGS), 2022 WL 1806303, at *4 (S.D.N.Y. June 2, 2022), *reconsideration denied*, No. 21 CIV. 3362 (LGS), 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) (finding that plaintiffs who purchased post-merger shares sufficiently alleged that they had been defrauded by pre-merger statements).

they can also follow a traditional statutory process that does not involve forming a new legal entity. Del. Code tit. 8, § 265. The former would extinguish liability under §10(b), but the latter would not. Switching to a holding company structure, or changing holding companies, would also eliminate liability, as would any number of other corporate developments that pass without notice. Investors who want to know whether they could rely on a corporate statement designed to induce that very reliance would have to conduct a detailed analysis of the subject company's corporate history.

### 4. The Court's Application Of *Frutarom* Would Mean Several Second Circuit Decisions Reached The Wrong Result

According to the majority of the *Frutarom* panel, *Frutarom* was a modest development as it stated that that it was not making substantial new law. *Frutarom*, 54 F. 4th at 88, n.7 ("The concurrence states that our opinion "create[s] new law" and urges that we should simply apply *Nortel*. Concurrence at 89. We respectfully disagree."). Instead, the majority stated that it its "conclusion follows directly from our decision in *Nortel*." *Id.* at 88 (citing *Nortel*, 369 F.3d at 34 ("the question is whether the plaintiff bought or sold the securities about which the misstatements were made")). *Frutarom* also endorsed and reiterated the long-standing "relates to" test endorsed in *Blue Chip Stamps*. *Id.* at 85 (citing *Blue Chip Stamps*, 421 U.S. at 747). Yet if the Court is reading *Frutarom* correctly, two recent Second Circuit reached the wrong result.

In *Pfizer*, 819 F.3d at 657, the Second Circuit found that Pfizer shareholders could establish liability for statements made by Pharmacia about a drug the two companies were co-promoting. Under Plaintiffs' reading, *Frutarom* is consistent with *Pfizer*: because the statements are about a drug the two companies are co-promoting, it is about each of their securities. But the Court's reading *Frutarom* conflicts with *Pfizer* because, under the Court's reading, Pharmacia's statements about a drug it was promoting, even though Pfizer was also promoting the drug, are solely about Pharmacia. Pfizer shareholders would not be allowed to sue (which, of course, they were). Moreover, as the Court reads

25

*Frutarom*, statements cannot be about multiple companies' securities. While *Pfizer* did not directly address standing, there have been no intervening *en banc* or Supreme Court cases that have undermined *Pfizer*'s holdings, so there are substantial grounds to believe that *Frutarom* did not implicitly find that *Pfizer* was wrongly decided (and, indeed, *Frutarom* did not have the authority to overrule the decision of a prior Second Circuit panel in any event).

The Court's interpretation of *Frutarom* also means the Second Circuit reached the wrong result, in part, in *Vivendi*, 838 F.3d 223. Vivendi went public through a triangular merger in which the surviving entity was its subsidiary. *Id.* at 234. This merger closed on December 8, 2000, during the class period, and the defendants did not make any more false statements until December 19, 2000. *Id.* at 251; *In re Vivendi, S.A. Sec. Litig.*, 02-cv-05571-PAE-HBP, ECF No. 1023-10 (March 26, 2010) (showing statements submitted to jury). Vivendi investors who purchased shares between December 8, 2020 and December 19, 2020 could only rely on statements made by pre-merger Vivendi. So under the Court's reading of *Frutarom*, the Second Circuit reached the wrong result in affirming a judgment in favor of these investors.

