UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MARK KUSNIER and ROBERT SCHEELE, Individually
and On Behalf of All Others Similarly Situated,

*Plaintiffs*,

-against-

VIRGIN GALACTIC HOLDINGS, INC., MICHAEL A.
COLGLAZIER, GEORGE WHITESIDES, MICHAEL
MOSES, RICHARD BRANSON, and CHAMATH
PALIHAPITIYA,

*Defendants*.

---

21-CV-3070 (ARR) (TAM)

<u>NOT FOR ELECTRONIC
OR PRINT PUBLICATION</u>

**OPINION & ORDER**

ROSS, United States District Judge:

This is a putative class action alleging violations of Sections 10(b), 20(a), and 20A of the

Securities and Exchange Act of 1934 ("Exchange Act"). In my prior opinion, I granted in part and

denied in part defendants' motion to dismiss plaintiffs' Second Amended Complaint ("SAC"). *See*

Op. & Order 1 ("2023 Op."), ECF No. 90. Plaintiffs now move for: (1) partial reconsideration of

my prior opinion; (2) certification of that opinion for interlocutory appeal under 28 U.S.C.

§ 1292(b); and (3) entry of partial final judgment as to plaintiffs Mark Kusnier, Robert Scheele,

Xinqiang Cui, Justin Carlough, Vipul Gupta, and Maria Joseph Rosales (the "dismissed plaintiffs")

under Federal Rule of Civil Procedure 54(b). *See* Mem. L. in Supp. Pls.' Mot. 1–2 ("Pls.' Mot."),

ECF No. 94. For the reasons below, plaintiffs' motion is denied.

## BACKGROUND

I assume familiarity with the facts underlying this case as detailed in my two previous

opinions. *See* 2023 Op. 1–8; *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 360–

67 (E.D.N.Y. 2022). I include here only the factual allegations and procedural background necessary to understand this opinion.[1]

### Virgin Galactic's Spacecraft and Initial Safety Issues

Defendant Virgin Galactic Holdings, Inc. ("Virgin Galactic") is a commercial space company founded in 2004. SAC ¶ 27, ECF No. 69. Its space travel system consists of two spacecraft: a carrier aircraft and a spaceship. *Id*. ¶ 64. The carrier aircraft takes the spaceship to approximately 45,000 feet and releases it; the spaceship then activates its rocket engine and reaches approximately 275,000 feet. *Id*. The spaceship stays in space for a few minutes before returning to Earth. *Id*.

There have been multiple catastrophic or near-catastrophic failures during the development of Virgin Galactic's space travel system. In October 2014, Virgin Galactic's first spaceship model, "Enterprise," disintegrated during a test flight, killing the co-pilot. *Id*. ¶¶ 66–67. Following this accident, Virgin Galactic severed its relationship with Scaled Composites, the company it had previously retained to build its spacecraft, and instead began using a Virgin Galactic subsidiary, The Spaceship Company, for construction. *Id*. ¶¶ 66, 69.[2] When this transition occurred, the second spaceship model, "Unity," was under construction and only about sixty-five percent complete. *Id*. ¶ 70. Scaled Composites never provided The Spaceship Company with "accurate or reliable engineering drawings" for either the carrier aircraft or Unity. *Id*. ¶ 126.

Virgin Galactic's safety testing of Unity revealed significant safety issues. *See id*. ¶¶ 73–83. During one particular test flight in February 2019, Unity "suffered critical damage to its

---

[1] I presume all facts alleged in the SAC to be true for the purposes of this opinion. *See Goldfarb v. Channel One Russia*, No. 18-CV-8128 (JPC), 2021 WL 1392850, at *1 (S.D.N.Y. Apr. 13, 2021).

[2] Virgin Galactic and The Spaceship Company later merged in 2020. *Id*. ¶ 27.

horizontal stabilizers" that was "so significant" that Virgin Galactic's head of safety remarked, "I don't know how we didn't lose the vehicle and kill three people." *Id*. ¶ 78. After the flight landed, Virgin Galactic employees "immediately noticed a large gash running along the trailing edge of the right horizontal stabilizer." *Id*. ¶ 80. This rupture was so extensive that Unity was "way too damaged to fly again." *Id*. ¶ 82. According to a former employee, the February 2019 test flight narrowly avoided a catastrophic failure that would have killed those onboard. *Id*. ¶ 83. Despite this near disaster, Virgin Galactic immediately issued a press release that characterized the test flight as traveling "safely to space and back." *Id*. ¶ 298.

### *Reverse Merger*

On July 9, 2019, defendants announced that Virgin Galactic would go public through a merger with Social Capital Hedosophia Holdings Corp. ("Social Capital"). *Id*. ¶¶ 2, 275. Social Capital is a "special purpose acquisition corporation" or "SPAC." *Id*. ¶ 48. SPACs are publicly traded holding companies created for the specific purpose of taking a private company public by acquiring the private company in what is referred to as a "de-SPAC merger" or "reverse merger." *Id*; *see* Reply Mem. L. in Supp. Pls.' Mot. 7 ("Pls.' Reply"), ECF No. 97. Following the July 9, 2019 announcement, the reverse merger between Virgin Galactic and Social Capital closed on October 25, 2019. SAC ¶ 51. Plaintiffs allege that after the merger was announced and prior to closing, defendants made numerous misleading statements regarding the development of Virgin Galactic's space travel system. *See id*. ¶¶ 275–94.

