UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
                                        21-CV-3070(ARR)
SHANE LAVIN, ET AL.,
                                        United States Courthouse
          Plaintiffs,                   Brooklyn, New York

          - versus -                    October 2, 2024
                                        10:00 a.m.
VIRGIN GALACTIC HOLDINGS,
INC., ET AL,

          Defendants.
------------------------------x

            TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
               BEFORE THE HONORABLE TARYN A. MERKL
                  UNITED STATES MAGISTRATE JUDGE
                      VIA TELECONFERENCE

APPEARANCES
Attorney for Plaintiff:  THE ROSEN LAW FIRM
                         275 Madison Avenue, 40th Floor
                         New York, New York 10016
                         BY:  JONATHAN R. HORNE, ESQ.
                                  -and-
                         GLANCY PRONGAY & MURRAY LLP
                         1925 Century Park East
                         Suite 2100
                         Los Angeles, California 90067
                         BY:  EX KANO S. SAMS, II, ESQ.

Attorney for Defendant:  LATHAM & WATKINS
                         1271 Avenue of the Americas
                         New York, New York 10020
                         BY:  KEVIN M. MCDONOUGH, ESQ.
                              COREY CALABRESE, ESQ.
                                  -and-
                         LATHAM & WATKINS
                         650 Town Center Drive
                         Costa Mesa, CA 92626
                         BY:  RYAN A. WALSH, ESQ

Transcription Service:   Georgette K. Betts, RPR, FCRR, CCR
                         Phone:  (201)314-3902
                         Email:  Georgetteb25@gmail.com
Proceedings recorded by electronic sound recording.
Transcript produced by transcription service.

2

PROCEEDINGS

(In open court; all present via teleconference.)

THE COURTROOM DEPUTY:  This is civil cause for a status conference, docket 21-CV-3070.  Lavin versus Virgin Galactic Holdings, Inc. et al.

Before asking the parties to state their appearance, I would like to note the following:

Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings.  Violation of these prohibitions may result in sanctions, including the removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court.

Will the parties please state their appearances for the record starting with the plaintiff.

MR. HORNE:  Good morning, your Honor.  This is Jonathan Horne from The Rosen Law Firm for plaintiffs.

THE COURT:  Good morning.

MR. SAMS:  Good morning, your Honor.  Ex Kano Sams, Glancy Prongay & Murray on behalf of plaintiffs.

THE COURT:  All right, good morning to you all.  So we're here today with a discovery dispute that has been bubbling up and the determination we that need to make today whether or not this needs to go to a full blown motion practice or whether or not we can help the parties to resolve

PROCEEDINGS

the dispute in some fashion.

I think it probably makes sense to start with plaintiff since the plaintiffs are seeking the documents.  So would you like to start, Mr. Horne?

MR. HORNE:  Yes, your Honor.

THE COURT:  Have there been any narrowing, first of all?

MR. HORNE:  There has been potentially a narrowing on the fourth issue, which is documents created shortly after public disclosure, request number 57.  The defendants have agreed to produce documents from the February 1st to 28th window.  You know, the issue is -- and I apologize, we realized this last night and emailed defendants and I don't expect them to have an answer, but the negotiation on the time period has moved away.  We initially contemplated the entire period up to January 31st would be included, but over discussions of search terms, the plaintiffs have made significant concessions and, you know, currently stated the period ends in October 2019, and we would like to add some days in January which would originally have been reflected in the defendants' concessions which are no longer included.

With that, we'd be ready to resolve the request number 57.  And --

THE COURT:  Okay --

MR. HORNE:  -- again --

PROCEEDINGS

THE COURT:  Thank you for that.  I recognize that I failed to give the defendants an opportunity to state their appearance, so I just wanted to do that before we get into any responses on any specific points.

Who do I have on for the defendants, please?

MS. CALABRESE:  Good morning, your Honor.  This is Corey Calabrese from Latham & Watkins on behalf of the defendants.  I'm joined by two of my colleagues who will be introducing themselves.

THE COURT:  Thank you.

MR. WALSH:  Good morning, your Honor.

This is Ryan Walsh also of Latham & Watkins on behalf of the defendants.

MR. MCDONOUGH:  Good morning, your Honor.

Kevin McDonough from Latham & Watkins on behalf of the defendants.

