# EXHIBIT 16

As filed with the Securities and Exchange Commission on August 7, 2019

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM S-4
## REGISTRATION STATEMENT
### *UNDER*
### *THE SECURITIES ACT OF 1933*

# Social Capital Hedosophia Holdings Corp. *
**(Exact Name of Registrant as Specified in Its Charter)**

| Cayman Islands* | 4789 | 98-1366046 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification Number)** |

**120 Hawthorne Avenue**
**Palo Alto, California 94301**
**(650) 521-9007**

**(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)**

**Chamath Palihapitiya**
**Chief Executive Officer**
**Social Capital Hedosophia Holdings Corp.**
**120 Hawthorne Avenue**
**Palo Alto, California 94301**
**(650) 521-9007**

**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| Howard L. Ellin | Matthew Gardner | Justin G. Hamill |
|---|---|---|
| Christopher M. Barlow | Michael Johns | Shayne Kennedy |
| Skadden, Arps, Slate, Meagher & Flom LLP | Michael Lockwood | Josh Dubofsky |
| | Maples and Calder | Charles K. Ruck |
| Four Times Square | PO Box 309, Ugland House, | Latham & Watkins LLP |
| New York, NY 10036 | Grand Cayman, KY1-1104, | 885 Third Avenue |
| (212) 735-3000 | Cayman Islands | New York, NY 10022 |
| | (345) 949-8066 | (212) 906-1200 |

**Approximate date of commencement of proposed sale of the securities to the public:** As soon as practicable after this registration statement is declared effective and all other conditions to the business combination described in the enclosed proxy statement/prospectus have been satisfied or waived.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box:  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering:  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering:  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act.  ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer)  ☐

Exchange Act Rule 14d-l(d) (Cross-Border Third-Party Tender Offer)  ☐

Table of Contents

Proposals is cross-conditioned on the approval of each other. The Adjournment Proposal is not conditioned upon the approval of any other proposal. Each of these proposals is more fully described in the accompanying proxy statement/prospectus, which each shareholder is encouraged to read carefully and in its entirety.

In accordance with the terms and subject to the conditions of the Merger Agreement, the aggregate merger consideration payable by SCH to V10 under the Merger Agreement will be 130,000,000 shares of VGH, Inc. common stock (at a deemed value of $10.00 per share) for an aggregate merger consideration of $1.3 billion (the "Aggregate Merger Consideration"). The Aggregate Merger Consideration does not take into account certain additional issuances and payments to V10 which may be made under the terms of the Merger Agreement and the Purchase Agreement, respectively, only to the extent certain conditions are satisfied or certain options are elected by V10, in each case, as contemplated thereunder, including, if applicable: (i) the issuance of additional shares of VGH, Inc. common stock to V10 or an affiliate of V10 as part of the Additional Holder Equity Amount (as defined below) under the terms of the Merger Agreement, (ii) the cash payment received by V10 in any Secondary Purchase under the terms of the Purchase Agreement, (iii) the issuance of additional shares of VGH, Inc. common stock to V10 in any Reinvestment under the terms of the Purchase Agreement, and (iv) any cash payment received by V10 in any Repurchase under the terms of the Merger Agreement, in each case, as described more fully elsewhere in the accompanying proxy statement/prospectus.

In connection with the Business Combination, certain related agreements have been, or will be entered into on or prior to the date of the Closing of the Business Combination (the "Closing Date"), including (i) the Stockholders' Agreement, (ii) the Registration Rights Agreement, (iii) the Transition Services Agreements and (iv) the Novation Deed and Amended TMLA, in each case, as defined in the accompanying proxy statement/prospectus. For additional information, see " *BCA Proposal—Related Agreements* " in the accompanying proxy statement/prospectus.