### 5.     The Court's Reading of *Frutarom* Arguably Conflicts With *Blue Chip Stamps*

Many of Defendants' challenged Pre-Merger statements were made in prospectuses. *See* ¶¶285, 287, 289, 291, 293.[12] In *Blue Chip Stamps*, the Supreme Court found that in order to have standing a plaintiff must have "dealt in the security to which the ***prospectus***, representation, or omission ***relates***." 421 U.S. at 730. This holding suggests that courts must determine not just a

---

[12] These paragraphs quote slides from an Analyst Day Presentation filed on September 5, 2019 and an Investor Presentation filed on September 26, 2019. ¶ 285. Both presentations were filed as a prospectus pursuant to SEC Rule 425 (the SEC Rule requiring prospectus disclosures) and were labeled "Subject Company: Virgin Galactic." *Id.*; *see also* ECF No. 79-4 (prospectus filed July 9, 2019 by Social Capital Pursuant to Rule 425, referring to "the clearing of the huge technical milestone which came from demonstrating Unity's full flight profile with two trips to Space").

26

statement's subject, but also to what security the prospectus in which the statement is contained relates.

By definition, a "prospectus" relates to a public offering of securities. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *see also* Black's Law Dictionary (a prospectus is "[a] printed document that describes the main features of an enterprise (often a corporation's business) and that is distributed to prospective buyers or investors."). In this case, Pre-Merger Virgin Galactic's securities were neither publicly traded nor for sale, so the statements in the Social Capital prospectuses cannot have related to Pre-Merger Virgin Galactic *securities*, even if they were about Pre-Merger Virgin Galactic as a *company*. The *securities* to which those prospectuses related can only be the securities of Social Capital and Post-Merger Virgin Galactic.

Nor is it dispositive that Post-Merger Virgin Galactic did not yet exist. Prospectuses, by their very nature, relate to contemplated *future* offerings of securities, and it is common for prospectuses to relate to securities that are not yet publicly traded. Indeed, that would be the case for any IPO. More broadly, companies regularly sell products they are not ready to deliver, whether they are preselling books or offering to custom-build houses. So too here: Defendants were pre-selling securities in Post-Merger Virgin Galactic that did not exist yet. The statements made in those prospectuses for the very purpose of inducing those purchases related to those securities.

### C.    An Immediate Appeal Would Materially Advance The Litigation

The claims the Court dismissed and those it sustained involve different facts and legal issues. The Court dismissed, citing *Frutarom*, statements that concerned the February 2019 Unity flight, Virgin Galactic's then-progress, and a statement concerning its vehicles' design configuration. Order at 17. The statement the Court sustained concerns Branson's July 2021 trip on Unity. Order at 61.

If the Second Circuit rejects the Court's reading of *Frutarom* and reverses the dismissal of the Pre-Merger statements, the parties will have to take discovery on these new facts and theories.

27

Because the theories are so different, the parties would essentially have to start discovery from scratch. Indeed, even the Court's class certification ruling would be at issue. The Court's order eliminates 35 months of the 37-month Class Period plaintiffs alleged. The circumstances supporting or opposing class treatment for the remaining 2-month period may not be the same as the circumstances applicable to the broader period.

Thus, should the Second Circuit reverse the Court's order, the parties would have to litigate this case twice. The parties would have to re-depose many of the persons who had already been deposed because they had information that was relevant to the claims the Court upheld. The Court would have to empanel a new jury; both juries would have to become familiar with the literal rocket science underlying this case. Thus, waiting for a post-trial appeal to determine whether the Court's reading of *Frutarom* is correct would result in unconscionable waste of the parties' and judicial resources, and would delay a final determination of this action by years, if not more.

If Plaintiffs never obtain Second Circuit review of the Court's interpretation of *Frutarom*, it will be because the parties reached a settlement. A ruling that "change[s] the landscape in dramatic ways" presents grounds for appeal under §1292(b). *In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374, 392 (S.D.N.Y. 2019) (leave to appeal granted Apr. 1, 2020); *see also Pollack v. Laidlaw Holdings, Inc.*, 1993 WL 254932, at *4 (S.D.N.Y. June 25, 1993) ("This proceeding remains in its initial stages; much repetition of discovery and a retrial may be avoided by permitting interlocutory review of the Court's decision to obtain a final decision as to whether the securities claims in the complaint are viable."). When determining whether a resolution advances the litigation, courts need not blind themselves to the practical consequences of their orders. For example, *General Motors* found that an immediate appeal would materially advance the litigation when one of its decisions dramatically limited the available damages. 427 F. Supp. 3d at 392. The court also reasoned

28

that because the MDL proceedings at issue in that case are almost invariably are either dismissed or settle, just like securities class actions, "the practical reality is that a broad swath of Plaintiffs' claims are likely to be resolved by settlement, and the value of that settlement will be heavily influenced by the Court's Opinion and Order." *Id.* at 394. The Order cuts off more than 90% of the class, much of it solely because of the Court's reading of *Frutarom*.