### *Branson's July 11, 2021 Flight*

On July 11, 2021, Virgin Galactic took its founder, defendant Richard Branson, on a flight into space. *Id*. ¶ 228. As described in the SAC, after the spaceship Unity reaches its apex in space, it must return to Earth by gliding through an imaginary "cone" that gradually narrows until the

spaceship reaches its designated landing strip. *Id*. ¶ 238. Deviating from the cone is dangerous because Unity burns all its fuel during its ascent into space, meaning the vehicle may not have enough energy to reach the landing strip if it veers off course. *Id*. ¶¶ 239, 337. Reporting by the *New Yorker* eventually revealed that during Branson's July 11, 2021 flight, Unity strayed outside its landing strip and left its FAA airspace for more than ten percent of its journey. *Id*. ¶ 244. On August 11, 2021, following an investigation, the FAA wrote an email to Virgin Galactic management deeming the July 11 flight a "mishap" (a term of art for a serious incident that does not result in an accident) and requiring Virgin Galactic to generate a final report and implement corrective actions "prior to conducting further FAA-licensed launches." *Id*. ¶ 250 & n.8.

Plaintiffs allege that prior to the *New Yorker* revelations, defendants represented Branson's July 11 flight as an unmitigated success. In a press release and interviews immediately following the flight, defendants characterized the flight as "successful," "perfect," and "flawless." *Id*. ¶¶ 229–31. Then, from August 10–12, 2021, Branson sold 10.4 million Virgin Galactic shares—every share he owned not subject to a lockup agreement. *Id*. ¶ 235. (The *New Yorker* story was not published until the following month, on September 1, 2021. *Id*. ¶ 240.)

***Procedural Background***

In May 2021, Plaintiff Shane Lavin initiated this action against Virgin Galactic and individual defendants, alleging various forms of securities fraud. *See* Complaint 16–21, ECF No. 1. Following appointment of lead plaintiffs and counsel, *see* Order, ECF No. 22, plaintiffs filed an amended complaint in December 2021, *see* First Amended Complaint ("FAC"), ECF No. 36. I granted in part and denied in part defendants' motion to dismiss the FAC and granted plaintiffs leave to amend. *See Kusnier*, 639 F. Supp. 3d at 390–91. Plaintiffs then filed the Second Amended Complaint and defendants moved to dismiss the action in full. *See* Notice of Mot., ECF No. 72.

After initial briefing on defendants' motion, I granted plaintiffs leave to file a sur-reply on whether Second Circuit precedent prevented plaintiffs from challenging statements made by Virgin Galactic prior to the de-SPAC merger with Social Capital. *See* Pls.' Mot. for Leave to File 2, ECF No. 83; Order Granting Pls.' Mot., ECF No. 85. I then granted in part and denied in part defendants' motion to dismiss. *See* 2023 Op. 1.

Plaintiffs now move for (1) partial reconsideration of my dismissal of their claims based on statements regarding the February 2019 test flight and Branson's August 10–12, 2021 stock sales; (2) certification of my opinion for interlocutory appeal; and, in the event that I decline to reconsider my opinion and decline to certify it for interlocutory appeal, (3) entry of partial final judgment as to the dismissed plaintiffs. *See* Pls.' Mot. 1–2.

## DISCUSSION

### I.   Reconsideration

Plaintiffs ask that I reconsider two parts of my opinion: (a) my dismissal of plaintiffs' claims under § 10(b) of the Exchange Act based on statements regarding the February 2019 test flight; and (b) dismissal of plaintiffs' § 10(b) insider trading claims based on Branson's August 10–12, 2021 stock sales. *Id*. at 1.

"The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd*., 956 F.2d 1245, 1255 (2d Cir. 1992) (quotation omitted); *see also Shrader v. CSX Transp., Inc*., 70 F.3d 255, 257 (2d Cir. 1995) ("[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be

expected to alter the conclusion reached by the court"). Neither of plaintiffs' requests for reconsideration satisfies these criteria; accordingly, their motion for reconsideration is denied.

### A. Press release statements

Plaintiffs first ask that I reconsider my dismissal of their § 10(b) claims based on statements regarding the February 2019 test flight. Plaintiffs allege that following the near disaster of that flight, Virgin Galactic issued a press release, on February 22, 2019, characterizing the flight as safe. SAC ¶ 298. Ten months later, on December 13, 2019, defendants issued a separate press release titled "Reflecting on a Remarkable Year"; this later press release included a description of the February 2019 flight with a hyperlink to the February 2019 press release. *Id*. ¶¶ 297–98.

In my first opinion, I held that statements initially made in the February 2019 press release were actionable. *See Kusnier*, 639 F. Supp. 3d at 390 (sustaining plaintiffs' claims based on statements in FAC ¶ 526, which is identical to SAC ¶ 298). In their motion to dismiss the SAC, defendants argued these statements were not actionable because they were made before the alleged class period began on July 10, 2019. Defs.' Mem. L. in Supp. Defs.' Mot. to Dismiss 11, 15 ("Defs.' Mot."), ECF No. 76. Plaintiffs responded that though the statements were *initially* made in February 2019, defendants made these statements *again* in December 2019 (*i.e.*, after the class period began) when they hyperlinked to the statements in the later press release. Pls.' Mem. L. in Opp'n 12, ECF No. 78-3. Defendants replied that the hyperlink in the December 2019 press release was insufficient to "transform a pre-Class Period statement into a Class Period statement." Defs.' Reply Mem. L. 4, ECF No. 82. I ultimately dismissed plaintiffs' claims based on statements in the February 2019 press release, concluding that "mere reference" to these statements in the December 2019 press release was insufficient to incorporate them into the later document. 2023 Op. 28.