THE COURT:  Good morning to all of you as well. Sorry about that.  So eager to jump into the substance I skipped that step, so my apologies.

MS. CALABRESE:  No problem.

THE COURT:  In light of what Mr. Horne just said vis-a-vis request number four, is that something we can attempt to narrow out of the dispute?

MS. CALABRESE:  Yes, your Honor.  And you'll see that we do actually address it in our papers because we had

PROCEEDINGS

responded to plaintiffs that we would agree to the proposal they had put forth in their motion. Yesterday they asked for an additional week of time period and, you know, while we don't necessarily think it's productive to continue to go back and forth on things we have agreement on, we're happy to add the additional week in order to move this issue.

THE COURT: All right. So next request 57, the documents created shortly after public disclosure issue, the parties can resolve amongst themselves. Perhaps what makes the best sense is to sort of tackle issue by issue that usually works best in these kinds of discovery conferences, so, Mr. Horne, having identified the narrowing, would you like to start on your other documents in whatever order just be very clear about what you're speaking about please.

MR. HORNE: Absolutely. I'd actually like to take them in reverse order because I think that's going to be simpler.

So documents concerning insider trading policies is request number 56 and it's our point three in our letter. You know, this is a case -- or this part of the case involves insider trading. And, you know, insider trading policies and, you know, what Virgin Galactic allows for insider trading is critical.

Now, the defendants have agreed to produce insider trading policies and certain -- certain noncustodial documents

as to Richard Branson's insider sales.  We don't believe that's sufficient, you know.  Any discussion of the insider trading is more likely to be reflected in internal communications and any discussions of whether Mr. Branson may sell shares or even whether, you know, certain exceptions should be made either for him or for others, that would be central to this case given that this is a case about -- or this portion of the case is about insider trading.  And, you know, we're happy to go through concrete examples of documents that would be helpful.  I don't think that's necessary because I don't think we need to make that showing, but, you know, given the centrality of this issue, I don't see that we can compromise on just getting the final lawyered-up documents rather than the communications about the interpretation of the documents and the use of -- and the formulation of the documents, the interpretation of the documents and the like.

THE COURT:  So can I just ask you what documents you have a good faith basis to believe even exist in these categories you're describing?

MR. HORNE:  Well, we believe there would be communications concerning insider trading.  We don't think the insider trading policy was formulated from thin air, you know.  There were people who were exchanging emails about, you know, how it should be formulated and we also believe that there would be emails to and from Richard Branson concerning the

7

PROCEEDINGS

sales of Richard Branson, you know, which -- which would be material to our case.  Those are the kinds of documents that wouldn't be covered by defendants' concession, but, you know, that we think we're entitled to.

We don't think it's likely that those documents don't exist.

THE COURT:  All right.  Ms. Calabrese, what's your response?

MR. WALSH:  Your Honor --

MS. CALABRESE:  Your Honor --

MR. WALSH:  -- this is Ryan Walsh.  I'll be addressing this issue today.

THE COURT:  Okay.

MR. WALSH:  So let me just start I think by kind of taking a step back in terms of understanding what the insider trading issue is here and what we sort of all agreed to produce and what specifically the request for production the plaintiffs are teeing up here in their letter.

So what really is at issue is with respect to this insider trading claim is what Richard Branson knew about Unity's horizontal stabilizers as of October 25th, 2019.

We've already agreed to collect documents from 12 custodians and eight requests for production on this particular issue.

THE COURT:  Remind me of the date you just said.

PROCEEDINGS

MR. WALSH:  October 25th, 2019.

THE COURT:  Okay.  Sorry, go ahead.

MR. WALSH:  So we've already agreed to a number of search terms applied over 12 custodians in response to eight requests for production on this particular topic.  We're reviewing, you know, 6,000, in excess of 6,000 documents.  This includes emails from Richard Branson collected from him.  And so I think the question here is what, you know, plaintiffs are looking for and have requested beyond that in request for production 56.  And while this case is about space, not everything in the universe is conceivably relevant here.  And plaintiffs' specific request in number 56 is for all documents and communications concerning Virgin Galactic's insider trading policy.  We have agreed to give and produce the insider trading policies that were in effect on October 25th, 2019 as well as any exemptions to the policy that related to Richard Branson from that date.

Plaintiffs are looking for all emails about the policy, all internal communications about the policy, and if you look at how they justify those requests in their letter, it's based purely on speculation about what the policies or what documents responsive to that request may reveal, you know, or may show.  All of which is just, you know, a classic example of being a fishing expedition.