Pursuant to the Cayman Constitutional Documents, a holder (a "public shareholder") of public shares, which excludes shares held by the Sponsor, may request that SCH redeem all or a portion of such shareholder's public shares for cash if the Business Combination is consummated. Holders of units must elect to separate the units into the underlying public shares and warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public shares and warrants, or if a holder holds units registered in its own name, the holder must contact the transfer agent directly and instruct it to do so. **Public shareholders may elect to redeem their public shares even if they vote "for" the BCA Proposal or any other Condition Precedent Proposal.** If the Business Combination is not consummated, the public shares will be returned to the respective holder, broker or bank. If the Business Combination is consummated, and if a public shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers its shares to Continental Stock Transfer & Trust Company, SCH's transfer agent, VGH, Inc. will redeem such public shares for a per-share price, payable in cash, equal to the pro rata portion of the trust account established at the consummation of our initial public offering (the "trust account"), calculated as of two business days prior to the consummation of the Business Combination. For illustrative purposes, as of March 31, 2019, this would have amounted to approximately $10.27 per issued and outstanding public share. If a public shareholder exercises its redemption rights in full, then it will be electing to exchange its public shares for cash and will no longer own public shares. The redemption takes place following the Domestication and, accordingly, it is shares of VGH, Inc. common stock that will be redeemed immediately after consummation of the Business Combination. See " *Extraordinary General Meeting of SCH—Redemption Rights* " in the accompanying proxy statement/prospectus for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

Notwithstanding the foregoing, a public shareholder, together with any affiliate of such public shareholder or any other person with whom such public shareholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended ("Exchange Act")), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares. Accordingly, if a

Table of Contents

**Holders must complete the procedures for electing to redeem their public shares in the manner described above prior to 5:00 p.m., Eastern Time, on              , 2019 (two business days before the extraordinary general meeting) in order for their shares to be redeemed.**

**Holders of units must elect to separate the units into the underlying public shares and warrants prior to exercising redemption rights with respect to the public shares. If holders hold their units in an account at a brokerage firm or bank, holders must notify their broker or bank that they elect to separate the units into the underlying public shares and warrants, or if a holder holds units registered in its own name, the holder must contact Continental, SCH's transfer agent, directly and instruct them to do so. Public shareholders may elect to redeem public shares regardless of if or how they vote in respect of the BCA Proposal. If the Business Combination is not consummated, the public shares will be returned to the respective holder, broker or bank.**

If the Business Combination is consummated, and if a public shareholder properly exercises its right to redeem all or a portion of the public shares that it holds and timely delivers its shares to Continental, SCH's transfer agent, VGH, Inc. will redeem such public shares for a per-share price, payable in cash, equal to the pro rata portion of the trust account established at the consummation of our initial public offering (the "trust account"), calculated as of two business days prior to the consummation of the Business Combination. For illustrative purposes, as of March 31, 2019, this would have amounted to approximately $10.27 per issued and outstanding public share. If a public shareholder exercises its redemption rights in full, then it will be electing to exchange its public shares for cash and will no longer own public shares. The redemption takes place following the Domestication and, accordingly, it is shares of VGH, Inc. common stock that will be redeemed promptly after consummation of the Business Combination. See " *Extraordinary General Meeting of SCH—Redemption Rights* " in this proxy statement/prospectus for a detailed description of the procedures to be followed if you wish to redeem your public shares for cash.

Notwithstanding the foregoing, a public shareholder, together with any affiliate of such public shareholder or any other person with whom such public shareholder is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended ("Exchange Act")), will be restricted from redeeming its public shares with respect to more than an aggregate of 15% of the public shares. Accordingly, if a public shareholder, alone or acting in concert or as a group, seeks to redeem more than 15% of the public shares, then any such shares in excess of that 15% limit would not be redeemed for cash.

SCH Sponsor Corp., a Cayman Islands exempted company and shareholder of SCH (the "Sponsor"), and each officer and director of SCH have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, and to waive their redemption rights in connection with the consummation of the Business Combination with respect to any ordinary shares held by them, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement, dated as of July 9, 2019, a copy of which is attached to this proxy statement/prospectus statement as Annex D (the "Sponsor Support Agreement"). The ordinary shares held by the Sponsor will be excluded from the pro rata calculation used to determine the per-share redemption price. As of the date of the accompanying proxy statement/prospectus, the Sponsor owns 20% of the issued and outstanding ordinary shares.