### D.    Discretionary Factors Support An Immediate Appeal

Resolution of the question of law will also impact other cases. "[T]he impact that an appeal will have on other cases is a factor that we may take into account in deciding whether to accept an appeal that has been properly certified by the district court." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990). "When a controlling issue of law satisfies the requirements of Section 1292(b) and involves a new legal question or is of special consequence, then the district court should not hesitate to certify an interlocutory appeal." *Guzman v. First Chinese Presbyterian Cmty. Affairs Home Attendant Corp.*, 2021 WL 1852038, at *2 (S.D.N.Y. May 7, 2021) (leave to appeal granted Sept. 1, 2021).

In the Second Circuit, seven judges in seven different SPAC cases must decide whether *Frutarom* denies standing to plaintiffs who bought post-merger securities but bring claims based on pre-merger statements.[13] Without guidance from the Second Circuit, the seven judges who are hearing

---

[13] *Margent v. Sunlight Financial Holdings Inc.*, 1:22-cv-10658 (S.D.N.Y 2022) (Hellerstein, J.), ECF No. 34, at ¶¶ 50, 51, 54-55 (motion to dismiss yet to be filed); *In re Lottery.com Inc. Securities Litigation*, 1:22-cv-07111 (S.D.N.Y. 2022) (Rochon, J.), ECF No. 52, at ¶¶ 38, 74, 75, 76 (same); *Brennan v. Latch, Inc.*, 1:22-cv-07473 (S.D.N.Y. 2022) (Koeltl, J.), ECF No. 1, at ¶ 18 (same); *Pitman v. Immunovant, Inc.,* 1:21-cv-00918 (E.D.N.Y. 2022) (Matsumoto, J.) ECF No. 82, at ¶¶ 221-247, 337, 338, 341; *In re Hyzon Securities Litigation*, 6:21-cv-06612 (W.D.N.Y. 2021) (Siragusa, J.), ECF No. 67 at ¶¶ 6-7, 109-142, 531; *In RE TMC the metals company Inc. Securities Litigation,* 1:21-cv-05991 (E.D.N.Y. 2022) (Komitee, J.), ECF No. 43 at ¶¶ 84-97, *Frutarom* argument made, ECF No. 50; *In re Arrival SA Securities Litigation*, 1:22-cv-00172 (E.D.N.Y. 2021) (Morrison, J.), ECF No. 93 at ¶¶ 97-106, 115-120 (*Frutarom* argument made, *see* ECF No. 123). This list does not include *CarLotz* because Judge Abrams has already made her decision.

29

these cases will have to individually resolve the same legal question the Court just decided. These efforts are even now costing judicial resources; Judge Komitee recently devoted time to analyzing the same *Frutarom* argument the Court rejected. This is a waste of judicial resources, because the Second Circuit itself will eventually resolve the question authoritatively, one way or another. In the meantime, without authoritative guidance, judges may release conflicting decisions on a point of law that will control whether cases can proceed or whether they are dismissed. This Court can save District Court judges an enormous amount of time by obtaining an authoritative resolution now. It should do so.