Plaintiffs now ask that I reconsider this conclusion, arguing that my prior opinion overlooked "key facts and controlling precedents in reaching its decision on these statements." Pls.' Mot. 8. Because plaintiffs fail to identify either key facts or controlling precedent that necessitate reconsideration, their request is denied.

1. *Key Facts*

Plaintiffs first argue that my opinion overlooked multiple facts related to the December 2019 press release, including that it "(1) described the February 2019 flight; (2) said, as to that flight, that 'we did it again'; and (3) provided a link to a February 2019 press release that described the flight in further detail." Pls.' Mot. 9–10. None of these facts suggests the December 2019 press release did anything more than reference the statements in the February 2019 press release. To be sure, the December 2019 press release clearly directed readers, via hyperlink, to the February 2019 press release for further information regarding the February 2019 flight. However, I do not think the December 2019 press release can be read as repeating, or even endorsing, specific statements in February 2019 press release regarding the flight's safety. As such, I decline to reconsider my determination that the December 2019 press release only referenced statements in the February 2019 press release.

2. *Controlling Precedent*

Plaintiffs likewise fail to identify any controlling precedent that would compel reconsideration of my conclusion that "mere reference" to the February 2019 press release was "insufficient to incorporate it" into the December 2019 press release. 2023 Op. 28. As plaintiffs acknowledge, "incorporation by reference via a hyperlink has not been directly decided in the Second Circuit." Pls.' Reply 5. Nonetheless, plaintiffs suggest reconsideration is warranted because my decision overlooks the Supreme Court's "ultimate authority" test in *Janus Capital*

*Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). Pls.' Mot. 10–11. *Janus* held that, "[f]or the purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id*. at 142. Plaintiffs argue that because Virgin Galactic had "ultimate authority" to include a link to the February 2019 press release in the December 2019 press release, it "made" the February 2019 press release statements again in December 2019 when it linked to them.

*Janus* is inapposite. The "ultimate authority" test identifies the *speaker* of allegedly misleading statements—yet here, the question is not the identity of the speaker, but rather the *content* of the speech. That is, there is no dispute that Virgin Galactic "made" the statements in the December 2019 press release. *See* Defs.' Opp'n at 6. Instead, the question is whether those statements included, by reference, the statements from the February 2019 press release. *Janus* does not address this question, much less control.

Plaintiffs also cite Second Circuit cases concerning whether a company may be held liable for misleading information disseminated in analysts' reports. *See* Pls.' Mot. 11 (citing *Elkind v. Liggett & Myers, Inc*., 635 F.2d 156, 163 (2d Cir. 1980), *superseded by statute by statute on other grounds*; *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). These cases offer little guidance. First, the reasoning in this line of cases often turns on factors that are indicative of the relationship between the company and the analyst firm, such as the company's level of involvement in preparing analysts' reports. *See, e.g*., *Liggett*, 635 F.2d at 163. This reasoning is difficult to apply to the present case, which concerns statements made by the *same* entity at different times. Second, and relatedly, none of the cases plaintiffs cite offer specific examples of when simply referencing misleading statements (as opposed to participating in their preparation, etc.) may itself be enough to make the speaker liable for those statements.

In their Reply, plaintiffs also refer to *In re Turquoise Hill Resources Ltd. Securities Litigation*, 625 F. Supp. 3d 164 (S.D.N.Y. 2022) and related cases, which address whether a company may incorporate cautionary language by reference to avoid liability for misleading statements. *See* Pls.' Reply at 5. *Turquoise Hill* is helpful insofar as it provides an example of how a company may incorporate its own language into later statements by reference. *See* 625 F. Supp. 3d at 213–15. However, though analogous, this case addresses a distinct legal issue—namely, the scope of the safe harbor for forward-looking statements in private securities litigation. And none of the statements at issue in *Turquoise Hill* used a hyperlink to refer readers to the company's earlier statements. As such, this case is not instructive; moreover, even if it were, it would not be controlling. *See Cobalt Multifamily Invs. I, LLC v. Shapiro*, No. 06-CV-6468 (KMW), 2009 WL 4408207, at *2 (S.D.N.Y. Dec. 1, 2009) (noting that district court decisions are not "controlling" for the purposes of a motion for reconsideration).

The final authority plaintiffs cite, *S.E.C. v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340 (S.D.N.Y. 2011), perhaps most closely tracks the present case. In *Tecumseh*, the court found that the defendant company made materially misleading statements where its offering memoranda "incorporate[d] by reference" earlier profit projections that were "undeniably false." *Id*. at 351– 52. However, the memoranda at issue in *Tecumseh* specifically stated that its contents were "further qualified and [] *in all respects subject to*" the earlier profit projections. *Id*. at 352 n.60 (emphasis added). This language is much stronger evidence of incorporation than appears in the December 2019 press release, which simply directed readers, via hyperlink, to the February 2019 press release for further information regarding the February 2019 flight. *Tecumseh* therefore does not conflict with my holding, and, like *Turquoise Hill*, it is not controlling. *See Cobalt*, 2009 WL

4408207, at *2. I conclude, in sum, that plaintiffs have not identified any controlling precedent that requires reconsideration of my prior decision regarding the press release statements.