This is, in our view, all about proportionality

PROCEEDINGS

here.  And we've already agreed to review and produce a large number of documents about what Richard Branson knew on October 25th, 2019 and plaintiffs' specific request in their letter RFP number 56 goes well, well beyond what is proportional to meet the case here.

THE COURT:  Mr. Horne?

MR. HORNE:  We -- let me start by disputing defendants' statement of what is at issue in this case.  One of the elements we will need to prove is scienter and it's not enough to show that Richard Branson knew the information on October 25th, 2021 -- 2019 and, you know, one way to show that we're going to be required to prove this, is Richard Branson made additional sales after the October 25, 2019 sale but before revelation of the material nonpublic information, but the Court held that those sales were not based on insider trading because the plaintiffs hadn't sufficiently alleged scienter.  So as a result, you know, we're going to be held to the burden of showing scienter and in order to do that looking at the policies themselves and how they were form -- is not sufficient, looking at how the policies were formulated is necessary and it is something that we're going to have to prove.

Now, as to specific examples, our point is that these documents are going to be relevant.  They are the kinds of documents that are going to be relevant.  You know, we

provide examples of how the documents -- of the types of documents that would help our case, but it's not -- we're not required to justify a request for production to indicate exactly what documents we're going to find because we don't know that unless we have the documents. We're not able to make that showing.

And so our showing that these are the kinds of documents that would be relevant I think is sufficient.

THE COURT: It doesn't mean that they are proportional depending on who created them and what they show. And so what I am really struggling with with this particular example, Mr. Horne, is the question that I asked you at the outset with regard to what specifically you're looking for. Because this is a very broad and vague request, objectively, right? Documents concerning the establishment of insider trading policies. When? Created by whom, the attorneys? Like, and then what? You know, does it show that he knew? And so there's a lot of questions in my mind about whether these are sufficiently described or sufficiently narrow to be proportional to the issues in the case, and also it's not clear to me, you know, there's a sort of how broad this is looking for in terms of a time frame in addition. I just have a lot of questions about the specificity of the request, Mr. Horne.

Can you shed any light on what you're actually

11

PROCEEDINGS

seeking practically?

MR. HORNE:  Let me take the Court's questions in reverse order.  The time frame we have agreed to a significantly narrowing of the time frame.  It's January 2019 through October 2019.  So this isn't one of those, you know, always and forever requests.  It's a very narrow 10-month period.

In terms of the specific documents we're looking for, the defendants' correspondence concerning the insider trading policies themselves, I take the Court's comments, but we believe that's a fairly narrow -- a fairly narrow exception particularly given that this is a custodial search, so it will only involve certain custodians.  And, you know, I think -- or our position is I mean, how often are they talking about their insider trading policies.  You know, we don't believe this is a large set of documents and, you know, we believe that discussions concerning the insider trading, including the existence of material nonpublic information and whether the information constitutes material nonpublic information and what kind of information would constitute material nonpublic information, we believe all of that is fair game.  And extremely -- and extremely helpful for us to prove our case.

We cannot say what specific documents we will attain through this because we don't have the documents, but these are the kinds of documents that would be helpful to prove our

12

PROCEEDINGS

case or to understand the facts.

THE COURT:  All right.  So going back to Mr. Walsh, I note that the letter represents that the defendants have offered to produce the policy itself as well as any exemptions given to Branson.

Have those documents been produced thus far?

MR. WALSH:  Your Honor, if they haven't been produced, they will soon be produced because we agreed to do it so there is no dispute about those.  We'll produce them to the plaintiffs forthwith.

THE COURT:  All right.  Because part of my -- part of me wonders whether documents exist.  Based on your knowledge so far, Mr. Walsh, do you know whether he was given any specific exemptions?

MR. WALSH:  So I don't -- to answer the question and whether there is documents that exist about this request, I don't know the answer to that.

With respect to this particular trade, it was kind of unique that that it was fully disclosed in the S-4, the registration statement that was filed in connection with the de-SPAC.  So the trade occurred on the day that the de-SPAC transaction happened and it was fully disclosed to stockholders exactly how the trade would occur.