The Merger Agreement provides that the obligations of VG to consummate the Mergers are conditioned on, among other things, that as of the Closing, the amount of cash available in the trust account, after deducting the amount required to satisfy SCH's obligations to its shareholders (if any) that exercise their rights to redeem their public shares pursuant to the Cayman Constitutional Documents ("Trust Amount"), is at least equal to the sum of (x) $400.0 million plus (y) if applicable, an aggregate of approximately $24.2 million of deferred underwriting commissions being held in the trust account (the "Minimum Available Cash Amount"). However, if the Trust Amount as of the Closing is less than the Minimum Available Cash Amount, then V10 and its affiliates will have the right (but not the obligation) to purchase (or seek a third party to purchase) additional shares of VGH, Inc. common stock at a price per share of $10.00 (the "Additional Holder Equity Amount") up to the Minimum

x

Table of Contents

Available Cash Amount less the amount of the aggregate purchase price paid to SCH by Mr. Palihapitiya in any Primary Purchase (the "Investment Amount"). If the Trust Amount when added to the Additional Holder Equity Amount and the Investment Amount (such aggregate amount, the "Available Cash") is equal to or greater than the Minimum Available Cash Amount, then this condition will be deemed to have been satisfied (such condition, the "Minimum Cash Condition"). This condition is for the sole benefit of VG except that this condition may not be waived by VG if the Trust Amount is less than $200.0 million, provided that V10 and its affiliates will have the right (but not the obligation) to purchase (or seek a third party to purchase) additional shares of VGH, Inc. common stock at a price per share of $10.00 in an aggregate amount such that the Available Cash is, at or immediately prior to the Closing, equal to at least $200.0 million after giving effect to such purchases. If such condition is not met, and such condition is not or cannot be waived under the terms of the Merger Agreement, then the Merger Agreement could terminate and the proposed Business Combination may not be consummated. In addition, pursuant to the Cayman Constitutional Documents, in no event will SCH redeem public shares in an amount that would cause VGH, Inc.'s net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) to be less than $5,000,001.

The Merger Agreement is also subject to the satisfaction or waiver of certain other closing conditions as described in the accompanying proxy statement/prospectus. There can be no assurance that the parties to the Merger Agreement would waive any such provision of the Merger Agreement.

The approval of each of the Domestication Proposal and Organizational Documents Proposals requires the affirmative vote of holders of at least two-thirds of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting. The BCA Proposal, the Director Election Proposal, the Stock Issuance Proposal, the Incentive Award Plan Proposal, Repurchase Proposal and the Adjournment Proposal require the affirmative vote of a majority of the ordinary shares represented in person or by proxy and entitled to vote thereon and who vote at the extraordinary general meeting.

*Your vote is very important.* **Whether or not you plan to attend the extraordinary general meeting, please vote as soon as possible by following the instructions in this proxy statement/prospectus to make sure that your shares are represented at the extraordinary general meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the extraordinary general meeting. The transactions contemplated by the Merger Agreement will be consummated only if the Condition Precedent Proposals are approved at the extraordinary general meeting. Each of the Condition Precedent Proposals is cross-conditioned on the approval of each other. The Adjournment Proposal is not conditioned upon the approval of any other proposal set forth in this proxy statement/prospectus.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted FOR each of the proposals presented at the extraordinary general meeting. If you fail to return your proxy card or fail to instruct your bank, broker or other nominee how to vote, and do not attend the extraordinary general meeting in person, the effect will be, among other things, that your shares will not be counted for purposes of determining whether a quorum is present at the extraordinary general meeting and will not be voted. An abstention or broker non-vote will be counted towards the quorum requirement but will not count as a vote cast at the extraordinary general meeting. If you are a shareholder of record and you attend the extraordinary general meeting and wish to vote in person, you may withdraw your proxy and vote in person.