**IV.     If The Court Declines To Reconsider Dismissal Of The Specified Claims And Declines To Certify Its Order For Interlocutory Appeal, It Should Enter Judgment Pursant To Fed. R. Civ. Proc. 54(b) So Impacted Investors May Pursue An Immediate Appeal**

If the Court *both* declines to reconsider its dismissal of the December 2019 press release as a false statement *and* declines to certify the Order for interlocutory appeal to resolve the *Frutarom* issue, then Plaintiffs who did not purchase shares during the remaining portion of the Class Period (*i.e.*, between July 11, 2021, the date of the first statement sustained in the Order, and September 2, 2021, the date of the last corrective disclosure upheld) will have had all their claims dismissed. If so, the Court should enter judgment now under Rule 54(b) against the representative plaintiffs whose claims will have been dismissed—Mark Kusnier, Robert Scheele, Xinqiang Cui, Justin Carlough, Vipul Gupta, and Maria Joseph Rosales—and find that there is no just cause for delay under Federal Rule of Civil Procedure 54(b). Then, these Dismissed Plaintiffs may immediately proceed to appeal the claims on behalf of themselves and the putative Class members of similarly-situated investors they sought to represent.

Federal Rule of Civil Procedure 54(b) allows courts to enter a final judgment as to fewer than all of the claims or parties involved upon a discretionary finding that there is "no just reason for delay." Fed. R. Civ. P. 54(b). The Court exercises its discretion to promote "sound judicial administration," considering "judicial administrative interests as well as the equities involved." *Curtiss-Wright Corp.*

30

*v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980). The Court should consider, among other things, "whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Id.*

In *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997), the district court permitted certain of the plaintiff's claims to proceed to trial while dismissing others because the court ruled that the assignment through which the plaintiff obtained the claims was invalid. The district court then entered final judgment on the order of dismissal of the assigned claims so that the plaintiff and the assignors could proceed to an immediate appeal under Rule 54(b). The Second Circuit ruled the district court did not abuse its discretion because an immediate appeal would present discrete issues (*i.e.*, the validity of the assignment) separate from the ultimate result at trial and would avoid the possibility of duplicative trials). *Id.*

This same rationale applies here. In *Advanced Magnetics*, without an immediate appeal, the district court might have to hold two trials and empanel two juries. *Id.* Here, the Court dismissed claims that Defendants made false and misleading statements, largely in 2019 before the merger, about progress on, and the status of, Virgin Galactic's test flights and commercialization program. None of the dismissed statements concern Branson's flight, and none of them were even made during the remaining claims' class period. So not only would two juries have to be empaneled, the parties would likely have to start discovery from scratch if the Second Circuit reversed because it disagreed with the Court's interpretation of *Frutarom*. In *Advanced Magnetics*, the courts of appeals' policy against piecemeal appeals was not dispositive because "the issues presented in the present appeal . . . are entirely unrelated to the merits of the claims that are to be tried." *Id.* at 17. Here as well, an appeal would principally concern whether *Frutarom* bars SPAC investors from suing based on statements

31

made before the merger, while the remaining issues concern facts and theories which will not be litigated in this case.

Moreover, the equities weigh more strongly in favor of an immediate appeal in this case than in *Advanced Magnetics*. In *Advanced Magnetics*, the plaintiff individual investors were prejudiced because they would have had to wait until judgment was entered after trial to have their appeal, but the parties had already gone through summary judgment. 106 F.3d at 17. The Order dismisses the §10(b) and Rule 10b-5(b) claims of plaintiffs and absent class members who purchased post-merger Virgin Galactic securities prior to July 11, 2021, the date of the first false statement presently sustained under the Order. These Plaintiffs include both Lead Plaintiffs, and four of the seven named Plaintiffs. These Dismissed Plaintiffs, who originally had claims sustained after the FAC Order, now have none. If the Court declines to reconsider its dismissal of the December 13, 2019 press release and declines to certify the Order for an interlocutory appeal under §1292(b), these Dismissed Plaintiffs (whom the Court previously held sufficiently alleged they suffered damages as a result of Defendants' fraud) will have no opportunity to seek an appeal. Unless the Court grants their motion for an immediate appeal under Rule 54(b), they must wait for years while the claims of investors who purchased during a two-month sliver of the 37-month class period take their case through class certification, fact and expert discovery, trial, and post-trial proceedings.[14] Thus, plaintiffs—including the Court-appointed lead plaintiffs—would suffer "hardship or injustice through delay which would be alleviated by immediate appeal." *Advanced Magnetics*, 106 F.3d at 21. That the dismissed claims are so much larger than the remaining claims further supports an immediate appeal. *See Topps Co. v. Cadbury Stani, S.A.I.C.*,

---

[14] The case meets the first requirement of Rule 54(b) because the claims are separable, in that "they involve at least some different questions of fact and law and could be separately enforced, or if different sorts of relief are sought." *Advanced Magnetics*, 106 F.3d at 21. Most notably, the primary and gatekeeping "different question" involving the application of *Frutarom* applies only to the dismissed statements and not to the remaining statements.