###### 3. *Additional arguments*

Plaintiffs raise two additional arguments for reconsideration, neither of which is persuasive. First, plaintiffs suggest that due to "unusual circumstances," they did not have an opportunity to respond to defendants' arguments regarding incorporation by reference in the initial briefing on defendants' motion to dismiss. Pls.' Mot. 8–9. These "unusual circumstances" include: (1) that several "key arguments and authorities" raised by defendants and discussed in my opinion were raised for the first time in defendants' reply brief; (2) that "the Court had already ruled in favor of Plaintiffs as to the hyperlinked statements in the December 2019 press release"; and (3) that no oral argument was held on defendants' motion to dismiss. *Id*.

These circumstances do not rise to the level of "clear error" or "manifest injustice" needed for reconsideration. *Virgin Atl. Airways*, 956 F.2d at 1255. My first decision did not explicitly address whether Virgin Galactic made the February 2019 press release statements again in the December 2019 press release when it hyperlinked to those statements. Defendants raised this issue for the first time in their motion to dismiss the SAC, arguing that the February 2019 statements pre-dated the class period. *See* Defs.' Mot. at 11, 15. Plaintiffs' decision not to brief the issue more extensively in their response to defendants' motion is not a compelling basis for reconsideration. Moreover, as the forgoing demonstrates, even with the opportunity to argue their position more fully, plaintiffs are unable to identify precedent that compels a different conclusion on this issue.

Finally, plaintiffs argue that my decision "missappl[ied] the *Frutarom* standing test." Pls.' Mot. 12. This argument refers to the Second Circuit's decision in *Menora Mivtachim Insurance v. Frutarom Industries*, 54 F.4th 82 (2d Cir. 2022), which held that "purchasers of a security of an

acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." *Id*. Plaintiffs suggest that I applied this holding to dismiss their claims based on the December 2019 press release. Pls.' Mot. 12. They argue these claims should not have been dismissed on *Frutarom* grounds because "[w]hen Post-Merger Virgin Galactic chose to make the [February 2019] statement again in December 2019 . . . it was talking to Post-Merger investors about the prospects of Post-Merger Virgin Galactic's business." *Id*. at 13.

Because the language in my prior opinion is confusing on this point, I will take the opportunity to clarify my reasoning here. I dismissed plaintiffs' claims based on the December 2019 press release because (1) the December 2019 press release did not incorporate the misleading statements in the February 2019 press release; and (2) the statements in the December 2019 press release were not themselves misleading. 2023 Op. 18. I did not reach plaintiffs' *Frutarom* argument because it assumes that the December 2019 press release *did* in fact incorporate the February 2019 press release statements. That is, plaintiffs' argument assumes that "Post-Merger Virgin Galactic chose to make the [February 2019] statement *again* in December 2019." Pls. Mot. 13 (emphasis added). I rejected this exact assumption when I concluded that a "mere reference" to the statements in the February 2019 press release was "insufficient to incorporate" them into the December 2019 press release. 2023 Op. 28. Plaintiffs' arguments regarding how *Frutarom* would apply to the December 2019 press release if it had, in fact, incorporated the February 2019 statements are irrelevant. I need not reconsider my decision on these grounds.

### B. Insider trading claims

Plaintiffs also ask that I reconsider my dismissal of their § 10(b) insider trading claims based on Branson's August 10–12, 2021 stock sales. Pls.' Mot. 1. The SAC alleges that Branson

engaged in insider trading of his Virgin Galactic shares because he was "in possession of material non-public information at the time [he] sold [his] shares." SAC ¶ 387. The SAC provides a list of material non-public information, which does not include Branson's knowledge that the July 11, 2021 flight experienced safety issues. *Id*. In my prior opinion, I concluded, based on this omission, that "plaintiffs do not advance insider trading claim[s] based on Branson's knowledge that the July 2021 flight had encountered problems." 2023 Op. 53 (citing SAC ¶ 387). Because the material information specified in the SAC had become public by the time of Branson's August 10–12, 2021 stock sales, I dismissed plaintiffs' insider trading claims as to those sales. *Id*.

In their motion, plaintiffs argue that their omission of the July 11, 2021 flight from SAC ¶ 387 was a "scrivener's error." Pls.' Mot. 15. They emphasize that the list of material non-public information in SAC ¶ 387 was non-exhaustive and urge me to read the count "liberally" and "in conjunction with the totality of the facts alleged in the SAC." *Id*. Plaintiffs do not, however, identify controlling law or overlooked evidence that compels their reading of the SAC, nor do they argue that my conclusion represents a "clear error" or "manifest injustice." 956 F.2d at 1255. As defendants note, unlike other counts in the SAC, plaintiffs' § 10(b) insider trading count does not incorporate by reference the allegations from the body of the complaint. *Compare* SAC ¶¶ 387–92 *with id*. ¶¶ 382, 393, 398. This discrepancy—combined with plaintiffs' omission of the July 11, 2021 flight from the list of material non-public information—supports my reading of the SAC. I therefore decline to reconsider my dismissal of plaintiffs' § 10(b) insider trading claims based on Branson's August 10–12, 2021 stock sales.

## II.    Certification for Interlocutory Appeal

Plaintiffs next move for certification for interlocutory appeal under 28 U.S.C. § 1292(b). Their motion principally concerns my conclusion that the Second Circuit's decision in *Frutarom*

prevents plaintiffs from challenging statements made by Virgin Galactic prior to the de-SPAC merger with Social Capital. *See* 2023 Op. 17.