So we think this is a little different from what you might think of as your classic insider trading claim, and it

PROCEEDINGS

was disclosed in advance of the stockholder vote on the de-SPAC, so it was all very, very clearly spelled out in the registration statement to stockholders which I think really again kind of underscored the proportionality questions that you were asking in terms of what communication about the policies and other documents about the policies are proportional here given that we've already agreed to provide the policies as well as a host of other, you know, documents that are responsive to search terms about this issue more generally.

THE COURT: So, Mr. Horne, part of me wonders whether or not this request is somewhat premature given that you haven't received the documents regarding the policy itself and any exemptions given to Mr. Branson. Depending on what really occurred here, the correspondence, if there is any, regarding any exemption or any decisions to sell shares may or may not fully exist. I don't -- because it's not clear to me at this moment whether exemptions were given.

Do you know, Mr. Horne?

MR. HORNE: We do not know whether exemptions were given, but we think regardless of whether exemptions were given, documents concerning the formulation of the insider trading policies will reflect the company's understanding of what constitutes material nonpublic information and whether that understanding was communicated to Branson. And that

PROCEEDINGS

will -- and, again, because we have to prove that Richard Branson made his sales with scienter, that will inform and assist us in proving that if the company says, you know, this constitutes material nonpublic information and Richard Branson has possession of the information, nonetheless makes a sale that goes to show that he understood that the information was material and nonpublic information.

On proportionality, I apologize I didn't make the comment, I don't know if the Court is thinking this is an individual lawsuit with one shareholder who lost their shares --

THE COURT:  I am not, I am not.

MR. HORNE:  Okay.

THE COURT:  I am just wondering about the scope of the search, but this doesn't really answer my question about whether or not this request is somewhat premature.  I mean, if -- I would agree, and I think that it would be difficult for Mr. Walsh to disagree, that, you know, if the insider trading policy, which you haven't yet received is clear, seeking confirmation that Mr. Branson received the policy, signed off on the policy, knew about the policy as CEO, documents to that effect I could see being relevant and readily searchable and proportionate.  But any and all correspondence concerning what you're calling formulation of the policy, that just seems to me to be extraordinarily vague.

PROCEEDINGS

I also don't know if it even attaches during the time frame you're talking about.  I mean, this is not a recently formulated company.  The notion that they formed their insider trading policy in the 2019 time frame seems likely to be entirely incorrect.  It seems like this policy probably has been in existence for a long time, whether any exemptions were granted to Mr. Branson might be interesting to learn, but in the absence of knowing any of those facts or what the policy even says, it's hard for me to understand how any and all communications with whomever regarding these issues would be proportional because it doesn't go to the issue you're seeking to -- that you need to establish here.

So what I really think needs to happen with regard to this particular claim, this particular issue is that you get the documents that they've already agreed to provide with regard to the insider trading policy and any exemptions given to Branson and, Mr. Walsh, is Virgin Galactic prepared to provide whatever confirmation that Mr. Branson received the policy and/or signed on to the policy at some point?  Is that something that's -- that, to me, seems proportional.

So Mr. Walsh, what's your position there?

MR. WALSH:  Yes, your Honor, I agree and I think we're fine giving exactly as you described.

THE COURT:  So I think that's the first step and if there -- through discovery there is more information that

PROCEEDINGS

seems readily on point with regard to these issues, based on what you've learned the facts to actually be with regard to any exemptions granted or other internal communications that may come to light that shed light on, you know, whether there were back channel conversations going on to permit this to go through or whatever your theory is, it just doesn't seem like we know that yet and so it seems very broad and very vague at this stage with all respect, Mr. Horne.

MR. HORNE:  Okay.  We understand and, you know, we think that's a good way to proceed provided that, you know, our concern is that with the back and forth and, you know, the amount of time it takes to negotiate a position, we just simply won't be able to get this done in time for the documents to be useful for us.  And so if we had some assurance that the negotiations will be prompt, then I think that would work for us.

THE COURT:  Mr. Walsh?

MR. WALSH:  So, your Honor, I think where we're sort of leaving this here is to make sure that they -- if I'm understanding correctly to make sure they get the policies as well as any, you know, indication that Branson received or signed off on the policies, which seems pretty discrete and something that we should be able to produce relatively quickly.

THE COURT:  Okay.  What I would like the parties to

do, as is of course required by the rules, is that to the extent that additional documents appear to be relevant and proportional, upon receipt of those records that you guys continue to meet and confer.