Your attention is directed to the remainder of the proxy statement/prospectus following this notice (including the Annexes and other documents referred to herein) for a more complete description of the proposed Business Combination and related transactions and each of the proposals. You are encouraged to read this proxy statement/prospectus carefully and in its entirety, including the Annexes and other documents referred to herein. If you have any questions or need assistance voting your ordinary shares, please contact Morrow Sodali LLC ("Morrow"), our proxy solicitor, by calling (800) 662-5200 or banks and brokers can call collect at (203) 658-9400, or by emailing IPOA.info@morrowsodali.com.

xi

Table of Contents

shares in accordance with the majority of the votes cast by the public shareholders in connection with an initial business combination, the Sponsor and each officer and director of SCH have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement. As of the date of this proxy statement/prospectus, the Sponsor owns 20% of the issued and outstanding ordinary shares.

Holders of the warrants will not have redemption rights with respect to the warrants.

### Appraisal Rights

Neither SCH shareholders nor SCH warrant holders have appraisal rights in connection with the Business Combination or the Domestication under the Cayman Islands Companies Law or under the DGCL.

### Proxy Solicitation

Proxies may be solicited by mail, telephone or in person. SCH has engaged Morrow Sodali LLC to assist in the solicitation of proxies.

If a shareholder grants a proxy, it may still vote its shares in person if it revokes its proxy before the extraordinary general meeting. A shareholder also may change its vote by submitting a later-dated proxy as described in the section entitled " *Extraordinary General Meeting of SCH— Revoking Your Proxy* ."

### Interests of SCH's Directors and Executive Officers in the Business Combination

When you consider the recommendation of SCH's board of directors in favor of approval of the BCA Proposal, you should keep in mind that the Sponsor and SCH's directors and executive officers have interests in such proposal that are different from, or in addition to, those of SCH shareholders and warrant holders generally. These interests include, among other things, the interests listed below:

- If SCH does not consummate a business combination by September 18, 2019 (or December 18, 2019, if our extension proposal is approved by our shareholders, or if such date is further extended at a duly called extraordinary general meeting, such later date), it would cease all operations except for the purpose of winding up, redeeming all of the outstanding public shares for cash and, subject to the approval of its remaining shareholders and its board of directors, dissolving and liquidating, subject in each case to its obligations under the Cayman Islands Companies Law to provide for claims of creditors and the requirements of other applicable law. In such event, the 17,250,000 SCH Class B ordinary shares owned by the Sponsor would be worthless because following the redemption of the public shares, SCH would likely have few, if any, net assets and because the Sponsor has agreed to waive its rights to liquidating distributions from the trust account with respect to the Sponsor if SCH fails to complete a business combination within the required period. The Sponsor purchased the SCH Class B ordinary shares prior to SCH's initial public offering for approximately $0.0001 per share and certain of SCH's directors and executive officers, including Chamath Palihapitiya and Ian Osborne, have an economic interest in such shares. The      shares of VGH, Inc. common stock that the Sponsor will hold following the Mergers (including after giving effect to the Domestication), if unrestricted and freely tradable, would have had aggregate market value of $     based upon the closing price of $     per share of public share on the NYSE on     , 2019, the most recent closing price. Given such shares of VGH, Inc. common stock will be subject to certain restrictions, including those described above, SCH believes such shares have less value.

- Chamath Palihapitiya, SCH's Chief Executive Officer and Chairman of SCH's board of directors, is expected to be the Chairperson of the board of directors of VGH, Inc. after the consummation of the

17

Table of Contents

Business Combination. As such, in the future, Mr. Palihapitiya will receive any cash fees, stock options, stock awards or other remuneration that VGH, Inc.'s board of directors determines to pay to him.