2006 WL 3247360, at *4 (S.D.N.Y. Nov. 7, 2006) (petition to appeal granted as reflected in *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 65 (2d Cir. 2008)) (that order narrowed potential claims such that trial which would otherwise take two months would only take a week supported appeal); *see also DeLeonardis v. Berg*, 40 F. Supp. 2d 488, 491 (E.D.N.Y. 1999) (petition to appeal granted as reflected in *DeLeonardis v. Berg*, 199 F.3d 1321 (2d Cir. 1999)) (entry of judgment under Rule 54(b) justified because Second Circuit's decision would affect the scope of discovery).

Significantly, the Court's prior FAC Order sustained Plaintiffs' claims that investors were misled by Defendants' announcement of the Merger on July 9, 2019. FAC Order at 18 ("the statement in Compl. ¶ 497 that test flights had 'demonstrated the repeatability of the full flight profile' and showed that VG 'ha[d] overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service' was materially misleading in context."). In fact, the Court previously found a number of statements to be actionable in the FAC Order and dismisses them now only based on the Court's application of *Frutarom*.[15] There is "no just reason to delay" the ability of investors who previously were held to have stated cognizable §10(b) claims based on these statements to seek redress.

Put simply, it makes no sense to delay an appeal for the Dismissed Plaintiffs, whose claims relate to the vast majority of the alleged Class Period and were dismissed on standing grounds, while the parties litigate the remaining two months. If the Second Circuit disagrees with the Court's reading of *Frutarom* after the trial of the remaining claims, the parties will have to relitigate this case from scratch.

---

[15] *See* FAC Order at 55 (holding Plaintiffs had sufficiently alleged that statements in FAC ¶¶ 497, 505, and 526 were actionable). The corresponding SAC paragraphs are ¶¶ 275, 279, and 298.

33

## V.      __Conclusion__

For the foregoing reasons, the Court should: (a) reconsider its Order dismissing Plaintiffs' §10(b) claims based on Post-Merger Virgin Galactic's December 13, 2019 statements and Plaintiffs' §10(b) insider trading claims regarding Branson's August 10-12, 2021 stock sales; and (b) amend the Order to include a certification for an interlocutory appeal under 28 U.S.C. §1292(b).  In the event the Court declines to reconsider its dismissal of the December 13, 2019 press release and declines to certify the Order for an immediate interlocutory appeal under §1292(b), then the Court should enter final judgment under Rule 54(b) against Mark Kusnier, Robert Scheele, Xinqiang Cui, Justin Carlough, Vipul Gupta, and Maria Joseph Rosales (because their claims will have been fully extinguished), finding there is no just cause for delay, and enabling them to seek an immediate appeal.

Dated: August 22, 2023                    Respectfully submitted,

                                          GLANCY PRONGAY & MURRAY LLP

                                          By: _s/ Kara M. Wolke_
                                          Kara M. Wolke
                                          Ex Kano S. Sams II
                                          Natalie S. Pang
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, CA 90067
                                          phone: (310) 201-9150
                                          fax: (310) 432-1495
                                          Email: kwolke@glancylaw.com
                                                 esams@glancylaw.com
                                                 npang@glancylaw.com

34

THE ROSEN LAW FIRM, P.A.

By: *s/ Jonathan Horne*
Jonathan Horne, Esq. (JH 7258)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com
lrosen@rosenlegal.com
*Counsel for Plaintiffs*

35

**<u>PROOF OF SERVICE</u>**

I hereby certify that on this 22nd day of August, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>*s/ Kara M. Wolke*</u>
Kara M. Wolke