Plaintiffs allege that the pre-merger statements in question violate § 10(b) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder. SAC 103. These provisions prohibit materially misleading statements "in connection with the purchase or sale of any security." 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. To bring claims under § 10(b) and Rule 10b-5, private litigants must satisfy the "purchaser-seller rule": they must be "actual purchasers and sellers," meaning they must have "dealt in the security" to which the challenged statement "relates." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 747 (1975); *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 31 (2d Cir. 2004). In *Frutarom*, the Second Circuit applied the purchaser-seller rule in the context of mergers, holding that the "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." 54 F. 4th at 88. (The *Frutarom* plaintiffs purchased securities in the acquiring company before and after the merger. *See id.* at 84.)

Here, Social Capital acquired its target, Virgin Galactic, in the de-SPAC merger that took Virgin Galactic public. *See* SAC ¶¶ 47–51. Plaintiffs then purchased securities in the post-merger entity. 2023 Op. 14. In my decision, I concluded that plaintiffs did not have standing under *Frutarom* to bring claims based on pre-merger statements made by the acquisition target, Virgin Galactic, about itself. 2023 Op. 17. Plaintiffs now seek interlocutory review of this conclusion.

A district judge may certify an order for interlocutory appeal where the order involves (1) "a controlling question of law" as to which there is (2) "substantial ground for difference of opinion" and where (3) "immediate appeal from the order may materially advance the ultimate

termination of the litigation." 28 U.S.C. § 1292(b). "The proponents of an interlocutory appeal have the burden of showing that all three of the substantive criteria are met." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 529 (S.D.N.Y. 2014). Certification for interlocutory appeal "is not intended as a vehicle to provide early review of difficult rulings in hard cases." *Adar Bays, LLC v. Aim Expl., Inc.*, 310 F. Supp. 3d 454, 456 (S.D.N.Y. 2018) (quotation omitted). Rather, the Second Circuit has indicated that interlocutory appeal should be treated as a narrow exception to the final judgment rule and should be "reserved for those cases where an intermediate appeal may avoid protracted litigation." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 866–67 (2d Cir. 1996). Interlocutory review is rare in the preliminary stages of litigation, especially in the securities context. *See In re* Facebook, 986 F. Supp. 2d at 533–34.

Plaintiffs argue that I should certify my prior order for interlocutory appeal because my application of *Frutarom* involves a controlling "question of law with substantial grounds for difference of opinion" and because "allowing investors to immediately appeal their dismissed claims will materially advance the ultimate termination of the litigation." Pls.' Mot. 15–16. For the reasons below, I conclude that plaintiffs fail to establish these factors, and I therefore decline to certify my order for interlocutory appeal.

### A. Controlling question of law

A controlling question of law must "refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record." *United States ex rel. Quartararo v. Cath. Health Sys. of Long Island Inc.*, 521 F. Supp. 3d 265, 275 (E.D.N.Y. 2021) (quoting *Fairbank Recons. Corp. v. Greater Omaha Packing Co.*, No. 13-CV-907S, 2020 WL 7427025, at *4 (W.D.N.Y. Dec. 18, 2020)). A question of law is controlling where reversal of the district court's order would terminate the action; "[s]hort of a reversal necessitating dismissal, at a

minimum, the resolution of the issue should materially affect the litigation's outcome." *Id*. at 276 (quotation omitted). A court should also consider whether "the certified issue has precedential value for a large number of cases," though precedential value alone is not "sufficient to meet the controlling issue of law standard." *In re Facebook*, 986 F. Supp. 2d at 536–38 (quotations omitted).

Plaintiffs seek interlocutory review on the question of "whether plaintiff SPAC investors who did not purchase the pre-merger private company's securities have standing to sue based on statements addressed to those plaintiffs." Pls.' Mot. 16. They argue this is a "pure legal question," resolution of which would affect whether plaintiffs can bring claims based on defendants' pre-merger statements. Pls.' Reply 7–9. Plaintiffs also emphasize that their question has "precedential value for a large number of cases." *Id*. at 15. Defendants counter that plaintiffs in fact seek review of my fact-specific application of *Frutarom* "to this particular de-SPAC transaction and statements about it." Defs.' Mem. L. in Opp'n to Pls.' Mot. 10 ("Defs.' Opp'n"), ECF No. 96. Moreover, they argue, resolution of this issue is "unlikely to affect the outcome of the case (much less terminate it), because there are many other reasons why Plaintiffs' claims about the[] pre-merger statements fail." *Id*. at 11.

I agree with plaintiffs that their motion identifies a pure question of law with precedential value. Plaintiffs' motion raises the issue of whether *Frutarom* controls in cases involving de-SPAC mergers, and their arguments turn on features common among these types of mergers. *See* Pls.' Reply 7–8. I believe this issue is sufficiently general such that it could be decided "quickly and cleanly" on appeal and would not require detailed study of the record. *Quartararo*, 521 F. Supp. 3d at 275. Further, as plaintiffs argue, a Second Circuit ruling would have precedential value for other cases involving de-SPAC mergers. *See* Pls.' Mot 29 & n.13 (identifying pending SPAC cases

in the Second Circuit that involve "plaintiffs who bought post-merger securities but bring claims based on pre-merger statements").