We understand that this stuff takes time, it's complicated and I know that Mr. Walsh has a lot of documents to sift through it sounds like and I'm sure there are many levels of review internally at his firm and at the company before documents are going out, so I understand things take time, but I just -- the request, as currently formulated, Mr. Horne, is not something that I could compel them to provide it's just so vague. So, you know, if that were to come before me at this juncture on a motion to compel, I would probably deny it as, you know, vague and disproportionate based on the facts presently known. So I think we just need to take this one in staples.

All right. Mr. Horne, or whoever is taking up the next argument, what's next? The defendants statement for additional MNPI.

MR. HORNE: Defendants' statements to investors, your Honor. I think the background for this is, in order to show -- in order to prove our claims, it's not sufficient for us to show that Mr. Branson knew the specific information at the time that he made his sales. We also need to show an intent to deceive. And, you know, the clearest proof of that

18

PROCEEDINGS

is presumably if Mr. Branson knew the information in October 2019 he also knew the information in May 2020, but our claims for the May 2020 sales were dismissed and so we're not going to be -- we're not going to be able to just prove that Mr. Branson knew the information and then rest there.

Defendants' statements to investors, Virgin Galactic went public via a stock and the pitch that they made to investors was, look, we've had our flights to space, we're ready to go. You know, we're going to go in space, we're going to start commercial operations within, you know, nine months, and they made statements to that effect. And whether those statements were deceptive, which, you know, the Court held initially that we sufficiently alleged that they were, you know, is going to be relevant to whether Mr. Branson was aware that the information he had was material nonpublic information. It's very different if Mr. Branson just knows something versus Mr. Branson told falsehoods to investors because he worried that if he told the truth the de-SPAC could not proceed. And so those documents are going to be -- even though the statements are not themselves in the case, documents concerning the formulation of those statements are going to be relevant to our case.

THE COURT: Who is taking the lead on this issue, Ms. Calabrese?

MS. CALABRESE: I will be, your Honor.

PROCEEDINGS

THE COURT: Okay, go ahead.

MS. CALABRESE: So, your Honor, I'd just like to focus on something that Mr. Horne just said which is that the statements are not in the case. And so, you know, I think that my colleague Mr. Walsh really hit on this, but the scope of discovery is quite narrow here, and that's not our subjective view, it's the reality of the district court's ruling on our motion to dismiss and all that remains is what Richard Branson knew about damage to Unity's horizontal stabilizers as of October 25th, 2019. And the materials that they are seeking here, information related to what went into the company's public statements, who created those statements, documents and communications around, you know, decisions to say one thing or another, that is all information that was part of plaintiffs' claims about allegations that the company made in its statements at the time and those claims were all dismissed.

So what we're producing here and, because we understand -- you know, we understand our discovery burdens and we're being responsive to it, we're producing information about Richard Branson's sales in October that was part of an overall de-SPAC transaction, we're going to produce documents relevant to that transaction and about Richard Branson's role in that transaction. But statements about what the company said and what the company knew are completely irrelevant at

PROCEEDINGS

this point based on the scope of the Court's order on the motion to dismiss.

THE COURT:  How do you expect to get around Judge Ross' ruling, Mr. Horne?

MR. HORNE:  The statements are essentially -- the statements in this case are essentially the denial of the material nonpublic information.  The statements are false because of the material nonpublic information.  And so the statements are evidence that the defendants are intending to conceal the material nonpublic information and, you know, for that reason the statements are relevant to scienter.

It won't be sufficient for us to prove that Mr. Branson knew the material nonpublic information, we also have to prove an intent to deceive and one way to do that is to prove that he concealed the information.  And so statements that are inconsistent with the material nonpublic information are relevant to our case.  Documents concerning those statements are relevant to our case.

THE COURT:  Is your argument essentially -- I mean, you know, to put it into like 404(b) analogy, right, are you trying to say that by just not -- by having insider trading or not inconsistent information with the public information on a prior occasion that proves intent later?

MR. HORNE:  So, I'm not sure I completely understood the Court, the Court's analysis.  I think -- or the Court's

statement but I think the fact -- so to the extent that we're able to show that the defendants liberally concealed the facts, the material nonpublic information concealed that from investors, you know, that's relevant to whether Mr. Branson had scienter when he made -- when he sold the shares while in possession of material nonpublic information, because it would tend to show that he understands the information is material.