- Adam Bain and James Ryans, current directors of SCH, are expected to be directors of VGH, Inc. after the consummation of the Business Combination (it is also anticipated that Dr. Ryans will serve as the chairperson of the audit committee of the Board). As such, in the future, Mr. Bain and Dr. Ryans will receive any cash fees, stock options, stock awards or other remuneration that VGH, Inc.'s board of directors determines to pay to them.

- In connection with the execution of the Merger Agreement, the board of directors of SCH approved the grant of the Director RSU Awards to select members of the board of directors of SCH that, at the Closing, will vest and be converted into the right to receive an aggregate of 1,500,000 shares of VGH, Inc. common stock. The Director RSU Awards will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1st and December 31st of the year following the Closing. The grant and vesting of the Director RSU Awards are contingent upon, among other things, the consummation of the Business Combination, the approval of the 2019 Plan by SCH's shareholders at the extraordinary general meeting and the continued service of the respective participants on the board of directors of SCH through the Closing Date.

- SCH's existing directors and officers will be eligible for continued indemnification and continued coverage under a directors' and officers' liability insurance policy after the Mergers and pursuant to the Merger Agreement.

- In the event that SCH fails to consummate a business combination within the prescribed time frame (pursuant to the Cayman Constitutional Documents), or upon the exercise of a redemption right in connection with the Business Combination (or our extension proposal), SCH will be required to provide for payment of claims of creditors that were not waived that may be brought against SCH within the 10 years following such redemption. In order to protect the amounts held in the trust account, the Sponsor has agreed that it will be liable to SCH if and to the extent any claims by a third party (other than SCH's independent auditors) for services rendered or products sold to SCH, or a prospective target business with which SCH has discussed entering into a transaction agreement, reduce the amount of funds in the trust account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case, net of the amount of interest which may be withdrawn to pay taxes, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the trust account and except as to any claims under the indemnity of the underwriters of SCH's initial public offering against certain liabilities, including liabilities under the Securities Act.

- A party related to our Sponsor and certain of our officers and directors has advanced funds to us for working capital purposes, including $0.4 million as of March 31, 2019. These advances are non-interest bearing, unsecured and due on demand. If we do not complete our initial business combination within the required period, we may use a portion of our working capital held outside the trust account to repay such advances and any other working capital advances made to us, but no proceeds held in the trust account would be used to repay such advances and any other working capital advances made to us, and such related party may not be able to recover the value it has loaned us and any other working capital advances it may make.

- In connection with the Public Offering, the underwriters of the Public Offering agreed to reimburse the Company for amounts paid by the Company to Connaught (UK) Limited for financial advisory services in an amount equal to 10% of the discount paid to the underwriters, of which $1.0 million was

18

Table of Contents

paid at the closing of the Public Offering and up to $2.4 million will be payable at the time of the closing of the initial Business Combination. Connaught (UK) Limited is an affiliate of us, our Sponsor and certain of our officers and directors.

- Following consummation of the Business Combination, the Sponsor, SCH's officers and directors and their respective affiliates would be entitled to reimbursement for certain out-of-pocket expenses related to identifying, investigating and consummating an initial business combination or repayment of loans, if any, and on such terms as to be determined by SCH from time to time, made by the Sponsor or any of SCH's officers or directors to finance transaction costs in connection with an intended initial business combination. However, if SCH fails to consummate a business combination within the required period, Sponsor and SCH's officers and directors and their respective affiliates will not have any claim against the trust account for reimbursement.