However, reversal on plaintiffs' question would not terminate the action, nor would it necessarily materially affect the litigation. Were the Second Circuit to reverse my prior decision with respect to *Frutarom*, I would then need to consider defendants' alternative grounds for challenging the pre-merger statements. *See* Decl. Kevin M. McDonough in Supp. Defs.' Mot., Ex. 2 at 1–9, ECF No. 73-2 (listing challenges to each statement). Given the possibility that claims relying on pre-merger statements could be dismissed on these alternative grounds, it is not clear that reversal would materially affect the litigation. Certification for interlocutory appeal is therefore inappropriate. *See, e.g.*, *Ryan, Beck & Co., LLC v. Fakih*, 275 F. Supp. 2d 393, 396 (E.D.N.Y. 2003) (declining to certify an order for interlocutory appeal where, if reversed, the district court would still need to determine issues not reached in its initial decision); *Chamarac Properties, Inc. v. Pike*, No. 86-CV-7919 (KMW), 1994 WL 410902, at *2 (S.D.N.Y. Aug. 3, 1994) (same).

**B.  Difference of opinion**

Substantial ground for difference of opinion on an issue may exist where "there is conflicting authority on the issue," or where "the issue is particularly difficult and of first impression for the Second Circuit." *Quartararo*, 521 F. Supp. 3d at 277 (quoting *Pen Am. Ctr., Inc. v. Trump*, No. 18-CV-9433 (LGS), 2020 WL 5836419, at *2 (S.D.N.Y. Oct. 1, 2020)). However, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996). Rather, a district judge must "analyze the strength of the arguments

in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." *Id*. (quotation omitted).

Plaintiffs argue that the issue of *Frutarom*'s application to de-SPAC mergers represents a difficult issue of first impression for the Second Circuit. They advance multiple arguments in opposition to my ruling, including that it misinterprets *Frutarom*, conflicts with Second Circuit and Supreme Court precedents, and overlooks the purpose of § 10(b). Defendants emphasize that there is no conflicting authority on plaintiffs' *Frutarom* question and assert that plaintiffs' arguments opposing my application of *Frutarom* fail to meet the "demanding standard" for interlocutory appeal. Defs.' Opp'n 13.

I agree with plaintiffs that *Frutarom*'s application to de-SPAC mergers represents a developing area of securities law. However, I am not persuaded that the ground for difference of opinion on this issue is so substantial as to warrant interlocutory review. First, as defendants note, there is no "conflicting authority" on plaintiffs' question: the only other court in this Circuit to apply *Frutarom* to a de-SPAC merger likewise held that plaintiffs who purchase securities in a company following a de-SPAC merger do not have standing to challenge pre-merger statements made by the target company about itself. *See In re CarLotz, Inc. Sec. Litig*., No. 21-CV-5906 (RA), 2023 WL 2744064, at *4–5 (S.D.N.Y. Mar. 31, 2023).

Moreover, I remain unpersuaded by plaintiffs' various arguments that, contrary to my ruling, they have standing to challenge pre-merger statements by Virgin Galactic. According to *Frutarom*, the purchaser-seller rule requires that a plaintiff purchase or sell the securities "about which" the allegedly misleading statements were made. 54 F.4th at 88. Plaintiffs argue they have standing consistent with this rule because—although the statements in question were made by pre-merger Virgin Galactic—they were "about" the post-merger securities that plaintiffs purchased.

*See* Pls.' Mot. 18–19. Yet this argument overlooks the fact that *Frutarom* specifically held that "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." 54 F.4th at 88. Read as a whole, then, *Frutarom* concluded that pre-merger statements by an acquisition target "about itself" are not "about" the securities of the acquiring company, and, as such, purchasers of those securities do not have standing under the purchaser-seller rule. Because the statements at issue here were made by pre-merger Virgin Galactic about its own business operations—*i.e.*, "about itself"—they were not, under *Frutarom*, "about" post-merger Virgin Galactic securities. *See* SAC ¶¶ 275–94.

Nevertheless, plaintiffs argue the distinct features of de-SPAC mergers require a different application of *Frutarom*'s "about which" test. Specifically, plaintiffs stress that "[i]n the SPAC context, the acquisition target is always a non-public company with no public shareholders of its own." Pls.' Mot. 18. Accordingly, "[w]hen the officers or controlling shareholders of a SPAC acquisition target speak publicly, they are not speaking to the target's shareholders," but rather to SPAC shareholders and "prospective purchasers of the securities of the post-merger company." *Id*. In other words, because de-SPAC mergers function to take the acquisition target public, when a SPAC acquisition target speaks publicly "about itself," it is essentially selling itself to potential investors, and should be understood to be speaking "about" the securities of the SPAC and post-merger, public entity. Plaintiffs also emphasize that they are "at the very core" of § 10(b)'s protections because "they engaged in the very securities transactions Defendants aimed to induce through their fraudulent statements." *Id*. at 23.

These arguments are compelling, yet they rely on the kind of functional analysis that *Frutarom* specifically rejected. That is, *Frutarom* cautioned against the "endless case-by-case

erosion" of the purchaser-seller limitation on standing and stressed that application of the purchase-seller rule should entail "a formal and not a functional inquiry." 54 F.4th at 87; *see also* Pls.' Mot. 23 (acknowledging that "*Frutarom* adopted a formal test"). I do not, therefore, read *Frutarom* to leave room for context-specific exceptions to its holding. And because *Frutarom* already decided the question at issue here—that is, whether pre-merger statements made by an acquisition target "about itself" are also "about" the securities of the acquiring company— interlocutory review is not warranted.