THE COURT:  Ms. Calabrese.

MS. CALABRESE:  Your Honor, Mr. Horne keeps saying "defendants" and defendants just not the right word anymore after the motion to dismiss.  It's what Richard Branson knew and what Richard Branson did, based on his sales in October 25th.  What the company did is out.  The company is not Richard Branson.  The company is -- the claims against the company have been dismissed and so we are agreeing to produce information related to Mr. Branson's knowledge, Mr. Branson's scienter, but as it relates to the company and what the company did and internal company communications about statements made to the public during that time period, those are the -- that's the discovery that is no longer at issue here and it appears to us that plaintiffs are trying to get around the Court's ruling by seeking information into what the company knew, what the company wanted to do to, you know, allegedly deceive investors as opposed to Richard Branson, which is where the focus of -- which is what we've agreed to

produce discovery.

THE COURT:  So, Mr. Horne, as to this issue I'm not sure that this would benefit from formal briefing at this juncture.  It seems to me that what you're seeking is slightly out of bounds based upon Judge Ross' ruling on the motion to dismiss and I'm just failing to understand exactly what your theory is about how what the company knew is attributable to Mr. Branson if they are providing you with the information regarding the trades at issue and Mr. Branson's knowledge.  So I'm just failing to see how this is not an end run around Judge Ross' ruling, Mr. Horne.

MR. HORNE:  And I have a couple of things.  First of all, one of the statements was actually by Richard Branson I believe.  And, you know, as to that statement, you know, the formulation of the statement is, you know -- it's not -- defendants' argument has nothing to say about that one.

Second, the company was, you know, 80 percent owned by Richard Branson at this point.  You know, he is the controlling shareholder and he calls the shots and what the company is doing when it's concealing the information is, you know, responsive to what Mr. Branson wants it to do.

And, you know, I -- there is not -- so this isn't a case where we're trying to revive claims that the Court has dismissed; because we can't.  The Court dismissed them on standing and no amount of discovery is going to be able to

PROCEEDINGS

allow us to revive those claims.  It's a legal issue and, you know, unless and until the Second Circuit weighs in, those claims are gone no matter what we find in discovery.

You know, we're trying to prove Mr. Branson's scienter, and merely showing that he knew the material nonpublic information is not sufficient.  We need more.  We're going to be held to the burden of showing more.

And, you know, concealing the information while going public, you know, whether it's at -- of a company 80 percent owned by Richard Branson and given that one of the statements at issue was from him, that would tend to show that he understood the information was material because otherwise why conceal it.

THE COURT:  Have you had a specific meet and confer regarding the statement made by him, Mr. Horne?

MR. HORNE:  We have.  I mean --

THE COURT:  A specific meet and confer with defense counsel about disclosure of documents related to the statement you're referring to that was made by him.  I don't know what statement you're referring to.  I assumed that you knew, I don't know if they knew, so have you had a specific meet and confer regarding discovery as to the specific statement made by him that you're referring to?

MR. HORNE:  We went through each of the statements and the defendants' response on each of them was that they

PROCEEDINGS

won't produce documents.  I don't know if that's what the Court is asking.

THE COURT:  Ms. Calabrese.

MS. CALABRESE:  Thank you, your Honor.

So I just to clarify one point, it appears that Mr. Horne is trying to get to Mr. Branson's scienter by somehow proving what the company knew and that's what we're trying to protect against.  Because there is no support in the law for the company scienter being relevant at all to Mr. Branson, the claim against Mr. Branson for selling with material nonpublic information.  If there is a specific statement that Mr. Horne would like to discuss related to what Mr. Branson said during the relevant time period, relevant to the sales, then I'm happy to go back and have a discussion with him about that specific statement, but to the extent that it's going to be broad, that's what we're concerned about.