- In connection with the Purchase Agreement, if V10 elects to have Mr. Palihapitiya purchase shares of VGH, Inc. common stock (i) in a Primary Purchase, Mr. Palihapitiya will be issued up to 10 million newly issued shares of VGH, Inc. common stock (depending on the size of the Primary Purchase as elected by V10) or (ii) in a Secondary Purchase, Mr. Palihapitiya will be purchasing up to 10 million shares of VGH, Inc. common stock from V10 (depending on the size of the Secondary Purchase as elected by V10), in each case, at a price of $10.00 per share. It is anticipated that, following the Business Combination, if V10 elects that Mr. Palihapitiya purchase the maximum number of shares in a Secondary Purchase (also assuming that (x) no public shareholders exercise their redemption rights in connection with the Business Combination or our extension proposal assuming consummation of the transactions contemplated by the Purchase Agreement and (y) VGH, Inc. will repurchase 20,000,000 shares of VGH, Inc. common stock from V10 in a Repurchase pursuant to the Merger Agreement), the Sponsor and related parties (including Mr. Palihapitiya) are expected to collectively own approximately 13.2% of outstanding VGH, Inc. common stock. Outstanding shares of VGH, Inc. common stock held by the Sponsor excludes the 1,500,000 shares of VGH, Inc. common stock underlying the Director RSU Awards that will be granted in connection with the Business Combination. The restricted stock units will vest at the Closing but will not settle into shares of VGH, Inc. common stock until a date, selected by VGH, Inc., that occurs between January 1 and December 31 of the year following the Closing.

- Pursuant to the Stockholders' Agreement, Mr. Palihapitiya will have the right to designate two directors to the Board of VGH, Inc. and such directors may have the power collectively to withhold approval in respect of future transactions between VGH, Inc. and its subsidiaries, on the one hand and V10 or its affiliates, on the other.

- Pursuant to the Registration Rights Agreement, the Sponsor, Mr. Palihapitiya and V10 will have customary registration rights, including demand and piggy-back rights, subject to cooperation and cut-back provisions with respect to the shares of VGH, Inc. common stock and warrants held by such parties.

- The Proposed Certificate of Incorporation will contain a provision that expressly elects not to be governed by Section 203 (Delaware's "interested stockholder" statute) of the Delaware General Corporation Law.

The Sponsor has agreed to vote in favor of the Business Combination, regardless of how our public shareholders vote. Unlike some other blank check companies in which the initial shareholders agree to vote their shares in accordance with the majority of the votes cast by the public shareholders in connection with an initial business combination, the Sponsor and each officer and director of SCH have agreed to, among other things, vote in favor of the Merger Agreement and the transactions contemplated thereby, in each case, subject to the terms and conditions contemplated by the Sponsor Support Agreement. As of the date of this proxy statement/prospectus, the Sponsor owns 20% of the issued and outstanding ordinary shares.

19

Table of Contents

***We have a specified maximum redemption threshold. This redemption threshold may make it more difficult for us to complete the Business Combination as contemplated.***

The Merger Agreement provides that VG's obligation to consummate the Business Combination is conditioned on, among other things, that as of the Closing, the Trust Amount, or the amount of cash available in the trust account into which substantially all of the proceeds of our initial public offering and private placements of our warrants have been deposited for the benefit of SCH, certain of our public shareholders and the underwriters of our initial public offering, after deducting the amount required to satisfy our obligations to our shareholders (if any) that exercise their rights to redeem their public shares (each, a "Redemption") pursuant to the Cayman Constitutional Documents, is at least equal to the Minimum Available Cash Amount, which is the sum of (x) $400.0 million plus (y) if applicable, an aggregate of approximately $24.2 million of deferred underwriting commissions being held in the trust account (the "Minimum Cash Condition").

However, if the Trust Amount as of the Closing is less than the Minimum Available Cash Amount, then V10 and its affiliates will have the right (but not the obligation) to purchase (or seek a third party to purchase) additional shares of VGH, Inc. common stock at a price per share of $10.00 (the "Additional Holder Equity Amount") up to the Minimum Available Cash Amount less the amount of the aggregate purchase price paid to SCH by Mr. Palihapitiya in any Primary Purchase (the "Investment Amount"). If the Trust Amount when added to the Additional Holder Equity Amount and the Investment Amount (such aggregate amount, the "Available Cash") is equal to or greater than the Minimum Available Cash Amount, then the Minimum Cash Condition will be deemed to have been satisfied. The Minimum Cash Condition is for the sole benefit of VG except that this condition may not be waived by VG if the Trust Amount is less than $200.0 million, provided that V10 and its affiliates will have the right (but not the obligation) to purchase (or seek a third party to purchase) additional shares of VGH, Inc. common stock at a price per share of $10.00 in an aggregate amount such that the Available Cash is, at or immediately prior to the Closing, equal to at least $200.0 million after giving effect to such purchases.