Plaintiffs next argue that my application of *Frutarom* overlooks the fact that the Second Circuit panel that decided *Frutarom* revised its decision to avoid conflict with *In re NYSE Specialists Securities Litigation*, 503 F.3d 89 (2d Cir. 2007). Specifically, plaintiffs emphasize that the panel revised the "about which" test for standing, changing the requirement that a plaintiff must purchase or sell "a security *of the issuer* about which a misstatement was made" to "the security about which a misstatement was made." Pls.' Mot. 20 (emphasis added) (quoting *Frutarom*, 54 F. 4th at 86). I agree with plaintiffs that this edit is consistent with *NYSE Specialists*, which rejected the argument that "only statements about a security issuer are actionable." 503 F.3d at 102. Nevertheless, plaintiffs overstate the significance of this edit. My prior decision did not rely on *Frutarom* for the broad proposition that allegedly misleading statements must be about the issuer of the security that plaintiffs bought or sold. (Indeed, as plaintiffs argue, *Frutarom* requires only that statements be about the security itself.) Instead, I applied *Frutarom*'s specific holding that pre-merger statements by a target company about itself are not "about" the securities of the acquiring company. *See* 54 F.4th at 88. This reading of *Frutarom* is entirely consistent with the panel's revised decision.

Finally, plaintiffs argue that my application of *Frutarom* is at odds with two prior Second Circuit cases and "arguably conflicts" with the Supreme Court's decision in *Blue Chip Stamps*. Pls.' Mot. 25–27. I am not persuaded by these arguments. Neither of the Second Circuit decisions addressed the purchaser-seller rule, and only one concerned a merger. *See generally In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016); *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016). Again, my decision relied on *Frutarom* for its holding that, in the context of a merger, plaintiffs who purchased securities in an acquiring company do not have standing under the purchaser-seller rule to challenge pre-merger statements by a target company about itself. Because neither of the Second Circuit cases plaintiffs identify address this issue, I am not persuaded that they support certification for interlocutory review.

Likewise, plaintiffs do not demonstrate a conflict with *Blue Chip Stamps*. In that case, the Supreme Court suggested that the purchaser-seller rule "limits the class of plaintiffs" with standing under § 10(b) "to those who have at least dealt in the security to which [a] prospectus, representation, or omission relates." 421 U.S. at 747. Plaintiffs interpret this language to mean that they necessarily have standing under *Blue Chip Stamps* because defendants made statements in prospectuses that "related" to "the securities of Social Capital and Post-Merger Virgin Galactic." Pls.' Mot. 27. Yet this argument completely overlooks *Frutarom*. There, the Second Circuit interpreted the above language in *Blue Chip Stamps* to require that plaintiffs buy or sell "the securities about which [] misstatements were made," and held that pre-merger statements by a target company about itself are not "about" the securities of the acquiring company. 54 F.4th at 85, 88 (quoting *Blue Chip Stamps*, 421 U.S. at 747). My application of the purchaser-seller rule to the present case is therefore consistent with *Blue Chip Stamps* as it has been applied in this Circuit.

20

In sum, having reviewed plaintiffs' arguments, I conclude that plaintiffs have not demonstrated substantial ground for difference of opinion regarding my application of *Frutarom*.

## C. Litigation advancement

Interlocutory appeal may "materially advance" litigation if the appeal "promises to advance the time for trial or to shorten the time required for trial." *Quartararo*, 521 F. Supp. 3d at 278–79 (E.D.N.Y. 2021) (quoting *Tantaros v. Fox News Network, LLC*, 465 F. Supp. 3d 385, 389 (S.D.N.Y. 2020)). Courts place "particular weight" on this factor. *Id.* at 278; *see also Koehler*, 101 F.3d at 865–66 ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation.").

Plaintiffs argue that interlocutory review would advance the litigation here because it would avoid potential duplication of pre-trial and trial proceedings. Specifically, plaintiffs suggest that, were the Second Circuit to reverse my decision regarding *Frutarom* after final judgment, the parties would need to conduct a new round of discovery and a new jury would need to be empaneled to decide the revived claims. Pls.' Mot. 27–28. Defendants respond that certification would in fact delay the litigation because progress on the surviving claims would likely stall pending appeal. Defs.' Opp'n 18. Moreover, if litigation of the surviving claims were to proceed pending appeal, any potential remand would likely come "on the eve of trial on the remaining claims." *Id*. at 18–19.

I conclude that interlocutory appeal is unlikely to materially advance the litigation. First, allowing discovery on the remaining claims to move forward pending appeal would make little sense. Taking into account the time required for appeal and—in the event of a reversal—subsequent consideration of alternate grounds for dismissal, by the time discovery on any revived claims could begin, litigation of the remaining claims would be much advanced. In this scenario,

the parties would likely need to duplicate discovery efforts, raising many of the same efficiency concerns that plaintiffs identify. Alternatively, I could stay the remaining claims pending appeal. However, as defendants note, a stay would significantly delay progress on those claims. Given the likelihood of an affirmance, a stay pending interlocutory appeal would most likely only serve to slow the instant litigation. "Under these circumstances, efficiencies do not favor the certification of an interlocutory appeal." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co*., No. 19-CV-10067 (PAE), 2023 WL 4249356, at *19 (S.D.N.Y. June 29, 2023).

Based on the foregoing, I conclude that plaintiffs have not demonstrated that certification for interlocutory review is appropriate at this time.