THE COURT:  I understand.  I just think that at this moment without, you know, a full and clear brief, which I don't necessarily want to encourage the parties to do, because it is so inefficient, discovery disputes are such a waste of a party's time.  As I understand the issue, plaintiff is seeking information to show Mr. Branson's scienter, I get that.  But absent clarity as to the specific statements at issue and how those show what you're seeking to establish and I just, at this juncture, Mr. Horne, think that it would behoove you all

PROCEEDINGS

to have a specific meet and confer regarding the statement you're referring to made by Mr. Branson himself and seek the underlying documents relating to that statement, if they exist, in terms of what he knew with regard to whatever the issue is that you're referring to that he said something public about, and you may well get what you need by focusing on his specific statement. But focusing on what the company knew more generally without, you know, a lot of discovery to show what he knew when vis-a-vis what the company knew, there's like a break in the chain there with regards to relevance. And, you know, I get it, that he is an 80 percent owner and you could argue maybe to a jury that he would know what was going on, but that doesn't make it true and it doesn't necessarily make it relevant and proportional if y able to get what you need by focusing on his actions as opposed to the company's knowledge more broadly. This is not, you know, as I understand it a respondeat superior situation where he would just be tasked with knowing everything the company knew, that's not how this works.

So I think the parties need to meet and confer and have a conversation about that specific Richard Branson statement that you're referring to the underlying as to that.

Are you willing to do that Mr. Horne?

MR. HORNE: We're willing to meet and confer, but I just want to be clear, we're not arguing that we can show

PROCEEDINGS

Mr. Branson's knowledge by showing what the company knows, we're arguing that we can show Mr. Branson's scienter by showing that the company deliberately concealed the information, which is -- it's focused on the company's action not the company's statements, but the formulation of the statements is relevant because it shows the company's actions. And I don't know if that was clear, but it is different than just trying to show that the company knew it so Branson knew it.  It's the company took steps to conceal this information.

THE COURT:  I do understand it, but I, as presently before me, without full briefing on the motion to compel, I'm not prepared to say that you're entitled to that information. If you can't work it out in a meet and confer perhaps you'll at least have substantially narrowed the issues and then they can be briefed, but at this juncture, with all respect, I think you and Ms. Calabrese need to have a very meaningful meet and confer where you clearly articulate which statements you're referring to and why and what those -- and try to seek the underlying documents with regard to those statements.  But this is not going to turn into a full scale fishing expedition on what the company did on claims that have essentially been dismissed, Mr. Horne.

MR. HORNE:  Understood, your Honor.

THE COURT:  All right.  Ms. Calabrese, are you also willing to have the meet and confer?

27

PROCEEDINGS

MS. CALABRESE:  Yes, your Honor.

THE COURT:  All right.  Very good.

All right.  So we are now moving on to our last point, additional MNPI.

Who is taking the lead on that?  Mr. Horne?

MR. HORNE:  For plaintiffs, that will be me, your Honor.

THE COURT:  Go ahead.

MR. HORNE:  I think some of the confusion here arises from the fact that there were statements made before the -- let me back up a little bit, I'm sorry.

The Court's opinion dealt with several different statements and several different sales, including some sales in May 2020 and June 2020.  And up to the May and June 2020 sales we had pointed to statements that were made after the statements that were on dismissed on *Frutarom* grounds.  And the Court didn't consider the *Frutarom* statements at any point.  During the opinion the Court expressly said she doesn't even consider in loss causation and when she discussed scienter she referred back to the statements that were made post *Frutarom*, and so we don't believe that the Court actually addressed the question of whether documents concerning the status of Eve, which is the other vehicle, the part of Virgin Galactic's system, we don't believe the Court actually addressed that and so we believe that the issue of whether

28

PROCEEDINGS

that material nonpublic information is still -- or whether that constitutes material nonpublic information that Mr. Branson knew when he made his statements.  We believe that issue is still alive and as a result we think we're entitled to take discovery and on that issue.  And as best I can tell, resolution of that question would resolve this issue because I think that's the only thing that's disputed.

THE COURT:  Ms. Calabrese.

MS. CALABRESE:  So, your Honor, I think we have a different reading of the motion to dismiss, as you would probably expect, and that is that the Court narrowed Richard Branson's material nonpublic information to what he knew about Unity's -- damage to Unity's horizontal stabilizers and where the company was with repairing the damage to Unity's horizontal stabilizers as of his October sales.

We have agreed to produce to plaintiffs a much broader scope of information here.  We're giving them information into the February 2019 flight more generally and they've asked for information related to (inaudible) reports that were sent to the board of directors, information related to resignation of one of Virgin Galactic's employees following the February 2019 flight.  We're still negotiating the exact search terms, but we're not objecting to producing that information and so we believe we're already sort of giving above and beyond what is required following the Court's ruling

29

PROCEEDINGS

on the motion to dismiss, and that any additional information which might be specific to Eve, which I believe is all that Mr. Horne might be asking for at this point following the discussions today, but that specific information to the extent it's not captured in the information that we're already gathering, would be disproportionate.