There can be no assurance that VG could and would waive the Minimum Cash Condition. Furthermore, as provided in our memorandum and articles of association, in no event will we redeem our public shares in an amount that would cause our net tangible assets to be less than $5,000,001 (so that we do not then become subject to the SEC's "penny stock" rules). If such conditions are not met, and such conditions are not or cannot be waived under the terms of the Merger Agreement, then the Merger Agreement could terminate and the proposed Business Combination may not be consummated.

If such conditions are waived and the Business Combination is consummated with less than the Minimum Available Cash Amount in the trust account, the cash held by VGH, Inc. and its subsidiaries (including the VG Companies) in the aggregate, after the Closing may not be sufficient to allow us to operate and pay our bills as they become due as the VG Companies will only be required to have held an aggregate of $2.0 million in cash as of the Closing under the terms of the Merger Agreement. Furthermore, our affiliates are not obligated to make loans to us in the future (other than our Sponsor's commitment to provide us an aggregate of $200,000 in loans in order to finance transaction costs in connection with a business combination). The exercise of redemption rights with respect to a large number of our public shareholders may make us unable to take such actions as may be desirable in order to optimize the capital structure of VGH, Inc. after consummation of the Business Combination and we may not be able to raise additional financing from unaffiliated parties necessary to fund our expenses and liabilities after the Closing. Any such event in the future may negatively impact the analysis regarding our ability to continue as a going concern at such time.

***The Sponsor may elect to purchase shares from public shareholders prior to the consummation of the Business Combination, which may influence the vote on the Business Combination and reduce the public "float" of our Class A ordinary shares.***

At any time at or prior to the Business Combination, during a period when they are not then aware of any material nonpublic information regarding us or SCH's securities, the Sponsor, Mr. Palihapitiya, V10, the VG

60

Table of Contents

Companies or their directors, officers, advisors or respective affiliates may purchase public shares from institutional and other investors who vote, or indicate an intention to vote, against any of the Condition Precedent Proposals, or execute agreements to purchase such shares from such investors in the future, or they may enter into transactions with such investors and others to provide them with incentives to acquire public shares or vote their public shares in favor of the Condition Precedent Proposals. Such a purchase may include a contractual acknowledgement that such shareholder, although still the record holder of SCH's shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that the Sponsor, Mr. Palihapitiya, V10, the VG Companies or their directors, officers, advisors or respective affiliates purchase shares in privately negotiated transactions from public shareholders who have already elected to exercise their redemption rights, such selling shareholder would be required to revoke their prior elections to redeem their shares. The purpose of such share purchases and other transactions would be to increase the likelihood of (1) satisfaction of the requirement that holders of a majority of the ordinary shares, represented in person or by proxy and entitled to vote at the extraordinary general meeting, vote in favor of the BCA Proposal, the Director Election Proposal, the Stock Issuance Proposal, the Incentive Award Plan Proposal, the Repurchase Proposal and the Adjournment Proposal, (2) satisfaction of the requirement that holders of at least two-thirds of the ordinary shares, represented in person or by proxy and entitled to vote at the extraordinary general meeting, vote in favor of the Domestication Proposal and the Organizational Documents Proposals, (3) satisfaction of the Minimum Cash Condition, (4) otherwise limiting the number of public shares electing to redeem and (5) SCH's net tangible assets (as determined in accordance with Rule 3a51(g)(1) of the Exchange Act) being at least $5,000,001.