## III.    Final Judgment

Finally, plaintiffs request that I enter judgment under Rule 54(b) as to the representative plaintiffs whose claims have been dismissed, so that they may "immediately proceed to appeal the claims." Pls.' Mot. 30. Rule 54(b) permits me to enter final judgment for a subset of claims or parties only if I "expressly determine[] that there is no just reason for delay." Fed. R. Civ. P. 54(b); *see Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co*., 769 F.3d 135, 140 (2d Cir. 2014). In assessing whether there is "just reason for delay," a district court must consider "judicial administrative interests" as well as "the equities involved." *Curtiss-Wright Corp. v. Gen. Elec. Co*., 446 U.S. 1, 8 (1980). "It is left to the sound judicial discretion of the district court to determine the appropriate time when each final decision in a multiple claims action is ready for appeal." *Id*. (quotation omitted).

### A.  Judicial administration

Whether entry of final judgment is consistent with "the interest of sound judicial administration" largely depends on whether the dismissed and remaining claims are sufficiently

"separable" such that "no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Id*. "Even if separable, if it appears that a claim already determined could again be subject to review in a subsequent appeal, then Rule 54(b) certification is improper." *Transp. Workers Union of Am., Loc. 100 v. N.Y.C. Transit Auth*., 505 F.3d 226, 230 (2d Cir. 2007).

Plaintiffs argue that final judgment is appropriate here because "an appeal would principally concern whether *Frutarom* bars SPAC investors from suing based on statements made before the merger, while the remaining issues concern facts and theories which will not be litigated in this case." Pls.' Mot. 31–32. Plaintiffs maintain that "the legal basis for the Court's dismissal of the Dismissed Plaintiffs is *Frutarom*," and, because *Frutarom* "does not apply at all to the Remaining Plaintiffs' claims," the panels "that hypothetically would have to hear this case would be dealing with different issues." Pls.' Reply 23.

These arguments elide potential inefficiencies that could result from plaintiffs' motion. The motion seeks final judgment as to six plaintiffs whose claims have been "extinguished entirely," including Mark Kusnier, Robert Scheele, Xinqiang Cui, Justin Carlough, Vipul Gupta, and Maria Joseph Rosales. Pls.' Mot. 1–2. These plaintiffs purchased securities in Virgin Galactic after the de-SPAC merger with Social Capital on October 25, 2019.[3] I dismissed their claims based on pre-merger statements under *Frutarom*. *See* 2023 Op. 17. However, I also dismissed their claims based on statements made *after* the merger;[4] these post-merger claims were dismissed on the merits, for

---

[3] *See* Mem. in Supp. Mot. to Appoint Counsel, Ex. 2, at 3–4 ("Kusnier Certification"), ECF No. 10-2; Aff. in Supp. Mot. to Appoint Counsel, Ex. B, at 3–10 ("Scheele Certification"), ECF No. 13-2; Notice, Attach. 1, at 2–30 ("Cui Certification"), ECF No. 40-1; FAC, Attach. 2, at 2 ("Carlough Certification"), ECF No. 36-2; SAC 117 ("Gupta Certification"); *id*. at 119 ("Rosales Certification").

[4] For example, the SAC alleges defendants made these misleading statements during a May 5, 2020 earnings call, SAC ¶¶ 300–01; in a June 25, 2020 press release, *id*. at ¶¶ 302–03; during a

non-*Frutarom* reasons, because the statements at issue were not materially misleading or fell within the safe harbor for forward-looking statements. *See* 2023 Op. 19, 25, 27.

Plaintiffs' motion applies to all claims asserted by the dismissed plaintiffs. *See* Pls.' Mot. 30. Thus, were I to grant the motion, my dismissal of certain post-merger claims for non-*Frutarom* reasons could also be immediately appealed. At the same time, other claims that I dismissed for similar reasons would *not* be immediately appealable because they post-date the period when the dismissed plaintiffs purchased securities. *See, e.g.*, *id*. at 27 (dismissing claims based on statements in SAC ¶ 320 as not materially misleading). This scenario could lead to repetitive appeals of similar claims, against the same defendants, that I dismissed on similar grounds. In other words, plaintiffs' motion does not cleanly isolate the *Frutarom* issue for appellate review. Rather, it implicates a broader set of claims and creates the possibility for "piecemeal appeals" on "interrelated issues." *Novak*, 642 F.3d at 311 (quotation omitted). Partial final judgment is therefore inappropriate.

### B. Equities

I am also not persuaded that the equities favor an entry of final judgment here. Plaintiffs argue that without final judgment, they "must wait for years" while litigation of the remaining claims proceeds. Pls.' Mot. 32. They also stress that the dismissed claims are "much larger" than the remaining claims. *Id*. But delay alone does not satisfy the requirements of Rule 54(b); rather, delay must cause "some danger of hardship or injustice" which could be "alleviated by immediate appeal." *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991) (quotation omitted). Hardship or injustice might arise, for instance, where a plaintiff demonstrates that delay

---

February 25, 2021 earning call, *id*. at ¶¶ 306–07; and in a form filed with the SEC on March 1, 2021, *id*. at ¶¶ 308–09. The dismissed plaintiffs purchased securities at different points throughout this period, from roughly April 2020 to December 2021. *See* certification documents cited *supra* note 2.

in receiving a monetary award would cause financial harm. *See Crespo v. Carvajal*, No. 17-CV-6329 (MKB), 2021 WL 4237002, at *6 (E.D.N.Y. Sept. 14, 2021) (collecting cases). Plaintiffs' concern—that I dismissed a much larger set of claims than remain—does not rise to the same level of hardship or injustice. Equitable interests therefore do not favor partial final judgment.

## CONCLUSION

For the above reasons, plaintiffs' motion for reconsideration, certification for interlocutory appeal, and entry of final judgment is denied.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:          December 19, 2023
                Brooklyn, New York