THE COURT:  Mr. Horne, if you haven't received the production yet and you haven't finalized your negotiations regarding this issue, is it possible that this is going to be narrowed and that you are going to find what you need?

MR. HORNE:  Given the restrictions and the fact that Unity and Eve were different vehicles and the issues with Unity and Eve are different, the problems with the vehicles are different, we do think it's unlikely.  I don't think we're going to get any documents on the status of Eve.  You know, if the defendants are willing to produce those documents, then, yes, that would answer our issue -- our need for discovery, but the way I read their response is they're saying they're not going to produce those documents.

THE COURT:  Ms. Calabrese, can you address the question about Eve specifically?

MS. CALABRESE:  Yes.  So giving some context might be helpful here.  Eve and Unity operate together, so Eve like flies Unity into space and releases Unity, so I don't know that there is any basis to believe that information discussing

PROCEEDINGS

Eve is not going to be captured in the information that discusses Unity, and to date in the documents that I've seen from the company they are generally addressed together, particularly in board of director meeting minutes, which has a lot of information about both spaceships. That is all information we've agreed to produce.

So perhaps if -- if after we make our production there is specific information about Eve or questions about Eve that have not been answered maybe that will be another good time for the parties to meet and confer, but I guess I just don't know that there's -- I believe we're likely to be producing information about Eve even if we're focusing our search efforts on Unity because they are so closely intertwined.

THE COURT: All right, Mr. Horne?

MR. HORNE: So I'm a little surprised by the defendants' position because the entire dispute here is about whether, you know, they'll produce documents concerning Eve and I'm not -- and their response is that they are refusing to do so. If they are changing their position and they will produce documents concerning Eve, then, you know, that does answer our concerns, and, you know, that's the relief we're seeking.

So I don't know exactly what Ms. Calabrese is offering, to the extent that I've accurately described what

31

PROCEEDINGS

she's offering, then, yes, it addresses our concerns.

THE COURT: All right. Well, I certainly don't know what Ms. Calabrese is offering since I haven't seen the documents, so, you know, I do think that this is an area for further follow up with one another once the agreed-upon production can go forward and I really would ask the parties to continue to meet and confer regarding any follow-up requests or alleged deficiencies after the production that the defendants are agreeing to produce and, you know, at this point I don't have a basis to say that there's -- I don't think it's a good use of any anyone's time, frankly, to try to brief this motion to compel until you've done a lot of the productions and exchange of information that we've discussed in this call and if there comes a time in the future when you guys cannot work additional requests out and/or follow-up requests, we can certainly take these issues up again, but at this stage, Mr. Horne, I think we've addressed the bulk of the issues and I hope that the parties are able to move forward in a productive manner.

Is there anything else we should try to do today, Mr. Horne?

MR. HORNE: I did want to flag something for the Court. The parties are currently negotiating an extension, hopefully a final extension of the fact discovery cutoff and deadlines in this case. They are not very far apart and I'm

PROCEEDINGS                                      32

hoping to be able to provide a proposal for the Court to consider shortly, I mean within the week or maybe shortly thereafter.

THE COURT:  Okay.  That's fine.  And I understand, particularly in light of this call, that there are issues to work through.

Ms. Calabrese, any reaction to that or anything final we should take up?

MS. CALABRESE:  No, your Honor, I agree with Mr. Horne that we should be able to work out a proposed schedule for a meet and confer.

THE COURT:  Okay, great.  All right, well, I appreciate the good faith efforts to try to resolve these issues amongst yourselves.  Motion to compel briefing is nobody's favorite, so focus your energies on the substance rather than fighting about document disclosures, I think it will help your practice all around and one of the many reasons that I really discourage discovery related motions.

So with all of that, good luck and we will look out for your request to adjust the schedule.  I'm sure it will be reasonable and if it is, we will certainly approve it.

(Matter concluded.)

*       *       *       *       *

PROCEEDINGS                                    33

I certify that the foregoing is an accurate transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


s/ Georgette K. Betts                    October 7, 2024
GEORGETTE K. BETTS                       DATE

*GEORGETTE K. BETTS, RPR, FCRR, CCR*