Entering into any such arrangements may have a depressive effect on the ordinary shares ( *e.g.* , by giving an investor or holder the ability to effectively purchase shares at a price lower than market, such investor or holder may therefore become more likely to sell the shares he or she owns, either at or prior to the Business Combination). If such transactions are effected, the consequence could be to cause the Business Combination to be consummated in circumstances where such consummation could not otherwise occur. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the proposals to be presented at the extraordinary general meeting and would likely increase the chances that such proposals would be approved. In addition, if such purchases are made, the public "float" of our public shares and the number of beneficial holders of our securities may be reduced, possibly making it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

### *Future resales of common stock after the consummation of the Business Combination may cause the market price of VGH, Inc.'s securities to drop significantly, even if VGH, Inc.'s business is doing well.*

After the consummation of the Business Combination and subject to certain exceptions, V10 will be contractually restricted from selling or transferring more than 50% of the shares of common stock it received in connection with the Business Combination, and the Sponsor will be contractually restricted from selling or transferring any of its shares of common stock. However, following the expiration of such lockup, neither V10 nor the Sponsor will be restricted from selling shares of VGH, Inc.'s common stock held by them, other than by applicable securities laws. As such, sales of a substantial number of shares of VGH, Inc. common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of VGH, Inc. common stock. Upon completion of the Business Combination, V10 and the Sponsor will collectively own approximately 59.5% of the outstanding shares of VGH, Inc. common stock (not including the shares of VGH, Inc. common stock that will be owned by Mr. Palihapitiya but will not be subject to the lock-up under the Registration Rights Agreement), assuming that no public shareholders redeem their public shares in connection with the Business Combination or our extension proposal, that V10 elects to have Mr. Palihapitiya purchase in a Secondary Purchase the maximum number of shares contemplated by the terms of the Purchase Agreement and that VGH, Inc. repurchases the maximum number of shares in the Repurchase contemplated by the terms of the Merger Agreement. Assuming approximately 27,688,223 public shares (which is the estimated number of public shares that could be redeemed in connection with the Business Combination and our extension proposal, in the aggregate, in order to satisfy the closing conditions contained in the Merger Agreement, at approximately $10.27 per share (based on trust account

61

Table of Contents

*SIGNATURES*

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Los Angeles, California, on the 7 th day of August, 2019.

SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP.

By:     /s/ Chamath Palihapitiya
Name:   Chamath Palihapitiya
Title:   Chief Executive Officer

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Chamath Palihapitiya, Steven Trieu, Simon Williams and Anthony Bates as his or her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him or and in his or her name, place and stead, in any and all capacities, to sign one or more Registration Statements on Form S-4, or other appropriate form, and all amendments thereto, including post-effective amendments, of Social Capital Hedosophia Holdings Corp. and to file the same, with any exhibits thereto, with the Securities and Exchange Commission, or any state securities department or any other federal or state agency or governmental authority granting unto such attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or his substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Chamath Palihapitiya<br>Chamath Palihapitiya | Chief Executive Officer and Chairman of the Board of Directors (Principal Executive Officer) | August 7, 2019 |
| /s/ Ian Osborne<br>Ian Osborne | President and Director | August 7, 2019 |
| /s/ Steven Trieu<br>Steven Trieu | Chief Financial Officer (Principal Financial and Accounting Officer) | August 7, 2019 |
| /s/ Simon Williams<br>Simon Williams | General Counsel and Secretary | August 7, 2019 |
| /s/ Anthony Bates<br>Anthony Bates | Vice Chairman of the Board of Directors | August 7, 2019 |
| /s/ Adam Bain<br>Adam Bain | Director | August 7, 2019 |
| /s/ Andrea Wong<br>Andrea Wong | Director | August 7, 2019 |

II-6

**Table of Contents**

| **Signature** | **Title** | **Date** |
|---|---|---|
| /s/ Jacqueline D. Reses<br>Jacqueline D. Reses | Director | August 7, 2019 |
| /s/ James Ryans<br>James Ryans | Director | August 7, 2019 |

II-7